IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
-------------------------------------------------------------------
ADELAIDA ANDERSON and JEFF ANDERSON,  |
                                      |
                Plaintiffs,           |
                                      |
v.                                    | Case No. 19-cv-800-SPM
                                      |
RAYMOND CORPORATION,                  |
                                      |
                Defendant.            |
-------------------------------------------------------------------
```

Transcript of Jury Trial - Volume I
November 1, 2021

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East Saint Louis, Illinois

```
-------------------------------------------------------------------
```

**REPORTED BY:**          **HANNAH JAGLER**, RMR, CRR, FCRR
                      Official Court Reporter
                      750 Missouri Avenue
                      East Saint Louis, Illinois 62201
                      618-482-9481
                      Hannah_Jagler@ilsd.uscourts.gov

Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**<u>APPEARANCES</u>**:

FOR PLAINTIFF:       **MICHAEL J. WARSHAUER**
                     **JASPER V. ABBOTT**
                     Warshauer Law Group, PC
                     2740 Bert Adams Road
                     Atlanta, Georgia 30339
                     404-892-4900
                     Mwarshauer@warlawgroup.com
                     Jasper@warlawgroup.com

                     **FRANK J. McCOY, JR.**
                     McCoy & McCoy, LLC
                     20 Church Street, Suite 1720
                     Hartford, Connecticut 06103
                     860-244-9100
                     Frank@mccoymccoy.com

                     **RYAN E. BRENNAN**
                     Brennan Law Firm PC
                     19 Bronze Pointe
                     Belleville, Illinois 62226
                     618-236-2121
                     Ryan@feladlc.com

FOR DEFENDANT:       **FRANCIS H. LoCOCO**
                     Husch Blackwell LLP
                     555 East Wells Street, Suite 1900
                     Milwaukee, Wisconsin 53202
                     414-978-5305
                     Frank.lococo@huschblackwell.com

                     **G. PATRICK MURPHY**
                     Murphy & Murphy, LLC
                     3415 Office Park Drive, Suite D
                     Marion, Illinois 62959
                     618-248-3236
                     Gpatrick@murphymurphyllc.com

                     **MARGARET KATHRYN HEITKAMP**
                     Husch Blackwell LLP
                     511 North Broadway, Suite 1100
                     Milwaukee, Wisconsin 53202
                     414-978-5373
                     Margaret.Heitkamp@huschblackwell.com

1          **<u>INDEX</u>**

2                                                              **PAGE**

3

4     Opening Instructions...................................    10

5     Opening Statement By Mr. Warshauer.....................    17

6     Opening Statement By Mr. LoCoco........................    45

7

8

9          **<u>INDEX OF EXHIBITS</u>**

10

**NO.  DESCRIPTION**                                    **ID'D   RCV'D**
11        None........................................

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

(Proceedings commenced at 9:12 a.m.)

THE COURTROOM DEPUTY:  US District Court for the Southern District of Illinois is now in session, the Honorable Stephen McGlynn presiding.  You may be seated.

Calls Case Number 19-cv-800, Adelaide Anderson, et al., v. Raymond Corporation.  Calls case for first day of trial.  Parties, if you would please state your name for the record.

MR. WARSHAUER:  Good morning.  Michael Warshauer for the plaintiff.

MR. McCOY:  Good morning, Your Honor.  Frank McCoy for the plaintiff.

MR. BRENNAN:  Good morning, Your Honor.  Ryan Brennan for the plaintiff.

MR. ABBOTT:  Good morning.  Jasper Abbott for the plaintiffs.

MR. LoCOCO:  Good morning, Your Honor.  Frank LoCoco for Raymond.

MR. MURPHY:  Good morning, Judge.  Patrick Murphy for Raymond, Defendant.

MS. HEITKAMP:  Good morning, Your Honor.  Margaret Heitkamp for the defendant Raymond Corporation.

THE COURT:  All right.  Are Plaintiffs ready for trial?

```
 1                    MR. WARSHAUER:  We are.
 2                    THE COURT:  Defendants ready for trial?
 3                    MR. LoCOCO:  Yes, Your Honor.
 4                    THE COURT:  All right.  Is there anything -- is
 5          there anything we need to take up before we bring in the
 6          prospective jurors, from the plaintiff's perspective?
 7                    MR. WARSHAUER:  No, sir.
 8                    MR. LoCOCO:  No, Your Honor.
 9                    THE COURT:  All right.  Bring in the jurors.
10                    (Voir dire.)
11                    THE COURT:  Okay.  Let's talk about opening
12          statements.  Counsel, how long -- how long do you wish to speak?
13          How long do you think your opening will be?
14                    MR. WARSHAUER:  I think it's under 25 minutes,
15          but I suspect by the time I screw it up, it will be 32 or 3.
16                    THE COURT:  That's fine.
17                    MR. LoCOCO:  Mine is about 45, Your Honor.
18                    THE COURT:  All right.  So if -- I've got to read
19          the opening instructions.  By the time we sit them down, it's
20          1:30.  What I will probably do is because it's after lunch,
21          we'll break right after your opening, all right?  And then come
22          back for your opening, and then that puts us -- we can at least
23          get one witness in, don't you think?
24                    MR. WARSHAUER:  I think we have one short one.
25                    MR. LoCOCO:  Yes, Your Honor.
```

```
1                    THE COURT:  All right.

2                    MR. LoCOCO:  And the other thing to tell you --

3        we talked about this Friday, but we've since done it.

4        Mr. Warshauer showed me what he's using in opening statement on

5        the screen and I showed him what I'm using, and I think we're

6        good to go.

7                    MR. WARSHAUER:  And I've objected to what he's

8        using, but, you know, here's my thought about opening.  If

9        somebody shows something that never comes in, that's their risk.

10       I mean, that's just sort of my thought.  I'm going to try to

11       keep it out when they offer it at trial, but right now he thinks

12       it's going to come in.  He can show it.  It's not horrifically

13       horrible blood-and-guts prejudicial, "no one can ever unsee it."

14                   MR. LoCOCO:  I think we'll get it in, Your Honor.

15       I'm confident.

16                   MR. WARSHAUER:  So, Your Honor, I'm just not a

17       big objector to things like that.

18                   THE COURT:  So you are not waiving your objection

19       to --

20                   MR. WARSHAUER:  Absolutely not --

21                   THE COURT:  -- that piece of demonstrative

22       evidence?  A photo?  What are we talking about?

23                   MR. LoCOCO:  It's a couple of -- well, I don't

24       know exactly.

