IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
------------------------------------------------------------------
ADELAIDA ANDERSON and JEFF ANDERSON,  |
                                      |
                 Plaintiffs,          |
                                      |
v.                                    | Case No. 19-cv-800-SPM
                                      |
RAYMOND CORPORATION,                  |
                                      |
                 Defendant.           |
------------------------------------------------------------------
```

Transcript of Jury Trial - Volume II
November 2, 2021

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East Saint Louis, Illinois

```
------------------------------------------------------------------
```

**REPORTED BY:**        **HANNAH JAGLER**, RMR, CRR, FCRR
                        Official Court Reporter
                        750 Missouri Avenue
                        East Saint Louis, Illinois 62201
                        618-482-9481
                        Hannah_Jagler@ilsd.uscourts.gov

Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES**:

FOR PLAINTIFF:      **MICHAEL J. WARSHAUER**
**JASPER V. ABBOTT**
Warshauer Law Group, PC
2740 Bert Adams Road
Atlanta, Georgia 30339
404-892-4900
Mwarshauer@warlawgroup.com
Jasper@warlawgroup.com

**FRANK J. McCOY, JR.**
McCoy & McCoy, LLC
20 Church Street, Suite 1720
Hartford, Connecticut 06103
860-244-9100
Frank@mccoymccoy.com

**RYAN E. BRENNAN**
Brennan Law Firm PC
19 Bronze Pointe
Belleville, Illinois 62226
618-236-2121
Ryan@feladlc.com

FOR DEFENDANT:     **FRANCIS H. LoCOCO**
Husch Blackwell LLP
555 East Wells Street, Suite 1900
Milwaukee, Wisconsin 53202
414-978-5305
Frank.lococo@huschblackwell.com

**G. PATRICK MURPHY**
Murphy & Murphy, LLC
3415 Office Park Drive, Suite D
Marion, Illinois 62959
618-248-3236
Gpatrick@murphymurphyllc.com

**MARGARET KATHRYN HEITKAMP**
Husch Blackwell LLP
511 North Broadway, Suite 1100
Milwaukee, Wisconsin 53202
414-978-5373
Margaret.Heitkamp@huschblackwell.com

1 <u>**INDEX**</u>

2                                                                **PAGE**

3  WITNESS: **RECHEL BOONE**

4       Direct Examination By Mr. Warshauer.....................  97

5       Cross-Examination By Mr. LoCoco........................ 119

6       Redirect Examination By Mr. Warshauer.................. 137

7       Recross-Examination By Mr. LoCoco...................... 141

8       Redirect Examination By Mr. Warshauer.................. 144

9  WITNESS: **JOHN JEKA, Ph.D.**

10       Direct Examination By Mr. Warshauer.................... 145

11       Cross-Examination By Mr. LoCoco....................... 167

12       Redirect Examination By Mr. Warshauer................. 206

13       Recross-Examination By Mr. LoCoco..................... 208

14  WITNESS: **JOHN MEYER, Ph.D., PE**

15       Direct Examination By Mr. Warshauer................... 210

16       Cross-Examination By Mr. LoCoco...................... 263

17

18

19                  <u>**INDEX OF EXHIBITS**</u>

20

21    **NO.  DESCRIPTION**                                **ID'D  RCV'D**
       1   Photo - Warehouse Floor........................ 114   1104

22    4    Photo - Warehouse Rack......................... 110   1104

23    5    Photo - Raymond Forklift....................... 103   1104

24    6    Photo - Forklift Console....................... 104   1104

25    24   Video - A. Anderson............................ 245   1105

28    RC5500 32.................................... 231

29    Photo - Warehouse Floor....................... 115    1105

30    Photo - Warehouse Floor....................... 247    1105

67    ANSI B56.1 - 2012 Standard.................... 226    1105

71    Computer Drawings - Meyer Report Including .... 246    1106
      Figures 20, 23

73    Photos - Exemplars by John Meyer.............. 122    1106

91    Flexor Withdrawal Reflex Image................ 155    1106

92    Crossed Extensor Reflex Image................. 156    1106

110   Drawing of Rear Wheel Guard................... 242    1106

120   CV - John Jeka................................ 146    1106

121   CV - John Meyer............................... 223    1106

129   Engrg Test Lab Report, 1/28/19................ 252    1106

500   Operator's Manual............................. 126    1107

502   OSHA Report................................... 143    1107

503   OSHA Pictures................................. 132    1107

558   ANSI/ITSDF B56.1 - 2012....................... 270    1108

582   Exemplar Wheel Assembly....................... 124    1109

1                **TRANSCRIPT OF PROCEEDINGS**

2           (Proceedings commenced at 9:00 a.m.)

3           THE COURTROOM DEPUTY:  United States District

4 Court for the Southern District of Illinois is now in session,

5 the Honorable Stephen McGlynn presiding.  You may be seated.

6                Calls case Number 19-cv-800, Adelaida Anderson,

7 et al., v. Raymond Corporation.  Calls case for Day 2 of trial.

8 Parties, if you would please state your name for the record.

9           MR. WARSHAUER:  Michael Warshauer for the

10 plaintiff.

11           MR. McCOY:  Good morning, Your Honor.  Frank

12 McCoy for the plaintiff.

13           THE COURT:  Good morning.

14           MR. ABBOTT:  Jasper Abbott for the plaintiff.

15           MR. BRENNAN:  Ryan Brennan for the plaintiff.

16           MR. LoCOCO:  Frank LoCoco for Raymond.

17           MR. MURPHY:  Patrick Murphy for Raymond.

18           MS. HEITKAMP:  Margaret Heitkamp for Raymond.

19           THE COURT:  Good morning, everyone.  My

20 understanding is that the lawyers wanted to take up something

21 before we bring the jury out.

22           MR. WARSHAUER:  Two quick things.

23           THE COURT:  All right.

24           MR. WARSHAUER:  First, we'd like Dr. Jeka, who

25 will be our second witness today -- the Court would recall he

1    talks about balance -- to be excused from the rule, because as

2    he said in his report, he's going to be talking about how

3    shaking of the forklift affects people's balance.  Our first

4    witness will probably describe that.  It's -- it's not changing

5    his opinion, but I'm going to be asking him otherwise, "A little

6    while ago we heard from a witness who said this, and how does

7    that affect human balance on a forklift?"  It's --

8                    THE COURT:  Well, what's the rule you're trying

9    to avoid?  I don't know what you're --

10                   MR. LoCOCO:  615.

11                   MR. WARSHAUER:  The rule of exclusion, that he's

12   been sequestered outside the courtroom.  And it's very common

13   for experts who are going to be basing their opinion on

14   testimony to be allowed to hear the testimony upon which their

15   opinion is based.

16                   MR. LoCOCO:  Here's my problem with this, Your

17   Honor.  Under Rule 26 -- and as you know, that's been beefed up

18   over the years.  We were supposed to get Dr. Jeka's opinions and

19   all the bases for his opinions months ago.  So months ago, what

20   he had was a written statement from Rechel Boone that said

21   nothing about balance, and today he wants to sit in on

22   Ms. Boone's testimony where she may or may not say something

23   about balance.  That's a new basis then for his opinion, and we

24   had a right to know about that and inquire of Dr. Jeka regarding

25   how he is utilizing that in his opinions.

1          MR. WARSHAUER:  Well, it --

2          MR. LoCOCO:  So it's improper.

3          MR. WARSHAUER:  It's simply not a new basis.  The

4    evidence that the forklift shook when it went over cracks has

5    always been a basis.  It just always has been.

6          MR. LoCOCO:  I agree with that.  I mean, I agree

7    that that's been -- where I'm getting back to this hearsay

8    statement that we were arguing about yesterday, which I want to

9    take one more swing at, but if she's going to today all of a

10   sudden say, "I heard her say she slipped and -- slipped and the

11   truck wouldn't stop," then that would be a new basis that

12   Dr. Jeka didn't have.

13          THE COURT:  Well --

14          MR. LoCOCO:  If she's not going to say that --

15          THE COURT:  If she testifies to that, I think

16   that it comes in as an excited utterance or present sense

17   impression, so it's not hearsay.  However, you get to

18   cross-examine her thoroughly on the fact that this is the first

19   time we're hearing about this from you.  "You gave a statement

20   early on during the accident investigation, gave a recorded

21   statement to Mr. McCoy, and you didn't say any of those things."

22   So I think you get to -- the proper way to deal with that is not

23   by excluding her testimony -- I don't know what it's going to

24   be -- but by allowing you to vigorously cross-examine her.

25          MR. LoCOCO:  Your Honor, on that point, this is

1    just a point actually for that in the whole trial.  So you've

2    made this ruling now about -- it is hearsay but it meets an

3    exception to the hearsay rule.  Is that preserved now, or do I

4    need to object again when Mr. Warshauer attempts to elicit it?

5                    THE COURT:  No, we'll treat that as preserved.

6                    MR. LoCOCO:  Okay.

7                    THE COURT:  You've made your record.  It's

8    preserved.  Let's hear -- let's hear what the witness testifies

9    to and then I'll answer your question or rule on your motion

10   with respect to what you can ask Dr. Jeka with regard to her

11   testimony.

12                   MR. WARSHAUER:  Oh, well, the question before the

13   Court is whether or not Dr. Jeka could hear her testimony and --

14                   THE COURT:  Oh, you mean sit in during her

15   testimony?

16                   MR. WARSHAUER:  Sure.

17                   THE COURT:  No.  That's an easy one.

18                   MR. WARSHAUER:  Okay.

19                   THE COURT:  There's a motion to exclude witnesses

20   and that was granted.

21                   MR. WARSHAUER:  Okay.  All right.  The second

22   point we wanted to bring up is, and Mr. Abbott's going to talk

23   briefly about it, was our discussion yesterday about evidence of

24   negligence in the cases that were brought up.  And just very

25   briefly, Jasper.

```
1            MR. ABBOTT:  Good morning, Your Honor.
2            THE COURT:  Good morning.
3            MR. ABBOTT:  I had a chance to review the
4    Jablonski and the...
5            THE COURT:  Safariland case.
6            MR. ABBOTT:  Yeah.  Safariland case.  And the
7    thing I want to make clear to the Court is the Jablonski
8    decision was the level of duty that's required under a negligent
9    product design case.  And that case was an 11-day trial.  Before
10   they went to deliberations, the plaintiffs actually dropped
11   their strict liability claim, pursued only on just a negligent
12   design issue.  And so the issue the Court was deciding, given
13   the duty that a manufacturer owes in light of the risk utility
14   test, essentially is in the context of the risk utility test in
15   a negligent product design case.  You can use some of those
16   factors.  And obviously there's going to be some crossover with
17   the strict liability claim.
18            But we look at the instructions from the pattern
19   instructions from Illinois Supreme Court, which were revised in
20   2015, four years after the Jablonski decision.  And it still
21   holds true that due care is not a defense in a strict liability
22   product case.  And so any evidence as to their due care still is
23   irrelevant and unfairly prejudicial.
24            And additionally, given the Nave decision that we
25   cited in our trial brief on the issue, the emphasis on that,
```

1    even when the instruction is given that due care is not a

2    defense can confuse a jury such that they make a verdict based

3    on the due care that the manufacturer has shown throughout the

4    trial.  And so I just wanted to bring up those concerns in light

5    of our trial brief and inform the Court.

6                   THE COURT:  All right.

7                   MR. MURPHY:  Your Honor, I know you had a chance

8    to look at Jablonski, and what he said is literally true.  But

9    in deciding Jablonski, the Illinois Supreme Court said when the

10   risk utility doctrine is there, they're conflated.  There just

11   isn't any difference at all.  And, you know, that's the

12   instruction you're going to give.  And Judge Durkin I thought

13   did a very good job of explicating it.  I've exhausted my

14   expertise on those two cases.  Thank you.

15                  THE COURT:  I think the issue is -- one of the

16   things I guess that kind of started this, of course there was

17   a -- you filed -- you brought it up in your trial memo.  But in

18   opening statement, the reference to "Here's the process.  We go

19   from drawing board to putting a product in the stream of

20   commerce," and the various steps and how thorough Raymond wants

21   to talk about its engineers as they are developing a product.

22   There was reference yesterday to, you know, some overhead

23   protective device that would protect from crush.  I don't know

24   that that's relevant to this case.

25                  I think it's relevant to the case for the

1       defendant to say, "Here's the steps we take when we're designing

2       this product, and ultimately here's why the product is designed

3       the way it is."  They can talk about whether they considered

4       alternates or different designs to the one in place.  They can

5       describe why it is they elected to put this product in market

6       the way they did with respect to whether there was a guard or no

7       guard over the wheel, or whether respect there was a deadman

8       switch or kill switch, or there was some design to address the

9       issue of a left foot that might leave the compartment while the

10      product -- I mean, while the machinery is still moving.  So as

11      long as you tie it to ultimately the issues that are

12      specifically questioned by the plaintiffs, I think you can get

13      that stuff in.

14              But if we have a lot of time talking about -- I

15      mean, I guess there could be all kinds of safety devices that

16      you put into this that really have nothing to do with this

17      particular accident scenario.  It's not relevant.  So I

18      understand the arguments about due care.  I get -- I'm going to

19      let you present your case, but I got to let them defend their

20      product as well, so.

21              MR. WARSHAUER:  Well, at this point, there's a

22      balancing, and the scales we think tip more towards exclusion of

23      good care than admission.  Some of it's going to have to come in

24      to explain some things.  We've done our best to educate the

25      Court.  I think the Court's well educated and we'll proceed.

1          MR. LoCOCO:  And we'll --

2          THE COURT:  How well educated I am or not, but I

3   will do my best to be fair to all.

4          MR. LoCOCO:  We'll try to stay on the correct

5   side of the line.  We'll get close, but stay on the right side.

6          MR. WARSHAUER:  Other thing is just quick

7   logistics.  We talked about just putting in all the exhibits

8   that we -- neither disagreed to.

9          THE COURT:  We talked about that last week,

10  didn't we?

11         MR. WARSHAUER:  And so we haven't called a first

12  witness.  Now would be the time to figure out how we do that

13  logistically.

14         MR. LoCOCO:  I guess my suggestion, Your Honor,

15  is "I know what you don't object to" and vice versa.  If we

16  could just use that as a guide right now, since the jury's

17  probably here.

18         MR. WARSHAUER:  Sure.

19         MR. LoCOCO:  And at a break, move everything in

20  that we're not objecting to.

21         MR. WARSHAUER:  Yeah, that's fine.  So the first

22  witness, you haven't objected to anything I plan to use, which

23  are 5, 6, 4, 29, and 30.  Okay?  5, 6, 29, and 30.  And none of

24  those are objected to.

25         MR. LoCOCO:  And I guess this is as good a time

1    as any for the record.  With the first witness, the first

2    witness, I'm not sure I'm going to use anything here.  I may

3    have some things to put up on the document camera depending on

4    what she says about her statements, you know, her prior

5    statements.

6                        THE COURT:  All right.  Is that everything?

7                        MR. WARSHAUER:  Yeah.  Yes, sir.

8                        THE COURT:  All right.  You guys ready to bring

9    the jurors in?

10                       MR. WARSHAUER:  Absolutely.

11                       THE COURT:  Take that as a yes.

12                       MR. LoCOCO:  Yes.  Yes, Your Honor.

13                       MR. WARSHAUER:  Should I go get the first

14   witness --

15                       THE COURT:  Ready or not, here they come.  Yeah,

16   you can bring her in.

17                       (Jury enters at 9:12 a.m.)

18                       THE COURT:  Everyone be seated, please.  Thank

19   you.

20                       Good morning, ladies and gentlemen.  Thank you

21   for being prompt.  We are on the record.  And I'm going to ask

22   Plaintiff to call their first witness.

23                       MR. WARSHAUER:  Good morning, Your Honor.  Good

24   morning, Jurors.  Our first witness will be Rechel Boone.

25   Ms. Boone, if you'll come take the witness stand, please.

```
 1                        (Witness sworn.)
 2                   THE COURTROOM DEPUTY:  Please state your full
 3          name and spell your last name, please.
 4                   THE WITNESS:  Rechel Boone, B-o-o-n-e.
 5                   THE COURTROOM DEPUTY:  Thank you.
 6                   THE COURT:  Now, ma'am, if you feel safe, you can
 7          take your mask off.  It's easier to understand you, and we have
 8          to try to transcribe everything, so thank you.
 9                          DIRECT EXAMINATION
10   BY MR. WARSHAUER:
11   Q    Ms. Boone?
12   A    Yes.
13   Q    Good morning.
14   A    Good morning.
15   Q    Where do you live?
16   A    I live in Vandalia, Illinois.
17   Q    Share with us a little of your background.  What do you do?
18        How'd you get to this point in your life?
19   A    I worked in factories and warehouses for probably 20 years.
20        After leaving FedEx, I became a CNA, and I started nursing
21        school.  So that's where I'm at today.
22   Q    So what is a CNA?
23   A    Certified nurse's aide.
24   Q    And what level nursing degree are you seeking?
25   A    RN.
```

1  Q   Why'd you choose to do that?

2  A   It's something that I've always wanted to do and my kids are

3     raised now, so I'm just going to do it.

4  Q   Now have we met before?

5  A   Yes.

6  Q   Where did we meet?

7  A   At a Mexican restaurant in Vandalia.

8  Q   What'd we talk about?

9  A   Talked about me, and then we talked about Lidy and the

10    accident.

11 Q   Did I give you any central rules that I've repeated over and

12    over every time we've met?

13 A   Basically just to tell the truth.

14 Q   Even if I didn't want to hear it?

15 A   Right.

16 Q   You also spoke to Mr. McCoy on the phone?

17 A   Yes.

18 Q   Did you answer all the questions he asked?

19 A   Yes.

20 Q   So if he didn't ask you a question, you didn't volunteer

21    anything?

22 A   Right.

23 Q   And would it be fair to say that if any of the other lawyers

24    involved in this case had wanted to buy you a taco, you would

25    have been up for it?

1   A   Right on.

2   Q   All right.  Where were you working on July the 29th of 2017?

3   A   I was working at FedEx Supply Chain.

4   Q   How long had you been there?

5   A   At that time was ten years.

6   Q   What were your duties?

7   A   I was weekend team lead, and I was basically -- supervise

8      what happened on the weekends, open and close the facility,

9      made sure everybody was safe, made sure everybody was on

10      task.

11   Q   Tell us about that facility.

12   A   It was a big warehouse.  We handled a lot of food product.

13   Q   All right.  So how did you get to be a team leader?  What

14      took you to that point in the process?

15   A   I started as a forklift operator.  Well, actually I started

16      picking, case picking, then I moved up to be a forklift

17      operator.  Then I moved up to be second shift team lead, and

18      then they wanted me to be -- and I was in the

19      shipping/receiving office.  I did pretty much every job in

20      the warehouse so I knew all the positions, and I just kept

21      moving up.  And weekend team lead was closest to -- next step

22      to being supervisor.

23   Q   Did you enjoy the work?

24   A   I did.

25   Q   Did you enjoy the people?

1  A   Yes, for the most part.

2  Q   One of those people is Lidy Anderson?

3  A   Yes.

4  Q   How did you know her?

5  A   Just basically through work.  We worked together for -- she

6      worked there longer than I had.

7  Q   Were you social friends?

8  A   No.  We never went out or hung out or anything.  We were

9      just --  basically had a working relationship.

10 Q   In your role as a team leader, did you have an opportunity to

11     observe her do her job?

12 A   Of course, yes.

13 Q   Can you describe what you observed with respect to Lidy

14     Anderson's performance at FedEx?

15 A   Lidy was a very good worker.  She's very proficient.  She's

16     always on task.  She was always on time.  Always worked

17     overtime.  She never missed a day.  She always made her

18     numbers.  She's a very good worker.

19 Q   A couple of things I want to ask you about.  You say never

20     missed a day.

21 A   Right.

22 Q   How long did she never miss a day?

23 A   I'm pretty sure from the beginning of her employment, she had

24     never missed a day.

25 Q   Like ten years?

1    A    Yes.

2    Q    And did you have an opportunity to know whether she was

3         properly trained?

4    A    Yes, she was properly trained.

5    Q    Did you have any opportunity to see whether, in the normal

6         use of the forklift by her, she appeared to be consistent

7         with her training?

8    A    She was very consistent.

9    Q    Did you have any reason to believe that she didn't understand

10        the rules of operating a forklift?

11   A    No.

12   Q    Now you said she always made her numbers.  I don't know what

13        that means.

14   A    Everyone had a quota that they were supposed to reach each

15        day for each job task they were doing.  And it didn't matter

16        what position Lidy was working.  She always made her numbers.

17        If she was case picking, she always made case-pick numbers.

18        If she was driving a forklift, she made put-away numbers.

19        She was very good at put-aways, and she often exceeded the

20        numbers expected for average production.

21   Q    With respect to her interaction with her coworkers, if she

22        saw careless conduct or people not following the rules, was

23        she a bit of a tattletale?

24   A    She was.  She often kind of -- she would confront people

25        herself, and then that usually led to conflict.  So I just

```
 1          pulled her aside and I said, "Moving forward," I said, "just
 2          come to me with an issue and then I'll take care of it."  And
 3          she did.  And after that, she really didn't have any problems
 4          with anybody on the floor after that.
 5     Q    But those issues were related to safety?
 6     A    Usually safety or productivity, but mostly safety.  If
 7          somebody was doing something -- she knew the job very well,
 8          and if someone was doing something that they weren't supposed
 9          to be doing, she was all about calling them out on it.
10     Q    I used a term, I think one of my kids used it, "mad
11          skills" --
12     A    Right.
13     Q    -- to describe Lidy's ability to control a standup forklift.
14          Did she have mad skills?
15     A    She did.  She was really good, very good.
16     Q    So what was her job?
17                    THE COURT:  Can I stop you there.  Did you say
18          "mad"?
19                    MR. WARSHAUER:  Mad skills.
20                    THE COURT:  M-a-d?
21                    MR. WARSHAUER:  Mad skills means that you can do
22          things really well.
23                    THE COURT:  All right.  Well, thanks for pointing
24          that out to this old fogey.  I didn't --
25                    MR. WARSHAUER:  As I said, Judge, I got the
```

1    definition from one of my kids.  "Did she have really mad

2    skills, Dad?"  "What are you talking about?"  Sorry.  I digress.

3                    THE COURT:  All right.

4    BY MR. WARSHAUER:

5    Q    But under that definition of doing her job, like at the next

6         level, was that where she was?

7    A    She exceeded.  She was an above-average employee, for sure.

8    Q    All right.  So what was her job?

9    A    Her job was mainly -- she would do whatever we asked.  I

10        mean, whatever was required, whatever was asked of her that

11        day, she did her job to the best of her ability.

12   Q    So I'm going to show you what's Exhibit 5 here.  What are we

13        seeing here?

14   A    Forklift.

15   Q    Is this the kind of forklift that you recall her operating?

16   A    Yes.

17   Q    And so this is a Raymond 4250 counterbalance forklift?

18   A    Okay.

19   Q    Did you know the model number or anything?

20   A    No.

21   Q    It was just a forklift?

22   A    Right.

23                    THE COURT:  Ma'am, this room, the way

24        architecturally it's designed, it's easy to get your sound lost.

25        Could you try to project so that you're positive the people in

```
 1          the very back of the room can hear you?

 2                      THE WITNESS:  Okay.

 3                      THE COURT:  All right?  Thanks.

 4                      MR. WARSHAUER:  Thanks, Judge.

 5   BY MR. WARSHAUER:

 6   Q    So she operated the forklift like this.  Did you know how to

 7        operate a forklift like this?

 8   A    Yes, I did.

 9   Q    Did you ever have an opportunity to do so as part of your

10        work?

11   A    Yes, I did.  Yes, I did.

12   Q    And did you do so at that FedEx facility in Effingham,

13        Illinois?

14   A    Yes.

15   Q    So let's move to Exhibit 6.  What are we looking at now?

16   A    That's the inside compartment of the forklift.

17   Q    So what is that thing?

18   A    That's the steer wheel.

19                      COURTROOM SECURITY OFFICER:  Your Honor, the

20        monitors aren't here.

21                      THE COURTROOM DEPUTY:  They're not supposed to

22        be.

