IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
------------------------------------------------------------------
ADELAIDA ANDERSON and JEFF ANDERSON,  |
                                      |
                Plaintiffs,           |
                                      |
v.                                    | Case No. 19-cv-800-SPM
                                      |
RAYMOND CORPORATION,                  |
                                      |
                Defendant.            |
------------------------------------------------------------------
```

Transcript of Jury Trial - Volume III
November 3, 2021

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East Saint Louis, Illinois

```
------------------------------------------------------------------
```

**REPORTED BY:**        **HANNAH JAGLER**, RMR, CRR, FCRR
                  Official Court Reporter
                  750 Missouri Avenue
                  East Saint Louis, Illinois 62201
                  618-482-9481
                  Hannah_Jagler@ilsd.uscourts.gov

Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES**:

FOR PLAINTIFF:      **MICHAEL J. WARSHAUER**
                    **JASPER V. ABBOTT**
                    Warshauer Law Group, PC
                    2740 Bert Adams Road
                    Atlanta, Georgia 30339
                    404-892-4900
                    Mwarshauer@warlawgroup.com
                    Jasper@warlawgroup.com

                    **FRANK J. McCOY, JR.**
                    McCoy & McCoy, LLC
                    20 Church Street, Suite 1720
                    Hartford, Connecticut 06103
                    860-244-9100
                    Frank@mccoymccoy.com

                    **RYAN E. BRENNAN**
                    Brennan Law Firm PC
                    19 Bronze Pointe
                    Belleville, Illinois 62226
                    618-236-2121
                    Ryan@feladlc.com

FOR DEFENDANT:      **FRANCIS H. LoCOCO**
                    Husch Blackwell LLP
                    555 East Wells Street, Suite 1900
                    Milwaukee, Wisconsin 53202
                    414-978-5305
                    Frank.lococo@huschblackwell.com

                    **G. PATRICK MURPHY**
                    Murphy & Murphy, LLC
                    3415 Office Park Drive, Suite D
                    Marion, Illinois 62959
                    618-248-3236
                    Gpatrick@murphymurphyllc.com

                    **MARGARET KATHRYN HEITKAMP**
                    Husch Blackwell LLP
                    511 North Broadway, Suite 1100
                    Milwaukee, Wisconsin 53202
                    414-978-5373
                    Margaret.Heitkamp@huschblackwell.com

1                            **INDEX**

2                                                           **PAGE**

3   WITNESS: **JOHN MEYER, Ph.D.**

4        Continued Cross-Examination By Mr. LoCoco............... 299

5        Redirect Examination By Mr. Warshauer................... 320

6        Recross-Examination By Mr. LoCoco....................... 333

7        Redirect Examination By Mr. Warshauer................... 341

8   WITNESS: **JASON KERRIGAN, Ph.D.**

9        Direct Examination By Mr. Warshauer..................... 345

10        Cross-Examination By Mr. LoCoco......................... 383

11        Redirect Examination By Mr. Warshauer.................. 401

12  WITNESS: **JAN KLOSTERMAN, RN**

13        Direct Examination By Mr. Warshauer.................... 404

14        Cross-Examination By Mr. Murphy........................ 418

15        Redirect Examination By Mr. Warshauer................. 432

16        Recross-Examination By Mr. Murphy...................... 433

17  WITNESS: **KAREN GROSSMAN TABAK, Ph.D.**

18        Direct Examination By Mr. Warshauer.................... 438

19        Cross-Examination By Mr. Murphy........................ 446

20        Redirect Examination By Mr. Warshauer................. 450

21  WITNESS: **JEFFREY LOW, MD**

22        Video Deposition Played................................ 452

23

24

25

1

## INDEX OF EXHIBITS

2

| NO. | DESCRIPTION | ID'D | RCV'D |
|-----|-------------|------|-------|
| 1 | Life Care Plan.................................. | 407 | 408 |
| 80 | Photo - Injuries............................... | 365 | 1106 |
| 81 | Photo - Injuries............................... | 365 | 1106 |
| 85 | Kerrigan Shoe Photos........................... | 358 | 1106 |
| 86 | Xray Images of A. Anderson's Foot.............. | 354 | 1106 |
| 87 | Graphical Depiction of Degloving Injury........ | 357 | 1106 |
| 88 | Anatomy of Left Foot........................... | 351 | 1106 |
| 90 | Graphical Depiction of Foot Interaction With .. Wheel | 367 | 1106 |
| 119 | Medical Bills and Records...................... | 407 | 1106 |
| 122 | CV-Jason Kerrigan.............................. | 346 | 1106 |
| 157 | To-Scale Forklift Floor........................ | 377 | 1107 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **<u>TRANSCRIPT OF PROCEEDINGS</u>**

2           (Proceedings commenced at 9:02 a.m.)

3           (Jury enters at 9:02 a.m.)

4           THE COURT:  Please be seated.  Good morning,

5   everybody.

6           All right.  We are ready to resume.  We're back

7   on the record in Anderson v. Raymond.  We are still in the

8   testimony phase of Mr. Meyer.  Mr. Meyer is on the stand.  Sir,

9   you are still under oath.  And with that...

10          MR. LoCOCO:  May I proceed?  May it please the

11   Court.

12          THE COURT:  Continue your cross-examination.

13          MR. LoCOCO:  Thank you, Your Honor.  Good

14   morning.

15          CONTINUED CROSS-EXAMINATION

16 BY MR. LoCOCO:

17 Q  Good morning, Dr. Meyer.  How are you?

18 A  Good morning.  Fine.

19 Q  I want to try and pick up sort of where we left off last

20   night.  You told the jury yesterday about your opinion that

21   the Raymond pedal configuration violates Section 7.20.2 of

22   the ANSI B56.1 Standard; correct?

23 A  Yes.

24 Q  You can't name a single other mechanical engineer who agrees

25   with your interpretation of this section of the standard;

1     correct?

2  A   I haven't attempted to pull other engineers, other than

3     engineers who are working for Raymond.  I don't know any who

4     don't -- who disagree with me.

5  Q   Well, let me go back to my question.  Can you name a single

6     other mechanical engineer who agrees with your interpretation

7     of that section of the standard?

8  A   As I just said, I haven't pulled other engineers, so I don't

9     know.

10  Q   Dr. Meyer, you agree that there are two principal ways to

11     stop the 4250?

12  A   Yes.

13  Q   One of the ways the jury heard about -- actually, could we

14     pull up 500-45?  I hope I have the right page.  So you see

15     this section here, Dr. Meyer, on page 41?  "To stop the lift

16     truck, normal operation"?

17  A   I do.

18  Q   Could we blow that up?  So "Using plugging to stop the lift

19     truck under normal operating conditions.  To use plugging, do

20     the following:  Move the control handle through neutral to

21     the direction opposite your current travel.  This action is

22     called plugging.  The farther you move the control, the

23     faster you slow down.  When the lift truck stops, release the

24     control handle and step off the deadman pedal.  Releasing the

25     deadman pedal disables travel and applies the parking brake."

1       Correct?

2    A  That's what it says, yes.

3    Q  And I just want to kind of walk through it with the jury.  So

4       that means if I'm in the compartment and the forks are to my

5       right and the opening to the forklift is to my left, and I'm

6       going -- forks leading, so I'm going that direction toward

7       the back of the courtroom, and I want to stop, I pull the

8       control handle back through neutral and put it in reverse;

9       correct?

10   A  That's correct.

11   Q  And because this is an electric truck with an electric motor,

12      you're not grinding gears?  This is perfectly acceptable for

13      an electric piece of equipment; correct?

14   A  Absolutely.

15   Q  All right.  And as it gets to a stop, you put it back in

16      neutral, you take your foot off the deadman pedal, and then

17      you get out?

18   A  In normal operation, that would be the way you would intend

19      to do it, yes.

20   Q  All right.  "To stop the lift truck in an emergency," you see

21      that section?

22   A  I do.

23                  MR. LoCOCO:  Page 24, can we blow that up,

24      please, Margaret?  Thank you.

25   BY MR. LoCOCO:

| | | |
|---|---|---|
| 1 | Q | "To stop the lift truck in an emergency, step off the deadman |
| 2 | | pedal immediately.  Releasing the deadman pedal stops the |
| 3 | | lift truck in the shortest possible distance."  Did I read |
| 4 | | that correctly? |
| 5 | A | Yes. |
| 6 | Q | All right.  So that means your right foot's on the -- if your |
| 7 | | right foot is on the deadman pedal and you're in an |
| 8 | | emergency, you pick up your right foot and that applies the |
| 9 | | brakes immediately? |
| 10 | A | It slows the forklift as quickly as possible. |
| 11 | Q | And that brings the truck to a stop? |
| 12 | A | It will. |
| 13 | Q | And with your right foot off the deadman pedal, your body |
| 14 | | weight is on your left foot? |
| 15 | A | If your left foot is within the operator compartment, yes. |
| 16 | Q | Which is where it should be? |
| 17 | A | It is where it should be. |
| 18 | Q | I want to go back to -- |
| 19 | | MR. LoCOCO:  Could I have the document camera, |
| 20 | | please? |
| 21 | BY MR. LoCOCO: | |
| 22 | Q | I want to go back to the Crown design for a second.  This is |
| 23 | | Figure 19 from your report.  So we're looking down into a |
| 24 | | Crown RC 5500; correct? |
| 25 | A | That's correct. |

| | | |
|---|---|---|
| 1 | Q | Okay.  And you told us yesterday that the horseshoe switch |
| 2 | | under the right foot in the Crown compartment, that's the -- |
| 3 | | that's the switch that if you take your foot up off of it, |
| 4 | | there's a one-second delay before the truck then starts to |
| 5 | | coast, or there's a one-second delay before traction power is |
| 6 | | removed from the truck? |
| 7 | A | That's the way the current Crown truck operates, that's |
| 8 | | correct. |
| 9 | Q | And if you take your foot off the left pedal, the brakes slam |
| 10 | | on? |
| 11 | A | Well, actually, in the RC 5500, there's four different |
| 12 | | gradients as far as braking, so you can have four different |
| 13 | | levels of braking, depending on how far up off of the brake |
| 14 | | you lift the pedal.  If it's up all the way, then you get |
| 15 | | full braking authority. |
| 16 | Q | And the truck will come to a stop as quickly as it's able to? |
| 17 | A | If it's -- if your foot is completely off the pedal. |
| 18 | Q | Correct.  All right.  And what's full speed on the RC 5500, |
| 19 | | do you know? |
| 20 | A | It's comparable.  I don't recall off the top of my head. |
| 21 | | It's very similar, around 8 miles an hour. |
| 22 | Q | And from 8 miles an hour -- let's use the Raymond.  From |
| 23 | | 8 miles an hour, how many feet does it take to stop from |
| 24 | | 8 miles an hour if you remove your foot from the deadman |
| 25 | | pedal? |

1  A    Around 11, roughly.

2  Q    All right.  Okay.  Now with regard to the Crown, you -- or

3       even the Raymond, you actually want brakes under both feet;

4       correct?

5  A    Pardon me?

6  Q    You want brakes under both feet?

7  A    I do, yes.

8  Q    So that whether you pick up your left foot or your right

9       foot, the brakes come on?

10 A    Yes.

11 Q    You haven't designed that system, have you?

12 A    I don't understand what you're saying.

13 Q    Do you have a design to show the jury of two pedals on 4250

14      that brake the truck?

15 A    I cannot show you an image of that, no.

16 Q    Have you designed one?

17 A    I -- my design is based on the Crown design, and all it

18      entails is a reprogramming of the logic of how the braking

19      occurs.

20 Q    But I thought you just told me on the switch on the right

21      side of the -- on the right side of the Crown compartment --

22      Crown compartment, the brake doesn't come on.  All it does is

23      disconnect traction power.

24 A    That's correct.  My proposal would be to reprogram that so

25      that it behaves as the left-foot pedal behaves, which would

1    be that when you leave your -- pick your foot up off of that

2    pedal, the brake is applied.

3  Q  And then you'd have to train people to only use the right

4    foot to brake; correct?

5  A  That's correct.  Yeah.  Just like in the Raymond forklift.

6    You would use your right foot.

7  Q  You haven't -- you haven't applied this design to a Raymond

8    or a Crown truck; correct?

9  A  I have not.

10  Q  You haven't prepared any warnings or instructions or training

11    materials that would assist in telling an operator, "Okay,

12    with this new system, you've got to use your right foot."

13    Correct?

14  A  No.

15  Q  And it's in fact true that there isn't a manufacturer that

16    you're aware of that has two brake pedals currently?

17  A  That has two brake pedals?  That's correct.

18  Q  Dr. Meyer, I want to switch gears now and ask you -- I want

19    to see if we can agree on a few things.  First of all, you

20    agree that just because a product such as a forklift is in an

21    accident that includes someone getting injured doesn't mean

22    that the product is defective or has a design flaw; true?

23  A  Absolutely.

24  Q  These trucks are heavy; correct?

25  A  They're very heavy.

1  Q   And if someone gets hit by a 4-ton piece of steel, that

2      person is going to get injured; you agree with that?

3  A   For the most part, yes.

4  Q   All right.  Will you also agree that reasonably qualified

5      engineers can disagree about how to accomplish a specific

6      design of a product?

7  A   I think there's definitely disagreement among engineers at

8      times.  I think that there are certain items where engineers

9      should not disagree.

10 Q   And one of those areas is having two brake pedals so that no

11     matter what foot gets picked up, the brake comes on?

12 A   I'm not understanding your question there.

13 Q   All right.  You think you have the right design concept

14     regarding the pedal configuration such that Raymond should

15     have two brake pedals, one under each foot; correct?

16 A   Not really.  I think that Raymond should have a pedal under

17     their left foot or a sensor that senses the left foot and

18     make sure the foot's in the proper operating position, and

19     that if it's not in that position, that braking occurs

20     because it's not in the proper operating position.

21 Q   And --

22 A   And I believe that the right foot should be the foot that is

23     directed to brake the truck.

24 Q   So to be clear, under the left foot on the Raymond, you don't

25     want what's under the right foot on the Crown, you want

1    something that actually activates the brake?

2  A   I want a true presence sensing device sensor.  It could be a

3     light sensor like the Yale or Hyster design, or it could be a

4     pedal like the Crown design.  But when the left foot is not

5     in the proper operating position, braking occurs, because

6     it's not in the proper operating position.

7  Q   And as you told us a few minutes ago, there isn't a

8     manufacturer that has two pedals that apply braking; correct?

9  A   Except for the fact that, I mean, in a Yale-Hyster design, it

10    has two sensors that sense that the operator's not -- if it's

11    not in the proper position, it will apply braking.

12 Q   You sure the Hyster-Yale only has two sensors?

13 A   It's got multiple sensors.

14 Q   How many light beams does it have?

15 A   Three.

16 Q   And have you ever operated a Hyster-Yale with that system?

17 A   I have.

18 Q   Have you talked to operators who use that system every day?

19 A   I've not.

20 Q   Have you talked to them about the problems they face with a

21    system like that?

22 A   I've -- having not talked to operators, no, I haven't.

23 Q   Now would you agree that designing a product or even a

24    component for a product involves multiple steps?

25 A   Sure.

1   Q   All right.  There's a design methodology that engineers use?

2   A   Usually, yes.

3   Q   All right.  I want to see if you and I can agree on at least

4       some of the steps.  I'm sure they won't be in the right

5       order, because I'm not an engineer.  All right.  I've put a

6       title, "Design Steps."  Can you and I agree that one design

7       step is to have a design concept?

8   A   Sure.

9   Q   Another step is at some point, someone actually has to design

10      something?  Years ago it would have been on paper; now it's

11      on a computer?

12  A   Yes.

13  Q   And what's that called?  CAD drawing?

14  A   Detail design.

15  Q   All right.  Part of the design process is to select

16      components; correct?

17  A   That would be part of detail design, but yes.

18  Q   Part of the design process is testing; correct?

19  A   Once you have a prototype, you would want to test it, yes.

20  Q   Okay.  So you want to do prototypes; right?

21  A   That would generally be something you would do, yes.

22  Q   But on the components, you might do some lab testing on

23      certain components of the design; correct?

24  A   Possibly.

25  Q   Is that sometimes called bench testing?

1    A    You could call it that.

2    Q    Then you have prototype testing; right?

3    A    Sure.

4    Q    If you don't agree with a step, you got to, you know, shout

5         it out.  So prototype testing.  Then the design methodology

6         will often include field testing; correct?

7    A    Possibly, sure.

8    Q    And when you're doing prototype testing and field testing,

9         one of the things you do is get feedback from the prototype

10        testers or field testers in order to know whether you've got

11        to refine the design; right?

12   A    That would be one of the purposes of doing field testing,

13        yes.

14   Q    So another step is design refinement; agreed?

15   A    Yes.

16   Q    And there are other steps; right?

17   A    Sure.  You're generally getting the idea of how you go about

18        a design.

19   Q    So there's steps between concept and getting it into the

20        marketplace?

21   A    Yes.

22   Q    All right.  And on the guard over the steer tire that you

23        talked about with the jury yesterday, you're up at the

24        concept phase; correct?

25   A    Generally, yes.

1    Q    You haven't engaged in any of these other steps?

2    A    That's correct.

3    Q    Isn't it true that when you do engage in the design

4         methodology, based on prototype testing and field testing,

5         you might get to the point where you realize, "This is a bad

6         idea, we can't do this"?

7    A    Potentially, absolutely.

8    Q    Or you might engage in field testing or prototype testing and

9         determine that the new design or the change to the design is

10        actually making use of the product more hazardous; right?

11   A    I would think that would be unlikely, but it's possible.

12   Q    Thank you.  So just to kind of finish off this area, you have

13        no drawings to show the jury; correct?

14   A    I do not.

15   Q    No prototype?

16   A    I do not have a prototype.

17   Q    No test results?

18   A    I have no test results to offer.

19   Q    In fact, you didn't do any testing in this case; correct?

20   A    I did not, because we've got a real world device that's been

21        tested.  The Crown 5500, RC 5500, that has two pedals, and

22        its pedals are controlled by logic.  The director of product

23        safety of Crown has said that the logic can be changed, and

24        that the pedal configuration is modified by logic, and that

25        that's something that can be easily implemented.

1  Q  So just so we're clear, because I'm getting to be an older

2     guy, when you say "logic," you mean computer software?

3  A  Yes.  The control -- the control -- the logic that controls

4     how the pedal operates when a foot is present or not present.

5  Q  And you're not a software engineer; correct?

6  A  I am not.

7  Q  You couldn't do this reprogramming on the Crown, could you?

8  A  Well, I probably could but I probably wouldn't be very

9     efficient at it.

10  Q  Bad question.  If you were going to do this, you would work

11     with someone who is a software engineer, ask them to do what

12     you want done?  That would be more efficient?

13  A  That would be way more efficient.

14  Q  And then you'd have to go on to the next steps, testing it;

15     correct?

16  A  As far as what goes?  Testing?

17  Q  Are you creating new hazards by having a design that has two

18     pedals no matter which foot gets picked -- two brakes no

19     matter which foot gets picked up?

20  A  I think you could evaluate that.  I don't see that as a

21     problem at all.

22  Q  Well, you'd agree that one potential problem is something

23     called inadvertent activation?

24  A  Raymond has maintained the fact that there's nothing that you

25     can do inside the operator compartment where you would lose

1    your balance, so I don't know how having brakes under both

2    feet would somehow cause a hazard as far as operating the

3    forklift.

4  Q  Because when the operator executes a deadman pedal maneuver,

5    the operator is consciously deciding to brake the truck;

6    correct?

7  A  That's correct.

8  Q  And what I'm saying is, in inadvertent activation, somebody

9    is in a compartment that requires both feet on the floor the

10    whole time or the truck brakes, and they're tired, and they

11    pick up a foot without thinking about it and the truck slams

12    to a stop.

13  A  These trucks don't slam to a stop.  They're going slow to

14    begin with.  They don't slam to a stop.  They don't brake

15    particularly fast, even under the most severe conditions of

16    braking.  I don't see that as a hazard.  It's not a hazard in

17    the Crown.  It hasn't presented itself as a hazard in the

18    Crown model at all.

19  Q  The Crown -- but Crown doesn't have it, Dr. Meyer.

20  A  Crown has two pedals that control the truck, and so all we're

21    doing is adding faster implementation of braking under the

22    right foot compared to the normal Crown.  It's not -- braking

23    would not be hazardous under those conditions.

24  Q  And you know this just because you know it?

25  A  Excuse me?

1   Q   What's your basis for saying that?  You've done no testing.

2   A   I've not.

3   Q   All right.  And you already told the jury that Crown on that

4       right-foot switch builds in a one-second delay, and you know

5       that's because of the concern over inadvertent activation;

6       true?

7   A   I don't know that.

8   Q   Okay.  Doesn't that make sense as a reason?

9   A   It's a possible reason.

10  Q   And you don't want the one-second delay?

11  A   I do not.

12  Q   Dr. Meyer, you agree that one of the responsibilities that an

13      operator has is to stay in the compartment during operation;

14      correct?

15  A   That's the idea, yes.

16  Q   And you agree that Ms. Anderson was injured when her left

17      foot was outside of the confines of the operator's

18      compartment?

19  A   I would agree with that.

20  Q   And you'd agree that if Mrs. Anderson had kept her foot

21      inside the compartment, she would not have been injured?

22  A   Most likely.

23  Q   I have a couple of questions about your path of travel that

24      you put together and discussed with Mr. Warshauer yesterday.

25      This is Figure 23 from your report.  You're familiar with it;

1    right?

2  A    Yes.

3  Q    So what we see here is the 4250 in a counterclockwise turn

4       that puts it in the direction of this vertical post that we

5       see there; correct?

6  A    Correct.

7                 MR. LoCOCO:  And could you pull up 503, please?

8  BY MR. LoCOCO:

9  Q    So Ms. Boone was here yesterday, and she testified that with

10      a couple of modifications -- strike that.  She was here

11      yesterday and she testified that the angle is approximately

12      correct as to what she found when she got to the scene of the

13      accident.  That's your understanding from your work in the

14      case; correct?

15  A    Generally, yes.

16  Q    All right.  This counterclockwise turn toward the vertical

17      post, that's not what Ms. Anderson testified to, is it?

18  A    No, it's not.

19  Q    She testified that she was going straight down the aisle

20      before the accident and was still straight down the aisle

21      after the accident; correct?

22  A    That's correct.

23  Q    So if we --

24                 MR. LoCOCO:  Can we go back to the document

25      camera?

1          THE COURTROOM DEPUTY:  Mm-hmm.

2          MR. LoCOCO:  Thanks.

3     BY MR. LoCOCO:

4     Q    So her testimony is she came into this aisle straight and

5          stayed straight; correct?

6     A    Correct.

7     Q    You understand that Ms. Anderson has been operating this lift

8          truck at FedEx for years before the accident?

9     A    She was a very experienced operator, yes.

10    Q    On the same floor?

11    A    Pardon me?

12    Q    She had been operating on the same floor?

13    A    Yes.

14    Q    And based on her deposition, Ms. Anderson didn't know how

15         fast she was going; correct?

16    A    There's no speedometer on the forklift, so it's a little hard

17         to know exactly how fast you're going.

18    Q    Standup forklifts don't --

19    A    Pardon me?

20    Q    Standup forklifts don't have speedometers generally?

21    A    That's correct.

22    Q    Okay.  So let me get back to my question.  She doesn't know

23         how fast she was going?

24    A    No.  She said she was going slowly.

25    Q    Right.  She doesn't remember whether she tried to brake the

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | forklift; correct?                                                   |
| 2  | A | I don't recall.  I -- her testimony as far as I recall was           |
| 3  |   | that she experienced some shaking, and then she was out of           |
| 4  |   | the forklift.                                                        |
| 5  | Q | Okay.  She didn't know when she left the compartment;                |
| 6  |   | correct?                                                             |
| 7  | A | Correct.                                                             |
| 8  | Q | She doesn't know if she pulled on the control handle while           |
| 9  |   | getting out of the compartment; correct?                            |
| 10 | A | Correct.                                                             |
| 11 |   | THE COURT:  Is this -- just so I understand,                         |
| 12 |   | you're just asking -- you're recounting now what's in her           |
| 13 |   | deposition?                                                          |
| 14 |   | MR. LoCOCO:  Yes, Your Honor.                                        |
| 15 |   | THE COURT:  If he understands her deposition --                      |
| 16 |   | MR. LoCOCO:  Yes, Your Honor.                                        |
| 17 |   | THE COURT:  -- to say that?  Okay.                                   |
| 18 |   | BY MR. LoCOCO:                                                       |
| 19 | Q | Yeah, this is your understanding from reading Mrs. Anderson's        |
| 20 |   | sworn testimony; correct?                                           |
| 21 | A | Yes.                                                                 |
| 22 | Q | All right.  And she doesn't recount when her right foot came         |
| 23 |   | up off the deadman pedal; correct?                                  |
| 24 | A | That is correct.                                                     |
| 25 | Q | All right.  By the way, Dr. Meyer, you're getting paid for           |

1     your work; correct?

2  A  That's correct.

3  Q  What's your hourly rate?

4  A  $445 per hour.

5  Q  And you would not dispute that you've been paid over $200,000

6     by Mr. Warshauer for the work you've been doing for him, not

7     just this case, but the Florida case?

8  A  I'm currently working on seven different cases that involve

9     forklifts, standup forklifts with left-leg injuries or

10    amputations, very similar to Mrs. Anderson.  And combined,

11    they probably do total that or more.

12  Q  Couple questions about the steer tire guard that you told the

13    jury about yesterday.  You've already -- and today you've

14    already told us you haven't actually designed anything for

15    the back of the truck; correct?

16  A  I'm not sure what you're asking.

17  Q  You haven't designed a guard for that steer tire opening?

18  A  I haven't done the detail design, that's correct.

19  Q  We saw a computer picture of something yesterday; right?

20  A  Yes.

21  Q  All right.  But here's the opening; correct?

22  A  Yeah.  It's kind of hard to see, at least on my screen.

23  Q  Can you see it now?  Better?

24  A  Not much better.  But I can see it on that screen better.

25  Q  All I want to ask you is this:  You couldn't just weld a