25                   THE COURT:  Slides?
```

1          MR. WARSHAUER:  Well, one is the -- as the Court

2     knows, we're objecting to anything that has to do with the door.

3     That's the off-dock videos he plans to show.  And the other

4     thing that we objected to was Mike Rogers driving a forklift,

5     that we don't think that is similar, but, you know, it's a

6     demonstration.  He can show it.  If it never came in at all, he

7     can show this is the path they took.  I mean, you know --

8          THE COURT:  Well, so for the record, you do not

9     have to voice your objection during his presentation.  You're

10    preserving your objections as to the admissibility of documents

11    or demonstrative evidence that he touches on in opening.  Right?

12         MR. LoCOCO:  So it's those three videos.  Any of

13    the paper stuff, photographs?

14         MR. WARSHAUER:  Most of the photographs we

15    jointly agree to.

16         MR. LoCOCO:  Right.  Okay.  Thank you.

17         THE COURT:  All right.  Let's bring the jurors

18    in.

19         MR. WARSHAUER:  Your Honor, could --

20         THE COURT:  Before -- anything else?

21         MR. WARSHAUER:  While they're panning in, I'm

22    going to go wash my hands real quick.

23         THE COURTROOM DEPUTY:  That's fine.  It takes a

24    few minutes for them to come up.

25         THE COURT:  Let's give them -- we'll plan on

1     giving them five minutes to come up.

2                    CHIEF DEPUTY CLERK:  They're on their way up

3     right now, Your Honor.

4                    THE COURT:  We'll give them five minutes anyway.

5     I'll build the suspense.

6                    (Recess from 1:14 p.m. to 1:19 p.m.)

7                    (Jury panel enters at 1:19 p.m.)

8                    THE COURT:  All right.  Be seated, everyone.

9                    All right.  We are on the record in the matter of

10    Anderson v. Raymond Corporation.  Ladies and gentlemen, we have

11    selected the jury.  For those of you who are not selected, you

12    are to report to -- when you leave here, report to the jury

13    assembly room.  I don't know if any other judges in this

14    courthouse have trials that are going on.  If so, there's a

15    chance that you could be asked to -- or invited to be part of

16    another jury trial this week.  They'll have a better idea

17    downstairs.

18                   But for those who are not selected, I want to

19    tell you that I appreciate very much your willingness to show up

20    and go through the process.  And I hope just by going through

21    this process, I hope it reaffirms some of the appreciation that

22    you have for the quality of our justice system.  We are very

23    dependent on good citizens like yourself showing up and being

24    available to serve on a jury even if ultimately you're not

25    picked.

1        In civil jury trials in the federal court, we
2    only have six jurors and two alternates, so we have way more
3    potential jurors here than we needed.  If you didn't get picked,
4    it wasn't because we didn't think that you weren't a good
5    citizen.  Frankly, we didn't get that far down the list before
6    we had picked all of our jurors.  So again, thank you, and
7    report downstairs.
8        With that, Juror Number 1 will be ████████████.
9    If you'll come up and have a seat down here, ████████.  Juror
10   Number 2 is ████████.  Juror Number 3 is ████████████.
11   Juror Number 4 will be ████████████.  Juror Number 5 will be
12   ████████████.  Juror Number 6 will be ████████.  Alternate
13   Number 1 will be ████████████.  And Alternate Number 2 will be
14   ████████.  Come take your seats.
15       All right.  And just a note, ladies and
16   gentlemen, what we will do after you check into the jury
17   assembly room, most likely they'll tell you that you can leave
18   for the day.  This case is open to the public.  If you're
19   sufficiently intrigued about the case and you want to come back
20   and sit in on opening statements we will have a little later
21   today, you're welcome to sit in the back.
22       With that, thank you.  You're free to go to the
23   jury assembly room.
24             (Struck jurors exit.)
25             THE COURT:  All right.  Everybody be seated.

1          All right.  We will now swear in the jury panel.

2          THE COURTROOM DEPUTY:  Jurors, if you would

3    please raise your right hand.

4          (Jury sworn.)

5          THE COURT:  Thank you.

6          Members of the jury, we are about to begin the

7    trial of this case.  And you've heard some details during the

8    jury selection.  But before the trial begins, there are certain

9    instructions you should have in order to better understand what

10   would be presented before you and how you should conduct

11   yourself during the trial.

12         The party who brings a lawsuit is called a

13   plaintiff in this action.  It's the plaintiffs, Adelaida

14   Anderson and her husband Jeff, who claim they suffered serious

15   injury when Adelaida was operating a lift truck.

16         The party against whom the suit is brought is

17   called a defendant.  In this action, the defendant is Raymond

18   Corporation because they manufactured the lift truck in

19   question.

20         The plaintiff alleges a count in strict

21   liability, products liability, alleging that the lift truck was

22   defective or unreasonably dangerous as designed.  The defendant

23   denies the allegations against it.

24         To succeed on the claims, the plaintiffs must

25   prove their claims by a preponderance of the evidence.  When I

1  say a particular party must prove something by a preponderance

2  of the evidence, that is -- this is what I mean.  When you have

3  considered all the evidence in the case, you must be persuaded

4  that it is more probably true than not true.

5  By your verdict, you will decide disputed issues

6  of fact.  I will decide all questions of law that arise during

7  the trial.  And before you retire to deliberate, at the close of

8  this case, I will instruct you on the law that you must follow

9  and apply in deciding your verdict.

10  Since you will be called upon to decide the facts

11  in the case, you should give careful attention to the testimony

12  and the evidence presented for your consideration, bearing in

13  mind that I will instruct you at the end of the trial concerning

14  the manner in which you should determine the credibility or

15  believability of each witness and the weight to be given to his

16  or her testimony.

17  During the trial, however, you should keep an

18  open mind and should not form or express any opinion about the

19  case one way or the other until you've heard all the evidence

20  and testimony, the closing arguments of the parties, and my

21  instructions to you on the applicable law.

22  While the trial is in progress, you must not

23  discuss the case in any manner among yourselves or with anyone

24  else nor should you permit anyone to discuss it in your

25  presence.

1        During the trial, I may be called upon to make

2    rulings of law on objections or motions made by the lawyers.  It

3    is the duty of the attorney of each side of a case to object

4    when the other side offers testimony or other evidence which

5    that attorney believes is not properly admissible.

6        You should not show prejudice against an attorney

7    or his or her client because the attorney's made objections.

8    You should not infer or conclude from any ruling or other

9    comment that I may make that I have an opinion on the merits of

10   this case, favoring one side or the other.  And if I should

11   sustain an objection to a question that goes unanswered by the

12   witness, you should not draw any inference or conclusions from

13   the question itself.

14       During the trial, I may confer with the lawyers

15   out of your hearing with regard to questions of law or procedure

16   that may require a consideration by the Court alone.  On some

17   occasions, you'll be excused from the courtroom for the same

18   reason.  I'll try to limit these interruptions, but you should

19   remember the importance of the matter you are here to determine

20   and should be patient, even though the case may seem to be going

21   slowly.

22       The case will proceed in the following order:

23   First, the plaintiffs make an opening statement outlining their

24   case.  The defendant will make an opening statement, outlining

25   its case.  Neither side is required to make an opening

1    statement.  What is said in opening statement is not evidence,

2    but is simply designed to provide you with an introduction as to

3    the evidence which the party making the statement intends to

4    produce or to prove.

5             Second, the plaintiff will introduce evidence in

6    support of her claims.  At the conclusion of Plaintiff's case,

7    the defendant may introduce evidence.  They're not obliged to

8    introduce evidence, but they may introduce evidence.  Then the

9    plaintiffs are allowed to offer what's known as rebuttal

10   evidence at the close of Defendant's case.  They may be able to

11   offer evidence to rebut evidence that was presented by the

12   defendant.

13            Third, I will instruct you on the law which you

14   are to apply in reaching your verdict.

15            Fourth, the parties present closing arguments to

16   you as to what they consider that the evidence has shown and as

17   to the inference which they contend you should draw from the

18   evidence.

19            What is said in closing argument, just as what is

20   said in opening statement, is not evidence.  The arguments are

21   designed to present you -- to you the contentions of the parties

22   based on the evidence introduced.  The plaintiff has the right

23   to start opening statement -- or the closing argument and they

24   get rebuttal.  So the plaintiff will get to make a closing

25   statement, then the defendant, and if the plaintiff wishes, can

1    rebut arguments made by the defendant.

2            The evidence in the case will consist of sworn

3    testimony of witnesses, regardless of who may have called them,

4    and all exhibits received into evidence, regardless who may have

5    produced them, and all the facts which may have been judicially

6    noticed and which I'll instruct you to take as true for the

7    purposes of this case.

8            Statements and arguments of Counsel are not

9    evidence in the case.  Any evidence as to which objection is

10   sustained by the Court and any evidence ordered stricken by the

11   Court must be entirely disregarded by you.

12           Anything you may have seen or heard outside the

13   courtroom is not evidence and must be entirely disregarded.  In

14   that regard, you should not seek out any information about this

15   case, the parties, or the attorneys from others or via the

16   internet.  You're to consider only the evidence in the case.

17           But in your consideration of the evidence, you

18   are not limited to the bald statements of a witness.  In other

19   words, you are not limited solely to what you see or hear as the

20   witness testifies.  You are permitted to draw from the facts

21   which you find have been proven such reasonable inferences as

22   you feel are justified in light of experience.

23           At the end of the trial, you will have to make

24   your decision based upon what you recall is evidence.  You will

25   not have a written transcript to consult, and it is difficult

1    and time-consuming for the reporter to read back lengthy

2    testimony.  So I urge you to pay close attention as the

3    testimony is being given.

4              After the evidence has been heard and arguments

5    and instructions are concluded, you will retire to consider your

6    verdict.  You will determine the facts of all the testimony that

7    you hear and other evidence that is submitted.  You are the sole

8    and exclusive judges of the facts, and in that field, neither I

9    nor anyone else may invade your province.  On the other hand,

10   and with equal emphasis, I instruct you that you are bound to

11   accept the rules of law that I give you, whether you agree with

12   them or not.

13             Now the law in the United States permits the

14   judge to comment on the evidence in the case during trial or in

15   instructing the jury.  Such comments are only expression of the

16   judge's opinions as to the fact and the jury may disregard them

17   in its entirety, since you are the sole judges of the facts.

18             During the trial, I will permit you to take

19   notes, but under caution and order.  There is always a tendency

20   to attach undue importance to matters in which one has written

21   down.  Some testimony which is considered unimportant at the

22   time presented and thus not written down takes on a greater

23   importance later in the trial in light of all the evidence

24   presented.  So keep in mind that your notes are only a tool to

25   aid your own individual memory, and you should not compare your

1    notes with other jurors in determining the content of any

2    testimony or in evaluating the importance of the evidence.  Your

3    notes are not evidence and by no means a complete outline of the

4    proceedings or a list of the highlights of the trial.  Above

5    all, your memory is your greatest asset when it comes time to

6    deliberate and render a decision in a case.

7            I remember the first case I tried as a judge.  It

8    was a bench trial.  And I was certain that the case was going to

9    go a particular direction.  And the outcome of the case changed

10    the very last question asked of the very last witness.  And so I

11    learned a very important -- a very important lesson there.  You

12    need to keep an open mind throughout the process.

13            The other thing is, you'll get an instruction on

14    circumstantial evidence.  Some people think, "Can we rely on

15    circumstantial evidence?"  Yes.  You can draw reasonable

16    inferences from things that would constitute circumstantial

17    evidence.

18            So with that, I'm going to turn this over now to

19    the lawyers.

20            Counsel, did you have something?

21            MR. LoCOCO:  Your Honor, can we just see sidebar

22    briefly?  We don't have to be on the record.

23            THE COURT:  All right.

24            (Discussion off the record.)

25            THE COURT:  If there are -- Counsel reminded me

1    that typically during trials, witnesses are excluded from

2    watching the trial.  So if there are anyone in the courtroom

3    that anticipates being a witness who is not a party or not the

4    son of the parties, that person should leave.  I have granted a

5    motion to exclude witnesses.

6              All right.  With that, Mr. Warshauer, you may

7    proceed.

8              MR. WARSHAUER:  May it please the Court, Counsel,

9    Anderson family.

10             It's taken a long time to get here, hundreds of

11   hours of work, but at the end of the day, while it's a big case

12   and an important case, it's a simple case.  And I hope not to

13   take too much of your time this morning, or this afternoon to

14   share that with you.

15             Let me start with this thought:  All talk and no

16   action.  It's how we judge people, and I think it's fair to

17   judge corporations that same way.  This is a case about a

18   forklift that kept moving after its driver was no longer in the

19   operator position, then that forklift ran over its own operator

20   and the unguarded wheel on the back of it crushed and tore the

21   flesh off her foot.