23                      MR. WARSHAUER:  I'm sorry --

24                      THE COURT:  They're not supposed to be?  You got

25        to talk to my bosses there.  Our practice is that when you are
```

1    showing a witness an exhibit, we only show it to the witness.

2    If you ask that it be published to the jury, then we will

3    publish to the jury.

4              MR. WARSHAUER:  Thank you, ladies.

5              THE COURT:  Do you guys want to have an

6    understanding now if the exhibit is one that has not been

7    objected to, that as it's shown to the witness, that it can also

8    be shown to the jury?

9              MR. LoCOCO:  As long as that's okay with all of

10   our bosses here.

11             THE COURT:  Yeah.

12             MR. LoCOCO:  That's fine.

13             MR. WARSHAUER:  I'm good with that too.

14             THE COURT:  That work?  We'll proceed that way.

15   That way, you guys in realtime are seeing what they're talking

16   about.

17             MR. WARSHAUER:  Thank you, Marshal.

18             THE COURT:  Thank you.

19   BY MR. WARSHAUER:

20   Q    So let's go back to Exhibit Number 5.

21             MR. WARSHAUER:  Everybody can see this?

22   BY MR. WARSHAUER:

23   Q    What are we seeing here?

24   A    This is the forklift.

25   Q    All right.  And that's kind of forklift they used in

|    |   |                                                                    |
|----|---|--------------------------------------------------------------------|
| 1  |   | Effingham?                                                          |
| 2  | A | Yes.                                                               |
| 3  | Q | Now we're going to go to Number 6.  Now are we looking into        |
| 4  |   | the back of the forklift?                                           |
| 5  | A | Yes, this is the compartment where the operator stands.            |
| 6  | Q | Okay.  This part that I've just highlighted -- and I'll            |
| 7  |   | actually just call it out, that would be better.  What is          |
| 8  |   | this knob?                                                          |
| 9  | A | That's the steer wheel.                                            |
| 10 | Q | And how do you use it?                                             |
| 11 | A | You crank it, turn it.                                             |
| 12 | Q | So if I was to have it in my hand and pull back, I would          |
| 13 |   | turn --                                                            |
| 14 | A | Turn.                                                              |
| 15 | Q | And what is this handle called?                                   |
| 16 | A | That's the plug control.  It makes the forklift go forward        |
| 17 |   | and backwards, has controls for up, down, tilt, side, side.       |
| 18 | Q | So if I'm in a forklift -- how do you stand in these              |
| 19 |   | forklifts, by the way?                                             |
| 20 | A | You stand sideways.  One arm is on the plug wheel, one arm is     |
| 21 |   | on the steer control.                                             |
| 22 | Q | My right shoulder where the forks are?                            |
| 23 | A | Yes.                                                              |
| 24 | Q | And my left would be where this doorway is?                       |
| 25 | A | Yes.                                                              |

1    Q    Right there?  Okay.  So let's go back to this, what you call

2         the plug control, multifunction.  It does a lot of functions?

3    A    Right.

4    Q    If I'm standing sideways, hand on the steering tiller and my

5         hand is here, if I push it towards the forks, which way do we

6         go?

7    A    Towards the forks.

8    Q    If I want to stop in the normal scenario, what do I do?

9    A    Pull it to the neutral position, and then you raise your

10        foot.

11   Q    You can raise your foot, or you could pull it back?

12   A    Or -- yes.

13   Q    The pulling back would be called plugging?

14   A    Yes.

15   Q    And if I want to go towards the door, towards my left

16        shoulder, I would pull it towards my left?

17   A    Yes.

18   Q    And again, if I wanted to stop, I could just push it back the

19        other way?

20   A    Correct.

21   Q    And then it has some other functions that we're not really

22        interested in, but you make the forks go up, down, sideways?

23   A    Right.

24   Q    I guess we are interested, but.  Now you mentioned also

25        something under the foot.  So what is this pedal that I've

1      pulled out?

2   A  That's the deadman brake.

3   Q  How many are there?

4   A  Just one.

5   Q  In the normal operation, the operators that you have seen and

6      that you have yourself done, what foot has been used to hold

7      that pedal down?

8   A  The right foot.

9   Q  Is there anything at all under the left foot on this forklift

10     that was being used at Effingham?

11  A  No.

12  Q  Would it be possible on this design to have your right foot

13     holding down the deadman pedal and your left foot out in the

14     air?

15  A  It would be possible, yes.

16  Q  Okay.  If Lidy had seen that, if Lidy had seen that, would

17     she have let them know?

18  A  She probably would have let me know, yes.

19  Q  That was not allowed?

20  A  No.

21  Q  What happened to Lidy Anderson on July the 29th of 2017 at

22     the FedEx facility at Effingham?

23  A  She was operating a forklift and she got her foot caught in

24     the wheel of the forklift.

25  Q  How did you find out about it?

1   A    I was working the shipping office, and I heard screaming and

2        so I went to investigate.  When I came down the aisle, I saw

3        Lidy on the floor.  Her foot was kind of in the air, and the

4        skin was torn from her foot.

5   Q    What did you do?

6   A    I directed another teammate to call 911.  I went to Lidy,

7        instructed her to lay down, to try to relax.  There were a

8        lot of people standing around.  I asked someone for a belt so

9        that I could make a tourniquet, and I applied the tourniquet

10        above the wound area.  There was still blood pulsing out of

11        her arteries, so I sat beside her and I tried to hold

12        pressure on the artery closest to the wound.  And then I just

13        tried to keep her calm.  She was in panic, of course, in a

14        lot of pain.

15  Q    How did you know how to do all that?

16  A    I was a first responder at the time.

17  Q    Is that the first time you'd had to respond to that level of

18        injury?

19  A    At work, yes.

20  Q    And is that one of the reasons you want to be a nurse?

21  A    Not really, but.  But it does, you know -- it just seems like

22        that's where I need to be, the field I need to be in, because

23        everyone else was standing, watching, and I kind of stepped

24        in and took control of the situation, directed people what to

25        do.

| | | |
|---|---|---|
| 1 | Q | So I'm going to show you now Exhibit 4. Where are we |
| 2 | | looking? |
| 3 | A | That's where Lidy had her accident. |
| 4 | Q | If we're on a forklift, are we heading into this picture? |
| 5 | A | Yes. |
| 6 | Q | Now we see the floor here has various expansion joints and |
| 7 | | maybe some cracks and things like that. Was that typical at |
| 8 | | the warehouse? |
| 9 | A | Oh, yes. |
| 10 | Q | Had you ever ridden over those? |
| 11 | A | Yes. |
| 12 | Q | We'll come back to that. I want to get you to page 12 of |
| 13 | | Exhibit 4. We see things like this in the floor. Is that |
| 14 | | the kind of crack that we're talking about? |
| 15 | A | Yes. |
| 16 | Q | Now we're at page 14. What does this depict? |
| 17 | A | That was similar to the position that Lidy's forklift was in |
| 18 | | when I found her on the floor. |
| 19 | Q | So this photograph apparently was made on December the 13th |
| 20 | | of 2017, some months later. At the time, was the forklift |
| 21 | | nearer or closer to the rack as shown in these pictures? |
| 22 | A | It was maybe a foot or so away from the rack. |
| 23 | Q | So it would be a little further back that way; is that fair? |
| 24 | A | Yes, that's correct. |
| 25 | Q | So it wasn't quite as far forward as depicted? |

1  A    Right.

2  Q    And so when we look at 16, similarly, we would have seen on

3       the day of the event a little more gap --

4  A    Correct.

5  Q    -- in this area?  Did you see where Ms. Anderson's foot had

6       interacted with the forklift?

7  A    Well, when I had to move the forklift, her shoe was in

8       between the steer wheels of the forklift.

9  Q    While you were talking to Ms. Anderson and providing first

10      aid, do you recall her saying anything?

11 A    She said that she didn't want to die, and when I asked her --

12      I asked her what happened.  She said that she slipped and the

13      forklift wouldn't stop.

14 Q    Did you report that conversation to Mr. Mulvany?

15 A    Yes, I did.

16 Q    If your left foot is out of the forklift, if I'm -- if I'm

17      standing in the normal position, my left hand on the tiller

18      and my right hand on the multifunction, if my left foot is

19      not on the floor, can I apply the emergency brake?

20 A    No.

21 Q    If I am falling to my right and pulling on the multifunction,

22      can I make it plug?

23 A    No.

24             MR. LoCOCO:  Objection.  Leading.  There's no

25      foundation for any of this.

1          THE COURT:  Well, any response?

2          MR. WARSHAUER:  I don't think it was leading,

3     because it was "Can I plug?"  That's a yes or no.  And the

4     foundation was she's previously told us she's operated these

5     machines, know how they worked and explained them to the jury.

6          THE COURT:  Overruled.

7  BY MR. WARSHAUER:

8  Q    Now you did talk to Mr. McCoy by phone?

9  A    Yes.

10  Q    Never met him?

11  A    No.

12  Q    He never asked you what she said, did he?

13  A    No.

14  Q    And you completed a statement that you wrote?

15  A    Right.

16  Q    And I've shown that to you.  Had you ever seen it before

17     today, since the day --

18  A    Not since the day I wrote it.

19  Q    What were you doing in that statement?

20  A    I basically was just stating what I did.

21  Q    Had you already reported to Mr. Mulvany what was said to you

22     by Ms. Anderson?

23  A    Yes, I did.

24  Q    Do you see any reason to write it down because of the point

25     of your report?

1   A     No.

2                     MR. LoCOCO:  Objection.  Leading.

3                     MR. WARSHAUER:  That was leading.

4                     THE COURT:  Sustained.

5                     MR. WARSHAUER:  That was leading.  I apologize.

6   BY MR. WARSHAUER:

7   Q     Why didn't you write it down in your report?

8   A     I don't know.  I basically was just reporting what I did.  No

9         one really asked me.

10  Q     Now we talked over our tacos.  I think I actually had a

11        chicken chimichanga that was pretty good.  You didn't even

12        tell me she said she didn't want to die?

13  A     Right.

14  Q     But you're comfortable -- are you comfortable that she said

15        that?

16  A     That's something that will probably stay with me for the rest

17        of my life.  And when anybody asks me what she said, that's

18        the first thing that comes to my mind.

19  Q     Was there anything about your conversations with Lidy

20        Anderson as she was on the floor immediately at the time of

21        the event while you were providing first aid, was there

22        anything that would lead you to believe that she lost

23        control?  Did she say anything like that?

24  A     No.  She never said she lost control.

25  Q     If she had lost control, would you have reported that to your

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | superiors?                                                            |
| 2  | A | Yes, I would.                                                        |
| 3  | Q | We talked a little earlier about the cracks in the floor?           |
| 4  | A | Yes.                                                                 |
| 5  | Q | Let's go back to just riding one of these forklifts.  You're        |
| 6  |   | in the forklift.  Will you share with us what the ride is           |
| 7  |   | like?                                                                |
| 8  | A | It's usually a very bumpy ride.  It's a lot of vibration,           |
| 9  |   | jarring, kind of as the forklift -- you feel every bump in          |
| 10 |   | the floor.                                                           |
| 11 | Q | But it has a cushion ride, doesn't it?                              |
| 12 | A | It's supposed to, yes.                                              |
| 13 | Q | Does it work?                                                        |
| 14 | A | I couldn't tell the difference whether it's cushion.  I             |
| 15 |   | really didn't know there was a floating floor in it until          |
| 16 |   | they mentioned it.                                                   |
| 17 | Q | So when we look at something like Number 30, the crack in the       |
| 18 |   | floor, when you went over a crack like that, could you             |
| 19 |   | explain to us what kind of -- how that would feel to the           |
| 20 |   | operator?                                                            |
| 21 | A | It was jarring.  It would jar your whole body.                      |
| 22 | Q | And some of these were as deep as a quarter?                        |
| 23 |   |                       MR. LoCOCO:  I'm sorry?                        |
| 24 |   |                       THE WITNESS:  Yes.                            |
| 25 |   | BY MR. WARSHAUER:                                                    |

1   Q   Number 29, is that representative -- how does that compare to
2       the cracks that you would see?
3   A   Very comparative.  Some were a lot worse.  There were
4       sections where they had to remove concrete and re-pour
5       concrete because the cracks were so bad.
6   Q   But even -- how about the cracks in the area that we see
7       where the event occurred?  Were those cracks -- how did those
8       cracks affect the ride of the forklift to operators?
9   A   Every time you hit a crack, it jars you.  It shakes you a
10      little bit.
11  Q   Okay.  I want to finish up with something that I told the
12      jury at the beginning of the case about a poster.
13  A   Yes.
14  Q   Do you recall that there was a poster of Adelaide Anderson in
15      the FedEx warehouse?
16  A   Yes.
17                  MR. LoCOCO:  Your Honor, could we approach on
18      this?
19                  THE COURT:  Yeah.
20                  (Sidebar begins.)
21                  MR. LoCOCO:  Your Honor, the fact that they had a
22      poster up saying she was a safe operator is irrelevant to the
23      accident here.  I let in -- we talked about this before on the
24      record, her saying that she was -- she observed her being safe.
25      But there's no foundation as to what went into that poster, why

1      FedEx decided to put it up, and it certainly doesn't mean that

2      on the day of the accident, she didn't make a mistake.  This is

3      improper.

4                    MR. WARSHAUER:  Well, there's --

5                    MR. LoCOCO:  It's improper character evidence.

6                    MR. WARSHAUER:  It's a lot more broad than that,

7      Your Honor.  First I do think it's relevant, because they are

8      going to say she violated rules and she was careless and didn't

9      know what she was doing.  But just as importantly, absolutely

10     just as important, she loved her job.  She took pride in that

11     job.  And this goes to her loss of enjoyment of life.  Someone

12     who does their job well enough to get a poster is somebody who

13     misses that job.

14                   THE COURT:  That's a stretch.  But I would say

15     this:  Are you -- do we know who made the decision to feature

16     her on the poster as opposed to somebody else?

17                   MR. WARSHAUER:  I really don't.

18                   THE COURT:  And we don't have anybody who's going

19     to come in and say how that came about?

20                   MR. LoCOCO:  All I'd say to that, Your Honor,

21     maybe Mrs. Anderson does, so it's not this witness, though.

22                   THE COURT:  I'm sorry?

23                   MR. LoCOCO:  It's not this witness.  Maybe

24     Mrs. Anderson knows why she was selected, but this witness sure

25     doesn't.

1      MR. WARSHAUER:  I can get it in through somebody

2   else.

3      THE COURT:  I mean, I was looking at character

4   evidence earlier.  Prior -- her prior safe habits or safe acts

5   can be used to show preparation, plan, knowledge, identity,

6   absence of mistake, or lack of accidents, proving motive,

7   opportunity, intent.  So I think ultimately, if the evidence --

8   if there's a proper foundation for -- that she was put on this

9   poster because she was safe, not just because she was female or

10   minority, because she just happened to be the person riding a

11   forklift at the time, and if it can be used as character

12   evidence to show that stuff that's admissible that I just

13   outlined, then I think it gets in.

14      MR. WARSHAUER:  I can't do that through this

15   witness.  I can do this through this witness:  "Was Ms. Anderson

16   proud to have her poster there?  Was she proud of her work at

17   FedEx?"

18      MR. LoCOCO:  But that gets into what's the poster

19   for?  What does the poster say?

20      MR. WARSHAUER:  She was proud to work there.  She

21   misses her job.

22      THE COURT:  I think ultimately the poster is

23   probably going to get in.  She's already testified that she was

24   a safe -- she knew her to be a safe employee.  I don't think you

25   got into yet whether or not she has a reputation of being safe

1     in the way she operated things.  But I think ultimately the

2     poster gets in.  But if you say you can't get it with this

3     witness, then I will sustain the objection.

4                 MR. WARSHAUER:  I can't get this witness to say

5     why she gave it.  There were multiple reasons I assume, you

6     know.  I can't in candor say to the Court that I can have this

7     witness say that.

8                 THE COURT:  All right.  But, I mean, I'm just

9     letting you know that I think ultimately it's going to get in.

10    It probably has to get in with the plaintiff, unless John

11    Mulvany --

12                MR. WARSHAUER:  Mulvany does know.  He said that

13    she was the poster child.

14                THE COURT:  That will keep us awake then.

15                (Sidebar ends.)

16                THE COURT:  All right.  Ladies and gentlemen of

17    the jury, that is an example of something that you will see not

18    infrequently.  Part of my job as judge is to rule on objections.

19    Part of these attorneys' job as the attorneys are to try to make

20    sure the rules of evidence are properly followed.  And so we

21    will have this sidebar, and they play that white noise so

22    apparently that's to prevent you from hearing what it is we're

23    saying.  But the important thing for you is it's a typical thing

24    that happens in jury trials.  Don't try to read too much into it

25    and don't try to guess why I ruled the way I ruled.  We'll move

```
 1          on.
 2                          Counsel?
 3                          MR. WARSHAUER:  Thank you, Judge.
 4     BY MR. WARSHAUER:
 5     Q    What was Lidy Anderson's reputation as to safety at the
 6          warehouse at Effingham?
 7     A    She was -- she's very safe.
 8     Q    From your observations and interactions with her, was she
 9          proud to work there?
10     A    She was very proud.
11     Q    Did she like it?
12     A    I believe she liked it.  She seemed happy.
13                          MR. WARSHAUER:  Thank you.
14                          THE COURT:  Cross?
15                          MR. LoCOCO:  Thank you, Your Honor.
16                              CROSS-EXAMINATION
17     BY MR. LoCOCO:
18     Q    I'm much shorter than he is.  Good morning, Ms. Boone.
19     A    Good morning.
20     Q    My name is Frank LoCoco.  You and I haven't met, have we?
21     A    No.
22     Q    All right.  But you did speak with my partner over there,
23          Margaret Heitkamp?
24     A    Yes, I did.
25     Q    All right.  A few days ago?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | I've just got a few followup questions for you.  You're here |
| 3 | | today voluntarily -- |
| 4 | A | Yes. |
| 5 | Q | -- correct?  You're not here by subpoena? |
| 6 | A | No. |
| 7 | Q | The plaintiffs offered to serve you with a subpoena; you said |
| 8 | | that wouldn't be necessary? |
| 9 | A | Correct. |
| 10 | Q | All right.  Other than the lunch a few weeks ago, did you |
| 11 | | meet yesterday with Mr. Warshauer to talk about your |
| 12 | | testimony? |
| 13 | A | I was here -- |
| 14 | Q | Well, did you meet with him -- is that when he -- I'm sorry. |
| 15 | | Go ahead and answer. |
| 16 | A | I was here.  I thought I was going to testify yesterday. |
| 17 | Q | Right. |
| 18 | A | He basically went over the same thing almost every time, just |
| 19 | | the questions he was going to ask me. |
| 20 | Q | And is that when you looked at your statement from the day of |
| 21 | | the accident? |
| 22 | A | No.  Actually he showed me that this morning. |
| 23 | Q | Okay.  Did you read it this morning? |
| 24 | A | Yes, I did. |
| 25 | Q | It's one page? |

1   A   Yes.

2   Q   All right.  I'm going to come back to that.  So you told us

3       that you had been at FedEx Supply Chain for about ten years;

4       correct?

5   A   At the time of the accident, yes.

6   Q   Were you there before or after Ms. Anderson started?

7   A   I was there after she started.

8   Q   Okay.  And did FedEx conduct your training on how to operate

9       a Raymond forklift?

10  A   Yes, they did.

11  Q   Who did your training?

12  A   I don't -- I'm not really sure.  It's been a while.

13  Q   That's okay.  It's a long time ago; right?

14  A   It was.

15  Q   You were trained to follow the safety rules; correct?

16  A   Correct.

17  Q   For example, you knew you needed to look in the direction of

18      travel?

19  A   Correct.

20  Q   Keep your forks as low as possible?

21  A   Correct.

22  Q   Especially when you didn't have a load?

23  A   Correct.

24  Q   You were trained that this is a very heavy piece of

25      equipment?

1   A   Yes.

2   Q   And if you got caught between the forklift and some other

3       object or got run over by the forklift, you'd be seriously

4       injured?

5   A   Correct.

6   Q   All right.  So you were trained to know that you had to keep

7       yourself in the compartment?

8   A   Correct.

9   Q   And as an operator --

10                  MR. LoCOCO:  Actually, can we put Plaintiff's 73?

11      Because it was renumbered.  Used to be Plaintiff's 82, but it's

12      Plaintiff's 73 now.  There we go.  And that can be published to

13      the whole jury, please.  Can you blow up this part here?  Can

14      you blow up the forklift?  Just blow it up, please.  There we

15      go.  All right.

16  BY MR. LoCOCO:

17  Q   So you talked with Mr. Warshauer about some of the controls

18      on the forklift.  You talked about the steering tiller;

19      correct?

20  A   Correct.

21  Q   And the travel lever?

22  A   Correct.

23  Q   And there's a red button right up here.  What's that?

24  A   That's an emergency stop.

25  Q   All right.  So if you got -- that's another way to emergency

|   |   |   |
|---|---|---|
| 1 |   | stop the truck?  You pull it up or punch it down? |
| 2 | A | You push it down. |
| 3 | Q | All right.  And you talked to him about the deadman pedal; |
| 4 |   | correct? |
| 5 | A | Correct. |
| 6 | Q | And then this back pad, when you operated the truck, did you |
| 7 |   | usually lean against the back pad? |
| 8 | A | Yes. |
| 9 | Q | Okay.  So when you were operating this truck or watching |
| 10 |   | others operate the truck, one of the things you looked for as |
| 11 |   | the team lead was to make sure people kept their body parts |
| 12 |   | in the compartment? |
| 13 | A | Correct. |
| 14 | Q | Because you knew if they didn't do that, they could be |
| 15 |   | seriously injured? |
| 16 | A | Correct. |
| 17 | Q | Mr. Warshauer demonstrated, you know, having your right foot |
| 18 |   | on the deadman pedal and then sticking your leg out.  You |
| 19 |   | kind of chuckled at that; right? |
| 20 | A | Right. |
| 21 | Q | That would be improper operation? |
| 22 | A | That's correct. |
| 23 | Q | Getting out while the truck is still moving would be improper |
| 24 |   | operation? |
| 25 | A | Correct. |

1    Q    When Mrs. Anderson told you that she slipped, you didn't know
2         what she meant by that; right?
3    A    It can mean a lot of things.
4    Q    Right.  She could have slipped while she was trying to get
5         out of the truck before it hit the post behind her; right?
6    A    It's possible.
7    Q    All right.  And then she said apparently -- and the truck
8         didn't stop?
9    A    Correct.
10   Q    But it did stop, didn't it?
11   A    Eventually, yes.
12   Q    Well, she wasn't crushed between that post and the back of
13        the truck?
14   A    No.
15   Q    As far as you could tell?
16   A    No.
17   Q    Right.  And when you got to Mrs. Anderson's position, she was
18        not caught by the truck?
19   A    No.
20   Q    Just her shoe?
21   A    Yes.
22   Q    All right.  I want to ask you about that.  This is
23        Exhibit 582, which is not the actual wheel assembly which
24        weighs about 200 pounds.  It's just the model.  Does that
25        kind of look like the wheel that we're looking at, at the

| | |
|---|---|
| 1 | back here? |
| 2 | A   Very similar, yes. |
| 3 | Q   All right.  So what I would like to know is, you said it was |
| 4 | caught, the shoe?  You found the shoe caught? |
| 5 | MR. LoCOCO:  Your Honor, could I approach the |
| 6 | witness and have her demonstrate to the jury where the shoe was |
| 7 | found? |
| 8 | THE COURT:  Yes. |
| 9 | MR. LoCOCO:  Thank you. |
| 10 | THE WITNESS:  So the toe of the shoe was in |
| 11 | between the wheels. |
| 12 | BY MR. LoCOCO: |
| 13 | Q   So you were indicating right in between the wheels? |
| 14 | A   Yes. |
| 15 | Q   The toe of the shoe? |
| 16 | A   Yes. |
| 17 | Q   Did you see the shoe there as soon as you got to the scene, |
| 18 | or did you only see the shoe when the truck was moved away, |
| 19 | the lift truck was moved away from the post? |
| 20 | A   I didn't see it until it was moved away. |
| 21 | Q   Do you remember who moved the truck away from the post? |
| 22 | A   His name was Jeff Hampton. |
| 23 | Q   And how far out did he move it? |
| 24 | A   Several feet.  I told him to move it so that EMS could get to |
| 25 | her better. |

1    Q    Okay.  Going back to your training, another thing you were

2         told is to look out for pedestrians; right?

3    A    Correct.

4    Q    You were also trained to look out for obstructions on the

5         floor; correct?

6    A    Yes.

7    Q    Ms. Boone, you were trained that during a collision, the

8         safest place to be was inside the compartment; correct?

9    A    That's correct.

10   Q    Maybe especially during a collision?

11   A    Correct.

12   Q    All right.  Because the compartment would keep you safe?

13   A    Correct.

14   Q    All right.

15                   MR. LoCOCO:  Can we put up Exhibit 500-4.  500

16        first, please.  No, just 500 first, just the cover page.

17   BY MR. LoCOCO:

18   Q    Okay.  Ms. Boone, I will represent to you that this is the

19        operator's manual for the 4250.  It's a booklet that looks

20        like this.  Have you seen this before?

21   A    No.

22   Q    There's a compartment on the inside of the forklift that

23        holds this manual?

24   A    Yes.

25   Q    You recall that?

1    A    Yes.

2    Q    All right.  Do you recall looking in that pocket for this

3         manual?

4    A    Never.

5                    MR. LoCOCO:  Can I hand the manual to the

6         witness, Your Honor?

7                    THE COURT:  You may.

8                    MR. LoCOCO:  Thank you.

9    BY MR. LoCOCO:

10   Q    Can you turn to page 8?  Actually, to page 4.  It's 8 here

11        but it's 4 in there.  And it's on your screen.  Do you

12        recall -- do you recall seeing that page as part of your

13        training?

14   A    I don't remember.

15   Q    All right.  The first warning says, "Stay inside the operator

16        compartment to operate this lift truck.  Never place any part

17        of your body between the mast uprights or outside the

18        operator compartment while operating -- while operating the

19        lift truck.  Turn the key switch off before getting off."

20        You were trained to do those things, though?

21   A    Correct.

22   Q    So if you were coming up to a stop, you could -- I think you

23        told Mr. Warshauer you could either use the plugging feature,

24        moving the handle through neutral in the opposite direction

25        to come to a stop?

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And then you take your foot off the pedal? |
| 3 | A | Correct. |
| 4 | Q | And then you leave? |
| 5 | A | Correct. |
| 6 | Q | And you don't leave until you do those things? |
| 7 | A | That's correct. |
| 8 | Q | And if you're going on a break, you turn the key off too? |
| 9 | A | Correct. |
| 10 | Q | All right.  There's one exception.  "If your lift truck |
| 11 | | starts to tip or fall off a dock or dock board, get off the |
| 12 | | truck immediately and move quickly away.  If the truck tips |
| 13 | | over with you inside, you could be seriously injured or |
| 14 | | killed."  You were trained to do that; correct? |
| 15 | A | Correct. |
| 16 | Q | All right.  So you were trained to keep away from the danger; |
| 17 | | right? |
| 18 | A | Correct. |
| 19 | Q | You're going to have a collision, you get -- make sure you're |
| 20 | | in the compartment? |
| 21 | A | Correct. |
| 22 | Q | If you're going to tip over or go off a dock, you get out of |
| 23 | | the compartment? |
| 24 | A | Correct. |
| 25 | Q | All right.  Now you told us on direct examination that you |

```
 1        knew Ms. Anderson to be a safe operator; is that right?
 2   A    That's correct.
 3   Q    You weren't an eyewitness to the accident?
 4   A    No, I was not.
 5   Q    You didn't investigate it; right?
 6   A    No.
 7   Q    You don't really know what happened to get Ms. Anderson into
 8        the position you saw her at the time of the accident?
 9   A    No.
10   Q    Correct?
11   A    No.
12   Q    What I said was -- that was a lawyer's question.  What I said
13        was correct, you don't know those things?
14   A    That's correct.  I don't.
15   Q    You don't know if Ms. Anderson made a mistake that day;
16        correct?
17   A    That's correct.
18   Q    Now I've got a copy of your statement too.
19   A    Okay.
20                   MR. LoCOCO:  Your Honor, may I hand it to the
21        witness?
22                   THE COURT:  Yes, you may.
23   BY MR. LoCOCO:
24   Q    Could you confirm, Ms. Boone, that that is the statement you
25        wrote out on the day of the accident?
```

1   A   Yes.

2   Q   Who had you write this statement out?

3   A   Probably Mr. Mulvany.

4   Q   All right.  Well, do you remember that it was Mr. Mulvany?

5   A   He was there that day.  He came that day later, and he was

6       investigating, yes.

7   Q   But let me go back to my question.  Do you remember it was

8       Mr. Mulvany, or could it have been someone else?  I don't

9       know the structure there.

10  A   It was James Mulvany.

11  Q   Okay.  All right.  You agree with me that it doesn't say

12      anything in this statement about how the accident happened?

13  A   That's correct.

14  Q   Nothing about slipping?

15  A   That's correct.

16  Q   Nothing about losing balance?

17  A   That's correct.

18  Q   Sitting here today, you're sure she didn't say she lost her

19      balance; correct?

20  A   That's correct.

21  Q   And then Mr. McCoy recorded a conversation with you on the

22      phone?

23  A   Yes.

24  Q   Have you seen the transcript for that telephone conversation?

25  A   Yes, I have.

```
 1                    MR. LoCOCO:  Your Honor, may I --
 2                    THE COURT:  Yes, you may.
 3                    MR. LoCOCO:  -- provide this to the witness?
 4   BY MR. LoCOCO:
 5   Q    Ms. Boone, when's the last time you saw that transcript?
 6   A    Actually it was sent to me in an e-mail, and I looked at it
 7        last night.
 8   Q    So you're pretty familiar with it now?
 9   A    Well, yeah, I've read through it a couple times, but.
10   Q    Do you remember when this conversation took place?
11   A    It was last year.
12   Q    Okay.  So in 2020.  The statement itself says it was taken on
13        July 8th, 2020.
14   A    That's correct.
15   Q    All right.  And there's nothing in here about "What did
16        Mrs. Anderson tell you about the accident?"
17   A    He never asked me that.
18   Q    Okay.  And you never offered?
19   A    No.
20   Q    All right.  Do you know why Mr. McCoy didn't ask?
21   A    No idea.
22   Q    Going back to how you brake the truck, bring it to a stop, we
23        talked about plugging.  You can also use the right foot -- or
24        you operated the deadman pedal, the brake pedal, with your
25        right foot; is that right?
```

1    A    Correct.

2    Q    Okay.  So if you've got your right foot on the brake pedal

3         and you decide you're going to stop the truck by using the

4         brake pedal, you pick your foot up off the pedal; correct?

5    A    Correct.

6    Q    All right.  And when you do that, your left foot is now

7         carrying your body weight?

8    A    Correct.

9    Q    So you can't get your left foot out?

10   A    Correct.

11                     MR. LoCOCO:  Can we go to 503, which is -- 503,

12        please.

13   BY MR. LoCOCO:

14   Q    So this is Defendant's Exhibit 503.  It's the photographs

15        that were taken by OSHA.  The date on the photographs is

16        December 13, 2017, which is a few months after the accident?

17   A    Correct.

18   Q    Were you still working at FedEx Supply Chain then?

19   A    Yes.

20   Q    Were you there when the OSHA investigator came?

21   A    I was, but they didn't ask me any questions.

22   Q    Were you there when the forklift was placed for the

23        photographs that we looked at earlier?

24   A    I was in the building, but no one asked me.

25   Q    Okay.

|    |   |                                                                              |
|----|---|------------------------------------------------------------------------------|
| 1  |   | MR. LoCOCO:  Can we go to 503-14?                                             |
| 2  |   | BY MR. LoCOCO:                                                                |

1          MR. LoCOCO:  Can we go to 503-14?

2     BY MR. LoCOCO:

3     Q    So Mr. Anderson -- Mr. Warshauer asked you some questions

4          about this photograph.  The forklift in this photo, which is

5          14th page of 503, is in -- is that the same angle that you

6          observed the day of the accident?

7     A    Very similar, yes.

8     Q    Okay.  Close enough?

9     A    Yes.

10    Q    All right.  And the truck is -- people have different

11         perceptions of distance.  While you were testifying, I would

12         have called that about a foot, foot and a half.  So what do

13         you see as the distance there?  What's your estimate?

14    A    The way I estimate it is, Lidy was laying where that line is.

15    Q    Which line?

16    A    The yellow lines, like her foot was past -- her feet were

17         past that yellow line.  Her foot was --

18    Q    I think you can draw too.  Can you circle the line you're

19         talking about?

20    A    This line right here.

21    Q    So Ms. Anderson was on the --

22    A    Her -- her body was like right here and her feet were over

23         here.

24    Q    Okay.  So was she laying at the angle that we see here?

25    A    She was laying kind of like this.

1  Q   Okay.  And her feet were how close to the wheel when you came

2      upon her?  This wheel.

3  A   Probably about where I have the line drawn to is where her

4      feet were.

5  Q   Okay.  All right.  We talked about this.  It doesn't get

6      saved, so I'm going to actually take a picture of this.

7      We'll figure out a way to get it captured later.

8                  You told the jury that the cracks in the floor

9      would cause the forklift to shake?

10 A   Yes.

11 Q   You don't know which cracks Ms. Anderson went over during her

12     route that got her to where we see the photograph in

13     Exhibit 503-14?

14 A   No.

15 Q   Those cracks that Mr. Warshauer showed you, you don't know

16     whether those would have had any impact on the feel of the

17     ride to the operator, those specific cracks?

18 A   If she would have hit them, yes, they would.  I mean, any

19     time you drive over a crack, it jars you.

20 Q   Any crack?

21 A   Yes.

22 Q   Okay.  And did you ever complain to FedEx about the cracks?

23 A   I didn't drive a forklift as often as a lot of people did, so

24     I didn't complain about it as much.  But there were people

25     who complained, definitely.

1    Q    So you heard people complain?

2    A    Yes.

3    Q    Okay.  You and I can agree that Raymond didn't put the

4         cracks?

5    A    Correct.

6    Q    All right.  Did you ever lose your balance or fall out of the

7         forklift going over a crack?

8    A    Never fell out, but I definitely have lost my balance.

9    Q    What does that -- what do you mean by that, you "lost your

10        balance"?

11   A    Well, there was one time that I hit a bump, and my feet --

12        like it jarred me so much that my feet both came off the

13        floor, so --

14   Q    So you went up in the compartment?

15   A    Yes.

16   Q    Not -- I'm sorry.  I interrupted you.  You went up in the

17        compartment?

18   A    Yes.  And then --

19   Q    You didn't go out?

20   A    I started to, but I got myself back in balance.

21   Q    Did you ever see anybody else fall out?

22   A    Fall out, no.

23   Q    When you get into the operator's compartment, the truck will

24        not move until you put your foot on the brake; correct?

25   A    Correct.

1   Q   When you went to -- you told us that you used your right foot

2       on the deadman pedal.  When you went to deposit a load or

3       pick up a load, so that you weren't actually traveling, would

4       you sometimes turn in the compartment to get some posture

5       relief, move around a little?

6   A   Yes, it's possible.

7   Q   Did you use the left foot on the pedal ever?

8   A   No.

9   Q   Okay.  But the right-foot pedal, the pedal that was in there,

10      you -- it helped you to be able to move around in the

11      compartment a little bit?

12  A   Correct.

13  Q   All right.

14                  MR. LoCOCO:  Just one second, Your Honor.

15  BY MR. LoCOCO:

16  Q   You said that you got e-mailed the telephone statement?

17  A   Yes.

18  Q   Last night?

19  A   It was this past week.

20  Q   Okay.  And who sent it to you?

21  A   Mr. Warshauer's paralegal, Stan someone.

22  Q   Okay.  Mr. Grantham.  You said when you got there to the

23      scene, Mrs. Anderson's foot was up in the air.  Can you

24      describe that for us?  What do you mean by that?

25  A   Well, the way she was -- she was sitting on her bottom so her

1    body was kind of in a "V" shape, so her feet were in the air,

2    her feet were at an angle, and her -- and her body was at an

3    angle.  She was --

4  Q    She wasn't with her back on the ground?

5  A    No, she wasn't laying on the ground when I found her.

6  Q    She was kind of sitting up with her foot up?

7  A    Yes.

8  Q    Okay.

9                    MR. LoCOCO:  I believe that's all I have.  Thank

10    you very much.  Thanks for coming in.  Nothing further, Your

11    Honor.

12                    THE COURT:  Redirect?

13                    MR. WARSHAUER:  Yes, sir.  Do we see Exhibit 73?

14    There you go.

15                    REDIRECT EXAMINATION

16  BY MR. WARSHAUER:

17  Q    Ms. Boone, you were just asked some questions about this

18    Exhibit 73, just the picture into the back of the forklift.

19    I want to ask you a couple things.  The operator position

20    that you and I talked about is two feet on the floor, left

21    hand on the tiller, right hand on the multifunction, back

22    against the backrest?

23  A    Correct.

24  Q    I've circled the floor.  If the operator's left foot leaves

25    the operator position, is the power disconnected?

1    A    No.

2    Q    I've circled the backrest.  If the operator's back leaves the

3         backrest, is the power disconnected?