```
 1        piece of steel over this opening right now the way the 4250
 2        is designed; correct?
 3   A    Actually, I think you could.  The -- you couldn't weld it
 4        even with the current structure, because it would interfere
 5        with the steering of the tire, but you could do it outside of
 6        the body of the truck and not interfere with the steering of
 7        the tire.
 8   Q    So you'd have to have something that would bump out a little
 9        bit?
10   A    It would, yes.
11   Q    Because otherwise, the tire would -- it would interfere with
12        the turn of the tire?
13   A    That's correct.
14                   MR. LoCOCO:  Just a moment, Your Honor.
15   BY MR. LoCOCO:
16   Q    Just one last thing, Dr. Meyer.  You told us yesterday
17        that -- I think you told us that Crown was over half the
18        market?
19   A    I don't recall saying that, but that's my understanding, is
20        that Crown sells approximately half of all of the standup
21        forklifts that are in the marketplace in the US.
22   Q    And every Crown 5500 that has this current design you believe
23        is defective?
24   A    I believe that their design should be changed, yes.
25   Q    And you believe that it's defective as it sits right now?
```

1    A    There are a lot of things that involve that design that I

2         believe should be changed, and if we want to get into that,

3         I'll be happy to get into that.  But yeah, I believe there

4         are issues with their design.

5    Q    I'm focusing right now just on the pedal design.  You want

6         this pedal design changed?

7    A    I think that changing the pedal design would make that

8         forklift safer.

9    Q    And you want Raymond's pedal design changed?

10   A    I do.

11   Q    And Nissan's pedal design changed?

12   A    Yes.

13   Q    All right.  Because they all got it wrong?

14   A    Pardon me?

15   Q    They all got it wrong?

16   A    I haven't looked at the designs of every single forklift in

17        detail, but I believe at least Raymond has a significant

18        problem, because they have no sensing of the operator's left

19        foot, and no action is taken when the left foot of the

20        operator is not in the proper operating position.

21   Q    Well, anyone who's got a design like this, Crown has got it

22        wrong?

23   A    Well, we're focused on the Raymond forklift and that's the

24        issue right now.  And I know that the Raymond forklift hasn't

25        got anything to sense the operator being in the proper

1    operating position for the left foot.

2  Q   Dr. Meyer, you've told us that you want Crown to change their

3    design; correct?

4  A   That's correct.

5  Q   And you want Raymond to change its design; correct?

6  A   I would.

7  Q   And any other manufacturer who has a design like Crown's you

8    want changed too?

9  A   I believe that would be a prudent thing to do.

10             MR. LoCOCO:  All right.  Thank you, Your Honor.

11   Nothing further.  Thank you, Dr. Meyer.

12                        REDIRECT EXAMINATION

13 BY MR. WARSHAUER:

14 Q   I wasn't sure the best way to display this for you,

15   Dr. Meyer, so I'm just going to go back to a keynote slide in

16   its build phase, if you will.  We're going to start where you

17   just ended up.  On the left, we see the image that -- of the

18   Crown forklift.  Now with respect to the compliance with

19   7.20.2, the requirement that there be a disconnect, yesterday

20   you gave us names of companies.  Do they universally comply

21   with that by having a left-foot deadman brake?

22 A   They do.

23 Q   So you were then asked about, "Well, can you move around?"

24   Let's take a look.  This is a foot.  It could be here, here,

25   here, here, as long as I'm holding it down; right?

1    A    Correct.

2    Q    The right foot, basically anywhere?

3    A    Yes.

4    Q    And what you've proposed is to make it so the right foot is

5         even -- the left foot even has more room to move?

6    A    Yeah.  There's no reason that you need to restrict the

7         position of either foot, other than they would need to stay

8         on one side of the operator compartment.

9    Q    And on every manufacturer but Raymond, when this foot comes

10        out, what happens?

11   A    The forklift brakes to a stop.

12   Q    In addition to that, if this foot even goes to the left -- we

13        see an orange line.  What happens on the Crown?

14   A    On the Crown, that is -- they call it an entry bar, and

15        basically it's a switch that will disable the power for the

16        truck, so.

17   Q    Does that serve to encourage the operator to keep the foot

18        further in so that it couldn't inadvertently slip off?

19   A    Yes.

20   Q    Now if we look at the Raymond, the toe -- it always has to be

21        your toe; is that correct?

22   A    It does.

23   Q    And on the Raymond, could we ride like that?

24   A    Yes.

25   Q    Could we ride like that?

1   A   Absolutely could.

2   Q   Is a machine that allows the machine to continue moving with

3       the left foot in that position compliant with 7.20 --

4   A   No.

5   Q   It's not compliant with the mandatory industry standard?

6   A   It is not compliant with that ANSI B56.1 Standard.

7   Q   You were asked a great number of questions about the B56

8       committee.  And you mentioned something called the ITA?

9   A   Yes.

10  Q   What is the ITA?

11  A   The ITA -- ITA stands for Industrial Truck Association, and

12      it's basically an entity that serves and protects the members

13      of its members, which consist of manufacturers of forklifts

14      primarily.

15  Q   If a proposal is made to B56.1, can an ITA member veto it?

16  A   Absolutely.

17                  MR. LoCOCO:  Objection.  Foundation.

18  BY MR. WARSHAUER:

19  Q   Are you aware of the process by which proposals become

20      standards?

21  A   Yes.  They --

22  Q   How did you become aware of the process by which proposals

23      become standards?

24  A   Mr. McDermitt, who is the current chair of the B56.1

25      committee --

1          MR. LoCOCO:  Your Honor, this is going to be

2    hearsay.

3          MR. WARSHAUER:  It's 7 --

4          (Sidebar begins.)

5          MR. LoCOCO:  Your Honor, I know you didn't mean

6    to do it, but you rolled your eyes when I got up to make an

7    objection.  And you can do whatever you want, but I think

8    that -- I just ask the Court to be aware of that.  The jury sees

9    you.

10         I have to protect my record, as the Court knows.

11   He's about to spout hearsay from a guy who's retired from Crown.

12   And that's not -- again, he can rely on foundation.  He can't

13   pour foundation into the record.  That's what the law says.

14         MR. MURPHY:  It's an opinion that's being

15   disclosed.  That's all I'd say on that subject.

16         MR. WARSHAUER:  Well, Judge --

17         THE COURT:  If you -- go ahead.  Are you -- he's

18   going to object to -- that you won't be able to lay a sufficient

19   foundation that this witness has an understanding of the

20   procedures of that committee and that he has an understanding

21   that a member of the ITA, whatever the group was called, can

22   veto any proposal made to it.

23         MR. WARSHAUER:  And he does indeed have that

24   understanding.

25         THE COURT:  And is it -- and other than hearsay,

1    how is it that you're going to be able to get around his

2    objection that it's -- that there's hearsay?

3              MR. WARSHAUER:  The basis of an expert's opinion

4    can be based on a variety of things that might not be -- I'm not

5    asking him to say what McDermitt said at all.  He said I wasn't

6    laying a foundation, so I simply started to go backwards in time

7    to create the foundation.  "Do you know?  How did you know?

8    What did you do to find out about this process?"  If I didn't

9    watch the game myself last night, it would be hearsay for me to

10   read it in the newspaper.  But if you asked me to testify as an

11   expert on baseball scores and I read it in the paper, that would

12   be a reasonable basis.  So what he has done is do a great deal

13   of work learning about the history of B56, which is in his

14   Rule 26, unquestionably, pages and pages of how the B56

15   committee works, including the fact that they actually share

16   office space.  I didn't bring it up in my direct how the B56

17   works.  But he wanted to say, "Well, you didn't go to the B56

18   committee."  He opened the door, and we get to explain why he

19   didn't do it.

20              THE COURT:  I rolled my eyes because I remember

21   having to read pages and pages of deposition transcript and

22   arguments that you guys had in the -- in your attacks under

23   Daubert on this guy's testimony.  The -- my recollection is that

24   there was references to it made in the disclosures, and you

25   opened it up.  So I'm going to give him latitude to try to lay a

foundation that he in his capacity as an expert can rely upon in talking about why it's his understanding that this could be -- that a member of this trade group could veto any proposal.

MR. LoCOCO:  And look, Your Honor, I agree with Mr. Warshauer, that when I made the foundation objection, he tried to do what a lawyer does, to lay a foundation.  This guy has been around six ways to Sunday, and he knows not to say, "Well, Mr. McDermitt said," and I know Mr. Warshauer's trying to cut him off.  The problem is, you have a well paid expert.  You know, that crack, when I asked him how much money he's charged, he rolls right in, he knew he was on unfirm ground, saying "I got seven other cases" because he knows your motion in limine order about other incidents.  And I just let it go.  But so the problem --

THE COURT:  You --

MR. LoCOCO:  I'm not complaining about it.  I'm saying now, we're talking about this now, Your Honor.  The issue is Mr. Warshauer is trying to control the witness, and he needs to answer the question that's being asked, not launch into hearsay.  That's what Mr. Warshauer's trying to prevent.

THE COURT:  I'm going to -- your objection is to -- was the foundation?

MR. LoCOCO:  Correct.

THE COURT:  I'm going to --

MR. LoCOCO:  And hearsay now.

1              THE COURT:  I'm going to allow him to lay a

2      foundation.  We'll see if he's able to lay an adequate

3      foundation, ask him followup questions about, does he have

4      enough information that would allow him to talk about procedures

5      of this committee.

6                   MR. LoCOCO:  All right.

7                   (Sidebar ends.)

8  BY MR. WARSHAUER:

9  Q    So, Dr. Meyer, have you taken steps to learn about how this

10     committee works?

11 A    I have.

12 Q    Have you read depositions of people who control the

13     committee?

14 A    I have.

15 Q    Have you looked at the minutes of the committee?

16 A    I have.

17 Q    Have you even discovered things about where it's located?

18 A    I have, yes.

19 Q    Have you discovered how it's funded?

20 A    I have, yes.

21 Q    All right.  Based on all of that, do you feel comfortable in

22     telling us whether or not if someone proposed that there be a

23     mandatory left-foot brake that Raymond would have the power

24     to veto it?

25 A    I believe that is exactly the case, yes.

1    Q    In fact, who provides the funds for the B56.1 committee?

2    A    About two-thirds to three-quarters of the funds for the B56.1

3         committee comes from the ITA, the Industrial Truck

4         Association.

5    Q    And do -- does the ITA, Industrial Truck Association, the

6         organization designed to look after the interest of its

7         members, in the safety committee that's supposed to provide

8         safe forklifts for people like Ms. Anderson, do they share a

9         common suite and address?

10   A    They do.  They are located in the exact same suite in

11        Washington DC.

12   Q    So is that one of the reasons that you haven't bothered to

13        make a recommendation?

14   A    It is exactly one of the reasons, and in fact, the reason.

15   Q    But if we go back to 7.20.2, "Means shall be provided," if

16        Raymond had complied with that in a manner consistent with

17        Hyster, Yale, Jungheinrich, Clark, Nissan, UniCarrier, if

18        they had complied with it as those companies do, would we be

19        here today?

20              MR. LoCOCO:  Objection, Your Honor.  This gets to

21        what we discussed last night.

22              THE COURT:  Overruled.

23              MR. LoCOCO:  Your Honor, I think we need to be

24        heard on this.

25              THE COURT:  You were heard last night on that,

1    and I just heard you now.

2  BY MR. WARSHAUER:

3  Q    Would we be here today if the brake had been under the left

4       foot?

5  A    I don't think we would be.  I think Mrs. Anderson would still

6       have her left lower leg.

7  Q    You were asked this question, question was something like

8       this:  "You can't name a single other engineer who agrees

9       with you that Raymond violates 7.20.2?"  Do you recall that

10      question?

11 A    I do.

12 Q    Can you name a mechanical engineer who works for Crown who

13      believes Raymond's design is dangerous?

14 A    I can.

15 Q    And who is that?

16 A    That is their director of product safety, Mr. Griset, Ronald

17      Griset.

18 Q    So you're not alone?

19 A    That's correct.

20 Q    You were asked about the guard over the steered wheel?

21 A    Correct.

22 Q    The one where Mrs. Anderson's foot was crushed, and you were

23      asked about the design process, these six steps.  I'm going

24      to ask you two series of questions about that.  The first

25      question is, if I gave you a plate -- a piece of plate steel,

1    couple feet by a couple feet, an appropriate metal cutting

2    saw and a drill, and two carriage bolts with some washers and

3    nuts and a drill bit of the appropriate diameter for those

4    carriage bolts, could you put a guard on?

5    A   I could.

6    Q   But what about the design and the prototyping?  Is it that

7    complex?

8    A   It really isn't.

9    Q   Oh, would you need a tape measure, even?

10   A   Probably not.

11   Q   So let's go back -- is there any knowledge that you have that

12   Raymond has ever tested the concept of a guard?  It's their

13   machine.

14   A   I have seen no evidence that they have done that.

15   Q   Have you ever seen whether Raymond has ever tested the idea

16   that a left-foot pedal would somehow make their forklift

17   unusable for its primary task of lifting, carrying, and

18   putting things down?

19   A   I have seen no evidence that Raymond has done that.  I think

20   that's one of the troubling things that I've heard from the

21   testimony of Mr. Kerila, who is Raymond's kind of

22   spokesperson as far as these matters.  He says that they

23   design their product by studying the hazards and then they

24   make their design.  And then he literally said, "We're not

25   going to put a truck out and then see what happens and then

1    redesign it based on accidents."  So Raymond doesn't appear

2    to be open to the idea of feedback from accidents to

3    potentially needing to change the design of their --

4  Q  So let's look at this --

5  A  -- forklift.

6  Q  -- concept.

7                    THE COURT:  Would you identify what you're

8    referring to for the record?

9                    MR. WARSHAUER:  I'm holding up the poster that

10   was used by Counsel for Raymond, where they hand wrote six,

11   seven steps.  There was a concept, a detail design, select

12   components, bench testing, prototype, prototype testing, field

13   testing, design refine.

14  BY MR. WARSHAUER:

15  Q  Is there any evidence that there's followup a year later, two

16   years later, five years later, to see whether or not the

17   design is actually causing injuries?

18  A  No.  And actually, there's explicit statements that

19   there's -- there's not going to be that.

20  Q  Is there even a systematic collection of accident reports --

21                    MR. LoCOCO:  Your Honor --

22  BY MR. WARSHAUER:

23  Q  -- that they can track?

24                    MR. LoCOCO:  -- this is beyond the scope of my

25   cross.

1          THE COURT:  Let's talk about that.

2                (Sidebar begins.)

3          THE COURT:  How is it not beyond the scope of

4     cross?

5          MR. WARSHAUER:  He had seven elements.  I'm

6     saying there should be an eighth.  The eighth element is to

7     follow up and part of following up is collection and analysis of

8     accident reports.

9          MR. LoCOCO:  I put up the list.  I asked him,

10    "Are there other steps?"  He didn't give any.  That opens the

11    door to get into accident reports when we never -- I never

12    touched accident reports.  That is beyond the scope.  And after

13    all the paper you've read regarding accidents and accident

14    reports, I would do something that would open the door on that?

15    That's just ridiculous.  He could have asked him that in his

16    direct examination.

17         THE COURT:  I think the --

18         MR. LoCOCO:  And it's got nothing to do with the

19    design of the truck.  That's conduct evidence, due care

20    evidence, which he says we don't get to put in.

21         MR. MURPHY:  It's a question whether it was on

22    direct or not.

23         MR. WARSHAUER:  There was a stage -- well, it's

24    the eighth step.  There was a stage between initial design and

25    2014 when this was made.  That stage is several years.  I can