22             The Raymond Corporation designed the forklift.

23   Its design choices are why we're here.  Let's talk a little bit

24   about these forklifts.  We see the forklift here.  And we'll see

25   a man come up in a moment, and he's going to get on the

1   forklift, and you'll see he puts two feet -- and the camera will

2   zoom in on the two feet.  I'm going to start the video in a

3   second.  You'll see the two feet, and then you'll see his hands.

4   One hand draws the tiller -- and I'll tell you about this -- and

5   the other's on this thing called a multifunction.  You go

6   forwards towards the forks, it goes towards the forks.  You go

7   this way towards the door, it goes towards the door.  There's

8   something called plugging.  If you're going this way and you

9   want to stop, you just pull it the other way.  That's the most

10  common way to stop it.

11          So this operator position that we're going to see

12  in this very short video clip is two feet on the floor, back

13  against the backrest, left hand here, right hand here.  Okay?

14          (Video played.)

15          MR. WARSHAUER:  Those are the two feet on the

16  floor that I mentioned.  That's a critical part of the operator

17  position, hands on the controls.  Now when you want to go

18  towards the forks -- we'll see that he drives it -- that would

19  be towards the forks, then you'll see it stop in neutral, then

20  comes back.  So what he's done is pushed forward, pull it back,

21  and if he keeps pulling it back, it comes towards us.

22          This idea that we see him coming towards us with

23  the forks trailing is the way that they normally drive in

24  warehouses, and there's a reason for that.  You don't want your

25  forks to run where they could poke people or poke things, and

1    you have the best view because you're not looking through the

2    mast.  There's a downside.  The open doorway is right there, and

3    your left foot is very near it.

4                So here we see a young woman on this forklift.

5    We see her two feet on the floor, her back against the backrest,

6    the left hand on the steering tiller, and the right hand, we

7    could see if she wasn't in the way, is over on the

8    multifunction.  But I want to point out one other feature that

9    we're going to be talking about, and that's this unguarded rear

10   wheel.

11               These forklifts, as I told you in voir dire, are

12   most often used in large warehouses.  Narrow aisles, lots of

13   things to bump into.  They pick things up, they carry them, and

14   then they put them down.  Let's keep in mind that that's all

15   they're supposed to do.  Pick things up, carry them, and put

16   them down.  That's it.

17               When these nearly 9,000-pound hard-tired -- they

18   don't have inflated tires.  They're hard rubber tires.  When

19   they go even over relatively minor cracks, it can be pretty

20   jarring to the operator.  Manufacturers try to fix this with

21   these cushion-ride floors, but at the end of the day, you can

22   only do so much.  Even on the smoothest riding forklift, they're

23   jarring when they go over cracks.  It's particularly true as

24   forklifts get older, just as old cars with bad shocks go over

25   speed bumps a little differently than new cars do.

1       A critical safety part that should exist in all

2   of these forklifts, and this is something we're really going to

3   be focusing on over the next several days, is that it should

4   stop moving if the operator leaves the operator position.

5   Doesn't matter why they leave the operator position.  The

6   forklift should not keep moving.  So if they fall out or are

7   thrown out because they hit an impediment, if they're swatting

8   at a bee, if they pass out from heat exhaustion, the forklift

9   needs to stop to protect them from injury.

10      Now if it doesn't, it can run the operator over.

11  Now we know that's important for the forklift to stop moving

12  first because it just makes common sense.  And, folks, one of

13  the things I hope that you brought into this building and into

14  that box is your common sense, because it's a really valuable

15  tool in a case like this, and I'm going to rely on it as we

16  present our case.

17      But there's a second reason, other than our

18  common sense, that forklifts shouldn't keep moving when we're

19  not on them, and that's that there are international and

20  national safety standards.  These standards require this, they

21  mandate it, that the forklift not keep moving when the

22  operator's no longer in it.  The US forklift safety standard

23  that governs forklifts, we're going to talk about it, it's

24  called the ANSI B56.1 Standard, American National Standards

25  Institute, B56.1 Standard.

1          The Raymond Corporation will say that its

2     products must comply with this standard to be safe, but

3     compliance requires design features, not just words.  So here's

4     part of the standard.  Means shall be provided -- "shall be

5     provided" means it's mandatory, not maybe, but shall be

6     provided -- to disconnect the travel circuit automatically when

7     the operator leaves the operator position.

8          So the operator position is two feet on the

9     floor, back against the backrest, hand on the tiller, hand on

10    the multifunction.  Virtually every manufacturer that sells

11    sidestance forklifts complies with this standard by having a

12    deadman pedal under the operator's left foot, the one that's

13    closest to the door, the one that might fall out if something

14    goes south.  They have that operator pedal there, that deadman

15    pedal there so that the emergency brakes will apply.  If safety

16    is going to be first, the first thing a forklift needs to do is

17    stop moving when the driver is not in the operator position.

18         Every other major manufacturer in the world

19    handles this with two pedals.  Every other major manufacturer,

20    when your left foot leaves the floor, the deadman pedal applies

21    the emergency brake.  But even without this safety standard and

22    even without the entire industry leading the way, as I said, it

23    just makes common sense.  Just makes common sense that a

24    forklift should not move if the operator is not safely in the

25    operator compartment.

1          So let's return back to the Raymond forklift.

2    Now we're looking down into the body of the forklift.  We see

3    that there's a pedal there, and that's the deadman pedal.  As

4    you operate the Raymond forklift, the two feet on the floor, the

5    forks to your right, the most natural place for that foot pedal

6    to be is under your right foot.  And the vast majority of

7    operators do it that way.  There may be some people who somehow

8    figured out a way to stand in a weird way, but most people stand

9    with their right foot on that pedal.  You hold that pedal down.

10   It's quite easy to hold down.  And you let the pedal up to apply

11   the emergency brake.

12          And so if you were to be in the forklift and you

13   needed to stop it the very fastest way, you come up on your

14   right foot.  Okay?  But if you fell out, the emergency brake

15   would not apply until your right foot leaves it.  Also keep in

16   mind, that if your hands are on the controls, as you fall to

17   your left and your right foot is still on the brake, while

18   you're trying to pull yourself back in, you're pulling towards

19   the door, meaning you're making things worse.

20                    MR. MURPHY:  Judge?

21                    THE COURT:  One moment.

22                    MR. LoCOCO:  Is this a witness?

23                    THE COURT:  Mr. Warshauer, is this your witness

24   in the courtroom?

25                    THE COURTROOM DEPUTY:  Is she one of the jurors?

1               MR. WARSHAUER:  No.

2               MR. LoCOCO:  I'm sorry.  Thank you.

3               THE COURT:  And, folks, if you don't want to wear

4      your mask, you don't have to wear your mask.

5               MR. WARSHAUER:  So there's just one pedal.  It's

6      nothing under the left foot.

7               So what I want to show you next is how other

8      manufacturers do it.  So on the left, we see Crown.  Crown has

9      about 50 percent of the market for this kind of forklift,

10     this -- what's called a counterbalance lift.  They're used to

11     load trucks.  They're the workhorse of warehouses, a

12     multipurpose lift.  Crown invented it in 1972.  They've had two

13     pedals, one under the right foot, which is the sensor, and under

14     the left foot is a deadman pedal, can be operated with the heel,

15     middle of your foot, anywhere you want, depending on how you

16     stand in the forklift.

17              If the left foot leaves the operator compartment

18     on the Crown and these other brands that I shared with you, the

19     forklift stops as fast as it's able to stop safely.  Now that's

20     the way the majority of the industry complies with that B56.1

21     7.20.2 Standard I showed you.

22              So now let's see what happens on the Raymond.

23     Right foot's holding down the single deadman pedal.  There's

24     nothing under the left.  When the left foot leaves, the forklift

25     keeps moving.  The Raymond Corporation is alone in choosing to

1    have nothing under the operator's left foot.  It's alone in

2    having a design that allows its forklift to keep moving even

3    when the operator has fallen out.

4              Our focus over the next several days together is

5    going to be on two of Raymond's design choices.  First choice:

6    The forklift keeps moving when the operator's out of it.  We've

7    got to decide if that's a good choice.  The second choice:

8    There's no guard over the wheel.  Okay, folks.  So this brings

9    us to your job.  You need to decide if either or both of the

10   Raymond Corporation's design choices -- if its design decisions

11   make the forklift unreasonably dangerous.

12             All right.  What's "unreasonably dangerous,"

13   you're thinking.  It just means more dangerous than it needs to

14   be to get the job done.  Okay?  A knife has to have a sharp edge

15   to get the job done.  So the dangerous part of a knife is the

16   only way a knife can exist.  If it's not sharp, it's a butter

17   knife.  But if you want a steak knife, it's got to be sharp.  So

18   there's the danger, but the benefit of that danger exceeds the

19   risk.  So a knife is not unreasonably dangerous.  Right?

20             A forklift does not have to keep moving when the

21   operator's not in the operator position to do its job of lifting

22   up, carrying, and putting back down, nor does it need to have an

23   open wheel that's unguarded so if you fall out, that wheel can

24   run you over, to do its job of lifting, carrying, and putting

25   down.

1          Now people may say, "Well, there's a benefit to

2    the one pedal.  You can -- you can do the hokey pokey with your

3    left foot."  You have to decide whether that benefit exceeds the

4    risk, not having a pedal under that foot.  The rest of the

5    industries decided that's not a good idea.

6          And then they say, "Well, there's a benefit to

7    not having a guard over the rear wheel.  It makes it easier to

8    inspect."  Well, you can look over the guard; you can look under

9    the guard.  They may say, "Well, it's difficult to change the

10    wheels."  You don't change the tires very often, but when you

11    do, you unbolt the guard.

12          So I showed you this a minute ago with only the

13    right-foot pedal.  And we have to decide whether that presents

14    an unreasonable danger, a danger that exceeds the benefit.

15    Again, the danger of a knife's sharp edge exceeds the benefit.

16          But how do we know if the choice of one pedal

17    with nothing under the left foot creates an unreasonable and

18    unnecessary danger?  The Raymond Corporation's going to say that

19    safety should be first.  But did the Raymond Corporation follow

20    this rule or simply give it lip service?

21          Here's what the evidence will show.  The Raymond

22    Corporation's reason for not having a pedal under the left foot

23    that would shut this forklift down if the operator fell out,

24    regardless of the reason they're out, is for comfort.  They say,

25    "Well, it might limit your ability to move your foot around."

1   The other companies are selling plenty of forklifts that way.

2   They don't advertise it as the safest.  Their marketing

3   materials talk about comfort.  Their sales brochures talk about

4   comfort, not safety.

5          We're going to help you understand another tool.

6   So we've looked at -- the first tool that I asked you to bring

7   is common sense.  The second tool that I wanted you to think

8   about is that B56 mandatory standard.  The third tool that we're

9   going to learn about is something called the Design Safety

10  Hierarchy.  Now this is used by engineers all over the world.

11  And what happens is -- and by the way, the Raymond engineers

12  believe that this is a good tool to use too.  They'll tell us

13  that.  But do they follow it?  When a danger is discovered, this

14  rule requires the designer, the manufacturer, to first try to

15  see if we can get rid of that danger.  Can we design the

16  forklift so that the danger just doesn't exist anymore?

17         The second thing you do is, because that's always

18  going to be the most effective, is that's what the little arrow

19  says, most effective is just get rid of the danger.  The

20  ultimate "get rid of danger of forklifts" is you automate

21  everything.  That's not possible, so getting rid of the danger

22  is tough.  Second thing you do is you can put a guard there.

23  Variety of ways that you can guard the danger.

24         Here, the danger is that the operator will fall

25  out while it's moving.  And what can we do to eliminate that?

1    Well, we conduce it with design by having the two pedals, but we

2    can eliminate the design -- the wheel being part of that risk by

3    simply putting a guard over it.  Again, it doesn't matter why

4    the operator comes out.  These changes, additional pedal and a

5    guard, would protect everybody.

6              Let me be clear.  The Raymond Corporation's

7    design allows nearly 9,000-pound forklifts, the weight of two

8    F150 pickup trucks, to keep moving, even when the operator is

9    not safely in the machine.  There's no reason for it to do so.

10              Let me also be clear.  The Raymond Corporation's

11   response to the danger is not actions.  It's words.  What it

12   says is, "We told you in our owner's manual to stay in the

13   forklift.  We put a sticker right there on the forklift that

14   says, 'Stay in the forklift.'  It's on you.  You should have

15   followed our direction.  Doesn't matter why you got out.

16   Doesn't matter if it was completely not your fault.  We told you

17   not to fall out.  It's on you."  Well, looking at this Design

18   Safety Hierarchy, this tool that's used by engineers all over

19   the world, words are your last choice.

20              So let's go back to the rear of the forklift.

21   Because the Raymond Corporation chose not to use a left-foot

22   deadman pedal that would have stopped the forklift from moving

23   if the operator was out of the position, out of the operator

24   position, this choice created a danger that's somewhat unique to

25   Raymond's forklifts.  All the other forklifts -- everybody has

1    an open rear wheel, but the other companies have the brake so it