4    A    No.

5    Q    Those are the operator positions, though, aren't they?

6    A    Yes.

7    Q    You were asked a question about pedestrians.  At the FedEx

8         warehouse, if an operator is doing their job safely and they

9         approach an aisle and they're going, you know, to the other

10        side of the warehouse, and there's an aisle in there,

11        pedestrians in there, picking or even walking, what is the

12        preferred thing if they have an alternate aisle they can go

13        through?

14   A    They take an alternate route.

15   Q    It's best not to go on routes with pedestrians?

16   A    Correct.

17   Q    You were asked about this ability to move your foot around

18        with the one pedal.  Have you operated forklifts that had two

19        pedals?

20   A    Yes, I have.

21   Q    Could you get reasonable comfort?

22   A    Yes.

23   Q    Was there any indication at all that Lidy Anderson -- Lidy

24        Anderson was trying to jump off to avoid a collision with

25        anything?

1   A   No.

2   Q   From your observations of Ms. Anderson, if she wanted to

3       avoid hitting the rack, did she know how to use the plugging?

4   A   Yes.

5   Q   Did she know how to use the emergency brake?

6   A   Yes.

7   Q   You were asked a question, "Did she say she lost her

8       balance?"  And you answered no?

9   A   No.

10  Q   What she said was she slipped?

11  A   Correct.

12  Q   What did you take that to mean?

13  A   It can mean a lot of things with Lidy.  It can mean she lost

14      her balance, it could mean she had a slip of hand, it could

15      mean something -- you know, it could mean something beyond my

16      opinion.

17  Q   But there's no definition that you took from her at the scene

18      that it meant she was aiming towards a rack and decided to

19      jump off and --

20              MR. LoCOCO:  Objection.  Leading.

21              MR. WARSHAUER:  That was leading.

22  BY MR. WARSHAUER:

23  Q   Was there any indication at all from that that you took that

24      would be consistent with her wanting to jump off?

25  A   No.  She's trained to stay on the forklift.

```
 1  Q   If Lidy Anderson is in the operator position, left hand on

 2      the tiller, right hand on the multifunction, right toe

 3      holding down the deadman pedal and her left foot slips off

 4      the forklift, can she operate the brake?

 5  A   No.

 6              MR. WARSHAUER:  Thank you for coming.

 7              MR. LoCOCO:  Your Honor, may we approach?  I've

 8      got a little recross, but.

 9                  (Sidebar begins.)

10              MR. LoCOCO:  She was asked, "Was there any

11      indication that Mrs. Anderson was in the process of jumping off

12      or tried to jump off?"  There is a -- and Mr. Warshauer knows

13      this.  There is a document in the FedEx file where people

14      thought that she jumped off.  So I should be able to ask her,

15      "Isn't it true that Mr. Mulvany and others at FedEx thought she

16      might have jumped off?" and show her the document.  But

17      because -- because of how it's coming up, I wanted to raise it

18      with the Court because he's going to object to it as being

19      hearsay.

20              MR. WARSHAUER:  I am going to object to it.  That

21      context of that redirect and the direct and the cross was

22      clearly at the scene, what she observed at the scene, not what

23      other people observed that she doesn't know about.

24              THE COURT:  Well, you were asking her to

25      speculate.
```

1      MR. LoCOCO:  Yes.

2      THE COURT:  And I kept expecting an objection.

3 You were asking her to speculate.  And you did, but I think that

4 you waltzed into any evidence -- I don't think you limited it to

5 what your -- I didn't think you limited your question to what

6 evidence at the scene indicated to you that she may have tried

7 to jump off.  I think that you asked her more broadly, "Did you

8 see anything or reason to believe that she tried to jump off?"

9      MR. LoCOCO:  Exactly.  And that's why --

10      MR. WARSHAUER:  And the context was clearly her

11 interaction with Ms. Anderson, what Ms. Anderson had said.  Was

12 there anything there that she saw?  What other people saw is

13 not -- you can't -- it's not impeachment.  403 would -- and 802,

14 both of these are serious problems here.  It's clearly hearsay,

15 what somebody else said.  She didn't -- you didn't even ask her

16 if she talked about it to somebody else.  Now we're going way

17 beyond the scope of my redirect.

18      MR. LoCOCO:  It's in the -- it's in our business

19 record from FedEx.  He asked the question as a way to make it

20 broadly sound like people would be crazy to think that she had

21 stepped out.

22      THE COURT:  I'm -- I think you opened the door.

23 I'm going to let him --

24      (Sidebar ends.)

25      RECROSS-EXAMINATION

1    BY MR. LoCOCO:

2    Q    Ms.  Boone, just a couple of followup questions.  First of

3         all, you were asked about whether you've been on a truck with

4         two pedals?

5    A    Yes.

6    Q    Whose truck was that?

7    A    It was -- another job I worked at.

8    Q    Pardon me?

9    A    A different job that I worked at.

10   Q    You don't remember the type?

11   A    It was a Crown.

12   Q    And actually at one point, two brake pedals, one was a pedal

13        and one was just a sensor to make sure that your foot was on

14        the compartment floor; right?

15   A    Correct.

16   Q    And the left foot on that Crown had a deadman pedal or brake

17        pedal?

18   A    Correct.

19   Q    Mr. McCoy did ask you during the oral statement about two

20        pedals, didn't he?

21   A    Right.

22   Q    And you said if they only have one pedal, then they can at

23        least shift their weight, didn't you?

24   A    Right.

25   Q    So you prefer the one pedal?

1   A   Correct.  It's a personal preference.

2   Q   Yeah.  Last thing, Mr. Warshauer asked you about the issue of

3       jumping off.  And I want to put up a page from a FedEx

4       business record, their investigation of this incident.  It's

5       Exhibit 502-12.  That says, "In an effort to reconstruct the

6       incident, it is thought that the transition to the adjacent

7       aisle may have occurred too quickly or that the teammate may

8       had been distracted based on the location and positioning of

9       the lift.  It appears that when the teammate was nearing the

10      racking, she may have tried to avoid a potential impact by

11      attempting to stop quickly, reverse direction, or exiting the

12      lift."  So someone thought she might have exited the lift;

13      right?

14  A   That's speculation, actually.  They're guessing.

15  Q   And you're guessing that she didn't?

16  A   I don't know what happened, honestly.

17  Q   Right.  Thank you.

18                  MR. LoCOCO:  Nothing further, Your Honor.

19                  MR. WARSHAUER:  Given the context, could I just

20      ask one question about that page?

21                  THE COURT:  You're allowed to continue to

22      inquire.

23                  MR. WARSHAUER:  On that same document.

24                  MR. LoCOCO:  Do you want to use ours?

25                  THE COURTROOM DEPUTY:  You want yours on?

1    MR. WARSHAUER:  Yes, ma'am.

2    REDIRECT EXAMINATION

3    BY MR. WARSHAUER:

4    Q    On that same page, it says, "One of our emergency responders

5         reported that Ms. Anderson stated that she slipped and the

6         lift would not stop."  That emergency responder was you?

7    A    Correct.

8                   MR. WARSHAUER:  Thank you.  That's all.  May this

9         witness be excused?

10                  MR. LoCOCO:  Yes, Your Honor.  Fine with me.

11                  THE COURT:  All right.  Thank you for coming.

12        Nobody wishes her to remain on call?

13                  MR. LoCOCO:  Correct.

14                  THE COURT:  Thank you.  You're done for the day.

15        You may go home.

16                  All right.  It's 20 minutes after 10.  Let's take

17        a 15-minute recess.  We'll start back at 10:35.

18                  (Jury exits at 10:19 a.m.)

19                  (Recess from 10:19 a.m. at 10:36 a.m.)

20                  THE COURT:  Did you guys talk about the exhibits

21        you wanted to admit?

22                  MR. WARSHAUER:  I'm sorry, I didn't hear the

23        question.

24                  THE COURT:  Well, at some point, we want to talk

25        about admitting the exhibits that you guys agree on.  Let's just

```
 1        bring the jury in.  We'll get through this witness.
 2                    MR. LoCOCO:  I'll look at that, and I'll let you
 3        know.
 4                    MR. WARSHAUER:  It's got to be on the record that
 5        at some point we did that.
 6                         (Jury enters at 10:37 a.m.)
 7                    THE COURT:  Thank you, everyone.  Please be
 8        seated.
 9                    All right.  We are back on the record in Anderson
10        v. Raymond.  Counsel, call your next witness.
11                    MR. WARSHAUER:  Your Honor, the plaintiff calls
12        Dr. John Jeka.
13                         (Witness sworn.)
14                    THE COURTROOM DEPUTY:  Please state your full
15        name and spell your last name for the Court.
16                    THE WITNESS:  John J. Jeka, J-e-k-a.
17                    MR. WARSHAUER:  May it please the Court.
18                    THE COURT:  Sure.
19                         DIRECT EXAMINATION
20   BY MR. WARSHAUER:
21   Q    Dr. Jeka, where do you live?
22   A    Philadelphia, Pennsylvania.
23   Q    What do you do?
24   A    I'm a professor in the Department of Kinesiology and Applied
25        Physiology and chair of the department at University of
```

1       Delaware.

2   Q   What is your specialty?

3   A   Human balance control during standing and walking.

4   Q   Now you've been approved by the Court as an expert in this

5       case to help us understand some balance issues.  What have I

6       asked you to help us do?

7   A   To understand the balance issues that are associated with

8       operating a forklift.

9   Q   I'm going to ask you -- we're going to go over your CV.

10                  MR. WARSHAUER:  Your Honor, we'll be publishing

11      this by agreement but it will not be going out as an exhibit.

12  BY MR. WARSHAUER:

13  Q   Exhibit Number 20 -- 120.  What do we see here, Dr. Jeka?

14  A   It's the first page of my CV.

15  Q   And what is your basic background and education and training

16      that allows you to help us understand this idea of human

17      balance?

18  A   My basic training is in neuroscience, because the control of

19      human balance involves the brain, the spinal cord, the

20      nervous system, in such ways that allow us to stand upright.

21  Q   Well, this document is 33 pages long.  If we spent the next

22      45 minutes talking about it, what would we learn about your

23      expertise and your fame in the community of balance experts?

24  A   Well, I've been involved in this field for close to 30 years.

25      I've published over a hundred articles on -- in the field of

1       balance control in humans.  I've gotten over $25 million in

2       grants from federal agencies and private agencies to support

3       the research that I do.  I've had over 20 students who have

4       worked in my lab and gotten their Ph.D.s over the years.  So

5       I've had a very fun ride.

6   Q   All right.  You know, tell us how balance works, human

7       balance.

8   A   Okay.  Can I use the easel for this?

9   Q   Sure.

10              MR. WARSHAUER:  Your Honor, with the Court's

11      permission?  So we're trying to find a good spot so everybody

12      can still see it.

13              MR. LoCOCO:  Your Honor, may I step over here?

14              THE COURT:  You certainly may stand in a position

15      where you can see.  You may want to move the podium, Counsel.

16              MR. WARSHAUER:  How about if we put it right

17      here, but, Judge, you'll be -- won't be able to see.

18              THE COURT:  I can hear.

19              MR. WARSHAUER:  Let's move the podium.

20              THE COURT:  If I want to step down, I can always

21      walk over here and watch.

22              MR. WARSHAUER:  Let's put it right there where

23      the podium was.  He's here.

24  BY MR. WARSHAUER:

25  Q   Okay.

```
 1    A    So okay.  So a couple things I want to explain first --
 2                        MR. LoCOCO:  Your Honor, do we have a question?
 3                        MR. WARSHAUER:  Yes.
 4    BY MR. WARSHAUER:
 5    Q    Dr. Jeka, will you help us understand the basics of human
 6         balance?  So that when we get into how that relates to an
 7         operator's balance system on a moving forklift, we'll have
 8         some context.
 9    A    Right.
10                        MR. LoCOCO:  Thank you.
11    BY MR. WARSHAUER:
12    Q    I'm going to try to get this microphone near you because the
13         court reporter is -- she gets mad.
14    A    I'll try to stay close.  So a couple of terms first to make
15         sure we're all on the same page.  When I refer to the
16         musculoskeletal system, that's the body in terms of the
17         bones, the skeletal system, and the muscles that allow us to
18         move and stand upright.  But distinguished from that is the
19         nervous system, which is like the wires, you know, all the
20         nerves that travel through your body and send signals to the
21         muscles from wherever they're coming from.  And those two
22         pieces are critical because we have approximately 300 muscles
23         in our body.  So the nervous system has a really tough
24         control problem.
25                        So it's not just about moving.  It's about
```

1    knowing how to move.  So for example, if I'm standing with my

2    foot here, and I decide, okay, I'm leaning forward a little

3    bit too much and I want to lean backwards, I have to activate

4    certain muscles to do that.  Okay?  And because muscles work

5    very specifically, they just do sort of one thing.  They move

6    your -- one limb one way or another.

7                    If my foot is over here, I activate a

8    completely different set of muscles to move myself back to

9    the center.  So the nervous system has to choose, out of all

10   these 300 muscles, which ones to activate and how much to

11   activate them.  Okay?  Those are both critical features.  And

12   it's got 300 muscles to choose from.  So that's what's known

13   as the control problem for balance control.

14                   You have this nervous system that has to

15   decide which ones to activate and how to activate them.  You

16   know, when you reach for something like an elevator button

17   when you're in a hotel, you go up to the elevator, you don't

18   slam into the button.  You quietly, you know, push it.

19   There's a certain activation that's necessary in order to

20   make that a very gentle move.  So it's an incredibly

21   complicated system.  Okay.  So how does it know that?  How

22   does it know --

23                   THE COURT:  I'll save you from objecting to the

24   narrative.  It's not a lecture, so it's going to have to be Q

25   and A.  I'll give you some leeway, but.

| | |
|---|---|
| 1 | THE WITNESS:  Okay. |
| 2 | BY MR. WARSHAUER: |
| 3 | Q  So, Dr. Jeka, when we're talking about this, let's get -- we |
| 4 | are right now at the -- how we move. |
| 5 | A  Right. |
| 6 | Q  How is this -- is our brain controlling it?  Is our nervous |
| 7 | system -- you've talked about all these 300 muscles.  What is |
| 8 | controlling them? |
| 9 | A  Right.  So what I was trying to get to is, how does the |
| 10 | nervous system know which muscles to activate?  That's where |
| 11 | it uses sensory information from your eyes, from your inner |
| 12 | ear, your vestibular system, and what's called |
| 13 | proprioception.  And proprioception is the one I wanted to |
| 14 | just mention a little bit because that's critical for |
| 15 | operating a forklift.  And that is, they're these sensors in |
| 16 | your muscles that know where your limb is.  When I move my |
| 17 | arm like this, my eyes are closed, I still know where my arm |
| 18 | is.  That's because of proprioception and the sensors in my |
| 19 | muscles.  And so that gets into, how do we make these |
| 20 | corrections when we're standing?  Because when we're |
| 21 | standing, I always have my muscles active. |
| 22 | So I'm going to draw you a little diagram of |
| 23 | how the balance system works.  And we like to use boxes, so |
| 24 | this box is your musculoskeletal system.  That's all the |
| 25 | bones and muscles. |

```
 1                    MR. LoCOCO:  Your Honor, I think we might need
 2        another question.
 3                    THE COURT:  I'm going to have to insist that
 4        you --
 5   BY MR. WARSHAUER:
 6   Q    All right.  So tell us how the various -- first, what are the
 7        various systems?
 8   A    Right.  So there's your musculoskeletal system.  Let's put
 9        the muscles here and your bones and joints there.  So your
10        muscles send -- you know, they're activated, which moves the
11        body.  And then there's a box here.
12   Q    And what is that box?
13   A    That's your visual system, all the sensory systems that are
14        involved in sensing where you are.  That's critical.  You
15        have to know where you are to activate your muscles
16        appropriately.  That then goes to your spinal cord.
17   Q    And what's the spinal cord do?
18   A    Spinal cord integrates all the information from your various
19        senses, your vision and your proprioception, and then that
20        sends a command back to your muscles.  Okay?  Sometimes you
21        can -- it can also go up to your brain, and that's a more
22        complicated response.  Sometimes it goes right to the
23        muscles.  And this is what I call an automatic balance
24        response.
25   Q    So how do you know that that's an automatic balance response?
```

1   A   Because it happens so quickly.

2   Q   And why does it need to be automatic?

3   A   Because if you are disturbed while you're standing --

4   Q   So I'll -- I push you like that.

5   A   Okay.  I just activated some muscles to make -- to resist

6       that.  That went to my spinal cord and back.  It never went

7       up to my brain because I just sensed that with my

8       proprioceptors, and then it activated my muscles to resist

9       his push.

10  Q   Is there enough time for it to go to your brain, get back to

11      the muscles before you fall over?

12  A   Oftentimes not.  That's why it's so quick.  It happens in 50

13      to 75 milliseconds, and a millisecond is one-one-thousandths

14      of a second, so it's really fast.  Very, very fast.  And you

15      need that as your first line of defense to maintain your

16      balance.

17  Q   All right.  I was -- in my opening, I said that I was

18      fascinated by the idea that if I raised my arm, that's a

19      voluntary action.  Are there any involuntary or automatic

20      aspects to my balance system just from the act of raising my

21      arm?

22  A   Right.  So one thing you're going to hear from me today is

23      there's no such thing as completely involuntary movement when

24      you're standing.  There's always an automatic response

25      associated with that.  So the example that Mr. Warshauer

1    gave, if I'm standing here and I have a task to raise my arm

2    or pull on a handle at the sound of a tone, which the

3    experiments have done this way, they measured the muscles

4    that turn on when you do that.  And when you pull on

5    something or you raise your arm, it's got to be by this

6    muscle in your upper arm called the biceps muscle, and that

7    does turn on to pull.

8                    However, before that muscle turns on, muscles

9    in your lower leg turn on first.  And the reason is that

10   because when you pull on something or you raise your arm, it

11   moves you.  Right?  Because you're displacing the mass of

12   your body.  The nervous system knows the consequences of that

13   movement, and therefore it activates these muscles first to

14   pull you back a little bit --

15  Q  So --

16  A  -- before you move.

17  Q  So if I was to push you hard enough -- if I was to push you,

18     are you -- is the movement of your feet in response to that a

19     voluntary action?  In other words, "Hey, I just got pushed in

20     the right shoulder, I need to move my feet a little bit," or

21     is it an automatic system response that you've been talking

22     about?

23  A  It's an automatic system response that is sensed by your

24     sense -- proprioceptors, sometimes your inner ear and so

25     forth, that actually activate these muscles without any

| | | |
|---|---|---|
| 1 | | conscious control. |
| 2 | Q | All right.  Do we need to use the board anymore? |
| 3 | A | I'm just -- I just want to emphasize that when you -- when |
| 4 | | you're standing, there's this movement that's constantly |
| 5 | | going.  Constantly you're always activating muscles, you're |
| 6 | | always taking sensory information, and decisions are made. |
| 7 | | Is this an automatic response, or do I have time to go up to |
| 8 | | the brain and make a voluntary response?  But this always is |
| 9 | | first and before a voluntary response.  Always. |
| 10 | Q | Okay. |
| 11 | A | That's all I need for that. |
| 12 | Q | Thank you. |
| 13 | A | Mm-hmm. |
| 14 | Q | So I want to bring this concept of automated responses, make |
| 15 | | sure I understand it with a couple of examples.  If I was |
| 16 | | walking and I stepped on a golf ball, if that information had |
| 17 | | to go to my brain and be processed and then back out to my |
| 18 | | foot balance system, musculoskeletal system, would I be on |
| 19 | | the ground before that could happen? |
| 20 | A | Probably.  What happens is your initial response to that |
| 21 | | disturbance is automatic.  It can be followed by a subsequent |
| 22 | | response, like you might have a response in the leg that |
| 23 | | steps on the ball and it activates muscles very quickly to |
| 24 | | sort of keep you upright.  And then there could be a |
| 25 | | subsequent step.  That could be more voluntary nature because |

1    it had time to make it a step, but the initial response is

2    automatic.

3  Q  Let's talk about it.  Are these reflex-like responses?

4  A  Yes.

5  Q  So let's take a look at -- I think you shared with me

6    something like a flexor withdrawal reflex image?

7  A  Yeah.

8  Q  Would that help us understand that concept?

9  A  Yeah.  I mean, there are lots of examples.  The question

10    might be, why do we have reflexes at all?  And that's

11    because, to make the control problem simpler.  So for

12    example, you blink your eye 21,000 times a day.  If you --

13    and every time your eye got dry, if you had to actually

14    think, "Oh, now I have to blink my eye," you'd spend most of

15    the day just blinking -- just controlling your eye blink

16    21,000 times.  Instead, the nervous system decided, this is

17    an automatic thing, I'm just going to do it without you

18    thinking about it.

19  Q  All right.  Let's take a look at this Exhibit 91.  So what

20    are we learning from this illustration?

21  A  So that's a cutout of the -- so that thing that looks like

22    sort of a bone on the right with these things coming out of

23    it, that's your spinal cord.  And that's just showing you

24    there's a section of the spinal cord that is controlling the

25    muscles in your leg.  And so what it's showing is that when

1    you step on a nail or something painful, your response is, I

2    have to pull my leg away because I don't want to -- I feel

3    pain.  And so that's controlled by these muscles in your leg

4    here shown in the back of your hamstrings and your calf

5    muscles called the gastrocnemius and so forth.  Those just go

6    to your spinal cord and back.

7  Q  No conscious thought?

8  A  No conscious thought.  You do that and you'll do it every

9    time if you feel that pain.  That's one of the things that

10    protects you from being injured.  So these responses are

11    important for you to function in the world.

12  Q  So we look at 92.  How does this relate to what we're

13    learning about human balance?

14  A  So this is a more complicated reflex but it's still

15    considered a reflex.  So here you see again a section of the

16    spinal cord that's sort of you're looking through the spinal

17    cord and all the wires that are -- the nerves that are going

18    to two legs.  And it's showing that not only do you get a

19    response in the leg that is disturbed, but when you disturb

20    one leg, the other leg has to do something to make sure you

21    stand up, because you can't just pull your leg up in the

22    state you're in because you'll fall over then.  So there's a

23    reflex that activates the muscles in your opposite leg that

24    stabilizes you so that leg can come up.

25  Q  Dr. Jeka, if one leg is not supported, can you lift the other

1     one?

2   A   If one leg is --

3   Q   If I'm standing with my right foot down and my left foot is

4       suspended or falling, is it possible for me to lift my right

5       foot up --

6   A   No.  No.  No, you need something to -- you need something --

7       some other platform to lift that leg.

8   Q   Let's move from sort of the general balance system as an

9       automated system to the specific and bring it home to how

10      that affects someone who's operating a standup forklift, a

11      sidestance standup forklift in particular, and even more

12      particular, the one that we're talking about here today, the

13      Raymond one.  Have you considered the balance issues that

14      would relate to an operator's use of that device?

15  A   Yes.  So what is a forklift in terms of balance control?

16      It's a moving platform that accelerates and decelerates and

17      forces the operator to make all sorts of balance adjustments

18      while they're operating this platform.  That's exactly what

19      we study in the balance control world.

20              We have equipment where the platform which

21      you're standing moves, and we study how people react to a

22      moving platform, either moving forward, backwards, side to

23      side, all sorts of directions.  And there are hundreds of

24      papers that are studying that specific situation, which I

25      would say is equivalent to the balance challenges that -- of

1          operating a forklift.

2     Q    From your point of view as an expert in the field, do you

3          need to actually do a test on a forklift to see whether a

4          forklift will interact with a human's balance system?

5                         MR. LoCOCO:  Objection.  Leading.

6                         THE COURT:  I think the question is okay.  Go

7          ahead.  You can answer.

8                         THE WITNESS:  I don't see anything about

9          operating a forklift in terms of the principles of human balance

10         control that is any different than the experiments that are done

11         on a moving platform.

12    BY MR. WARSHAUER:

13    Q    So when we talk about these -- this science of being on a

14         moving platform, what do we know about the movement of

15         people's feet as part of their response to -- what's the word

16         you used -- perturbations?

17    A    Or disturbance, yeah.  So we know there are three balance

18         strategies when you're standing and you're disturbed.  Two of

19         them you're standing upright.  One is called the ankle

20         strategy, where you essentially think of the human body, this

21         is my trunk, these are my legs, and in an ankle response, I

22         just move my body together and just everything comes from my

23         lower muscles in my leg to maintain my balance.  Another is

24         called the hip strategy, where I actually counter-rotate at

25         the hips and I use a different set of muscles to actually

1    maintain my balance, but that also keeps me upright.  And the

2    third is a step.  You just step in order to maintain your

3    balance.  Those are the three main strategies we always use.

4  Q  How strong is this step response?

5  A  I'm not sure I understand.  How strong?

6  Q  Well, are there any studies where the subjects are told,

7    "Don't move your feet"?

8  A  Yes.  There are a lot of studies where they want to just

9    understand this ankle and hip strategy and how you recruit

10   one or the other, and so in many studies, they say don't move

11   their feet.

12 Q  Are they successful in getting people not to do that?

13 A  Not always.  Sometimes yes, sometimes no.  And sometimes

14   people step anyway, depending upon their state and the

15   strength of the perturbation and, you know, how much they're

16   moved and how fast they're moved.  So it depends.

17 Q  How would you describe the foot movement in response to a

18   disturbance?  And for our purposes here, we're going to call

19   that disturbance a crack.  Is that an automated response?  Is

20   that a voluntary response?  Why would someone's foot move in

21   response to a forklift going off -- over a crack?

22 A  So one thing that's very important about balance control is

23   how certain you are of your balance.  So for example, there

24   are many experiments in our field where people put a piece of

25   foam on the floor and you stand on foam, like just a thick

1    piece of foam like that, which makes the floor, you know, not

2    rigid, not -- you know, not hard.  And we know that makes

3    people far less comfortable.  They're less stable.  They

4    don't feel the same way.  If you give them a disturbance in

5    that case, they're far more likely to step than in the case

6    where they're on a rigid floor, because they don't have the

7    same information that's giving their system the ability to be

8    very stable.

9  Q  And is that step something they think about, or that just

10   happens?

11 A  No.  It happens way too fast for them to think about it.

12   Again, it's an automatic response.

13 Q  In this case, one of the things that have been provided to

14   you is a study that was referenced I believe by the attorney

15   for Raymond yesterday, by Rhoades from Ann Arbor.  Did you

16   consider that study in your -- formulating your conclusions

17   that you're going to share with us in this case?

18 A  I did.

19 Q  And what did you learn?

20 A  I learned that when people are operating a forklift, they're

21   moving their feet all the time.  And in fact, that makes

22   perfect sense to me, because we've done -- in our

23   experiments, you know, if we ask people to stand for four

24   minutes and say "don't move," that's very uncomfortable for

25   people to stand like that, because your muscles fatigue, they

| | | |
|---|---|---|
| 1 | | get tired, you start feeling actual pain actually.  And so |
| 2 | | therefore, you relieve that by just changing your stance a |
| 3 | | little bit, and people operating a forklift are doing that |
| 4 | | all the time. |
| 5 | Q | So in this case, have you considered what you understand |
| 6 | | occurred to Mrs. Anderson? |
| 7 | A | Do I understand what I think? |
| 8 | Q | Yes. |
| 9 | A | Yes. |
| 10 | Q | So what is your understanding of what led to her being out of |
| 11 | | the compartment? |
| 12 | A | So my understanding is that she was driving the forklift, she |
| 13 | | went over cracks that caused the forklift to shimmy and |
| 14 | | shake, according to user -- the words in the deposition I |
| 15 | | read, and that creates this feeling of uncertainty. |
| 16 | Q | When you say a "feeling of uncertainty," is this something |
| 17 | | we're thinking, or a feeling of uncertainty somewhere else? |
| 18 | A | Yeah, that's a hard question.  I mean, you know that when |
| 19 | | you're -- if you stand on two feet, you feel very stable.  If |
| 20 | | you stand on one foot, suddenly you don't feel as stable. |
| 21 | | That's the feeling of uncertainty.  Right?  You just don't |
| 22 | | feel like you're -- you can withstand the same disturbance as |
| 23 | | you could when you're standing on two feet. |
| 24 | | So you're driving across these cracks and it |
| 25 | | starts to shake, that's going to create great uncertainty. |

1        And that's going to make you far more likely to try to

2        correct your balance, because you're just not in a state --

3        you're not in as stable as a state as you were before.

4  Q   When you say "try to correct your balance," is this going to

5        be a voluntary correction, or is this going to be an

6        automatic, or one or the other, or what?

7  A   Well, there's always going to be an automatic component to

8        it.  Okay?  Again, I say that the automatic component always

9        comes first when you're standing, always.  And then it could

10      be followed by a voluntary response, but that's well down the

11      road, you know, timewise.  I mean, your automatic response is

12      going to come first.

13  Q  Well, don't you need a hard force to lose your balance?

14      Doesn't somebody have to push you or there be a sudden

15      jerking?

16  A  No.  That's one way you can lose your balance, but the other

17      way is just by your environment changing.  And by that I mean

18      when that floor starts to shake, suddenly again you're not as

19      sure of the surface.  It's now shaking a little bit, and so

20      you're going to say, "Hey, I'm not going to -- I'm not as --

21      I don't feel as safe when I am standing."  So now when I'm

22      going to think about making an adjustment, I don't think

23      about it, my nervous system is going to automatically make an

24      adjustment based upon the fact that my environment has

25      changed.

1          You can also be perturbed visually.  You know,

2     you can -- if you're standing on a street corner and a bus

3     comes by that sweeps across your visual field, that's a

4     disturbance to your balance system.  It's not about force.

5     Suddenly your environment has changed, and that sweeping

6     across your visual field can actually make you -- to cause

7     you to have a balance adjustment.

8  Q  And that balance adjustment is volitional or automatic?

9  A  Automatic.  It has to be automatic.  If it was volitional, it

10    would take too long and you'd be on the floor.  You'd be on

11    the ground too often.

12 Q  So when we're talking about responding to a shake of the

13    forklift, if there's a foot movement, is that volitional or

14    automatic?

15 A  It's -- it always will start as automatic and will -- you can

16    make a foot movement that is completely automatic, and then

17    subsequently it can be followed by a voluntary movement.  But

18    that first foot movement is going to be automatic.  It

19    happens too fast to be considered voluntary.

20 Q  Well, did you need to test a forklift to see whether or not

21    foot movement could occur?