```
 1            limit my question to those several years.
 2                      THE COURT:  I think the problem is, I would have
 3            allowed you to do it on direct, but I don't think -- I don't
 4            think you -- I do think the objection that it goes beyond the
 5            scope of his cross is legitimate.  Now I don't know if there's
 6            going to be another expert that comes in that testifies as to
 7            these stages or whatever, or that it may open it up on rebuttal.
 8            But I would --
 9                      MR. WARSHAUER:  Okay.
10                      THE COURT:  -- agree that it's beyond the scope
11            of his cross.
12                      (Sidebar ends.)
13     BY MR. WARSHAUER:
14     Q    We're going to go back real quickly to the drawing that you
15          helped us with yesterday.  The box is the point of rest?
16     A    Correct.
17     Q    If the brake is applied in the area where this circle, does
18          it get to the point of rest?
19     A    No.
20     Q    At any speed?
21     A    Correct.
22     Q    Doesn't matter whether the brake was right foot or the left
23          foot?  If a brake is applied at the beginning, it doesn't get
24          there, does it?
25     A    That's correct.
```

1    MR. WARSHAUER:  That's all.  Pass the witness.

2    THE COURT:  Recross?

3    MR. LoCOCO:  Yes, Your Honor.

4                    RECROSS-EXAMINATION

5    BY MR. LoCOCO:

6    Q    Dr. Meyer, I'm a little confused about the standards, so I'm

7         going to start there.  You came in yesterday and you told

8         this jury that Raymond's design violates 7.20.2; correct?

9    A    I did.

10   Q    And today just now on redirect, you told this jury that you

11        can't trust the B56.1 Standard because any manufacturer can

12        veto a proposal; correct?

13   A    I have issues with how the B56.1 committee -- and the

14        standard is formed.  That's correct.

15   Q    So they're screwing that up too, in your opinion?

16   A    Who is "they"?

17   Q    The B56.1, the ITA, ITSDF, Raymond, they're all screwing up

18        how the standards should be written?

19   A    I think they're protecting themselves.  The manufacturers are

20        looking after their own interest.  That's the stated

21        objective of the ITA, to protect and serve its members.  And

22        I think that's precisely what has occurred with the formation

23        of the B56.1 Standard.  It's been written in a way that

24        protects its members.

25   Q    And that's based on your vast experience with standup

| | | |
|---|---|---|
| 1 | | forklift trucks over the last year and a half; correct? |
| 2 | A | That's been -- that is my assessment based on the work that |
| 3 | | I've done in reading how the standard is -- how the standard |
| 4 | | is made and how the ITA works as well as how the ITSDF and |
| 5 | | the B56.1 committee works, reading the deposition of |
| 6 | | Mr. McDermitt, for example, who is the chair of that |
| 7 | | committee, who is a Crown employee who's looking after the |
| 8 | | best interests of Crown. |
| 9 | Q | So he doesn't care about -- you've decided that he could care |
| 10 | | less about operator safety, Mr. McDermitt? |
| 11 | A | I didn't say that. |
| 12 | Q | You've decided Mr. Kerila could care less about operator |
| 13 | | safety? |
| 14 | A | I didn't say that either. |
| 15 | Q | You're the person who cares about operator safety? |
| 16 | A | I am -- |
| 17 | Q | Can I get a yes on that? |
| 18 | A | I think that safety is an important thing that needs to be |
| 19 | | looked after, yes. |
| 20 | Q | Yeah.  So let's talk about this veto testimony that you gave |
| 21 | | to this jury.  Let's make sure the jury understands the |
| 22 | | process.  First of all, could we get the membership up again? |
| 23 | | And as a reminder, you've never been to a meeting; correct? |
| 24 | A | I have not attended a meeting.  That's correct. |
| 25 | Q | If we look down at the B56.1 committee here, so if you put in |

1      a proposal or if Raymond puts in a proposal, this person

2      here, Kevin Smith.  I did something.  The circle is not

3      working.  You see Kevin Smith in the lower right-hand corner?

4    A   I do.

5    Q   He can veto the proposal; correct?

6    A   Yes.

7    Q   Any member can veto the proposal; correct?

8    A   Yeah, that's correct.

9    Q   The UAW representative can veto the proposal?

10    A   That is correct.

11    Q   The OSHA representative can veto the proposal?

12    A   I don't think OSHA votes on any proposals.

13    Q   You sure about that?

14    A   I'm pretty sure.

15    Q   All right.  The Ford Company -- Ford Motor Company guy could

16      veto the proposal?

17    A   That's correct.

18    Q   And that's because the standard is a consensus standard, and

19      at least the first time the proposal gets presented, it

20      doesn't pass without a unanimous vote; correct?

21    A   That's my understanding.

22    Q   But then it can go out for reballot with a lesser

23      requirement; isn't that true?

24    A   I believe that is the case.

25    Q   And you didn't tell the jurors any of that information, did

|   |   |   |
|---|---|---|
| 1 |   | you? |
| 2 | A | I did not. |
| 3 | Q | The ITA doesn't actually vote on this standard, does it? |
| 4 | A | The ITA is not an entity that is a part of the standard. |
| 5 | Q | And the standard is not even sponsored by ITA, the Industrial |
| 6 |   | Truck Association, is it?  Or do you know? |
| 7 | A | Technically not.  It's just funded by -- the subcommittee is |
| 8 |   | funded by the ITA, and Mr. McDermitt has testified that |
| 9 |   | anything that the ITA proposes is adopted by the B56.1 |
| 10 |   | committee. |
| 11 | Q | Dr. Meyer -- |
| 12 | A | So in a sense, even though the ITA is not a part of the |
| 13 |   | committee, it essentially controls what the committee adopts. |
| 14 | Q | You know this is a balanced committee; correct? |
| 15 | A | In theory, yes. |
| 16 | Q | Is it balanced in its membership or not? |
| 17 | A | I think in theory, it is balanced, but in practice, I think |
| 18 |   | it is controlled by the manufacturers and the ITA. |
| 19 | Q | And that's based on some reading you've done? |
| 20 | A | It's based on the work that I've done, yes. |
| 21 | Q | Not by a meeting you've attended where you've accused these |
| 22 |   | people of being in cahoots with the industry; correct? |
| 23 | A | I have not attended any meetings. |
| 24 | Q | So you think the UAW representative is being controlled by |
| 25 |   | the forklift manufacturers? |

1    A    I don't know what the UAW members -- I can't put myself in
2         their position to know what they're thinking.
3    Q    Let's go back to the balanced committee issue.  What that
4         means is only one-third of that membership can be
5         manufacturers; correct?
6    A    In -- that is correct.
7    Q    And this is a later standard, but for years, there was a
8         member on this committee named John Sevart.  You know that;
9         right?
10   A    I do.
11   Q    And John was a long-time mechanical engineer who testified
12        against forklift manufacturers; correct?
13   A    Yes.
14   Q    And you know he made proposals, some of which were adopted?
15   A    Okay.  Yes.
16   Q    Correct?
17   A    Some.
18   Q    And some weren't?
19   A    Most, yes.
20   Q    Because you've looked at half a dozen minutes, you're saying
21        most weren't?
22   A    I've read many of -- many of the proposals that he made that
23        were voted down.  So it seemed to me that most of his
24        proposals were not adopted.
25   Q    Last thing I want to ask you about is this new opinion that

| | |
|---|---|
| 1 | you gave us in your redirect, that if Raymond had -- if |
| 2 | Raymond had a design like we see in the Crown, Mrs. Anderson |
| 3 | wouldn't have lost her leg.  Is that what you said? |
| 4 | A   I believe that is the case.  And I don't think that's a new |
| 5 | opinion. |
| 6 | Q   Well, that's not what you told me at your deposition, is it? |
| 7 | Is it? |
| 8 | A   I'm not sure what you're referring to. |
| 9 | Q   Well, let's read it.  Page 98. |
| 10 | MR. WARSHAUER:  Which deposition? |
| 11 | MR. LoCOCO:  Of the first one. |
| 12 | BY MR. LoCOCO: |
| 13 | Q   The end of -- page 98, the end of line 23.  My question -- |
| 14 | let me know when you're there.  Are you there yet, sir? |
| 15 | A   I am.  I'd just like a minute to read so I have some context |
| 16 | of what you're asking about. |
| 17 | Okay. |
| 18 | Q   My question:  "So it's possible that the pedal could have |
| 19 | prevented the accident, the injury?"  Answer:  "It could |
| 20 | have." |
| 21 | Question:  "All right."  Answer:  "I can't say |
| 22 | conclusively that it would have, but I believe it could have. |
| 23 | It certainly is going to be bringing the machine to a stop, |
| 24 | and that could prevent the accident from occurring."  Did I |
| 25 | read that correctly? |

| | |
|---|---|
| 1 | A    I'm not following where you are, so. |
| 2 | MR. LoCOCO:  May I step up, Your Honor? |
| 3 | THE WITNESS:  Okay.  Sorry about that. |
| 4 | BY MR. LoCOCO: |
| 5 | Q    So let me start again.  Question:  "So it's possible that the |
| 6 | pedal could have prevented the accident, the injury?" |
| 7 | Answer:  "It could have." |
| 8 | Question:  "All right."  Answer:  "I can't say |
| 9 | conclusively that it would have, but I believe it could have. |
| 10 | It certainly is going to be bringing the machine to a stop, |
| 11 | and that could prevent the accident from occurring."  Did I |
| 12 | read that correctly? |
| 13 | A    Yes.  And I think what I said here is correct.  I can't say |
| 14 | conclusively.  I can't say -- issue a blanket statement.  But |
| 15 | I think more likely than not, it would have prevented the |
| 16 | accident. |
| 17 | Q    But that's not what you said here, is it?  You said -- |
| 18 | A    That's exactly what I said there. |
| 19 | Q    You didn't say it's more probable than not.  You said it's |
| 20 | possible.  Didn't you? |
| 21 | A    I said -- I'm saying right now, it's more likely than not, |
| 22 | had a brake been under the left foot, it would have prevented |
| 23 | the accident. |
| 24 | Q    Go to page 99, line 22, please.  I'm sorry.  Yeah, 99-22. |
| 25 | Question -- are you there?  Line 22? |

1    A    I am.

2    Q    "You need more data in order to make a final determination

3         about the pedal configuration; correct?"  Answer:  "Yeah, I

4         think at this point, all I can say is that the pedal

5         configuration could have prevented, not necessarily that it

6         would have prevented."  Did I read that correctly?

7    A    Yes.

8    Q    Show us your analysis of that, all your drawings, your video,

9         your testing, to explain to the jury how it's possible that

10        it would have prevented her accident.  Do you have anything

11        to show the jury?

12   A    I don't know what you're asking me.

13   Q    Do you have anything to show the jury to demonstrate your

14        opinion that you think it's possible that your new pedal

15        configuration would have made a difference here?

16   A    I think we did that diagram yesterday.  Mr. Warshauer showed

17        it again today that shows if Mrs. Anderson came out of the

18        operator compartment and a brake was applied, she would never

19        get to the point where the brake actually -- the forklift

20        actually ran over her foot.

21   Q    Because you're counting -- you're going all the way to the

22        point of rest.  And the only way she gets run over is if the

23        forklift gets to the point of rest, correct, in your drawing?

24   A    That's correct.

25   Q    Well, if the point of rest is some other place, you've done

| | | |
|---|---|---|
| 1 | | no analysis to show that her foot still doesn't get into the |
| 2 | | wheels? |
| 3 | A | It takes a certain amount of time for her to come out of the |
| 4 | | operator compartment, so she would have to -- she would not |
| 5 | | be out of the operator compartment in that scenario. |
| 6 | Q | Where's your analysis of that? |
| 7 | A | I'm giving it to you right now. |
| 8 | Q | You're just saying it?  You have nothing to show the jury; |
| 9 | | correct? |
| 10 | A | I don't -- I don't think there's anything that needs to be |
| 11 | | shown to the jury. |
| 12 | Q | This is -- this is physics; right?  It's dynamics, it's a |
| 13 | | time motion study that we're discussing; correct? |
| 14 | A | It's kinematics. |
| 15 | Q | Kinematics.  And you have nothing to show the jury that |
| 16 | | supports the opinion you just gave? |
| 17 | A | I think this exactly supports the opinion I just gave. |
| 18 | Q | So a handwritten drawing that you gave last afternoon, that's |
| 19 | | it? |
| 20 | A | I don't think anything more is necessary. |
| 21 | Q | Okay. |
| 22 | | MR. LoCOCO:  Thank you.  Nothing further, Your |
| 23 | | Honor. |
| 24 | | MR. WARSHAUER:  Two questions. |
| 25 | | REDIRECT EXAMINATION |

```
 1   BY MR. WARSHAUER:
 2   Q    Dr. Meyer, if the forklift had run over Mrs. Anderson back
 3        here and drug her all the way there, is there any evidence,
 4        there's a shoe here or blood here, or anything other than a
 5        shoe at the very end?
 6                    MR. LoCOCO:  Objection.  Form and foundation.
 7        Leading.
 8   BY MR. WARSHAUER:
 9   Q    Are you aware --
10                    THE COURT:  Overruled.
11                    MR. WARSHAUER:  I'm sorry, Judge?
12                    THE COURT:  I said overruled.
13                    MR. WARSHAUER:  Oh.
14                    THE WITNESS:  No.  The evidence suggests that
15        Mrs. Anderson was run over at the very end of the forklift's
16        travel.
17   BY MR. WARSHAUER:
18   Q    And with respect to your thoughts about -- this is the B56.1
19        Standard, Plaintiff's Exhibit 67.  And when we go to page 51,
20        we see the 7.20.2.  "Means shall be provided to disconnect
21        the travel circuit automatically when the operator leaves the
22        operator compartment."  Are you certain to a reasonable
23        degree of engineering certainty that it is more likely true
24        than not that had this forklift been built in compliance with
25        that standard and the manner followed by companies like
```

1      Crown, Nissan, Jungheinrich, Clark, Yale, Hyster, Mitsubishi,

2      Schaeff, and Hyundai, it would have stopped and prevented

3      this injury?

4                      MR. LoCOCO:  Objection.  Goes beyond Rule 26, the

5      Rule 26 disclosure.  He never gave this opinion until today.

6                      THE COURT:  Response?

7                      MR. WARSHAUER:  I believe it is -- we were just

8      talking about the level of certainty of his opinion.  He's

9      already identified the way that all of these companies do in

10     fact choose to comply with this standard by having the left-foot

11     brake.  So the question is merely, "Are you reasonably certain

12     that it's more likely than not that that compliance would change

13     the outcome?"

14                     MR. LoCOCO:  Was not disclosed.

15                     THE COURT:  Overruled.

16                     THE WITNESS:  I think that had the Raymond

17     forklift been in compliance with that clause of the standard,

18     then we would not be here today.

19  BY MR. WARSHAUER:

20  Q    In compliance with the way the industry does it?

21  A    Correct.

22                     MR. WARSHAUER:  Thank you.

23                     THE COURT:  Anything else?

24                     MR. LoCOCO:  All good things must come to an end.

25                     THE COURT:  All right.  Thank you.

```
 1                    THE WITNESS:  Thank you.
 2                    THE COURT:  Is there a reason to require him to
 3       be available?
 4                    MR. WARSHAUER:  No.
 5                    MR. LoCOCO:  No, Your Honor.
 6                    THE COURT:  All right.  You are finished.
 7                    It is -- it's quarter after 10.  Let's -- who's
 8       your next witness?
 9                    MR. WARSHAUER:  Dr. Jason Kerrigan.
10                    THE COURT:  All right.  Let's take a ten-minute
11       recess and we'll come back at 10:25.
12                    MR. WARSHAUER:  Thank you.
13                    (Jury exits at 10:14 a.m.)
14                    (Recess from 10:14 a.m. to 10:29 a.m.)
15                    (Jury enters at 10:29 a.m.)
16                    THE COURT:  All right.  Please be seated.  We're
17       back on the record in Anderson v. Raymond.
18                    Counsel, call your next witness.
19                    MR. WARSHAUER:  Your Honor, the plaintiff calls
20       Dr. Jason Kerrigan.
21                    THE COURT:  Come on up, sir.
22                    (Witness sworn.)
23                    THE COURTROOM DEPUTY:  Please state your full
24       name and spell your last name for the Court.
25                    THE WITNESS:  Jason Robert Kerrigan,
```

```
 1        K-e-r-r-i-g-a-n.
 2                    THE COURTROOM DEPUTY:  Thank you.
 3                         DIRECT EXAMINATION
 4    BY MR. WARSHAUER:
 5    Q    Good morning, Dr. Kerrigan.
 6    A    Good morning.
 7    Q    What is your address?
 8    A    My home address?
 9    Q    Just your business address will be fine.
10    A    My business address is 4040 Lewis and Clark Drive in
11         Charlottesville, Virginia 22911.
12    Q    What is your occupation?
13    A    I'm a professor at the University of Virginia.
14    Q    And what do you profess to do?
15    A    I'm a -- my direct appointment is in the Department of
16         Mechanical and Aerospace Engineering at UVA.
17    Q    Are you in any other departments or colleges there?
18    A    I have an appointment also in the Department of Orthopedic
19         Surgery within the School of Medicine.
20    Q    What is your specialty?
21    A    My research is in injury biomechanics, so I study how people
22         get hurt in situations that involve trauma.
23    Q    What have I asked you to help us understand in this case?
24    A    It's been three things that you asked me for.  The first
25         thing was to try to understand the specific details
```

1      surrounding the injury causation event of Mrs. Anderson, how

2      she was specifically injured.  The second thing you asked me

3      to do was to provide feedback or response as to how

4      particular changes to the design of the forklift involved in

5      this case, how those changes would have resulted -- could

6      have affected injury causation in this case.  And the third

7      thing you asked me to do was to review the responses, the

8      rebuttal responses from the defense experts, and provide

9      feedback on those as well.

10  Q   So I'm going to show Exhibit 122, just for purposes of

11      demonstration.  Dr. Kerrigan, I think you can take your

12      pencil and erase that.  Good.  Thank you.  So we're looking

13      at your curriculum vitae, and we start off with your

14      education.  As you shared with us, you are a professor at

15      UVA, and what is your doctorate in?

16  A   It's in mechanical and aerospace engineering.

17  Q   Within -- now that's the title, but again, your specialty?

18  A   Right.  That's the name of the degree.  So the department

19      offers degrees that are named with respect to the department.

20      So for graduate school, for that department, we only offer

21      one degree.  That is a Ph.D. in mechanical and aerospace

22      engineering.  But my specialty is really in biomechanics,

23      injury biomechanics, as I discussed.  So it's really about

24      sort of the application of the theory of mechanical

25      engineering to the human body.

1    Q    And do you have teaching duties?

2    A    I do.  I do.  I have teaching, research, and service duties.

3         So I teach a full load of teaching.  For me, for someone in

4         my position, it's about one class per semester.  So I

5         teach -- I typically have taught one undergraduate

6         engineering class in the spring semester, and I teach a

7         graduate engineering course in the fall semester.

8    Q    And where do you show up to work most days?  Do you have a

9         lab?

10   A    I do.  I do.

11   Q    Tell us about that.

12   A    I'm the director of a group called the Center for Applied

13        Biomechanics at UVA.  So this is a multi-professor research

14        group that does all injury biomechanics research within the

15        same location.  So on the days that I don't go to the campus

16        to do teaching, my main office is within that laboratory

17        called the Center for Applied Biomechanics.

18   Q    And this Center for Applied Biomechanics, is it -- how does

19        it compare to similar centers around the country?

20   A    We are the largest group doing research like the research

21        that we do worldwide.  And "largest" is really in every

22        conceivable metric, so that's everything from the number of

23        people who are employed to the research expenditures that we

24        do, the dollars that we're spending to do research, to the

25        number of peer-reviewed publications that we put into the

1    literature, and really to the impact of our research.

2  Q  Do you work with both live people and cadavers?

3  A  That's true.  That's true.  So our research involves both

4    human cadavers and living -- what we call volunteers, human

5    volunteers.  Most of our research involves human cadavers,

6    because what we're trying to do is understand the tolerance

7    of injury.  And we can't subject living volunteers to a study

8    that would measure that tolerance.  So what we would do is

9    use a human cadaver and subject the cadaver to loading, some

10    kind of forces or some kind of pressure in a way to -- that

11    would simulate how they might -- how someone could be injured

12    in a traumatic situation like a car crash or if they were a

13    military soldier or if they're playing a sport, for instance.

14            And so we would subject the cadaver to that

15    load and measure at what point the injury occurs and use that

16    information to help us develop what I would call an injury

17    countermeasure, or some kind of device or safety item that

18    would prevent injuries from happening when humans are in

19    those situations at other times.

20  Q  Does that work involve the analysis of radiographs, x-rays,

21    and things of that nature?

22  A  Yes.  Yes, it does.

23  Q  Does that work also involve dissection on occasion of the

24    human body?

25  A  All the time.  Yes.

1   Q   So do you feel that this background has prepared you to help

2       us understand these three topics:  How she got hurt, the

3       connection between that injury and the design choices made by

4       the Raymond Corporation, and the validity, if you will, or

5       your opinions about the defendant's experts, thoughts that

6       some are consistent with yours and some are different?

7   A   I do.  A large portion of my work is to study what I would

8       call a case study, where someone has been injured in a

9       certain situation, and I take information about that

10      situation and try to figure out how that injury occurred, how

11      the person interacted with whatever it is that they

12      interacted with that caused the injury, to find out some kind

13      of specific engineering details.  And oftentimes, we're

14      looking for what I would call the involved physical

15      component.  So for instance, in a car crash, this could be

16      the airbag, or if it's in a sport, it could be your cleat

17      interacting with the grass, so the involved physical

18      component that actually results in the injury.

19                  And then the specific mechanism, which is kind

20      of how the forces or loads or pressures are developed during

21      the incident to create a stress on the bone or the ligament

22      or the muscle that would cause the injury, so I'm thinking

23      about what happens to cause the injury, and then the kind of

24      individual physical pieces, items that were involved around

25      the person to understand the injuries.  And I can offer some

1    feedback about the defense experts, but certainly the defense

2    experts' expertise is quite a bit beyond mine.  So I can only

3    offer feedback on their expert opinions that are specific to

4    my expertise.

5  Q  Which is human biomechanics?

6  A  Which is in injury biomechanics, human injury biomechanics,

7    yes.

8  Q  Does that include how people move?

9  A  Absolutely.  Absolutely.  The study is called kinematics,

10   which is a physics term for how things move without concern

11   for the forces that cause those motions.  So we study a lot

12   of how people move as a result of their environment moving

13   around them or for some other reason.  We try to study that

14   motion to help us understand how a force could be applied to

15   cause an injury.

16 Q  And we're going to talk about the three topics in a moment,

17   but in addition to this professional background and formal

18   education, have you done case-specific work on this case and

19   others like it, without naming any names, but have you

20   considered forklift-related injuries?

21 A  I have.  I have.  I've done work on this case and in other

22   incidents related to forklifts, yes.

23 Q  Okay.  So what I want to talk to you about -- and have you

24   read depositions?

25 A  I have.

1   Q   And looked at medical records, et cetera?

2   A   Absolutely.  Yes.

3   Q   Okay.  So let's talk about how Mrs. Anderson came to be

4       injured.  I think that a good place to start -- well, you

5       tell me where you'd like to start.  You want to start with

6       x-ray or talk about the summary of the picture?

7   A   Yeah.  I guess we have both, so I have a picture that kind of

8       shows a skeleton image of the foot, and it points out the

9       specific fractures that had occurred that were identified by

10      a radiologist.  And so that in addition to the actual

11      radiology images would be both good to show.  I think we can

12      start in either place.

13               MR. WARSHAUER:  Let me talk with Counsel here for

14      a second.

15               MR. LoCOCO:  Is that okay, Your Honor?  Can I

16      confer with Mr. Warshauer?

17               MR. WARSHAUER:  Yeah, I'm sorry about that.

18               (Discussion off the record.)

19 BY MR. WARSHAUER:

20   Q   So let's start with this Exhibit 88.  There.  So,

21      Dr. Kerrigan, is this a good place to start with respect to

22      the injuries that Mrs. Anderson's interaction with the rear

23      wheel, the steered wheel of this forklift, caused?

24   A   Yes.  This is a good -- this is a summary of the fractures

25      that were identified by the radiologist.  Yes.

1    Q    Okay.  So what are we learning here?

2    A    Sure.  I can point out each one.  Can I draw on this?  Is

3         that how that works?

4    Q    Absolutely.

5    A    Okay.  So what you're looking at is kind of a top-down look,

6         like you're kind of standing up, looking down at your foot

7         here, so you're looking down at the top surface of your foot.

8         So your ankle would be back in this corner here, and

9         obviously here is your toes.  And so what you see here is

10        where her injuries occurred.  So this first one I'll point

11        out is written here.  It's pointing to the head of her first

12        metatarsal, which is right there, which is not part of the

13        toe but it's part of the forefoot that interacts with the big

14        toe.  So the top of this bone here is fractured in this

15        location.  There's actually an additional fracture that I

16        didn't include on this image, but it's in my other report.

17        This bone is fractured down below in the middle of that bone

18        as well.

19                    There's also a fracture here at this location.

20        That bone is called the medial cuneiform there.  So it's

21        what's called a comminuted fracture there.  Comminuted is

22        used to describe if it's just two pieces of bone in a

23        fracture or if it's just one break, or if the fracture itself

24        can make multiple fragments of bone here.  And so there's

25        some comminution of that bone there as well.

1   Q    Comminution means multiple?

2   A    It means that the fracture resulted in multiple fragments.

3        That's what it means.

4   Q    Okay.

5   A    So there's a fracture here as well.  At this area at the

6        intersection, I've drawn this pink line on tarsometatarsal or

7        Lisfranc joint, and I kind of indicate that right here.

8        Basically there's a fracture of the bases of the first four

9        metatarsals here, one, two, three, and four, at that

10       location.  And that suggests that the -- there was some kind

11       of bending to the foot in that location where the foot can

12       kind of -- would kind of open up on this side.  This side

13       over here, I'll just draw it right out here, this is called

14       the medial side of the foot.

15  Q    So the medial side is the part on the inner side of our foot?

16  A    That's correct.  That's on the inside on the next -- to your

17       big toe.

18  Q    What's the outside called?

19  A    The outside is called the lateral aspect, lateral side.

20  Q    Okay.

21  A    So we had fractures of the bases of the first four

22       metatarsals, along that pink joint, which suggests kind of a

23       joint disruption there of the foot.  And then lastly, there's

24       a fracture here in the fifth metatarsal, so that's the baby

25       toe, and the fracture itself is within the toe there, and

1    near where the toe actually meets the foot, right in that

2    spot right there, so near where the toe meets the foot.  In

3    addition, that baby toe is dislocated, so it's actually

4    separated from the joint, and there's kind of an opening of

5    the joint there.  So this describes all the bone fractures

6    that occurred to Mrs. Anderson's foot in this case.

7  Q  Was there anything that was just in these fractures that was

8    indicative of a crushing or catastrophic kind of impact?

9  A  Usually when there's a crush, when you actually have a

10    crushing injury, you see many more fracture lines; right?  So

11    if you could imagine, if I had a stiff structure like inside

12    of a balloon for instance, and I rolled like a steam roller

13    over that thing, the bone fragments inside would all be very,

14    very small fragments.  We'd expect many, many fractures,

15    many, many small fragments of bone, almost like a bag of

16    pebbles or something afterward.  And so when there's a severe

17    crush because of high energy, we see more fracture lines and

18    more small fragments of bone.

19  Q  So if we move to the x-ray, Exhibit 86, is there any

20    indication of that kind of -- where something rolled over her

21    for a distance or crushed her in that method?

22  A  So she has two bones that are listed as having what's called

23    a comminuted fracture.  That's the first metatarsal, the big

24    bone that meets her big toe inside of her foot, and then that

25    medial cuneiform.  If there's a crushing injury, I'd expect

1    to see many more fragments.  You can have a comminuted

2    fracture if it's a high energy fracture.  That's not really a

3    crush.  It's not really a smashing.  So if you can apply

4    enough energy, you can get multiple fragments, but not the

5    kind of fragments that I would expect to see, for instance,

6    if this forklift, which weighs thousands of pounds, had

7    literally driven over top with her foot -- with

8    Mrs. Anderson's foot.  If it was under the wheel, directly

9    pinched between -- like literally below the wheel, smushing

10   down onto the pavement, I would expect to see more crushing,

11   more small fragments of bone in this case than we do.

12   Q   So what is the injury that was the worst part of her

13       injuries, if you will?

14   A   It's not actually these fractures at all.  Can I erase the --

15   Q   Yes.

16   A   How do I do that?

17                   MR. LoCOCO:  Lower left-hand corner I think.

18                   THE WITNESS:  Oh, the clear.  That's perfect.  So

19       this is a good diagram, but we also can see it.

20   BY MR. WARSHAUER:

21   Q   This is Number 87?

22   A   On her -- on the x-ray.  Maybe we can go back.

23   Q   Okay.  Let's go back to the x-ray.

24   A   Mrs. Anderson's -- maybe if you could zoom in on that bottom

25       image.  The biggest problem that occurred in this case is

1    called degloving.  Degloving.  And so if you can imagine
2    wearing like a rubber glove and then taking it off; right?
3    That's kind of the idea with degloving.  What's happened to
4    Mrs. Anderson's foot in this case is the skin has been
5    degloved from her foot.  So what you're seeing in this area
6    of the image here is actually all of Mrs. Anderson's skin
7    that starts from an area just above her ankle and is pulled
8    down and sort of left at rest there around her -- around her
9    toes.
10               So the cut to her ankle -- or the cut to the
11   skin starts about two inches above her ankle.  And by ankle,
12   I mean if you kind of feel around where your ankle joint is,
13   the widest part there where you see the two kind of knobby
14   bones on the medial and lateral side, so about two inches
15   above that area is where the skin was torn away from there,
16   so the rest of the soft tissue is under there.  So there's
17   still ligaments and tendons and other connective tissue.
18   There's some muscle and a variety of other things, but just
19   the skin itself has been detached.  It actually is torn from
20   itself above the ankle, but it's also separated from all of
21   that underlying tissue there.  So it's been pulled down kind
22   of all the way down off of her foot, and it's even pulled off
23   of her big toe here as well.
24               You can see maybe in the image over here,
25   there's no skin here, but all of the skin is sort of wrapped

1   in this area here.  And that's really the worst part of her

2   injury here, and as I understand by looking at the medical

3   records, that's why she needed to have amputation.

4  Q   So if we move from 86, the x-ray that we were just looking

5   at, to 87, is this -- what does this -- how does this relate

6   to your commentary about the degloving?

7  A   This is just a graphical image that I created to illustrate

8   what that degloving would look like without using such gross

9   kind of imagery.  So basically this line that I'm showing

10   here is approximate, approximately the location where her

11   skin was torn away from its detachment there.  So the leg

12   skin above her ankle is still intact, but just right there at

13   that dashed line, that's where there was a split of the skin.

14   And then what I'm showing over here on the right is kind of

15   what looks like what it looked like at the end with the

16   detached skin kind of wrapped around or kind of just in the

17   area of her little toes there.  But it had been pulled off

18   the whole part of her foot, so it's been pulled off the top

19   of the foot, the bottom of the foot, and even back on the

20   heel here.

21  Q   So I talked about this in my opening as if it was an athletic

22   sock sort of pulled off to the end of the toes.  Is that kind

23   of what we're seeing here, all the way around?

24  A   That's correct.  It's been pulled all the way around.

25  Q   In the process of formulating your thoughts about what caused

1    this to occur, what interaction with the machine -- did you

2    also examine her shoes, which I believe are Exhibit 85?

3  A    I did.

4  Q    You brought those in a box?

5  A    I did examine her shoes, yes, and I have them here.

6  Q    And did you compare that -- how did you compare that to the

7    design of the forklift, the wheel in particular?

8  A    Well, I was trying to figure out -- at least in the medical

9    records, her shoe is not involved in that ball at the bottom.

10    I believe her sock is involved in that ball of skin that's at

11    the bottom.  But her shoe was off.  So what I was trying to

12    do is figure out if I could see something on the shoe that

13    gave me kind of a real clear indication of what happened.

14    And I read from some of the witness statements as well that

15    the shoe was kind of trapped in the recess or even in

16    between.  There was some differing -- some of the people said

17    something different.  But the shoe was somewhere trapped in

18    between the steer wheels or in the compartment under the

19    forklift where the steer wheels sit.

20  Q    Regardless of where the shoe ended up, do you have an opinion

21    as to the mechanism of how this degloving occurred?  What

22    caused this skin to peel back from her ankle down to her

23    toes?

24  A    Well, it must have taken a lot of force.  The skin is very,

25    very strong.  You can stretch your skin very long distance

1    before it will actually tear.  So there had to have been

2    something -- something pulling on her skin very strongly.  So

3    I had to conclude that her foot -- that really her shoe is

4    pulled off first.  It may be early within this interaction.

5    So her foot is interacting with the wheels.  Her shoe had to

6    have been pulled off first and kind of taken out of there.

7    There was no blood on her left shoe at all, so it had to have

8    been taken away.

9              But then something -- some part of the wheel

10   had to really grab on to the skin and maybe draw her foot

11   closer to the wheels, maybe to the -- within the area where

12   the wheel is.  There's kind of a recess, an opening, because

13   that wheel can turn.  And so her foot could have been pulled

14   in between the wheel and the housing itself, sort of trapped

15   in between there.  It also could have been pushed in between

16   the wheels.  There's two steer wheels there.  It's a very

17   small opening and so it's hard to tell exactly where it went,

18   but something about interacting with those wheels caused the

19   skin to be just pulled off of both sides of her foot or off

20   the whole part of her foot.

21 Q  Well, do you have a sense of how long this took?  Was this a

22   15-foot-long path, or was it based on the rotation of the

23   wheel, relatively short?

24 A  So it's obvious to me in this case that the skin -- once it

25   started getting pulled off of the foot, it kept going; right?

1    So it got pulled off.  But since the skin was all trapped

2    down on her -- I'm using my hand here to kind of describe,

3    but the skin was all collected around her smaller toes of her

4    foot, and it started up above her ankle.  It couldn't have

5    gone very far, because if the steer wheel started interacting

6    with the foot and pulling the skin off, and then the forklift

7    kept running for, I don't know, several feet, I would have

8    expected the skin to be pulled off completely and maybe left

9    under the forklift as it drove over it somehow.  I would have

10   expected to see blood maybe stained farther away from where

11   the forklift was.

12            So I believe that the forklift interacted,

13   grabbed on to the skin, and really pulled it, but maybe only

14   over a short distance, 10, 15 inches or something.  The wheel

15   is a 10-inch diameter wheel, so it has a 31-inch

16   circumference around it there.  And so if it -- if the wheel

17   had continued to turn for 30 inches or something, I would

18   have expected the skin to be pulled off completely.  So the

19   wheel had to have turned just maybe half the way around or a

20   third of the way around or two-thirds.  It's a little hard to

21   say exactly.  But once it grabbed on to the skin and pulled

22   it down there, it pulled it over that distance.  So I didn't

23   measure Mrs. Anderson's foot directly to figure out the

24   distance between where the skin started, all the way down to

25   where her toes were, but I estimate it's in the 10 to

| | | |
|---|---|---|
| 1 | | 15 inches range. |
| 2 | Q | So if we find the forklift at rest -- and Dr. Meyer told us |
| 3 | | that she would not have affected where the thing was coming |
| 4 | | to rest, given its weight.  It was going to stop when it got |
| 5 | | ready? |
| 6 | A | That's right. |
| 7 | Q | And you agree with that from a physics point of view? |
| 8 | A | Absolutely. |
| 9 | Q | So the first -- the interaction that began the injury was |
| 10 | | about 15 inches back; is that what you're saying? |
| 11 | A | So if the interaction that began the injury started several |
| 12 | | feet before the forklift stopped, the only thing that I could |
| 13 | | think of that would happen is either the forklift would have |
| 14 | | continued to kind of pull forward, pull her foot and leg |
| 15 | | inside, and it would have gone farther up her leg, or the |
| 16 | | forklift would have had to push her like a broom kind of |
| 17 | | across the floor, and I didn't see any evidence of that at |
| 18 | | all.  So I have to conclude that the injury occurred, that |
| 19 | | the sort of peeling of the skin off of her foot, occurred |
| 20 | | over the very last, you know, foot, less than a foot and a |
| 21 | | half of the travel there. |
| 22 | Q | Ms. Boone told us as our first witness that the shoe was |
| 23 | | right there with the wheel.  It wasn't 3 feet back.  It was |
| 24 | | right there with the wheel under the -- interacting with the |
| 25 | | wheel.  Is that consistent with your thought that the wheel |

1    didn't travel far after the interaction began?

2  A  Yeah.  It's hard to say exactly when the shoe got pulled off.

3    I think it happened before her foot was injured.  But the

4    shoe itself wasn't bloody at all.  So if the shoe was trapped

5    in that housing or even up in between the wheels or behind

6    the wheels or something, it was in a place that didn't

7    interact with the foot.  I guess the shoe could have been

8    pulled off the foot and then trapped up behind the wheel or

9    in the recess there for some time.  But I guess that could

10   have happened.  But since the shoe was pulled off first and

11   then the -- once the injury started to happen, I can't figure

12   out how the forklift could have traveled longer.  It would

13   have only traveled that last, maybe, foot, foot and a half

14   there.  I'm sorry, Mr. Warshauer.  Did I answer your

15   question?

16  Q  I think you did.  Let me ask the judge about something before

17   we talk about the next thing we're going to talk about.

18              (Sidebar begins.)

19              MR. LoCOCO:  Hope you don't mind gross pictures.

20              THE COURT:  Let's make sure we show it right

21   before lunch.

22              MR. WARSHAUER:  In respect for Counsel's concerns

23   about this, I wanted to sort of bring it to the Court's

24   attention.  So this is 81, and it sort of begins the process.

25   And there's 80.  I think that what I'd like to do -- I mean,

1     look, this is a graphic, gross injury.  There's no question
2     about that.  What I would propose to do, not going to leave
3     these up long, but I'm going to show them.  I'm going to warn
4     the jury beforehand:  "Some of you may not want to look at this.
5     If you don't, it will be back.  You can look later.  But we're
6     going to put it up for 15 seconds.  Turn away if you don't want
7     to see them.  If you do want to see them, you're welcome to."
8     Then we'll do this, and he'll just explain how this relates to
9     the intersection and how a guard would have changed the outcome.
10                  MR. LoCOCO:  And our objection is for all three.
11    It's -- I think its probative value, its prejudicial impact is
12    not outweighed by its probative value.
13                  MR. WARSHAUER:  Unfortunately, it supports the --
14                  THE COURT:  I think in a leg-off case, probably
15    expect they were going to see it.  You've got one of the jurors
16    works with dead people.  Another one is a doctor.  I think that
17    if it's showed for a limited time, they're given a heads-up --
18    what is the -- what do you prove with these photos that you
19    haven't already proved with the schematics?
20                  MR. WARSHAUER:  That we show the laceration and
21    how the -- how it's been pulled back up.  And it's consistent
22    with the intersection here, and it couldn't have drug her very
23    long or the forklift would have gone further up her leg.
24                  THE COURT:  All right.
25                  MR. LoCOCO:  Which I think is what he --