2    makes it exceedingly unlikely that that wheel will run you over.

3    Raymond doesn't.  So if they didn't do the design change, that

4    meant they had to do the guard, and the guard is pretty simple.

5    You just put a piece of metal over the leading edge of the wheel

6    and it can't eat people's feet anymore.  It will be for you to

7    decide if relying on warning stickers and videos and owner's

8    manuals is the right way to go.

9              So is it an unreasonable danger?  Forklift keeps

10   moving after the operator is out.  Is that danger greater than

11   the benefit?  That's the evidence you're going to have to look

12   for.  Can Raymond show you that that danger is worth having,

13   because there's some benefit it brings?  There's no guard over

14   the wheel to prevent it from crushing an operator's foot, and

15   Raymond needs to bring you an excuse for that too.

16             So once we decide that the forklift is

17   unreasonably dangerous, either because it doesn't stop when you

18   leave the operator position or because the wheel is not guarded

19   or both, once we decide the danger is not necessary, what do we

20   do next?  Okay.  Next we have to decide if it's more likely true

21   than not that these design choices caused us to be here in this

22   courtroom, from the lack of a brake pedal or the lack of a guard

23   over the wheel or any combination thereof, caused the injuries

24   that we're here about.

25             Well, to do that, we need to go back in time.

1       I'm going to take you back in time to July the 29th of 2017.

2       We're in a huge FedEx Supply warehouse, over 2 million square

3       feet.  When we look around, we'll actually see a poster of Lidy

4       Anderson on the wall because she is the face of the safety

5       program at FedEx, the poster woman.  We also see a bunch of

6       these Raymond Corporation forklifts like the one I've been

7       talking about:  One pedal, unguarded wheels.

8             Now it's an older warehouse.  It's in Effingham.

9       It's an older warehouse.  It's got cracks in the floor, divots

10      where concrete is broken up.  Not like huge -- not like a hole

11      that you would trip in, but when you're riding it, 9,000-pound

12      or 8- to 10,000-pound forklift with a hard rubber tire, these

13      things are jarring.

14            Now no one is saying FedEx did anything out of

15      the ordinary or wrong.  Not a single expert has blamed this on

16      FedEx.  I haven't seen Raymond say it's FedEx's fault.  No one

17      has said it's FedEx's fault.  In fact, Raymond knows that its

18      forklifts will be driven over expansion joints and pieces of

19      pallets and cracks and divots in the floor.  That's just life in

20      warehouses.  They're not perfect places.  And it knows as a

21      result of that, or it should, that people's feet will shake and

22      that they will make movements of their feet when they're moving

23      around with just little movements, just to stay vertical.

24            Indeed when we look at the forklifts being used

25      in the warehouse, back in July of 2017, we see that the

1    operators are constantly reacting to the floor by subconsciously

2    moving their feet for comfort and balance.  These are not

3    volitional movements.  You don't think about, "Oh, you know, I

4    think I'd be more comfortable if my foot was a half-inch to the

5    left.  I think I'd be -- I need -- I'm going to look back

6    towards my right.  Or I'm going to look this way.  I think I

7    probably ought to move my feet before I do so."  We don't think

8    about those things.  They just happen as part of our effort to

9    stay standing on a moving machine.

10                It's about 12:45 in the afternoon, a little after

11   lunch back there in Effingham on the 29th of July of 2017 on a

12   Saturday.  We see Lidy Anderson getting directions from her team

13   leader Rechel Boone.  She goes up to Rechel's office.  She goes

14   up there with her forklift.  As one of the hardest workers at

15   FedEx, the poster child, if you will, for being a good worker,

16   she's up for the work.  But she says, you know, "I think I'll be

17   better if I got a new battery first."

18                So we see her driving from Ms. Boone's office to

19   get a new battery.  As we look, we see a path that she takes.

20   We see Ms. -- my cursor doesn't go there.  We see to the left,

21   we see that Ms. Boone's office, and then we see this little

22   thing.  It looks like a plug for an extension cord, but that's

23   the forklift path.  When this was made, the warehouse had been

24   cleaned out.  All the shelving had been sold.  FedEx had moved

25   to a new place, and so this is kind of computer-generated stuff.

1          But on the day of the event, we do have a view

2     down the aisle.  This was the aisle that Ms. Anderson chose

3     because the adjacent aisles had pedestrians in them, workers who

4     were picking product.  And one thing you know when you're a good

5     forklift operator is you don't want to be near people.  Why be

6     near people when you can go around them?  And that's what she

7     did and that's consistent with the rules.

8          But she hit some cracks as she entered this

9     aisle.  You can see some of them on the floor, expansion joints

10     and cracks.  And it just shook her a little bit.  And she says

11     the next thing you know, she lost her balance.  And when she

12     lost her balance, she ended up falling out and the wheel gets

13     her left foot.

14          Now this is the path that she took, and she hits

15     these cracks and loses her balance and falls out.  But what we

16     need to keep in mind as we consider the evidence is that if she

17     had been on one of those machines that complied with B56.1, one

18     of those machines that has common sense, one of those machines

19     that puts safety first, it would have proceeded, she still might

20     have lost her balance, but the difference is, when she fell out,

21     it would have stopped and it wouldn't have run over her.

22          So one of the first people on the scene is Rechel

23     Boone.  We're going to hear from Ms. Boone.  She was

24     Ms. Anderson's team leader.  As Lidy, who is what she's known by

25     to all her friends, as she lies on the floor in this growing

1   puddle of blood, Lidy tells her she slipped off and the forklift

2   would not stop.  That makes perfect sense.  Right?  Because if

3   the left foot goes off, the right foot can't come off the brake

4   and you're making it worse.  It can't stop until something bad

5   happens.  And that's indeed exactly what happens.  "Slipped off"

6   means she lost her balance.

7            Now despite this, the Raymond Corporation will

8   try to convince you in the next few minutes and over the next

9   several days that Ms. Anderson loses control while driving down

10   this relatively straight aisle, that this woman with ten years

11   of experience operating this forklift just loses control on a

12   turn that she's done 10,000 times, and that instead of applying

13   the emergency brake or plugging that would have stopped the

14   forklift, she simply decides to step off the forklift in the

15   middle of an aisle for no apparent reason so it can run her

16   over.  Raymond Corporation will want you to ignore her expertise

17   as a forklift operator, ignore the cracks, ignore the fact that

18   operators at the facility complain about how the cracks at the

19   facility jostle them, ignore the fact that while she was on the

20   ground, she said she lost her balance, ignore the fact that its

21   forklift design allows it to keep moving after she fell off.

22            It will even show you a video.  It will show you

23   a video of a forklift taking the same path, a path that you'll

24   see is not challenging to the operator in the video, who's not

25   even close to as skilled as Lidy Anderson.  I mean, she had mad

1    skills.  And what you need to ask yourself, and use your common

2    sense, is the forklift the same?  Did it hit the cracks?  Did he

3    know what was happening?

4                But that's its only argument.  Its only argument

5    to distract us from its design decisions is that this is Lidy's

6    fault, because it must be.  She didn't follow the rules.  She

7    didn't follow the training.  She didn't follow the sticker.  She

8    knew the rules.  She knew the training.  She knew the sticker.

9    And she knew that she would never ever get off a moving forklift

10   so that it could run her over.  You'll have to decide if that

11   makes sense.

12               We're going to meet Lidy Anderson and her husband

13   Jeff.  Now Lidy's from the Philippines.  She met her first love

14   there and they came back home to Southern Illinois to live

15   happily ever after.  It didn't work out that way.  He died at a

16   young age from a heart attack, leaving her a widow.

17               But happily for Jeff Anderson, his mother was a

18   matchmaker.  Said, "Jeff, I got a girl you need to meet."  Jeff

19   said, "I don't want any girls.  I just finished a bad marriage.

20   I'm finished with the girl business."  And she said, "This is a

21   good woman."  And he said, "Really good woman?"  His mom says,

22   "She's a good woman."  So he says he'll take her on a date.

23   They go on a date, they fell in love, and they married 18 years

24   ago.

25               They lived a really amazing life, sort of the

1   American dream of hard work.  They both worked all the time.

2   Lidy worked all the time.  And she worked all the time because

3   they loved adventure.  They would go back home to the

4   Philippines.  And it was an adventure.  They would ride motor

5   cycles.  It was an adventure.  They had horses.  It was just

6   this life of adventure.  And they had this amazing young man,

7   Luke, who's turned into a pretty decent basketball player, I'm

8   told.  I don't know about that, but he's been raised right.

9   You'll see.

10          Well, Lidy's life changed when the Raymond

11  Corporation's forklift ran over her because she lost her

12  balance.  She hit some cracks.  Her foot moved a couple inches

13  to the left.  Not intentionally.  Just because people's feet

14  move when we bump into things.  And she fell out.  And then the

15  unguarded wheel ran her over and chewed the skin off her leg

16  from the ankle down, like removing an athletic sock.

17          She's not done well.  We're not going to be

18  hearing about one of these amazing people who get an amputation

19  and they get great prosthetics and they go on to be in the

20  Olympics.  We're going to hear about somebody who it hurts to

21  put her prosthetic on.  We're going to hear about somebody who

22  has phantom pain, that is, they feel as if their foot was still

23  there and it won't go away.  We're going to hear about somebody

24  who basically lives in a wheelchair.  She's 54 and she's going

25  to be a different person with different needs for the rest of

1     her life.  Her past medical bills alone are $870,776.

2               Now we're going to bring a witness to you named

3     Jan Klosterman who's a certified nurse life care planner.  And

4     what Ms. Klosterman's going to help us understand is that living

5     with this kind of injury requires money.  As she ages, she's

6     going to need health care.  She needs home adjustment.  She

7     needs prosthetics.  She needs therapy.  She needs all of these

8     things and it costs money.  And Ms. Klosterman has made it her

9     life goal as an adult to help people figure out how to do that,

10    how to come up with that money, to live the best life possible.

11              The cost for Lidy's life care plan, just to keep

12    her in legs and assistance, is $3,014,062.  And we'll bring all

13    this to you later.  Because she's unable to work, we're going to

14    learn that the value of her lost wages is $973,248.  But these

15    numbers don't include physical pain, mental pain, disfigurement,

16    posttraumatic stress disorder, loss of society, companionship,

17    marital relations.

18              And I want to share with you a little bit about

19    Jeff.  Jeff has terminal cancer.  He has had some rough goes of

20    it.  We're doing good today.  But Lidy could not take care of

21    Jeff when he needed her most.  And when he will need her even

22    more, I pray to God that it doesn't happen, but when he needs

23    her even more, she won't be able to give him the support that

24    that 18-year investment in their marriage warranted, that she

25    wants to be able to do, and that he deserves.  And that's one of

1    the damages we're going to be talking about.

2              Now before I end my discussion with you, I've got

3    to tell you that we're going to hear from a variety of expert

4    witnesses.  When you consider their testimony, compare them to

5    your common sense.  I'm going to bring you Dr. John Meyer.  He's

6    a mechanical engineer.  He's going to help us understand how the

7    Raymond 4250 compares with the standards, with the Design Safety

8    Hierarchy, with the rest of the injury, and just good

9    engineering.  And he's going to help us understand how if this

10   forklift had been designed consistent with the way the rest of

11   the industry does it, we would not be here.

12             We're going to meet a fellow named Professor John

13   Jeka from the University of Delaware.  He's one of the world's

14   leaders on balance.  I think you're going to find this really

15   cool.  It's really fascinating, because we all think we know

16   about balance because we learn in seventh grade how our inner

17   ear works.  It's not that way at all.  It's an automatic

18   response that's modulated by our spinal cord.  And we move our

19   feet sometimes and we don't have any idea they're moving.  He'll

20   tell us things like, raise your right arm.  What's the first

21   muscle that fires?  It's not your shoulder.  It's in your legs,

22   because if it wasn't in your legs, you'd tip over.  Nobody knows

23   that.  He's going to help us understand that, because it

24   explains how Lidy's foot got out.  That's not carelessness by

25   her.  It just happens because humans move that way as part of

1    our balance system.  Now it's just an automatic response to an

2    ever-changing world and ever-changing riding.

3                We're also going to hear from Professor Jason

4    Kerrigan.  Dr. Kerrigan teaches both biomechanical engineering

5    and he teaches at the medical school at University of Virginia

6    to help people understand biomechanical issues.  And

7    Dr. Kerrigan's going to help us understand how Ms. Anderson fell

8    out of the forklift and why a wheel guard would have made a

9    difference.  In other words, if there had been a wheel guard,

10   the injuries would be either none or substantially less.

11               One last thing about these experts, Dr. Meyer,

12   Dr. Jeka, Dr. Kerrigan, they're also going to help us understand

13   why the opinions offered by the experts brought by the Raymond

14   Corporation just don't make sense.  Look at their video, ask, Is

15   that the same age forklift?  Does it ride the same?  Are the

16   hours on the forklift the same?  In other words, are the mileage

17   the same?  Is the path the same that Lidy took?

18               Well, at the end of the evidence, we're going to

19   ask you to put the cost of Raymond, the Raymond Corporation's

20   choices, the cost of what the Raymond Corporation took away from

21   this family, from Lidy and from Jeff Anderson, on the Raymond

22   Corporation, and not on Lidy and Jeff and their family.  And we