22 A  No, because there are hundreds of studies that do this very

23    thing.  You're standing on a platform that can move.  The

24    platform accelerates or decelerates and people study the

25    movements that occur because of that.  It's exactly like

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | operating a forklift.                                        |
| 2  | Q | Well, you were telling us about Ms. Anderson's event.  Did  |
| 3  |   | you come to some conclusions with respect to how -- to      |
| 4  |   | whether her exit from the forklift, based on the facts that |
| 5  |   | you've been told and assumed, was as part of an automatic   |
| 6  |   | response or an intentional act by her?                      |
| 7  | A | So what makes me think it was an automatic response is that |
| 8  |   | there was -- she ran across these cracks in a way that was  |
| 9  |   | unexpected.  That's a key element to all this.  If you expect |
| 10 |   | something to happen, that changes the balance response      |
| 11 |   | enormously, because then you can actually adjust ahead of   |
| 12 |   | time and have a very different response.  But when you're   |
| 13 |   | running through the warehouse, you're maybe looking at the  |
| 14 |   | rack, maybe doing all sorts of things, and suddenly you hit |
| 15 |   | these cracks.  Now suddenly, you know, you're like, "Oh, wow, |
| 16 |   | I didn't expect that."  That's when the automatic balance   |
| 17 |   | system kicks in.                                            |
| 18 | Q | So, Dr. Jeka, you come back to "Oh, wow, I didn't expect    |
| 19 |   | that."  This is not -- is this a conscious thought, or is   |
| 20 |   | this the balance system saying "Oh, wow, I didn't expect    |
| 21 |   | that"?                                                       |
| 22 | A | Right.  I'm sorry.  You're right.  I shouldn't use the term |
| 23 |   | "Oh, wow."  It's the balance system that's reacting there.  |
| 24 |   | You're just -- you may be -- you know, the operating        |
| 25 |   | environment of a forklift is very complicated.  There's all |

1    sorts of auditory noise.  There's all sorts of visual

2    distractions.  There are other forklifts operating around

3    you.  You're not necessarily paying attention just to, you

4    know, one specific aspect.  And so all sorts of unexpected

5    things can happen, and when those unexpected things happen,

6    your automatic system kicks in.

7   Q  And can that result in the left foot moving to the left --

8   A  Absolutely.

9   Q  -- for an operator like Ms. Anderson?

10  A  Yes.

11  Q  Is that what you believe happened here?

12  A  Yes.

13  Q  Well, what if she had been specifically looking at the floor

14     and only at the floor and knew she was coming to a crack?

15     Would you have expected the same result?

16  A  Possibly could be different.  You know, if she had an

17     expectation that she was about to run over those cracks and

18     can prepare for that, I would expect a different result.

19  Q  Have you had an opportunity to look at the movement of

20     forklifts at that particular warehouse, an experiment that

21     someone did?

22  A  I saw videos of the forklift driving in that warehouse.

23  Q  How does that video -- I think it was done by Mr. Rogers.

24     How does that affect your opinions that Mrs. Anderson lost

25     her balance?

1          MR. LoCOCO:  Objection, Your Honor.  This is

2     beyond the scope of what was disclosed under Rule 26.  It's a

3     new opinion.

4          THE COURT:  Why don't you guys come over.

5          (Sidebar begins.)

6          MR. LoCOCO:  He issued a three-page supplemental

7     report after we disclosed this testing.  Nothing in there about

8     how it affected his opinions, what conclusions he was drawing,

9     how he was going to criticize that --

10         MR. WARSHAUER:  I'll just rephrase the question.

11         THE COURT:  All right.  Don't have to get to it,

12    don't have to get to it.

13         (Sidebar ends.)

14  BY MR. WARSHAUER:

15  Q   Dr. Jeka, let me rephrase this a little bit.  If we see

16    someone successfully negotiate a particular path, what does

17    that mean with respect to someone else who might have

18    negotiated it and had a different result?

19  A   So the key here is expectation.  I've watched a lot of videos

20    of forklift operators, and in all the videos I've watched,

21    they know exactly what's -- what they're expected to do and

22    they know the environment they're traveling in.  So when

23    someone is in that situation, there are these things called

24    anticipatory responses, so they initiate the deceleration of

25    the forklift because they're initiating that.  Again, they

1    know the consequences of that and they've prepared their

2    muscles accordingly to respond to that deceleration.  That's

3    expected.  All the videos I've seen are all expected

4    responses, and so of course they never lose their balance in

5    that situation.  But when it's unexpected, everything

6    changes.

7  Q  Let me see if I can summarize where we are with you.  You

8    shared with us that a human being's balance response with

9    respect to movements of our feet is an automatic response?

10  A  Yes.

11  Q  And what is your opinion as to whether or not that automatic

12    response contributed or caused Mrs. Lidy Anderson being

13    outside the forklift when it ran her over?

14  A  I think there's a very high probability that the automatic

15    balance response was the fact that she caused the movement of

16    the foot outside the platform and caused her to fall out of

17    the platform.

18              MR. WARSHAUER:  Thank you, Dr. Jeka.

19              I'm sorry.  I got one more thing.

20              THE COURT:  All right.

21              MR. WARSHAUER:  No, we're good.

22              THE COURT:  You're up.

23              MR. LoCOCO:  We're good?

24                        CROSS-EXAMINATION

25  BY MR. LoCOCO:

1   Q   Dr. Jeka, good morning.

2   A   Good morning.

3   Q   You and I have met a couple of times in the past; right?

4   A   Yes.

5   Q   Well, actually, we've only met in person once.  We met

6       virtually a couple of times.

7   A   Yes.

8   Q   Okay.  When I took your depositions?

9   A   Yes.

10  Q   And you know this is the time of the trial where I get to ask

11      you some followup questions about what you've done in the

12      case and your background and experience?

13  A   Yep.

14  Q   You're being paid to be here today; correct?

15  A   Yes.

16  Q   $500 an hour?

17  A   Yes.

18  Q   All right.  I want to start by asking you some questions

19      about what you kind of finished up with with Mr. Warshauer.

20      You said the issue is what's expected.  Mrs. Anderson had

21      worked at that facility for ten years; right?

22  A   Yes.

23  Q   She had operated this type of forklift for three or four

24      years; correct?

25  A   Yes.

1    Q    She had driven over these same floors for years; correct?

2    A    Yes.

3    Q    As opposed to the engineer in the video that you looked at

4         who only saw that floor the first time he did his video;

5         correct?

6    A    I don't know how often he had done it.

7    Q    Got it.

8    A    All I saw was the video.

9    Q    You've never seen that warehouse in Effingham?

10   A    No.

11   Q    You didn't think you needed to see it?

12   A    No.

13   Q    All right.  So what are you saying was unexpected -- well,

14        let me withdraw that.  Mrs. Anderson knew how the forklift

15        operated?

16   A    Yes.

17   Q    She knew how it felt driving over the floors in that

18        warehouse; correct?

19   A    I assume so.

20   Q    She had been down this aisle previously?

21   A    I assume so.  I don't -- you know, I assume so.

22   Q    So I'm trying to -- I'm having a hard time about what was

23        unexpected about her driving down that aisle, something she

24        had done for years in that warehouse.

25   A    You don't know the state of the operator at the time when

1      they encountered those cracks.

2   Q   She might have been distracted?

3   A   She might have been distracted.  She might have been looking

4      elsewhere.  She might not have known exactly where she was in

5      the warehouse.  It can be a completely unexpected event, even

6      though you've encountered it before.

7   Q   And you don't know what was going on at the time?

8   A   No one knows.

9   Q   Well, you're on the stand right now.  You don't know?

10  A   No one knows I would say is my answer.

11  Q   Including you?

12  A   Sure.

13  Q   All right.  Dr. Jeka, you're here to try and explain why

14     Mrs. Anderson was outside of this forklift when she knew she

15     wasn't supposed to be; correct?

16  A   Yes.

17  Q   All right.  You're not an -- I want to talk about your

18     background now.  You're not an engineer; true?

19  A   No, although I've taken many engineering courses.

20  Q   I took calculus, I'm not a mathematician.  So I'm going to go

21     back to my question.  You're not an engineer; correct?

22  A   Correct.

23  Q   You're certainly not a design engineer; true?

24  A   True.

25  Q   You have no experience whatsoever in the design of standup

| | | |
|---|---|---|
| 1 | | lift trucks; correct? |
| 2 | A | That's correct. |
| 3 | Q | You would agree with me that you're not an expert on the |
| 4 | | design of standup lift trucks; right? |
| 5 | A | That's correct. |
| 6 | Q | You've never been retained by any standup lift truck |
| 7 | | manufacturer to help work on the design of lift trucks and |
| 8 | | balance related to them; correct? |
| 9 | A | Correct. |
| 10 | Q | You've never been involved in writing or editing |
| 11 | | instructions, operator's manuals or safety manuals for use |
| 12 | | with standup lift trucks? |
| 13 | A | Correct. |
| 14 | Q | You're not a human factors engineer; correct? |
| 15 | A | Correct. |
| 16 | Q | You have no experience with writing or placing warning |
| 17 | | decals, safety decals on products; correct? |
| 18 | A | Correct. |
| 19 | Q | You have no training in accident reconstruction; correct? |
| 20 | A | Correct. |
| 21 | Q | You've not done an accident reconstruction in this case; |
| 22 | | true? |
| 23 | A | True. |
| 24 | Q | And prior to being retained by Mr. Warshauer in this case and |
| 25 | | in another case involving Raymond's competitor Crown, you had |

```
 1         not spent a single minute thinking about balance issues
 2         related to standup lift trucks; correct?
 3    A    I've spent enormous amounts of time thinking about issues
 4         related to standup -- standing up on a moving platform, which
 5         I'd say is equivalent to a standup forklift.
 6    Q    Prior to being retained by Mr. Warshauer, in your entire
 7         career, you had never done any type of work with regard to
 8         forklifts; correct?
 9    A    That's correct.
10    Q    Now you've told us that you didn't think you needed to do any
11         testing in this case; right?
12    A    That's right.
13    Q    But you could have?
14    A    Well, anything's possible.
15    Q    Well, you've done a lot of -- you're selling yourself short,
16         Doctor.  Don't you do a lot of testing?
17    A    Yes.
18                    MR. LoCOCO:  Could I have the document camera,
19         please?
20    BY MR. LoCOCO:
21    Q    I've got a few photographs, pictures off the internet I want
22         to ask you about.  So that's a picture of you with some of
23         your students and it's off a site called JekaLab.org?
24    A    That's right.  That's my lab.
25    Q    Here's another photograph of the lab, isn't it?
```

1   A   Yep.

2   Q   And what we see there is an operator or a test subject who is

3       being held up so that he doesn't fall; right?

4   A   Yep.

5   Q   And you can control the sensory experience of the operator?

6   A   That's right.

7   Q   It's a huge space, isn't it?

8   A   Oh, it depends on what you think -- what you call "huge."

9   Q   Well --

10  A   It's not an Olympic stadium.

11  Q   A forklift could fit in there, a standup forklift?

12  A   See, it could fit in there, but whether you could actually

13      record measurements in there is a real question.

14  Q   Okay.  You could build a compartment section and put it in

15      your lab?

16  A   So I feel like you're telling me what's possible for me

17      scientifically and you have no basis to do that.  It's a very

18      complicated environment in a lab like this.  There's

19      something called the volume of which you can capture someone

20      walking in this lab.  A forklift is way larger than that

21      volume.  So I would argue that, no, it would be very -- and

22      plus the weight of a forklift would not be supported by the

23      equipment that's in there.  So I would say, yes, it would be

24      very difficult, if not impossible, to record a forklift

25      operating in that environment.

1   Q   The reason I ask is, when I took your deposition, you did
2       admit that the concepts you're talking about here could be --
3       could have been tested with forklifts, wiring up a person,
4       wiring up a truck; correct?
5   A   It would be challenging, but possible.
6   Q   You didn't do that here?
7   A   No, because I felt there was no need to do it, because again,
8       these sort of experiments that are done all the time in my
9       field directly apply to the operation of maintaining your
10      balance on a forklift.
11  Q   We saw your CV, Dr. Jeka.  33 pages.  Not a single paper in
12      there even says the word "forklift" or "lift truck."
13      Correct?
14  A   Correct.
15  Q   Your publications and presentations, none of that work deals
16      with lift trucks?
17  A   That's correct.  There's a reason for that.
18  Q   I get to ask questions.
19  A   I'm not asking questions.  I said there's a reason for that.
20  Q   I know, and Mr. Warshauer will get a chance to follow up.
21      But since you raised it, I'm not going to keep something from
22      the jury.  Explain to us what the reason for that is.
23  A   So these experiments are very expensive to run.  You have to
24      pay students to run them.  The equipment is -- the equipment
25      in my lab is worth well over a million dollars.  And as a

1   scientist, you have to get money to raise your -- to run

2   these experiments, and most of that comes from the Federal

3   Government, National Institute of Health, in my case National

4   Science Foundation.  If a forklift manufacturer came to me

5   and said, "We want to run some studies on balance control and

6   we'll fund those studies," I'd be happy to do it.  But no one

7   has ever approached me to do that.

8   Q   Did you ask Mr. Warshauer if you could do some testing?

9   A   I just --

10  Q   That's a yes or a no.

11  A   I don't recall whether -- I think we had a short discussion

12      about that, and then I decided it wasn't necessary based upon

13      the literature.

14  Q   You were asked -- you just talked about the funding you

15      received.  A lot -- most of the funding you've gotten is from

16      the government?

17  A   Yes.

18  Q   Has any of your research ever involved balance on standup

19      lift trucks?

20  A   No.

21  Q   Putting a lab aside, it is true that you have done no testing

22      specific to the Anderson case?  Correct?

23  A   That question -- no, I would disagree with that question.  I

24      have done testing specific to the Anderson case, because the

25      principles of balance control on a support platform that

| | |
|---|---|
| 1 | moves is the same.  And anyone who knows anything about |
| 2 | balance would say the same thing, frankly. |
| 3 | Q    Is it correct that you have done no testing specific to the |
| 4 | Adelaida Anderson case? |
| 5 | A    You just asked me that question. |
| 6 | Q    Oh, well -- |
| 7 | A    I thought I answered it. |
| 8 | Q    Let's go back to what you told me under oath back in |
| 9 | December of 2020. |
| 10 | MR. LoCOCO:  May I approach the witness? |
| 11 | THE COURT:  You may. |
| 12 | BY MR. LoCOCO: |
| 13 | Q    Remember we put you under oath, Dr. Jeka? |
| 14 | A    Uh-huh. |
| 15 | Q    Before, I got to ask you questions.  And if you could go to |
| 16 | page 33, line 14, I asked you this question:  "And is it |
| 17 | correct that you've done no testing specific to the Adelaida |
| 18 | Anderson case?"  And you answered? |
| 19 | A    "That's correct."  So that question -- that answer is |
| 20 | correct, but I would also say you can interpret that question |
| 21 | differently.  And my answer today is based upon the |
| 22 | interpretation of what principles of balance control apply to |
| 23 | the Adelaide Anderson case, and I would say I've done plenty |
| 24 | of testing that relate to those principles. |
| 25 | Q    Dr. Jeka, after we took this deposition in December of last |

1    year, you were given an opportunity to read the deposition

2    and correct any of your answers; correct?

3  A  Yeah.

4  Q  Did you change that answer then?

5  A  No.

6  Q  Since you were retained in this case by Mr. Warshauer --

7    actually, do you remember when you were retained in this

8    case?

9  A  It was fall I think in two-thousand -- I'm not exactly sure.

10   Fall of 2019 or maybe spring of '20.  I'm not sure.

11 Q  Since whenever you were retained, what you've done in this

12   case is read a lot of material; correct?

13 A  Mm-hmm.

14 Q  You have to answer out loud.

15 A  Yes.  Yes.

16 Q  Wrote two reports?

17 A  Yes.

18 Q  Sat for two depositions?

19 A  Yes.

20 Q  And then came to trial this week?

21 A  Yes.

22 Q  You've done no testing and no study of the direction or level

23   of force that the 4250 would experience encountering any of

24   the cracks in the subject warehouse in the vicinity of the

25   accident; correct?

1   A   Yes, but I don't need to.

2   Q   Dr. Jeka, you've done nothing to determine whether the cracks

3       in the aisle of the warehouse where this happened will even

4       cause a 4250 to shimmy or shake; correct?

5   A   That's correct.

6   Q   But you would agree that there are mechanisms that can be

7       used to measure whether the lift truck is experiencing shimmy

8       and shake going over those cracks?

9   A   Yes.

10  Q   Now you were asked about this video.  When I deposed you in

11      March of this year, you didn't know whether you had even been

12      provided the data generated by Dr. Rodowicz and Mr. Rogers on

13      this issue of forces from the cracks; correct?

14  A   Is that in my deposition that I said I didn't?  I may have

15      not remembered at that time.  Yes.

16  Q   So you think you did now get it?

17  A   You're asking me whether I think I did know?  I'm not sure I

18      understand.

19  Q   Did you ever get the data?  Not just the video, but the data?

20  A   I got the report.

21  Q   No.  Did you ever get the data from the video runs that

22      Mr. Rogers and Dr. Rodowicz did?

23  A   No.

24  Q   Do you know from even looking at the report what the g-level

25      loading was experienced going through that course?

1    A    I don't need to know that.

2    Q    But my question, Dr. Jeka, is do you know what it is?

3    A    Offhand, no.

4    Q    All right.  Well, you said that there are strategies that

5         people use to deal with balance issues; correct?

6    A    Yes.

7    Q    There's an ankle strategy?

8    A    Yes.

9    Q    And a hip strategy?

10   A    Yes.

11   Q    And a step strategy?

12   A    Yes.

13   Q    And I'm driving a forklift and I hit the outside edge over in

14        the corner, not by the -- not by the compartment, but I run

15        into a concrete or steel bower, and I get hit with a 6- or

16        7-g load.  That for sure is going to be a compensatory step

17        to try to keep me in the compartment; right?

18   A    Yes.  Yeah.

19   Q    And if the load -- we should talk about g's.  You know what

20        g's are; right?

21   A    Mm-hmm.  Yes.

22   Q    So right now, I'm holding my hand up against 1g, whatever --

23        my hand and arm away.  I'm keeping it up by my muscles

24        against the 1 gravity.

25   A    Yes.

1  Q   And if I went down on the floor, which I'm not going to do,

2      but if I went down on the floor and I was asked to resist a

3      20g load, assuming I was 200 pounds, which I'm not, but

4      assuming I was only 200 pounds, that would be like me trying

5      to do a pushup with 4,000 pounds on my back?

6  A   I'll trust your numbers there.  It's something like that.

7  Q   Trying to do simple math.  Right?

8  A   Yep.

9  Q   So if as I'm operating a forklift, I am experiencing a

10     quarter of a g.  That's not very much, is it?

11 A   Well, depends.  Relative to what?  I mean, it's -- yeah,

12     relative to 100g, no, it's not very much.

13 Q   All right.  If I'm experiencing a quarter of a g, I might use

14     an ankle strategy, might use a hip strategy, probably

15     wouldn't use a step strategy; correct?

16 A   No, I disagree with that.

17 Q   Okay.

18 A   I've read studies that show that at 0.05g, so

19     five-one-hundredths of a g, that can create a compensatory

20     step.

21 Q   And those studies are with somebody just standing; correct?

22 A   Yes.

23 Q   Not holding on to two handles and a back nestled against the

24     back pad; correct?

25 A   Those two handles are not -- they can move, so they don't

1    provide stability in response to a disturbance, and you don't

2    know whether the person is lying against the backrest.

3  Q  Dr. Jeka, I want to ask you about the studies you mentioned.

4  A  Right.

5  Q  The studies that you're citing for this jury, finding -- a

6    compensatory step from 0.05g involves a subject who was not

7    holding on to anything and was not -- did not have their back

8    against the pad?

9  A  That's correct.

10  Q  And you've also testified that there's research that says if,

11    for example, I try to stand on one foot, right -- you could

12    see I'm having trouble balancing -- and I just touched with

13    my finger.  That makes a big difference in balance?

14  A  Only if the surface is perfectly rigid.

15  Q  Well, which this podium is?

16  A  Right.  But then in the handles, they are not.

17  Q  Because they're control handles?

18  A  Because they can move.

19  Q  And there's a back pad?

20  A  And many people have -- I've read depositions that say they

21    often don't use the back pad or they don't know how much they

22    use the back pad.  We have no -- we have no way of knowing

23    whether the back pad is being used.

24  Q  Mrs. Anderson testified that she was using a back pad;

25    correct?

1    A    I -- no, I don't remember that.

2    Q    You don't remember that?

3    A    Mm-mm.

4    Q    All right.  Well, she'll testify, and if she was using a back

5         pad, that was giving her extra stability, wasn't it?

6    A    Yes.

7    Q    Dr. Jeka, you're not a certified forklift operator; correct?

8    A    Correct.

9    Q    Never have been?

10   A    That's correct.

11   Q    You've never operated a Raymond Model 4250; correct?

12   A    I operated a Raymond model, but I don't know if it was a

13        4250.

14   Q    And you've maybe operated a Crown for about five minutes?

15   A    Yep.

16   Q    You spent no time in this case interviewing operators of

17        Model 4250 lift trucks; correct?

18   A    Correct.

19   Q    So I want to understand your theory.  Your opinion is that

20        something happened to challenge Mrs. Anderson's balance;

21        right?

22   A    Yes.

23   Q    It might have been the cracks?

24   A    Yes.

25   Q    You don't know if it was the cracks; correct?

1  A   My supposition was the cracks, because she reported that the

2      forklift started to shake and shimmy.

3  Q   Where did she report that, except in her deposition?

4  A   I'm just going off the deposition.

5  Q   Okay.  So were you provided the FedEx investigation report?

6  A   I don't recall if I've seen that.

7  Q   Were you provided the OSHA investigation report?

8  A   I don't recall if -- you know, there are a lot of reports

9      that I read, and so I look for balance issues in each of

10     them.  And some of them I went through more quickly than

11     others, so I can't remember specifically each report.

12 Q   Well, is there a single piece of paper that you could show

13     the jury that you looked at, other than Mrs. Anderson's

14     deposition in April of 2020, that said she had a balance

15     challenge or she lost her balance?

16 A   I -- just her deposition.

17 Q   All right.  Same question regarding shimmy or shaking over

18     cracks.  Just her deposition?

19 A   Well, there were other -- other depositions of other people

20     said they also experience such shaking and shimmying.

21 Q   Yeah, but I meant with respect to this incident, where

22     Mrs. Anderson complained about a crack or a shimmy or a

23     shake.  Anything other than her deposition?

24 A   I don't know what else there would be.  I don't know.

25 Q   There was an OSHA file where Ms. Anderson was interviewed?

1    A    Mm-hmm.

2    Q    Did you read the notes from that interview?

3    A    I don't remember.

4    Q    Did you read the notes from the interview where she said,

5         where it was noted by the OSHA investigator who was

6         interviewing her, that she went over a piece of wood?

7    A    I don't recall that.

8    Q    Let's go back to your opinion.  Something happened to

9         challenge her balance, and so your opinion is she employed

10        the step strategy?

11   A    Yes.

12   Q    And took a compensatory step with her left foot out, and when

13        she went to re-weight it, there was no platform there?

14   A    Right.

15   Q    And fell?

16   A    Yes.

17   Q    As part of your work in this case, have you observed other

18        operators operating standup lift trucks, either the 4250 or

19        something like the 4250?

20   A    Yes.

21   Q    Have you seen --

22   A    In videos.

23   Q    Okay.  Well, let's talk about real people first.  Have you

24        seen that in real people?

25   A    Have I seen what?

1    Q    Real people operating the 4250.

2    A    Well, a video is a person -- is of a real person.  And I also

3         was in a warehouse in Florida where I was watching people

4         operate a forklift.

5    Q    And this is when you were working for Mr. Warshauer in the

6         McHale case?

7    A    Yes.

8    Q    All right.  But they were operating a Crown forklift in

9         McHale?

10   A    Yes.

11   Q    Or in this -- was it an Amazon facility?

12   A    Yes.

13   Q    So I want to go to Raymond.  Have you ever watched an -- with

14        your own eyes, an operator of a Raymond lift truck?  No video

15        first.  Just your own eyes in a facility.

16   A    No.

17   Q    You've watched a video, we know for sure the video that

18        Mr. Warshauer was referring to.  What other videos have you

19        watched?  Things off YouTube?

20   A    No.  I mean, I'm not sure what you mean by the videos

21        Mr. Warshauer's referring to.  You mean the ones that show

22        the driver going over the cracks?

23   Q    The path, yes.

24   A    I've also seen the video of the operator at a Walmart

25        facility, I believe, where he was just asked to -- that he

| | | |
|---|---|---|
| 1 | | went down the path.  He was asked to just stop, decelerate |
| 2 | | and stop the forklift, and his left foot came out as he was |
| 3 | | doing that, even though it's a completely expected event. |
| 4 | Q | And it came out just an inch or so? |
| 5 | A | Yeah.  Something -- it came out. |
| 6 | Q | Well, that was a Crown forklift; right? |
| 7 | A | I believe so, yes. |
| 8 | Q | In a Crown forklift, the brake pedal was under the left foot; |
| 9 | | right? |
| 10 | A | Right. |
| 11 | Q | Correct? |
| 12 | A | Mm-hmm. |
| 13 | Q | And the Raymond forklift, Ms. Anderson -- Ms. Boone testified |
| 14 | | they used the right foot.  Do you understand that? |
| 15 | A | Yes. |
| 16 | Q | And if you took that Crown operator that you saw at this |
| 17 | | facility, put them on a Raymond truck, and he used the brake |
| 18 | | pedal and picked up his right foot, he couldn't have gotten |
| 19 | | his left foot out; correct? |
| 20 | A | That's correct. |
| 21 | Q | Because his left foot would have been weighted with his body, |
| 22 | | and unless he hopped out, he was going to stay in the |
| 23 | | compartment; correct? |
| 24 | A | Okay.  Yes. |
| 25 | Q | All right.  And actually, Dr. Jeka, it's your testimony under |

1    oath that it would be a vast improvement in terms of

2    preventing the balance challenge if the design -- instead of

3    the left foot being the emergency brake, the right foot was

4    going to be utilized as the emergency brake and the

5    instruction was to keep the left foot on the ground; correct?

6  A   Yes.

7  Q   Your opinion is that anything that keeps the left foot on the

8    ground when you have an open compartment next to you and

9    you're using the emergency brake under the right foot is

10    clearly going to virtually eliminate the balance problems;

11    correct?

12  A   No.

13  Q   Do you have the McHale transcript up there?

14  A   The deposition, you mean?

15  Q   Oh, that's the deposition.

16  A   This is the Anderson deposition.

17             MR. LoCOCO:  May I approach the witness, Your

18    Honor?

19 BY MR. LoCOCO:

20  Q   So this is the transcript, Dr. Jeka, of your testimony in

21    that Crown case down in Florida, which --

22  A   Okay.

23  Q   -- took place on October 5 and 6, less than a month ago;

24    correct?

25  A   Yes.

1    Q    Could you turn to page 58?  I'm sorry.  It starts on 57,

2         line 25.  You were asked this question by Mr. Warshauer's

3         partner on direct examination.  Question:  "If there was a

4         design of the forklift that said instead of raising the left

5         foot, you had to do something else to brake it, would that

6         eliminate that left-foot balance challenge that's created by

7         instructions from Crown?"  And you said, answer:  "So I'm not

8         a design expert, but I can tell you that any design with --

9         that has an open door on the left that encourages you to keep

10        your left foot on the floor is a better design than what

11        Crown currently has."

12                   Next question:  "So for example, if there was

13        a design that said instead of the left foot being the

14        emergency brake, that the right foot was going to be utilized

15        as the emergency brake, and the instruction was to keep the

16        left foot on the ground, would that be a better design in

17        terms of preventing balance challenge and the left foot

18        getting out?"  And you answered what?

19   A    "That would be a vast improvement."

20   Q    And these were truthful answers when you gave them --

21   A    Right, but you asked would it eliminate the balance problem,

22        and I said no to that.  That's the answer to your question.

23        I said it would be a vast improvement.  That does not mean it

24        would eliminate the balance problem.

25                   THE COURT:  I think the question on the floor was

1      whether that was your answer in the deposition.

2   BY MR. LoCOCO:

3   Q   Was that your answer?

4   A   Yes.

5   Q   You were then asked another question at line 7.  "How about

6       if instead of having to move the feet at all -- well, let

7       me -- before we do that, how about if instead of having to

8       lift that foot up like that to do the brake, that there was a

9       press-down brake on the floor where you put your foot and

10      pressed it down so that your feet were solidly on the ground.

11      How would that be in comparison to this?"  And you answered,

12      "I think that also would be a vast improvement.  Anything

13      that keeps the left foot on the ground when you have an open

14      door next to you is clearly going to reduce the -- virtually

15      eliminate the balance problems and the injuries that are

16      associated with it."  Did I read that correctly?

17  A   Yes.

18  Q   And when the operator uses the right foot up off the deadman

19      pedal, the left foot has to stay on the floor of the

20      compartment?

21  A   Well, obviously that's not the case because people are

22      falling out.

23  Q   Dr. Jeka --

24  A   So wait.  Let's be clear of your question here.  You're

25      saying if you use the right hand -- the right foot to

1      encourage to -- to initiate the brake, the left foot has to

2      stay down?

3   Q  Right.

4   A  Yes, that's true.  However, that doesn't mean the left

5      foot -- the left foot can also leave the compartment, which

6      actually makes it impossible to engage the brake on the right

7      foot.

8   Q  Unless you take your right foot off the brake first?

9   A  Right.  But what if the left foot moves first?

10  Q  Well, aren't operators trained to take their foot off the

11     deadman pedal before they leave the compartment?

12  A  That doesn't mean that that training is going to work.  In an

13     emergency situation, automatic balance system is going to

14     take over and training's not going to do anything.

15  Q  Mrs. Anderson had been operating this truck for four years.

16     She knew how the truck operated; correct?

17  A  Mm-hmm.

18  Q  Yes?

19  A  Yes.

20  Q  She knew that if she took her right foot up off the deadman

21     pedal, the truck would brake?

22  A  Yes.

23  Q  The fact is, less than a month ago, you were in a different

24     courtroom criticizing Crown's pedal configuration?

25  A  That's correct.  And I continue to criticize that.

```
 1   Q   Other than Mrs. Anderson -- you said people are falling out.
 2       Other than Mrs. Anderson, have you ever seen anyone else fall
 3       out of a 4250?
 4   A   No.
 5   Q   I want to go back to your knowledge of Mrs. Anderson -- I'm
 6       sorry.  I apologize.  I need to check something.  It's the
 7       other deposition.
 8                   MR. LoCOCO:  I apologize, Your Honor.  I thought
 9       I had it out here.
10                   THE COURT:  It happens.
11   BY MR. LoCOCO:
12   Q   You said you didn't know that Mrs. Anderson was leaning
13       against the back pad?
14                   MR. LoCOCO:  Your Honor, may I approach?  Thank
15       you.
16   BY MR. LoCOCO:
17   Q   Let me show your deposition from March 26 of this year,
18       page 12.
19   A   Okay.
20   Q   At page 12, line 7, or line 12, "Have you accounted for her
21       testimony that she was leaning against the back pad while she
22       traveled from her starting point to the end point before she
23       got off the forklift?"  Your answer:  "Well, I believe that
24       she's -- she's telling the truth there."  Did I read that
25       correctly?
```

1  A  Yeah.

2  Q  So either because I told you or because you read it, you know

3     that Mrs. Anderson was using the back pad?