```
 1                      THE COURT:  Go ahead.

 2                      MR. LoCOCO:  He already got that out with the

 3        schematics.

 4                      THE COURT:  Is this going to be the most graphic

 5        thing we show the jury, you think?

 6                      MR. WARSHAUER:  I can't think of anything else

 7        worse than this.

 8                      THE COURT:  With the leg amputated, or?

 9                      MR. WARSHAUER:  No, we don't have anything like

10        that.

11                      THE COURT:  All right.

12                      MR. WARSHAUER:  And Dr. Low uses these same

13        photographs.  He uses this set here, I think.

14                      THE COURT:  Who's Dr. Low?

15                      MR. LoCOCO:  He's the surgeon.

16                      MR. WARSHAUER:  The surgeon that took her foot

17        off.

18                      MR. LoCOCO:  If you're going to overrule the

19        objection, I guess the only request I'd have then, Your Honor,

20        is that you tell the jurors that you're the one who invites them

21        to either close their eyes or --

22                      MR. WARSHAUER:  That's fine with me.

23                      (Sidebar ends.)

24                      THE COURT:  All right, ladies and gentlemen.  The

25        next series of questions that are going to be directed to this
```

1    witness relate to actual photos of Mrs. Anderson's foot that

2    were taken I'm presuming at the hospital after this accident.

3    They are graphic in nature.  You are not obliged to look at the

4    photos if you do not want to.  The photos will be shown to you

5    for a very limited period of time, long enough for the witness

6    to identify in those photos things that he thinks are relevant

7    to his opinions.

8                    And with that, tell me when you're ready to

9    publish.

10                    MR. WARSHAUER:  The first photograph is going to

11   be Exhibit 80 and the second one will be Exhibit 81.  And we're

12   ready to go.

13                    THE COURT:  All right.  Count down.  Five, four,

14   three, two, one.

15   BY MR. WARSHAUER:

16   Q    So, Dr. Kerrigan, we're looking at Exhibit 80.  And what are

17        we seeing?

18   A    This is a picture of Mrs. Anderson's foot at -- that was

19        taken at the hospital.

20   Q    And what has happened to the skin here?

21   A    It's my understanding that the surgeons or the other

22        physicians there have tried to collect the skin from around

23        her small toes and draw it back up over her foot in an

24        attempt to cover the exposed area in this case.

25   Q    Okay.  And if we look at 81, is this the glove, if you will,

1          pulled back up?

2    A     Yes.

3    Q     With the forklift at the bottom?

4    A     That's correct.

5    Q     So let's move from your consideration of those to whether or

6          not a -- whether or not a guard -- whether or not a guard at

7          the rear steered wheel would have made a difference in the

8          outcome for her injury.  So now we're looking at the forklift

9          at the bottom of Exhibit 81, I think.  And if a guard had

10         been put in this location, do you have an opinion as to

11         whether or not it would have changed the outcome based on

12         your understanding of the injuries that were suffered?

13   A     Absolutely.  So Mrs. Anderson's foot was injured because it

14         was allowed to pass through that recess and into that opening

15         to interact with the wheel.  So a guard like that or a guard

16         like that just covering that opening would have prevented her

17         foot from going at least as far in.  I understand that it

18         can't go all the way to the floor.  If it could go all the

19         way to the floor, it would have prevented her foot from going

20         inside at all, but at least a guard over the lower part would

21         have prevented her foot from going into the sort of recess

22         there.  I call it a recess, but the opening, and then the

23         area where that wheel is.  It would have prevented it from

24         going in as far as I think it must have gone in.

25   Q     Well, if it had not gone in as far, would it have been able

1    to cause the degloving injury where we saw where the

2    laceration was at the ankle level?

3  A  I don't think that the ankle could have gotten to interact --

4    the ankle could not have gotten to the steered wheel at all

5    in that case to let the forefoot of -- her toes might have

6    been able to get under there a little bit, but it's not going

7    to allow her whole ankle and the back part of her foot to

8    get -- in interacting with the wheels.

9  Q  So let's move from that to this Exhibit 90.  And you've drawn

10    some things here.  What are we seeing in Exhibit 90,

11    Dr. Kerrigan?

12  A  I was trying to show kind of with an approximately scaled

13    image of where the steered wheel was.  We're kind of looking

14    at a side view of the forklift, so showing the direction of

15    rotation of the wheel, which shows that when the forklift is

16    traveling in the forks trailing direction, the red wheel is

17    actually turning in the direction I indicate with the arrow

18    there.  So that the part of the wheel that is going to

19    interact with the rear side of the forklift is going to be

20    traveling downward, so it's going to be pushing down, kind of

21    as you see it's going to push down on this side.  Sorry.  On

22    that side of the forklift pushing down here.  And so what I

23    was trying to show is that in order for the skin to get

24    pulled off all the way up at that level, I expect that her

25    foot and the skin above her ankle would have had to interact

1    with -- like literally touch or be grabbed by the forklift

2    wheel in that location.

3                So the forklift wheel is a 10-inch diameter,

4    so the radius of the wheel's 5 inches, and so that means that

5    kind of this dimension, if I can draw it here, sort of the

6    vertical dimension of the widest part, that's 5 inches there.

7    So it's not a perfectly scaled image, but what I was trying

8    to illustrate is that the widest part of the wheel is

9    5 inches off the warehouse floor, and that's approximately in

10   the area of where the skin degloving began, which according

11   to the medical records, was about two inches above her ankle.

12  Q   Okay.  When we look at this, if we were to -- here we're

13      seeing through the --

14  A   Right.

15  Q   -- the -- we're seeing through the forklift, if you will?

16  A   Exactly.

17  Q   But if instead of seeing through the forklift, this was a

18      guard, would that be the height at which it would be?

19  A   Right.  So my understanding is that the forklift -- that the

20      side of the forklift can't come all the way to the floor.

21      There's clearance issues and things when you're driving this

22      forklift up and down ramps.  And so sort of this distance is

23      3 inches here, so that's kind of from the ground or from the

24      warehouse floor up to that, what I call the rear skirt of the

25      forklift, the kind of black part that wraps around.  So if

1        there was a guard that was at the same level as the skirt,

2        it, you know, it would be on this side over here, but it

3        could -- I don't see why it couldn't come down to the same

4        level as the skirt itself there.

5   Q    And if it did come down to the same level as the skirt, of

6        the rear skirt of the forklift, would we have had the level

7        of injuries that you've described to us?

8   A    No.   No.   Because her foot could not have gotten far enough

9        in.   The skin could not have been grabbed up as high as above

10       the ankle.

11                    MR. LoCOCO:   May I ask, which exhibit is this?

12                    MR. WARSHAUER:   I'm sorry.   This is Number 90.

13                    MR. LoCOCO:   Thank you.

14                    MR. WARSHAUER:   I think you actually showed it in

15       opening.

16                    MR. LoCOCO:   I'm not -- just didn't make a note.

17                    MR. WARSHAUER:   Just to remind you where it was.

18  BY MR. WARSHAUER:

19  Q    So that was Number 90.   Dr. Kerrigan, I want to move from

20       the -- water is right there to your right.   I think it's

21       open.

22  A    I was -- I was going to say, do you want to -- I could show

23       the shoe to illustrate what I mean by how far the foot can

24       get under.

25  Q    Absolutely.

1    A    Is that okay?

2    Q    Yes.  Yes, please.

3    A    I have Mrs. Anderson's left shoe here, and this is just a

4         ruler.  And so if the rear skirt -- if her foot's on the

5         floor of the warehouse and the rear skirt of the forklift is

6         3 inches up -- it's a little hard to see, but I'll just put

7         my thumb just above the 3-inch mark there.  Maybe my finger

8         like this.  So what this means is that this part of the foot,

9         the toe kind of could get under the skirt.  And it could keep

10        going really until -- if the guard is at that 3-inch level,

11        it could go maybe to this far.

12   Q    But if I can approach, the wheel is like this?

13   A    Yes.

14   Q    So even though it goes in, we're only interacting with the

15        tip of the toes?

16   A    Sure.  So the toe and the front of the shoe certainly could

17        have interacted with the wheel going under the skirt.  But

18        the degloving injury actually started above the shoe, above

19        her ankle, way up here.

20   Q    So because this isn't here, the wheel's able to go back to

21        here?

22   A    Exactly.  The foot can get all the way, all the way in.

23   Q    Well, let's move from -- thank you.  Let's move from this

24        injury mechanism to how she got there.  What is your

25        understanding with respect to how Mrs. Anderson got to the

1    point where she could interact with this rear steer -- rear

2    wheel?

3  A  So she was driving her forklift, and she -- she testified in

4    her deposition that she was driving her forklift straight.

5    But there was a reconstruction done by Dr. Meyer that showed

6    that the forklift turned before it stopped, so it was kind of

7    turning towards the -- so it's the racking system in the

8    warehouse.  And so she's driving over these cracks in the

9    floor.  And if you start to lose your balance or if you -- if

10   you perceive that you could lose your balance -- and maybe --

11   I'm not the balance expert, so I'll say what I understand.

12   But if you perceive that you could lose your balance, it's

13   very common for a human to try to expand their base of

14   support, to move that -- move one foot out to make your

15   support wider.  So it's kind of like riding on a subway

16   without -- the subway car starts without you holding on, you

17   end up spreading your feet further apart to prevent yourself

18   from falling.  So I think she pushed her foot out to try to

19   prevent herself from falling.  But if her foot goes over the

20   edge and she tries to put weight on it and it starts to fall,

21   she's going to lose her balance there.

22           So I think she loses her balance, which is

23   what she also testified to.  And she loses her balance, and

24   so now her left foot is down off of the top of the platform

25   floor there.  And she's still holding on to the controls.

1   She's holding on to the multifunction control handle and the

2   steering tiller with her hands.  And her right foot would

3   have had to have been on the deadman brake.  And so at that

4   point --

5 Q Let me interrupt you.  From a biomechanical point of view, if

6   the left foot is not on the floor, is it possible for her to

7   apply this brake after the fall process began?

8 A The only way she could take her right foot off of the

9   brake -- there's two ways that I think it could have

10   happened.  The first way is if she can plant her left foot

11   down on the warehouse floor enough to shift her weight over

12   and pick that right foot up.  The other way it could happen,

13   if she had just fallen out completely, she's lost both of her

14   feet, and she's now falling towards the floor.  So one of

15   those two things had to have happened in this case.

16 Q Is there any evidence that after she hit the floor, that the

17   forklift pushed her for several feet before it ate her foot?

18 A I didn't see any evidence of that at all.

19 Q Okay.  Is the biomechanics that you've described consistent

20   with the loss of balance, the movements that get to where she

21   got consistent with the loss of balance?

22 A Absolutely.  Yes.

23 Q The last thing I asked you to do is to consider the opinions

24   offered by the defendant's experts, because you're going to

25   be returning back to, as you people call it, the grounds?

```
1    A     The grounds.

2               MR. LoCOCO:  Your Honor, can we approach, please?

3               (Sidebar begins.)

4               MR. LoCOCO:  Your Honor, this is improper -- he's

5    going to get into him rebutting my experts' opinions at this

6    point.  That's improper rebuttal.  We may never put our

7    witnesses on.  And as the Court explained to the jury before the

8    trial started, the way things go is the plaintiff puts its case

9    on, the defense puts its case on, and then the plaintiff gets to

10   put on rebuttal again.  And the opinions that he wants to rebut

11   right now, frankly, in fairness, haven't been presented to the

12   jury yet.  And it's going to be his view of what my experts are

13   going to testify to.  I think it's improper to do it this way.

14               MR. WARSHAUER:  Well, he certainly did it in his

15   deposition and his reports.  As to the timing of it, they have

16   identified that they're going to call Dr. Rodowicz, and going

17   ahead and anticipating that from an efficiency point of view is

18   certainly appropriate and within discretion to allow you to do

19   it.  If the Court says, "Well, I just don't want you to do that

20   right now," then I can say, "Well, did it happen this way?"

21   without mentioning her name.

22               MR. LoCOCO:  Again, it's improper -- go ahead.

23               MR. WARSHAUER:  It's absolutely in his opinions,

24   though.

25               MR. LoCOCO:  I'm not saying it's a surprise.
```

1    MR. MURPHY:  If you think that through, what

2    would happen is, his expert would get to testify twice, because

3    they have a rebuttal expert.  The jury would hear it now and

4    then they would hear it later.  And what he's saying is very

5    true.  He doesn't know what we're going to ask our experts.  We

6    can't ask him anything we didn't disclose.  But we may not ask

7    him very much at all.  And then the jury has heard something

8    that as rebuttal that doesn't need to be rebuttal -- rebutted.

9    That's our -- and he said he's bringing him back anyway.

10    MR. WARSHAUER:  I'm not bringing him back.

11    MR. LoCOCO:  He's trying to avoid bringing him

12    back.  That's not how our system works, Your Honor.  And as

13    Mr. Warshauer knows, the last case we tried together, we put on

14    one expert.  We didn't put on all our experts.

15    THE COURT:  Well, what's he going to talk about?

16    MR. WARSHAUER:  Well, there's a description that

17    Dr. Rodowicz offers that basically is, in his opinion and mine,

18    somewhat bizarre.  So I can -- it involves multiple steps --

19    THE COURT:  I mean, the way you set it up, the

20    way you segued into your next line of questioning is, this is to

21    rebut opinions or show his disagreement with opinions that these

22    experts had.  Their point is well taken.  I think that you could

23    explore with him alternatives of -- there's alternative

24    explanations or "Did you look at any other alternatives to your

25    opinions?"