23   will ask for your verdict in the amount of $14 million.  Thank

24   you.

25               THE COURT:  All right.  It is 20 minutes after 2.

1    I anticipate the opening statement of Defendant will take a

2    little time so we're going to take our first break.  This break,

3    folks, we will show you to the jury room.  There are snacks in

4    there.  If you look in the refrigerator, there's various

5    chocolates and other goodies that are there for your use.

6                So I'm going to read you an instruction, though.

7    I won't read it every time we take a break, but I am required to

8    do it regularly.  And here it goes.

9                We are about to take our first break during the

10   trial.  I want to remind you of the instruction I gave you

11   earlier.  Until the trial is over, you're not to discuss this

12   case with anyone, including your fellow jurors, members of your

13   family, people involved in the trial, or anyone else.

14               You may not communicate with anyone about this

15   case using your cell phone or through e-mail, a Blackberry, an

16   iPhone, text messaging, or Twitter.  Certainly you're not

17   supposed to go through any blog or website, Facebook or any

18   internet chat room, other social media, Instagram, Snapchat,

19   LinkedIn, or YouTube.

20               If anyone approaches you and tries to talk to you

21   about the case, do not tell your fellow jurors but advise me

22   about it immediately.  And also, do not read or listen to any

23   news reports of the trial.

24               Finally, remember to keep an open mind until all

25   the evidence has been received and you have heard the views of

1    your fellow jurors.

2                While I may not repeat this instruction at every

3    break, it is important that you keep it in mind throughout the

4    trial.  We are in recess until 2:30.

5                (Jury exits at 2:19 p.m.)

6                (Recess from 2:19 p.m. to 2:31 p.m.)

7                THE COURT:  All right.  Let the record reflect

8    that we're back on the record.  The jury is still in the jury

9    room and Counsel for Raymond wanted to present something to the

10   Court.

11               MR. LoCOCO:  Thank you, Your Honor.

12               We talked Friday about opening statements and the

13   use of exhibits during opening statement and showing each other

14   what we intended to use.  When we came in this morning, I asked

15   Mr. Warshauer what he intended to use, and I had up all the

16   slides I intended to use, which I showed to him.  I just added

17   one, which I showed to him.  He showed me about six pieces of

18   paper, which I knew would be shown --

19               THE COURT:  Could you hold on a second?  People

20   are running in and out of this door.  I don't know what's going

21   on.  Is there something going on?

22               THE COURTROOM DEPUTY:  Well --

23               THE COURT:  We're going to have something --

24               THE COURTROOM DEPUTY:  Go ahead.

25               THE COURT:  We've got a hearing going on on the

1    record.  When this is over, then we'll alert the jury.  We'll

2    bring them out.  Okay?

3              MR. LoCOCO:  And so I asked Mr. Warshauer to show

4    me what he intended to use.  He showed me about six pieces of

5    paper, most of which were photographs.  I saw no video.  I saw

6    no, you know, PowerPoint with arrows moving and I saw nothing

7    about the Safety Design Hierarchy.  And I -- we prepared a

8    motion to warn the Court, because I've been in trials with

9    Mr. Warshauer before.  And we decided on our team, it's a new

10   day, we didn't want to start off on the wrong foot.  And I

11   probably wouldn't have objected to what was used.

12             My objection, Your Honor, is that we had a clear

13   directive from you Friday.  I in good faith showed Mr. Warshauer

14   everything I intend to use to show to the jury, and he did not

15   return the favor.  And I hate that we have to put everything on

16   the record, but we'll have no choice but to keep doing that if

17   Mr. Warshauer isn't -- doesn't comply with instructions and, you

18   know, the niceties and the decorum that you require.

19             I was left with -- there was one I wanted to

20   object to, but then I'm interrupting his opening statement,

21   which as you know, Your Honor, given your experience, no lawyer

22   wants to do that to another lawyer.  So I'm not asking for any

23   relief at this point.  It's a -- it's something on the pile,

24   though, that concerns me, since we're at the start of the trial.

25   Thank you.

1         THE COURT:  All right.  Mr. Warshauer?

2         MR. WARSHAUER:  I'm not even sure it merits a

3    response, Your Honor.

4         THE COURT:  It does merit a response.  If --

5    wait.  If in fact you made representations to your opponent

6    that, "Here are the things I'm going to show the jury," and you

7    did not -- and you did not share with him things that you

8    actually did show the jury, that merits a response.

9         MR. WARSHAUER:  That would if that was true.

10        THE COURT:  Because it invites a response from

11   me.

12        MR. WARSHAUER:  That would be true.

13        THE COURT:  All right.  So go ahead.

14        MR. WARSHAUER:  But the reason I said it doesn't

15   merit a response is because it is not true.  The video, I showed

16   him the still from the video.  I said, "This is from your video

17   called 'Safety on the Move.'"  There was no -- nothing

18   surprising about that.  The Design Hierarchy, the response --

19   the agreement was we would show each other evidence.  That

20   triangle doesn't go out with the jury.  It's just a

21   demonstrative thing that we draw.  It's not part of what we're

22   doing.  The logos aren't evidence either.  They're part of my

23   argument.  I didn't show him unreasonable danger.  I said, "I'm

24   not showing you the words.  I'm showing you things that are

25   evidence that if you have a problem with these going out --"

1          Similarly, he showed me things that are evidence.

2     I had no expectation nor do I believe I've seen anything he has

3     that are words or surely demonstrative.  We talked about his

4     evidentiary things and we did that before lunch.  I said, "I

5     don't agree with all of them."  And the Court said, "Well, you

6     don't have to make the objection during the closing -- opening,"

7     which I -- is fine.  But I showed him the things that were

8     evidentiary, the things that had numbers, that have a potential

9     for coming in.  I absolutely stuck with what I understood to be

10    our agreement.

11          THE COURT:  Except this.  If -- suppose you put

12    something up there that you said, "Well, this is not going to be

13    evidentiary, because I know the judge would never allow it in to

14    begin with," that's problematic.  When lawyers tell me that

15    they've met and they've discussed things and they've shared what

16    they're going to share, I take them at their word.  I'm

17    fourth-generation trial lawyer.  That's the way I was raised.

18    It's the way I practice law.  I don't like having to micromanage

19    trials, particularly one that's going to last this long.  But

20    I'm also very sensitive to the problems with springing surprises

21    on opponents during the middle of trial.

22          MR. WARSHAUER:  There was no --

23          THE COURT:  And particularly when there's a

24    gentlemen's agreement ahead of time.  We're not going to be

25    doing those things.

1  MR. WARSHAUER:  I showed him all the evidence.

2  That's what I understood would be our agreement.

3  MR. LoCOCO:  Your Honor --

4  MR. WARSHAUER:  I would never show anyone

5  something like my list of unreasonable danger.  That wouldn't --

6  I'm not showing the whole thing.  I never understood "Show the

7  entire slideshow."  It was "Show things that are evidentiary so

8  that we can object beforehand."

9  THE COURT:  I think going forward, you should

10  presume that if we have an understanding that you're going to

11  show something to the jury, that you have to show the other side

12  first.  It works both ways.  "I'm going to show this picture."

13  So you've made your record.  You've responded --

14  MR. LoCOCO:  Well, I didn't lie, Your Honor,

15  about what I said happened this morning.  And Mr. Warshauer has

16  now admitted that he didn't show me everything he was going to

17  put up in front of the jury.  That was my understanding.  And I

18  guess I used the wrong words.  Shame on me.  That's not how

19  lawyers are supposed to deal with each other.  And

20  Mr. Warshauer's a smart guy.  This is the third time he's done

21  this to me, and it's going to be the last.

22  MR. WARSHAUER:  You know what?  It's not the

23  third time.  Quit inventing things, Mr. LoCoco.

24  MR. LoCOCO:  Young, Dezoete.  You were admonished

25  in Dezoete over it.

1      MR. WARSHAUER:  That's not true.  The reality,

2  Your Honor, is I genuinely believed it was limited to evidence.

3  I've never ever in my life shown every slide that I would show.

4  If that's what I should have understood, I apologize.  If that's

5  what I should have understood, I will make sure that that is

6  what I understand as we move forward.  I'd --

7      THE COURT:  Well, a slide that just shows your

8  argument that ticks off, you know, "It's unreasonable for one,

9  two, and three," I could understand that.  But the videos and

10  photos and logos, those are all things --

11      MR. WARSHAUER:  I did show all the photos.  The

12  video still, I said, "This is from your 'Safety on the Move.'"

13  I told him that.

14      MR. LoCOCO:  He didn't say he was going to show

15  the video, Your Honor, and he didn't show me the logos.  So I'm

16  fine.

17      MR. WARSHAUER:  I intentionally didn't show the

18  logos.  I didn't think they were evidence.  That was my

19  understanding.  I won't do it again.

20      THE COURT:  All right.  Thank you.

21      MR. LoCOCO:  Thank you.

22      THE COURT:  Let's bring the jury in.

23      (Jury enters at 2:39 p.m.)

24      THE COURT:  Please be seated, everyone, thank

25  you.

1          We are back on the record in Anderson v. Raymond.

2     We're now at that part of the proceeding with Defendant's

3     opening statement.

4          Counsel, please proceed.

5          MR. LoCOCO:  Thank you.  Thank you, Your Honor.

6          May it please this Honorable Court,

7     Mrs. Anderson, Mr. Anderson, Counsel.  May it please you,

8     members of the jury.

9          As you know from this morning, my name is Frank

10    LoCoco.  And along with Pat Murphy and Margaret Heitkamp, we're

11    proud to be here representing the people at Raymond in Greene,

12    New York, who are today working on the design, manufacture, and

13    sales of lift trucks like the one you see in the photograph here

14    that are useful and safe for society.

15         Thank you very much for all of your service.  We

16    know it's an inconvenience.  I was listening to Mr. Warshauer's

17    opening statement, and I've never used this reference or

18    metaphor in an opening statement, but it seemed apt.  I think we

19    all missed it now, but there used to be a newscaster up in

20    Chicago.  He broadcast out of Chicago, but he was national.

21    Paul Harvey.  And he was famous for "the rest of the story."

22         And there's always the rest of the story, and

23    what I'm going to try to do for -- through this opening

24    statement is explain to you the rest of the story, why this

25    product was designed the way it is, why it has an open back, why

1   it has a deadman pedal, the fact that it's over 8,000 pounds,

2   and nothing that weighs that much stops on a dime.  I'm going to

3   explain to you how Raymond went about designing the truck as

4   opposed to what you'll hear in the evidence about how

5   Mr. Warshauer's plaintiff expert witnesses criticized this

6   truck.  There's a whole design process that you're going to hear

7   about.

8         I'm going to explain to you that we didn't

9   hear -- you know, when a lawsuit is brought, it takes a year or

10   two to come to this point.  We're at trial.  The lawyers ask for

11   things from each other's witnesses and each other's parties,

12   depositions are taken where people sit down and they're sworn

13   under oath and you take testimony, we got medical records, we

14   got the FedEx Supply Chain investigation materials,

15   Ms. Anderson's training documents.  She was trained very well

16   and she was a good worker, but the evidence is going to show she

17   made a mistake this day.  So we got that.

18         We got the medical records.  We got statements

19   that were given, including by Rechel Boone, who's supposed to

20   testify.  I think our first witness.  And there is not one piece

21   of paper that we came across that said anything about losing

22   balance.  The first time we heard "losing balance" in this case

23   is when I sat down virtually, because of the pandemic, with

24   Mrs. Anderson.  She was in her home in Effingham.  I was in my

25   office in Milwaukee.  And she testified -- I got it further down

1   in my notes, but I want to read it to you now.  She testified,

2   "I was driving in my forklift.  I ran over some crack.  My

3   forklift was shaking and I lost my balance.  The next thing I

4   knew, I was on the ground and the forklift ran over my leg."

5           A few pages later in the transcript, I tried to

6   follow up.  "Do you recall how you came out of the compartment?"

7   Answer:  "It was shaking in my forklift.  The next thing I knew,

8   I was on the floor and it ran over my leg."  That time, she

9   didn't say "balance."  There's no piece of paper, no medical

10  record, no statement from a witness saying that Ms. Anderson

11  lost her balance.  We heard that after the lawyers got involved

12  and after the lawsuit got filed.

13          And I'm going to come back to the issue of

14  balance, because this compartment that we see in this photograph

15  here was designed to make the operator comfortable and safe and

16  secure.  And you're going to hear about that during the trial.

17          So why are you here?  Why did we need you to be

18  here?  Because you need to decide this case.  And this case,

19  this trial, and ultimately your deliberations are about one

20  thing:  Who or what is responsible for the accident and serious

21  injury suffered by Mrs. Anderson back on July 29, 2017.  We will

22  prove to you through the witnesses who testify and the exhibits

23  that you see that this accident, these injuries, were caused not

24  by the design of this lift truck, but by the conduct of

25  Mrs. Anderson herself, her failure to take care of her own

1    safety, her failure to follow the training, warnings, and

2    instructions she was provided.  If she had done that, we

3    wouldn't be here today.

4                    Mrs. Anderson was taught to stay within the

5    protective confines of the operator's compartment, and we'll

6    show that during normal operation of the forklift, there's no

7    reason to leave the safe confines of the operator's compartment.

8    And Mrs. Anderson sustained a serious injury because she left

9    the compartment while it was still moving, while it was moving

10   toward a potential collision with that post that we see in this

11   photograph.

12                   This photograph was taken a few months after the

13   accident, but this shows how the forklift was situated at the

14   time Mrs. Anderson was found by Ms. Boone.  As Mr. Warshauer

15   told you, she was found in this area.  She's only a foot or two