4  A  Okay.

5  Q  You agree with that?

6  A  That she's using the back pad?

7  Q  Yes.

8  A  Yes.

9  Q  Okay.  Last -- I think it's the last thing, although I have

10    to check with my coworkers here.  You mentioned that it's

11    extremely difficult to stand in one position for a long

12    period of time; correct?

13  A  That's correct.

14  Q  Eight hours would be really excruciating?

15  A  Oh, yeah.

16  Q  Let alone 30 minutes?

17  A  Yes.

18                    MR. LoCOCO:  Just a moment, Your Honor.

19  BY MR. LoCOCO:

20  Q  Did you review all the documents that were provided to you by

21    Mr. Warshauer and his colleagues?

22  A  Yes.

23  Q  You reviewed the depositions that were provided?

24  A  Yes.

25  Q  You agree with me that no one other than Mrs. Anderson said

1    they experienced shaking when going over the cracks?  In the

2    depositions you received.

3 A  Well, there were other documents I received that, for

4    example, Rechel Boone who said that shaking was very common

5    going across the cracks.

6 Q  That was a statement or you talked to her this morning?

7 A  No, no, that was a statement I read, as well as other

8    employees.  I read statements from other employees from the

9    facility who also said that they ran over cracks and

10   experienced shaking.

11 Q  And none of them ever fell out; correct?

12 A  That's my understanding.

13            MR. LoCOCO:  All right.  Thank you, Your Honor.

14   Nothing further.

15            THE COURT:  Mr. Warshauer, Counsel, would you

16   guys approach?

17            (Sidebar begins.)

18            THE COURT:  We are as they say in the radio

19   business coming up on a hard break.  So --

20            MR. WARSHAUER:  Probably have about six minutes

21   or seven minutes.

22            THE COURT:  And then it's a hard break.  So that

23   means after lunch that you do redirect.

24            MR. LoCOCO:  If I have any.

25            THE COURT:  If you have any.  But I'm just

1    alerting you, at five minutes to 12, hard break, jurors leave.

2                    MR. LoCOCO:  What's your preference, Your Honor?

3                    THE COURT:  I'm asking you, because you're the

4    lawyer.

5                    MR. WARSHAUER:  Let's go ahead and break now.

6                    THE COURT:  Okay.  Yeah.  That's what I'm asking.

7    I think it's very important that they don't feel rushed.  All

8    right?

9                    MR. LoCOCO:  Thank you.

10                   (Sidebar ends.)

11                   THE COURT:  All right, ladies and gentlemen.  One

12   of my jobs as judge is to make sure that we break at the

13   appropriate times.  And I know there's more questions of you,

14   Dr. Jeka, but I'm going to ask -- I'm going to hold you over for

15   lunch because I have to get our jurors fed and they have to

16   order their lunch.  So it is ten minutes to 12.  We will start

17   back -- how long does it take to get those lunches?  Already

18   here.  How about that?

19                   Let's start back at 10 after 1.  We are in

20   recess.

21                   (Jury exits at 11:48 a.m.)

22                   (Recess from 11:48 a.m. to 1:07 p.m.)

23                   THE COURT:  Let the record reflect we are back

24   after lunch break in Anderson v. Raymond.  The jury is not

25   present and wanted to take up a few matters with the attorneys

1    before we bring the jury back out.

2                    The first thing I was inquiring about was whether

3    or not the parties have agreed how they want to proceed on

4    putting on the record those exhibits that they agree to.

5    Starting with Plaintiff.

6                    MR. WARSHAUER:  I think the best way would be at

7    some point, we just say, "The following exhibits..." and we list

8    them by number, have been agreed to be admitted or are

9    collectively moved by the parties to be admitted, and then

10   you -- we would expect you to go "That's fine with me," and then

11   they would all be in.

12                   MR. LoCOCO:  That's fine, with us, Your Honor.

13   I'm thinking that if it works for the court and your staff, we'd

14   do it twice, once at the end of the plaintiff's case and once at

15   the end of our case.  My concern if we admit everything, I could

16   do -- I could read into the record the exhibits for which the

17   plaintiff has no objection, but if there's no testimony

18   regarding it, then I'm not sure we want to give access to those

19   exhibits to the jury.  You know, we overdesignated, obviously.

20                   MR. WARSHAUER:  Yeah.  I think that makes sense

21   too, that at the end of our case, what we'll do is, "We've

22   touched --"  You're shaking your head.

23                   THE COURTROOM DEPUTY:  I'm just -- I'm thinking.

24                   MR. WARSHAUER:  If we have overdesignated too and

25   we've talked about 17 exhibits, then we'll collectively move

1    those 17 in.  And the defendant, if they've talked about 17,

2    they'll move those in.  And the individual ones that we fight

3    about, the Court -- you'll make the ruling simultaneously with

4    the fight.

5                    MR. LoCOCO:  Right.  If that works for you, Your

6    Honor.

7                    THE COURT:  Okay.

8                    MR. LoCOCO:  And your staff.

9                    THE COURT:  All right.  Well, so much for that.

10                   THE COURTROOM DEPUTY:  May I -- I have an idea.

11                   THE COURT:  Yes.

12                   THE COURTROOM DEPUTY:  My experience has been at

13   the end of each day that a representative from each party will

14   meet with Jackie to confirm what exhibits were admitted for the

15   day, because that way, she knows which ones specifically will go

16   back to your jury for deliberations.

17                   MR. WARSHAUER:  That's a great plan.

18                   MR. LoCOCO:  That works.

19                   THE COURTROOM DEPUTY:  Just a suggestion.  And

20   it's done daily.

21                   THE COURT:  I should have called on you first.

22   Leave it up to these guys.

23                   MR. LoCOCO:  And, Your Honor, I have one other

24   thing that's hopefully quick.  When I was cross-examining -- and

25   Dr. Jeka's here, but I don't care if he hears this.  Actually he

1 should hear this.  When I was cross-examining Dr. Jeka, he in

2 response to one of my questions -- well, it wasn't really in

3 response to the question, but he kind of blurted out, "Well,

4 you've got people, other people falling out of these

5 compartments."  We had filed a motion in limine to keep out

6 other incidents without flagging the issue for the Court for the

7 parties and getting a chance to have the other side lay a

8 foundation.  I'm not here to accuse Dr. Jeka of malfeasance.

9 I'm just -- wanted to remind the parties about that,

10 particularly prior to Dr. Meyer coming on the stand, that if

11 that's going to be an issue, we need to talk about it with the

12 Court ahead of time.

13     MR. WARSHAUER:  Well, you asked a question,

14 Counsel:  "Other than Ms. Anderson, are you aware of anyone else

15 who fell out?"  Well, he is.

16     MR. LoCOCO:  Of a -- of a 4250.

17     MR. WARSHAUER:  Of a 4250.  Ms. Pogue was in a

18 4250.  Mr. Jones was in a 4250.  Mr. Hampton was in a 4150, but

19 there's absolutely no difference in the operator's compartment.

20     MR. LoCOCO:  Well, the 4200 is what Hampton was

21 in and it doesn't have the floating floor, so there is a

22 difference.  And he certainly can't lay a foundation for those

23 other two incidents.  And I didn't ask it this way.  I was

24 really careful about how I asked it.

25     THE COURT:  My recollection of the way that you

1     asked it was, "Did you see anyone other than Mrs. Anderson --

2     Ms. Anderson fall out?"

3                    MR. LoCOCO:  Yes.

4                    THE COURT:  And I thought he didn't even see her

5     fall out.

6                    MR. LoCOCO:  Exactly.

7                    THE COURT:  Nobody saw her fall out.  That's one

8     of the issues in this case.

9                    MR. LoCOCO:  I have the same concern.

10                   THE COURT:  No witnesses.

11                   MR. WARSHAUER:  Well, Judge, could I ask this

12    question?  "You were asked a number of questions about other

13    people through your work on these cases.  Are you familiar with

14    other people who have complained about balance?"  That's in his

15    report, multiple quotes.  I'll leave it at that.

16                   THE COURT:  Well, it's -- I'm not going to

17    prejudge -- here's the thing.  The first time this issue was

18    brought to my attention, it was brought to my attention by the

19    plaintiffs, who complained that the defendants were not keeping

20    records of injuries involving their forklifts, and that they had

21    a procedure in place to destroy all those records that related

22    to injuries within five years, or at a five-year -- I guess a

23    five-year sunset provision on keeping those.  And that it was

24    Mr. Warshauer's contention that that was purposely done to try

25    to limit the plaintiff's ability in discovery to learn about all

1    prior instances.  So that's the first it's been brought to my

2    attention.

3              I was told that the plaintiff was contemplating

4    bringing in other people who had experienced falls from this

5    forklift.  I don't know if that's going to happen or not.  And I

6    think we're just going to have to take up the issues of

7    foundation as they arise.  If you -- there's no way I'm going to

8    enter a blanket order that they can't refer to other instances

9    where people were injured on these forklifts, because it may

10   very well be relevant, and if people are falling off and their

11   legs are getting cut off, that may be extremely relevant.  I'm

12   not going to enter an order that prohibits that.  So I think we

13   should take it up as a foundational issue any time it works its

14   way into testimony of a witness.

15             MR. LoCOCO:  Which is how things were set up,

16   Judge, when we talked on Friday.

17             THE COURT:  Okay.

18             MR. LoCOCO:  And what I'm saying is that Dr. Jeka

19   threw that out in response to my question about seeing somebody

20   else.  He threw it out as to others.  And like I said, I'm not

21   accusing Dr. Jeka of malfeasance.  All I'm saying is, this Court

22   set out a process for taking up the foundational issues.

23             THE COURT:  I -- we can address that later if

24   need be.  We'll see --

25             MR. WARSHAUER:  Well --

1       THE COURT:  -- in the grand scheme of things if

2  it was prejudicial or not.

3       MR. WARSHAUER:  Well, the question that I would

4  like to be able to ask Dr. Jeka is, "You have worked on another

5  case on a 4250 where Ms. Pogue said she lost her balance and was

6  run over by the wheel."

7       THE COURT:  You can ask about that.

8       MR. WARSHAUER:  That's it.  I'm just going to --

9       THE COURT:  That's not a surprise to you, is it?

10       MR. LoCOCO:  Well, it is, because first of all,

11  it's a leading question.  That's not what Ms. Pogue said.

12       THE COURT:  All right.  That's not a surprise.

13  That's just the form of the question.

14       MR. LoCOCO:  Well, the form of the question is

15  leading.  Ms. Pogue gave a completely different explanation, and

16  her supervisor Angel Aponte, who testified the next day after

17  her, said that she reported to him an excited utterance that she

18  stuck her foot out.  So what the case law talks about, Your

19  Honor, is one of the problems with doing this is you're having

20  mini-trials of other matters.  And what's the foundation going

21  to be out of this witness to get that in?

22       THE COURT:  Well, I'm not interested in

23  mini-trials, but this stuff could be -- this could be evidence

24  of notice.

25       MR. LoCOCO:  We're not denying --

1          THE COURT:  It might be relevant because it puts

2   you on notice.  There's a couple reasons it might come in.

3   Let's just take it up as it plays out.  I'm not going to enter a

4   blanket order that says you may not mention -- look, you got to

5   cross-examine him on a case he testified about.  That's a

6   different case in a different deposition and a different

7   product.  I could have said, "Wait, wait, wait.  That's an

8   entirely different product."  This is -- was perfectly

9   legitimate cross-examination, and it involved a different case.

10  So I don't know, as I sit here, what it is you're asking me to

11  do, to say you can't talk about any other cases that I know

12  nothing about.

13          MR. LoCOCO:  What we --

14          THE COURT:  You guys know everything about it

15  apparently because you're fighting over it, and you know what

16  the witnesses are going to say or what they said in depositions.

17  But I don't know.

18          MR. LoCOCO:  Well, I apologize for interrupting

19  the Court.  What we asked for in the trial brief we filed is

20  that if this was going to be an issue, that the plaintiff be

21  required to lay a foundation outside the presence of the jury as

22  to substantial similarity before the Court rules, rather than

23  doing it in front of the jury.

24          THE COURT:  So what say you?

25          MR. WARSHAUER:  The simple question I will ask:

1    "Dr. Jeka, have you worked on another case where the plaintiff

2    said she had a loss of balance, fell out, and was run over by

3    the wheel?  Yes or no."  And then we'll leave it at that.

4                MR. LoCOCO:  Well, it's a leading question, which

5    is a problem with the form.  And secondly, where is

6    Mr. Warshauer pulling that from?  Because that's not what

7    Ms. Pogue testified to.

8                MR. WARSHAUER:  She -- her deposition testimony

9    said she lost her balance.

10               THE COURT:  Do you represent Mrs. Pogue?

11               MR. LoCOCO:  Yes.

12               THE COURT:  Or Ms. Pogue?

13               MR. WARSHAUER:  I do.

14               THE COURT:  Okay.  And is this another Raymond

15   case or different case?

16               MR. LoCOCO:  It's a Raymond case.

17               MR. WARSHAUER:  And it's on a 4250.

18               THE COURT:  Well, if he -- so foundation, he's

19   been asked -- you asked him about his opinions, you asked him

20   about his knowledge of any -- of other accidents, other

21   instances, if he studied anything, what's he basing it on.  So I

22   think if he lays the foundation that you have been retained as

23   an expert in another case, "Does it involve a forklift similar

24   to this?"  "Yes."  "And what did the plaintiff say happened in

25   that?  Have you offered opinions based upon that?"  "Yeah."

1     That's sufficient foundation.

2                    MR. LoCOCO:  Judge, the other thing is, this is

3     redirect.  I didn't bring this up.  Now he threw -- he threw

4     that out in response to a question that I asked in a very

5     limited way.  And the way the Court just asked the question is

6     also hearsay.  "What did Ms. Pogue say?"  So, I mean, I'm making

7     my record, Your Honor.

8                    THE COURT:  You mean an expert can't rely on

9     hearsay in formulating opinions?

10                   MR. LoCOCO:  Sure.

11                   THE COURT:  Yes.

12                   MR. LoCOCO:  Yeah.  An expert can rely on

13    hearsay.

14                   THE COURT:  Okay.

15                   MR. LoCOCO:  But the case law also says that the

16    expert can't put the hearsay into the record.  He can't be just

17    a vessel for getting hearsay to the jury, but he can rely on

18    hearsay for his opinions.

19                   MR. WARSHAUER:  I'm --

20                   MR. LoCOCO:  And I would again come back to the

21    fact that I didn't open this door.  He did in response to a very

22    limited question.  Even the Court had to stop Dr. Jeka at one

23    point from not being responsive.  So I'm going to get penalized

24    on redirect because this guy violated an order of the Court.

25    This is an area, Your Honor, in the jurisprudence that is rife

1    for verdicts being overturned.  Substantial similarity --

2              THE COURT:  Wouldn't be my first, my friend.

3              MR. LoCOCO:  I'm just saying substantial

4    similarity requires certain foundation, and this is not it.

5              THE COURT:  What was the questions he asked that

6    you think allows you on redirect to ask about this incident?

7              MR. WARSHAUER:  There were a couple of areas that

8    I made notes.  "Other than Mrs. Hampton, anyone else?"  That was

9    the gist of the question.  And I actually made my notes of all

10   the other people I think, but I wrote that question with a

11   square.  I'm not a perfect stride, but that was it.  There was

12   another area, "Have you interviewed any other operators who --

13   read their testimony who said they lost their balance?"  And he

14   hadn't interviewed them, but he's read their depositions where

15   they said they lost their balance, which is equivalent to an

16   interview.  It's a question-and-answer exchange.

17             So I think those inquiries where you're -- he's

18   trying to establish that this is a one-off, and I have a right

19   to rebut that one-off.  "It's not the first person you've heard

20   about who lost their balance and got run over by the wheel on a

21   4250?"  I mean, they don't even admit --

22             THE COURT:  Sounds like those questions open the

23   door.

24             MR. LoCOCO:  Well, I don't think I asked them

25   like that, Your Honor.  I'm trying to find in my notes the exact

1   questions.

2                   THE COURT:  I remember the gist of the

3   questioning.  And --

4                   MR. LoCOCO:  Here's the question I asked, Your

5   Honor.

6                   THE COURT:  Now is this today's transcript?

7                   MR. LoCOCO:  No.  This is my note, what I was

8   reading, because I had a cite to his deposition.  "You have

9   never observed a single Model 42 operator do this; correct?"

10  i.e., broaden base of support and fall out of the compartment.

11  That's a note to me.  "You haven't found a single video of such

12  an event, even on --" I didn't say YouTube, but "You haven't

13  found a single video of such an event; true?"  So I asked about

14  his observation and a video off the internet.

15                  THE COURT:  I think you're asking him about --

16  but I do think that one can draw the inference that you're

17  asking about his knowledge, are there other instances.  And I

18  think you open the door, but I'll allow the question.

19                  All right.  What else do we need to do before we

20  bring the jury in?

21                  MR. WARSHAUER:  I think that's it for us, Your

22  Honor.

23                  THE COURT:  All right.  Dr. Jeka, I appreciate

24  your patience.  I know I made you wait through lunch.  Let's

25  bring the jury in.

```
 1                    (Jury enters at 1:23 p.m.)

 2                    THE COURT:  All right.  Please be seated.  We are

 3        back on the record in the matter of Anderson v. Raymond.

 4                    Dr. Jeka, we broke for lunch during the

 5        questioning of you as a witness.  I appreciate your patience to

 6        stick around.  You are still under oath, and we are now on the

 7        redirect of Plaintiff.

 8                    MR. WARSHAUER:  May it please the Court.  Good

 9        afternoon, everyone.

10                         REDIRECT EXAMINATION

11   BY MR. WARSHAUER:

12   Q    Dr. Jeka, you were asked about whether you'd ever been

13        retained by a forklift manufacturer.  If the Raymond

14        Corporation retained you, would you be willing to help them

15        create a design that's consistent with foreseeable balance --

16        automatic balance movements to minimize the risk of injury to

17        operators?

18   A    Certainly.

19   Q    Are you available for that kind of consulting?

20   A    Well, I would certainly want to help in offering my opinion

21        about reducing balance issues if I had the time.

22   Q    You were asked about the perturbations and you were talking

23        about g forces and 0.05g forces.  To trigger the movement of

24        the left foot of an operator who is in the operator position,

25        to move it just an inch or two to the left, enough to go off
```

1    the edge, how much force is needed?  What are we talking

2    about here?

3  A   So again -- well, as I said in my deposition, actually zero

4    force is enough, because again, the environment can

5    contribute to an automatic balance response without there

6    being any force at all.  But papers have shown that forces as

7    low as 0.05g can trigger a compensatory step.  And keep in

8    mind, those papers are triggering steps in the fore-aft

9    direction, forward, backward.  You need even less to trigger

10   a step in the sideways direction because balance is much more

11   challenged in the side to side direction.  But the point is,

12   there can be visual or proprioceptive perturbations,

13   disturbances, that can lead to a compensatory step with zero

14   force.

15  Q   And lastly, you were asked some questions about your

16   experience in investigation of other people on 4250s.  Have

17   you worked on another case involving a 4250 that was similar

18   to this?

19  A   Yes.

20  Q   Did it involve a loss of balance?

21  A   Yes.

22  Q   Did it involve getting run over by the rear wheel?

23  A   Yes.

24              MR. WARSHAUER:  Thank you.

25              THE COURT:  Recross?

1        MR. LoCOCO:  Yes, Your Honor.  Excuse me just one

2    moment.

3                    RECROSS-EXAMINATION

4    BY MR. LoCOCO:

5    Q    This other matter that Mr. Warshauer asked you about right at

6         the end here, that's another case where Mr. Warshauer's the

7         plaintiff's lawyer; right?

8    A    I think he's involved.  I'm not sure if he's the primary

9         lawyer or not.

10   Q    You haven't talked to him about that case?

11   A    I've talked briefly about -- we prepared somewhat.  But I

12        know there are other lawyers involved, so when you say he's

13        the lawyer, that's a detail I'm not sure about.

14   Q    He's one of the lawyers in the case, Dr. Jeka; correct?

15   A    Okay.  Yes.

16   Q    All right.  And have you read that plaintiff's deposition in

17        the case?

18   A    So I've read the case of Rodney Jones --

19   Q    No, that's not what he was asking you about.  Have you read

20        the -- let's do -- have you read Rodney Jones' deposition?

21   A    Yes.

22   Q    Do you know what model that involved?

23   A    Off the top of my head, I don't recall exactly.

24   Q    All right.  I think Mr. Rogers -- Mr. Warshauer's referring

25        to a different case.  I'll give you the name:  Pogue.

1   A   Mm-hmm.

2   Q   You understand that that's Mr. Warshauer?

3   A   Yes.

4   Q   Have you read Ms. Pogue's deposition?

5   A   Not recently.  It was some time ago.

6   Q   Did you read Mr. Aponte's deposition?

7   A   No.

8   Q   Do you know who Mr. Aponte is?

9   A   No.

10  Q   You don't know that Mr. Aponte is Ms. Pogue's trainer?

11  A   No.

12  Q   Mr. Warshauer asked you about being available for

13      manufacturers including Raymond to help with this balance

14      issue.  Other than telling this jury the issues you find with

15      balance on the 4250, have you sent a letter to OSHA telling

16      OSHA that that's -- this is a problem?

17  A   No.

18              MR. LoCOCO:  That's all I have, Your Honor.

19      Thank you.

20              MR. WARSHAUER:  Thank you, Dr. Jeka.

21              THE COURT:  Thank you.

22              THE WITNESS:  Thank you.

23              THE COURT:  Does anybody require this witness to

24      remain available?

25              MR. LoCOCO:  No, Your Honor.

 1                    THE COURT:  All right.  Thank you.  Call your

 2       next witness.

 3                    MR. WARSHAUER:  Plaintiff's next witness will be

 4       Dr. John Meyer.

 5                    (Witness sworn.)

 6                    THE COURTROOM DEPUTY:  Please state your full

 7       name and spell your last name.

 8                    THE WITNESS:  John Meyer, last name M-e-y-e-r.

 9                    THE COURTROOM DEPUTY:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. WARSHAUER:

12   Q   Good afternoon, Dr. Meyer.

13   A   Good afternoon.

14   Q   What is your address?

15   A   My address?  It's a mouthful.  It's 40W373 Edgar Lee Masters

16       Lane in St. Charles, Illinois.

17   Q   What do you do?

18   A   I'm a mechanical engineer, so I do engineering consulting

19       related to mechanical engineering issues.

20   Q   Judge McGlynn has approved you to help us understand

21       mechanical engineering opinions.  I want to ask you, what is

22       a mechanical engineer as you practice that expertise?

23   A   Mechanical engineer basically uses the laws of physics to the

24       design and analysis and manufacture of machines and other

25       devices.

1           THE COURT:  Mr. Meyer, I'm going to ask you to

2     try to speak so that you know you can clearly be heard at the

3     back of the courtroom.  And pull the microphone a little closer

4     to you.  I want to make sure that we hear you well.

5           THE WITNESS:  Is that better?

6           THE COURT:  Yep.

7   BY MR. WARSHAUER:

8   Q   I was talking about this mechanical engineering.  Do you hold

9     any certifications in that?

10  A   I do.  I am a professional engineer, which is really the

11    highest standard that can be attained as an engineer.  You

12    have -- to become a professional engineer, you have to

13    basically pass two rigorous exams, as well as have a certain

14    amount of time practicing engineering under another

15    professional engineer.

16  Q   Did the Raymond Corporation try to prevent you from

17    testifying in this case?

18          MR. LoCOCO:  Objection, Your Honor.  May we be

19    heard on this?

20          (Sidebar begins.)

21          THE COURT:  The first thing I'll say is, I

22    haven't approved your expert, either the last one or this one.

23    So quit introducing them as someone the judge has approved,

24    because I think that's misleading.

25          MR. WARSHAUER:  Okay.  I will tell you I did it,

1    I apologize.  It won't happen again.  The last place I was in,

2    the judge told me I had to do that, said that's the way you

3    ought to do it.

4                    THE COURT:  Don't do it that way.

5                    MR. WARSHAUER:  I thought it was weird.  I won't

6    do it again.

7                    THE COURT:  All right.

8                    MR. LoCOCO:  In Florida?

9                    MR. WARSHAUER:  You had to be there the whole

10   trial.

11                   MR. LoCOCO:  Okay.  Well, that didn't happen in

12   Florida.

13                   THE COURT:  Let's move on.

14                   MR. WARSHAUER:  Yes, it did.

15                   MR. LoCOCO:  This is tangential to all the issues

16   here.  This man worked for two companies that were doing work

17   for the Raymond Corporation, and Raymond filed a trade secret

18   injunction action when he was first identified.  That's been

19   litigated in the Northern District of Illinois and dismissed

20   based on representations from Mr. Warshauer, who happened to be

21   his lawyer during the case.  It's got nothing to do with the

22   issues in this case.  So if you let this go, Your Honor, I got

23   to cross-examine him about something that is completely

24   irrelevant to the engineering issues here.

25                   THE COURT:  All right.  Whether you've objected

1    or not, I don't know that that's relevant.  Because I've not --

2    I've overruled whatever objections you had.  But if you want to

3    get into the fact that he has done work with Raymond, is that

4    where you're going with this?

5              MR. WARSHAUER:  I'm getting in that Raymond has

6    sued him twice and called him a turncoat, and that there is

7    relevant case law that says when a defendant or opposing party

8    takes steps to prevent you from testifying, you can tell the

9    jury about it.  Mr. Abbott has this case law handy.

10             MR. LoCOCO:  This is not something that could

11   have been raised before this man got on the witness stand?

12             MR. WARSHAUER:  I didn't think I needed to.  It's

13   a legitimate question.

14             THE COURT:  Pat, do you have these cites?

15             MR. LoCOCO:  No, we don't.

16             THE COURT:  Why don't you write down the cites.

17   I'll go read the cases.  We'll take a five-minute break.

18             MR. LoCOCO:  And he's -- what he's saying we

19   said, Raymond didn't say.  Raymond's lawyers wrote a complaint,

20   and as the Court knows, a complaint is only allegations.

21             MR. WARSHAUER:  It said "turncoat."

22             MR. LoCOCO:  In the complaint.

23             MR. ABBOTT:  That's in Raymond's name.

24             MR. LoCOCO:  It's not -- these are noticed

25   pleadings, Judge.  You're looking at --

1          THE COURT:  It's worth taking a five-minute

2     break.

3          (Sidebar ends.)

4          THE COURT:  All right.  I think they thought I

5     looked too bored up here so they're keeping me busy, and they

6     brought up a question and I want to take just a brief

7     five-minute break so that we're not standing over here and

8     arguing or whispering.  So why don't we take a five-minute

9     break.  We'll come back for questions.

10          We are in recess for five minutes.

11          (Jury exits at 1:36 p.m.)

12          (Recess from 1:36 p.m. to 1:53 p.m.)

13          THE COURT:  All right.  We are on the record

14     outside the presence of the jury.  We've asked the witness to

15     leave the courtroom.  An issue was brought up by the plaintiff,

16     that the plaintiff wants to ask this witness specifically about

17     two lawsuits that were filed against him by Raymond Corporation

18     that relate to seeking some type of declaratory relief,

19     prohibiting him from testifying against Raymond.

20          It's your motion, Counsel.  Please proceed.

21          MR. ABBOTT:  Yes, Your Honor.  I think the case

22     law we cited I think is very clear, that in civil cases where

23     one party, particularly a litigant in the case, tries to get a

24     witness not to testify, that in those circumstances, that

25     evidence can come in to suggest that the party thinks that their

1    case is fraudulent, frivolous, et cetera, against that party.

2    And that's the purpose for which we would be offering this

3    evidence.

4            And yes, in Docket 64, the Court did not grant us

5    sanctions as to Raymond's conduct, but that doesn't mean that

6    it's not an issue that the jury can consider in considering this

7    matter.

8            MR. MURPHY:  Judge, you've read those three cases

9    and you've looked over them.  There's no issue here that we

10   suborn perjury.  That's one of the cases.  There's no -- not

11   even an allegation that we tampered with a witness, tampering

12   with a witness.  We filed a lawsuit over intellectual property,

13   saying that, "Hey, you know, you work for a firm that

14   represented us."  Okay?  That's what it was about.  But it's

15   even more basic than that.  This is direct examination.  What

16   you're talking about here is if a party wanted to impeach a

17   witness, you could do that.  Why would you bring this up in your

18   case in chief?  It just doesn't apply, Judge.

19           THE COURT:  Well, I went through a lot of stuff,

20   a lot of depositions and reports of Dr. Meyer.  Does the fact

21   that he previously worked with Packer Engineering, would that

22   fact get in and the jury could know that?

23           MR. LoCOCO:  Sure.

24           THE COURT:  All right.  Does the fact that while

25   he was at Packer Engineering, Raymond had hired or employed

1   Packer Engineering to do engineering work for it?

2                 MR. LoCOCO:  Sure.

3                 THE COURT:  That the engineering work may relate

4   to the operation or design of forklifts?

5                 MR. LoCOCO:  Yes.

6                 THE COURT:  So that gets in.  Was there any

7   nondisclosure agreement that he signed?

8                 MR. LoCOCO:  Dr. Meyer?

9                 THE COURT:  Yeah.

10                 MR. LoCOCO:  Well, that gets into the -- the

11   reason why the lawsuit was filed, Your Honor, is that Dr. Meyer

12   abjectly refused to tell the lawyers who are representing

13   Raymond whether he had signed a nondisclosure agreement and

14   whether he had any access to any intellectual property at all.

15   And as the Court knows, anyone who has intellectual property, if

16   you don't protect it, you lose the protection.  So Raymond's

17   lawyers tried to ask him and then another person, "Do you have

18   this information," and Dr. Meyer told us -- refused to engage.

19   Then Mr. Warshauer was engaged apparently by Dr. Meyer, and they

20   refused to issue an affidavit.

21                 When the Northern District of Illinois got the

22   case, your counterpart up there said, "Mr. Warshauer, just let

23   him sit for a deposition so that they can find out whether he's

24   got this information."  He sat for a deposition, confirmed he

25   didn't have any intellectual property, and then the Court

1        dismissed the case, and Raymond dismissed it voluntarily.  All

2        they were trying to do is protect their intellectual property.

3        And so all of this is an irrelevancy.

4                    And Judge -- I forgot the name already -- said

5        specifically the Court cannot find Raymond was attempting to

6        intimidate Dr. Meyer when it pursued litigation against

7        Dr. Meyer.  I don't know -- and those cases have nothing to do

8        with this circumstance.

9                    MR. ABBOTT:  Your Honor, the first contact we

10       received was from a Bruce Wickersham regarding this matter.

11                   THE COURT:  Yeah, I remember he was in-house

12       counsel.