```
 1                    MR. WARSHAUER:  I'll do that.

 2                    THE COURT:  Without saying --

 3                    MR. WARSHAUER:  I'll do it that way.

 4                    MR. MURPHY:  Assuming they're disclosed, I guess.

 5                    MR. WARSHAUER:  They are.

 6                    THE COURT:  Yeah.  But to set it up as "We're

 7      going to pre-rebut witnesses that may or may not be called," we

 8      can't do that.

 9                    MR. WARSHAUER:  I did say that as part of the

10      thing.  Objection was handy there.  I understand.  I'm not

11      complaining about that.  But no, I'll do it the way you suggest.

12      I think that's fine.

13                    THE COURT:  As long as it's not "Dr. Rodowicz or

14      Dr. Whoever said this or that."

15                    MR. WARSHAUER:  Got it.

16                    THE COURT:  And why is she wrong, or.

17                    MR. LoCOCO:  And it can't be done with leading

18      questions, which --

19                    THE COURT:  You're right.

20                    MR. MURPHY:  So we -- just to know where we're

21      at, the objection to the question that he was going to presently

22      rebut our expert witnesses was sustained.

23                    THE COURT:  Is sustained.

24                    MR. MURPHY:  That's all.  Thank you.

25                    THE COURT:  All right.
```

```
 1                    (Sidebar ends.)
 2    BY MR. WARSHAUER:
 3    Q   So, Dr. Kerrigan, have you considered alternative ways that
 4        she could have gotten out other than a loss of balance?
 5    A   I've -- sure.
 6    Q   Okay.  We have a floor.  What does this appear to be to you?
 7    A   I understand that's just a scaled diagram of the floor
 8        compartment from the subject forklift.
 9    Q   I'm going to ask, with the Court's permission, that you be
10        allowed to come down, and I'll ask you some questions about
11        alternative ways that she could have gotten out and your
12        thoughts about whether they're consistent with biomechanics.
13        Okay?
14    A   Sure.
15                    THE COURT:  Make sure you speak up, because
16        you're no longer in front of a microphone.
17                    THE WITNESS:  Not a problem for me.
18                    THE COURT:  Good.
19                    MR. LoCOCO:  Your Honor, may I ask --
20        Mr. Warshauer, can you just represent that it's to scale?
21                    MR. WARSHAUER:  Yeah.  Dr. Meyer actually
22        measured it, and it's actually pretty --
23                    THE COURT:  Is it marked as an exhibit?
24                    MR. WARSHAUER:  No, but we're going to.  What's
25        my last number?
```

1        THE COURT:  Whether it's admitted or not, just

2    for purposes of the record, I want to make sure that this is

3    identified so that --

4        MR. WARSHAUER:  We have marked the scale floor as

5    Exhibit 157.  Thank you, Judge.

6        MR. LoCOCO:  Thank you.

7   BY MR. WARSHAUER:

8   Q   So if you will begin what you understand to be -- first, do

9       you have an understanding of the operator position for this

10      kind of forklift?

11  A   Yes.

12  Q   Have you ever been trained to use a forklift?

13  A   Yes.

14  Q   Okay.  So show us the normal, typical, correct operator

15      position.

16  A   So the way that an operator would enter the forklift would be

17      from this side, so the operator would come onto the forklift

18      this way and would stand in this position.  It's called a

19      sidestance.  So in this way, the forks are in this direction,

20      and the operator compartment opening is here.  And similarly,

21      since we already showed another picture of the steer wheel,

22      would be kind of in this area here.

23          So this U-shaped part of the front, that's the

24      deadman brake pedal.  So in order to operate the forklift,

25      the operator has to depress the deadman brake pedal.  As I

1    understand, this is designed to allow operators to turn their

2    body and maybe use more either the right foot or their left

3    foot to compress the brake.  But as I understand in this

4    case, Mrs. Anderson was standing in with her right foot on

5    the brake pedal with her right hand on the multifunction

6    control handle, which is here.  There's a steering tiller

7    like a wheel kind of here.  And there's a pad, a back pad

8    here for her posterior area.  And she's kind of in this

9    position while she's operating the forklift.

10  Q    From a biomechanical point of view, if she wanted to leap

11       away from the forklift, what would we expect?

12  A    I would expect this.

13  Q    Had that kind of conduct been done, would we have -- would

14       that be consistent with the injuries that you saw?

15  A    No.  I would have expected her to jump and try to get as far

16       away as possible.

17  Q    Is there any evidence from that that the injury caused is

18       consistent with that kind of conduct?

19  A    No.

20  Q    All right.  So is there another way that you've considered

21       getting down?  Perhaps stepping down?

22                    MR. LoCOCO:  Objection.  Leading.

23  BY MR. WARSHAUER:

24  Q    What other ways have you considered that she escaped?

25  A    Well, what I was trying to do in my analysis is figure out

1    how her left foot could interact with the steer wheel, which

2    is -- it's kind of in this area.  So one thought I had was

3    that she could have actually kept her right foot on the brake

4    pedal, and maybe even her left foot could even be outside

5    this way and interacting in this direction.

6              She -- so I was trying to figure out if she

7    could have kept her right foot on and had her foot

8    interacting.  As I mentioned, I think she loses her balance

9    because she tries to broaden her base of support and she

10   steps down off of the 9- or 10-inch step, so she lost her

11   balance.  And at this point, as I mentioned, there's -- in

12   order for the forklift to stop, it either has to hit

13   something or it has to -- her right foot has to come off of

14   the brake.  So it's hard to see what could have happened.  I

15   don't know if she's kind of stepping along on the floor.  As

16   I mentioned, she could have transferred her whole weight to

17   that foot to take her right foot off.  That could have

18   happened.  Or as I said, she could have just fallen out.

19             But when her right foot is on the brake pedal

20   and her left foot is somehow off, she's going to -- I assume

21   she would try to get back on if she wanted to stay on, or if

22   she wanted to get off, I assume she would have tried to step

23   away.  And so if she wants to get off -- because it's still

24   moving and it's moving in this direction.  I kind of think of

25   it like if I was sitting on the hood of a car and tried to

1     step off, a car moving forward, from sitting on the hood, I'd

2     try to get as far away as possible because it's just coming

3     behind me here.

4              So I really tried to consider all the ways

5     that she could have tried to get off the forklift.  And in

6     some situation, her foot had to interact with that wheel in

7     order to cause her injury.  So somehow the foot --

8  Q    Would that be consistent with the forklift turning in

9     response to a pull?

10            MR. LoCOCO:  I'm sorry.  I missed the question.

11  BY MR. WARSHAUER:

12  Q    Would that be consistent with, as she falls, turning the

13     wheel, pulling the forklift towards her?

14            MR. LoCOCO:  Objection.  Leading.

15            THE COURT:  Overruled.

16            THE WITNESS:  So as I understand from Dr. Meyer's

17     drawing, the forklift turned in this direction toward the rack.

18     So, you know, if she loses her -- she loses her balance, her

19     foot is now -- or she has broadened her base of support, she's

20     lost her balance.  She's this way.  She probably has a hard time

21     getting all of her weight transferred to her left foot.  So I

22     assume that she's trying to pull back onto the forklift.  So if

23     she's pulling back onto the forklift, she's pulling with --

24     probably with her hands, because that's the only thing she has

25     to pull with.

BY MR. WARSHAUER:

Q    Is that a consistent biomechanical response?

A    Absolutely.  She's going to try and hold her body, and if
     she's trying to pull herself back on, she can only pull on
     the two control handles, the multifunction control handle or
     the steering tiller.  So I don't know, I wasn't there, but it
     seems to me she pulls on the steering tiller.  That could
     cause the forklift to turn.

Q    All right.  Let me ask you this.  I want to demonstrate
     something for you.

A    Excuse me?

Q    Is there a scenario that you can think of where she finds
     herself like this?  That is, the right foot's still on the
     platform parallel to the forks, and the left foot parallel to
     the forks, but the right foot no longer on the deadman pedal?

A    In this case, absolutely not.  I mean, that's how you might
     get off the forklift if it was stopped.  So if it was
     stopped, you know, I might -- I would probably still step off
     this way.  But I can also see, kind of like climbing down a
     ladder, you might turn to the edge and then step down.  But
     in this case, since it's moving and it's moving in this
     direction, she's either trying to get far away from it or
     she's trying to stay on.  And if she -- you know, this --
     what you showed is her kind of doing a bunch of steps to get
     over to the edge.  I just don't think that would have

1    happened.

2  Q    All right.  Thank you.  Dr. Kerrigan, just a couple of quick

3        followups.  You can return.  Two quick conclusion questions,

4        and we'll let Mr. LoCoco ask you some things if he's

5        interested.  First, you talked about the guard being right

6        flush with the edge, the rear edge or skirt.  If we moved it

7        out three-quarters of an inch or half an inch or moved the

8        wheel further in, would we have had any interaction at all?

9  A    Let me try to understand.  So you're saying if the -- if the

10       guard wasn't flush with the rear of the forklift, and it

11       was --

12  Q    Well, the wheel was further back.  If there was a bigger gap

13       between the guard and the wheel, would we have had an

14       interaction?

15  A    No.  Because if it was -- it would need to be large enough

16       such that her foot going under the guard up to the 3 inches.

17       If the wheel was at a distance that couldn't interact with

18       her toes, then I don't understand -- I can't see how any

19       injury could have occurred.  Well, let me take that back.  I

20       don't see how Mrs. Anderson's injuries could have occurred.

21       At that time, if the forklift is moving and there's a stiff

22       steel guard that's digging into her foot, she certainly could

23       have been injured, absolutely.  But this injury that involves

24       this degloving and pulling the skin off, I think that all

25       happened because her foot is interacting with the wheel.  And

```
 1        if there was not enough room for her foot to get to the
 2        wheel, I don't see how that injury could have occurred.
 3                      MR. WARSHAUER:  Thank you.
 4                      THE COURT:  How long is your cross, do you think?
 5                      MR. LoCOCO:  I'm hopeful we can get it done
 6        before noon, but if you've got a different break...
 7                      THE COURT:  Well, let's do this.  Let's at least
 8        give you a five-minute break, because we've been going for an
 9        hour.  Let's take a quick five-minute break.  We'll come back
10        for your cross.  We're in recess.
11                      (Jury exits at 11:29 a.m.)
12                      (Recess from 11:29 a.m. to 11:38 a.m.)
13                      (Jury enters at 11:38 a.m.)
14                      THE COURT:  All right.  Please be seated.
15                      Counsel, cross-examination?
16                      MR. LoCOCO:  Thank you, Your Honor.
17                            CROSS-EXAMINATION
18   BY MR. LoCOCO:
19   Q    Good morning, Doctor.  How are you?
20   A    Good morning.  I'm well.
21   Q    What size are your shoes?
22   A    My shoes are 11.
23   Q    Okay.  And what size are the shoes that Mrs. Anderson was
24        wearing at the time of the incident?
25   A    If I recall off the top my head, I think it's 5.
```

1  Q  Can you look?  It should be attached; right?

2  A  It should be right there.  Sorry.  It's a US -- I think this

3     is a -- it says US8, but I'm not clear if that's a women's 8

4     or men's 8.

5  Q  Okay.  Definitely smaller than your shoe?

6  A  That's correct.

7  Q  All right.  I've got a few questions first about your

8     background and experience.  You don't have any experience

9     designing standup forklifts; correct?

10  A  I do not.

11  Q  You did not do an inspection of the facility; correct?

12  A  I did not.

13  Q  And you did not inspect either the -- you didn't inspect a

14     4250 lift truck as part of your work in this case?

15  A  I did not.

16  Q  You've never operated a Raymond Model 4250; correct?

17  A  I think that's true.  Yes.

18  Q  And you have no experience designing warnings, instruction

19     manuals, training materials for forklift trucks; correct?

20  A  I do not have experience in that, no.

21  Q  And you've never had any responsibility for making design

22     decisions with respect to forklift trucks?

23  A  I have never had that responsibility.

24  Q  You've never trained anyone on how to operate a 4250?

25  A  I have not.

1   Q   And would you agree you're not qualified to provide that

2       training?

3   A   I would agree, I'm not qualified.

4   Q   Would you agree with me that if Mrs. Anderson had stayed in

5       the compartment, she wouldn't have sustained her left-leg

6       injury?

7   A   Yes.

8   Q   You've never been retained as a consultant by a forklift

9       manufacturer; correct?

10  A   That's correct.

11  Q   You have -- I think you talked about this in your direct

12      exam.  You've written papers and have other publications;

13      correct?

14  A   That's correct.

15  Q   None of those deal with standup forklifts; true?

16  A   That's correct.  Most of my -- well, in fact all of my

17      publications pertain to my research at the University of

18      Virginia.

19  Q   And you've done no testing in this case?

20  A   I have not done any testing for this case.

21  Q   Did you meet Mrs. Anderson today?

22  A   Not yet.

23  Q   Okay.  Have you ever spoken with her?

24  A   I have not.

25  Q   So at the time you put together your report, you had not

1    spoken with Mrs. Anderson?

2  A   That's correct.

3  Q   But you had read her deposition; correct?

4  A   That's correct.

5  Q   And she doesn't provide any detail testimony about what her

6      hands were doing or what her feet were doing between when she

7      felt shaking and when she ended up on the ground?

8  A   That's correct.

9  Q   So all of this -- all these questions you were asked with the

10     platform were assumptions or surmises or suppositions you

11     were making?

12 A   That's correct.

13 Q   You told Mr. Warshauer that you were certified to operate

14     standup forklifts?

15 A   That's correct.

16 Q   And that was in March of 2017?

17 A   I believe that's correct.

18 Q   Since you were certified in March of 2017, have you spent

19     more than five minutes on a Raymond standup forklift?

20 A   No.

21 Q   You've done no testing to determine whether going over cracks

22     of the area of the incident would cause the 4250 to shake;

23     correct?

24 A   I have not done any testing, no.

25 Q   Which includes what I just said?

1   A   That's correct.

2   Q   Okay.  You have not determined what her speed was during this

3       event; correct?

4   A   I believe in her deposition, Mrs. Anderson said that she -- I

5       don't remember exactly what she said.  I think she said that

6       "I wasn't traveling at full speed."  And so I assumed that it

7       was somewhat less than full speed of the forklift, based on

8       what she said in her deposition.

9   Q   Yeah.  And I apologize, because I asked the -- I didn't ask

10      the right question.  You've not determined what her speed was

11      during this event, other than her qualitative description?

12  A   That's correct.

13  Q   All right.  And you haven't -- I think you told us you're not

14      a balance expert?

15  A   I would say that neuromuscular control and balance, there's

16      an overlap in biomechanics with that field, so I certainly am

17      aware of at least some of the balance literature and have

18      read it and understand how it relates to injury biomechanics

19      and biomechanics in general.  But Dr. Jeka is certainly much

20      more of an expert on balance and neuromuscular control than I

21      am.

22  Q   All right.  Let me ask a more precise question.  Comes right

23      from your dep.  You've not formed an opinion to a reasonable

24      degree of certainty or probability in your field of expertise

25      as to the cause of this balance challenge that's been

1      alleged; correct?

2   A   My opinion is that --

3   Q   Let me go back.  Before we get to your opinion -- I'm going

4      to let you finish your answer.  I want to see if we can get

5      an answer to my question.

6   A   Okay.

7   Q   You've not formed an opinion to a reasonable degree of

8      certainty or probability in your field of expertise as to the

9      cause of the balance challenge; correct?

10   A   My opinion about the cause of the balance challenge was

11      formed based on the deposition of Mrs. Anderson.  I'm not

12      sure I understand what you're asking.  I'm sorry.

13   Q   So she didn't -- she said in her deposition that she lost her

14      balance?

15   A   That's correct.

16   Q   You were also provided with the FedEx Supply Chain

17      investigative materials; correct?

18   A   That's correct.

19   Q   And the medical records?

20   A   That's correct.

21   Q   And the OSHA records?

22   A   That's correct.

23   Q   And nowhere in any of those records is there any report that

24      Mrs. Anderson said she lost her balance; correct?

25   A   I don't think that's true.  I think Mrs. Anderson did say she

1       lost her balance in her deposition.

2   Q   I'm putting the deposition aside.

3   A   Okay.

4   Q   I'm saying -- you and I can agree she said that in her

5       deposition.  I'm saying before she was deposed, anyplace in

6       the FedEx Supply Chain materials, the OSHA records, or the

7       medical records, where it is written down that Mrs. Anderson

8       reported losing her balance?

9   A   I don't believe I saw that in those records.

10  Q   Okay.  Mrs. Anderson does not testify to exerting a rearward

11      pull on the control handle; correct?

12  A   In her deposition, I don't think she said anything about

13      that.

14  Q   All right.  So you told us that the -- that putting a guard

15      over the back of the steer tire -- would you agree that your

16      opinion is that it would have either mitigated her

17      interaction with the steer tire or completely eliminated it?

18  A   It is my opinion, yes.

19  Q   Okay.  Because you're not saying that Mrs. Anderson wouldn't

20      have been injured if she had gotten struck by an 8,000-pound

21      forklift?

22  A   No.  I think I tried to qualify that at the end.  Maybe I'll

23      try again.  So the specific injury she sustained was because

24      her foot interacted with the steer tires, the steer wheels of

25      the forklift.  A guard over that panel would have prevented

1      that interaction of her foot with the steer tire if the steer

2      tire was far enough away.  It would mitigate that if her foot

3      could still interact with the steer tire but couldn't pass as

4      far under the forklift.  But you're right, if even if that

5      was there, if she's hit by this forklift, she certainly could

6      have been injured.

7  Q   Seriously injured?

8  A   It's hard to say.

9  Q   I'm just saying "could have."

10  A   Could have, sure.  She could have been seriously injured.

11      She could have been killed.

12  Q   Right.  And so what you're saying here is that her foot might

13      not have been injured or might not have been as injured if

14      there had been this guard that we've talked about?

15  A   That's correct.

16  Q   Okay.  I've got another -- actually, I want to go back to the

17      image that Mr. Warshauer put up with you.

18  A   Okay.

19  Q   So we had some issues and had to renumber.  This is

20      Plaintiff's old 100.  We'll figure out what it was.

21               MR. WARSHAUER:  It is presently -- we just

22      offered this.  It is presently Number 90, Plaintiff's 90.

23  BY MR. LoCOCO:

24  Q   Okay.  So this is Plaintiff's 90.  And you put together what

25      we're looking at here on the screen; correct, Doctor?

1   A   That's correct.

2   Q   First of all, this is a demonstrative image that we're

3       looking at here; correct?

4   A   Yes.

5   Q   All right.  Is it to scale?

6   A   Well, so the -- so "to scale" means a bunch of things, I

7       guess.  So the red wheel is 10 inches, and so what I tried to

8       do was picture the foot such that it was approximately scaled

9       relative to a 10-inch diameter wheel.  Similarly, I tried to

10      indicate that the rear skirt of the forklift was

11      approximately 3 inches above the ground, and that the

12      entirety of the wheel was behind that -- this kind of -- this

13      edge of the forklift.

14  Q   Yeah.  So --

15  A   Skirt.

16  Q   So we've got this distance here from the bottom of your

17      depiction of the forklift to the ground.  Do you see that?

18  A   Yes, I do.

19  Q   And if --

20  A   It --

21  Q   On the actual truck, it's 3 inches?

22  A   That's correct.  In this image, it looks like it's a little

23      bit less than 3 inches.

24  Q   Because if that's 3 inches and you've got a 10-inch diameter

25      wheel, you should only be able to get 3 across here?

1    A    Exactly.  So this -- this distance would be 5 inches, so the

2         rear skirt should be three-fifths of the way above the

3         ground.  And maybe that's more accurately in this location.

4    Q    So from the perspective of how high off of the depiction of

5         the ground, it's not to scale?

6    A    That's correct.

7    Q    Okay.  But you have another -- I'm sorry.  I've got another

8         photograph which we'll get into evidence later.  It's -- but

9         you've seen this.  This is in Dr. Rodowicz' file.  I think

10        this is JPEG 93 or 293.  Anyway, you were trying to discuss

11        this particular issue with Mr. Warshauer, correct, of, you

12        know, the relative position of the foot with the same size

13        shoe to the skirt of the forklift; correct?

14   A    That's correct.

15   Q    So I know we're looking at an angle, but if we put the edge

16        of a guard where I've kind of drawn it in -- and I will tell

17        you the shoes that we see in the photograph, I'll represent

18        to you are the same size shoes that you've got in the box up

19        there.  That gives the jury an indication of how the shoe

20        could interact with the steer tire; correct?

21   A    Right.  If the guard is flush against the rear of the

22        forklift, then I would expect that up to that far, the shoe

23        could go under the guard, yes.

24   Q    And then the foot could be further injured by the steer tires

25        or the frame of the truck; correct?

1   A   Right.  The guard would come into her foot at this location,

2       impact her or impact with her foot at that location.

3   Q   And even with a guard in place, her foot's not going to stop

4       the truck?

5   A   No.

6   Q   Because it's 8,000 pounds times whatever -- I guess it's F=ma

7       or some other formula.  It's a lot of mass.  Her foot's not

8       going to stop the truck?

9   A   That's correct.

10  Q   Also you've got another schematic.  I want to ask you about

11      another schematic.  You've got Figure 7.  I'll put it up in a

12      second.  When you had this -- I got smaller feet.  Actually

13      I'm going to put it your direction.

14  A   Okay.

15  Q   So now I'm -- the opening to the compartment is facing you,

16      Dr. Kerrigan.

17  A   Okay.

18  Q   And the forks are to my right facing the back of the

19      courtroom.  Are you with me?

20  A   That's correct.

21  Q   And you and Mr. Warshauer talked about a number of foot

22      positions at the tail-end of your direct examination;

23      correct?

24  A   Yes.

25  Q   And what you offered to the jury is that somehow

1       Mrs. Anderson in your mind went to broaden her base of

2       support, there was no floor there, her left foot hit the

3       floor, and she fell out of the compartment?

4    A  She must have fallen out at some point.  It's hard to say

5       exactly when it happened.  She lost her balance because her

6       left foot came off of the operator compartment floor.

7    Q  And you've done no analysis as to when her right foot came

8       off the deadman pedal; correct?

9    A  Well --

10   Q  Other than sometime during the process?

11   A  Yes.  It would have -- since the forklift didn't hit

12      anything, I would assume that when her right foot came off,

13      it started the braking that slowed the forklift to a complete

14      stop.

15   Q  Now in this position, when she got hit by this -- when her

16      foot interacted with the steer wheels, was she still

17      standing?

18   A  It's hard to tell.  I'm not sure.

19   Q  All right.  Well, you've got a diagram, a figure, schematic

20      in your report, Figure 7.  Do you see that?

21   A  I do.

22   Q  And that figure is such that Mrs. Anderson is outside of the

23      compartment.  I guess her -- her left foot is somehow turned

24      and interacting with the steer tire?

25   A  That's correct.

1  Q   All right.

2  A   But I don't know if she was standing there, and I don't know

3      how to define "standing there."  I mean, her right foot could

4      have been on the deadman brake when her foot came down into

5      this position, but it also seems to me that maybe her right

6      foot was off and she was laying on the floor at that point,

7      or she was on her way to the floor.

8  Q   Yeah.  I guess the only point I'm trying to make is, she's

9      not interacting with the back of the standup lift truck in

10     the area of the operator's compartment; she's over here in

11     your diagram interacting with the wheels?

12 A   In order for her left foot to interact with the wheels, her

13     left foot would have had to have been over there, yes,

14     definitely.

15 Q   And it's toes first?

16 A   I believe so, or maybe the side first.

17 Q   Okay.

18 A   Maybe the medial side of the foot first.  It's a little hard

19     to tell.

20 Q   Yeah.  And I apologize for turning my back on you.  You took

21     a peek at this earlier; right?

22 A   I did see it, yes.

23 Q   Yeah.  And you know it's not an actual wheel assembly?

24 A   It appears to be 3-D printed.

25 Q   Yes.  So if you look at Figure 7, you've got Mrs. Anderson's