16   from a collision with that vertical post.  And the evidence that

17   we bring to you is going to show that instead of just staying in

18   the compartment, where she would have been safe even in a

19   collision, or lifting her right foot to stop the forklift, she

20   got out and tried to get away, and that's why she got caught by

21   that steer wheel.

22                   And you're going to see a lot of scientific

23   evidence that explains that to you, kind of like CSI, working

24   with the medical records and the injuries and working backwards

25   with this geometry to figure out actually what happened, because

1    there were no eyewitnesses and Mrs. Anderson's memory is not

2    great about what happened, other than what I read to you.

3              So this forklift is loaded with design features

4    that are intended to keep not just Mrs. Anderson safe but any

5    operator of a lift truck like this.  It's over 4 tons.

6    Mrs. Anderson will tell you, she knew that it could hurt her

7    badly if she got out of the truck while it was still operating,

8    while it was still moving.

9              If Mrs. Anderson -- and this is what the evidence

10   is going to show.  If she had followed her training, used her

11   right foot to stop the truck, because she testified that she

12   used her right foot on that deadman pedal -- just to be clear,

13   the deadman pedal -- let me get to a better picture.  So this is

14   the deadman pedal down there.  Now the way it works is backwards

15   of a car.  You don't push on it to brake the lift truck.  In

16   order for the -- it's an electric truck.  It's powered by a

17   36-volt battery.  In order to power the truck, you have to push

18   your foot down on the pedal.  Before you do that, though, you

19   turn a key.  There's three microprocessor computers at least on

20   this truck.  It does a self-test to make sure everything's

21   working, then you put your foot down on the pedal to energize

22   the truck and make sure it can work.  And this handle is used,

23   the travel lever, to go forwards and backwards, and this steer

24   tiller is used to go left or right, to turn.  And that's how the

25   truck is used.

1         So if Ms. Anderson had just picked up her right

2    foot, two things would have been true:  One, the truck would

3    have stopped.  But it doesn't stop on a dime.  It's

4    8,000 pounds.  From full speed, this truck will stop -- which is

5    about 8 miles an hour.  This truck will stop in about 10 feet.

6    The other thing that happens, if you're standing the way

7    Mr. Warshauer described -- so I'm in that compartment the way

8    you see it.  You pick up your right foot.  What happens then?

9    Your left foot has the weight of your body.  You're holding on

10   to these handles.  Your back's against the back pad.  You can't

11   get out of the forklift because you weighted your left foot.

12   All your weight's on your left foot, so you can't stick your

13   left foot out.

14        Now even though we don't have the burden of proof

15   on the design issues, as I said, we're going to explain to you

16   why this forklift is free of defects.  We heard about two that

17   they're claiming this forklift had back at the time of this

18   incident.  Mr. Warshauer mentioned Dr. Meyer and Dr. Kerrigan.

19   Well, when I took their depositions last year, they had at least

20   four theories, so I guess we're down to two now.

21        In any event, this truck was designed as a safety

22   system to minimize the overall risk to operators, no matter what

23   the hazard is.  So there's a hazard of a collision, obviously.

24   Right?  Whoops.  Let me get rid of this.  Went the wrong way.

25   So that's a collision hazard.  Raymond designs for that.  These

1    trucks also lift things very high and so the trucks can tip

2    over, and they're used on loading docks so they can also go off

3    a dock if other safety rules aren't followed.  And so the

4    operator -- that compartment has to have an open back.  That

5    open back has to be there so that an operator, in the event of a

6    tip-over or an off-the-dock, can get away from the danger of the

7    tip-over quickly and easily.

8            The flip side is, the compartment is designed so

9    that if you're about to have a collision, you get away from the

10   danger by getting yourself further into the compartment.  And

11   the evidence is going to show that in addition to this pedal --

12   which if you take your right foot off of it, your left foot is

13   weighted so it can't go outside.  Also, you're going to learn

14   that this left-side hip bolster keeps -- is just enough of an

15   edge to help you keep nestled in that compartment.

16           You're going to learn that the floor down here is

17   tipped.  So if you're looking at the back of it like we are,

18   it's tipped from left to right and from the back of the forklift

19   to the front in order to keep you in that corner furthest away

20   to give you stability and comfort and safety.  All of that was

21   designed into this compartment to help the operator stay in.

22           There's a slip-resistant floor mat there.  These

23   handles that we talked about are substantial for keeping the

24   operator firm.  And then we of course have the back pad.

25           We are also going to prove to you -- so we're

1    going to prove to you that this design the way it is minimizes

2    the risk for all users.  We're going to also prove to you that

3    this pedal design that Mr. Warshauer spoke with you about is

4    extremely safe and flexible for the operator.  You put two

5    pedals down and force the operator to stand on two pedals for

6    eight hours, they get no posture relief.  So it will be

7    important to listen to the other side's experts on how they took

8    that into account, which they didn't, because they haven't

9    designed anything.

10              Mr. Warshauer says if they had just done what

11   Crown did, left-foot deadman pedal -- these same expert

12   witnesses, who I expect you'll hear from in this case, Dr. Meyer

13   and Dr. Jeka, were in a courtroom in Florida less than one month

14   ago criticizing Crown for having a left-foot deadman pedal.

15   Dr. Jeka likes the right-foot deadman pedal.  But we're here now

16   against Raymond, so the evidence you'll hear from Dr. Jeka and

17   Dr. Meyer here is that they should have the Crown pedal, not the

18   Raymond pedal.  Well, this is the Raymond case.

19              We will also show to you through the evidence

20   that even if there had been a left-foot deadman pedal, even if

21   there had been a left-foot deadman pedal, we'd still be here.

22   The truck did stop.  The truck did stop.  It didn't collide.

23   And Mrs. Anderson doesn't remember how her left foot came out.

24   She doesn't remember the details of how it got under the left --

25   under the steer tire.  And that left-foot deadman pedal that

1    Mr. Warshauer's talking about would only matter if the truck had

2    stopped before it hit the left foot.  And we're going to have

3    evidence to prove that even if the pedal had been under the left

4    foot instead of the right foot, she would have still been

5    injured, which brings up an important concept.

6              Part of your work in this case is to determine

7    whether the defect claims they make, if fixed, would it have

8    made any difference in the outcome here?  Lawyers call that

9    causation.  I guess normal people call it causation too.  It'd

10   be like saying that the Raymond lift truck is defective because

11   it's red.  Well, the defect of redness only matters if it would

12   have prevented -- if it had something to do with Mrs. Anderson's

13   accident.  Same with the second deadman pedal.  Same with the

14   guard over the steer tire.  We're going to have scientific

15   evidence here to show you that it would have made no difference

16   whatsoever.  What would have made a difference is Mrs. Anderson

17   following her training and instructions, staying in that safe

18   compartment.

19             This case is very simple, but designing a piece

20   of equipment like this is complex, and you can't do it on the

21   back of a napkin.  One of the things you're going to -- one of

22   the witnesses we intend to have here is a man named Bob Kerila.

23   Mr. Kerila is a mechanical engineer at the Raymond Corporation.

24   He's been there for 25 or 30 years.  He will take you through

25   the steps of the design process that Raymond uses.  I've got up

1    on the screen now -- it's a little small to see.  We'll blow it

2    up during the trial.

3            But Raymond has a seven-step process from Phase 0

4    to Phase VI.  It includes a concept, feasibility, planning and

5    specification, design, develop, and test, document, release and

6    launch, production, program audit, review.  It's a lengthy

7    process.  It's got hundreds of steps.  And Dr. Meyer, who's here

8    to tell you about these two defect allegations that he's come up

9    with, the left-foot deadman pedal and the guard over the steer

10   tire, he'll tell you that he's only gotten to the concept phase.

11   He hasn't done any of these other steps in the design process,

12   but he'll be here tomorrow or the next day criticizing Raymond's

13   design.

14           So I want to kind of dig in a little bit more

15   into each of those three areas:  What happened during the

16   accident, how this truck was designed, and why it's designed the

17   way it is.

18           Let me tell you a few things about Raymond.

19   Raymond is a company that was founded by a man named George

20   Raymond almost a hundred years ago.  It had been ongoing for

21   about 45 years prior to that, but then it was only making

22   agricultural implements.  It's in upstate New York, in Greene,

23   New York, which is about an hour and a half southeast of

24   Syracuse, about three hours west of New York City.  It's in the

25   Finger Lakes region.  They also have a plant in Muscatine, Iowa.

1    And over the years, Raymond has become a major

2  manufacturer of lift trucks.  Currently, they have about 1,500

3  employees total, about 1,100 in Green, New York, 400 in

4  Muscatine.  These people design, manufacture, sell, market lift

5  trucks.  If I said this, I apologize, but they have about 200

6  degreed engineers of all sorts of types:  Software engineers,

7  mechanical engineers, electrical engineers.  It's an electric

8  truck.  And those engineers spend their time designing and

9  testing to make sure that the truck is safe for people to use

10  like Mrs. Anderson.

11    As I said, the open back is a conscious safety

12  feature.  It's a required safety feature.  Mr. Warshauer showed

13  you the B56.1.  This is the ANSI Standard.  This is the standard

14  that Raymond has to comply with when it sells a truck to an

15  employer, and you'll see a few sections.  Mr. Warshauer already

16  showed you this 20.2, which says you have to have a traction

17  cutoff if the operator leaves the operator's station.

18    Well, first of all, a traction cutoff is not a

19  brake.  Put that aside for a second.  All that means is when you

20  get out of the truck, it shouldn't -- the traction should cut

21  off, which this truck does.  If you look at the operator's

22  manual, when you get out of the -- and we'll do this.  When you

23  get out of the truck, you come to a stop, you take your foot off

24  the deadman pedal, that sets the parking brake, you turn off the

25  key, and then you get out of the truck.

1    In any event, a couple other sections.  There's a

2  Section 7.41, which has this note on it.  "Stand-ups, rear

3  entry, end control, narrow aisle, and reach trucks shall be

4  designed with open operator compartments to permit easy ingress

5  and egress.  This allows the operator where possible a free and

6  easy egress from the truck in the event of an imminent tip-over

7  or off-the-dock accident."

8    This standard, the B56.1, is called a balance

9  standard.  Only one-third of the seats on it are held by

10  manufacturers.  Another one-third are by users.  Another

11  one-third are by people who are interested in being on the

12  standard writing committee.

13    Mr. Warshauer's expert witnesses, Dr. Meyer and

14  Dr. Jeka, they could be on that committee if they petitioned to

15  be on it.  They could write recommendations for the standard.

16  They haven't done that.

17    In any event, it's a balance committee.  It

18  includes someone who represents the UAW, all the auto workers.

19  It includes a representative from OSHA whose only task is

20  operator safety.

21    There's another section -- whoops, let me get rid

22  of this.  In the section for users, it says "A dock tip-over can

23  occur if a truck is steered over the edge or driven off a dock

24  or ramp.  They can also occur if a highway truck or trailer

25  rolls away from the truck -- from the dock or is driven away.

1           "(e) These trucks are designed with open operator

2    compartments to permit easy ingress and egress.  Although

3    there's no sure way in all circumstances to avoid injury, where

4    possible, in the event of an imminent tip-over or off-the-dock

5    accident, the operator should step off and away from the truck.

6    These actions are intended to reduce the risk of serious injury

7    or death.  For non-tip-over accidents, such as imminent

8    collision with other objects in the work environment, the

9    operator should utilize protection provided by the compartment

10    by staying within its confines."

11           So right there in that snippet of the standard,

12    you hear about collisions and you hear about off-the-docks and

13    tip-overs.  Now there's other safety features on the truck that

14    really aren't relevant here.  There's an overhead guard to

15    protect the operator if stuff falls off from up on other

16    shelves.  Doesn't really have anything to do with this case.

17           The battery, by the way, is here.  It's a 36-volt

18    battery, I think.  Anyway, it weighs over a ton, just the

19    battery.

20           That's the front page of the operator's manual

21    that goes with the forklift.  This is the top section of the

22    warning decal that's on the forklift.  "When stopping, stay

23    inside the compartment until truck comes to a complete stop --

24    complete halt.  Keep all portions of the body inside the

25    operator's compartment."

1        This compartment is designed to accommodate the

2   5th percentile male -- female, up to the 95th percentile female,

3   so someone who's small in stature.  Mrs. Anderson, who was about

4   5'3" at the time of the accident and 170 pounds, something like

5   that, it accommodates someone her size.  It also accommodates --

6   I don't know if my weight fits it, but it accommodates somebody

7   up to 6' or 6'2" and 2-something.  So it's made to accommodate a

8   number of different sized individuals.

9        This one's a little hard to see here, but we'll

10  have some other pictures that show these armrest areas.  There's

11  three levels of arm rests because it's there to accommodate

12  different sizes of operators.

13       This forklift, the 4250 -- this is not true on

14  most other forklifts.  The 4250, though, had something that

15  Raymond calls the floating floor.  These trucks -- Mr. Warshauer

16  said they're hard rubber tires, they're not inflated, and

17  there's no suspension like you have in a car, so there's --

18  there can be obvious road shock.  But this truck has a floating

19  floor, and that's -- that means it's got a dampener to take on

20  going over cracks in the warehouse floor.  The truck is designed