13                   MR. ABBOTT:  We were told we couldn't even talk

14       to Dr. Meyer.  That's why they didn't get the affidavit.  We

15       were told we couldn't talk to Dr. Meyer or we might get sued in

16       litigation.  That was the first time that we were contacted

17       about them having an issue with Dr. Meyer testifying in this

18       case.  And they've hired Packer and they've hired Exponent and

19       they know Dr. Meyer did not work on those files.  They know

20       that.  They knew that beforehand.

21                   If all they wanted was a deposition, they could

22       have said, "We asked for a deposition."  Instead, they filed

23       first an action in the Northern District of New York where

24       Dr. Meyer does not live.  They filed an action up there.  We had

25       to try and get him local counsel there to deal with that issue.

1    They filed an action up there to try and get him not to testify
2    where he doesn't live, and the Court dismissed that action
3    because it was improper jurisdiction because he doesn't live in
4    that state.  Then they filed the action in the Northern District
5    of Illinois, and eventually we said, "Okay, if that's all you
6    want is a deposition, we will comply."  But that's not the
7    relief that's requested in those injunctions.  The relief
8    requested in those injunctions is for Dr. Meyer to be prohibited
9    from testifying against Raymond ever, and the fact that they say
10   it's not witness intimidation -- one of the men who is assisting
11   him, Mr. Long, refused to work with Dr. Meyer on any of these
12   matters based on these lawsuits.
13             MR. LoCOCO:  Well, okay.  You want to get into
14   all these details, Your Honor.  Mr. Long had actually worked on
15   Raymond matters when he was at Packer and at ITC.  Mr. Long
16   contacted us in response -- contacted Mr. Wickersham in response
17   to the letter, quickly signed an affidavit saying, "I don't have
18   any of this stuff," and the lawsuit was dropped.  This fiction
19   that once it was filed in the Northern District and we asked for
20   a deposition, they agreed to it, is ridiculous.  Mr. Warshauer
21   said, "No way.  If you want to take his deposition, you'll do it
22   in the Southern District case."  And the Court in Chicago said
23   just have him sit for a deposition.  I mean, it was like
24   schoolyard boys again.  Right?
25             THE COURT:  I consider it --

1          MR. ABBOTT:  And, Your Honor --

2          THE COURT:  -- a pretty aggressive tactic to sue

3  the guy, say, "You can't even talk to Plaintiff's Counsel.  You

4  can't testify or participate in any case against us."

5          MR. LoCOCO:  That's not exactly what happened.

6          THE COURT:  Presumably Raymond would know whether

7  or not it had a nondisclosure agreement with this gentleman.

8          MR. LoCOCO:  Your Honor, how would we know that?

9  I mean, we would know if we had one with him.  But as it came

10  out in the case, Packer's files were not protected, Packer

11  Engineering.  We had no idea whether Dr. Meyer had access to the

12  files.  It's not an aggressive tactic in the context of

13  protecting intellectual property.  And if in fact Dr. Meyer had

14  confidential information and he had disclosed it to

15  Mr. Warshauer, that would be a further violation.

16          So the Court can say it's an aggressive tactic,

17  but we couldn't get a response.  And so it -- even the Northern

18  District judge said, "It looks like you're hiding something

19  during the hearing regarding this matter.  Have him sit for a

20  deposition," which he did, and he wasn't hiding anything, and it

21  was clear that Mr. -- Dr. Meyer and Mr. Warshauer were just, you

22  know, yanking chains.

23          MR. ABBOTT:  Your Honor, just to follow up.  They

24  could have done that through this Court.  They could have come

25  to this Court and said, "We feel our intellectual property is at

1    risk.  We ask the Court order for a deposition of this witness

2    in this case, and this is the matter where we're concerned

3    about."  They could have done that in this Court.  It could have

4    been handled really easily.  Instead, they filed one lawsuit,

5    gets dismissed for lack of jurisdiction, and they're smart

6    enough lawyers to know Dr. Meyer had no contacts in New York for

7    jurisdiction to even be proper.  And then they filed another one

8    in the Northern District of Illinois, and then they eventually

9    got the deposition.

10              But they could have gone to this Court and said,

11   "We feel -- there's a witness that's been identified, Dr. Meyer,

12   that we feel might have intellectual property that we're

13   concerned about," and done it without the risk of litigation and

14   the costs of outside litigation for Dr. Meyer, if that was

15   really their intent.

16              MR. LoCOCO:  Your Honor, at the time that that

17   suit in the Northern District was filed, he hadn't been

18   disclosed as a witness or as an expert.  This Court wouldn't

19   have had jurisdiction.

20              MR. ABBOTT:  Your Honor, they knew that he was a

21   witness, which is why they filed the lawsuits in the first

22   place.  They figured that out.  They could have gone to this

23   Court.

24              MR. LoCOCO:  Are we really going to do this with

25   a witness on the stand, Your Honor?

1          MR. WARSHAUER:  So, Judge --

2          MR. LoCOCO:  Based on three cases that don't

3     stand for what Mr. Abbott says they stand for?

4          MR. WARSHAUER:  If I may.  The

5     question-and-answer exchange would have been, "Have they --"

6     exactly what I intended to be something along these lines:  "Did

7     the Raymond Corporation try to prevent you from testifying in

8     this case?"  Answer:  "Yes."  "What'd they do?"  "They sued me

9     twice."  Move on.  That's all I was going to do.  I'm not going

10    into great details.  I got a case to try, but I do think that

11    this was relevant.  The case law allowed me to do it.  And it is

12    intimidation when you drag somebody all the way to New York.

13    Only reason to do it is to make their costs high.  That's

14    intimidation.

15         THE COURT:  I think it's a very close call.  But

16    it was brought to Judge Daly's attention, she had the time to

17    consider it, and she did not believe it to be sanctionable.  The

18    fact that it's not sanctionable doesn't mean that it's not

19    relevant or that it wouldn't be admissible.  However, at this

20    stage, I'm inclined to not allow it in because I think that the

21    confusion would outweigh the probative value that it would have.

22         Now depending on what comes up in

23    cross-examination, questions that are asked in

24    cross-examination, it may suddenly become more helpful to the

25    jury to know that this incident happened.  But I think at this

1      stage, I'm going to sustain the objection but without prejudice.

2                          MR. LoCOCO:  Thank you, Your Honor.

3                          MR. WARSHAUER:  Let me go get our witness, and

4      he'll be ready when the jury comes back.

5                          THE COURT:  Let's get our witness in.

6                          (Jury enters at 2:06 p.m.)

7                          THE COURT:  All right.  Thank you.  Please be

8      seated.  I apologize, ladies and gentlemen.  I know that took

9      longer than five minutes.  One thing you'll notice about trials

10     is that when the lawyer says "One last question," it's never

11     just one question.  And I'm going to tell you when a judge says,

12     "Let's take a five-minute break," that's really the judge

13     saying, "I hope I can deal with this in five minutes."  But we

14     weren't able to deal with it in five minutes.  I couldn't deal

15     with it fairly and thoroughly in five minutes.  And that's why I

16     had to make you wait a little while longer so I could try to

17     deal with matters fairly and thoroughly.

18                          With that, Mr. Warshauer?  Dr. Meyer, you're

19     still under oath.  Continue with your --

20                          MR. WARSHAUER:  Thank you, Judge.

21                          THE COURT:  -- examination.

22     BY MR. WARSHAUER:

23     Q    So I'm kind of lost.  I've asked you what a mechanical

24          engineer is.  Did I -- did you help us understand what I

25          asked you to do?

1   A   No, not yet.

2   Q   That's the next question.  Why are you here?

3   A   I was asked to look at Mrs. Anderson's accident and look at

4       any contribution that the machine that she was using, the

5       forklift, may have contributed to her accident.

6   Q   Were you asked to analyze the design of the machine?

7   A   Yes.

8   Q   And also, as you say, how it contributed to her accident?  So

9       those are the two things we'll talk about?

10  A   If it did and if it -- and if it did, how did it.  Yes.

11  Q   I'm going to show you -- we're going to publish, but not

12      offer as an exhibit, Exhibit 121.  This is the first page of

13      your curriculum vitae, which I think is about seven pages.

14      Share with us just briefly, what about your background and

15      professional education, professional experience, qualifies

16      you to help us understand those two questions?  That is, is

17      the machine appropriately safe, et cetera, and did those

18      design features contribute to the cause of Mrs. Anderson's

19      injuries?  How -- how are you qualified to help us with that?

20  A   Sure.  So my undergraduate degree is in physics, and I have a

21      master's degree and Ph.D. from MIT in mechanical engineering.

22      Mechanical engineering, as I kind of said before, is really

23      kind of applied physics.  And so that really gave me the

24      technical background to be able to analyze this forklift and

25      understand elements of its design.

```
 1                    And then throughout my professional career,
 2       which has been 28 years, I've had the opportunity to analyze
 3       many, many different machines and designs, and apply those
 4       concepts to those machines.  And so that's really what I did
 5       here in this case is look at, from a mechanical engineering
 6       standpoint, when a designer is going to design a machine,
 7       what do they do, and does this machine really follow the
 8       recommendations of how a machine should be designed.
 9   Q   So briefly going through this formal education, started at
10       Bethel College?
11   A   That's right.
12   Q   Summa cum laude.  That means you can't have a higher grade
13       than that?
14   A   That's correct.
15   Q   Then the Massachusetts Institute of Technology, Mechanical
16       Engineering?
17   A   Correct.
18   Q   You have a master's degree?
19   A   I do.
20   Q   And then you have -- it says a Ph.D.  What is a Ph.D., a
21       doctorate?
22   A   That's correct.
23   Q   Also from the Massachusetts Institute of Technology?
24   A   Yes.
25   Q   And if we are to measure in the community of mechanical
```

1    engineers, where do most people put the mechanical

2    engineering program at the Massachusetts Institute of

3    Technology, MIT?

4  A   It's pretty much -- pretty well recognized as the best in the

5    country.

6  Q   Perhaps in the world?

7  A   Yes.

8  Q   So what were your conclusions in this case?  And then we're

9    going to break them down.  Big picture, what's your first

10    conclusion?

11  A   Big picture is that this forklift violates both national and

12    international standards for the design of forklift --

13    forklifts.

14  Q   Okay.  Second big conclusion.  Did that design -- how did

15    that design contribute to the cause of Mrs. Anderson's

16    injuries?

17  A   I believe that directly led to her injury.

18  Q   All right.  So let's talk about this first conclusion, that

19    it was not in compliance with recognized standards.  Where

20    did you go to find the standards?

21  A   There is an entity called -- the acronym is ANSI, American

22    National Standards Institute, and they are sort of a

23    repository of technical standards for the design of many

24    different items, and there's a particular standard for the

25    design of forklifts.

1   Q   What is that standard called?

2   A   It's called -- basically known by a designation, a number, a

3       letter.  B56.1.

4   Q   That covers forklifts like this, low-lift and high-lift

5       trucks?

6   A   Right.  It is not -- it's not specifically oriented at

7       standup sidedance forklifts, although it does include those.

8       But it's more general for low-lift and high-lift trucks.

9   Q   So we're looking at Exhibit 67.  That's the first page of

10      what?

11  A   That's the cover page of that standard.

12  Q   Would this have been the standard in effect at the time this

13      product was sold for use?

14  A   Yes.  It was -- the standard is a 2012 standard.  It goes

15      into effect about a year later.  And this forklift was

16      manufactured in 2014.

17  Q   All right.  In addition to this US standard, did you also

18      search for other standards that you believe were applicable

19      to the design of this forklift?

20  A   I did.  I think as an engineer, a prudent thing to do is look

21      not only at something going on within our country but also

22      look broadly.  Standards are becoming more even throughout

23      the world, so I wanted to see what the international

24      community looks at for the design of a similar sort of

25      forklift.  So I looked at the international equivalent of

1       this forklift standard.

2  Q    And what is that called?

3  A    That's identified as ISO 3691-1.

4  Q    And was it consistent with the B56.1 Standard?

5  A    There are differences, but it's consistent in the particular

6       area in which I believe this forklift does not meet either

7       standard.

8  Q    All right.  So what do those standards require of a forklift,

9       relevant to our issues here?

10 A    Yeah, relevant to the issues here is, the ANSI B56.1 Standard

11      says to disconnect the travel circuit, basically make it

12      impossible to move the forklift if the operator is not in the

13      operating -- normal operating position.  And the ISO standard

14      basically says something very equivalent, not exactly worded

15      the same, but it's essentially the same meaning.

16 Q    And what particular standard of the B56.1 are we talking

17      about?

18 A    We're talking about Clause 7.20.2.

19 Q    So I have moved to page 42, and I will -- is this what you're

20      talking about?

21 A    Yes.

22 Q    Read that for us, sir.

23 A    "Means shall be provided to disconnect the travel circuit

24      automatically when the operator leaves the operating

25      position."

1  Q  Have you made any efforts to see how the industry, other than

2     Raymond, what they are doing to comply with this standard?

3     What are you seeing in their designs?

4  A  Their designs basically make it so that the forklift will

5     brake and come to a stop when the left foot of an operator

6     leaves the forklift.

7  Q  And what manufacturers have that feature that the left foot

8     will cause -- the left foot leaving the operator position

9     will cause the forklift to come to an emergency stop?

10 A  There's a whole raft of them.  Nissan, Schaeff, Jungheinrich,

11    Mitsubishi, Hyster, Yale, Crown, Hyundai, Clark, UniCarriers.

12 Q  Is the design offered by Raymond, with respect to compliance

13    with 7.20.2 first, compliant with that standard?

14 A  No.

15 Q  We heard from Ms. Boone earlier today about the operator

16    position.  What is the operator position for the proper

17    positioning for a Raymond sidestance forklift like the

18    subject forklift?

19 A  The normal operating position would be to have the operator's

20    left hand on the steering tiller, so controlling the

21    steering, right hand on the multifunction control that moves

22    the forklift, both feet on the floor.  In the Raymond, the

23    right foot has to be in normal operation on the deadman

24    switch in order to move the forklift, and then the back up

25    against the backrest.  And that's typically referred to as

1      having five points of contact.

2  Q  On the Raymond 4250 that Mrs. Anderson was operating, if the

3      operator's left foot leaves the compartment for any reason,

4      if it leaves the normal operator position, what does the

5      forklift do?

6  A  It does nothing.

7  Q  It doesn't disconnect the travel circuit automatically?

8  A  No.

9  Q  So I didn't mean to be humorous, maybe I did, who knows, in

10     my opening, and I said that the Raymond design would allow

11     the operator to have their right foot on the brake pedal,

12     their left hand on the tiller, their right hand on the

13     multifunction, and do the hokey pokey with their left foot.

14     Is that indeed possible?

15  A  Yes, it is.

16  Q  Assuming they knew the hokey pokey?

17  A  Assuming they know the hokey pokey.

18  Q  Is there any reason that that is necessary for the operation

19     of a counterbalance forklift?

20  A  None whatsoever.

21  Q  What are the primary functions of a forklift like this one?

22  A  To pick up, move, and place material, usually on pallets.

23  Q  Does the ability to move the left foot off the operator's

24     position without triggering the brake or an automatic

25     disconnect of the travel circuit have any value in the

1       accomplishment of what a forklift does?

2  A   No.  No.

3  Q   You've told me the list of brands that have a left-foot

4       brake, a left-foot deadman pedal.  Is there a difference from

5       your point of view, using these words, between a brake and a

6       deadman pedal?

7  A   There is in the sense of how it's really thought of in its

8       use.  It may accomplish the same thing of bringing the

9       forklift to a stop, but the way it is utilized is I think

10      very critical.

11  Q   And how is that?

12  A   So a deadman switch is basically -- - you can think of kind

13      of like a tether on a forklift -- a treadmill, if anybody's

14      ever used a treadmill, or like a jet ski.  The idea is for

15      some reason, you leave where you're supposed to be, the

16      machine shuts off.  And that is different than a brake, which

17      you're using frequently to bring the machine intentionally to

18      a stop.

19  Q   Well, even if it's an emergency brake?

20  A   Even if it's an emergency brake.

21  Q   Okay.  Well, I showed the jury in my opening the Crown floor.

22      Are you familiar with that?

23  A   I am.

24  Q   I need to -- tell us about the Crown floor, and whether it

25      complies -- while I'm looking this up -- whether it complies

 1          with B56.1, and even if it does, whether you still think it

 2          has some problems that ought to be addressed.

 3     A    It does comply with B56.1, and specifically that clause that

 4          we were just talking about.  And the way it does that is it

 5          has two pedals that you stand on.  Your right foot is on a

 6          pedal that basically is that deadman switch, so your right

 7          foot is supposed to basically stay there.  And the idea is

 8          that if for some reason you leave the operator position, that

 9          deadman switch will cut off the machine.  The left foot is a

10          brake, and you operate the brake by lifting your foot up.

11          And so that's the way braking can be accomplished in a Crown

12          machine.

13               Now I do not like that design from the

14          standpoint of -- especially in an emergency.  The tendency is

15          to -- you want to stop this machine as fast as you can, so

16          you're going to lift your foot all the way off the brake, and

17          then it's up in the air.  And the tendency would be to have

18          it potentially come outside of the occupant compartment,

19          which is not a good thing.

20               MR. WARSHAUER:  Let me just tell Counsel

21          something briefly.

22     BY MR. WARSHAUER:

23     Q    So, Dr. Meyer, I'm going to show you a page from Exhibit 28.

24          And so when we look at this, what are we seeing?

25     A    We're seeing the operator compartment of a Crown forklift,

1    basically kind of a top-down look.  And sort of right in the

2    middle of that image are a bunch of horseshoe-shaped ridges.

3    That's basically that operator presence switch or the deadman

4    switch for the operator.  That's where their right foot is

5    meant to be.  To the -- below that in the image, there is

6    another pedal.  That is the brake, and that is what an

7    operator can use to bring that forklift to a stop, by lifting

8    their foot off of that pedal.

9  Q   Well, have you testified that this -- well, first, is this

10    design compliant with B56.1 7.20.2?

11  A   It is.

12  Q   Have you testified that despite that compliance, it still

13    presents risk to the user?

14  A   I have.

15  Q   And what is that risk?

16  A   As I indicated earlier, it's a design that encourages the

17    left foot to come out into the air and potentially outside of

18    the occupant compartment, which is not desirable.

19  Q   Well --

20  A   In fact, I think Mr. Griset, who is the director of product

21    safety at Crown ironically --

22              MR. LoCOCO:  Objection, Your Honor.  This is

23    going to be hearsay testimony from somebody who's at Crown.

24              MR. WARSHAUER:  I'll agree to that.

25              THE COURT:  All right.  We'll drop it.  Would you

1      approach?

2                        (Sidebar begins.)

3                        THE COURT:  Mr. Anderson's body language is

4      telling me he's very uncomfortable, and you might want to check

5      and see if he wants to leave the room.  I don't want to --

6                        MR. LoCOCO:  It's fine.  Whatever he needs to do

7      is obviously --

8                        MR. WARSHAUER:  He's extraordinarily ill.

9                        THE COURT:  Yeah.  I've been sitting here, and

10     I'm starting to think -- I don't want the jury to start watching

11     him.  But he has all those movements like, "I've got a terrible

12     headache" or "I'm about to throw up" or "I'm about to pass out,"

13     and so.  All right?  I think we'll let Mr. McCoy deal with it,

14     and we'll go back.  All right.  And then --

15                       MR. LoCOCO:  He said he's going to cut it off.

16                       MR. WARSHAUER:  I'll cut that off.

17                       THE COURT:  Okay.

18                       MR. McCOY:  He says he's okay.  He wants to

19     continue through it.  He's sick.  He just --

20                       THE COURT:  Okay.  I just want to...

21                       (Sidebar ends.)

22                       MR. WARSHAUER:  Thank you, Judge.

23  BY MR. WARSHAUER:

24  Q    So we were talking about this pedal.  What I want to do is if

25       this system was the way you wanted it, where would the

| | | |
|---|---|---|
| 1 | | deadman pedal be? |
| 2 | A | My preferred design would be to have the deadman pedal under |
| 3 | | your left foot, so that way, the left foot is encouraged to |
| 4 | | stay on the floor at all times. |
| 5 | Q | All right.  So I've encouraged that.  And where would the |
| 6 | | brake be that you would apply in an emergency? |
| 7 | A | That would be under your right foot. |
| 8 | Q | Is this design with the two pedals, the right foot having a |
| 9 | | disconnect and the left foot having a stop-everything |
| 10 | | disconnect, are people using them in the industry? |
| 11 | A | Yes. |
| 12 | Q | Through your readings and work on this case, have you |
| 13 | | discovered whether others in the industry are thinking the |
| 14 | | Raymond design with nothing under the left foot presents |
| 15 | | dangers?  Are you alone in that? |
| 16 | A | No, I'm not alone in that.  Raymond is really unique in the |
| 17 | | industry, in that it offers -- it's kind of a one-of-a-kind |
| 18 | | deal, where there's nothing preventing the left leg from |
| 19 | | leaving the occupant compartment with the forklift doing |
| 20 | | nothing in response. |
| 21 | Q | Okay.  Now did you also -- so we've talked about the rule, |
| 22 | | the standards.  Are these standards accepted by people like |
| 23 | | corporations like Raymond as mandatory? |
| 24 | A | They're voluntary consensus standards.  Raymond actually |
| 25 | | participates in the process to come up with the standards, so |

1    by and large, they conform or try to conform to the standard.

2    It's --

3  Q  Is there an outside entity that comes and investigates the

4    forklift and says whether it complies or not?

5  A  No.  It's self-certified.

6  Q  So when Raymond sells this product, the only entity that

7    decides whether it's compliant with 7.20.2 is who?

8  A  Raymond.

9  Q  Okay.  You have the standard B56.1 and we have a specific

10    standard within that, 7.20.2.  And the entity that gets to

11    decide whether Raymond's machine complies is Raymond?

12  A  That's correct.

13  Q  Okay.  Did you also look at engineering methodologies, if you

14    will, that are other than just "Here's a standard.  Do you

15    comply?"

16  A  Yes, I did.

17  Q  All right.  And what would that process be called?

18  A  Well, there is -- there are a number of different concepts.

19    Basically in today's engineering, the sort of ideal is to

20    design for what's termed acceptable risk.  And in order to

21    determine if you are achieving acceptable risk, you have to

22    do what's called a risk analysis, which is basically

23    determining all the different things that could potentially

24    cause harm with the machine and ranking them from worst to

25    least bad, and really determining what you can do about each

1    of those and trying to reduce the risk of each of those to a

2    level that's acceptable.  And the criteria that you use for

3    what is acceptable is when you can't reduce that risk any

4    more without compromising the functionality of the machine or

5    having some outrageous expenditure of resources, so it's like

6    outrageous expensive, triples the cost of the machine or

7    something like that.

8  Q  In this case, does Raymond's design with only the pedal

9    that in the normal operator position is activated by the

10   right foot and nothing under the left foot, in your opinion,

11   present an acceptable risk to the user?

12  A  No.

13  Q  Why not?

14  A  Because I think based on that definition of acceptable risk,

15   that Raymond has done really nothing to address the risk that

16   is presented to an operator like Mrs. Anderson, who ends up

17   leaving the, for whatever reason, the occupant compartment.

18  Q  So I want to go back to the B56 Standard.  I can't remember

19   the page unfortunately.  Here it is.  Does this 7.20.2, does

20   it have any differentiation whether or not the person fell

21   out from a loss of balance or a bee sting or a heart attack

22   or whatever?

23  A  No, it does not.  And that kind of goes back to another

24   concept that is really the norm in engineering design today,

25   which is to design a machine both for intended use and

1     reasonably foreseeable misuse. And that reasonably

2     foreseeable misuse sounds kind of odd, but what it really

3     means is, use of a machine not really in a manner that a

4     manufacturer intends it to be used. And Raymond doesn't want

5     an operator to come out of the operator compartment, so it

6     would fall under reasonably foreseeable misuse if something

7     happens and an operator does come out of the operator

8     compartment. So it's not -- it doesn't mean intentional

9     abuse like, you know, trying to do donuts with your forklift.

10    But it does -- it's supposed to take into account things

11    like -- things -- basically that humans are not perfect and

12    they make mistakes. They sometimes go too fast or forget or

13    are inattentive, and those are things that need to be

14    designed for.

15  Q   Well, I think a car hitting a tree, that's a misuse?

16  A   Yes.

17  Q   Is that a foreseeable misuse?

18  A   It is.

19  Q   But it says in the owner's manuals "Don't hit trees" or

20    something like that?

21  A   Generally I'm pretty sure a manufacturer doesn't want you to

22    run into a tree.

23  Q   Do they still have an obligation to take reasonable steps to

24    have an acceptable risk for people who do hit trees?

25  A   They do.

1 Q Even if they're drunk?

2 A Even if they're drunk.

3 Q Even if they fall asleep?

4 A Even if they fall asleep.

5 Q What about they're run off the road by another drunk driver,

6   if they're run off the road by a drunk driver?

7 A Really the means in which you find yourself in that situation

8   is not as important as the fact that it's foreseeable that

9   you can be in that situation.  And in this particular case,

10   it's foreseeable for Raymond that an operator could have some

11   sort of incident, something go on unexpectedly, and react.

12 Q Would a loss of balance be one of those?

13 A Loss of balance would be one of them.

14 Q Are there international design standards that -- or

15   publications in the field that are respected that encourage

16   engineers to anticipate things like loss of balance?

17 A Absolutely, yes.  The international standard for forklifts

18   actually specifically mandates that human factors be taken

19   into account in a design and foreseeable misuse as well.  So

20   it's actually a part of the standard that it has to be

21   accommodated in the design process.

22 Q We've heard that Ms. Anderson said she slipped off, and I

23   believe she'll tell us she lost her balance, that those are

24   the same things.  Let's just assume for the sake of argument

25   that she had lost control.  Would this requirement still

| | | |
|---|---|---|
| 1 | | require a design that stops the machine as soon as possible |
| 2 | | if that occurs? |
| 3 | A | I believe so, yes. |
| 4 | Q | Okay.  So we talked about acceptable risk in that process and |
| 5 | | you went through that process here to analyze it? |
| 6 | A | Correct.  Yes. |
| 7 | Q | Did you also use a tool -- I showed a triangle.  What is that |
| 8 | | called? |
| 9 | A | It's referred to by a couple different names, Safety Design |
| 10 | | Hierarchy, Hierarchy of Controls, things like that.  It's |
| 11 | | basically the preferred method of addressing risks.  You have |
| 12 | | at the top the most preferred.  If you can, you design out |
| 13 | | the hazard.  You get rid of it altogether.  You can't get |
| 14 | | injured by something if you designed the hazard out.  That's |
| 15 | | often not possible, but it can be done at times.  So that's |
| 16 | | what you'd like to do. |
| 17 | | If you can't do that, then you do other things |
| 18 | | like add engineering controls, which you typically think of |
| 19 | | as being like a guard.  Add a guard onto it or do something |
| 20 | | else to try to mitigate that hazard and make it so that an |
| 21 | | operator doesn't encounter the hazard. |
| 22 | | And the least preferred of the three in the |
| 23 | | Hierarchy is what's called administrative controls. |
| 24 | | Administrative controls is a fancy word for like training, |
| 25 | | warnings, instructions, personal protective equipment, things |

1    that might -- might be helpful, but are not going to reduce

2    the consequence of encountering the hazard.

3  Q    Did you use the Design Safety Hierarchy, if you will, this

4    design, guard, warn process in analyzing this case and this

5    product and the steps Raymond did take and what they should

6    have done in regards to whether this is a reasonably safe or

7    unreasonably dangerous product?

8              MR. LoCOCO:  I'm sorry, could I have that

9    question back, please?

10             MR. WARSHAUER:  There's no way in the world I can

11   read that question back, but I'll redo it from scratch.

12             MR. LoCOCO:  Thank you.

13  BY MR. WARSHAUER:

14  Q    Did you consider the Design Safety Hierarchy in your process?

15  A    I did.

16  Q    And when you applied it, what did you discover?

17  A    I think in my professional career, I have never encountered a

18   company like Raymond that is so obstinate at insisting that

19   the bottom layer administrative controls are the appropriate

20   method to address hazards.  They repeatedly and insistently

21   say that it's up to the operator to follow the directions,

22   it's up to the operator to follow their training.  And never

23   have I seen them admit that they need to take reasonably

24   foreseeable misuse into account at all.

25  Q    So I'm going to show you what's been marked as D1.  It's the

1      operator manual.  It's got all kinds of pictures and telling

2      people to stay in.  Based on your professional -- based on

3      your formal education and your professional experience, is an

4      operator manual a substitute for compliance with 7.20.2?

5  A   No.

6  Q   Based on your professional education and your professional

7      experience, is an operator manual a substitute for doing it

8      the way the rest of the injury -- industry does it, by having

9      a left pedal that applies a brake when the operator leaves

10     position?

11  A   No.  No.  Relying on warnings and instructions is especially

12     fraught with danger, just because humans have a tendency to

13     ignore them or be unable to follow them.

14  Q   So in this case, Raymond has a design that does not have a

15     pedal under the left foot.  Given that situation, was there

16     anything that they should have guarded?

17  A   Well, I believe there is.  I think they needed to guard

18     against the operator leaving the protection of the occupant

19     compartment.

20  Q   Well, once they're out, was there any risk presented by the

21     design as made?

22  A   Once they're out, right in front of the operator is the

23     steered wheel of the forklift, which presents a problem and

24     as Ms. -- unfortunately, Mrs. Anderson knows all too well.

25  Q   Well, you've told us that the industry has complied with

1    7.20.2 by having the left-foot deadman pedal?

2  A  Correct.

3  Q  Do they have -- does anybody have a guard over the steered

4     wheel?

5  A  Not to my knowledge.

6  Q  Are you critical of that?

7  A  I am.  Yes.

8  Q  Well, is it as big a risk if the machine stops earlier?

9  A  If the machine stops due to an operator leaving the occupant

10    compartment, it becomes less of a risk.  There's still a

11    risk, but it's less of a risk.  And there's less -- so that

12    risk could be considered that has been addressed by a

13    left-foot brake or deadman pedal.

14  Q  So I'm going to show you Plaintiff's Exhibit 110.  Have you

15    drawn a simple guard?