```
 1        foot on the -- let me pull back a little bit.  You've got
 2        Mrs. Anderson's foot, left foot on the outer edge of the
 3        outboard, furthest outboard wheel of the tandem wheel;
 4        correct?
 5   A    That's correct, except I think at that time, the wheel
 6        housing itself had rotated, so it's not parallel to the back
 7        of the truck.  Like that, so that the forklift could be
 8        moving to its left.
 9   Q    Okay.  And you don't know what actually -- but you don't have
10        it interacting between the two wheels?
11   A    In this image, I don't show that, no.
12   Q    But you're not telling the jury it couldn't have been the two
13        wheels -- in between the two wheels?
14   A    I'm not saying that.
15   Q    Okay.
16   A    It most definitely could have been.  I think that her foot
17        either is trapped between that outer wheel and the housing
18        that holds the wheels or maybe even between the wheels.
19   Q    Do you know where the shoe came out of the tandem wheels?
20   A    I know that there were two different accounts offered by the
21        FedEx employees in the files that I read.  And one of those
22        said that the shoe was trapped between the wheel and the
23        housing, and then another -- I think at least two other
24        people said that the shoe was trapped between the two wheels.
25   Q    Okay.  Mrs. Boone was -- Ms. Boone was here --
```

1          MR. LoCOCO:  I'm losing days, Your Honor.

2   BY MR. LoCOCO:

3   Q   Monday, I think.  Tuesday.  Yesterday.  And she said that she

4       couldn't see the -- she didn't notice the shoe until somebody

5       moved the truck away from the scene of the incident, and the

6       wheel came out from between the two wheels.  So that's

7       consistent with at least something you read in the file?

8   A   The shoe came out from between the two wheels, yes.  That is

9       consistent with some of the accounts that were in the file.

10  Q   Yeah.  And if I said "foot," I meant shoe.  But you're not

11      saying it's -- so if -- you're not not crediting Ms. Boone's

12      testimony.  Between the wheels is perfectly fine with you?

13  A   No, I -- it seems there's a lot of things that could have

14      happened.  Her shoe could have been pulled off on the left

15      side and gone behind the wheels, and then when they rolled it

16      forward, it could have came back in between.  Her shoe could

17      have came in between from the beginning.  I don't exactly

18      know.  The shoe appears to be pinched, but it doesn't look to

19      me like it was rolled over --

20  Q   Right.

21  A   -- by the steer wheels.

22  Q   Okay.

23  A   So I don't exactly know how the shoe got to where they found

24      it when they rolled the forklift -- I understand they rolled

25      the forklift forward, forks first, to pull it away from

1       Mrs. Anderson and that's when it came out.

2  Q   All right.  Last area I want to ask you about.  This is

3       Figure 23 from Mr. Meyer's -- or Dr. Meyer's report.  You've

4       seen this diagram; correct?

5  A   I have.

6  Q   And you see this counterclockwise angle turn toward the

7       vertical posts that we see in the image; correct?

8  A   Yes.

9  Q   And you testified that Mrs. Anderson -- that might have

10      happened by Mrs. Anderson pulling on the steering tiller

11      while she was coming out of the compartment, or falling out;

12      correct?

13  A   Right.  I was trying to understand her testimony, which

14      suggested that it was going straight and she didn't steer,

15      versus this evidence that suggests that blue line in the

16      picture that I understand to be the track of the forklift,

17      that turned it towards the aisle there.

18  Q   Because you know her testimony is that she was completely

19      straight in the aisle after the accident?

20  A   I don't know if she said after the accident.  What I remember

21      is that she said that she was traveling straight and she did

22      not turn.  But I don't know that she said after the accident.

23      I don't remember that.

24  Q   Okay.  I know that's what she said.  Do you have any basis to

25      dispute that?

1    A    No.

2    Q    All right.  So assuming she said that after the event, the

3         truck was still straight, that's inconsistent with what we

4         see here on Figure 23; correct?

5    A    That's correct.

6    Q    And you said one of the ways to explain the truck turning

7         toward the post was Mrs. Anderson pulling on the steer tiller

8         as she was coming out?

9    A    Yes.

10    Q    She didn't testify to that?

11    A    That's correct.

12    Q    All right.  Another explanation for the turn towards the post

13         is oversteering as she came into that aisle and just making a

14         mistake; right?

15    A    I guess that could have happened, sure.

16    Q    And this event that you've described for Mr. Warshauer, it

17         was a dynamic event; correct?

18    A    Maybe could define that a little bit more, so we're on the

19         same page as to what you mean by that.

20    Q    Sure.  The truck was moving and she was moving?

21    A    Yes.  She was moving in the truck and maybe even moving with

22         respect to the truck.

23    Q    Yeah.  And then whenever she got out of the truck, at least

24         for some amount of time or distance, she was moving and the

25         truck was moving relative to each other?

```
 1   A    I expect that happened at some point.  She was in the truck
 2        at first and then at the end was outside of the truck.  So
 3        she had to move with respect to the truck.
 4                    MR. LoCOCO:  I think I'm finished, Your Honor.
 5        Let me just...
 6   BY MR. LoCOCO:
 7   Q    Just two quick final questions, Dr. Kerrigan.  During this
 8        event, you don't know when her right foot came off the
 9        deadman brake; correct?
10   A    Since the truck stopped, I have to assume that her foot
11        coming off the deadman brake applied the braking.  I've seen
12        some testing from Mr. Rogers, I think is his name, where he
13        did some testing and Raymond has done some testing to give us
14        some idea about a given initial speed, how far it would take
15        for the forklift to stop once the foot has come off the
16        deadman pedal.  We don't know how fast she was going, but I
17        could conjecture a range of distances based on the fact that
18        he evaluated a range of speeds and measured how long it took
19        to stop.
20   Q    Yeah.  Generally Courts don't like conjecture, so I'm going
21        to go back to my question.  You don't know during the event
22        where her foot came off the right foot -- off the deadman
23        pedal?
24   A    I know a range.
25   Q    All right.  But not a precise -- is the range a plus or
```

| | | |
|---|---|---|
| 1 | | minus? |
| 2 | A | The range would be -- it's going to be between 3 and 8 feet. |
| 3 | Q | Okay. |
| 4 | A | It would be 8 feet if she was traveling at the maximum speed |
| 5 | | of the forklift, and I think it was 3 feet if she's traveling |
| 6 | | at 1 and a half miles per hour. |
| 7 | Q | I'm sorry.  Yeah.  One last question.  The x-ray images that |
| 8 | | you showed and the one that showed what you described as the |
| 9 | | skin, that was the skin and the sock too; right? |
| 10 | A | That's what I understand, that's correct. |
| 11 | Q | All right.  Thanks very much. |
| 12 | | MR. LoCOCO:  Your Honor, nothing further. |
| 13 | | THE COURT:  How long is your redirect going to |
| 14 | | take, do you think? |
| 15 | | MR. WARSHAUER:  Two minutes, maybe less. |
| 16 | | REDIRECT EXAMINATION |
| 17 | BY MR. WARSHAUER: |
| 18 | Q | You were asked about, after the event, things that Lidy |
| 19 | | Anderson said.  If she said she slipped, is that consistent |
| 20 | | with a loss of balance? |
| 21 | A | Yes. |
| 22 | Q | Is that a synonym for "loss of balance"? |
| 23 | A | Yes. |
| 24 | Q | If she had made a driving error and somehow lost control at |
| 25 | | the beginning of this turn down the aisle, is the injury |

1      mechanism that you saw consistent with someone who intended

2      to jump off?

3    A    No.  I think if she lost control, she -- my understanding is

4      Mrs. Anderson had a lot of experience.  I expect she would

5      have tried to stop the forklift or tried to jump off and move

6      herself far enough away so she would not have been injured.

7      And I didn't -- and I don't think that having her foot

8      interact with that steered wheel is consistent with that.

9                     MR. WARSHAUER:  Thank you.

10                    MR. LoCOCO:  It's lunchtime, Your Honor.

11                    THE COURT:  All right.  What I like to hear.

12                    MR. LoCOCO:  No further questions.

13                    THE COURT:  All right.  Let's -- sir, you may

14      step down.  Thank you.  Is there any reason to keep this

15      witness?

16                    MR. LoCOCO:  No, Your Honor.

17                    THE COURT:  All right.  All right, ladies and

18      gentlemen.  Let's -- we'll try -- we'll come back at -- we'll

19      start at 10 after 1.  That gives you an hour for lunch.  And we

20      are in recess.

21                    (Jury exits at 12:07 p.m.)

22                    (Recess from 12:07 p.m. to 1:12 p.m.)

23                    MR. WARSHAUER:  Judge, what we'll do, I think I

24      will read the stipulation of the parties regarding the past

25      medical expenses, just read that into evidence.  Is that --

 1                        THE COURT:  That's fine with me, however you want
 2          to do it.
 3                        MR. LoCOCO:  I'll just confirm or stipulate.
 4                        (Discussion off the record.)
 5                        (Jury enters at 1:13 p.m.)
 6                        THE COURT:  Thank you.  Everyone be seated.
 7                        All right.  We're back on the record in Anderson
 8          v. Raymond.  Before the next witness is called, my understanding
 9          is that you wish to read a stipulation to the jury; is that
10          correct?
11                        MR. WARSHAUER:  Yes, sir.
12                        THE COURT:  All right.
13                        MR. WARSHAUER:  This is a stipulation of the
14          parties regarding past medical expenses.  The parties to this
15          case, Adelaida and Jeff Anderson and the Raymond Corporation,
16          hereby stipulate that the medical bills incurred to date to
17          treat Adelaida Anderson's injuries related to her July 29, 2017,
18          accident at the FedEx Supply Chain facility in Effingham,
19          Illinois, total $870,776.
20                        The parties further agree that Raymond's
21          stipulation to these amounts is not to be construed by you, the
22          jury, as an admission of liability or responsibility for any of
23          these damages or any other damages for which Plaintiff may
24          provide evidence.  Raymond specifically denies it is liable or
25          responsible for any of the damages claimed by the plaintiff.

1    This stipulation is being entered to simplify the case so the

2    plaintiff does not have to present evidence on these amounts.

3              MR. LoCOCO:  And we so stipulate, Your Honor.

4              THE COURT:  Thank you.

5              All right.  Call your next witness.

6              MR. WARSHAUER:  Your Honor, the plaintiff calls

7    Jan Klosterman.

8              THE COURT:  Come on up here, ma'am.

9              (Witness sworn.)

10              THE COURTROOM DEPUTY:  Would you please state

11    your full name and spell your last name.

12              THE WITNESS:  Jan Klosterman,

13    K-l-o-s-t-e-r-m-a-n.

14              THE COURTROOM DEPUTY:  Thank you.

15              MR. WARSHAUER:  Good afternoon.

16                        DIRECT EXAMINATION

17    BY MR. WARSHAUER:

18    Q    And good afternoon to you, Ms. Klosterman.  Please tell us

19         your professional address.

20    A    My professional address is 410 Sovereign Court, and that's

21         Saint Louis, Missouri.

22    Q    What do you do?

23    A    I'm a registered nurse and certified nurse life care planner.

24    Q    What have we asked you to do?

25    A    I've been asked to prepare a life care plan for Ms. Anderson.

1    Q    What is a life care plan?

2    A    A life care plan, it's the document that I have here that

3         we'll all be discussing.  It is a concise plan of care and

4         treatment that is required by Ms. Anderson as a result of her

5         amputation.  It includes, you know, medical care,

6         medications, mobility devices, whatever it is that she needs

7         to function or to have her function restored to the highest

8         level that's possible, and looks towards the prevention of

9         complications.  Costs are attached as well, so it's not only

10        a plan of care but it's also the cost for that care.

11   Q    Tell us about your formal education and professional

12        experience that qualifies you to help us understand Adelaida

13        Anderson's life care needs.

14   A    First and foremost, I'm a registered nurse.  I graduated from

15        the Jewish Hospital School of Nursing here in Saint Louis in

16        1979.  I have 42 years of nursing experience.  More than 25,

17        probably closer to 28 of that, is assessing people in their

18        homes.  In addition to that, I am certified and have been for

19        about 22 years as a nurse life care planner.  There's other

20        certifications that I hold too, but don't directly impact

21        what I have done here.

22   Q    Well, how does one become a certified life care planner?

23   A    First, you have to have a certain amount of clinical

24        experience.  You have to have a, you know, licensure as a

25        registered nurse.  Experience in case management or rehab

1    nursing is preferred.  You have to take, I guess it was about

2    120 hours of coursework, and an exam to be certified as a

3    life care planner.

4  Q  What is the process that you followed in coming to the life

5    care plan that we'll be talking about in a few minutes?

6  A  Well, I follow the same methodology every single time, as do

7    other life care planners, you know, in the industry.  And it

8    starts with a medical record review and then an assessment of

9    the patient.  It involves some physician collaboration.  The

10   treaters involved in her care have also participated with me

11   in developing this plan, as well as cost research to identify

12   the cost of her needs or services in her community.

13  Q  Was there any actual interaction with Mrs. Anderson and her

14   family?

15  A  Yes.  I ordinarily do an on-site assessment and do that in

16   person in their home, but due to the constraints of COVID, we

17   had to do a Zoom video assessment.  And Mr. Anderson was

18   very -- he was very good at this, very helpful in showing me

19   around the house.  I didn't feel limited in any way on the

20   information that I gathered because we covered everything.  I

21   could see -- I could see everything and we could discuss

22   everything that needed, you know, to be done.

23  Q  All right.  So we're going to show you --

24                  MR. WARSHAUER:  What is this exhibit, Jasper?

25  BY MR. WARSHAUER:

1  Q   119 is the medical records.  It's about 5,000 pages.  That's

2      part of the -- your work, is to review the medical records;

3      is that right?

4  A   Yes, it is.

5  Q   Did you feel comfortable that you obtained the appropriate

6      understanding of Ms. Anderson's physical injuries as well as

7      her future needs?

8  A   Yes.  As a cumulative process, reviewing the records and my

9      on-site, you know -- or my Zoom assessment, I felt like I

10     obtained all the information I need to make good decisions

11     about her needs currently and into the future.

12 Q   So part of this process is to come to dollar amounts that

13     you've sort of referenced.  If we were to take an -- one of

14     the -- there's lots of different needs.  Can you name several

15     of those for us, different line items in your report?

16 A   Oh, sure.  As I talked about before, we -- there's some

17     mobility aides, wheelchairs, walkers, those kinds of things,

18     some adaptive material or devices, help at home, doctor's

19     appointments, transportation needs, medications.

20 Q   Okay.  And you've placed that in your life care plan, the

21     process and how -- and the numbers that relate to those?

22 A   I have.

23             MR. WARSHAUER:  Your Honor, that's been marked as

24     Plaintiff's Exhibit Number 1.

25             THE COURT:  Are you moving for its admission?

1          MR. WARSHAUER:  I am.

2          MR. MURPHY:  No objection, Your Honor.

3          THE COURT:  All right.  Exhibit 1 will be

4     admitted without objection.

5     BY MR. WARSHAUER:

6  Q   So let's talk about when the jury looks through this and they

7     come to line items.  How do we build line items?  So let's

8     give us a relevant one that we can talk about, mobility

9     items, prosthetics.  Choose one of those and then maybe we'll

10    talk about one other.  Just the process so we can get a sense

11    of it.  I assume the process is the same for all of them; is

12    that fair?

13 A   Prosthetics is a little different, because I do that in

14    collaboration with her prosthetist.  But again, you identify

15    the need, that you look at usage, you talk to him about how

16    the fitting is going, and he has -- the prosthetist has

17    supplied her with a definitive prosthetic.  So in order for

18    him to make that, there are code numbers that are all the

19    separate pieces that make up a prosthesis.  Each one of those

20    has a cost, and so that is basically how we come up with the

21    cost for prosthetics.  And then there is, you know, customary

22    replacements that are needed due to wear and tear and change

23    of the shape of her residual limb that are necessary to keep

24    her walking and up, safe, and comfortable and doing that on

25    her prosthetic.

1    Q    We'll hear from Mr. King tomorrow morning, I think.  Just to

2         pay for prosthetics, what's the cost of that in the future?

3         And this is written in the plan, of course.

4    A    Right.  Well, I don't have those totaled all by their self,

5         because we have replacements of the full prosthetic, then the

6         socket only, then there are some supplies, liners and things

7         she wears on her leg to help attach the prosthetic.  And then

8         her prosthetic -- prosthetist and I have also recommended a

9         swim device for swimming, which has its own set of, you know,

10        items that are, you know -- which make up the prosthetic and

11        the socket.  And just to be clear, the socket is the part

12        that fits on her leg that holds the device to her leg, and

13        then a full prosthetic is not only the socket, but the full

14        leg and all the components including the foot.

15   Q    So maybe it would be helpful if we went to page 50 of your

16        report?

17   A    Correct.

18   Q    There we go.  So we're all looking at page 50 and we see a

19        chart.  Can you see 50?

20   A    I can.

21   Q    Okay.  And at the top of that, it says "Prosthetics," and

22        then over on the left "Full prosthetic placement, socket

23        replacement, cosmetic cover," et cetera.  So what's that

24        left-hand column?  That's the item, I guess?

25   A    The left is the -- well, it's the product or the services.

1      So each line item represents a component of her prosthetic

2      care, so this whole section under prosthetics is what

3      constitutes her needs going forward.  And then the next

4      column is "Frequency."  That's how often it needs to be

5      replaced.  And then there's a high and low cost --

6   Q  Let me stop you, because you said it says "during life

7      expectancy."  How do you arrive at life expectancy?

8   A  I rely on the United States Vital Statistics system report.

9      They publish a life expectancy table for Americans in the

10     United States, living in the United States.  So you go by age

11     and gender.

12  Q  Okay.  And then you have values at low, high, et cetera?

13  A  And those are the cost -- the cost research that I did.  So

14     in this -- in her community, the high and low numbers is the

15     range of cost you would find from various providers.

16  Q  We'll talk to Mr. King tomorrow, but if it had been, say, the

17     kind that Walter Reed gives to our veterans, absolute state

18     of the art, that would be a higher number?

19  A  Those are very high-tech electronic devices.  That is not

20     what Mrs. Anderson has.

21  Q  Okay.  So this is sort of the mid range, if you will?

22  A  Yes.

23  Q  Okay.  And then you go to lifetime low and lifetime high.

24     When you say "lifetime high," is that sort of your worst case

25     scenario for where we are now for this same quality leg?

1    A    That is the lifetime cost of her leg and all the replacements

2         that we need.  And I might point out that her particular

3         provider that she's using right now is the high number.

4    Q    Okay.  So just to keep what we have would be the $181,506?

5    A    Correct.

6    Q    So we add up those items, and that's a large item.  Now if we

7         scroll up, "Therapies and Services," we see items -- let's

8         take attendant care.  1,725,720.  How do you arrive at that

9         kind of a number and why do you think it's necessary for her

10        best life in the future?

11   A    Well, Ms. Anderson has not been -- and this injury has not

12        made it back to her pre-level of functioning.  She was very

13        active before this happened.  She enjoyed walking, hiking,

14        gardening, played golf once a week, was very energetic and

15        active, loved her job.  In the course of her job, walked

16        three miles almost every day just in the course of, you know,

17        what she was doing at work.  The other thing that was part of

18        this is she used to like to dress up and wear high heels and

19        had a closet full of beautiful shoes.  And with her

20        prosthetic now, just as far as walking with the prosthetic,

21        it's safer for her to have more sensible shoes, and so her

22        dressing-up activities have been scaled way back.

23   Q    So why would she need care, though?  Why would we --

24   A    Oh, I'm sorry.  Yes.  She has not -- I guess one of the

25        surprising things when I did my on-site -- or my assessment

1   by Zoom, she had not achieved in three years since her injury

2   any level of normal ambulation.  The amount that she could do

3   at one time was only two hours.  That was basically due to

4   endurance.  It's a lot more difficult and takes more energy

5   to walk on a prosthetic.  But she was having difficult with

6   her fitting and having a lot of phantom pain and other

7   neuropathic pain, which was severely limiting the amount of

8   wear that she could tolerate with her prosthetic on.

9            So in resorting to hopping on one foot with a

10   walker or doing her activities from her wheelchair, it's far

11   more difficult to do laundry -- which by the way, is in her

12   basement -- to clean, bend, stoop.  She has difficulty due to

13   pain with static standing, which means she can't stand in one

14   place for a long time, so she has to alternate when she's

15   cooking or doing little dishes at the sink.  She has to

16   frequently sit down, you know, and alternate periods of

17   standing with periods of sitting in a chair.  Well, you can

18   imagine how burdensome just chores around the house, pickup,

19   cleanup, and, you know, cleaning.  Certainly her gardening is

20   just very, very difficult.

21            We still want her to have those things and to

22   not struggle or to be totally dependent on Mr. Anderson.  So

23   it's my belief and her treaters' belief that she would

24   benefit from some assistance at home with activities that

25   require standing, you know, prolonged ambulation, activity,

1    bending, stooping, and that kind of thing.

2                    Now while she's a little bit younger and

3    healthier, that doesn't require as many hours.  However, with

4    the aging process, when you take age and disability, it makes

5    it a little more difficult to maintain your strength and

6    endurance.  You're more prone to falls.  She will have

7    increased safety needs in her transfers.  And so I've

8    increased for the latter stages of her life, you know,

9    increased her attendant care.

10                   My main concern with this attendant care is

11   what happens if something happens to Mr. Anderson.  Certainly

12   we don't want her to be totally dependent on her 15-year-old

13   son if something happens to Mr. Anderson.  His health is very

14   questionable.  And I would not want her for safety or quality

15   of life to be without some extra assistance.

16   Q   And so that's factored in?

17   A   Yes.

18   Q   So we could go through a lot of these line items.  We've

19       talked about two big ones, the prosthetics and the therapy.

20       But there's -- you also mentioned the house.  You go into

21       people's houses fairly regularly to see, "Is this a good

22       house for somebody who's an amputee?"

23   A   Absolutely not.

24   Q   Well, I -- you didn't get to the question.  The question

25       is -- first, it was a statement, which is you do it, which is

1     a leading question.  How is this house?  Is this a good house

2     for her?

3  A  It has major assessibility issues, even though some things

4     have been done to try to make it better.  But it's -- I would

5     call it assessibility nightmare, frankly.  It's a two-story,

6     but it's like a split-level two-story, and so there's all

7     these different levels on the first level.  It's ramped as

8     you come in, and you come into a foyer level that's -- has

9     level egress with the family room, a guest room, and a

10    bathroom that has been modified.  But that living room -- I

11    guess let's go back to the foyer.  There's three or four

12    steps up into the living room, not the family room.  And

13    there's a lift there, where she can be raised in her

14    wheelchair to that level, so that gets you to the living

15    room, dining room, and kitchen.

16                But from the kitchen, there's two steps back

17    down to the family room and her bedroom, so she has to come

18    back around, take the lift down to that level in order to

19    access that level of the house.  From that upper level, the

20    kitchen, living room area is a full staircase up to the

21    second story, and there are also two steps out to the garage.

22    So everywhere she goes, there's steps that need -- that

23    have -- well, some have remediation; some have not.  But it

24    makes it very difficult to move through the house,

25    particularly -- well, either with her prosthetic or in her

1      wheelchair.  And you have to keep in mind, even though she is

2      ambulatory on her device, her prosthetic, she does not wear

3      it all day, every day.  And so moving through her house,

4      she -- you have to consider her, you know, wheelchair-bound.

5 Q So, Ms. Klosterman, is it your vice that they ought to just

6      give up on this house?

7 A Well, it makes -- even though with the modifications that

8      have been made, it still makes it a difficulty everywhere you

9      turn to have to move the wheelchair to different levels or

10      you have to get on a lift, or, you know, you have -- it's

11      just not ideal at all.  She needs a single level, and there's

12      no way to level this many floors that you -- she really needs

13      to start over in a single-level home where the egress is flat

14      and where she can have, you know, continuous roll in her

15      walking or wheelchair to the different levels.

16               Right now, I mean, her real master bedroom is

17      in the upstairs, as well as her son's bedroom.  So, I mean,

18      she can ride her stair lift up to the top of the stairs.  If

19      she has her prosthetic on, she can walk and visit her son in

20      his bedroom.  If not, somebody -- she rides the lift and

21      somebody has to carry the wheelchair up.

22 Q Or she crawls or hops?

23 A Or she could crawl up or hop up.  I don't think she has the

24      strength and endurance to hop 13 steps.

25 Q From your point of view, as a professional life care planner,

1          is that a reasonable lifestyle to --

2     A    No.  No, it is not.  You should be able to just move through

3          your house and have access to all areas without impediments,

4          you know, impediments everywhere you go.

5     Q    So without going through every line item, you did come to a

6          bottom line, and I'm showing it on page -- at the bottom of

7          page 51.  Now we'll hear from Dr. Tabak in a minute how much

8          money we need to have in today's dollars to fund this.  But

9          what is your best number to give Ms. Anderson the best life

10         that she can have, based on your experience and professional

11         expertise as a life care planner?

12    A    Well, I have a high and a low total here from my cost

13         research and the number of items that she needs.  You know,

14         that impacts the low end, the high end, in addition to what

15         the cost of items are.  I do want to be clear in this plan.

16         This is not everything Ms. Anderson will need in her entire

17         life.  There are limitations with the life care planning in

18         what I call variables, and variables are complications that

19         she may experience ahead of time, some additional medicines

20         or surgical treatment or more advanced, you know,

21         prosthetics.  This is calculated today on the needs that we

22         know within a reasonable degree of certainty that she will

23         need and we have given her standard replacements and that

24         kind of thing.  But they're very well -- I won't say

25         "maybe" -- will be other costs she incurs that cannot be

1     calculated, you know, reasonably or accurately by me sitting

2     here today.

3                So having said that, my range here is

4     $2,095,861.03 on the low, to $3,912,795.83 on the high side.

5     And that's with her needs today.

6  Q  For example, if a leg that would serve her better than her

7     present prosthetic does come out next year, science is always

8     advancing, but it's $160,000, that's not included?

9  A  No, it is not.

10  Q  And is there any money in this life care plan for -- you

11     mentioned things like phantom pain and things like that.  Is

12     there any money for that?

13  A  We go -- we calculate today with the medications that are

14     currently prescribed, so that is her medication budget going

15     forward.  If some new medicine comes out on the market not

16     available in a generic in the future that is helpful to her,

17     that would not be -- that would probably be above and beyond

18     what I've calculated.

19  Q  Is there -- from your evaluation of this case and

20     Ms. Anderson, does she have psychiatric effects from this

21     that are addressed in your plan?

22  A  I've worked with her psychologist to address her needs to the

23     best that we can.  She has severe, significant depression and

24     PTSD as a result of the trauma that she went through.  That

25     requires pretty much lifelong treatment in order to be the

1    best you can be.  So we've outlined a baseline treatment plan

2    for her, with the anticipation that it's not going to keep

3    her from getting worse.  But yeah, I mean, that's not

4    anything any of us can control or know as we sit here today.

5  Q  Ms. Klosterman, you've provided money for the treatment, but

6    you haven't provided money for the pain or suffering; is that

7    right?

8  A  No.  That is not a calculation that is included in this plan.

9  Q  And there's no calculation in this plan for Jeff Anderson's

10   loss of the services that Lidy provided to him?

11 A  No, there is not.

12 Q  Is there a loss of services that she provided to the

13   household in this plan?

14 A  Well, in reducing her dependence on Jeff and helping to

15   restore what her contributions were to the household, there

16   are some household services in there, but that -- that's not

17   everything.

18 Q  All right.

19                      MR. WARSHAUER:  Thank you.  Counsel?

20                      CROSS-EXAMINATION

21 BY MR. MURPHY:

22 Q  Good afternoon, Nurse Klosterman.

23 A  Good afternoon.

24 Q  How are you today?

25 A  I am great.

1   Q   I've read your deposition.  Have you talked to either

2        Mr. Anderson or Mrs. Anderson since your deposition that was

3        in July of 2020?

4   A   No, I have not.

5   Q   So you wouldn't know if things had changed or not?

6   A   I would have been notified if something big had happened --

7   Q   But you haven't been notified?

8   A   I have not been notified.

9   Q   Let's start with the house situation.  It does sound like

10       that would be difficult for her where she's presently living.

11       And in fact, you recommended that she sell that house and get

12       a different house?

13   A   Correct.

14   Q   And you explained she could get an offset; in other words,

15       whatever she sold her house for would be applied against

16       whatever she purchased?

17   A   Correct.

18   Q   They haven't followed your advice, have they?

19   A   Well, I'm not sure they're in a position to do that right

20       now.

21   Q   I didn't ask that question.  I just -- I want to be very

22       careful here so we don't misunderstand each other.  They have

23       not followed your advice that you know of?

24   A   I'm not sure if -- well, I know they know what I was

25       recommending, because I discussed it with them.  But no, they

| | | |
|---|---|---|
| 1 | | have not to date moved from their home that I'm aware of. |
| 2 | Q | Right.  And certainly you can't make them do that or no one |
| 3 | | else can? |
| 4 | A | Well, no.  After this is over -- |
| 5 | Q | Okay. |
| 6 | A | -- they're free to do what they need. |
| 7 | Q | They're free?  They can make that decision? |
| 8 | A | Well, and I think they have, because we discussed what they |
| 9 | | would like to do because it was an unacceptable situation. |
| 10 | Q | But they have not done that? |
| 11 | A | Not today, yes. |
| 12 | Q | Okay.  Now you talked about some apparatus that would make it |
| 13 | | possible for her to swim, which would be a very good thing |
| 14 | | for her; correct? |
| 15 | A | Absolutely. |
| 16 | Q | Get some exercise? |
| 17 | A | Mm-hmm. |
| 18 | Q | Move about? |
| 19 | A | Correct. |
| 20 | Q | Probably help with the depression? |
| 21 | A | If she was, yes, motivated to push herself to do that |
| 22 | | physical activity. |
| 23 | Q | All right.  To your knowledge, she hasn't availed herself of |
| 24 | | that equipment? |
| 25 | A | No.  She was going to discuss that.  The prosthetist tomorrow |

| | | |
|---|---|---|
| 1 | | could tell you what their latest discussions are -- |
| 2 | Q | But to your knowledge, that hasn't happened? |
| 3 | A | Not to my knowledge. |
| 4 | Q | Now you've got some pretty big numbers there for, you know, |
| 5 | | future medications in your report? |
| 6 | A | I think there's one medication and one over-the-counter that |
| 7 | | she uses. |
| 8 | Q | I didn't ask that.  What you have projected, what she might |
| 9 | | need in the future, didn't you tell us you've allowed for |
| 10 | | future medical and drug expenses? |
| 11 | A | Yes, based on what she's currently prescribed. |
| 12 | Q | Okay.  Let me stop you right there.  Now you have recommended |
| 13 | | that she start a regimen of antidepressant pharmaceuticals? |
| 14 | A | Absolutely, as have her treating physicians. |
| 15 | Q | And you, at least when you talked to her, what, a year and a |
| 16 | | half ago, you explained to her that this was important and |
| 17 | | this is something that she should do? |
| 18 | A | It was certainly an option open to her, yes. |
| 19 | Q | No, you told her she should do that, that it would help her, |
| 20 | | didn't you? |
| 21 | A | I did. |
| 22 | Q | Okay.  And she refused; correct? |
| 23 | A | She did.  And -- |
| 24 | Q | And you said, "Please, please consider it, because it will |
| 25 | | help you get better."  Right? |

1    A    I didn't know that was a question, but that's correct.

2    Q    Well, that is my question.

3    A    I believe --

4    Q    Did you tell her, "Please take the medication and you can get

5         better"?  Did you tell her that?

6    A    I told her that there was medication available for her to

7         take and to please consider it, because I think it would be

8         very helpful.

9    Q    And she wouldn't do it?

10   A    She has to date decided not to.  She and her husband together

11        made that treatment choice at this very moment to not use the

12        antidepressants.  However, I have calculated them for a

13        ten-year period, number one, because her treaters are

14        recommending it, and she deserves the right to change her

15        mind about that if in the future she doesn't get better and

16        just is darn tired of sitting around waiting to feel better.

17   Q    The doctors have told her that too.  You know that because

18        you've carefully studied the medical records?

19   A    That is true.

20   Q    But she and her husband have decided not to take the

21        medication and that's the way things stand today?

22   A    Today, yes.  Tomorrow, it remains an option.

23   Q    Yes.  But you just told these ladies and gentlemen of the

24        jury that it was reasonably certain that she would need these

25        things, that she would take these things.  Now isn't that