21  to accommodate that.

22       Also what you'll hear is that Raymond does not

23  put a product out in the field until it's gone through thousands

24  and thousands of hours of testing and evaluation.  I'll just

25  give you one example.  The 4250, this issue of balance,

1     Mr. Kerila will tell you that they have -- they have people at

2     Raymond called night riders.  They come in second and third

3     shift, and all they do is drive prototypes around the factory,

4     around the test lab, at Raymond, and even over something called

5     a bump track, which has bumps and ridges and -- to mimic going

6     over a rough floor.  And the operators keep notes, they report

7     problems, and Raymond designs based on the feedback they're

8     getting.  Mr. Kerila will explain that to you.

9               We intend to have three -- we told you about

10    Mr. Kerila.  We intend to have three other experts testify.

11    We're not going to call all of them.  As you already heard, we

12    don't have to put any evidence on.  But they're Dr. Timothy

13    Rhoades, Dr. Kate Rodowicz, and Mr. Michael Rogers.

14              Dr. Rhoades is a renowned human factors expert

15    witness.  He is -- he was a professor for a long time at

16    University of Michigan in Ann Arbor.  Raymond's engineering

17    department went out and had him look at the operator's

18    compartment and the right-foot pedal.  And he did testing

19    involving Raymond trucks, Raymond operators, millions of pieces

20    of data, to determine how operators use the truck, and he'll

21    explain his research to you.

22              And he'll tell you that his research showed that

23    people use the back pad, that people do move their feet around

24    in the compartment, and that gives them good posture relief.

25    And that during all the testing he did, no one ever fell out or

 1     lost their balance.  Mrs. Anderson had been operating in this

 2     facility for three or four years.  She had never fallen out or

 3     lost her balance.

 4                 You'll hear about some other things that Raymond

 5     sends along with the truck:  A DVD entitled "Principles of Safe

 6     Operation."  I expect you'll see that.  Training is incredibly

 7     important.  You can't just get on this truck.  It's not a

 8     toaster or a blender.  So you'll hear about that.

 9                 You'll hear that operators are trained to stay

10     away from the danger.  If there's a collision, you get in the

11     compartment.  If you're going off the dock or tipping over, you

12     get out of the compartment.

13                 Mr. Kerila will explain to you how safety is a

14     part of every bit of their design effort within the engineering

15     department.  They test component parts, they make prototypes for

16     use in the lab, then they do field testing out in the field.

17     And they get feedback and they refine the design, and only then

18     does it get ready to be put into the facility -- into the

19     market.

20                 You'll also learn that no product, let alone a

21     lift truck that weighs 8,000 pounds, is accident-proof.  So the

22     evidence is going to show that this design, though, is there to

23     protect operators, including Mrs. Anderson.  She had the

24     protection she needed.

25                 Dr. Rodowicz and Mr. Rogers -- Mr. Rogers is a

1    mechanical engineer.  He has -- he's a member of the B56.1

2    committee.  He's on the committee that writes that standard.

3    He'll tell you that this design complies with even 20.2,

4    Mr. Warshauer's section.  He's a mechanical engineer.  He's been

5    working on forklift issues for 30 years, over 30 years.

6              Dr. Rodowicz is a biomechanical engineer.  She's

7    from a company called Exponent, which has like 700 engineers and

8    multiple offices.  She's got her Ph.D. in biomechanics, which is

9    the study of biology, people, and engineering principles.  I'm

10   going to come back to her in a second.

11             Mr. Rogers is with a company called Fusion

12   Engineering, located in Naperville, Illinois, which most of you

13   know is a little west of Chicago.

14             We talked about the open back, why the truck has

15   an open back.  Well, part of the analysis that Mr. Rogers and

16   Dr. Rodowicz did for Raymond was, well, what happens if somebody

17   does stay in the compartment and doesn't get away?  Well, they

18   can be seriously injured.  And so they did -- to learn about

19   that, they did some off -- what we call off-the-dock testing.

20   This is the same style of truck that was involved in

21   Mrs. Anderson's accident.  I'm going to just play it through.

22   There's an anthropomorphic test dummy on the truck, an ATD.

23             (Video played.)

24             MR. LoCOCO:  Here's the same test, but this is

25   from the back and it's in slow motion.  The ATD is instrumented

1    in the head, the neck, the chest, the pelvis.  The head has

2    chalk on it so you can see if it hits anything.  It's going to

3    hit the edge of the dock here.  And so it's work like this that

4    supports the standard and frankly Raymond's decision to have an

5    open back.

6              Okay.  So Raymond designed the truck, though, so

7    that you can use either foot, left foot or right foot.

8    Mrs. Anderson was a right-foot operator, so you'll learn about

9    that.  And that's perfectly fine.  And like I said, if you pick

10   your right foot up off the deadman pedal, your left foot can't

11   get out.

12             Now I mentioned that the plaintiff's expert

13   witnesses, Dr. Meyer and Dr. Jeka, Dr. Meyer in particular,

14   because he's the engineer, they've not designed a pedal

15   configuration for this Raymond truck.  I guess they're just

16   going to rely on Crown in this case.  They've not designed a

17   guard for over the steer tire.  And as I said to you earlier,

18   they've done no testing.  They've done no design work.  They've

19   done no testing.  They've done no analysis.  There's no science

20   that they're going to bring to you that will prove that either

21   of their fixes would have made a difference here.

22             Mr. Warshauer said, "Put a guard over the steer

23   tire."  Well, one of the things that Dr. Rodowicz did is she did

24   what's called a circuit study in her work in this case.  She

25   went and got a model, approximately the same height and weight

1    as Mrs. Anderson, put on the exact same style of shoe that

2    Mrs. Anderson was wearing.  And this is just one of the pictures

3    that Dr. Rodowicz took.  And what this shows is that even if

4    this steer tire had been guarded with a guard right to the level

5    of the rest of the frame, Mrs. Anderson's foot still gets into

6    the tire.  We're still here.  Besides the fact that you'll

7    learn, that this is an 8,000-pound vehicle.  Getting hit by an

8    8,000-pound vehicle, even at 2 miles an hour, is going to hurt.

9    It's going to hurt you.

10              On the deadman pedal, as I said earlier, there's

11   no evidence that they're going to show you that the timing would

12   have made any difference, because -- and they also don't know

13   Mrs. Anderson's speed at the time.  They don't know when she

14   came out.  They don't know when her right foot came up off the

15   deadman pedal, which of course would have braked the truck.  And

16   the truck did brake.  It stopped.  It didn't collide with that

17   post.  The evidence is going to show she got out before she

18   should have.

19              All right.  I want to talk a little bit about the

20   plaintiff's accident.  A few things we haven't talked about yet.

21   I told you that first time we heard about loss of balance was

22   Mrs. Anderson's deposition.  You were told about Rechel Boone.

23   You were told that Mrs. Anderson told Ms. Boone, "I slipped off

24   and it would not stop."  I wrote it down in my notes.  The

25   reason I wrote it down in my notes is, Ms. Boone gave a written

1    statement right after the accident on the same day.  That's not

2    reported in there, that Ms. Anderson said anything like that.

3            Mr. McCoy took a telephone statement from

4    Ms. Boone months after the accident.  She doesn't say anything

5    like that in the statement.  Mr. Warshauer apparently had lunch

6    with Ms. Boone about a month ago, and today we hear "slipped off

7    and would not stop."  I don't know if we'll hear that from

8    Ms. Boone, but that's what we heard today.  And even "slipped

9    off and did not stop" is not "I lost my balance."

10           Mrs. Anderson doesn't -- can't tell you how her

11   feet came out of the compartment.  She can't tell you how her

12   left foot got caught by the steer tire.  She couldn't remember

13   her speed.  She couldn't remember her actions in getting out of

14   the compartment.

15           And I mentioned Dr. Jeka.  Dr. Jeka's theory is

16   that Mrs. Anderson was -- now I'm coming toward you in the

17   forklift.  She was coming down this aisle, making that S-turn,

18   down the aisle.  And for some reason, her automatic balance

19   system got triggered, even if she didn't know it.  So she went

20   to broaden her base of support and when she did that, oops,

21   there's no platform there, and she fell out.  Mrs. Anderson

22   never had that happen to her before.  There's no evidence that

23   that's what happened.  And if that's what would have happened,

24   the evidence is going to show, she wouldn't have been hit by the

25   tire.  She would have been hit by the frame, this far over.

1    So this is a video that was taken by Mr. Rogers

2    and Dr. Rodowicz.  They took an exemplar down to this facility.

3    As Mr. Warshauer said, all the racks were cleared out.  And he

4    drove the path over the same cracks --

5                    (Video played.)

6                    MR. LoCOCO:  -- at various speeds.  What else did

7    they do?  Because scientifically, Mr. Rogers and Dr. Rodowicz

8    were trying to figure out what happened.  Ms. Anderson had

9    limited information.  She'd been through a trauma, a terrible

10   trauma.  There's no dispute about that.  And so what do you

11   have?  You have the truck, you have the geometry, you have the

12   medical records.  So Dr. Rodowicz worked backwards from the

13   medical records and figured out that the only way for

14   Mrs. Anderson to have gotten hurt is to have gotten her left

15   foot in between these two steer tires that are at the back.

16                    So you see there's -- it's a dual steer tire.

17   And the evidence is going to show that Mrs. Anderson's injuries

18   occurred because her foot got between those two tires.  In fact,

19   I expect Ms. Boone is going to testify that when she came on the

20   scene and they had to move the truck, they pulled

21   Mrs. Anderson's shoe, not her foot, but her shoe out from

22   between those steer tires.  And we've got a model of the steer

23   tires so you can see that.  So they had that information.

24                    And Dr. Rodowicz went further in her analysis --

25   it's the last slide here -- and determined that this is what

1  happened.  The truck was moving counterclockwise toward the

2  vertical post, and Mrs. Anderson was trying to move clockwise

3  away from the compartment.  She came out, over, and down with

4  her left foot, and that's how it got caught.  Even Dr. Kerrigan,

5  Mr. Warshauer's biomechanical engineer, will tell you that she

6  got caught by the steer tires in basically this condition,

7  facing the back of the forklift, not just a step down.  So all

8  the scientific evidence -- I know it sounds a little complicated

9  now, but it's not -- it's pieces of a puzzle that are going to

10 be put together by Dr. Rodowicz and Mr. Rogers.

11             So we've got today these two claims of a

12 left-foot deadman pedal and a guard over the steer tire.  Hasn't

13 been designed, hasn't been tested, and there's no analysis on

14 this issue of causation that it would have made any difference.

15 And that is important -- that's an important part of the proof,

16 because if it wouldn't have made a difference, it's irrelevant,

17 even if it was a defect, which we believe we'll show you neither

18 of these were.

19             None of these claimed defects had anything to do

20 with this accident or Mrs. Anderson's injuries.  Now I'm almost

21 done.  I have just a few additional things to say before I sit

22 down, and we hear -- start hearing evidence.

23             I spent a lot of time talking about the model

24 4250, the design process at Raymond, the analysis that's been

25 done in this case, and the safe design of this lift truck.  We

disagree with the plaintiff, as you can tell, about a lot of, a lot of things.  But there's one thing we don't disagree on, and that's that Mrs. Anderson was seriously injured.  This was a bad accident.  It was a really bad accident.  And I don't know the Andersons very well.  I met them a couple of times.  But they're nice people.  This was just a bad thing that happened.  And it's not because of the design in the truck.  But it's a bad injury.

Our focus is on the first part of the case, the issue of defect.  Now that doesn't mean that we're going to agree with everything that the plaintiffs put in front of you regarding the amount of the damages.  We don't, and we'll cross-examine those witnesses.  But we do agree that she sustained serious injuries here.

A couple of other general points before I sit down.  First is a reminder to keep an open mind.  Don't make up your mind until you've heard all the evidence.  I've never had a Court -- I've never heard that story, it was the last question from the last witness.  Absolutely true.  Wait until you've heard all the evidence before you make up your mind.

We go second in the case always.  And as you see in closing argument, the plaintiff gets to go on rebuttal again.  Even on the evidence, the plaintiff gets to go on rebuttal.  But they have the burden of proof.  And the burden of proof is a burden of proof.  The law calls it a burden for a reason.  They have the burden to prove the defects, one or the other, and that

1    the alleged defects actually caused Mrs. Anderson's injury.

2             Third point is to say something about common

3    sense.  The Court addressed this.  Mr. Warshauer addressed this.

4    This is my pitch.  Common sense is the most important thing

5    you've got going for you as jurors.  You didn't leave it down in

6    the parking lot or out on the street.  You didn't check it at

7    the door to Judge McGlynn's courtroom.  It's very important in

8    this case.  Where is the proof?  You know the old commercial,

9    "Where's the beef?"

10            I said at the beginning of this opening statement

11   that this trial and your deliberations are about one thing:  Who

12   or what is responsible for Mrs. Anderson's terrible injuries

13   that she sustained back on July 29th, 2017?  The evidence will

14   show overwhelmingly that Mrs. Anderson's injuries were caused by

15   her own conduct, not by the design of this lift truck.  The

16   design of this lift truck was there to protect her if she would

17   have let it.  All she had to do was follow her training.

18            Mrs. Anderson is responsible for her injuries,

19   and that will be the proof in this case.  And that's why at the

20   end of the case, we'll be here at the end of the case, we'll be

21   asking you for a verdict in Raymond's favor.  Thank you.

22            Thank you, Your Honor.

23            THE COURT:  Thank you.  All right.  It's 3:25.

24   We have one witness.  Would Counsel approach the bench?

25            (Sidebar begins.)