16  A  Yes.

17  Q  How simple is that?

18  A  It's very simple.

19  Q  So what do you have to do?

20  A  The idea is just basically prevent access to that wheel.  One

21    of the functions of an operator is to check the wheel before

22    operating every day as part of their preoperational

23    checklist, make sure that the wheel is in good shape.  So the

24    idea is to have some sort of maintained visibility of that

25    wheel, but guard against a foot becoming in contact with that

|   |   |
|---|---|
| 1 | wheel.  And if you are a designer designing the machine, then |
| 2 | it's certainly a lot easier than this, which is kind of a |
| 3 | retrofit sort of design.  If you're the designer at the |
| 4 | design phase, you can build that into the design of the |
| 5 | machine so that, for example, the wheel is further away and |
| 6 | is more difficult to reach in -- by a foot. |
| 7 | Q | Well, we know, or we will learn, that one of the things that |
| 8 | the operator should do every day is a safety check.  And I |
| 9 | think the evidence in this case will show that that was done |
| 10 | on this day.  That includes looking at the drive wheel. |
| 11 | Would that make this impossible?  Would your -- |
| 12 | A | No.  No.  There are clearly guards that could be devised that |
| 13 | would allow for visually being able to inspect the wheel but |
| 14 | still have the function of being a guard. |
| 15 | Q | Would a guard interfere with the forklift's primary task of |
| 16 | lifting, carrying, and putting things down? |
| 17 | A | There's no reason a guard would need to interfere with those |
| 18 | things. |
| 19 | Q | Is the present design without a guard in your opinion |
| 20 | unreasonably dangerous? |
| 21 | A | I believe it is. |
| 22 | Q | Does it present an acceptable risk? |
| 23 | A | I do not believe it does. |
| 24 | Q | Let's move from the design to the event.  What work did you |
| 25 | do to help you understand how this event occurred? |

| | | |
|---|---|---|
| 1 | A | Well, I looked at a lot of material.  I looked at the |
| 2 | | testimony of a number of people as far as what occurred, |
| 3 | | Mrs. Anderson included, looked at the accident location and |
| 4 | | got an understanding of her path on her final trip, and then |
| 5 | | looked at the vehicle itself and tried to understand how the |
| 6 | | vehicle fit into the accident sequence and understand how -- |
| 7 | | what happened going from normal operation to its final point |
| 8 | | of rest. |
| 9 | Q | Did you go to the warehouse in Effingham? |
| 10 | A | I did. |
| 11 | Q | What was its condition when you got there? |
| 12 | A | It was completely empty. |
| 13 | Q | No shelves, no racks, no nothing? |
| 14 | A | Nothing.  Nothing. |
| 15 | Q | Who was there when you were there?  I was there? |
| 16 | A | You were there. |
| 17 | Q | Mr. McCoy? |
| 18 | A | Yes. |
| 19 | Q | Who else was there that was important to you? |
| 20 | A | Mrs. Anderson. |
| 21 | Q | And what did you do with Ms. Anderson to get a sense of the |
| 22 | | path that she took on the day of her injury? |
| 23 | A | Basically I was able to be with her and she told me the path |
| 24 | | that she took. |
| 25 | Q | Did you walk that path with her? |

| | | |
|---|---|---|
| 1 | A | I walked it with her.  I basically wheeled her in her |
| 2 | | wheelchair while she told me what -- how she drove. |
| 3 | Q | So we're going to look at Exhibit 29 [sic], the video of |
| 4 | | that.  Where -- what are we seeing here? |
| 5 | A | I'm not seeing anything. |
| 6 | Q | Oh, that's because -- hang on.  Let me fix this.  All right. |
| 7 | | (Video played.) |

BY MR. WARSHAUER:

| | | |
|---|---|---|
| 9 | Q | Now what are we seeing here? |
| 10 | A | So you're seeing Mrs. Anderson and me, and she's basically |
| 11 | | telling me how she's traveling, and basically why. |
| 12 | Q | And what did you learn in this process? |
| 13 | | MR. LoCOCO:  Objection.  Hearsay. |
| 14 | | THE COURT:  Response? |
| 15 | | MR. WARSHAUER:  It's the fundamental basis of -- |
| 16 | | it's not offered for the truth of the matter asserted, so much |
| 17 | | as it's offered to the basis of his opinions as to what |
| 18 | | occurred. |
| 19 | | THE COURT:  On the videotape, I don't think it's |
| 20 | | hearsay, it's demonstrable evidence.  So it's overruled. |

BY MR. WARSHAUER:

| | | |
|---|---|---|
| 22 | Q | So what are you learning as you're pushing? |
| 23 | A | So Mrs. Anderson indicated to me that the path that she took |
| 24 | | was generally very consistent of a pretty gentle turn, two |
| 25 | | gentle turns, because there was nothing -- even though there |

1    was racking present at the time, in between the two pillars

2    that are in the video, one L6, L7, and the other two M6 and

3    M7, there was nothing really preventing her from cutting over

4    from one aisle to the next in between those two pillars, so

5    she just made a gradual transition from one aisle to the

6    next.

7  Q    And did you draw a path of that?

8  A    Yes.

9  Q    With the aid of a computer?

10  A    Yes.

11  Q    How did you go about doing that?  How did you go about making

12        this path of this thing?

13  A    Well, I basically took what she told me and fit that to the

14        evidence of where her forklift came to rest and the

15        capabilities of the steering and braking of the forklift.

16  Q    Did you -- 71.

17                    MR. WARSHAUER:  71's okay right?  No objection?

18        We see it.  We found it.

19                    MR. LoCOCO:  No, that's fine.  Thank you.

20  BY MR. WARSHAUER:

21  Q    So I'm going to show you Exhibit 71.  And what are we seeing

22        here?  We'll look at the top first and then the bottom.

23  A    So the top is really an overview of the general path that we

24        saw Mrs. Anderson basically convey to me of the path that she

25        took.

1    Q    From your observations of that path, was there anything

2         challenging for a standup forklift like this one?

3    A    No.  No.  No real obstacles and two real gentle turns.

4    Q    And then if we look at the bottom of this exhibit, what are

5         we seeing?

6    A    So the bottom we're seeing sort of a top-down view of the

7         forklift's path at the very end of Mrs. Anderson's journey,

8         and the forklift -- the point of rest is put there.  That is

9         generally the point of rest as it was shown in photographs as

10        reconstructed by OSHA later.

11   Q    We see some black lines on the floor, again looking down on

12        to 71.  What do those represent?

13   A    Those are cracks that are in the floor.

14   Q    And did you also photograph these cracks?

15   A    I did.

16   Q    So let's take a look at Exhibit 29.  What are we seeing here?

17   A    That's not so much a crack as a pretty big hole or divot in

18        the floor.

19   Q    And how about Number 30?

20   A    That as well.  That's more of a crack.

21   Q    Through your investigation in this case and reading of

22        depositions and statements and the like, did you come to any

23        sense about how the forklifts being used by the operators at

24        the FedEx warehouse in Effingham, how those operators felt

25        when they went over these cracks?

1   A   They all pretty consistently indicated that it was -- it

2       would cause the forklift to shake.

3   Q   Are you able to -- let me ask you, through your work here on

4       this case, did you acquire information about the braking

5       distance of the forklift when the right foot leaves that

6       right-foot pedal?

7   A   Yes, I was.

8   Q   So what sources did you have for that?

9   A   There were a number of sources, two.  Mr. Rogers, who's

10      working for Raymond, did some stopping tests.  Mr. Colton did

11      as well in another case.  And Raymond did their own testing

12      instrumented of the forklift stopping under different

13      conditions.

14  Q   Can we figure out, based on this stopping distance

15      information, where the right foot would have left the brake

16      at various speeds?

17  A   Yes.

18  Q   So for example, if we know you're going X miles per hour and

19      that takes 2 feet, if it stops here, that brake went on

20      2 feet back.  Is that the way that works?

21  A   Yes, that would be the way it works.

22  Q   And was this data in existence -- does it allow you to help

23      us understand, working back from the drawings that we just

24      looked at, back from the point of rest to where at various

25      speeds the foot went -- brake went on, and also where -- you

1    have a sense of where she might have left the compartment,

2    where her left foot might have left the compartment

3    initially?

4  A   Yes.

5  Q   All right.

6            MR. WARSHAUER:  Your Honor, if I may, I'd like

7    Dr. Meyer to come down and use this easel, sort of draw us the

8    curve and work backwards from the point of rest and show us the

9    various information.

10           THE COURT:  That's fine.

11           MR. LoCOCO:  Your Honor, could we see you at

12    sidebar?

13           THE COURT:  Yeah.

14           MR. LoCOCO:  Thank you.

15           (Sidebar begins.)

16           MR. LoCOCO:  I have an issue with this under

17    Rule 26.  He didn't do anything like this in his reports or his

18    depositions where he worked backwards and had an opinion about

19    where her left foot came out of the compartment.  I specifically

20    asked him if he knew that and he said he didn't.  So this is new

21    material, which shouldn't be permitted.

22           MR. WARSHAUER:  I don't think we're going to

23    offer any new material at all.  The braking distance has been in

24    his report from the get-go.  We know that if it's at a point of

25    rest and a brake would have applied at X miles an hour, we know

1    that that's the only way it can get there.  That's always been

2    in his report.  Where the left foot came out, I'll just not ask

3    that question.  But if we go back and use that same braking

4    data, that's absolutely there.  But I don't have to ask where he

5    thinks it came out.  But we'll just do -- show how this works

6    from a mathematical point of view.

7                    MR. LoCOCO:  Yeah, the braking data has been in

8    the case.  I have no problem with that.  But opinions about

9    where the feet were or when they came out --

10                   MR. WARSHAUER:  We'll just do the math.

11                   MR. LoCOCO:  Okay.

12                   THE COURT:  All right.  How much longer do you

13   think your direct is going to go?

14                   MR. WARSHAUER:  12, 13 minutes.

15                   THE COURT:  Okay.  So we'll take a break after

16   you finish your direct.

17                   MR. WARSHAUER:  I think that will be about right

18   then.  You know what, Judge?  Just to make sure, because I don't

19   want to have him say, "Well, this is where the left foot came

20   out," if we take a break now, I can be assured that the

21   testimony he offers is consistent without the opinion.

22                   MR. LoCOCO:  I'm cool with that too.  Thank you.

23                   THE COURT:  All right.

24                   (Sidebar ends.)

25                   THE COURT:  All right, ladies and gentlemen.

1    This stretch is a good time to take a ten-minute break.  That

2    way, when we come back, we'll be able to listen to the rest of

3    the direct examination of this witness and as well as the

4    cross-examination.  So ten-minute break.  This time, I mean it.

5                        (Jury exits at 2:56 p.m.)

6                        (Recess from 2:56 p.m. to 3:10 p.m.)

7                        (Jury enters at 3:10 p.m.)

8                        THE COURT:  All right.  Everyone, be seated.

9                        All right.  Before we start, I want to remind

10   people who are here, this case -- this courtroom is open to the

11   public.  However, being as I have a face for radio, I become

12   very concerned about people who appear to be recording events.

13   No one may record visually or audibly what's going on in the

14   courtroom.  If you have a laptop with you, I don't know how you

15   got it in here, but you need to turn it off and put it away.  If

16   you have a cell phone with you, you need to turn it off and put

17   it away.

18                        If I see a laptop or a cell phone opening up, I'm

19   going to ask one of our court security officers to escort you to

20   the nearest exit.  You will not be allowed back in.  All right?

21   And that's not back in today, not back in tomorrow.  Not back in

22   the rest of the trial.

23                        MR. WARSHAUER:  Wow.  Thank you, Judge.

24   BY MR. WARSHAUER:

25   Q    All right.  Let me get my wits about me.  We were talking

1    about stopping distances.  I'm going to show you Exhibit 129.

2    Okay.  What is this and how does it relate to your

3    understanding of the stopping distance of the forklifts that

4    we're talking about?

5    A    This is basically a test report that was prepared by Raymond

6    when they tested the stopping distances of the same forklift,

7    Model 4250, under various conditions.  So I used that

8    information to be able to basically predict what the stopping

9    distances would be for speeds that they didn't test.

10   Q    Okay.  Well, you have shown us through the two drawings we

11   looked at, I believe that was Exhibit 71, perhaps, the

12   drawings right above each other, the path.  And you walked

13   that path with Mrs. Anderson.  If we -- did you have an

14   understanding of the speed that she was going as she was

15   doing this work for FedEx?

16   A    She indicated that she liked traveling slowly and indicated

17   she was traveling at a slow speed.

18   Q    All right.  What's your understanding of the maximum speed

19   that this particular forklift would go?

20   A    The design maximum speed is about 8 miles an hour.  After the

21   accident, it was tested and its stopping distance was

22   calculated and that -- the speed at that time was about 6 and

23   a half to 7 miles an hour, according to Mr. Rogers' analysis.

24   So it's not entirely clear if it's capable of getting all the

25   way up to 8.

1    Q    And what assumptions did you make with respect to -- she said

2         she likes to travel slowly and, you know, short of the

3         maximum speed, both published and actual, if you will, what

4         assumptions did you make about her most likely speed?

5    A    So for analysis I'm assuming I'll present, I'm assuming kind

6         of a worst-case sort of scenario where she's traveling

7         5 miles an hour, which is on the -- which is higher than what

8         I would expect her to be traveling based on her testimony,

9         but also I think within the realm of possibility.

10   Q    All right.  Well, again, with the Court's permission, what

11        I'd like you to do is come down and draw the path and show

12        us -- help us understand what would happen if the brakes were

13        applied at various locations along that path.

14   A    Okay.

15   Q    I have some other markers if you want to get colorful.

16   A    Okay.  So I have to preface this that I was not an art major,

17        so I apologize.  So just simplistically, we have

18        Mrs. Anderson's path basically going straight, and then at

19        some point, it begins to curve.  And we have the forklift at

20        its point of rest here.  The length of this arc is about

21        10 feet.  And we know basically in order to get into that

22        orientation, it has to be about that long.  And that's

23        consistent actually with testing that was done by Mr. Rogers,

24        who works -- was hired by Raymond, who measured 180-degree

25        steer input, and that creates a certain amount of steer with

1    the steer wheel of -- I'm sorry.  Yeah, that's right.  A

2    certain amount of steering angle when the -- of the steered

3    wheel, which is consistent with that sort of arc, so.

4  Q  Let me stop you here.  If an operator is in the forklift in

5    the operator position, and their left hand is on the tiller

6    and their right hand is on the multifunction and they were to

7    fall out to their left, could they initiate the turn that you

8    and Ms. Anderson followed and the one that you've diagrammed

9    for us?

10  A  I believe absolutely, yes.  It's entirely consistent with --

11    as an operator is falling out and trying to not fall out of

12    the operator compartment, basically commanding 180-degree

13    steer of the tiller as they're falling out.  That would

14    create a path like this.

15  Q  I want to -- I'm going to mark on your thing here.  My

16    automobile, when I'm going straight, I can look at the

17    steering wheel and it's horizontal.  There's a horizontal bar

18    and the logo is vertical.  And if I get in the car later on

19    and it's at an angle, I pretty much have a sense that we're

20    going to be going left or right, and I need to do that.  When

21    we look at this steering tiller with the ball on it, is there

22    a correlation between where the ball is and the directions of

23    the steered wheel?

24  A  There really isn't, which is something that you would not

25    normally think of.  And in fact, Mr. Rogers did some testing

1    where they slowly rotated that steering tiller 180 degrees

2    and got the steer wheel to move about 20 degrees, and then

3    did it rapidly and it moved about 25 degrees.  So you can

4    have the same steer input and have a different result,

5    depending on how fast you do it, which also means that

6    there's no absolute.  So if the steering tiller is at the

7    top, it doesn't mean that the wheels are pointed a certain

8    direction.

9  Q  But if the steering wheel is here, that may well mean a

10    straight line?

11  A  It may.

12  Q  And if the steering wheel is here, that also might mean a

13    straight line?

14  A  That's correct.

15  Q  And if I was to have it in my hand and fall out and rotate it

16    through an arc, that could cause the steering to turn?

17  A  It could.  Absolutely.  It would cause it to turn, and

18    particularly if you're doing it rapidly, which you would

19    expect you would do in a scenario where you're falling out

20    and desperately trying to stay in, that rapid turning of the

21    steering tiller is going to cause the greatest amount of

22    steer of the steered wheels as opposed to if you were doing

23    it really slowly.

24  Q  So let's go back to your drawing, and we'll forget about mine

25    for the moment.  When we -- we know where the rest is, and we

1      know the 10 feet it took to have the arc.  Ultimately this

2      forklift stopped because of what input?

3  A  Mrs. Anderson's right foot coming off of the deadman pedal.

4  Q  Well, her -- we know that her left foot got under the wheel.

5      Given the weight, momentum, mass, et cetera, of this

6      forklift, would that have had a significant effect on where

7      it stopped?

8  A  Not -- not at all, no, unfortunately.

9  Q  It was going to stop where it wanted to stop?

10  A  Yes.

11  Q  Regardless of her foot?

12  A  Yeah.

13  Q  Okay.  So you said 5 miles an hour.  So if we were to assume

14      that for the moment to be the speed at which she was moving

15      and that braking would have been instigated by her right foot

16      separating from the -- I guess it's her right foot,

17      separating from the pedal as she completed the fall, how far

18      back would that right foot have come off the brake?  In other

19      words, what's the stopping distance at 5 miles an hour?

20  A  Yeah.  So the stopping distance at 5 miles an hour is a

21      little under 5 feet, so it's about halfway through this arc.

22      So from 5 miles per hour, you can -- if your foot comes off

23      the deadman pedal at 5 miles an hour right here, the forklift

24      will stop right here.

25  Q  Okay.  Now we saw in your illustration earlier that we looked

1      at that you had drawn in some cracks?

2  A   Yes.

3  Q   And to put it in scale, this is obviously not perfect scale,

4      but about where are those cracks on the drawing we see here?

5  A   They're kind of in this area, a little before the steering

6      begins.

7  Q   All right.  So let's just --

8  A   Amorphously --

9  Q   Just draw kind of what those cracks are based on your

10     photographs.

11  A   Well, I know there's one that --

12  Q   You want to look at the picture again?

13  A   Yeah, I do.

14  Q   Okay.  71.  So we're looking at 71.  So if we're sort of

15     using that as a -- now these drawings were picked up by

16     the -- your computer system?

17  A   Yes.  When I was at the accident site, I had a laser scanner

18     that basically surveyed the area of the accident and was able

19     to identify the cracks from that.

20  Q   All right.  So millions of points of data, I guess?

21  A   Yeah, millions -- millions of points of data, hundreds of

22     thousands a second.

23  Q   So based on that again, just roughly, give us a sense of

24     where those cracks are in relationship to the beginning of

25     the arc.

1   A    Yeah.  So it looks like there's kind of one that kind of goes

2        transverse here around 14 or so feet away from the point of

3        rest, and then kind of a bunch that kind of squiggle along

4        longitudinally.

5   Q    As well as backwards?

6   A    As well as backwards.

7   Q    Dr. Meyer, if the braking had begun here at this horizontal

8        crack, where would this forklift have stopped?

9   A    Well, again, if braking starts here and Mrs. Anderson's

10       traveling 5 miles an hour, it would be roughly a little bit

11       below 5 feet, so she would stop here.

12  Q    Well, do you think that as she's falling because of the right

13       hand on the multifunction, that there would be some

14       acceleration as she uses that as a balance aide?

15                     MR. LoCOCO:  Objection.  Foundation.

16                     THE COURT:  Response?

17                     MR. WARSHAUER:  Well, I'll change the question.

18  BY MR. WARSHAUER:

19  Q    If we assume that the right hand pulls on the accelerator as

20       her body moves to the left, would that have caused these

21       braking distances to change any?

22                     MR. LoCOCO:  Same objection, Your Honor.  There's

23       no foundation for this and there won't be.

24                     THE COURT:  Overruled.

25  BY MR. WARSHAUER:

1    Q    Go ahead.

2    A    So if Mrs. Anderson at some point before -- basically if she,

3         at the same time as she starts steering, she's in the process

4         of falling out, so she's performing the steering and she's

5         pulling on the multifunction controller, the forklift will

6         speed up going the same direction she's traveling.  The

7         problem is, it's only got a short distance -- can I use the

8         green?  It's only got a short distance to go.  So we know at

9         5 miles an hour, the forklift will stop from here.  So if

10        she's here starting to accelerate, she only has at most this

11        distance to accelerate.  But if she's speeding up, it's going

12        to cause the forklift to take a little bit longer to stop.

13             So in reality, the forklift would end up

14        stopping -- or accelerating a shorter distance and then

15        braking a little bit longer distance.  So using some

16        reasonable numbers for acceleration, instead of 5 feet, her

17        stopping distance would be about 6 feet.  And she would

18        still -- the forklift would still stop at the same spot.  She

19        would just be beginning that stop a little bit earlier.

20   Q    Well, again, if the forklift brake had been applied back

21        here, even assuming the acceleration associated with falling

22        to her left, do we get to the point of rest?

23   A    No.  Again, it would be, you know, maybe a foot increase in

24        stopping distance, but not an extra 5 feet.

25   Q    So if the brake applies here, this is our stop?  Is that

1      about right?

2  A  Yes.

3  Q  Thank you.  Dr. Meyer, I want to just conclude by making sure

4      that I've got your conclusions.  It's your belief that the

5      forklift as designed -- do you believe it complies with the

6      B56.1 Standard relating to stopping forklifts when the

7      operator's not in the compartment?

8  A  I do not.

9  Q  Does it comply with the industry standards and practices by

10     peer manufacturers?

11  A  It is -- it is alone in the industry as far as not having a

12     left-foot activated brake.

13  Q  Does it comply with relevant international standards relating

14     to what should happen to a forklift if the operator falls

15     out?

16  A  No.

17  Q  Given that potential, does the wheel in your opinion present

18     an unreasonable danger?

19  A  I believe the wheel is definitely a risk and a hazard, and

20     that steps need to be taken to reduce that hazard.

21  Q  You've suggested two changes.  What are they?

22  A  To add a left-foot deadman pedal and to cover the opening to

23     the wheel, basically the steered wheel area, so that a foot

24     cannot get into it.

25  Q  Would those changes in your opinion negatively affect the

1    utility of this forklift in a way that would make it

2    difficult or unusable for its primary task of lifting,

3    carrying, and putting things down?

4  A  No.  I don't see those as affecting the functionality or the

5    usability of the forklift at all.

6  Q  We might hear later that, well, there's an advantage to only

7    one pedal and that you can put your left foot anywhere you

8    want.  Does the benefit of that outweigh the risk presented

9    by allowing the forklift to continue to move if the

10    operator's left foot gets into danger?

11  A  No.  The benefit of having no sort of sensing whatsoever on

12    the left foot is not outweighed.  That doesn't outweigh the

13    risk that the operator coming out or the left foot coming out

14    of the operator compartment poses.  And there are ways of

15    accomplishing the same thing without restricting the foot

16    position of the left foot.  The pedal that the operator is

17    standing on could literally be the whole left side of the

18    operator compartment so that there's freedom to move your

19    foot around within the operator compartment.

20  Q  Are there also designs that use lasers and things like that?

21  A  There are, essentially kind of like the light laser or

22    whatever it is, light sensor in a garage door.  So you break

23    the light beam, it does something or it doesn't do something.

24    If your leg is in the proper spot, it's going to break the

25    light beam.  If it's not in the proper spot, you're not in

1    the proper spot, and so the light beam now completes the

2    circuit and braking begins.

3  Q   Are there any benefits to a design that allows an operator to

4    be in an operator position that does not include both feet on

5    the floor?

6  A   I can't think of any, no.

7  Q   Now let's move to the steered wheel.  It might be argued,

8    well, that will make it harder to see the wheel to do the

9    morning check.  Does that detriment overcome the risk?

10  A   I think that there may be some minor obstruction of the

11    steered wheel to perform the guarding function, but certainly

12    not sufficient to eliminate the possibility to observe the

13    steered wheel.

14  Q   Dr. Meyer, you've shared with us a variety of opinions today.

15    Do you hold these opinions to a reasonable degree of

16    engineering certainty?

17  A   I do.

18                    MR. WARSHAUER:  Thank you, sir.

19                    THE COURT:  Cross?

20                    MR. LoCOCO:  Your Honor, can we approach briefly,

21    please?

22                    (Sidebar begins.)

23                    MR. LoCOCO:  I just want to make sure he's

24    tendered the witness.

25                    THE COURT:  What do you mean "he's tendered the

1     witness"?

2                     MR. LoCOCO:  He's done with his direct

3     examination.

4                     THE COURT:  Yeah.  Aren't you?

5                     MR. WARSHAUER:  I think so.  I'm going to have

6     the right to redirect.

7                     MR. LoCOCO:  Understood.  I have a motion to

8     make, Your Honor.  It's going to be a motion to strike his

9     testimony.

10                    THE COURT:  Okay.

11                    MR. LoCOCO:  And I can -- we could -- it's a

12    significant motion.  It's not a pro forma motion.  And there's

13    basis for it.

14                    THE COURT:  Are you going to preserve it and do

15    it after --

16                    MR. LoCOCO:  As long as everybody agrees that I'm

17    not waiving it by starting my cross.

18                    MR. WARSHAUER:  Sure.

19                    MR. LoCOCO:  Is that all right with you, Your

20    Honor?

21                    THE COURT:  That's all right with me.

22                    MR. LoCOCO:  All right.  Great.  Thank you.

23                    (Sidebar ends.)

24                              CROSS-EXAMINATION

25    BY MR. LoCOCO:

1  Q   Dr. Meyer, I'm not sure I can get you out of here by 4 but
2      we'll at least get a stab at it.  You know that I represent
3      the Raymond Corporation; correct?
4  A   Yes.
5  Q   And I took your deposition twice in this case?
6  A   Yes.
7  Q   I have some questions for you, but I want to start with this.
8      It's football season; right?
9  A   It is.
10 Q   All right.  I want to find out if you've ever heard the term
11     "Monday morning quarterback."
12 A   I have.
13 Q   All right.  I want to give you a definition.  This is the
14     definition.  A Monday morning quarterback is someone who
15     never played in the game but tells everyone else later how
16     the game should have been played.  Does that make sense to
17     you?
18 A   I understand that, yes.
19 Q   That's you in this case, isn't it?
20 A   I'm not a professional forklift operator, if that's what
21     you're asking, but I am a professional engineer, so I
22     understand how machines are designed.  I understand the
23     requirements of how machines are designed, and a forklift is
24     just a machine.  The rules of mechanical engineering apply to
25     a forklift as well as they apply to any other mechanical

| | | |
|---|---|---|
| 1 | | device. |
| 2 | Q | You're here criticizing the design that my clients put |
| 3 | | together of the 4250; correct? |
| 4 | A | I have been critical of the design, yes. |
| 5 | Q | And you're critical of the Crown design as well; correct? |
| 6 | A | There are elements of the Crown design I am not -- I find |
| 7 | | fault with, yes. |
| 8 | Q | Is there a reason you couldn't answer that last question with |
| 9 | | just a yes? |
| 10 | A | I was just trying to answer the question. |
| 11 | Q | All right.  And before Mr. Warshauer called you about this |
| 12 | | case and this case down in Florida against Crown, you had not |
| 13 | | spent a single professional minute thinking about the design |
| 14 | | of standup forklifts; correct? |
| 15 | A | That's correct. |
| 16 | Q | You hadn't spent a single professional minute on the issues |
| 17 | | related to safety on standup forklifts like the 4250; |
| 18 | | correct? |
| 19 | A | That is correct. |
| 20 | Q | And that's true even though you had worked at facilities that |
| 21 | | used forklifts? |
| 22 | A | That's correct. |
| 23 | Q | And tested standup forklifts? |
| 24 | A | That's correct. |
| 25 | Q | When the standup forklifts were at the facilities at which |

1  you worked in the past, you didn't tell any of your coworkers

2  that you thought those forklifts were defective, did you, or

3  unreasonably dangerous?

4  A  I -- no, I certainly didn't.  I wasn't involved in anything

5  related to their usage, so no.

6  Q  You told us that you think the 4250 violates the B56.1

7  Standard 70.20.2 [sic]; correct?

8  A  Yes.

9  Q  You've told the jury that today; correct?

10  A  Yes.

11  Q  You told me that when I took your depositions; correct?

12  A  Yes.

13  Q  Have you filed a -- sent a letter to OSHA telling OSHA that

14  you thought this was an unreasonably dangerous truck?

15  A  I sent a letter to OSHA asking them to revisit their rules

16  related to standup forklifts, yes.

17  Q  When did you do that?

18  A  Months ago.

19  Q  How many -- after I took your deposition?

20  A  Yes.

21  Q  After I asked you at your deposition whether you had said to

22  anyone that you thought this was an unreasonably dangerous

23  truck?

24  A  And I realized that I really should inform OSHA and bring it

25  to their attention.

1  Q   You realized that I was going to ask you at trial whether you

2      had told anyone of your -- of your criticisms?

3  A   No.  As a professional engineer, one of the canons of being a

4      professional engineer is to hold the safety of the public

5      paramount, and so I feel it was my obligation to do that.

6      You bringing it up in my deposition, it was actually

7      something I hadn't thought of before.  But when you brought

8      it up, I realized that was something that would have been

9      worthwhile that I should have done, and I did.

10 Q   So until I brought it up at your deposition, you had been in

11     violation of the professional ethics canons?

12 A   I don't think I was in violation, but I think that was

13     something that was -- something that I could do as a

14     professional engineer to ask OSHA to revisit their rules

15     pertaining to standup forklifts.

16 Q   Did you send this -- so I took your second deposition in

17     March of 2021, March of this year.  Was this letter sent

18     after that?

19 A   I don't remember exactly when I sent it.  Probably.

20 Q   Dr. Meyer, you've never designed a standup forklift; agreed?

21 A   Agreed.

22 Q   Or a component part for use in a standup forklift; true?

23 A   That's true.

24 Q   You've not designed a warning and instruction or a training

25     program to be used to train standup forklift operators;

1        correct?

2    A   That is correct.

3    Q   You have no publications regarding standup forklifts;

4        correct?

5    A   None directly relating to standup forklifts, correct.

6    Q   You have no design patents; true?

7    A   I do not have any design patents.

8    Q   And no design patents therefore relating to standup

9        forklifts?

10   A   Correct.

11   Q   You've never been trained or certified to operate a Raymond

12       Model 4250; correct?

13   A   I was trained to operate a Hyster and Yale standup forklift,

14       which I believe qualified me to assess the usage of a

15       Raymond.  They're very similar in design.

16   Q   You've never been trained on a Raymond 4250; correct?

17   A   That's correct.

18   Q   And you've never been certified to operate a Raymond 4250;

19       correct?

20   A   The rules for certification are that you have to be certified

21       in the particular vehicle that you were going to be

22       operating, and I was not certified -- I was not operating a

23       Raymond forklift, so I was unable to be certified as a

24       Raymond 4250 operator.

25   Q   So you were never certified to operate a Raymond 4250?

1  A  Correct.

2  Q  You took -- you told us you took a training course, forklift

3     training course?

4  A  I did.

5  Q  And you took that after Mr. Warshauer contacted you about

6     this case?

7  A  I did.  Yes.

8  Q  Did he suggest that to you?

9  A  I don't think so.  I think it was part of my -- part of my

10    acquisition of knowledge related to forklifts and standup

11    forklifts, sidestance standup forklifts in particular, to

12    become able to understand what an operator does.  Part of

13    that learning curve for me was becoming a certified operator

14    of sidestance forklifts so I could understand the environment

15    that they're operating in.