```
 1        what you just told the jury?
 2    A   I did.  And I included that because many patients, after a
 3        while, they sit at home and it dawns on them, "I'm going to
 4        have to work harder to get back to feeling better and doing
 5        more things," and they then consider different treatment
 6        options that should be available to her.  And I can't base a
 7        plan on what patients will and won't do.  I have to provide
 8        the proper care and the pathway to making her the best she
 9        will be.  I can only hope in the future that she will see to
10        reason.  She has 30 years to contemplate --
11    Q   Well, you hope she changes her mind?  You hope she changes
12        her mind, don't you?
13                  MR. WARSHAUER:  Counsel, I'm going to make an
14        objection.  Could she please be allowed to finish her answer?
15                  MR. MURPHY:  That's a pretty long answer, Judge,
16        but I'll let her if she has something to say.
17                  MR. WARSHAUER:  She was still talking.
18                  THE COURT:  Ma'am, was there something else you
19        wanted to say?  Were you finishing your testimony?
20                  THE WITNESS:  I'm -- the only thing I have to say
21        is I'm providing her that opportunity in the future for a
22        limited period of time because she should be able to have that
23        treatment.
24                  THE COURT:  All right.  Thank you.
25                  THE WITNESS:  And that's what I have to say.
```

BY MR. MURPHY:

Q    And my question to you is, what you're telling us is you're
     hoping she changes her mind in the future?

A    Essentially, I hope she sees to reason the benefits or gives
     it a try, because I really believe this is a tool that could
     make her -- help her.

Q    Yes.  And if she would take her medication and start feeling
     better and get over her depression, she might be able to get
     some exercise and get about her life; true?

A    That would be my hope for her, yes.

Q    Yes.  And what I'm asking you, as a professional, a nurse, a
     very experienced person, there's a difference between what is
     reasonably certain to happen and what you hope will happen;
     true?

A    Well, all I can say is that people who are depressed for a
     long time get tired of feeling so miserable that they do
     consider other options.  That's been my experience over all
     these years with patients.

Q    Certainly.

A    And so no, I have no control over Mrs. Anderson when this is
     all over, but I'm providing her the availability of the
     treatment that she needs.  Now what she does, nobody has
     control over.

Q    You talked to her about attendant care as well?

A    I did.

1   Q   And you recommended that it could very well be helpful to her

2       to have some attendant care?

3   A   Correct.

4   Q   And isn't it true that she and her husband expressed to you

5       that they didn't want people in the house that they didn't

6       know or weren't related to?

7   A   Well, they did -- they did have that apprehension.

8   Q   Okay.

9   A   They do --

10   Q   Okay.  I just asked you, is that true they told you that?

11   A   They're apprehensive about it, yes.

12   Q   Now do you know if to this day that there's ever been

13       attendant care in that house, other than maybe friends coming

14       over to help out?

15   A   They pay their friends to do some housekeeping.

16   Q   Okay.  Okay.  And is that what you had in mind for attendant

17       care, somebody to come in occasionally and help them?

18   A   No.  I believe she needs more assistance and that is

19       definitely going to be the case if something happens to

20       Mr. Anderson.

21   Q   And of course, that's true for all of us, isn't it?

22   A   Well, no --

23   Q   If something happens?

24   A   Because the rest of us don't have amputations and a pain

25       syndrome and require help around the house, so I disagree.

1  Q   Now you've also talked about, even today and in your report,

2      about the problems that she's had with her prosthesis?

3  A   Correct.

4  Q   And her doctors and you as well have talked to the

5      possibility of a surgical rescission.  You even -- revision.

6      You even put that in your plan?

7  A   I did.

8  Q   Okay.  And she's resisted that, hasn't she?

9  A   She has said right now she wanted to try everything possible

10     to get in a comfortable fit through prosthetic care before

11     she agreed to any more surgery.

12 Q   And when you talk about a comfortable fit, that's basically a

13     function of how you use your prosthesis and how much you move

14     around and how you adapt to it?

15 A   No, not really.

16 Q   Not really?  Do you know how much she's using her prosthesis?

17 A   I know as of the time -- the last I talked with her, she was

18     wearing it intermittently throughout the day and only two

19     hours at a time.

20 Q   And she doesn't like the prosthesis?

21 A   It hurts her.

22 Q   It hurts?

23 A   And she's been recommended by her physician not to ambulate

24     long distances while it's hurting her so badly.

25 Q   Certainly.  And she's been offered a revision for her

1     prosthesis, hasn't she?

2  A  She has, but there's more to know about what's going on with

3     her residual limb.

4  Q  And that's for the doctors to decide?  I mean, you don't

5     recommend surgery or not; that's for the physicians to?

6  A  Well, a physician would recommend surgery, but I have

7     additional information from the prosthetist about what makes

8     surgery not the total answer to her problem with her fit.

9  Q  Now your medical summary was very thorough and I think we've

10    all -- we've all read it.  And what did you note in your --

11    or in the medical records about her compliancy with her

12    physical therapy?

13  A  Well, I know at times she's not wanting to do it.  It's not

14    an unusual thing that happens, especially when it's very

15    difficult and painful.

16  Q  Nurse Klosterman, but I didn't ask you that question.  I

17    asked you, what did you notice?  And you noticed it had been

18    sporadic at best, her compliancy with her physical therapy?

19  A  That's true.

20  Q  All right.  That's true.  That's true.  Now what you wanted

21    to tell us was, it's uncomfortable and it hurts; right?

22  A  That's true and --

23  Q  And it does?

24  A  Well, and Dr. Chen [phonetic], her rehab physician, wanted to

25    hold off on any further therapy until she got a comfortable

|    |   |                                                                    |
|----|---|--------------------------------------------------------------------|
| 1  |   | fit and could participate and engage more fully.                   |
| 2  | Q | Now to get a more comfortable fit, she has to interact with         |
| 3  |   | her doctors and with her prosthetist; right?                        |
| 4  | A | Correct.                                                            |
| 5  | Q | All right.  To your knowledge, has that happened?                   |
| 6  | A | Well, it was happening at the last engagement we had               |
| 7  |   | together.                                                          |
| 8  | Q | So I guess we'll find out then whether she has decided to           |
| 9  |   | have the surgical revision and work with a prosthetist and          |
| 10 |   | try to get something that feels better for her?                     |
| 11 | A | She is engaged heavily in the prosthetic work.  At the time         |
| 12 |   | of my collaboration with Mr. King, they were trying all sorts       |
| 13 |   | of things to make her fit better.                                   |
| 14 | Q | So -- and that was back when?  2019?                                |
| 15 | A | Right about the time the plan was completed in June of 2020.        |
| 16 | Q | So we should know now whether that's been successful?              |
| 17 | A | Well, it's trial and error.  There was COVID in there, so I         |
| 18 |   | am not up to date on what happened after our discussing it.         |
| 19 | Q | Now if you don't take your antidepressant medicine, it's            |
| 20 |   | going to be hard to become active and carry on with our             |
| 21 |   | rehabilitative --                                                   |
| 22 | A | Not everyone who's depressed takes antidepressants.                 |
| 23 | Q | Did I say that, though?  I'm asking you -- you're a                 |
| 24 |   | professional.  If you will not take the antidepressant              |
| 25 |   | medicines that your doctors recommend to you, it's going to         |

1      be hard for you to participate in painful rehabilitation?

2   A  Well, the pain is part of the problem, and then the

3      depression is part of the problem.  I mean, it makes it

4      difficult because you're not energetic and ready to engage in

5      that kind of, you know, activity, that it's not because of

6      the antidepressant, it is because of the level of depression

7      and the -- her level of pain.  The two combined, it's a bad

8      combination.

9   Q  And isn't it true that she has refused the strong pain

10     medication that has -- her physicians have recommended to

11     her?  I mean, she's taking Tylenol for a below-the-knee

12     amputation.

13  A  Well, she also has a medication Lyrica, which is for the

14     neuropathic pain, but not everyone tolerates heavy-duty

15     narcotics.  If they make you feel drowsy or tired or, you

16     know, have side effects, that there's no reason --

17  Q  I didn't see anything in your report that she had that

18     problem.  She just didn't want to take powerful pain

19     medication.

20  A  And you know what?  That's her choice.

21  Q  Yes, it is.  Yes, it is.  We agree with that.

22  A  And there are none in the life care plan.

23  Q  And if you won't do that, if it hurts too bad to rehabilitate

24     yourself and you won't do something to help it, you're never

25     going to get better.  Do you disagree with that?

1    A    No.  I would never say never.

2    Q    Okay.

3    A    As a nurse, no.  People change.  People get tired.  People

4         get angry.  And they get up and they start working on them

5         self and that's -- happens at a different time for different

6         patients.

7    Q    Nurse Klosterman, you've seen a lot of seriously injured

8         people in your life and done --

9    A    I have.

10   Q    So this is a below-the-knee amputation, which is a bad

11        injury.  But you've seen that and worse in your career?

12   A    I've seen many, many tragic traumatic injuries.

13   Q    And you know the only thing you can do is to go about your

14        business and try to get better and feel better?

15   A    That's right.  And different patients go about it in a

16        different way.

17   Q    Well, but they go about it some way?

18   A    Well, it's just very difficult.  I will tell you that when

19        you are hurting and you are depressed, your mindset is not

20        where it needs to be.  And if we could get her over that

21        hump, she could do some of the things that she really enjoyed

22        before, but she's got quite an obstacle to overcome.  And for

23        now, it's -- she's not as actively participating, but it's

24        the combination of sequela of this injury that has put her in

25        this place.

1  Q   And she's done none of the things that you've recommended to
2      her to do?
3  A   She has tried.  I'm not saying she's not doing anything.  And
4      people -- patients have the right to choose what happens to
5      their bodies, what they prefer.  Over like, do they prefer
6      trying to get a better fit on their prosthetic versus taking
7      a bunch of narcotics.  I mean, she's being proactive in the
8      way she feels is right for her body to get through this.
9      It's not going well, but.
10 Q   But you've told us --
11 A   She has the right.
12 Q   But you've told us today that it's reasonably certain that
13     she's going to incur somewhere between 2,000,000 and 3 and a
14     half million dollars for services that to this date she has
15     just refused.  That's what you just told us?
16 A   I believe the services I have recommended she will receive
17     with a reasonable degree of certainty in my knowledge and
18     experience with these kinds of patients.
19 Q   Now she's four years post her accident; correct?
20 A   Correct.
21 Q   All right.  None of this has happened yet?
22 A   No.  And I --
23 Q   She's complained of pain the whole time, and it's real.  And
24     she's refused to sell her house and get a more comfortable
25     house; right?

| | |
|---|---|
| 1 | A   She's not refusing.  No one said she refused.  She hasn't |
| 2 | done that.  While I don't -- you know -- part of my |
| 3 | assessment is not digging into their, you know, income and |
| 4 | that kind of thing.  I don't know if that's feasible for them |
| 5 | right now. |
| 6 | Q   Well, I looked at your report and you even gave the value of |
| 7 | her house.  You said the fair market value of her house was |
| 8 | equal to or might have even exceeded the value of a small |
| 9 | ranch-style home that you recommend; isn't that true? |
| 10 | A   Well, that is true. |
| 11 | Q   All right.  Thank you. |
| 12 | A   But there's still -- |
| 13 | Q   I'm done.  Thank you. |
| 14 | MR. MURPHY:  That's all the questions I have. |
| 15 | REDIRECT EXAMINATION |
| 16 | BY MR. WARSHAUER: |
| 17 | Q   Finish your answer for us.  There's still... |
| 18 | A   Well, there's still a dollar amount above and beyond what |
| 19 | they can get for their house that they need to get the next |
| 20 | house.  And I'm not sure they -- what the status of their |
| 21 | savings is. |
| 22 | Q   All right.  What is the effect of depression from your |
| 23 | experience of a loss of a leg?  Does it make people |
| 24 | depressed? |
| 25 | A   Oh, my gosh, yes.  Profoundly. |

| | | |
|---|---|---|
| 1 | Q | If that happened simultaneously with their spouse being |
| 2 | | diagnosed with terminal cancer, does it make it even harder |
| 3 | | to overcome the leg? |
| 4 | A | Oh, yes, it's just one more, I guess, loss of normalcy in |
| 5 | | their life that contributes to the depression. |
| 6 | Q | All of these things that were identified as things that |
| 7 | | haven't happened, if this life care plan that you have |
| 8 | | recommended is funded, can we at least make sure that they |
| 9 | | can happen? |
| 10 | A | Yes, that's the purpose. |
| 11 | Q | You just spent the last several minutes talking about whether |
| 12 | | your life care plan is correct or not correct. |
| 13 | | Ms. Klosterman, are there other individuals in the greater |
| 14 | | Saint Louis area who can do life care plans? |
| 15 | A | Yes. |
| 16 | Q | Have you in this case -- has anyone identified anyone who has |
| 17 | | your level of experience, skills, certifications, who has |
| 18 | | looked at your life care plan, other than the lawyers, and |
| 19 | | criticized even a single line of it? |
| 20 | A | No. |
| 21 | | MR. WARSHAUER:  Thank you. |
| 22 | | MR. MURPHY:  Judge, just have about two |
| 23 | | questions. |
| 24 | | THE COURT:  Sure.  Redirect -- I mean, recross? |
| 25 | | RECROSS-EXAMINATION |

1    BY MR. MURPHY:

2    Q    Nurse Klosterman, the other lawyer said, "Well, do you think

3         that they will get these services when they're funded?" Did

4         you hear that question?

5    A    Yes, I did.

6    Q    Do you know of any service at all that's been needed for the

7         plaintiff in this case, any medical service, any help,

8         anything that she hasn't been provided for to date?

9                     MR. WARSHAUER:  Your Honor, I'm going to object

10        to this.  We know where this is going.

11                    MR. MURPHY:  No, you don't.

12                    THE COURT:  Let's do a sidebar.

13                    (Sidebar begins.)

14                    MR. WARSHAUER:  We know he's trying to get

15        worker's comp out here.  Pat, you know you're fishing to get

16        worker's comp out here.

17                    MR. MURPHY:  I'm not about to ask about worker's

18        comp.  I'm 73 years old.  Now he just put in front of the jury

19        that she's not getting this because she's not been getting any

20        help.  She said she has disability, Social Security, every other

21        type of help.  She's not being medicated because she doesn't

22        have money.  She's not getting this service because she doesn't

23        want it.  Now I'm not going to ask about work comp or Social

24        Security, but I can certainly put that question in light of the

25        fact that he opened it up.

1          MR. WARSHAUER:  The question --

2          THE COURT:  You can't get in comp collateral

3     source.

4          MR. MURPHY:  Right.

5          THE COURT:  But the line of questioning suggested

6     that perhaps she's not getting this because she doesn't have the

7     money yet.

8          MR. WARSHAUER:  Actually, the line was very

9     carefully written so that it said, all these things he said she

10    hasn't had, "If we fund this life care plan, will we be sure she

11    has it?"  That's all it was.  It didn't have anything to do with

12    past -- I just said future.

13         THE COURT:  That she can?

14         MR. WARSHAUER:  That it will be ensured that she

15    can get them.  If the life care plan is funded, it will be

16    future.  That was the question.  Future.

17         MR. MURPHY:  She can get it right now.

18         MR. LoCOCO:  She's got it right now.

19         MR. MURPHY:  That's not what I'm doing anyway.

20         THE COURT:  You know what you -- you're going to

21    create a real problem for yourself if you stumble into comp.

22    You can't invite her to suggest, "Well, there's comp or Social

23    Security disability, all these other sources."  So I'll give you

24    a little leeway and hope that you don't trip over it.

25              (Sidebar ends.)

1    THE COURT:  All right.  Would you restate your

2    question or re-ask your question, Counsel?

3    MR. MURPHY:  Judge, I'd just like to restate it,

4    because I don't know that I can remember everything I said

5    verbatim at my extreme age.

6  BY MR. MURPHY:

7  Q   What I'm saying is, all of the services that have been

8      suggested for her to this point in time have been provided to

9      her.  That is to say, if she needed painkillers, they're

10     available.  Do you agree with that?

11 A   Yes.

12 Q   If she needed antidepressant medicine, and she did, it's

13     available?  Yes?

14 A   Yes.

15 Q   And if she made the decision, she and her husband, to sell

16     their home and get a one-story house, she could do that too?

17 A   I can't answer that.  I don't know if financially they can do

18     that at this moment.

19 Q   Well, didn't you put it in your report?  Am I imagining this?

20 A   No, she -- I'm identifying the need.  They don't have it to

21     date.

22 Q   Well, didn't you say her house was worth $240,000 that she's

23     living in?

24 A   Well, they had already contemplated getting a different house

25     and had someone come over to give them a value.

 1    Q    All right.  And they didn't do it?  That's all I'm saying.

 2         I'm not being critical.

 3    A    No, to date --

 4    Q    Thank you.

 5    A    -- they have not done it.

 6                        MR. MURPHY:  Thank you.

 7                        THE COURT:  All right.  Any redirect?

 8                        MR. WARSHAUER:  No, Your Honor.

 9                        THE COURT:  All right.  It's -- thank you.

10                        THE WITNESS:  Thank you.

11                        THE COURT:  You may step down.  Any reason to

12         keep this witness available?  All right.  You're free to go.

13         Let's take a 15-minute break.  We'll start back at 25 after.

14                        (Jury exits at 2:09 p.m.)

15                        (Recess from 2:09 p.m. to 2:29 p.m.)

16                        (Jury enters at 2:29 p.m.)

17                        THE COURT:  All right.  You may be seated.

18         Thanks.

19                        Call your next witness.

20                        MR. WARSHAUER:  Dr. Karen Tabak.

21                        (Witness sworn.)

22                        THE COURTROOM DEPUTY:  Please state your full

23         name and spell your last name for the Court.

24                        THE WITNESS:  Karen Grossman Tabak, T-a-b-a-k.

25                        THE COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. WARSHAUER:

Q    Dr. Tabak, what is your professional address?

A    Well, I have two:  Maryville University in Saint Louis, and
     my home address is in Creve Coeur.

Q    What is your occupation?

A    I'm two of those too.  I'm a professor of accounting and
     economics at Maryville University, and I'm a consultant in
     litigation.

Q    What do you do as a professor in accounting and economics,
     and how does that apply to the work you're doing here?

A    Well, I teach a lot of classes and I do research, and I serve
     on an endless number of committees.  The things that really
     help me are the courses that I teach.  They involve a lot of
     the pieces of the puzzle that I'm putting together today.  So
     I teach things about interest rates and the economy and
     economic damages all as a part of my courses.

Q    What is economics?

A    Well, it's kind of this wizardry stuff where we try to help
     you and help ourselves put together the different tools that
     help us as a -- as a group of people allocate resources in
     the most efficient way.  So the goal of studying economics is
     to understand which parts of the economy, which parts of the
     things that we do to distribute resources, can function the
     best.  And so we look at government and we look at the public

1      sector, the private sector, and we look at consumers to help

2      us understand how the economy or how the system works to make

3      sure people get the resources they need in the most efficient

4      way.

5 Q   What have I asked you to help us understand?

6 A   The -- two pieces. First would be the earning capacity lost

7      by Ms. Anderson as a result of her injury, and the amount of

8      money that's necessary to replace what she would have earned,

9      had she been able to continue working.

10 Q   Can we just call that lost wages?

11 A   Or lost earning capacity, yes. Lost wages.

12 Q   Okay. And what's the other thing?

13 A   We looked at the amount of money necessary today to provide

14      the medical services that she will need for the rest of her

15      life.

16 Q   And we just heard from Ms. Klosterman who told us about the

17      life care plan. Is that the underlying data that you used

18      for that?

19 A   Yes. I took Ms. Klosterman's report and said, "Well, how

20      much money do we need today to hopefully have enough to pay

21      for all of those costs as she ages?"

22 Q   Tell us about your formal education and professional

23      experience that allows you to share with us your opinions on

24      those subjects.

25 A   So I have a bachelor's degree in accounting from Saint Louis

1       University.  I have a master's in business administration

2       from Saint Louis University, with areas of concentration in

3       statistics and economics.  And then I have a Ph.D. in

4       business from Saint Louis University, with a major in

5       accounting and a minor in economics.  And so there, I studied

6       parts of the economy and economic forces as well as -- we

7       call it "data analytics" now; we don't use "statistics."

8       It's got a more grandiose name so you can charge more.  And I

9       also worked in accounting and studied accounting so that I'm

10      better able to understand the tax returns and the pieces of

11      that puzzle that I'm looking at.

12  Q   Okay.  Does this experience help you understand how to bring

13      these numbers down to what we're going to call present value,

14      how much money it costs -- well, first, does it help you do

15      that?

16  A   Yes.  So what we're looking at is what you need today to be

17      able to take out those future costs or what she would have

18      earned.  And then at the end, there's nothing left.  So you

19      need to understand market forces and that leads to what we'll

20      talk about is discount rate.  And you asked me about my

21      experience and I guess I pushed that aside.  I have been

22      doing this for over 30 years.

23  Q   This is not the first jury you've helped understand this?

24  A   No.

25  Q   Okay.  What did you do in this case to come up with the

1        conclusions that we're going to talk about, as soon as you

2        tell us what you did to arrive at them?

3    A   I'm sorry.  Ask me the question again.

4    Q   What'd you do?  What's the process that you used?  First,

5        let's talk about the wages or the lost earning capacity, and

6        let's go through that, and I'll write that number on the

7        board for us.  And then we'll move to the life care plan,

8        because I think it has more subparts.

9    A   So the first thing I did was to look at Ms. Anderson's W-2s

10       to see what she had been earning.  And she had a fairly

11       steady increase in income from 2012 to the last year before

12       she was hurt when she made $60,021.  That was the salary the

13       last full year that she worked.  And she had --

14                   THE COURT:  I hate to stop you.  Ma'am, in the

15       back, are you working on an electronic device?

16                   SPECTATOR:  I'm sorry?

17                   THE COURT:  Are you working on an electronic

18       device?

19                   SPECTATOR:  I am.  I can put it away.

20                   THE COURT:  Or I can have you escorted out.

21                   SPECTATOR:  I'm sorry?

22                   THE COURT:  Or I will have you escorted out.

23                   SPECTATOR:  Okay.  Yeah.

24                   THE COURT:  All right.  Sorry to interrupt.

25                   THE WITNESS:  So the last year that she worked,

1    she made $60,021 and she had fringe benefits, health insurance,

2    and a 401(k) plan.  And I took that figure and I just multiplied

3    that figure, the $60,021, and added 15 percent to it.  So I

4    multiplied it by 1.15 to get her actual earnings at the time of

5    her loss.  I'm sorry.  I didn't -- do you want --

6              I took $60,021 and I multiplied it by 4.1 years,

7    and that was the period from the last day she worked until about

8    a month ago when the report was done.  So that gave us the loss

9    to date of $246,086.  So that assumes that during that entire

10   time, her wages didn't grow.

11   BY MR. WARSHAUER:

12   Q   Okay.  Did you -- if they had grown, it would be a larger

13       number?

14   A   Yes.

15   Q   All right.  So that's one number?

16   A   Yes.

17   Q   Now that just gets us to now?

18   A   Correct.  So for the future, we know that wages have grown

19       during the last four years, and they've grown dramatically in

20       the last year during COVID.  But even before that, they were

21       growing at an average of 2.5, 2.0, 2.7.  I used 2.3 as kind

22       of the average.  My report, my calculations were all done

23       before we got the results of 2020, so this is all pretty much

24       based on 2019-ish numbers.

25              So I assumed that that $60,021 would grow, and

that she'll get fringe benefits -- or she would have earned
fringe benefits going forward. So the loss, the annual loss
to her now is $76,810 as an annual loss right now. That's
what she would be making today with fringe benefits, with
health insurance, and her 401(k) contribution. That's what
she would be making today with just kind of the wage growth
that we had been seeing before these last -- this last year.

Then I took that figure, that $76,810, and
assuming that she would take that money and invest it, how
much does she need today to be able to pull off $76,810?
Which will grow a little bit in the future, because she's
going to earn interest in it, but it would have grown a
little bit in the future anyway because wages go up. So I
reduced it to present value. I assumed that money, the money
that you would -- that she would be given would grow
2 percent more than wages would grow. Now that's not what's
happening right now, but historically, money has grown
2 percent more than wages.

Right now we're in a really funny time where
wages are growing more than money, and if that continues,
there won't be enough here. But I'm assuming we will at some
point get back to a new normal, where money will continue to
grow a little bit more than wages will grow.

So today, in order to give her what she would
have earned for the next ten and a half years --

1   Q   Ten and a half years being a projected retirement age?

2   A   Assuming she would retire at age 65, we're looking at

3       10.6 years from September 30th to her retirement.  That would

4       be 10.6 years is my understanding, that she intended to

5       retire at age 65, even though she's not eligible for Social

6       Security until 67.  She would need today $727,162.

7   Q   700 -- and what?

8   A   27 --

9   Q   727,000?

10  A   Yeah, 727,162.

11  Q   And what is the total of that for the wage loss portion

12      of (unintelligible.)

13                      (Interruption by court reporter.)

14  BY MR. WARSHAUER:

15  Q   What is the total of the past and future for the lost earning

16      capacity that you've calculated?

17  A   $973,248.

18  Q   Now to make sure that we understand this right, if that

19      money -- the first part, money that's already passed, already

20      lost.  But if we take the 727,162 and we invest it in the

21      reasonable pool of investments that you've described and she

22      just takes her wages, doesn't go on a wild trip, just takes

23      her wages and lives the lifestyle she previously enjoyed, at

24      retirement, how much would be left?

25  A   Nothing.

1    Q    Okay.  So now let's move to the life care plan.

2         Ms. Klosterman explained to us the various elements.  So --

3         and gave us a number as well as a lot of line items there in

4         Exhibit Number 1, which is her life care plan.  What did you

5         do with that information to arrive at a single number, that

6         if invested in a reasonably safe investment and drawn down

7         whenever she needed the things on the plan, that again at her

8         death, would be zero left?

9    A    So I used a 2 percent discount rate for wages.  Okay?  But we

10        know that medical costs have grown more than wages have

11        typically grown, so I used a lower discount rate.  And I went

12        through each item on Ms. Klosterman's report, and I said,

13        "Well, is this medical care, is this wages, or is this some

14        other type of commodity?"  And I discounted every single item

15        on Ms. Klosterman's report based on the appropriate discount

16        rate to get the amount of money she would need today to take

17        care of all of those costs.

18   Q    All right.  So if we had an amount of money -- we'll call

19        this the life care number -- how much money do we need in

20        today's dollars, invested in a reasonably safe investment, so

21        that there would be zero dollars left if she was able to

22        spend that, not if there was a -- something extra cost.  That

23        would leave it negative; right?

24   A    Yes.

25   Q    But how much money do we need just to fund what

1      Ms. Klosterman helped us understand about life care expenses?

2   A   Well, at the highest care level, she would need $3,014,062.

3   Q   Dr. Tabak, these numbers that you have just shared with us,

4      do they include anything for physical pain and suffering?

5   A   No, they do not.

6   Q   Do they include anything for emotional pain and suffering?

7   A   No.

8   Q   Do they include anything for loss of consortium or support

9      that Jeff Anderson would have received and recovered from his

10      wife?

11  A   No.  There's no services around the home in these costs.

12  Q   Not even services around the home, the -- if she can't cook

13      dinner one night, you didn't include that in?

14  A   No.

15  Q   Are you comfortable in your -- based on your professional

16      experience and formal training as an economist and accountant

17      that the numbers you have provided to us are appropriate and

18      fair?

19  A   I believe they are reasonable and conservative.

20              MR. WARSHAUER:  Thank you.

21                     CROSS-EXAMINATION

22  BY MR. MURPHY:

23  Q   Good afternoon.  You're a Grossman?

24  A   Yes.

25  Q   There was an economist Grossman that was around many years