```
 1                    THE COURT:  How long do we think she's going to
 2    take?
 3                    MR. WARSHAUER:  25 minutes of direct.
 4                    MR. LoCOCO:  Yeah, so we won't finish her today.
 5                    MR. WARSHAUER:  I don't think so.  Or bring her
 6    back in the morning, but.
 7                    THE COURT:  Yeah.  That's been brought to my
 8    attention, that we have a juror that's -- lives a fair distance
 9    away in Salem, and he's concerned that he --
10                    MR. WARSHAUER:  Salem.
11                    THE COURT:  He says, "I ain't got money for a
12    hotel.  I ain't got gas money."  So we're going to have to take
13    that up.
14                    MR. LoCOCO:  I think we should start in the
15    morning, personally.  She'll be a pretty quick witness.
16                    MR. WARSHAUER:  I don't mind.
17                    MR. LoCOCO:  He says 25 minutes.  It's not going
18    to be 25 minutes.
19                    THE COURT:  Well, it's -- well, but then how long
20    is your cross-examination?
21                    MR. LoCOCO:  Depends on how much he gets out, but
22    10, 15, 20 minutes.
23                    MR. MURPHY:  We've got a motion to make
24    beforehand.
25                    MR. LoCOCO:  And we've got an argument we've got
```

1    to make on her.

2                    THE COURT:  All right.  Well, what I'm going to

3    do then is I'll announce to the jury that we have some matters

4    to take up that will try to help streamline the case, so I'm

5    going to let them go today and have them come back tomorrow, 9,

6    with the hopes that we start at 9:15.  And we'll start fresh

7    tomorrow.

8                    MR. MURPHY:  Sounds good.

9                    THE COURT:  Any problem with that?

10                   MR. LoCOCO:  No.  Thank you.

11                   (Sidebar ends.)

12                   THE COURT:  All right.  Ladies and gentlemen, you

13   started today earlier than we normally start.  I think they had

14   you here by 8 a.m.  And we have a witness that I think will

15   probably take about an hour.  But my -- I try to get people out

16   by 4 o'clock, and if I -- if I err, I'm going to err on letting

17   you out a little earlier than letting you out later.

18                   So we will -- there's some other matters that the

19   lawyers and I have to take up today, and so we thought that we

20   would let you guys go for today.  We'll finish some of the

21   matters that we have to take up so it will take a while anyway,

22   and so I'd rather take them up this afternoon while you guys are

23   on your way home than have you waiting in the jury room cooling

24   your heels while we take it up in the morning, so.

25                   So we are in recess for five minutes.  Make it

1    ten minutes.  But the jury will be released for the day.  Folks,

2    I'd like you back here at 9 a.m., by 9 a.m.

3              They're meeting in the jury room here, not the

4    jury assembly room; is that correct?  So instead of starting off

5    downstairs, you're going to come in here and we'll have you

6    waiting in the jury room before we -- until we start.  All

7    right?  We are in recess for five minutes.

8              And Juror Number -- ███████, Juror Number 5, I

9    would like to discuss a matter with you before you leave.  All

10   right?  Not a problem.  All right.  We are in recess.

11             (Jury exits at 3:27 p.m.)

12             (Sidebar begins.)

13             THE COURT:  All right.  It's been brought to my

14   attention you have some concerns about the financial impact of

15   coming to trial for the next week and few days may have on you.

16   Are you concerned about not having money for a hotel room and

17   not having money for gas?  Is that correct?

18             JUROR NO. 5:  True.

19             THE COURT:  In a nutshell?

20             JUROR NO. 5:  Yes.

21             THE COURT:  What do you do for a living?

22             JUROR NO. 5:  I work at a tire center in Salem,

23   Salem Tire.

24             THE COURT:  Who runs that?

25             JUROR NO. 5:  Glenn Hernandez.  I actually work

1    for him.  Just kind of like his little to-do guy.

2               THE COURT:  All right.  The -- do you have any

3    thoughts?  Do they have a fund here or anything to help?

4               MR. MURPHY:  I think the district court fund -- I

5    dipped into that thing incessantly.

6               THE COURT:  We have a district court fund, and

7    why don't you -- I've been to Salem a lot of times, I know --

8    there's just not -- not a quick way to get from there to East

9    Saint Louis.  But why don't you -- when you drive home tonight,

10   make a note on your mileage, and we'll get something for you to

11   get that addressed.

12              JUROR NO. 5:  I appreciate that.  Thank you.

13              THE COURT:  All right?

14              JUROR NO. 5:  Thank you.

15              THE COURT:  Any other concerns?  If we have that

16   taken care of, are you good to go?

17              JUROR NO. 5:  Yeah.  As long as I got gas to get

18   back and forth, that's fine, or stay here during the week.

19   Something -- you know, gas is fine.  I can drive.  It's no big

20   deal.

21              THE COURT:  Okay.  All right.  We will address it

22   that way.  So just when you come back, let me know your mileage.

23   What's gas going for in Salem now?

24              JUROR NO. 5:  Probably like 3.20-something a

25   gallon.

1          THE COURT:  If you fill up a tank, you do one of

2     two things.  I don't know where you are now.  If you could see

3     what the -- what it takes to get here, if it's a half tank a

4     quarter tank or whatever, and...

5          JUROR NO. 5:  Okay.

6          THE COURT:  And if you have a receipt, I can look

7     at it that way.  All right?

8          JUROR NO. 5:  All right.

9          THE COURT:  Because the miles -- the cents per

10    mile I think was set when gas was, you know, a dollar-50 ago,

11    so.  But we'll get you taken care of.

12         JUROR NO. 5:  Thank you.

13         THE COURT:  All right?  Anything for the record?

14         MR. LoCOCO:  No, Your Honor.

15         THE COURT:  Thank you.  Head out.

16         (Sidebar ends.)

17         (Discussion off the record.)

18         THE COURT:  We are on the record in Anderson v.

19    Raymond.  I have excused the jury and the jury is -- they're not

20    out of the building.  They're out of the immediate area of the

21    courtroom.

22         Did Defendants have a motion that they wanted to

23    present?

24         MR. MURPHY:  I do.

25         THE COURT:  All right.

1        MR. MURPHY:  And, Your Honor, I'm going to speak

2    right here so the court reporter can hear me.  I don't have on a

3    mike.

4        You have heard the opening statements and we have

5    been presented with what the plaintiff expects Mrs. Boone to

6    say.  And before she testifies, irrespective of what she has

7    stated in her written statement that we all have, her

8    description of what happened to her, to Mrs. Boone, is the

9    classic description of hearsay under Federal Rule 801.  It

10   doesn't matter that she's here and that she can be

11   cross-examined.  And by that, I mean the plaintiff can be

12   cross-examined, what she said to Mrs. Boone, her statement

13   describing the accident, if she says that.  Now in her

14   statement, she says she doesn't know anything about that, but

15   she can come here, change her mind.  That's hearsay under

16   Federal Rule 801.  It's an out of court statement offered to

17   prove the very thing that was said what happened to her.  "I was

18   flipped out or flipped off the lift."  It's hearsay, Judge.

19   801.  In the motion --

20           THE COURT:  Not an excited utterance?

21           MR. MURPHY:  It's not.  It doesn't come within

22   that -- I think the excited utterance is what, 803(3)?

23           LAW CLERK:  Yes.

24           MR. MURPHY:  And it's not a present sense

25   impression.  It's already happened.

1          THE COURT:  All right.

2          MR. MURPHY:  It doesn't come with any exception

3     is what I'm saying.

4          THE COURT:  Mr. Warshauer?

5          MR. WARSHAUER:  I think the statement that you

6     make at the time of the event while it is absolutely ongoing

7     couldn't be more classic excited utterance exception to the rule

8     against hearsay.

9          THE COURT:  Rule 803 is exceptions to rule

10    against hearsay, regardless of whether the declarant is

11    available as a witness.  Present sense impressions:  Statements

12    describing or explaining an event or condition made while

13    perceiving the event or immediately afterwards.  Or an excited

14    utterance, which is (2):  Statement relating to a startling

15    event or condition made while the declarant is under the stress

16    of excitement that it caused.  There's also then existing

17    mental, emotional, or physical conditions.

18          I do not have the value of having the statement

19    of this witness, having previously read it.  I'm going to deny

20    the motion now because if it is as I understand, statements that

21    may have been made contemporaneous to this incident happening,

22    they could come in under 803(1) as a present sense impression or

23    803(2) as an excited utterance.

24          Is there -- is this before she's taken away from

25    the hospital?

1            MR. WARSHAUER:  Indeed.  It is while she is lying

2     there, probably within under three minutes of the event.  I

3     mean, it's pretty -- pretty ripe.  I do have something I would

4     like to take up also.

5            MR. MURPHY:  I'm not finished yet on this.

6            THE COURT:  Right.  Go ahead.

7            MR. MURPHY:  Now the other problem we have is

8     Mr. McCoy took a written statement, and it's going to be

9     inconsistent with what we were just told.  Okay?  So that means

10    that he's going to have to be a witness when we impeach this

11    woman.  Now that's just something that has to be taken into

12    account.

13           MR. McCOY:  It's a recorded statement.

14           MR. MURPHY:  It's a recorded statement by him.

15           MR. McCOY:  That's transcribed.

16           MR. MURPHY:  That's right.

17           MR. WARSHAUER:  We don't mind.  Put him up.  He

18    didn't ask her the question.  There's no -- you can't use that,

19    "What did you say?  You didn't say it in the statement," when

20    you weren't asked the question in the statement.  It's never

21    happened.

22           MR. MURPHY:  I'll let the jury and the judge

23    decide that question.  But what you just heard today is the

24    first time there's ever a whisper that she was flipped out of

25    this unit.

1               MR. WARSHAUER:  Oh, my gosh.  That is absolutely

2   not true.  Page 67 --

3               MR. MURPHY:  Judge, I don't --

4               THE COURT:  One at a time.  Go ahead.

5               MR. MURPHY:  I'm a little different on these

6   fellows.  I'm pretty careful about what I say.  It's not there.

7   There's none of this getting flipped out of the unit.  That's

8   all I'm going to say.  Tomorrow we're going to hear what the

9   foundation is.  We have the recorded statement.  We have the

10  recorded statement.  And we'll just have to go from there.  But

11  you're alerted to it, and that's all I can ask any judge to do.

12              THE COURT:  All right.  And I'll keep that in

13  mind, and --

14              MR. WARSHAUER:  Judge?

15              THE COURT:  Did you want to respond?

16              MR. WARSHAUER:  Sure.  With all due respect to

17  Mr. Murphy, I don't think he's quite as familiar with the record

18  as perhaps other ones are.  Indeed, when Mr. Mulvany was deposed

19  on June the 25th of 2020 --

20              THE COURT:  And I don't know who he is.

21              MR. WARSHAUER:  Mr. Mulvany was the plant

22  manager, if you will.

23              THE COURT:  All right.

24              MR. WARSHAUER:  Mr. LoCoco asked him a question

25  at page 67, line 7.  Line 6 is where it begins.  And he's

1    pointing to the written report that Mr. Mulvany has created.  He

2    says, "All right."  I'm quoting Mr. LoCoco.  "Sort of in the

3    middle of this box, you write, quote, one of our emergency

4    responders reported that Mrs. Anderson stated that she slipped

5    and that the forklift would not stop."  "That's pretty much what

6    I said she said."

7                    The next question is, "Do you recall who this

8    person was?"  Answer:  "Rechel Boone."

9                    So to say that the first time it's ever existed

10   in the history of the planet was either that I created it or

11   that I first said it here is just not true.  The record reflects

12   that "slipped and it wouldn't stop" goes back to the moment of

13   the event, from two sources.

14                   Unless there's more to say on that, Judge, I do

15   have one thing I'd like to do.

16                   THE COURT:  Are you guys -- anything more to say?

17                   MR. LoCOCO:  We're good.

18                   THE COURT:  All right.

19                   MR. MURPHY:  I mean, that's another hearsay

20   statement.  I'm -- that's all I've got to say.  I've said what I

21   have to say.

22                   THE COURT:  All right.  Thank you.  All right.

23                   MR. WARSHAUER:  Just briefly.  And I really --

24   it's not in the form of a motion as much as sort of a reminder

25   to Counsel, but I do need to put it on the record.

1          The plaintiffs filed a motion in limine about

2     evidence of due care, and we pointed out how evidence of due

3     care was inappropriate in this strict liability case.  We're not

4     four minutes into the opening when they're talking about their

5     design process and how it shows the good care that they went

6     through, these seven steps to design their machine.  And it

7     basically proceeded throughout the entire argument about how

8     "we're so careful" and how "the good people at Greene, New York,

9     really care with our 200 engineers."  That's not relevant,

10    Judge.  And they need to be reminded to stick to the ruling,

11    which was that it shouldn't come in.

12          MR. LoCOCO:  That's not the ruling.

13          MR. MURPHY:  Judge, I've got -- you asked for

14    some authority on that and I brought it.

15          THE COURT:  All right.

16          MR. MURPHY:  Illinois Supreme Court answered the

17    question in Jablonski, and it was followed up by the Federal

18    District Court in Kane.  I thought you'd probably enjoy reading

19    this this evening.  And I checked the appellate court decision.

20    It was overturned from the Fifth District, and you were not on

21    the panel.

22          THE COURT:  I remember Jablonski.  You're right.

23          MR. MURPHY:  That's all I have to say about that.

24          THE COURT:  All right.  The case is Jablonski v.

25    Ford Motor Company.  It was an Illinois Supreme Court case,

1    decided September 22nd, 2011.  It's citation 2011 IL 110096.

2                    Then there's a -- I've been handed a case out of

3    the Northern District of Illinois, Hakim v. Safariland, LLC.

4    That's a Northern District -- it's a decision from the Northern

5    District of Illinois.  2019 410 F. Supp. 3d 862.  It's a memo.

6    I'm trying to see who the judge was.

7                    MR. LoCOCO:  If I could just add one other thing

8    about this.

9                    THE COURT:  Let me see if there's a judge that --

10   Thomas Durkin was the trial judge on that one.  Yes, sir?

11                   MR. LoCOCO:  Yeah.  I think Mr. Warshauer's

12   actually misstating the rule a little bit.  The pattern

13   instruction says that even if you find that the defendant

14   exercised all due care, what's relevant is the design.  So that

15   instruction itself assumes that there's going to be evidence

16   about how the design was -- came about.  We've got nothing to

17   say otherwise.  Right?  So we've got to be able to explain what

18   we did and how we did it.

19                   And of course, it also is in juxtaposition to the

20   shoddy work from their expert witnesses.  So it goes to their

21   credibility as well.  And I think those two cases Mr. Murphy

22   provided to you also explain that there's not some hammerlike

23   law that says we can't talk about our -- what we did in the

24   context of design.

25                   THE COURT:  All right.  I will read these cases.

1      The Jablonski case was unanimous decision.  I remember it in the

2      Fifth District, but I'll read this tonight.  You brought it to

3      my attention.  We can take it up tomorrow morning before we

4      bring the jury in.  All right?

5                   So we're going to start with tomorrow the first

6      witness -- is her name Bloom?

7                   MR. WARSHAUER:  Rechel Boone.

8                   THE COURT:  Okay.  Then who do we got next after

9      that?

10                  MR. WARSHAUER:  Next will be Dr. Jeka, then --

11                  THE COURT:  Do you think that takes us to lunch?

12                  MR. WARSHAUER:  A little before.

13                  THE COURT:  All right.  And then --

14                  MR. WARSHAUER:  I'm told by my

15     wife/partner/boss --

16                  THE COURT:  I'm sorry?

17                  MR. WARSHAUER:  I'm told by my wife/partner/boss

18     that I've got to shorten things up.  I talk too much.  So we

19     will be quicker with him than in the past.  I trust her.  She's

20     smart.

21                  THE COURT:  All right.  And then do we have

22     people online for tomorrow afternoon?

23                  MR. WARSHAUER:  Yeah, we've got a full day.  We

24     have then Dr. Meyer and we have Dr. Kerrigan here.

25                  THE COURT:  All right.  That's a full day.

1          MR. LoCOCO:  I just want to confirm that's the

2    order.

3          MR. WARSHAUER:  That is -- it's the order as --

4    the order that I know.

5          MR. LoCOCO:  That's fine.  Because I don't think

6    we're going to -- I don't think we're going to get to Kerrigan.

7    It has to do with how late am I going to stay up tonight, so.

8          THE COURT:  Well, I -- having thoroughly enjoyed

9    the massive briefing on Daubert motions on this, I would think

10   that Meyer would take an afternoon.

11         MR. WARSHAUER:  I hope not.

12         THE COURT:  Yeah, no, I hope not either, but, I

13   mean, I read the depositions, and that took longer than the

14   afternoon, I can tell you that.

15         MR. WARSHAUER:  Keep in mind that over half of

16   that was doors.

17         THE COURT:  Pardon me?

18         MR. WARSHAUER:  Over half of that was doors.

19         THE COURT:  There's a lot of truth to that.

20   Well, we'll see what we see.  All right.

21         Anything else before we go off the record?

22         MR. WARSHAUER:  No, sir.

23         MR. LoCOCO:  No thank you.

24         THE COURT:  All right.  So tomorrow, please be

25   here by 9 a.m.  You can tell jurors to be here at 8:30, but

1  there's always somebody that's here at 8:45.  We've got some

2  jurors that travel quite a distance, so I would be happy if

3  we're able to start in earnest at 9:15.  All right.  See you all

4  tomorrow.

5              (Recess at 3:50 p.m.)

6

7

8              ° ° ° ° ° ° ° ° ° ° °

9              **COURT REPORTER'S CERTIFICATE**

10              I certify that the foregoing is a correct
   transcript from the record of proceedings in the above-entitled
11 matter.

12

              Dated this 21st day of December, 2021

13

14   /s/ Hannah Jagler
   _____

15

              Hannah Jagler, RMR, CRR, FCRR
16              Official Court Reporter

17

18

19

20

21

22

23

24

25