16 Q  And you billed your time to Mr. Warshauer for taking the

17    training course, didn't you?

18 A  No, I did not.

19 Q  All right.  At least as of November 20th of last year, when I

20    took your first deposition, you had never operated a Raymond

21    Model 4250; true?

22 A  I believe that's true.

23 Q  And then I took a supplemental deposition in March of this

24    year.  By then, you had operated a 4250; correct?

25 A  Yes.

1   Q   That was for a few minutes at Fusion Engineering in

2       Naperville, Illinois?

3   A   Correct.

4   Q   Correct?  And that was an exemplar that Mr. Rogers had at his

5       facility in Naperville?

6   A   Correct.

7   Q   Dr. Meyer, you would agree that you're not an expert standup

8       lift truck operator?

9   A   I would definitely agree with that.

10  Q   Dr. Meyer, you'd admit that you've never been a member of any

11      safety committee whose job is to develop safety standards

12      related to the design of standup forklift trucks?

13  A   That's correct.

14  Q   We talked about the B56.1 Safety Standard.  So Defendant's

15      558, it's the first page of this B56.1 Standard that we've

16      discussed; correct?

17  A   That's correct.

18  Q   You've discussed it with Mr. Warshauer?

19  A   Yes.

20                      MR. LoCOCO:  Could you pull up page 6?

21  BY MR. LoCOCO:

22  Q   What we're looking at right now, these are the members of the

23      B56.1 back in -- when this 2012 standard was issued; correct?

24  A   Yes.

25  Q   So the chair is somebody named Dennis Graham from Ford Motor

| | | |
|--|--|--|
| 1 | | Company.  Do you see that? |
| 2 | A | I see that. |
| 3 | Q | And there's a guy here named Ron Graunstadt, |
| 4 | | G-r-a-u-n-s-t-a-d-t, with the UAW.  Do you see that? |
| 5 | A | I do. |
| 6 | Q | Do you know him? |
| 7 | A | No. |
| 8 | Q | You know "UAW" is the Auto Workers Union? |
| 9 | A | I do know that. |
| 10 | Q | You see Rudy "Fiers" or Fiers?  He's from OSHA? |
| 11 | A | Yes. |
| 12 | Q | Do you think OSHA -- strike that.  You know that OSHA's |
| 13 | | charter is operator safety? |
| 14 | A | OSHA's charter is the health and safety of employees. |
| 15 | Q | Well, which includes operators of lift trucks? |
| 16 | A | It's part of it. |
| 17 | Q | And certainly, the UAW representative would be interested in |
| 18 | | making sure that operators of lift trucks are safe? |
| 19 | A | One would think so.  However, my -- that's one of the |
| 20 | | troubling things that I've uncovered in my investigation in |
| 21 | | this case is how the B56.1 committee seems to be really |
| 22 | | controlled by -- |
| 23 | | MR. LoCOCO:  Your Honor, I'm going to object to |
| 24 | | this.  There's no foundation for this conspiracy theory. |
| 25 | | THE COURT:  You opened it up.  Continue your |

```
 1          answer, sir.
 2                    MR. LoCOCO:  Fine.  Go ahead.
 3                    THE COURT:  You asked the question; he gets to
 4          answer it.
 5                    THE WITNESS:  The ITA, which stands for the
 6          Industrial Truck Association, they provide the vast majority of
 7          the funding for the B56.1 committee.  And the current chair of
 8          the B56.1 committee, Mr. McDermitt, who was the vice chair back
 9          in 2012, has testified that any recommendation that the ITA
10          makes to the B56.1 basically gets implemented.  So I have found
11          a very troubling connection between the ITA and the B56.1
12          committee that I think has led to a standard that doesn't really
13          hold up to the standard that an ANSI standard should.
14     BY MR. LoCOCO:
15     Q    You finished with your answer?
16     A    Yes.
17                    MR. LoCOCO:  Your Honor, I move to strike the
18          answer.  My question was, "Do you believe that this UAW
19          representative is concerned about safety of operators?"  The
20          rest of what he said is nonresponsive.
21                    THE COURT:  You asked him to speculate about that
22          individual.  I will allow -- I will grant the motion to strike,
23          but I will allow Plaintiff's Counsel to get up and ask him the
24          same question and allow him to elaborate, as you have -- you've
25          asked his opinions about the intentions of the members of the
```

1    people who are on that subcommittee and to presume that their

2    intentions are purely noble.

3    BY MR. LoCOCO:

4    Q    Do you know any of these people, Dr. Meyer?

5    A    I do not.

6    Q    Have you ever gone to a meeting?

7    A    I have not.

8    Q    You know that meetings are open to the public?

9    A    I do.

10   Q    Have you ever submitted a proposal to the B56.1 committee?

11   A    No.  And the reason I haven't is because Mr. McDermitt also

12        indicated that --

13                   MR. LoCOCO:  Your Honor, I'm going to move to

14        object to this based on hearsay.  I didn't ask about

15        Mr. McDermitt.  I asked him if --

16                   THE COURT:  You opened up whether or not he --

17        you did not ask about Mr. McDermitt, that's correct, so he can

18        say no.  But since you've raised it, Counsel will be allowed in

19        redirect to ask him if there was a reason why he has not.

20   BY MR. LoCOCO:

21   Q    I want to move to the -- well, let's look at 70.20.2, which

22        is 558-53.  If you could blow up 70.20.2, please.  "Means

23        shall be provided to disconnect the travel circuit

24        automatically when the operator leaves the operating

25        position."  That language doesn't say "Means shall be

1    provided to brake the truck when the operator leaves the

2    operator's position," does it?

3  A   No, it does not.

4  Q   And if -- I want to put up the Crown --

5              MR. LoCOCO:  Could I have the document camera?

6  BY MR. LoCOCO:

7  Q   I'm going to make sure we're clear about how the Crown design

8    works.  So the Crown design under the left foot is the

9    deadman pedal or deadman brake; correct?

10 A   It is their brake.

11 Q   It's also the deadman brake?

12 A   It's a deadman brake in the sense that if the operator's foot

13    isn't there, it's braking the machine, yes.

14 Q   Well, but the right side of that compartment -- I think you

15    called them horseshoes.  That's -- that doesn't operate the

16    way the brake does under the left foot; correct?

17 A   That's correct.

18 Q   The way that operates is if an operator takes his or her foot

19    off of the right side, before the truck does anything,

20    there's a one-second delay; correct?

21 A   Correct.

22 Q   And at 5 miles per hour, how far would the 4250 travel in one

23    second?

24 A   Roughly 7 and a half feet.

25 Q   Okay.  So there's a one-second delay, during which I guess

1    physics is physics; even the Crown truck would travel 7 and a

2    half feet at 5 miles an hour?

3  A    If an operator's right foot comes off of the deadman -- their

4    deadman pedal, yes.

5  Q    And then the truck coasts?

6  A    In the Crown design, yes.

7  Q    Right.  In the Crown design, then it coasts.  It doesn't slam

8    the brakes on.  It doesn't bring the truck to as quick a stop

9    as possible?

10  A    That's correct.

11  Q    Okay.  And you're critical of this design because you think

12    that brake pedal should be under the right foot?

13  A    I do.

14  Q    In fact, you testified less than a month ago that all Crown

15    needed to do was do some software switches or to make the

16    left side be the present sense switch and the right side be

17    the brake; right?

18  A    That's correct.  In actuality, they wouldn't need to do

19    anything with the left pedal, because it's already acting as

20    a deadman pedal.

21  Q    No, but you testified that this design is unreasonably

22    dangerous?

23  A    I don't like that design.  We've been through that.  I think

24    that it encourages the left leg to be raised, especially in

25    an emergency, because it encourages and actually requires the

1    left leg to be used for braking if you're going to brake with

2    your feet.

3  Q    And your sworn testimony is all Crown had to do was reverse

4    the functions of those two pedals, pedal switches?

5                   MR. WARSHAUER:  Your Honor, I object.  It's never

6    been his sworn testimony.

7                   THE COURT:  It's cross-examination.  Overruled.

8  BY MR. LoCOCO:

9  Q    Isn't that your sworn testimony?

10 A    I don't believe that was my sworn testimony, the way you're

11   putting it, no.

12                  MR. LoCOCO:  I apologize, Your Honor.  It's here

13   somewhere.  Found it.  Your Honor, may I hand up the transcript,

14   a transcript of Dr. Meyer?

15                  THE COURT:  You may.

16 BY MR. LoCOCO:

17 Q    Let me hand you the transcript of your trial testimony, your

18   courtroom testimony from McHale v. Crown from October 6th and

19   7th, 2021.  Could you turn to page 26, please?  Let me know

20   when you're there.

21 A    I'm there.

22 Q    Actually, 25, line 6.  Let me know when you're with me.  Are

23   you there?

24 A    I'm there.

25 Q    All right.  Question:  "And what do you want to see happen?"

1     Answer:  "What I want to see is essentially a reversal of

2     that, so that the present sensing switch is now on the left

3     side for the left foot and the right foot controls the brake.

4     And by doing that, it's actually more intuitive, because all

5     of us who have driven cars typically brake with our right

6     foot, so we're back to using our right foot for braking,

7     which is an improvement in my mind."  Did I read that

8     correctly?

9  A  Yes.

10  Q  Was that your testimony back in October of this year?

11  A  It was.

12  Q  And then on page 26, at line 10, you were asked, quote,

13     Question:  "Is this change just on the RC 5500?  Did this

14     require any mechanical fix?"  Answer:  "Essentially no.

15     There are switches that are electronic in nature, so there's

16     no physical brake that is being applied when the foot is

17     lifted off the brake pedal in the sense that there's no

18     direct physical linkage.  It's an electronic linkage, so

19     there's no reason why the two cannot be reversed and still

20     function."  Did I read that correctly?

21  A  You did.

22            MR. LoCOCO:  Your Honor, could we approach?

23            THE COURT:  Yeah.

24            (Sidebar begins.)

25            THE COURT:  How much more do you think you got?

 1          MR. LoCOCO:  A lot.  I'm at a natural breaking

 2     point.  Just wanted to let you know that.

 3          THE COURT:  When you say you have a lot, another

 4     half hour, another 45 minutes, another hour?

 5          MR. LoCOCO:  45 to an hour.

 6          THE COURT:  All right.  Well, then do you want to

 7     break now?

 8          MR. LoCOCO:  Sure.

 9          THE COURT:  I'll let them go now.  I'll have them

10     come back at 9, and we'll start with where you are and then once

11     we get them out of here, we can entertain your motion.

12          MR. LoCOCO:  Thank you.

13          THE COURT:  All right?  How does that sound to

14     you?

15          MR. WARSHAUER:  That's fine with me.

16          THE COURT:  All right.

17          (Sidebar ends.)

18          THE COURT:  Ladies and gentlemen, we have

19     probably at least another hour with this witness.  As I told

20     you, I want to try to get jurors out of here at 4 o'clock for a

21     lot of reasons.  And sometimes I'll keep jurors longer so that

22     we can finish up a witness, but this is very technical

23     scientific engineering testimony, and so there's a lot to take

24     in.  And so I've elected at this point to stop the witness's

25     testimony at this point.  We'll break for the day.  If you can

1    be here by 9 tomorrow, we'll get started right away.  All right?

2                    Other than -- now there has been an issue.  Is

3    there any jurors that have more than 60 miles to drive one way?

4    I know you do.  All right.  We do have things to help assist

5    those jurors that have longer than a 60-mile commute.  So I'll

6    have one of my clerks talk to you about that.  All right?

7                    All right.  Anything else before we let the jury

8    leave for the day?

9                    MR. LoCOCO:  No, Your Honor.

10                    THE COURT:  All right.  We are -- I want them

11    back at 9 a.m.

12                    (Jury exits at 3:59 p.m.)

13                    THE COURT:  All right.  How long is your motion

14    going to be, you think?

15                    MR. LoCOCO:  Three minutes.

16                    THE COURT:  Oh, okay.  Madam Court Reporter, do

17    you need a break?

18                    THE COURT REPORTER:  I'm okay.  Thank you.

19                    MR. LoCOCO:  I guess I'd ask Dr. Meyer to be

20    excused for this.

21                    THE COURT:  Mr. Meyer, you are excused for today.

22    You may want to wait out in the hall.  I don't know if Counsel

23    wants to talk to you, but they've asked you be excluded as a

24    witness during this part of the hearing, so I'm going to honor

25    it.

1         All right.  Let the record reflect that the

2    jurors have been excused, the witness Professor Meyer has

3    been -- or Dr. Meyer has been excused.

4         Counsel, you had a motion that you want to put on

5    the record that you wanted to address to the Court at the

6    completion of the direct examination of this witness.  For

7    purposes of moving the trial efficiently, I asked that we wait

8    until we could release the jurors for the day, without waiving

9    your objection.  So, without having waived your objection, it's

10   your motion.

11        MR. LoCOCO:  Thank you, Your Honor.

12        Now that Dr. Meyer has testified, we move to

13   strike his testimony because it is unhelpful to the jury on any

14   issues before the jury, principally, because as the Court knows,

15   in a case like this, the plaintiff has to prove that the product

16   was defective and unreasonably dangerous and that those -- that

17   defect or those defects caused the plaintiff's injuries.

18        I listened very carefully to his testimony, and

19   while he was critical of both the pedal configuration, that part

20   of the design, and the steer tire, the lack of a guard on the

21   steer tire, Dr. Meyer never offered an opinion that either of

22   those defects were a cause of Mrs. Anderson's injuries, and

23   you -- and in a case like this that is so technical, the jury

24   can't be allowed to speculate on the issue of causation.

25        And I would add that the testimony at the end

regarding braking distance, distances, actually highlights,

highlight that -- highlights the issue here, because Dr. Meyer

would have had to say that this is what happened with Mr. --

with Mrs. Anderson, this is when her left foot would have come

off of this non-designed pedal.  If he wanted a deadman brake

under the left foot, you know, this is when it would have come

out, which he doesn't know, and this is why it would have

stopped before her foot got caught by the wheel.

            None of that evidence is in the record, so this

witness is not bringing to the party -- to the case the

causation evidence that's required.  And I know the only expert

witness -- Dr. Jeka didn't address that.  And this is just a

motion to strike as opposed to a motion for judgment.

            I know that Dr. Kerrigan, who's scheduled to

testify tomorrow, specifically testified that he has no idea

whether a different pedal configuration would have made a

difference.  But of course that's cross-examination.  We

shouldn't have to get to that issue, especially on the pedal

configuration issue.

            There's no causation evidence in the record.  The

plaintiff didn't put any in the record during direct exam.  And

therefore, Dr. Meyer's testimony is not probative of any of the

issues in this case, and we'd ask his testimony to be stricken.

            THE COURT:  Response?

            MR. WARSHAUER:  Yes, sir.

1          I think Dr. Meyer's testimony is quite explicitly

2     and clearly probative on a variety of issues, and in fact, every

3     issue in this case except perhaps damages.  Dr. Meyer first

4     explained that this product does not comply with accepted

5     published industry standards, then he explained that it does not

6     comply with accepted international standards or just basic

7     practices of engineering or what is done in the industry in

8     general.

9          And this is what we know so far about the

10    evidence.  We know there are cracks on the floor.  We know that

11    cracks cause shaking.  We know that shaking causes loss of

12    balance.  We know that the -- Ms. Anderson said that she

13    slipped.  "Slipped" is a commonly accepted synonym for "loss of

14    balance."  If you looked it up in a thesaurus under Google, the

15    very first thesaurus site says "loss of balance" is equivalent

16    to "slip."  We know that a fall causes steering input and

17    Dr. Meyer helped us explain that, helped us understand that.  He

18    said as you would fall, you could bring the steering wheel and

19    that is explained in the beginning of the arc.

20          We know that the -- there is no evidence at this

21    point that she has any explanation for the beginning of the arc

22    other than the fallout and Dr. Meyer helped us understand that

23    the fallout with the tiller in your left hand, as you pull on it

24    falling to your left, would cause the beginning of the arc.

25          Dr. Meyer further explained to us the braking

1    distances in two ways that are important that do demonstrate

2    causation.  First way is he said this is where it stopped.  If

3    we go back approximately 5 feet, that's where the right foot

4    came out.  I then moved him further back to things that we know

5    from the evidence are sufficient to cause a loss of balance, and

6    thus a fall to the left, the cracks, which are 14 feet back.

7    And I said, "If braking began there, where would it have

8    stopped?"  It would have stopped before it got to point of rest.

9    If it gets -- stops before it gets to the point of rest, it

10   doesn't have an opportunity to run over Ms. Anderson.

11               So Dr. Meyer has explained that the product is

12   defective and unreasonably dangerous quite explicitly.  He has

13   explained that if the brake started working because the left

14   foot came off a pedal at the cracks, it stops before it gets to

15   the point of rest and therefore doesn't have a chance to eat her

16   foot.  And so I'm not quite sure that they're listening to the

17   same evidence that I believe the rest of us heard, but it's all

18   there, Judge.

19               MR. LoCOCO:  Just a couple of points, Your Honor.

20               Mr. Warshauer's argument makes clear the point

21   that we're making.  He says Dr. Meyer, for example, talked about

22   how falling off -- you can pull on the steer tire -- steer wheel

23   or the steering tiller to make the tire turn.  There's no

24   evidence of that.  Mrs. Anderson says she doesn't know what

25   happened.  She doesn't know whether she pulled on it or not.

1    And it was supposition upon supposition.  "If, if, if, if, if."

2    I'm sorry.  If you go back to the record, all of this was "if

3    this" and "if that."  They were hypotheticals for which there's

4    no foundation.

5                 Secondly, Mr. Warshauer makes the point that if

6    she came off of the truck when she first hit the crack --

7    there's two problems with that.  First of all, yeah, the truck

8    wouldn't have gotten to the point of rest, but it doesn't mean

9    that her left foot wouldn't have still gotten under the steer

10   tire.  Those are two different things.  A point of rest would

11   have been someplace else.

12                And secondly, we don't know when her right foot

13   came off of the deadman pedal, because we don't know her speed

14   and we don't know the stopping distance because we don't know

15   her speed at this moment.  And that's all -- those are all

16   things that they have the burden of proving if they want to

17   establish, especially then the pedal side, that the pedal would

18   have made a difference.

19                Now I guess the last thing I'd add, Your Honor,

20   as I've been sitting here thinking about this, is the steer tire

21   guard is really a two -step theory for the plaintiffs, because

22   Dr. Meyer specifically talked about the defect of not having the

23   steer tire guard, but he will say that he can't say whether it

24   would have made a difference in this accident or not.  In fact,

25   in his deposition, he said "I defer to Dr. Kerrigan on that."

1    And so maybe that gets resurrected with Kerrigan tomorrow.

2              But the pedal configuration issue doesn't get

3    resurrected at all anymore, because they have no proof it would

4    have made a difference here, and the jury can't be permitted to

5    speculate on something this technical.

6              THE COURT:  What was the language from B56.41?

7              MR. LoCOCO:  The B56.1?

8              THE COURT:  Yeah.

9              MR. LoCOCO:  Says that "Means shall be provided

10   to disconnect the --"

11             MS. HEITKAMP:  "Means shall be provided so that

12   the travel circuit --" I'm sorry.  "Means shall be provided to

13   disconnect the travel circuit automatically when the operator

14   leaves the operating position."

15             MR. LoCOCO:  And the -- one of the points I was

16   making at the end is the travel circuit is not the brake.  He

17   admitted that.  The travel circuit just means putting power to

18   the motor so that it will move.  So even if his interpretation

19   of that section is correct, it's got nothing to do with our

20   case, because we would be in compliance with a present sensor

21   switch like Crown has.  And that's not a brake, which he

22   admitted.  So --

23             THE COURT:  Well, what has not been explained so

24   far, is there a difference between a brake, a deadman switch,

25   and an emergency brake?  Is there one that just simply cuts

1      power to the motor and this forklift coasts to a stop?  Is there

2      one that actually applies some intense friction or force on the

3      moving wheels to stop them immediately?  Or is there, in

4      braking, is there something that will actually slow down

5      significantly the movement of this forklift?

6                So say you're in a boat.  You're moving along.

7      You cut the motor.  It still drifts.  I don't know what the --

8      this jury does not yet know if there is a difference between

9      these three things, if there's a material difference, or if

10      there's no difference, if they're all the same.  There are three

11      ways to accomplish the same thing.  And in deploying one of

12      those three things, the emergency brake, the red button, I'll

13      add plugging, taking your foot off the deadman switch, do they

14      all have the same impact on how long this forklift is going to

15      travel before it comes to a stop?  That to me is the big

16      question.  Do you think that's been answered yet?

17                MR. WARSHAUER:  I do think it's been answered,

18      Judge.

19                THE COURT:  All right.  Who told me that?

20      Because I wasn't paying attention.

21                MR. WARSHAUER:  You know, I think that eight

22      other people perhaps have heard it differently than you, but I

23      hope they have.  But this is what I believe the evidence has

24      shown this jury.

25                THE COURT:  Who told me the difference between

1    emergency brake, plugging, taking your foot off the deadman

2    switch, killing power to the motor as opposed to actually -- by

3    friction or some other device, stopping the roll of the wheel?

4                   MR. WARSHAUER:  What Dr. Meyer has testified to

5    is that every manufacturer but Raymond satisfies their

6    obligations under 7.20.2 by having a deadman pedal under the

7    left foot, that applies the brake.  That is the application of

8    friction, if you will, to use your terms, that every

9    manufacturer does it that way.  And that is the right way to do

10   it and any choice other than that is not compliant.  He talked

11   about the -- here's where we can get a little confused, and that

12   was the cross that we just heard about.  "Well, you said you

13   wanted to make the left pedal present sensor."  If we read

14   further in that testimony, what he says is, that left foot

15   leaves the pedal, that brake should go on in the most aggressive

16   way that's safe.  He's always said that.  It's in every report

17   he's ever written.  It's in his report here.  That left -- and

18   that was his testimony today, that when the left foot leaves,

19   the brake should go on, and that's the way it's satisfied by

20   Crown, Hyster, et cetera.

21                   With respect to this plugging, plugging is a

22   little less aggressive.  We haven't gone into that because it's

23   really not part of our case.  With respect to the emergency

24   stop, I think that's just a cutoff.  I don't think it applies at

25   all.  Again, it's not part of our case so we haven't used our

1    time capital to talk about that.  But what we have talked about

2    is that the present right-foot deadman pedal brake, when it

3    comes up, it does apply the brake.  We know that she couldn't

4    have plugged while she was falling to her left, so the only

5    explanation for why this forklift eventually stopped before it

6    ran into an object capable of stopping it was that her right

7    foot came off the brake.  That has to be the explanation.

8              We did then explain why he thought it was 5 miles

9    an hour based on her testimony, the length of the arc,

10   et cetera.  It made sense to him.  That's the number he picked.

11   If they want to cross-examine him and say, "Well, you picked a

12   stupid number," that's within their prerogative.  But he picked

13   a number and have a basis for it based on her testimony and said

14   "I actually went a little higher than what I thought she had

15   said because I wanted to see where we would end up."

16             But with respect to this causation, we're going

17   to get an explanation of how the wheel ate her foot.  That's not

18   this person's job.  We're going to get an explanation for how

19   the guard would have prevented that.  Again, he's not here to

20   talk about biomechanics and medical testimony.  Dr. Kerrigan

21   will handle that.  But focusing on the basis of this opinion,

22   that he's not been helpful, when he has described violations of

23   good engineering, written standards, industry practices relating

24   to the compliance with those standards, including international

25   aspects of that, that's just not true.

1          When he says that we haven't explained how a

2    brake would have changed the outcome, that's not true either

3    because we've said, if the brake starts up here where these

4    cracks are, we stop before we get to the end.  And then it will

5    be for Dr. Kerrigan to say, "Well, if we stopped before we get

6    to the end, do you have evidence that this wheel would have

7    rolled another 4 feet?  You know, was she in it 4 feet?"  And

8    the answer is no one's going to say that.

9          MR. LoCOCO:  That last comment is beyond

10   Dr. Kerrigan's Rule 26 report and his depositions.  He

11   specifically said, "I can't tell you whether the different brake

12   system would have made a difference here."  And the only issue

13   on this pending motion, Your Honor, is they have not gotten

14   expert testimony on how the brake pedal design -- their

15   alternative would have prevented this injury, or put another

16   way, how our brake pedal design was a cause of this injury.

17   That's the problem.

18          THE COURT:  I understand where you're going.

19          MR. LoCOCO:  And if I have to, candidly, and

20   again thinking more about it, I would add to our motion to

21   strike, I think we can do this under the new rules, a Rule 50

22   motion to strike the brake pedal configuration claim from the

23   plaintiffs because they can't satisfy the causation issue.

24          THE COURT:  All right.  The motions are denied.

25   If I was going to gut this case, I probably would have done

1    it -- we have -- I don't know how this case is going to end.  I

2    haven't heard all the witnesses.  I think that the -- this

3    witness was competent to testify in the areas that he testified

4    about, and so I'm not going to strike his testimony.  And this

5    is probably best addressed at the end when I've heard all the

6    plaintiff's case and the plaintiff rests.  I'm sure we'll

7    revisit it at that point.  But I'm not going to strike this

8    witness's testimony at this point.

9                    MR. LoCOCO:  And you're denying my Rule 50 right

10   now without prejudice?

11                   THE COURT:  I'm denying your Rule 50 right now.

12                   MR. LoCOCO:  Without prejudice?  I mean, I can

13   raise it again?

14                   THE COURT:  You're going to raise it again,

15   whether I want you to or not.  But no, because I think it's

16   premature.

17                   MR. LoCOCO:  All right.

18                   THE COURT:  I haven't heard all the witnesses.

19   And it would be very presumptuous of me to think that I know all

20   the evidence that's going to relate to these claims.  And once

21   the jury hears all the evidence like I have, that there may be

22   sufficient question of fact to present to the jury and enough

23   presented to them that they could conclude that this was an

24   unreasonably dangerous product, and that the design defect is

25   causally related to her injuries.

1          All right.  What else do we need to take care of

2     today?  20 after 4.

3          MR. LoCOCO:  Just for my record, I understand the

4     Court's ruling.  I understand the Court believing that it was

5     premature.  I raised it because I don't want any question later

6     that we were waiving this issue with respect to this witness, so

7     I wanted to raise it now.

8          THE COURT:  All right.

9          MR. LoCOCO:  Thought I needed to.

10         Oh, I think it's pretty clear that the lawyers

11    for the other side can't confer with Dr. Meyer overnight about

12    his testimony.  I don't know if I have to put that on the record

13    or not.

14         MR. WARSHAUER:  Different judges handle it

15    different ways, Your Honor.  It's an expert witness.  We wanted

16    to get the best testimony out that's helpful to the jury.  Some

17    judges say, "You know what, if you talk to him overnight, the

18    other side's going to inquire what you said.  Have at it."

19    Other judges say, "No, we're going to be very strict."  I'd

20    prefer obviously to be able to talk to him.

21         MR. LoCOCO:  Except -- I understand everything

22    Mr. Warshauer's saying.  But the rules were changed about ten

23    years ago so that I can't find out what he talked to

24    Mr. Warshauer about.  That's sacrosanct communication between

25    expert and retaining lawyer now, so it's different than it used

```
1    to be.  Yeah, I used to get up and say, "What did you guys talk
2    about at the break?"  I can't do that now.
3                    MR. WARSHAUER:  I'll tell you this.  If I talked
4    to him overnight, I don't mind them asking about it the next
5    day.
6                    THE COURT:  Well, he's in the middle of his
7    testimony, so.  So you're saying that during a break, a lawyer
8    can't talk to the expert?  If we did a 15-minute recess or a
9    lunch, he's not able to talk to him?
10                   MR. LoCOCO:  No, he can talk to him unless he's
11   on cross-examination or vice versa.  Right?  So we took a break
12   when Dr. Meyer was in the middle of his direct --
13                   THE COURT:  Because we broke during your cross --
14                   MR. LoCOCO:  Yes.
15                   THE COURT:  -- you'll have to wait.
16                   All right.  So we finish up with Meyer tomorrow.
17   Who do we have on track for tomorrow?
18                   MR. WARSHAUER:  Kerrigan, life care planner,
19   economist.  We might have Mr. Mulvany, we'll decide about that,
20   or play Mr. Mulvany.  That's very short.
21                   MR. LoCOCO:  We have some objections to deal with
22   on Mulvany if that happens, so.
23                   MR. WARSHAUER:  I don't know that it's necessary,
24   frankly.
25                   MR. LoCOCO:  Dr. Low.
```

1          MR. WARSHAUER:  Dr. Low, we'll fit in when we

2     have half an hour.

3          THE COURT:  And do you want to wait until

4     Thursday to put the Andersons on, or?

5          MR. WARSHAUER:  I think that we're probably going

6     to put Jeff on, Mr. Anderson on first, and kind of depend on

7     where we are tomorrow.  We might well show up after lunch.

8     We'll just have to see.  I've got to get this economist on or

9     off tomorrow, or Thursday morning.  So we may just do the life

10    care planner tomorrow and wait for the economist.  I mean, the

11    economist is really short.

12         THE COURT:  All right.  So do you anticipate

13    closing your case sometime on Thursday?

14         MR. WARSHAUER:  I still hope to close by the end

15    of -- I used to think before lunch, but now I think the end of

16    business, end of the day Thursday.  That's my goal.

17         THE COURT:  All right.  And are you going to have

18    people ready to go on Friday?

19         MR. LoCOCO:  We're going to put Mr. Rogers, Mike

20    Rogers on first thing, and then he's going to take a little bit

21    of time.  It might just get us through lunch.

22         THE COURT:  All right.

23         MR. WARSHAUER:  And --

24         THE COURT:  We'll have witnesses here and we'll

25    be able to be productive and the jury will know that we're

1    getting at it.  We're not looking at stopping tomorrow at

2    1 o'clock?

3                    MR. WARSHAUER:  No, I've got people, and my worst

4    case scenario is Mr. Rogers still would start at lunch and be

5    able to be finished by 4.

6                    MR. LoCOCO:  Oh, okay.  Yeah.

7                    THE COURT:  All right.

8                    MR. LoCOCO:  Thank you, Your Honor.

9                    THE COURT:  All right.  We are in recess until

10   tomorrow at 9 a.m.

11                   (Recess at 4:24 p.m.)

12

13                    ° ° ° ° ° ° ° ° ° ° ° °

14              **COURT REPORTER'S CERTIFICATE**

15              I certify that the foregoing is a correct

16   transcript from the record of proceedings in the above-entitled
     matter.

17

18              Dated this 21st day of December, 2021

19        /s/ Hannah Jagler

20        _____

21        Hannah Jagler, RMR, CRR, FCRR
          Official Court Reporter

22

23

24

25