```
1         ago.
2    A    Yes, that was my father.
3    Q    Okay.
4                     THE COURT:  Lou?
5                     THE WITNESS:  Leroy Grossman.
6    BY MR. MURPHY:
7    Q    I knew him well.  Dr. Grossman, first, I'm not going to
8         quarrel with your discount rate whatsoever.  If I understood
9         what you just said, just said, you simply determined how much
10        money it would take today to create the stream of payments
11        required in the future.  Now that being said, you have to
12        accept everything that Nurse Klosterman said as being
13        accurate?  In other words, when she says "This person will
14        have these expenses," that's what you're basing it on?
15   A    My calculations are based on her life care plan, that is
16        correct.
17   Q    Right.  And to the extent that her estimates are incorrect,
18        accordingly, the number that you come up with would not
19        reflect reality?
20   A    If her numbers change, my numbers would change, yes.
21   Q    Your formula would be correct; it's just the result would be
22        different?
23   A    Correct.
24   Q    And I noticed one thing.  You extended her lost income out to
25        age 65, but you took her medical expenses out until death?
```

1    A    Yes.  My assumption is that she would stop working at age 65,

2         but that she would live longer than that, and so the care is

3         to her life expectancy.

4    Q    Just so we're all clear on that.  And to the extent that

5         Nurse Klosterman was wrong, then it'd almost be directly

6         linear; your ultimate result would be wrong to the same

7         extent?  In other words, if she worked a quarter time, her

8         lost future earnings would accordingly be 25 percent less

9         than what you reported here just recently?

10   A    I'm sorry?

11   Q    I'll try that again.  I think you said she had ten years of

12        her working life left?

13   A    She -- it's my understanding that she was -- intended to

14        retire at age 65.

15   Q    Okay.

16   A    So that's --

17   Q    And it's your understanding from Nurse Klosterman that she

18        would never earn any more money; she just simply would not

19        ever work again?

20   A    Not with the life care plan that's been provided, yes.

21   Q    That's what I mean.  And if in fact she did work some, then

22        your number would be reduced accordingly?

23   A    If she's able to work without accommodations.  There's no

24        accommodations built into this report.

25   Q    Right.  Right.  And on future medical expenses, if it

1    didn't -- if they weren't that high, if she actually didn't

2    have those expenses or didn't need them for whatever reason,

3    then your figure would change?

4  A  If she didn't need these, but -- and didn't need others, yes.

5    That is true --

6  Q  And of course, you would have no way about knowing about

7    other expenses because you're relying on Nurse Klosterman?

8  A  Correct.  But sometimes when you take away -- economists are

9    great.  We were the first physicians, or we were physicians,

10   the first economists.  When you take away one thing, it

11   impacts some thing else.  So if you take away one kind of

12   care that Ms. Klosterman might have had in her report, and

13   you substitute it with something else because that's what she

14   needs, then those numbers would change, yes.

15 Q  And Nurse Klosterman just told her that every patient has a

16   right to refuse recommended treatment if that's what they

17   choose.  You certainly agree with that, wouldn't you?

18 A  Yes.

19 Q  And all I'm saying is, to the extent Nurse Klosterman's

20   numbers aren't right, then your ultimate result will not be

21   right?

22 A  If her numbers change, then my numbers would change, yes.

23 Q  Right.  Now just a few more things.  All economists who are

24   involved in the kind of work that you are have to work off of

25   general assumptions, for instance, your life expectancy.  I

```
 1          think you said somebody in her position's got 33 years of
 2          life left; is that right?
 3     A    It was less than that, but yes.
 4     Q    Some people live longer; some people live less?
 5     A    That's correct.
 6     Q    All right.  And same thing with -- same thing with working.
 7          Sometimes people -- their job goes away and they don't get to
 8          work; right?
 9     A    That's correct.
10     Q    But you're just looking at the nation as a whole?
11     A    For her retirement age, I used the information that she
12          provided, that she intended to work until age 65, even though
13          based on her year of birth, she's not able to retire at full
14          Social Security benefits until 67.
15     Q    Yes.  And of course when she's -- you say she would work
16          until then, assuming there's a job and that she can get the
17          job in her individual case?
18     A    Yes, it assumes she could continue to find employment.
19     Q    Sure enough.  Sure enough.  Have I asked you anything that
20          seems askew or wrong?
21     A    No.
22                    MR. MURPHY:  Thank you very much.
23                    THE COURT:  Redirect?
24                         REDIRECT EXAMINATION
25     BY MR. WARSHAUER:
```

| | |
|---|---|
| 1 | Q   If Lidy Anderson turns out to need more care, or, for |
| 2 | example, prosthetics that are vastly more expensive become |
| 3 | available that could improve her life, the number you've |
| 4 | provided, even at the highest end, will be short, won't it? |
| 5 | A   Yes. |
| 6 | MR. WARSHAUER:  That's all. |
| 7 | THE COURT:  All right.  Thank you.  You may step |
| 8 | down.  Anyone going to need this witness subject to recall? |
| 9 | MR. WARSHAUER:  No, Your Honor. |
| 10 | MR. LoCOCO:  No, Your Honor. |
| 11 | THE COURT:  All right.  You're free to go.  All |
| 12 | right. |
| 13 | MR. WARSHAUER:  Your Honor, our next witness is |
| 14 | going to be Dr. Jeffrey Low.  It's going to be by deposition, if |
| 15 | the Court wants to talk about that with the jury or not. |
| 16 | THE COURT:  All right.  Is it going to be read or |
| 17 | is it going to be played? |
| 18 | MR. WARSHAUER:  It's going to be played. |
| 19 | THE COURT:  All right. |
| 20 | MR. WARSHAUER:  Takes 29 minutes and some change. |
| 21 | THE COURT:  All right.  It's not uncommon that |
| 22 | witnesses will appear not in person, but by video deposition. |
| 23 | Is there any objection to this deposition? |
| 24 | MR. LoCOCO:  No. |
| 25 | THE COURT:  All right. |

1          MR. MURPHY:  There was one objection, Judge, at

2     the very end, and it's withdrawn.  So if you just tell the jury

3     that.

4          THE COURT:  All right.  So what you're going to

5     see is you're going to see the next witness being questioned by

6     Plaintiff's Attorney and then cross-examined by Defense Counsel.

7     It's going to be played to you.  At the end, there's an

8     objection that you will hear.  The defendant decided to withdraw

9     the -- withdraw the objection, and so you're not to concern

10     yourself with that, whether the objection was meritorious or

11     not.  You're going to hear the testimony.  You're to give it the

12     same weight that you would give if the witness was available and

13     appearing here in person.  All right.

14          MR. WARSHAUER:  I have not looked at this.  I'll

15     apologize to the Court ahead of time.  I didn't know I'd be in

16     the video.  I would have worn a necktie.

17          THE COURT:  All right.

18          MR. WARSHAUER:  I probably wouldn't have had my

19     office in the background.  At any rate, this will be the

20     beginning of this.  If we can get the signal, please.  There I

21     am.

22          (Video deposition of Dr. Low played.)

23          THE COURT:  All right.  It is 3:30.  Do you have

24     any other witnesses that we can get to today?  I've got a half

25     hour before I would like to make sure that I have the jurors

1    wrap up for the day.  Do you have something we can do the next

2    half hour?

3                        MR. WARSHAUER:  Give me two minutes and we'll

4    chat.

5                        THE COURT:  I'll give you five minutes.  You guys

6    can take a quick five-minute break.  We are in recess for five

7    minutes.

8                        (Jury exits at 3:27 p.m.)

9                        (Recess from 3:27 p.m. to 3:35 p.m.)

10                       (Jury enters at 3:35 p.m.)

11                       THE COURT:  All right.  Please have a seat.

12                       In all fairness to the parties, I want to get you

13   out of here at a reasonable time.  If we start the next witness,

14   there's not a chance that we can do that witness justice and,

15   you know, break up the testimony.  So I have determined that it

16   would be best to just go ahead and let you guys go for the day.

17   There's always stuff for us lawyers to do outside the presence

18   of the jury, so we'll let you go tonight so if we start

19   tomorrow, things are fresh.  Appreciate your patience.  We are

20   moving a little ahead of schedule, which is a good sign.

21                       So with that, you're gone for the day.  Be back

22   here so that we can try to start by 9 o'clock.  We're in recess.

23   Adjourned until tomorrow.

24                       (Jury exits at 3:37 p.m.)

25                       (Recess at 3:37 p.m.)

```
 1
 2                    o  o  o  o  o  o  o  o  o  o  o
 3                COURT REPORTER'S CERTIFICATE
 4              I certify that the foregoing is a correct
          transcript from the record of proceedings in the above-entitled
 5        matter.
 6
                   Dated this 21st day of December, 2021
 7
 8        /s/ Hannah Jagler
 9        _____
10        Hannah Jagler, RMR, CRR, FCRR
          Official Court Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```