IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
------------------------------------------------------------------
ADELAIDA ANDERSON and JEFF ANDERSON,  |
                                      |
                  Plaintiffs,         |
                                      |
v.                                    | Case No. 19-cv-800-SPM
                                      |
RAYMOND CORPORATION,                  |
                                      |
                  Defendant.          |
------------------------------------------------------------------
```

Transcript of Jury Trial - Volume IV
November 4, 2021

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East Saint Louis, Illinois

```
------------------------------------------------------------------
```

**REPORTED BY:**       **HANNAH JAGLER**, RMR, CRR, FCRR
                   Official Court Reporter
                   750 Missouri Avenue
                   East Saint Louis, Illinois 62201
                   618-482-9481
                   Hannah_Jagler@ilsd.uscourts.gov

Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES**:

FOR PLAINTIFF:        **MICHAEL J. WARSHAUER**
                      **JASPER V. ABBOTT**
                      Warshauer Law Group, PC
                      2740 Bert Adams Road
                      Atlanta, Georgia 30339
                      404-892-4900
                      Mwarshauer@warlawgroup.com
                      Jasper@warlawgroup.com

                      **FRANK J. McCOY, JR.**
                      McCoy & McCoy, LLC
                      20 Church Street, Suite 1720
                      Hartford, Connecticut 06103
                      860-244-9100
                      Frank@mccoymccoy.com

                      **RYAN E. BRENNAN**
                      Brennan Law Firm PC
                      19 Bronze Pointe
                      Belleville, Illinois 62226
                      618-236-2121
                      Ryan@feladlc.com

FOR DEFENDANT:        **FRANCIS H. LoCOCO**
                      Husch Blackwell LLP
                      555 East Wells Street, Suite 1900
                      Milwaukee, Wisconsin 53202
                      414-978-5305
                      Frank.lococo@huschblackwell.com

                      **G. PATRICK MURPHY**
                      Murphy & Murphy, LLC
                      3415 Office Park Drive, Suite D
                      Marion, Illinois 62959
                      618-248-3236
                      Gpatrick@murphymurphyllc.com

                      **MARGARET KATHRYN HEITKAMP**
                      Husch Blackwell LLP
                      511 North Broadway, Suite 1100
                      Milwaukee, Wisconsin 53202
                      414-978-5373
                      Margaret.Heitkamp@huschblackwell.com

## INDEX

PAGE

WITNESS: **BRYAN KING**

    Direct Examination By Mr. Warshauer.....................  476

    Cross-Examination By Mr. LoCoco.........................  497

    Redirect Examination By Mr. Warshauer...................  503

WITNESS: **JEFF ANDERSON**

    Video Deposition Played.................................  512

WITNESS: **ADELAIDA ANDERSON**

    Direct Examination By Mr. Warshauer.....................  515

    Cross-Examination By Mr. LoCoco.........................  551


## INDEX OF EXHIBITS

| NO. | DESCRIPTION | ID'D | RCV'D |
| --- | --- | --- | --- |
| 9 | Photos of Prosthetic Supplies.................. | 546 | 1105 |
| 10 | Photos of House............................... | 547 | 1105 |
| 42 | Photo-Jeff and Adelaida; J. Anderson Depo...... | 512 | 1105 |
| 43 | Photo-Jeff and Adelaida in Woods; J. Anderson . Depo | 512 | 1105 |
| 44 | Photo-4 Family Members; J. Anderson Depo....... | 512 | 1105 |
| 45 | Photo-Adelaida At Grand Canyon; J. Anderson ... Depo | 512 | 1105 |
| 46 | Photo-Jeff and Adelaida With Newspaper; ....... J. Anderson Depo | 512 | 1105 |
| 47 | Photo-Adelaida in Dress; J. Anderson Depo...... | 512 | 1105 |
| 48 | Photo-Adelaida in Pool; J. Anderson Depo....... | 512 | 1105 |

49    Photo-Adelaida in Grass; J. Anderson Depo...... 512    1105

50    Photo-Adelaida in Climbing Tree; J. Anderson .. 512    1105
      Depo

51    Photo-Adelaida in Lake; J. Anderson Depo....... 512    1105

52    Photo-Adelaida on Motorcycle With Son; ........ 512    1105
      J. Anderson Depo

53    Photo-Adelaida Shoveling Snow; J. Anderson .... 512    1105
      Depo

54    Photo-Jeff and Adelaida With Son; J. Anderson . 512    1105
      Depo

55    Photo-Adelaida on 4-Wheeler; J. Anderson Depo.. 512    1105

56    Photo-Adelaida With White Horse; J. Anderson .. 512    1105
      Depo

57    Photo-Adelaida on Brown Horse; J. Anderson .... 512    1105
      Depo

58    Photo-Adelaida on Horse and Jeff; J. Anderson . 512    1105
      Depo

59    Photo-Adelaida and 2 Horses; J. Anderson Depo.. 512    1105

60    Photo-Adelaida in Hospital Room With Son; ..... 512    1105
      J. Anderson Depo

61    Video-Adelaida Post-Injury; J. Anderson Depo... 512    1105

62    Photo-Adelaida in Hospital Pre-Amputation; .... 512    1105
      J. Anderson Depo

563   Safety on the Move............................ 530    1108

583   FedEx Supply Chain Production OSHA Report...... 566

1          **TRANSCRIPT OF PROCEEDINGS**

2          (Proceedings commenced at 9:01 a.m.)

3          THE COURTROOM DEPUTY:  United States District

4   Court for the Southern District of Illinois is now in session,

5   the Honorable Stephen McGlynn presiding.  You may be seated.

6          Calls Case Number 19-cv-800, Adelaide Anderson,

7   et al., v. Raymond Corporation.  Parties, please state your name

8   for the record.

9          MR. WARSHAUER:  Michael Warshauer for the

10  plaintiff.  Good morning.

11         MR. BRENNAN:  Ryan Brennan for Plaintiff.

12         MR. McCOY:  Frank McCoy for Plaintiff.

13         MR. ABBOTT:  Jasper Abbott for the plaintiff.

14         MR. LoCOCO:  Frank LoCoco for Raymond.

15         MR. MURPHY:  Patrick Murphy for Raymond.

16         MS. HEITKAMP:  Margaret Heitkamp for Raymond.

17         THE COURT:  All right.  We've not brought the

18  jury in yet.  My understanding is the parties want to take up

19  something on the record before we bring the jury in this

20  morning; is that correct?

21         MR. LoCOCO:  Yes, Your Honor.  One issue with the

22  next witness, and then one issue with Mr. Anderson's video

23  deposition.  They decided to play his video dep instead of

24  putting him on the stand.

25         THE COURT:  All right.

1          MR. LoCOCO:  Which under Rule 32, you're

2     permitted to approve because of infirmity, et cetera, so we're

3     not even going to argue about that.

4          The prosthetist was identified as a potential

5     trial witness.  He was identified to talk about his treatment,

6     evaluation, and rehabilitation of Mrs. Anderson.  There were

7     no -- there was no report from him.  He's a treater.  This

8     morning -- I appreciate Mr. Warshauer showing this to me.  I'm

9     told that he intends to talk about a number of different

10    prosthetic limbs that are available to an amputee such as

11    Mrs. Anderson.  None of those were ever identified as exhibits.

12    And I also understand that he intends to ask Mr. -- I forget his

13    name, I apologize.

14          MR. WARSHAUER:  King.

15          MR. LoCOCO:  About the cost for those various

16    limbs.  Several of those limbs were not included or discussed or

17    priced out in the life care plan.  If they had been, that might

18    have changed our view of whether to get a testifying life care

19    planner.  So under Rule 26 and -- mostly under Rule 26 and

20    under -- and given the evidence that we've -- that's been

21    elicited so far, this witness should not be allowed to talk

22    about any of the limbs that weren't included in the life care

23    plan, and also for which there's no evidence that Mrs. Anderson

24    would ever use those limbs in the future.  We'd be substantially

25    prejudiced.  I don't know the prices of any of those, and

1      there's no way to cross-examine those prices today.

2                THE COURT:  Your response?

3                MR. WARSHAUER:  Yes, sir.  I think our

4      identification of Mr. King as a testifying witness expert under

5      Rule 26 will be broad enough to cover everything we're going to

6      do.  With respect to whether or not the life care plan includes

7      a particular cost, I specifically pointed out to the jury what

8      it does include.  It does include a present.  And then I asked,

9      "Well, what if in the future she wanted bigger, better, that was

10     more expensive?"  And the life care planner said, "Well, that

11     wouldn't be included."  "That wouldn't be enough money to cover

12     it?"  "No."

13                Then Ms. Klosterman said, "And people sometimes

14     do get better and they do decide that they want to really

15     improve their lives."  And she talked about that in some degree

16     of detail, particularly on cross.

17                So Mr. King has brought with him a series of

18     prosthetics.  We plan to do a couple of things with Mr. King.

19     One is we're going to talk specifically about Lidy Anderson's

20     care, what prosthetics she's had, the difficulty she's had with

21     fitting those prosthetics, pain, et cetera.  We're going to talk

22     about the options available to her, and in the process of doing

23     so, it's relevant to talk about what they cost.  They're not

24     going to be like $50,000.28.

25                It will be what she has now, "Is this more

1    expensive?  About what -- how much does this run?"  "Well, if

2    she gets to a point where she thinks this is in her best

3    interest, this is a $50,000 limb, and if we put a suction device

4    on it, it goes to about 70."  That's something that has -- that

5    is relevant.  The jury can consider it.  And we specifically

6    talked with Ms. Klosterman about it.  The number we presented

7    didn't include it, but the option that it might be something the

8    jury wants to consider in the future was absolutely alluded to.

9                    THE COURT:  It's certainly relevant.  The

10   question is, if he hasn't been -- it's my understanding that he

11   was identified as a potential fact witness.

12                   MR. WARSHAUER:  Potential expert witness.  We did

13   do a Rule 26 disclosure.

14                   THE COURT:  You did.

15                   MR. WARSHAUER:  But keep in mind, that's not the

16   same level of detail one would expect from a retained expert.

17                   MR. LoCOCO:  He's a treater, Your Honor.

18                   THE COURT:  All right.  He's identified as a

19   treater.  And you have all his treating notes?

20                   MR. LoCOCO:  We have his treating notes, yes,

21   sir.

22                   THE COURT:  But is this going to be go above and

23   beyond what's in his notes?

24                   MR. WARSHAUER:  I think it goes consistent with

25   our identification, which Jasper's looking for it right now,

 1    what the disclosure was.  But I recall the way we typically do

 2    it.  He would be talking about prosthetics, future needs, future

 3    options.  I kind of make that a broad sentence.  It's not really

 4    very prejudicial at all anyway.  The jury wants to know what the

 5    options are.  That clearly is there.  Whether -- even if we were

 6    excluded to talk about the cost, I should still be allowed to

 7    say, "Is this more expensive than what she has?" because we did

 8    leave that open, and the options are available to her.

 9                    That is part of the treatment that he is

10    providing to her and in the future and continuously talks to her

11    about.  Like swim legs, that's an a option.  She doesn't

12    presently have one but he would like her to have one.  That's

13    part of his treatment.  She doesn't have a running leg.  She'll

14    testify she used to be on the treadmill all the time.  It would

15    be something she wants.  It's not part of the treatment plan.

16    It's not presently something she owns.

17                    THE COURT:  What document is your Rule 26

18    disclosure in?

19                    MR. WARSHAUER:  Excuse me?

20                    THE COURT:  Because I'm going to have to go back

21    and see --

22                    MR. LoCOCO:  Well, Your Honor, I'll read it to

23    you.  We found it.  It's right here.  This is what it says.  I

24    should put my glasses on.  "Bryan King is a prosthetist who

25    provided prosthetic services to the plaintiff after her injury.

1     Mr. King will be expected to testify based upon his observations

2     and professional evaluation of the plaintiff and the facts

3     contained in its medical records, which have been produced to

4     the defendant and are incorporated by reference and made a part

5     of this disclosure.  He's expected to testify as to the nature

6     and extent of Plaintiff's injuries, her prognosis, and the

7     limitations faced by Plaintiff after incurring the injuries,

8     during her recovery, and into the future.  He is expected to

9     discuss prosthetics available to the plaintiff as well as the

10    cost and durability of these devices and associated supplies."

11             Your Honor, I assume that last sentence catch-all

12    is what Mr. Warshauer is relying on, but the related issue is

13    that for a medical opinion to come in, the standard is that the

14    testifier, which is why you require Rule 26 reports, has to be

15    able to state that it's reasonably certain that she will need

16    this device, this surgery, this therapy, if not now, into the

17    future.  And I don't think -- we haven't been given any

18    disclosure that says she is reasonably certain to need or to use

19    any of these high-tech limbs that Mr. King has brought with him

20    today, which we're seeing for the first time.

21             MR. WARSHAUER:  I think that disclosure was put

22    in my notes.  We're going to be talking about costs and future

23    needs.

24             THE COURT:  I don't know what's in the medical

25    records.

1          MR. WARSHAUER:  It's --

2          THE COURT:  Wait.  I don't know what's in the

3     medical records.  Generally, when you're disclosing a treater

4     and you -- if you want to go above and beyond what's in their

5     records and notes, you really got to say "And we also intend to

6     have this."  Now he does say that he's expected to testify about

7     what prosthetics may be available and their respective costs, so

8     you're put on notice.  How are you prejudiced because you

9     decided not to take the deposition or go further?  How are you

10    prejudiced?

11         MR. LoCOCO:  Yeah.  So I'm going to do it by

12    metaphor.  Very first trial I observed as a lawyer back in 1986,

13    there was a treater.  It was a quadriplegic case, forklift

14    actually made by Yale.  Quadriplegic -- tetra-quadriplegic.  He

15    still had his hands.  And in the disclosure -- we didn't have a

16    report requirement then.  Nobody did.  In the disclosure, it

17    said he's going to talk about his medical records, et cetera,

18    et cetera, and he's going to talk about injury causation.

19    Right?  Which has a real technical meaning now.

20         The guy gets on the stand and goes through a real

21    injury causation analysis, not treatment.  And they did the same

22    thing, said "You're on notice."  We tried to hire somebody in

23    the middle of trial and the Court wouldn't let us do it because

24    of the significant prejudice of that.  Well, shame on us.  And

25    that had happened to a lot of parties.

1      So the rules were changed so that if you're going

2  beyond the medical records, you have to write a report, to give

3  reasonable notice.  I don't think that throw-away line at the

4  end of the disclosure is reasonable notice that they intend to

5  come in here and say, "Well, she could have gotten a $70,000 --

6  she could get a $70,000 limb in the future that has a motor in

7  it" versus "I don't know what the limb costs that she's wearing

8  today."  I assume we'll hear that.  We should hear that.  I

9  mean, and that's been taken into account in the life care plan.

10  So that's prejudice.

11      The additional prejudice is, if we had had the

12  costing for those, we could have compared them, gotten our own

13  prosthetist, and possibly named him or her as an additional

14  retained testifying witness.  The way that was written, you

15  could look at any of the other disclosures about the docks,

16  they're all going to say the same -- same type of thing, that --

17  lawyers do catch-alls, so.

18          THE COURT:  I understand.

19          MR. WARSHAUER:  Well --

20          THE COURT:  The key, you're saying, is that there

21  was no report --

22          MR. LoCOCO:  Correct.

23          THE COURT:  -- generated because it is above and

24  beyond what is part of his ongoing treatment or his historic

25  treatment.  Anything else?

1          MR. WARSHAUER:  "Expect to discuss prosthetics

2  available to the plaintiff."  "Available to the plaintiff" is

3  present and future tense word, as well as the cost and

4  durability of these items.  It's not a throw-away line.  I don't

5  use availability of prosthetics with any other treater.

6          Additionally, Your Honor, it's a way big

7  difference between some doctor who's going into sophisticated

8  medical causation and a prosthetist.  And I don't in any way

9  mean to demean that profession, but we're not talking about

10  connecting a drug to a disease here.  We're talking about the

11  mechanics of what is available to her as a device, which we said

12  he's going to talk about.  These are available to her right now.

13  Forget about the future.  They are available to her right now if

14  she's able to use them.  And they do have a cost.  Both of those

15  were disclosed.

16          They weren't going to hire another life care

17  planner and they weren't going to hire another prosthetist.

18  They've never done that.  Nobody ever hires two prosthetists.

19  It's silly.  I don't --

20          THE COURT:  They could have taken his deposition.

21          MR. LoCOCO:  Mm-hmm.

22          THE COURT:  If they thought, "Oh, this guy's

23  going to come in and he's going to say, 'Oh, by the way, there's

24  another 5-, $600,000 worth of prosthetics that are in the

25  queue,'" that all she has to do is say "I want them" and then

1    there's another $500,000 in damages.  Certainly relevant.

2                    But the issue is, we have rules that make sure

3    that our trials proceed in a fair way.  And one of the ways we

4    the Courts have tried to make sure they proceed in a fair way is

5    to avoid these last-second -- avoid surprises or allowing

6    witnesses to talk beyond what they were initially identified as

7    the subject matter of their discussions.  So I'm going to -- I'm

8    going to do a little research on this, look at the disclosures,

9    pull up -- what document?  You guys read it to me.  What

10   pleading?

11                   MR. LoCOCO:  It wasn't filed, Your Honor.

12                   THE COURT:  Pardon me?

13                   MR. LoCOCO:  It wasn't filed.  We could e-mail it

14   to you.

15                   THE COURT:  All right.  I'll be back in ten

16   minutes.

17                   MR. LoCOCO:  Thank you, Your Honor.

18                   (Recess from 9:15 a.m. to 9:25 a.m.)

19                   THE COURT:  Please be seated.  All right.  We're

20   back on the record in Anderson v. Raymond.

21                   We have the motion with respect to Bryan King.

22   Rule 26 requires disclosures.  Under (1)(A)(iii), it's required

23   that there be a computation of each category of damages claimed

24   by the disclosing party who must also make available for

25   inspection and copying under Rule 34 the documents or other

1      evidentiary material, unless otherwise privileged or protected

2      from disclosure on which each computation is based, including

3      materials bearing on the nature and extent of injuries suffered.

4              Under Rule 26(2)(B) -- I'm sorry, (2)(C)(ii), for

5      witnesses to not provide a written report:  Unless otherwise

6      stipulated or by order of the Court, if a witness is not

7      required to provide a written report, the disclosure must state,

8      quote, a summary of the facts and opinions to which the witness

9      is expected to testify.

10             The disclosure as written says an important part.

11     He's expected to testify as to the nature and extent of

12     Plaintiff's injuries, her prognosis and limitations faced by

13     Plaintiff after incurring the injuries during her recovery in

14     the future.  It starts off by saying, "Mr. King will be expected

15     to testify based upon his observations and professional

16     observations --" I'm sorry.  Professional -- let me start that

17     over again.  "Mr. King will be expected to testify based upon

18     his observation and professional evaluation of Plaintiff and the

19     facts contained in his medical records, which have been produced

20     to the defendant and are incorporated by reference."  The facts

21     contained in the medical records.

22             It also says, "He is expected to discuss

23     prosthetics available to the plaintiff as well as the costs and

24     durability devices and associated supplies."  However, it does

25     not set out in the disclosure the facts of what those costs may

1    be or how long they are expected to last.  It just says that he

2    may be giving those opinions.

3                It further says in the disclosure, "It is

4    expected that the witness will refer to his medical records and

5    in particular his patient notes.  It's expected that the

6    photographs of Plaintiff will be used with this witness.  It is

7    expected that prosthetics of the kind Plaintiff has and should

8    have will be used.  It is possible but less likely that medical

9    bills will also be used with this witness."  And it says there's

10   a high probability that this expert will be called as a witness.

11               I don't know what's in his medical records.  But

12   it does not sound like under Rule 26(A)(iii) that the plaintiff

13   has produced a computation of each category of damages including

14   materials that support the computation as to these prosthetic

15   devices that Mr. King may be referencing.  I don't think that --

16   well, there's a summary of opinions.  There's not a summary of

17   the facts.  It doesn't say what prosthetic devices he

18   anticipates she will need.  It does not say what the prospective

19   costs are.  And so I don't think that you're going to be able to

20   get into what the costs are.  And I think that was the specific

21   objection of the defendant.

22               If in the medical records it supports either that

23   they discussed or he had contemplated different prosthetic

24   devices that he may show, then he certainly may show those and

25   talk to them about it.  But I'm not going to allow him to come

1        in and talk about the costs.

2                    MR. LoCOCO:  Thank you, Your Honor.  I just want

3        to add one thing for the record, and since Mr. King is here,

4        he'll hear this.  I think everyone agrees, I think he'll say

5        this, that he's not a physician, so he can't prescribe a

6        prosthetic limb anyway.  He can only fill the order.  And

7        there's no doctor opinion saying she would need any of these

8        other ones in the future.  So I just --

9                    THE COURT:  Well, certainly his knowledge of

10       prosthetics is going to be greater than the average juror's, and

11       so I'm going to give him a lot of leeway --

12                   MR. LoCOCO:  Sure.

13                   THE COURT:  -- in testifying what's within his

14       scope.  Obviously the doctors can talk to --

15                   MR. WARSHAUER:  So --

16                   THE COURT:  -- professionals with his credentials

17       and say, "What do you think about this?  What do you think about

18       that?  Or what do you have that could accommodate her desire to

19       swim or to run a marathon?"

20                   MR. WARSHAUER:  So, Judge, what I intend to do,

21       based on the Court's ruling, based on the "have" and "should

22       have" language of the disclosure, we will talk about a range of

23       options, everything from what she has to less expensive to more

24       expensive.  I will not ask the cost.

25                   THE COURT:  You're not even going to say,

"Here's -- this is the Cadillac model.  It costs a lot more than what we -- what the other person said."

MR. WARSHAUER:  I can't even say "That's more expensive"?

THE COURT:  You can't say it's more expensive. You can just say, "Here's other prosthetics that are available," if that's contemplated in his records.  All right?  All right.

MR. LoCOCO:  The other issue, Your Honor, just from a time-saving perspective, is it deals with the video of Mr. Anderson's trial testimony that was taken in February.  As part of that video, the plaintiff showed a cell phone camera video of a moment -- I don't even know when, because I don't recall what the foundation was -- when Mrs. Anderson is shown on her bed in night clothes, having a spasm involving her amputated leg, writhing in pain, wailing.  It's something awful to listen to, a close-up on the limb showing the muscle spasm, and we've objected to this.

If you read the first part of the deposition, I spent two pages objecting to it, going into the trial testimony, and we continued to object to it.  I don't think it's actually relevant, given the other testimony we're going to have.  But putting that aside, it's certainly -- its prejudicial effect far outweighs any probative value it has.

THE COURT:  And now you're bringing it to my attention?  These are the sort of things, as I said, if there's

1    evidence that's going to be coming in and there's a problem, I

2    want to know ahead of time.  I don't want to be asked to shoot

3    from the hip.

4                    MR. LoCOCO:  Well, I understand that, Your Honor.

5    Until last night -- until this morning, we were being told

6    "We're going to try and put him on the stand and not use the

7    video."

8                    MR. WARSHAUER:  We were always going to use the

9    video of Ms. Anderson.

10                   MR. LoCOCO:  And I've always objected to it, and

11   I think we've noted -- I don't know if that -- and that

12   particular video, we objected to in our --

13                   THE COURT:  All right.  Let me ask you this.

14   Who's going to be first?

15                   MR. WARSHAUER:  Bryan King's going to be first.

16                   THE COURT:  All right.  So let's -- we'll do

17   Mr. King.  We'll break.  I'll view the -- somebody can then get

18   queued up the part of the deposition and I can hear your

19   objections.

20                   MR. LoCOCO:  It's also separately listed as

21   Exhibit 61.  I guess that's your old number.  I don't know what

22   it is right now.

23                   MR. McCOY:  I think that's the new number.

24                   MR. LoCOCO:  New number.  It's 61, to which we

25   objected under 401 and 403.

1               MR. McCOY:  It's about a 20-second video.  I

2    don't know the exact time, Your Honor, but it's a very short

3    video.  38 seconds.

4               THE COURT:  All right.  The other thing I think

5    we have to put on is under Rule 32, use of depositions in court

6    proceedings, under Rule 4 -- or 32(4)(C), a party may use for

7    any purpose the deposition of a witness, whether or not the

8    witness -- I'm sorry -- whether or not a party, if the Court

9    finds that the witness cannot attend or testify because of age,

10   illness, infirmity, or imprisonment.

11              Now Mr. Anderson has attended every day of trial.

12   There are -- there were times during the trial proceedings where

13   he excused himself for reasons the Court did not inquire about.

14   But on what basis am I to find that, due to illness or

15   infirmity, he cannot testify, since he is present?

16              MR. WARSHAUER:  He has been present, Judge.  As

17   the Court is aware, he has cancer.  The cancer is requiring him

18   to take drugs.  The cancer is also just wearing him out.  He

19   will not be able to sit and offer intelligent responsive answers

20   very long as a witness.  He does only drive part of the way both

21   directions.  He drives to get out of town and then they let

22   their 15-year-old do the long driving, because his concentration

23   does not allow him to even drive back and forth from Effingham.

24              He has throughout the trial had to excuse himself

25   to be ill, to be sick.  So he is presently quite ill.  And it

1    appears to be to my observations, the stress of the trial seems

2    to have -- or being here, whatever, seems to have made him iller

3    each day.  It certainly gets worse as the day goes on.  I don't

4    think that we -- and I have met with him and talked to him, and

5    sometimes I am not getting answers that I believe are responsive

6    to simple questions.  They're rambling.  They're nonresponsive.

7    And I don't think that he would be able to represent himself

8    appropriately or fairly as a witness before the jury.

9                THE COURT:  All right.  Mr. LoCoco, do you have

10   any objections?

11               MR. LoCOCO:  I'm sorry?

12               THE COURT:  Do you have any objection to the use

13   of the deposition, other than what you've raised as parts within

14   the -- or objections that you raised during the course of the

15   deposition that you're not waiving?

16               MR. LoCOCO:  We do not.  I mean, we can sit here

17   and ask you to require a doctor's note.  We're just not going to

18   do that under the circumstances.

19               THE COURT:  All right.  Then under the

20   circumstances, what I will do is I will announce before his

21   deposition is played, that the jury has been introduced to

22   Mr. Anderson, and you have seen him here during most of the

23   trial.  But Mr. Anderson is ill, and the rules allow me to

24   permit deposition testimony be presented of a witness, even if

25   the witness is available, if I find that due to illness or

1    infirmity, it would be appropriate to allow the party to play

2    his deposition as opposed to calling him as a witness.  Anybody

3    have any objection to that type of explanation?

4              MR. WARSHAUER:  I think that's appropriate, Your

5    Honor.

6              MR. LoCOCO:  We don't, Your Honor.  I'll just

7    add, less is more.  As you know from our pretrial filings, we're

8    sensitive to how much of this is actually relevant.  So --

9              THE COURT:  I understand.

10             MR. LoCOCO:  But obviously the jury should get

11   some explanation.

12             THE COURT:  The jury should get some explanation.

13             MR. LoCOCO:  Yep.

14             THE COURT:  All right.  So why don't we -- let's

15   let the jury know we're going to bring them in at 9:45.  And

16   based upon my rulings thus far, you can think about how you want

17   to handle your next witness.  We're in recess until 9:45.

18             (Recess from 9:40 a.m. to 9:46 a.m.)

19             (Jury enters at 9:46 a.m.)

20             THE COURT:  Please be seated.

21             Ladies and gentlemen, if I'd have known we

22   weren't going to be able to get started until 9:45, I'd have let

23   you sleep in this morning, so I apologize.  But as is typical,

24   there's a lot that goes into these cases, and there's a lot that

25   we have to do outside the presence of the jury.  Things come up

1    and it's just -- it's just the nature of trying to make sure

2    that I try to give a fair trial and that we present it to you in

3    the fairest way and in the most appropriate way.

4                    So with that, call your next witness.

5                    MR. WARSHAUER:  Good morning.  The plaintiff

6    calls Mr. Bryan King.

7                    (Witness sworn.)

8                    THE COURTROOM DEPUTY:  Please state your full

9    name and spell your last name for the Court.

10                    THE WITNESS:  Bryan David King, K-i-n-g.

11                    THE COURTROOM DEPUTY:  Thank you.

12                            DIRECT EXAMINATION

13   BY MR. WARSHAUER:

14   Q    Good morning, Mr. King.

15   A    Good morning.

16   Q    What is your professional address?

17   A    2600 South Raney Avenue in Effingham, Indiana -- or Illinois,

18        I'm sorry.  62401.

19   Q    What do you do?

20   A    I'm an orthotist and prosthetist, so I provide prosthetic

21        care and orthotic care to patients who are referred to us.

22   Q    What is that?

23   A    Prosthetics is designing and fitting an artificial limb for

24        someone who's lost a limb, either through a disease process

25        or trauma.  So we get a referral from a physician or a

1       physical therapist, and then we evaluate the patient and

2       formulate recommendations that we think are going to best

3       meet their needs, and then we get medical documentation

4       support from the physician to move forward with our plan.

5   Q   What kind of training and education and experience do you

6       have that allows you to work in the field of prosthetics?

7   A   I have an undergraduate degree in health science from Purdue

8       University.  From there, I went to Northwestern University,

9       where I had two long-term certificate degrees in orthotics

10      and prosthetics.

11  Q   There's a couple ways we can talk this morning.  One is, I

12      want to get a sense of how prosthetics work, and then I want

13      to focus on Lidy.  So let's start with the idea of how

14      prosthetics work, what the various prosthetics that are out

15      there for lower limbs, and then we'll talk specifically about

16      how you've dealt with Lidy's injuries.  I think that makes

17      the most sense.  Is that okay with you?

18  A   Sure.

19  Q   So when we're talking -- today we're going to be talking and

20      focusing on a below-the-knee amputation.  So when we start

21      there, when you have that in general come to you, what are

22      you thinking, and where are you going to go with that?  How

23      do you formulate a treatment plan, if you will?  How do you

24      formulate what prosthetics you're going to offer to them, and

25      how do these prosthetics work?

1    A    Yeah.  So initially, it's essentially an interview with the

2         patient, trying to determine what their pre-amputation

3         lifestyle was, what kinds of activities were they typically

4         engaging in.  Lidy is not our typical patient in that our

5         typical prosthetics patient is an individual who has diabetes

6         or advanced vascular disease and typically a whole host of

7         health issues related to that.  So when we have someone come

8         in as a traumatic amputee, the dynamics are a little

9         different in that we know having lost a leg traumatically is

10        typically going to be a different psychological impact than

11        someone who's lost a diseased limb, where losing this limb is

12        liberating to some extent.  So it's a lot different, so we're

13        sensitive to that.

14                  Obviously we do a physical assessment.  We

15        look at the residual limb and assess the length and the

16        health of the soft tissue, because the prosthesis -- the part

17        that I make is called the socket.  That's the top of the

18        prosthesis that her residual limb -- and I refer to it as a

19        residual limb instead of a stump.  The residual limb fits

20        into that socket, and that socket is custom-made in a way

21        that it distributes pressure evenly around soft tissue in the

22        residual limb so the patient can bear all of his or her

23        weight comfortably in walking on that.

24                  So I have to look -- I have to do a physical

25        assessment and determine what kind of -- what kind of socket

1    are we going to make.  There are some that sort of target

2    specific regions of the residual limb and soft tissues.

3    There are some -- the more frequent way we do it now is what

4    we call total surface bearing, where we essentially make a

5    mold of the residual limb and we're shooting for even

6    pressure distribution over the entire limb.  Historically, we

7    would create reliefs or voids over bony areas that might be

8    sensitive to pressure.  The total surface bearing starts

9    where we're loading every square inch of that residual limb

10   uniformly as much as we can.

11   Q   What if they gain weight or lose weight over their life?  Do

12       you have to start over?

13   A   Sometimes.  And that's a reality for any amputee is volume

14       fluctuation.  That's a normal part of it.  For a new amputee,

15       we know -- I always emphasize to those folks, the first

16       prosthesis that you get is going to last the shortest length

17       of time of any that you'll have, because the residual limb is

18       going to change dramatically in the first year as they start

19       walking on it.  You're going to have soft tissue and muscle

20       that's going to naturally atrophy or shrink down.  So the

21       amputee can manage that up to an extent by adding socks

22       over -- typically there will be a cushion liner on the

23       residual limb first, and then they, as they lose volume, they

24       will add socks over that liner to keep the socket tight and

25       so that it's comfortable so bear weight in it.

1        But there's really a limit to how much sock it

2   can pack on over the liner or the residual limb before we

3   say, this limb has changed enough in size or shape that we

4   need to remake the socket.  So it's not uncommon in the first

5   year to have two, sometimes three socket replacements.  And

6   when we do a socket replacement, we just replace the socket,

7   and then the existing prosthetic foot is transferred onto the

8   socket.

9  Q   Well, I interrupted you in the socket, because I was curious

10     what happened if they lose or gain weight.  So you are sort

11     of telling us that you're starting with the building of the

12     socket, and then I guess you've got to figure out what goes

13     below the socket, the choice of how that socket connects to

14     the residual limb?

15 A   Yeah.

16 Q   You have some options there?

17 A   Right.

18 Q   So let's talk about -- do you want to finish up on the

19     socket, the choice of how it hooks on, if you will?

20 A   Yeah.  So we refer to that as suspension or how the

21     prosthesis is suspended or attached to the residual limb.  Do

22     you want to know all the options, or?

23 Q   Yeah.  I'd like to know -- well, we can focus mostly on Lidy.

24     What were the options available to her?  What were the

25     benefits and detriments to each?

1    A    Yeah.  Well, when she first came to me, she already had a
2         prosthesis that had a locking pin suspension system, where
3         she has a silicone or mineral oil gel liner that she rolls
4         onto her residual limb, and then there's a metal pin that
5         attaches to that liner.  She inserts her residual limb into
6         the socket and that pin goes into a locking mechanism, so
7         it's mechanically locked on.
8    Q    All right.  So let me stop you there.  You said "rolled on."
9         So she puts her leg on and then --
10   A    I have one, if you --
11   Q    That's even better.
12   A    Okay.  Yeah.  So is it okay to show the mechanism?
13   Q    Sure.
14   A    Okay.  So this is a liner that we would typically use for a
15        below-knee amputee.  And what she has to do is reflect this
16        thing inside out completely, and then roll it onto the
17        residual limb like this.  And once that's on the residual
18        limb, then this metal pin will go into a locking mechanism in
19        the bottom of the socket and it locks on like that.
20   Q    Okay.
21   A    Okay.
22   Q    And that's what she had initially?
23   A    That's what she had initially.  I took her out of that
24        because she was having problems.  She was having comfort
25        issues.  And the reality is, when we fit someone with this

1    type of suspension system, we're really attaching the

2    prosthesis just on the end of this liner.  So we know there's

3    going to be some movement between the residual limb and the

4    socket.

5  Q    Does that create safety or balance issues?

6  A    It can -- it can create balance issues.  But the bigger issue

7    is when you have movement within that socket, rubbing issues,

8    where the limb is prone to get sores because it's just moving

9    too much.  So we want as little movement between her residual

10   limb and the socket as possible.  So the other thing is, the

11   better we suspend this prosthesis, the better we attach it to

12   the residual limb, the lighter it's going to feel.  Every

13   amputee will tell you, when they first start out wearing a

14   prosthesis, this thing weighs a ton.  It's because it's

15   not -- it's not part of the body.  It's something that's

16   attached and suspended off of you, right?  But we know the

17   better -- the more secure attachment we get, the lighter it's

18   going to feel.  So the perception of weight is really

19   minimized when we have really good suspension.

20             So the first thing I did for Lidy was to put

21   her in a suction suspension.  So --

22  Q    How's that work?

23  A    With suction suspension, the pin's gone.  She still has a

24   cushion liner, but it's -- it's no longer a means of

25   suspension, but it just serves as a cushion interface between

1    her and this hard socket.  So the same routine for her,

2    rolling that onto the residual limb, but rather than having

3    to lock into some kind of mechanism in the bottom of the

4    socket, she inserts her leg into the socket, and then there's

5    an outer sleeve on here that rolls up onto her thigh and

6    makes skin contact to create a seal.  Then there's a one-way

7    air expulsion valve down in the bottom of the socket that

8    will evacuate air and not let anything come back in.

9  Q  Do you have one of those you can show us?

10 A  I do.  So that was kind of an easy thing to observe and think

11   that this might help her, this might help her comfort, her

12   stability, her confidence.  So this is just one example where

13   there's a little air expulsion valve on the back of the

14   socket.  So after she rolls the liner onto the residual limb,

15   inserts her leg into the socket, then she has to roll this up

16   onto her thigh and it has to make skin contact to create an

17   air seal.  And then if she walks, all the air's evacuated.

18   So now this leg is held on over the entire surface of the

19   residual limb and not sort of dangling off of a pin.

20 Q  And that's a better system?

21 A  It's a better system.

22 Q  Okay.

23 A  It's more secure.

24 Q  So we've talked about socket, talked about the suspension

25   system.  Now what is the next thing we've got to consider

1       when we're --

2    A  The next big thing is, what kind of foot are we going to put

3       on this patient?  There's a lot of technological development

4       in prosthetic feet and it moves fast.  So when I got into

5       this field over 30 years ago, the feet available to us, there

6       were far less feet than we have now.  So that's where we want

7       to know what was her lifestyle before she lost her leg.  What

8       kinds of things do you want to get back to doing?  And we

9       want to provide a foot that will best meet those needs.

10              So obviously, you know, if I see a 20-year-old

11      traumatic amputee who wants to return to playing softball or

12      volleyball and returning to work full-time versus an

13      85-year-old brittle diabetic whose goal is household

14      ambulation, there are radically different feet options for

15      those folks.  And it's kind of everything between those ends.

16   Q  I think over the next couple of hours today, we're going to

17      learn that Lidy was fairly active.  We've already learned she

18      worked in manual labor as a forklift operator.  I think we

19      will learn she enjoyed riding horses.  She enjoyed running

20      treadmill.  She enjoyed walking, shopping.  She enjoyed

21      wearing high heels.  She enjoyed swimming.  Did she share

22      with you those kinds of things as part of her discussions

23      with you, that she was an active woman?

24   A  Yeah.  I don't recall outlining specifics, but yeah, just in

25      our casual conversations in the treatment room, it was clear

1        that she was active --

2    Q   Okay.  So what --

3    A   -- prior to the amputation.

4    Q   -- are the kinds of feet available to her, and what did she

5        eventually end up with?

6    A   Well, again, I'm going to reference what she had when she

7        came to me.  She had a foot that has a hydraulic ankle on it.

8        So unlike this foot, the ankle will bend up and down, and the

9        user can adjust the hydraulic resistance for whatever walking

10       activity she's going to be engaged in.  That's nice, but for

11       her, it was heavy.  So that was just a tradeoff that ended up

12       not being good.

13               So we put her in a -- just a standard carbon

14       fiber, what we call an energy storing or dynamic response

15       foot.  So the way it works is, when she's walking, whatever

16       load she puts into the carbon fiber foot, it will deflect,

17       and as her weight progresses through the step cycle, it will

18       return that energy to her, so it's energy storing, and that's

19       something that's unique to carbon fiber.  And that's why

20       carbon fiber is really the standard material now for

21       prosthetic feet.

22               So we just wanted to give her a foot that

23       would give her maximum energy return, maximum responsiveness,

24       and also one that is what we call multiaxial, so that if she

25       does go outdoors and walk in the yard or if she goes to an

| | |
|---|---|
| 1 | outdoor sporting event where she's going to be walking on |
| 2 | uneven terrain, that foot will accommodate those varied |
| 3 | walking surfaces or inclines or slopes or terrain. |
| 4 | Q   So let's talk about some other things that were available. |
| 5 |     You told us what she -- you fitted her with, which she's |
| 6 |     wearing. |
| 7 | A   Yeah. |
| 8 | Q   So perhaps we can use this to explain how this works. |
| 9 |               MR. WARSHAUER:  May I approach? |
| 10 | BY MR. WARSHAUER: |
| 11 | Q   What are we seeing here on her actual prosthetic? |
| 12 | A   So this is her actual prosthesis.  And like I showed you |
| 13 |     here, this is suction suspension.  So she puts her residual |
| 14 |     limb into the socket, rolls this suspension sleeve up onto |
| 15 |     her thigh to create a seal, all the air gets pushed out, and |
| 16 |     we've got a suction fit now.  Very secure.  It's not moving |
| 17 |     on her residual limb.  You can't see much of the foot unless |
| 18 |     I take the shell off.  Do you want to see it? |
| 19 | Q   Well, I'm kind of interested in it. |
| 20 | A   Sure.  So -- |
| 21 | Q   What is this that you're pulling off? |
| 22 | A   This is called a foot shell.  This is not the foot itself. |
| 23 |     And I'm not going to take that off the rest of the way |
| 24 |     because I wouldn't get it back on. |
| 25 | Q   Okay. |

1    A    Okay.  But I can show you another that is similar.  So

2         essentially she's got a carbon spring in there, so this is

3         the material that will deflect under load and then spring

4         back to help push her into the next step.  I hope that...

5    Q    Yeah.  Thank you.  So I'll return that to Lidy.  Thank you.

6    A    Yeah.  So there's a little sock inside that foot shell called

7         a spectra sock.  It's just a special material to keep the

8         rubber shell from squeaking on the carbon.

9    Q    All right.  So what were some other things that were

10        available, perhaps less sophisticated or even more

11        sophisticated?  You've talked about the ones she came with

12        which had hydraulics.  You've talked about the one with the

13        carbon fiber.  Are there any that are electronically

14        controlled that were available?

15   A    There are.  And those are things that after we get her to a

16        certain level functionally, that would enter the discussion

17        of, you know, what sorts of technology might we make

18        available to you to take your life back to the next level.

19   Q    And did you bring one of those that you can share with us?

20   A    Yeah.  So one of the -- sorry.  One of the things that we did

21        discuss specifically with Lidy was her interest in getting

22        back to swimming.  So it's really not feasible for her to

23        swim in her everyday prosthesis because there are some

24        components that can rust.  The foot shell can hold water.  So

25        we had discussed providing her with a special prosthetic foot

1     that she can walk around a pool in and then once she's in the

2     pool, she can lock that foot in a position for swimming.  You

3     put a flipper on here.  So that's something that we did

4     discuss specifically and we're looking to at some point

5     provide one of these for her.

6   Q   Okay.

7   A   So that's just one example.  Another would be a foot that

8     looks a lot different than the one I just showed you.  This

9     is a microprocessor-controlled foot.  So when the amputee

10    walks on this, there are sensors in here that are reading

11    loading information, angular information, and adjusting

12    instantaneously to that data to give them the most efficient

13    walk.  So I have two examples of microprocessor feet, and

14    these are really helpful for folks that want to do outdoor

15    activities, where they're going to be encountering

16    unpredictable surfaces or terrain.  This foot will adjust to

17    that for them.

18   Q   So if she wanted to return to hiking and -- this would be the

19    foot she would eventually need?

20   A   Absolutely.  And another one I have here, which is also a

21    microprocessor-controlled foot, is really a revolutionary

22    foot in my experience, in that it has power propulsion.  So

23    as the person walks, when they get onto the toe, this foot

24    has a little motor in the back of it that will literally push

25    them onto their other foot, just like we walk.

1   Q   Okay.  And again, those are more sophisticated than she has

2       now?

3   A   They are.  There's -- yeah.  Those require programming, they

4       require charging every night, carrying a battery, battery

5       pack.

6   Q   So let's -- we've sort of gone through the options.  One of

7       the things we haven't talked about is if she has running

8       blades.  We see those on television with runners.  Is that

9       kind of product available?

10  A   It is, and I brought an example of that.  There are lots of

11      different running legs now, running feet.  Again, far more

12      than when I came around 30 years ago.  This is an example of

13      a foot that would be for jogging or court-type sports, but

14      not sprinting.  So sometimes you'll see on television, you'll

15      see somebody running with a prosthetic leg that is really

16      just designed for sprinting, and those have no heel at all.

17      So you'll notice when they walk on those, they have to stay

18      on the toe of that prosthesis.  They can't shift their weight

19      back or else they'll fall over because there's no heel to

20      support them.  This is one that an individual can run or jog

21      on and still walk on effectively.

22  Q   Okay.  Thank you.  So now we've sort of talked about socket,

23      suspension system, the foot.  What about the part in the

24      middle?  Does that just come with the foot?

25  A   No.  So the componentry between the foot and the socket,

1    those are manufactured parts that we buy.  Most prostheses

2    nowadays are what we call endoskeletal, which means the

3    supporting structure of the prosthesis is on the inside.  We

4    could put a foam cover on this if we wanted to make it more

5    cosmetic.  But so essentially these are modular.  And the

6    reason this kind of technology is used now is because this

7    little clamp here has four screws around it; this one has the

8    same.  We use these screws to make angular changes between

9    the socket and the foot, or linear changes.  So the alignment

10   of this foot, where this foot is placed in space under this

11   socket, is really critical in terms of how the patient

12   functions on it.

13   Q   And that's the art of what you do, so to speak?

14   A   It is.  Yeah.  It's not rocket science, but that's -- yeah.

15   That's my expertise.  So the manufacturers of these feet have

16   specifics on where the body's weight line, which is just a

17   plumb line through the body's center of gravity down through

18   this foot -- they tell us where that weight line should fall

19   in this plane and also in this plane, and that's where we put

20   it as a starting point, but then we walk the patient in a

21   test socket and make adjustments.

22                    It's nice to have these kinds of components,

23   though, long term because we know an individual's not going

24   to walk the same three months out on a prosthesis that they

25   did on Day 1.  They're going to walk differently six months

1      out.  So as they learn how to walk and walk more robustly and

2      confidently, better balance, and get a stronger weight shift

3      onto the prosthesis, we have to change the alignment, we have

4      to adjust the alignment, and these components give us the

5      ability to do that.

6   Q  All right.  So I think we've talked about all the mechanical

7      features.  You mentioned cosmetics.

8   A  Yeah.

9   Q  Now have you talked about cosmetics with Lidy?

10  A  We have.  And that is something that is very personal for

11     some folks.  It's really important to have this prosthesis

12     look like a real leg.  So we certainly have -- we offer the

13     option of once we get our alignment set and we're happy with

14     the fit and function of the prosthesis, we can put a foam

15     material over this hardware and shape it like a leg, and then

16     typically we can go with a cosmetic skin over that.

17  Q  Did you bring an example of that?

18  A  I did.  I didn't bring an example of the foam cover.

19  Q  Okay.

20  A  But once -- we would take measurements of her sound-side leg

21     or her intact leg and take a tracing.  So once we lay up the

22     foam on here, we sculpt it to match the other leg as best we

23     can.  And then there would be this silicone or PVC, lots of

24     different materials, outer cover that would go over that and

25     would glue to the top so you have a nice cosmetic finish.

1  Q   This one in your hand, who was that made for?

2  A   This is for Lidy, yeah.  But, you know, she faced a dilemma

3      or reality of having to make a choice on whether to put this

4      on.  At one point, this was important to her and we had it

5      covered.  But then she realized it's minimal but it's added

6      weight, and she's very sensitive to the weight of the

7      prosthesis.  So she's elected for now to wear her prosthesis

8      without a covering skin.  But --

9  Q   If she had a complete other leg with the covering skin on it,

10     that would be an option?

11 A   That would be.

12 Q   All right.  But right now, how many prostheses does she have?

13 A   She just has one that she uses functionally.

14 Q   What if that one breaks?

15 A   If that one breaks, she's going to get ahold of me and we'll

16     try to get her in and see what we can do.  You know, it

17     depends on what breaks.  If the foot breaks, we can call the

18     manufacturer and get a loaner or something in a day or two.

19 Q   In a day or two.  But right now, if the prosthesis she has

20     fails, until she gets with you and the manufacturer and all

21     that, she's without a foot to stand on, so to speak?

22 A   Yeah.  And that's a reality too.  When we put her cover on,

23     when we do that foam cover, it takes me a day to do that.  So

24     that's a situation where you got to drop off your prosthesis

25     to me in the morning and I'll get it back to you by the end

1  of the day.  So you got to make other arrangements to get

2  around that day.

3 Q  All right.  So I think we finished the leg.  We've gone from

4  top to bottom, inside to out.

5 A  Okay.

6 Q  I want to talk to you now about the reality of care of having

7  a residual stump and having to do the socks and liners.  And

8  you said movement can create problems.  What do you teach --

9  what did you teach Lidy and what do you teach amputees with

10  respect to the daily care necessary to stay at the highest

11  function with their prosthetic?

12 A  Well, we emphasize proper donning or application of the

13  liner.  That's -- seems simple, but putting the liner on

14  correctly is important for skin health.  We emphasize

15  hygiene.  It's important to keep those liners clean and keep

16  the skin clean.

17 Q  You have to clean the liners daily?

18 A  Daily.  Yeah.  And those have to be hand-washed.  So we

19  typically supply two, so they will cycle those, wear one

20  today, wash it, let it air dry tonight, put the other one on

21  the next day.  In addition to daily washing, it's recommended

22  that they wipe those with rubbing alcohol once a week or

23  periodically just to disinfect them.  The socks that she

24  would use over that liner, those have to be washed and dried.

25  They can be machine washed and dried.  So yeah, we just

1    emphasize proper donning and good hygiene of the skin and the

2    liner and the sleeve.

3  Q  Mr. King, with respect to your work with Lidy Anderson, have

4    there been -- can you describe it to us?  Have there been --

5    has it been easy?  Hard?  How's she doing?

6  A  It's been hard.

7  Q  What do you mean?

8  A  When she first came to me, she and Jeff -- I recall Jeff

9    saying, "We're interviewing you.  We're looking for better

10    care."  So I knew they were frustrated with where she was at

11    at that point.  So I told them in my experience, someone with

12    her health profile, her age, that amputation level, I expect

13    her to thrive.  That's just the reality.  So that was my

14    goal, and I think I probably inspired them a little bit.

15           But as we -- as I took her on as a patient,

16    it's been hard to get her comfortable because of pain issues,

17    ongoing pain issues in the residual limb.  So as a

18    prosthetist, I try to -- I try to come up with solutions with

19    what tools I have to help her with that pain, which would be

20    maybe a different type of liner material.  One issue she had

21    was just the heat.  You know, when you roll one of these

22    liners on the residual limb, there's no air getting to that

23    skin, so they're hot.  We switched her to a liner that has a

24    special material that sort of acts like a heat sink, where

25    it's supposed to pull heat away from the residual limb.  Just

1    trying to find solutions to help her.

2                    But her residual limb had multiple areas of

3    hypersensitivity, just even sensitive to touch.  So I pretty

4    quickly knew this is going to be a challenge to get her in a

5    socket that she can bear all of her body weight on every

6    other step when there's this kind of sensitivity just to

7    light touch.

8  Q  I think she's going to share with us that it just hurts to

9    use the prosthetic.  Despite your training at Northwestern

10   and your years of clinical experience, have you been able to

11   solve this problem?

12 A  No, I don't think so.  No.

13 Q  Well, is there -- I know you're not a physician.  I'm not

14   asking for medical opinion.  But even if she has surgery,

15   does that always solve problems of these hypersensitive spots

16   in the nerves?

17 A  In my experience, not always.

18 Q  We talked about the residual limb.  She's a woman of short

19   stature.  If a surgical procedure reduced the residual limb,

20   even a little bit, how would that affect your ability to fit

21   her with a prosthesis that will give her the best and highest

22   function?

23 A  That would be a compromise.  And that's a real concern of

24   mine.  Her residual limb is shorter than average for the

25   below-the-knee level.  Average or really ideal is about

1    6 inches of residual limb, and she's about 4.  So I'm already

2    coming into less surface area to load.  So it certainly would

3    be a concern of mine if she would elect to have surgery, if

4    there's any more length taken.  That would create a challenge

5    for me.  If there was any new scar tissue now that I have to

6    work around, that could be a problem too.  That would be a

7    concern of mine.  So probably wouldn't be so much if she had

8    a 6-inch residual limb.  I've just got more area to load.

9    But when she's already got a short residual limb, then

10   surgery's a bigger concern to me.

11  Q  What is your hope for the future as the prosthetist for Lidy

12     Anderson?  What are you -- what's your best case scenario?

13  A  I want her to -- I want her to be whole again.  I want her to

14     be able to do literally everything she could do before.  And

15     I think that's possible.  That's my experience.  You know,

16     there are lots of below-the-knee amputees that you won't be

17     able to identify out in public.  They walk as well as I do

18     and they can do anything I can do.  So a lot of folks at that

19     level, it's hard for me to identify them as handicapped.  So

20     I want to get her there.  We've talked about that.  That's

21     where I want her to be.  I want her to thrive.

22  Q  We talked about all these various options.  If you had

23     unlimited access to options, does that increase the

24     likelihood of that occurring?

25  A  I think that's a way that a person gets to where they want to

```
 1            be and I think they have the potential to be.  When we can
 2            get them back to being able to participate in as many things
 3            that they did prior to the amputation, that's restoring life
 4            for them.
 5      Q     Thank you.  I just -- I'll finish with this.  I guess it's --
 6            don't most amputees have a couple of legs or three?
 7      A     Yes.  Yeah.
 8      Q     She has one, though?
 9      A     Yeah.
10      Q     Okay.
11      A     Yeah.  By this point, I think she's got some parts, but I
12            don't think she has a leg that, other than the one she has
13            today, that she could use.
14                        MR. WARSHAUER:  All right.  Thank you.
15                        THE COURT:  Cross?
16                        MR. LoCOCO:  Thank you, Your Honor.
17                        THE COURT:  Ladies and gentlemen of the jury,
18            you'll notice that Mr. LoCoco and I have the same tie on.  We
19            don't belong to the same club or we're not from the same frat.
20            We just both have exquisite taste in ties.
21                        MR. LoCOCO:  Pure coincidence too.  I'm going to
22            try and guess what he's going to wear tomorrow.
23                              CROSS-EXAMINATION
24      BY MR. LoCOCO:
25      Q     Mr. King, my name is Frank LoCoco.  We haven't met before,
```

1      have we?

2   A  Just briefly in the conference room.

3   Q  Outside?

4   A  Yeah.

5   Q  I represent the defendant in the case.  I've got some

6      followup questions for you.  Basically picking up where you

7      left off, it is possible for someone with a below-the-knee

8      amputation to, I'll use your word, thrive?  You agree?

9   A  Yeah.  Definitely.

10  Q  And would you agree with me that the -- a person's frame of

11     mind has a lot to do with that?

12  A  Absolutely.

13  Q  So if you have a physician or a psychologist or a

14     psychiatrist encouraging you to do more, to get out, and you

15     try to implement those instructions, that helps?

16  A  Yes.

17  Q  And you have, I assume, lots of clients who, maybe you could

18     tell that they're wearing a prosthetic limb, but lots of

19     other people couldn't tell?

20  A  Yes.

21  Q  All right.  So this does kind of work backwards through your

22     direct examination.  I don't know that lawyers have a lot of

23     skills, but one of the skills they have is to listen to

24     answers.  And you were asked at the end and you were asked

25     toward the beginning how many limbs -- how many prosthetic

1     limbs does Mrs. Anderson have.  And the note I have is, one

2     that's functional.  So you didn't say "one."  You said "one

3     that's functional."  Do you know how many limbs she has?

4 A  Complete limbs, no.

5 Q  All right.  And actually when you saw her, she had already

6     had a limb; correct?

7 A  Yes.

8 Q  All right.  So you were her second prosthetist?

9 A  I'm not sure.  At least second, I believe.

10 Q  Okay.

11 A  Yeah.

12 Q  And you've told the jurors that when someone experiences a

13     below-the-knee amputation, that first year especially, it's a

14     lot of changes to the person's anatomy so that they can

15     utilize the prosthetic limb?

16 A  That's correct.

17 Q  So you use things like -- I didn't hear you testify about

18     this, but I've heard it in the past -- stump shrinkers?

19 A  Yeah.

20 Q  So in other words, you're trying to harden the stump so that

21     it can actually take the load of that person's body?

22 A  Well, it's not necessarily hardening.  It's just shaping --

23 Q  Right.  Okay.

24 A  -- to get it to a point -- so typically when someone goes

25     through an amputation, when they come to us, the lower part

1 of the residual limb will actually be larger around than the

2 part, say, just below the knee.  So that's not supportive of

3 getting in a socket.  You might get in it but you won't get

4 out of it.

5 Q Because it's so swollen?

6 A We're shooting for that to become cylindrical in shape.  And

7 the shrinker just speeds up the process of eliminating

8 swelling and just speeds up shaping.

9 Q All right.  So how often do you see Mrs. Anderson?

10 A Give me a time --

11 Q Well, let me ask it this way.  When's the last time you saw

12 Mrs. Anderson?

13 A The last time I saw her was probably a couple months ago.

14 Q All right.  And you don't have a regular appointment, do you?

15 A No.

16 Q She comes in when she thinks she needs to see you or if

17 something breaks?

18 A Yes.  Or if we have something new that we're making for her,

19 then she's going to be on a regular schedule to carry out

20 whatever process it is we're working on for her.

21 Q All right.  You know she spends a lot of her day not wearing

22 the prosthetic limb?

23 A I do.

24 Q And I assume you've encouraged her to wear it more often, as

25 much as she could tolerate it?

1  A   Yeah.

2  Q   And you know that a revision to her -- I'm trying to remember

3      the term you used instead of "stump."

4  A   Residual limb.

5  Q   Yeah.  That a revision to her residual limb has been

6      recommended by her physicians?

7  A   Yes, I'm aware of that.

8  Q   And you know she's chosen so far not to get it done?

9  A   Yes.

10 Q   And you would agree that if she were to get that done, that

11     would give you a better opportunity or might very well give

12     you a better opportunity to give her a better fit?

13 A   I don't know.

14 Q   Well, the doctors, based on your experience, wouldn't be

15     recommending it if they didn't think it would help her?

16 A   Yes.

17 Q   All right.

18 A   Yeah.

19 Q   And you'd certainly work to give her a better fit if she were

20     to have that surgery?

21 A   Yes.  If she had that surgery, we would need to get her back

22     in and reassess the limb and see whatever changes in shape

23     there might be.  But obviously we'd really be looking forward

24     to be less sensitive and painful.

25 Q   And you know that that's one of the reasons the surgery has

| | | |
|---|---|---|
| 1 | | been recommended, is to deal with the sensitivity and the |
| 2 | | pain that she has described? |
| 3 | A | Yes. |
| 4 | Q | All right.  And that of course then helps you have a better |
| 5 | | frame of mind so that you can become -- you can start |
| 6 | | thriving? |
| 7 | A | That would be my expectation.  If it's not hurting, I think |
| 8 | | you're going to do better. |
| 9 | Q | Right.  These limbs that you showed to the jurors, or even |
| 10 | | the one that Mrs. Anderson is wearing now, have you had |
| 11 | | people use those and still do manual jobs, like even a |
| 12 | | forklift operator? |
| 13 | A | Yes. |
| 14 | Q | Okay. |
| 15 | A | Yes. |
| 16 | Q | And do you ever have really active clients who you kind of |
| 17 | | have to slow down -- |
| 18 | A | Absolutely. |
| 19 | Q | "You got to work with me; we're going to get you to where you |
| 20 | | want to be"? |
| 21 | A | Absolutely. |
| 22 | Q | And Mrs. Anderson hasn't been like that, has she? |
| 23 | A | She has not. |
| 24 | Q | All right. |
| 25 | | MR. LoCOCO:  Just a moment, Your Honor. |

```
 1   BY MR. LoCOCO:
 2   Q    One last question.  The prosthetic limb that Mrs. Anderson is
 3        wearing right now, is that the kind of limb you'd wear if you
 4        were going to be operating a forklift, or is there a
 5        different one that you'd recommend?
 6   A    I don't know the mechanics of a forklift to really give you a
 7        good answer.
 8   Q    If it was a standup forklift where you're just standing in a
 9        compartment?
10   A    That would -- yeah, I don't think that would hamper her, what
11        she's wearing.
12   Q    Okay.  Thank you.
13                     MR. LoCOCO:  Thank you, Your Honor.
14                     REDIRECT EXAMINATION
15   BY MR. WARSHAUER:
16   Q    We talked about the revision surgery when I asked you
17        questions.  It poses risks, doesn't it?
18   A    I assume it does, yeah.  I think there's risk with any
19        surgery.
20   Q    And in your experience, it hasn't even been successful for
21        all of your patients, has it?
22   A    It has not.
23   Q    And some have been worse?
24   A    That's true.
25   Q    She knows what she has?
```

```
1   A   Yes.

2   Q   And through your experience working with amputees, depression

3       is common, isn't it?

4   A   Absolutely.

5   Q   Depression makes thriving difficult?

6   A   It does.

7                   MR. WARSHAUER:  Thank you.

8                   MR. LoCOCO:  Nothing further, Your Honor.  Thanks

9       for coming in.

10                  THE WITNESS:  Thank you.

11                  THE COURT:  Thank you, sir.  You may step down.

12                  THE WITNESS:  Thank you, Judge.

13                  THE COURT:  Is there any reason to for this

14      witness to stick around to be available?

15                  MR. LoCOCO:  No.

16                  THE COURT:  Thank you.  You are free to leave.

17                  Ladies and gentlemen, it's 10:35.  I think that

18      we have some things to do before we present the next witness, so

19      let's take a break.  Do I have -- I've got video to review?  How

20      long is that going to be?

21                  MR. LoCOCO:  You guys have that queued up?

22                  THE COURT:  All right.  Let's make it a 15-minute

23      break.  We'll come back at ten minutes to 11.

24                  (Jury exits at 10:33 a.m.)

25                  THE COURT:  All right.  We're back on the record
```

1       in Anderson v. Raymond.  We're outside the presence of the jury.

2       I have been shown that part of the deposition of Mr. Anderson

3       that includes a cell phone video that he took.  And my

4       understanding is that it was -- the foundation for it was that

5       he took the video on his cell phone and that he says that it

6       captures an event that is not unique and captures an event that

7       happens from time to time with regard to his wife and spasms in

8       her leg.  Is that fair to say, Counsel?

9                      MR. McCOY:  Yes, Your Honor.

10                     MR. ABBOTT:  Your Honor, just to clarify

11      something really quick.  That was exhibit -- you're showing the

12      actual video of the Exhibit 61.  That wasn't the video that we

13      just showed, wasn't the video of it being in the deposition.

14      It's just shown -- it's shown on the screen during the

15      deposition, but that video just reviews just the actual exhibit

16      of the video that was shown during the deposition.

17                     THE COURT:  So are we -- so this is not something

18      that -- how is it going to be offered?  We're playing the

19      deposition.  Do we stop and say, "All right, ladies and

20      gentlemen, on the screen now is going to be the video that he

21      shot"?

22                     MR. McCOY:  I think it's part of Mr. Anderson's

23      deposition that we've already recorded.  And, Your Honor, I'm

24      not sure if it was perfectly clear.  Mr. Anderson had a

25      discovery deposition taken in this case.  And then in

1   anticipation of him being sick, we did a video in anticipation

2   of this so everybody knew that this was going to be it.

3   Mr. LoCoco made his objection before we started and certainly to

4   the video itself.  But we preserved any other objections when we

5   play the video as trial evidence.  It was -- there was no

6   objection.  There was no foundational objection to it.  We just

7   preserved the objection to the video itself.  So that's the

8   basis that I offered it.  I think we did lay a foundation for

9   it.

10           THE COURT:  So what was the basis of your

11   objection?

12           MR. LoCOCO:  Well, so first of all, it's

13   Rule 403, it's gratuitous.  It's highly prejudicial.  It's not

14   probative.  All of the -- whatever they want to get out of this,

15   they could get from the -- from Mrs. Anderson.

16           Secondly, this is not a typical day-in-the-life

17   video, which is -- and there's case law in this circuit on this

18   issue.  We had gotten this video the day before the deposition,

19   and I -- when I made a record, I cited Jimenez v. The United

20   States, 2008 WL 3849915 and Furey, F-u-r-e-y, v. City of

21   Chicago, 2015 WL 13682033.

22           I had one other note, Your Honor.  And there's no

23   doctor who has testified or will testify explaining physically

24   what was going on there.  So as I said, I just think it's highly

25   prejudicial.  Those two cases that we cite, assuming

1    Ms. Heitkamp is right, and she usually is, our cases stand for

2    the proposition that this kind of video is not a typical

3    day-in-the-life video that Courts -- I know you've seen them

4    before.  You've admitted them.  You've used them.  That's not

5    what this is.  This is completely gratuitous to show a moment in

6    time over the last four years where Mrs. Anderson was in pain.

7    And I also think the sound is completely inappropriate.

8            MR. McCOY:  Your Honor, this is not a

9    day-in-the-life video.  A day-in-the-life video is sort of a

10   stage production of what people go through on a typical day.

11   This was actual direct evidence of what she goes through and

12   what she was going through on this day.  You know, it may be

13   prejudicial to their case because it shows extreme damage and

14   extreme pain, but that's not unfair prejudice.  That's actually

15   what happened.

16           And we can't convey that with our client.  She

17   speaks broken English.  She is going to do it the best she can,

18   but that is the only way we're going to be able to capture what

19   she went through on that day and what she's gone through again.

20   So we think this is very, very relevant, and it should come into

21   evidence.  I don't see any reason why it shouldn't.

22           MR. LoCOCO:  Your Honor, just -- this notion that

23   she speaks broken English, when I took her deposition, I asked

24   her about that.  I gave her the opportunity to testify through a

25   translator, and she said no.  So if we're going to hear that as

1    an excuse for her testimony, then we need to wait and get a

2    Filipino or Tagalog translator in here and let her testify.

3    Otherwise, it should never be used as an excuse for her failure

4    to testify to her condition.

5                    MR. McCOY:  Well, let me just say this then.  I

6    would say her ability to communicate that thing that she's going

7    through in that actual picture, it can't be conveyed any other

8    way.  That's the best evidence and we'd ask that that be

9    admitted.  It's relevant.

10                    THE COURT:  All right.  Rule 403 says that I may

11   exclude relevant evidence -- I think that it is relevant -- if

12   its probative value is substantially outweighed by a danger, a

13   danger, of one or more of the following:  Unfair prejudice,

14   confusing the issues, misleading the jury, would cause undue

15   delay, would be a waste of time, or needlessly presenting

16   cumulative evidence.

17                    I'm going to read the cases that you cite.  I'll

18   come back and give you my ruling.  But I myself don't feel or

19   believe that it's going to confuse any issues, I don't think

20   it's going to mislead the jury, and I don't think that it's

21   unduly prejudiced.  So I'll read the case law and see if my

22   superiors on the Seventh Circuit direct me to do otherwise.  So

23   I'll be back.  And we are -- I'll give you my ruling just before

24   we start back at 10 [sic].  We're off the record.

25                    (Recess from 10:43 a.m. to 10:52 a.m.)

1          THE COURT:  All right.  Let the record reflect

2     that we're back on the record, but we are outside the presence

3     of the jury.  I reviewed the case law offered by Defendant with

4     respect to this video of the plaintiff.

5          One of the issues that is part of this case is --

6     and I suspect that the defendant's position is going to be that

7     if the plaintiff is not a malingerer, she's certainly someone

8     that is not taking reasonable steps to try to advance a full --

9     the best recovery she can have from this injury, and also that

10    perhaps that the plaintiff could be doing a lot more with her

11    life, even returning to work as a forklift operator.  But she's

12    electing not to follow the advice of doctors, not to take

13    medications that may help her.

14          The video is not particularly long.  While the

15    video is powerful, the fact that evidence can make a powerful

16    impact doesn't make it prejudicial or unduly prejudicial.  And I

17    don't think the rules contemplate excluding this kind of

18    witness -- I mean, this type of evidence simply because the

19    party might be able to present it in a more anesthetized way or

20    less visually graphic way.  I think I have to make the

21    determination that this video would in fact have such an effect

22    on the jury as to confuse them as to the issues or blind them

23    from other facts that are being presented, even if they're

24    uncontroverted facts.  It's not my sense that this video is such

25    that the evidence is something the jury must be precluded from

1  seeing.  I don't think that the video compromises the

2  defendant's ability to secure a fair trial.

3  So for purposes of 403, I'm not going to exclude

4  the video.  I'm not going to exclude it as it not being

5  relevant.  It is relevant.  We can watch the -- we can watch the

6  deposition of Mr. Anderson, and I don't know if in the

7  deposition the sufficient foundation is laid, although I don't

8  think there's an objection to foundation.  It might be that some

9  further foundation would have to be laid for the video, but

10  that's not going to be difficult to do for the plaintiff.  So

11  the motion to exclude that video as evidence in this case is

12  denied.

13  MR. LoCOCO:  Thank you, Your Honor.  Just

14  procedurally, so we know how we did this because of this issue,

15  I put my objection at the front end of the video, so when we get

16  to that, the video itself becomes, because of the technology

17  today, pinned into it.  So it just is part of the deposition,

18  so --

19  MR. ABBOTT:  It's actually -- the video we have

20  doesn't -- your objection isn't in that video.

21  MR. LoCOCO:  Right.  So you ruled on it, and it

22  won't -- the jury won't even hear it.

23  THE COURT:  All right.  Is there anything that

24  you raise in that objection that I haven't addressed?

25  MR. LoCOCO:  No, Your Honor.

1              THE COURT:  All right.  Let's get the jurors

2      back.

3              Madam Court Reporter, do you need a break?

4              THE COURT REPORTER:  No thank you.

5              (Discussion off the record.)

6              (Jury enters at 10:57 a.m.)

7              THE COURT:  Please be seated.  Thank you.

8              We're back on the record.  The jury is back in

9      the jury box.  Call your next witness.

10             MR. ABBOTT:  Plaintiffs present through video

11     Plaintiff Jeff Anderson.

12             THE COURT:  All right.  Ladies and gentlemen,

13     right now you're going to see the video deposition of

14     Mr. Anderson.  The -- I can as the judge allow -- even though

15     you've seen Mr. Anderson here in court from time to time, the

16     plaintiffs have elected to play a video deposition instead of

17     placing him on the stand because presently he is not feeling

18     very well.  And I've agreed to allow them to play this video.

19             Mr. LoCoco or somebody for the defendant is at

20     the deposition and is able to cross-examine the -- Mr. Anderson,

21     so I don't believe that there's any prejudice in that regard.

22     And it's just one of those legal issues that we are -- we talk

23     about while outside the presence of the jury.  And you are not

24     to read anything more into it than the fact that I determined

25     that because Mr. Anderson's not feeling particularly well today,

1    I was not going to make him take the stand.

2                    So with that, please proceed.

3                    MR. ABBOTT:  Thank you, Your Honor.

4                    THE COURT:  Why don't we pause until we get --

5    you have the cameras on?

6                    THE COURTROOM DEPUTY:  Mm-hmm.

7                    THE COURT:  There you go.

8                    (Video deposition of Mr. Anderson played.)

9                    THE COURT:  Would you hit pause for a second?

10   Has the witness already been sworn?

11                   MR. ABBOTT:  He's about to be sworn in a second,

12   Your Honor.

13                   THE COURT:  Okay.

14                   (Video deposition of Mr. Anderson played.)

15                   THE COURT:  Let me stop right here.  Take a

16   break.  Ladies and gentlemen, I asked Counsel to come over to

17   talk to me to find out how much longer this deposition has to

18   go, and it's about an hour.  So I wanted to -- now is a good

19   time to break.  I'll give you an hour.  We'll come back at

20   1 o'clock.  Have your lunch.  But I did not want to force

21   anybody to sit through without a break.  So we are in recess

22   until 1 o'clock.

23                   (Jury exits at 11:56 a.m.)

24                   (Recess from 11:56 a.m. to 1:04 p.m.)

25                   (Jury enters at 1:04 p.m.)

1          THE COURT:  Please be seated.

2          All right.  We will resume the playing of the

3     deposition testimony of Mr. Anderson.

4          MR. ABBOTT:  Thank you, Your Honor.

5          (Video deposition of Mr. Anderson played.)

6          THE COURT:  All right.  It is ten after 2.

7     Counsel, why don't you approach.  We'll talk about what

8     witnesses we have, so we can figure out what kind of break we

9     need.

10          (Sidebar begins.)

11          MR. WARSHAUER:  Our next witness will be

12     Ms. Anderson.

13          THE COURT:  Okay.

14          MR. WARSHAUER:  That will take -- certainly won't

15     take that long, and then we'll finish with Luke Anderson, and

16     then we'll rest.

17          THE COURT:  All right.  You got motions you want

18     to present?

19          MR. LoCOCO:  Yeah.  Well, my guess is that this

20     is going to take us until 4.

21          THE COURT:  That's what I would think.

22          MR. LoCOCO:  And so we've got a motion ready to

23     upload to PACER.  We thought we'd upload it to PACER, give them

24     a copy.

25          THE COURT:  I can look at it, read it tonight.

1      Just figure out a time tomorrow morning.

2              MR. LoCOCO:  Maybe have the jury come in a little

3      late tomorrow so we can argue.

4              THE COURT:  How long do you think it will take to

5      argue?

6              MR. LoCOCO:  30 minutes total.

7              THE COURT:  All right.  And so how long a break?

8              MR. LoCOCO:  I mean, how long is your direct?

9              MR. WARSHAUER:  Not long.  We got the vast -- a

10     huge amount of stuff taken care of.  I don't have to go through

11     the before and after pictures.  All that's been done.  So, you

12     know, not --

13             THE COURT:  However long it takes.

14             MR. WARSHAUER:  It shouldn't take long.

15             (Sidebar ends.)

16             THE COURT:  All right, folks.  Let's take a break

17     until 2:25.  We'll come back with the next witness.  We are in

18     recess.

19             (Jury exits at 2:11 p.m.)

20             (Recess from 2:11 p.m. to 2:31 p.m)

21             THE COURT:  My understanding is you're going to

22     testify next.  You're going to want to try to speak as clearly

23     as you can, because I want to make sure that we get all of your

24     words down properly.  Sometimes people get excited, they speak

25     fast.  So if we slow down a bit, it might be better.

```
 1                         (Jury enters at 2:31 p.m.)
 2                    THE COURT:  Everyone can be seated.  All right.
 3          We are back on the record in Raymond -- I'm sorry -- Anderson v.
 4          Raymond.  Call your next witness, please.
 5                    MR. WARSHAUER:  Thank you, Your Honor.  At this
 6          time, the plaintiff calls the plaintiff, Adelaida Anderson.
 7          Ms. Anderson?
 8                    THE COURT:  Thank you.
 9                    (Witness sworn.)
10                    THE COURTROOM DEPUTY:  Please state your full
11          name and spell your last name.
12                    THE WITNESS:  Adelaida Anderson, A-d-i-l-e-i-d-a.
13                    THE COURTROOM DEPUTY:  Thank you.
14                    THE COURT:  All right.  Ma'am, I notice you're
15          somewhat soft-spoken, so try to pull that microphone a little
16          closer to you so we make sure that you can be heard throughout
17          the courtroom.  And you'll want to try to speak in a tone of
18          voice where you think that you can be heard in the back of the
19          courtroom.  All right?  Thank you.
20                              DIRECT EXAMINATION
21     BY MR. WARSHAUER:
22     Q    What do people call you?
23     A    Lidy, L-i-d-y.
24     Q    I'll call you Lidy and Mrs. Anderson?
25     A    Yeah.
```

```
1    Q    Where do you live?

2    A    I live in Effingham, Illinois.

3    Q    Who do you live with?

4    A    My husband Jeffrey L. Anderson.

5    Q    Anybody else live there?

6    A    My son.

7    Q    And what is his name?

8    A    Luke Anderson.

9    Q    Where were you born?

10   A    I born in Philippines.

11   Q    And what is your birthday?

12   A    May 11, 1967.

13   Q    You've been in the courtroom now for four days.  Has that --

14        how's that been for you?

15   A    No good.

16   Q    Why not?

17   A    Because I'm tired, my lower back hurts, and I can't sleep in

18        the night.

19   Q    Well, sometimes I see you in your wheelchair and sometimes in

20        the chair.  Why do you switch?

21   A    To move around.

22   Q    We saw you walk up.  Have there been times when you've been

23        able to use your prosthetic better than you're using it now?

24   A    I use once a while, like sometime an hour, sometime -- I

25        never use all the time because it hurts my stump.  It hurts
```

```
 1        to walk, and I'm out of balance when I walk.  I feel like I
 2        will fall down.
 3   Q    We'll talk about that a little more in a moment.  I want to
 4        find out about you.
 5   A    Me?
 6   Q    About you.  So where'd -- you told us you were born in the
 7        Philippines.  Where did you grow up?
 8   A    I grew up in the Philippines.  I move in the US 1994.
 9   Q    Well, what kind of upbringing did you --
10   A    My first husband.
11   Q    No.  When you lived in the Philippines, what was your family?
12   A    My family have a big farm.
13   Q    And what did you --
14   A    A rice paddy.
15   Q    How far did you go in school?
16   A    Tenth grade.
17   Q    Is that the end of schooling there?
18   A    That's the end of the school in Philippines and you graduate
19        then high school.  That's before 1985.
20   Q    When did you enter the workforce?
21   A    I work in US '94.
22   Q    When did you start working --
23   A    2007.
24   Q    Okay.  Lidy, let's -- let me finish.  When did you start
25        working as a person?  When was your first job?
```

1   A   My first job in the Philippines is factory sardines and I

2       work in high school.

3   Q   Still in high school?

4   A   Yeah.

5   Q   And what did you do in the sardine factory?

6   A   I'm a picker.

7   Q   What does a picker do?

8   A   Put in the box and put in the pallet jack.

9   Q   What was your next job?

10  A   My next job is a maid.  I work with my first husband.

11  Q   And what was his name?

12  A   Andrew Tiemann.

13  Q   And how did you meet Mr. Tiemann?

14  A   I work for him.  He had a business in the Philippines and I

15      work with him.

16  Q   And did you marry him?  Obviously you've --

17  A   Yeah, I married him.

18  Q   Where did you get married?

19  A   1993.

20  Q   Where?

21  A   In the Philippines.

22  Q   And you've told us you moved to the United States in 19 --

23  A   '94, yeah.

24  Q   Were you with Mr. Tiemann at that time?

25  A   Yeah.  He stay in the Philippines that time because he had a

1    business there.

2  Q   When you moved to the United States, did he come with you?

3  A   No.  He go home first because I have to do my paperwork to

4      come over to the US.

5  Q   Okay.  And did you eventually live with him here?

6  A   Yes.

7  Q   Okay.  And what happened to that marriage?

8  A   He had heart attack.  He pass away.

9  Q   When -- about when was that?

10 A   '96.

11 Q   So when you had arrived in 1994, until Mr. Tiemann's death,

12     did you work?

13 A   Yeah.  I work in the nursing home and I work in the Fedders

14     air conditioner for job.

15 Q   So after Mr. Tiemann died, did you stay working somewhere?

16 A   Yeah, I still stay there.

17 Q   All right.  What was your next job after that?

18 A   I work in Krispy Kreme.

19 Q   At some point during this time in the '90s, did you have the

20     opportunity to become a United States citizen?

21 A   Yes.

22 Q   And how do you feel about that?

23 A   It's good.  I like it.

24 Q   So you said you worked at the Krispy Kreme?

25 A   Mm-hmm.

| | | |
|---|---|---|
| 1 | Q | What was your job at the Krispy Kreme? |
| 2 | A | I drive a forklift. |
| 3 | Q | What kind of forklift? |
| 4 | A | It's Toyota. |
| 5 | Q | And how did you -- what kind of forklift was it? |
| 6 | A | Standup. |
| 7 | Q | Was it also -- was it like the one you drove at FedEx? |
| 8 | A | The same like it.  It's different model. |
| 9 | Q | Sideways, though? |
| 10 | A | Sideway. |
| 11 | Q | So now we've got you into about 1996.  You're a US citizen. |
| 12 | | And when did you start working at the Krispy Kreme? |
| 13 | A | '95.  I start 2003.  Closed down in '95.  They closed down. |
| 14 | Q | Okay.  You started in 1995 and they closed down in about |
| 15 | | 2003? |
| 16 | A | No, it start 2003. |
| 17 | Q | Okay. |
| 18 | A | I have to think.  2003, and they closed down in 2005. |
| 19 | Q | Okay. |
| 20 | A | That's what I remember. |
| 21 | Q | What kind of things did you like to do?  What were the |
| 22 | | activities that you enjoyed while you were working at the |
| 23 | | Krispy Kreme and at the air-condition factory and things like |
| 24 | | that? |
| 25 | A | I used to -- I go bowling, I go fishing, and I ride a bike, |

| | | |
|---|---|---|
| 1 | | and I go to gym after work. |
| 2 | Q | Did you have family in the Effingham area? |
| 3 | A | I have my sister live here before, and she move to Vegas, and |
| 4 | | she graduated with her nursing degree. |
| 5 | Q | We might need to do that one again.  Your sister lives where? |
| 6 | A | She live in Las Vegas. |
| 7 | Q | Las Vegas? |
| 8 | A | Yeah. |
| 9 | Q | Do you have any family in the Effingham area? |
| 10 | A | Yeah, I have my nieces. |
| 11 | Q | Are you close to them? |
| 12 | A | Mm-hmm. |
| 13 | Q | Try to answer yes or no, because the -- |
| 14 | A | Yes. |
| 15 | Q | Otherwise she has to guess. |
| 16 | A | Sorry. |
| 17 | Q | So during this time, did you also enjoy going to church? |
| 18 | A | Yeah, I go to church every Sunday.  And I -- |
| 19 | Q | Have you been doing that since -- how long have you been |
| 20 | | going -- |
| 21 | A | I've been doing that since I got here. |
| 22 | Q | And what kind of church do you enjoy going to? |
| 23 | A | St. Anthony. |
| 24 | Q | And that's a Catholic church? |
| 25 | A | Yes. |

```
 1   Q   We heard from your husband Jeff.  Is that your husband?
 2   A   Yeah.
 3   Q   And we heard from him a little about how you met.  Let us --
 4       you tell -- let me hear your version of it.
 5   A   I have to tell that?  I met his mom.  His mom, I work with
 6       her in the Fedders.
 7   Q   At the air-condition factory?
 8   A   Yeah.  And he asked me -- he said, "You been widow a year
 9       now.  I never see you go out a month.  You always working.  I
10       have a son.  Can you meet my son?  I will call him."  I said,
11       "I don't know.  I'm not sure yet."  And he keep bugging me
12       and I met him.
13   Q   And he told us about your first date at --
14   A   IGE.
15   Q   At a grocery store?
16   A   Yeah.
17   Q   That's very romantic?
18   A   Yep.
19   Q   So eventually you got married?
20   A   Yeah.  We live -- first time we live together for about three
21       years, and after that, we get married.
22   Q   And you have a child Luke?
23   A   Yeah, Luke.  Just one.
24   Q   And Mr. Anderson, as we saw in the photographs that we saw on
25       the TV a little while ago, has two children already?
```

1   A   Yeah, he have one boy and one girl.

2   Q   And do you get along with them?

3   A   Yep.  We go together shopping and go everywhere, go swimming

4       and go fishing.  We go everywhere, and we going the mall.

5       And everybody, I said, his friend, his classmates, he said,

6       "Who's that with you?  I like to go out with her."  And he

7       said, "No, that's my stepmom."

8   Q   So did you enjoy dressing up?

9   A   Yeah.  I used to.  Not no more.

10  Q   Well, there was a woman from the Philippines who was famous

11      for having a gazillion pair of high heels, Imelda Marcos.

12      Did you like having high heels?

13  A   I got rid of high heel.

14  Q   You did?

15  A   After my accident, I already gave away because I cannot wear

16      it anymore.

17  Q   But before, you enjoyed that?

18  A   Yep.  I go to church with high heel and I go party.  That's

19      why I have 40 of them, high heel.

20  Q   40?

21  A   Yep.

22  Q   So we heard a good bit from Jeff Anderson about your life,

23      horses and travel and things, fishing.  Did you play golf

24      too?

25  A   Yeah, I play with him because he used to -- he play golf a

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | lot and he have a lot of trophy he win.                      |
| 2  | Q | Were you a good golfer?                                       |
| 3  | A | Not really.  He beats me.                                    |
| 4  | Q | How about the horses?  We saw several pictures of you on     |
| 5  |   | horses.                                                      |
| 6  | A | Yeah, I like ride horses all the time.  I love horses to     |
| 7  |   | ride.  We go to Shawnee.                                      |
| 8  | Q | One of the things that was talked about was travel?          |
| 9  | A | I like travel all the time.                                  |
| 10 | Q | Back in the before time, what kinds of trips were you able to |
| 11 |   | take?                                                         |
| 12 | A | I go my sister, we going Arizona, we travel everywhere, to go |
| 13 |   | have -- just have fun, you know.                             |
| 14 | Q | There was also some discussion that you traveled back to the |
| 15 |   | Philippines for your mother's death?                         |
| 16 | A | Yeah.  My mother pass away in 2019.                          |
| 17 | Q | Were you able to make that trip alone?                       |
| 18 | A | I think a year ago.  No, somebody with me to help me.       |
| 19 | Q | Who was that?                                                 |
| 20 | A | My friend.  And somebody help me in the airport too.  I hired |
| 21 |   | somebody.                                                     |
| 22 | Q | We've talked a little bit about your house.  What room do you |
| 23 |   | sleep in?                                                     |
| 24 | A | I live downstair because I have hard time to go upstair.    |
| 25 | Q | What room does your husband sleep in?                        |

1   A   Upstair.

2   Q   When was the last time that the two of you shared a room

3       together?

4   A   Last time is in -- I think before my accident.  I think

5       July 2017.

6   Q   Lidy, did you and Mr. Anderson enjoy an intimate relationship

7       before your injury?

8   A   Yes.  We're happy.

9   Q   Since your injury, have you had a change in the intimacy and

10      the romance and the physical relationship that you enjoyed

11      with your husband?

12  A   Yeah.  It change a lot.

13  Q   Do you miss it?

14  A   Yeah.

15  Q   Does your husband?

16              Now Mr. Anderson worked for the equity in

17      February?

18  A   Yeah.

19  Q   Has he changed jobs since then?

20  A   Yeah, he changed job.  He was elected in Effingham for road

21      commissioner.

22  Q   So he's now the road commissioner for Effingham County?

23  A   Yeah.

24  Q   Or the city of Effingham?

25  A   City of Effingham.

1   Q   Mr. Anderson shared with us his concerns back in

2       February about his Stage IV cancer, and at that time, it was

3       in remission, if you will.  Where are we now?

4   A   Yes.  He had cancer, and now got back again.  Don't know

5       when -- I don't -- he's not getting --

6   Q   Just take a breath.  Move back for a second.  We're okay.

7   A   It was okay.  Now it's back again.

8   Q   So because we didn't have him testify, I'm going to ask you,

9       when we look at Mr. Anderson's face -- he had pointed to

10      something on his jaw during the deposition and was happy it

11      had gone away.  When we look at him now, there's something

12      there.  Is that --

13  A   It's back again.  He have a bunch in his back and in his head

14      again.

15  Q   Do you want to be taking care of him?

16  A   I want to.  I can't.  It's hard for me.

17  Q   Does -- are you concerned that as this gets worse and he

18      needs you, that you won't be able to give him the help that

19      you want to give him as his wife?

20  A   Yeah.  Last time when he was sick and he have only three

21      months to live, he need me and I can't help him.  My son help

22      him.  It changes everything in his back, because he had a

23      surgery in his back.

24  Q   Ms. Anderson, let's focus on your work at the FedEx warehouse

25      in Effingham.  Okay?

1    A    Okay.

2    Q    When'd you go to work there?

3    A    2007.

4    Q    And what had been your job before that?

5    A    Krispy Kreme.

6    Q    So you went from the Krispy Kreme to --

7    A    To FedEx.

8    Q    FedEx.  What were your jobs at FedEx when you first got

9         there?

10   A    First got there, I'm a picker.

11   Q    What's a picker do?

12   A    Pick some product, the order, and you had to go in the lead

13        to get order for picking the pick face [phonetic].

14   Q    And over time did that job change?

15   A    Yeah.  About a year, they have posted in the board, you

16        have -- to do the forklift job.

17   Q    Did you apply for that?

18   A    Yeah, and I took it.

19   Q    And what kind of forklift was the first one you drove at --

20   A    A sitdown.

21   Q    And how long did you drive the sitdown?

22   A    About three years.

23   Q    Did you eventually change from the sitdown to the standup?

24   A    Yeah.  The sitdown to standup because they bring the forklift

25        from Raymond in the FedEx.  They changed to standup.

| | | |
|---|---|---|
| 1 | Q | Was sort of the basic operation of that what you had been |
| 2 | | used to at Krispy Kreme? |
| 3 | A | Yeah. |
| 4 | Q | So did you -- how did you get to do that job?  How did you |
| 5 | | get to go from the sitdown to the standup? |
| 6 | A | Because the sitdown job, the forklift, they take away, and |
| 7 | | they put a new standup forklift.  They change it. |
| 8 | Q | Were you trained on how to use the standup? |
| 9 | A | Yes. |
| 10 | Q | Had you been trained at Krispy Kreme? |
| 11 | A | Yes. |
| 12 | Q | Did you -- how did you feel about your skills as a standup |
| 13 | | forklift operator? |
| 14 | A | I'm a good safety.  I'm very careful. |
| 15 | Q | We heard from Ms. Boone.  A word that I just threw out:  "Mad |
| 16 | | skills."  Are you really good at it?  "Better than average" |
| 17 | | is what she described? |
| 18 | A | Yep. |
| 19 | Q | How would you say you were compared to your other workers? |
| 20 | A | Everybody say me in work, I'm a good worker, I'm a good |
| 21 | | driver. |
| 22 | Q | So I want to show you some things, but first, tell us -- |
| 23 | | well, let's start this way.  This is the owner's manual.  Had |
| 24 | | you been trained to do the things in the owner's manual? |
| 25 | A | Yeah. |

1  Q    How were you trained to stand in the forklift?

2  A    You stand in the forklift.  You had to go inside and you have

3       that -- well, you have wheel in here and you have both side.

4       You had to hold this one, you go -- you go this go, and this

5       one is a -- you can brake.  You brake.  And you go, you go

6       there, and you go there.  It feel -- take up your hands, it's

7       sat up and the pedal in the one in the bottom, you had to

8       shut it up and you don't have to step on it.

9  Q    So what you've shown us is, your right hand --

10 A    The right hand is the one you turn, turn left and right.

11      Wherever you want to go, right here.

12 Q    That's your left hand.

13 A    Yeah.  This left.  This is a right.  Sorry.  I confuse.

14 Q    So the left hand is the steering?

15 A    This is the steering.  This is the go and stop and you go

16      there, you stop, you -- this is the one you go and come back

17      and go.

18 Q    That's in your right hand?

19 A    Yeah.  In the right hands.  This one, the left hand, is the

20      one you steering wherever you want to go toward.

21 Q    Did you understand from your training about staying inside

22      the forklift?

23 A    Yeah.

24 Q    What were you taught about staying inside?

25 A    Stay inside.  Don't out in the forklift.  Inside in the

| | |
|---|---|
| 1 | compart. |
| 2 | Q   Did you ever, ever, either Krispy Kreme or at your time at |
| 3 | FedEx, intentionally get off a moving forklift? |
| 4 | A   No. |
| 5 | Q   Did you ever see anybody who wasn't riding completely in or |
| 6 | got off moving forklifts? |
| 7 | A   No. |
| 8 | Q   If you had seen somebody do that, what would you have done? |
| 9 | A   I'm going to tell him don't do that because it's dangerous. |
| 10 | Q   Did you see warnings on the forklift encouraging you to keep |
| 11 | all parts of your body inside the forklift? |
| 12 | A   Yeah. |
| 13 | Q   Why was that important? |
| 14 | A   That's important to people, when you work the forklift, for |
| 15 | safety. |
| 16 | Q   I'm going to show you -- what I just showed you was |
| 17 | Exhibit 500 and I'm going to show you something from |
| 18 | Exhibit 563, which is a movie called "Safety on the Move." |
| 19 | (Video played.) |
| 20 | BY MR. WARSHAUER: |
| 21 | Q   Both feet should be on the floor? |
| 22 | A   Yep. |
| 23 | Q   Were you told -- what were you told about that being an |
| 24 | important position to have? |
| 25 | A   For safety. |

1   Q   Was that the operator normal operating position?

2   A   Yeah.

3   Q   Both feet on the floor?

4   A   Yeah.

5                   (Video played.)

6   BY MR. WARSHAUER:

7   Q   What were your understandings about that last phrase, the

8       need to stay inside the compartment?  Did you understand that

9       you needed to stay inside the compartment?

10  A   Yeah.

11  Q   Any question in your mind about that?  Did you ever think

12      that it was a good idea to not be in the compartment?

13  A   You have to be inside all the time the compartment.

14                  (Video played.)

15  BY MR. WARSHAUER:

16  Q   What was the way that you normally rode the truck around the

17      warehouse in Effingham, forks behind you or forks ahead of

18      you?

19  A   Forks behind me.

20  Q   Was that the normal way that --

21  A   That's the way always I drive.

22  Q   I'm going to show you -- does this look like the floor of

23      a --

24  A   Yeah.

25  Q   -- forklift that you used at Effingham?

1    A    Yeah.

2    Q    It's Exhibit 157.  When you stood in this forklift, there's a

3         pedal.  What foot was on that pedal?

4    A    The right foot.

5    Q    When you stood in this forklift, where was your left foot?

6    A    In that inside, yeah.

7    Q    Once you were moving, did you ever look at your feet to see

8         what they were doing?

9    A    No.

10   Q    You didn't just drive around like this to see --

11   A    No.  No.

12   Q    Okay.  I'm going to give you several ways to get out.  Don't

13        tell me anything until I do it.  Okay?

14   A    Okay.

15                     MR. LoCOCO:  Your Honor, object to this.  It's

16        leading.

17   BY MR. WARSHAUER:

18   Q    How do you get out of the forklift?  Well, first, how do you

19        get in?

20   A    You get in straight.  Straight.

21   Q    Like this?

22   A    Like that.  Yeah.

23   Q    And like this.  How do you get out?

24   A    You go back and go straight.  Like that.

25   Q    Okay.  Did you ever get out like this?

1   A   No.

2   Q   Why not?

3   A   How do you get out like that?  I never do that.

4   Q   Did you ever get out like this?

5   A   No.  I get out straight like that.

6   Q   Every time?

7   A   Yeah.  All the time.  You have to get out like that.

8   Q   Okay.  You mean you never got out like this?

9   A   No.  Never in my life.

10  Q   Okay.  The record needs to just reflect that you described a

11      scenario where when you exited the forklift, your back was to

12      the forks, and typically your left foot would lead out to

13      step down parallel to the forks; is that correct?

14  A   Yeah.

15  Q   Okay.  Were you good at your job at FedEx?

16  A   What you say?  I didn't hear you.

17  Q   Were you good at your job?

18  A   Yeah, I'm good there.  I'm perfect attendance ten years.

19                      THE COURT:  Perfect attendance?

20                      THE WITNESS:  Yeah.

21  BY MR. WARSHAUER:

22  Q   Perfect attendance for ten years?  Really?

23  A   Yeah.  Ten years.  Go check my record.

24  Q   Okay.  Did you enjoy your work at FedEx?

25  A   Yeah, I love my job.

1  Q   Were you given commendations at FedEx?

2  A   What you say?

3  Q   Awards and letters --

4  A   Yeah, I got bunch awards.  I got bunch of award.

5  Q   Did that give you pleasure and pride --

6  A   Yeah, yep.

7  Q   Why?

8  A   Because I have -- I have my perfect attendance.  They give me

9      a bonus.  And I have contest and award, I have money.  And I

10     have -- and I work -- they have a quota, you know, like you

11     work a day for 12 hours, and you make your -- it's like a --

12     I can't explain it.  It's hard to explain.

13 Q   So you say a quota.  They expected a minimum number of --

14 A   Yeah, minimum number.

15 Q   Of liftup, carry, and putdowns?

16 A   No, it's not like that.

17 Q   Okay.

18 A   Like you pick -- like you pick 7,000 a day.  And the quota

19     only 3,000, I pick 7,000.  That's what that mean, all day.  I

20     pick 7,000 a day, sometimes 6,000 a day, when I was a picker.

21 Q   How about on a standup forklift?  Were you also good at that?

22 A   I load the truck and I loaded truck.  I can load eight truck

23     a day, sometime seven truck.

24 Q   How did that compare to other people?

25 A   Sometime people they have five or six.  It depends what kind.

1       Sometime it's hard.

2   Q   Were you awarded commendations and recognition for safety?

3   A   I always careful.

4   Q   You told me about a poster?

5   A   Yeah.  I have award poster for safety.  They give me award

6       because I'm a good safety.  In ten years, I never have

7       accident.

8   Q   Your picture was on the wall?

9   A   A picture on the wall.  Picture in the break room.

10  Q   Safety person?

11  A   Yep.

12  Q   Did that give you pleasure?  Were you proud of that?

13  A   Yeah.  I think I give to you.  I think I give to you.

14  Q   You gave me a lot of things, but we got them a little late to

15      be sharing them today.  But I -- you told us a few minutes

16      ago you started work when you were 16?

17  A   Yeah, in the Philippines.

18  Q   Until this accident, until this event on July the 29th of

19      2017, have you ever had a time outside the workforce when you

20      weren't working?

21  A   No.

22  Q   If you were physically and emotionally able to work now,

23      would you do it?

24  A   Yeah.

25  Q   Do you miss work?

1  A   I miss working.

2  Q   We heard from Dr. Tabak yesterday about your wages, that

3     that -- how much money you made.  Did that seem accurate to

4     you?

5  A   I make --

6  Q   Did you earn a lot of money?

7  A   Yeah, I make 60,000 a year I work in FedEx.

8  Q   That's a lot of overtime at $15 an hour?

9  A   Yeah.  15.50.  It have bonus.  If you work Sunday, you have

10     bonus.  $300 bonus.

11  Q   How did you work on Sundays and still get to St. Ann's?

12  A   I go to St. Anthony the night church, 5 o'clock.  I work 7 to

13     3.  And I get off, I get shower.  I go to church, me and my

14     son.

15  Q   I want to focus with you on July the 29th of 2017.  What were

16     your hours that day?  What time were you to go to work and

17     what time did you expect to get off?

18  A   That Saturday is 7 o'clock.  I work 7 o'clock in the morning.

19  Q   Until when?

20  A   3.

21  Q   When you would get to work, to start your day, were you going

22     to do -- it was going to be forklift work?

23  A   No.  We had to meeting in the break room.  After have

24     meeting, you have to check your fork truck.

25  Q   What did you do to check your fork truck?

1   A   You check your fork truck okay or not, check the hose and
2       battery and the horn.
3   Q   Did you do that?
4   A   Yeah, every day.
5   Q   Was your forklift working fine that day?
6   A   It's fine.
7   Q   And what kinds of -- who was your immediate person that gave
8       you orders?  Your boss, your team leader.
9   A   That day?
10  Q   Yes.
11  A   It's Rechel Boone.
12  Q   We met Rechel Boone on Monday -- I'm sorry -- Tuesday
13      morning.  Had you had any interactions with her before the
14      forklift caused your injury?
15  A   No, when -- when I have my accident.
16  Q   Had she given you a task or job to do?
17  A   Yeah.
18  Q   What did she tell you to do, do you recall?
19  A   I was -- the first job, I was doing put-away.  And they call
20      me into ride room [phonetic].  They said, "Lidy, you need to
21      come into shipping," and I go drive there to shipping.  And
22      she give me the paper, the list, to find some product.
23  Q   All right.  So after you met with her, where were you heading
24      before you did that job?
25  A   She give me the paper and I told them I think I have to go in

|     |   |                                                                      |
|-----|---|----------------------------------------------------------------------|
| 1   |   | the battery area to change my forklift because I have only           |
| 2   |   | one line.  And I drive all the way there.  Then I hit the            |
| 3   |   | crack and my forklift go shaking, and I lose my balance.  And        |
| 4   |   | next thing I know I was on the floor.  That's can remember.          |
| 5   | Q | Ms. Boone said you told her you slipped and it wouldn't stop?        |
| 6   | A | It slipped.  It's the same thing.  You lose balance.  That's         |
| 7   |   | the one to mean -- for me, that's what that mean.  "Slip" and        |
| 8   |   | "losing balance" is same thing.                                      |
| 9   | Q | While you were driving, were you looking at your feet?               |
| 10  | A | No.                                                                  |
| 11  | Q | Have you ever hit cracks before?                                    |
| 12  | A | Yes.                                                                 |
| 13  | Q | Had you had shaking?                                                 |
| 14  | A | Yeah.                                                                |
| 15  | Q | Did you look at your feet that time?                                |
| 16  | A | No.                                                                  |
| 17  | Q | Immediately before the fall -- I'm going to show you               |
| 18  |   | Plaintiff's Exhibit Number 6.  Where were your hands as you         |
| 19  |   | were driving down the aisle?                                        |
| 20  | A | My hands, one here and one here.                                    |
| 21  | Q | So --                                                               |
| 22  | A | The one turning the left hands.                                    |
| 23  | Q | Did you have your right hand where I put a red circle around       |
| 24  |   | the multifunction?                                                 |
| 25  | A | Yeah.                                                               |

1  Q    Did you have your left hand here?

2  A    Yeah.

3  Q    Do you recall the path that you chose to take?

4  A    Straight.

5  Q    Do you remember going with -- remember the man who was here

6       the other day, Dr. Meyer?  Do you remember meeting him at the

7       warehouse?  He testified yesterday morning and the day

8       before.  John Meyer?  Let me -- do you remember being at the

9       warehouse --

10                   (Video played.)

11                   THE WITNESS:  Yeah, I remember now.

12 BY MR. WARSHAUER:

13 Q    Do you remember this?

14 A    Yeah.

15 Q    Is this -- how does this compare to what you recall, the path

16      you took before you hit the cracks?

17 A    That's -- the crack is staying this way.

18 Q    But is this --

19 A    I went straight.  It's straight because that one here, it's

20      straight, you go.

21 Q    Okay.  Is this the path that you took that you're telling him

22      about at the time?

23 A    Yeah, because it was empty.  That's why I'm just straight.

24 Q    This turn that you just went through, is that challenging?

25      Was that a difficult turn?

1   A   No.  It was straight.

2   Q   Simple turn?

3   A   No.

4   Q   Is this -- how does this Picture Number 4 -- just looking

5       down an aisle, is this where you were headed?

6                   THE COURT:  Is there supposed to be a picture --

7                   MR. WARSHAUER:  Oh, sorry.

8   BY MR. WARSHAUER:

9   Q   We're looking down an aisle.  Do you recognize this?

10  A   Yeah.

11  Q   Why did you choose that aisle?  First, let me go back.

12      Ms. Boone's told us this is the aisle you were on.  Do you

13      agree this is the aisle you were on?

14  A   Yeah.  This is aisle I want to go because the other aisle you

15      cannot go because it's a picker area.  This is the different

16      replen area.  This the one you go.  So I choose this aisle.

17      And this aisle is straight.  You don't have turn.

18  Q   Why didn't you want to go down the picker aisle?

19  A   Because you cannot go in the picker aisle.  You have people

20      pick there.  And it's not allowed to go over there.

21  Q   If for some reason you had found yourself heading towards the

22      rack, what would you have done?

23  A   I didn't remember that, toward the rack.

24  Q   Well, listen to me carefully.  If your forklift was heading

25      towards the rack and you didn't want to hit the rack, what

| | | |
|---|---|---|
| 1 | | would you have done? |
| 2 | A | I hit the brake. |
| 3 | Q | Okay.  What kind of brakes were available? |
| 4 | A | They have brake right here in the -- |
| 5 | Q | Did you know how to do that? |
| 6 | A | Yeah, you had to -- you can go that way, you have brake, and |
| 7 | | pick up the pedal in the bottom.  You have to pick up your |
| 8 | | legs. |
| 9 | Q | Would you have -- if you were heading towards a rack, why |
| 10 | | would you choose the brake as opposed to just jumping off? |
| 11 | A | I never jump off. |
| 12 | Q | Would you ever jump off a moving -- |
| 13 | A | Never. |
| 14 | Q | -- forklift? |
| 15 | A | No. |
| 16 | Q | Never intentionally do that? |
| 17 | A | No. |
| 18 | Q | You told us a moment ago that it shook and you lost your |
| 19 | | balance? |
| 20 | A | Yeah, I lose my balance. |
| 21 | Q | What part of the forklift interacted you -- what hit you? |
| 22 | | What caused your injury to your foot? |
| 23 | A | Hit the crack and my forklift, it was shaking. |
| 24 | Q | But did the forklift run over part of you? |
| 25 | A | Yeah. |

1    Q    What part of the forklift ran over you, do you remember?

2    A    It was in the middle.  I don't know.  I was -- I think it was

3         in the middle.  Because I was on the ground, and I got lot of

4         blood.  And I cannot see.  So blurry.

5    Q    What do you mean it was blurry?  After you were on the

6         ground?

7    A    Yeah.  After on the ground.

8    Q    Your vision got blurry?

9    A    I got blurry, and been calling for help.

10   Q    Did help eventually arrive?

11   A    Yeah.  About probably a minute, something like that.

12   Q    And do you recall who got there first?

13   A    Got there first is Rechel Boone.

14   Q    Do you recall what she did for you?

15   A    I don't know.  I remember...  I hear been yelling to find

16        a -- to tie my leg because it's a lot of blood.  That's what

17        I hear.  And I hear a lot of people and I see the head.  It's

18        so blurry.

19   Q    Did you see how much blood you had lost?

20   A    It's a lot on the ground.

21   Q    Was it just right where you were?

22   A    Yeah.

23   Q    Do you recall what happened after -- Ms. Boone tells us she

24        put a tourniquet on and then I guess the ambulance people

25        arrived.  When's the next thing that you remember?

1   A   I don't remember I'm in ambulance.

2   Q   Do you remember the helicopter ride?

3   A   No.

4   Q   Do you remember the first surgery?

5   A   No.

6   Q   Can you tell us about the discussions before Dr. Low, who we

7       heard from, decided to take your left leg off?  Do you recall

8       being part of that discussion?

9   A   Yeah.  That's the one, the Dr. Low.  The first time we go

10      there, Dr. Brown.

11  Q   Right.  But eventually Dr. Low did the amputation; right?

12  A   Yeah.

13  Q   Do you recall making that decision?

14  A   They told me they're not going to live no more, my leg.

15  Q   Was that a hard decision to make?

16  A   It's hard.  I told them I said, "I want to get -- I don't

17      want to get cut my leg.  I want to get -- try something to

18      get -- you know, I don't want to cut my leg."  That's what I

19      said.  "You need to try something to fix my legs."  And they

20      said I could -- you cannot fix it because it's already dead.

21  Q   So we learned about your amputation.  After that, you stayed

22      in the hospital, I think Mr. Anderson told us, around a

23      couple of months.  Do you recall that?

24  A   Yeah.  Been there I think two months and a half, something

25      like that.

1    Q    Then you went home?

2    A    I went home.

3    Q    And did you eventually start trying to get your life back

4         together with a prosthetic and things like that?

5    A    Not for a while.  I think my prosthetic a year later.

6    Q    Okay.  What kind of efforts have you made to learn to use

7         your prosthetic or prosthesis?

8    A    What's that?

9    Q    What have you tried -- what efforts have you made so that it

10        becomes more comfortable?  How have you worked to make this

11        so that you can use it better?

12   A    I don't know, because -- and I put my prosthetic leg, it's --

13        and I walk like couple like minute or two minutes.  It's --

14        it hurts in the stump, the one in the bottom and the side.

15        It hurts to walk.

16   Q    Have you considered getting surgery to make that maybe

17        better?

18   A    They asked me to doing another surgery, and I said, I'm going

19        to start the beginning again.  I don't want to do that.  And

20        I ask I can get medication for that to go away.

21   Q    And do you take medication?

22   A    I take medication three times a day.

23   Q    Has that helped?

24   A    It help, the Tylenol and the other one.

25   Q    What do you hope will happen so that you can use your

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | prosthetic better?                                           |
| 2  | A | They said -- they told me need to get surgery and you have   |
| 3  |   | get better prosthetic leg and you can walk better.  That's   |
| 4  |   | what they told me.                                           |
| 5  | Q | Are you scared of the surgery?                               |
| 6  | A | I'm scared surgery again.                                    |
| 7  | Q | How many have you had?                                       |
| 8  | A | I have five.                                                 |
| 9  | Q | Do you ever feel like your foot is still there?             |
| 10 | A | Yeah.  I feel that twice a week sometime.  Like in the night |
| 11 |   | I wake up and it -- my foot is itching.  And I look, it's    |
| 12 |   | nothing in there.                                            |
| 13 | Q | Have you ever been in bed and forgotten that you didn't have |
| 14 |   | a leg?                                                        |
| 15 | A | I've done a couple time and I don't have my leg.  I just     |
| 16 |   | stick out my bed and I got about three minutes.  I forgot I  |
| 17 |   | don't have my legs.  And I fall over --                      |
| 18 | Q | And you fall over?                                           |
| 19 | A | -- many time.                                                |
| 20 | Q | I think that we've learned from the life care planner and    |
| 21 |   | certainly from your husband that you seem to be depressed?   |
| 22 | A | I take medication for depression and I quit on it because I  |
| 23 |   | get suicide.                                                 |
| 24 | Q | So when you took the medicines to make the depression go     |
| 25 |   | away, it made you want to kill yourself?                     |

1  A   Yeah.  That's why I quit that medication.  I take no more.

2  Q   Have you tried talking to psychologists to try to get out of

3      this --

4  A   Yeah.

5  Q   Is it -- how's the combination of the loss of your leg and

6      your husband's problem, is it -- how can you bear that

7      weight?

8  A   It's hard, because he's sick and I cannot help him.  My son,

9      he help him a lot.

10 Q   I'm looking here, and we see -- what are we seeing here in

11     Exhibit Number 9?

12 A   That's my leg.

13 Q   And there's a walker.  And when we look at page 2 of

14     Number 9, we see -- what are we seeing here?

15 A   That's the cover if you put the legs.  I have to wash it

16     every day because you not wash it, it smell.

17 Q   How many functioning legs do you have?

18 A   The two of them, cannot use it because it's so big.

19 Q   So you have just one that works?

20 A   I have only one, this one.  That's it.  And I cannot walk

21     very good because I'm go fall down.  I cannot get the

22     balance.

23 Q   Mr. Anderson told us about the house and Nurse Klosterman had

24     told us about the house too.  You and Mr. Anderson bought

25     this house together?

1   A   Yeah.

2   Q   I'm going to show you Exhibit Number 10.  And it has seven

3       pages, so we look at the front page and I just want to call

4       up one thing.  Why do you have a sign that says "I'm a

5       Bulldog"?

6   A   That's my son.  He's a bulldog.  St. Anthony basketball.

7   Q   Are you proud of that?

8   A   Yeah, I always take him there.

9   Q   When I was asking you about things that you enjoy doing,

10      how -- what are your thoughts about watching him play

11      basketball?

12  A   I like it.

13  Q   Does it give --

14  A   I'm proud of him.

15  Q   So what part of the house are we looking at when we look at

16      this ramp?

17  A   I'm looking in the front house.

18  Q   Okay.  That's page 2.  When we move to page 3, what are we

19      seeing here?

20  A   That's my bathroom, the one I'm go shower.

21  Q   And when we go to Number 3, what is this?

22  A   That's a shower.

23  Q   Number 4, actually.  And is this one also part of the

24      bathroom?

25  A   Yeah.

1  Q    Number 5?  What are we seeing here on Number 6 --

2  A    The one going upstair.  We have an Acorn.

3  Q    So how often do you -- what is at the top of these stairs?

4  A    It's upstair.  You have to use the Acorn to go the second

5       floor.

6  Q    And what is this that we see here?

7  A    That one, and you have to go in the living room.

8  Q    So there's lots of steps in your house?

9  A    Yeah.  We have a lot of steps and you have basement, and I

10      cannot go anywhere in the basement almost three years.  And I

11      go only this year.  My son help me.  I go on my butt.

12 Q    How do you go?

13 A    I go sit down on my butt.

14 Q    Well, since you've mentioned "butt," I'm going to ask you.

15      Have you gained a little weight since this event?

16 A    Yeah, I gain a lot.

17 Q    Before this event, about what size were you?

18 A    I'm 120.  180, something like that.

19 Q    What size clothes did you wear?

20 A    Size 3, size 2.  It depends what kind of clothes.

21 Q    We looked back at this prosthetic on Exhibit 9.  Would you

22      like to have a swim prosthetic?

23 A    Yeah.  I like it because I like swimming a lot.

24 Q    Would you like to have a prosthetic to wear your 40 pairs of

25      high heels?

| | | |
|---|---|---|
| 1 | A | I don't know you can wear prosthetic with high heel.  I think |
| 2 | | you not. |
| 3 | Q | If such a thing existed, would you like it? |
| 4 | A | Yeah. |
| 5 | Q | All right.  Would you like one so that you could jog? |
| 6 | A | Yeah, because I used to jog. |
| 7 | Q | Where did you jog? |
| 8 | A | I go to -- I go around in the Park Hill, the village in -- I |
| 9 | | have a member the gym in there. |
| 10 | Q | Did you also have a treadmill at the house? |
| 11 | A | Yeah, I have treadmill in the house. |
| 12 | Q | Mrs. Anderson, if you were able to work, would you work? |
| 13 | A | Yeah. |
| 14 | Q | Could you drive a forklift again? |
| 15 | A | No.  I'm not doing that no more.  I'm scared.  And I see the |
| 16 | | forklift, I'm already... |
| 17 | Q | Before we finish up with a couple of questions, I want to go |
| 18 | | back to Exhibit 6.  Why wouldn't you jump out of that |
| 19 | | forklift? |
| 20 | A | What's that? |
| 21 | Q | You told me that you didn't think jumping out of a forklift |
| 22 | | is something you would do.  Why wouldn't you? |
| 23 | A | I never jump in the forklift. |
| 24 | Q | Why not? |
| 25 | A | That's dangerous. |

| | | |
|---|---|---|
| 1 | Q | Lidy, what's the future hold? |
| 2 | A | What's that? |
| 3 | Q | What do you hope will happen in the future for you and your |
| 4 | | family? |
| 5 | A | I didn't understand what you say. |
| 6 | Q | Are you hoping to be more active? |
| 7 | A | Yeah.  And I can walk better. |
| 8 | Q | Are you hoping to beat this depression? |
| 9 | A | Yeah.  I want to get out the -- I'm so depressed. |
| 10 | Q | Have you ever -- I know that you said the medication made you |
| 11 | | want to take your life.  But even without the medication, |
| 12 | | have you ever thought that it was just maybe the best thing? |
| 13 | A | Sometime I think. |
| 14 | Q | Are you -- what are your thoughts about how your parenting of |
| 15 | | Luke has changed? |
| 16 | A | I see my son every day.  And he's not home, I'm so depressed. |
| 17 | | That's only keep me alive is my son. |
| 18 | Q | Have you been able to be the parent for him that you were |
| 19 | | before July the 29th of 2017? |
| 20 | A | Before, I take care of him a lot.  Now he take care of me. |
| 21 | | He do laundry and go grocery. |
| 22 | Q | And are you concerned about your ability to take care of |
| 23 | | Jeff? |
| 24 | A | Yeah. |
| 25 | | MR. WARSHAUER:  Thank you. |

1    THE COURT:  You want a break before cross?

2    MR. LoCOCO:  Only if you do, Your Honor.

3    THE COURT:  Yeah.  Let's take a five-minute

4    break.

5    MR. LoCOCO:  Okay.

6    THE COURT:  We've been going for a while.

7    (Jury exits at 3:28 p.m.)

8    (Recess from 3:28 p.m. to 3:40 p.m.)

9    (Jury enters at 3:40 p.m.).

10   THE COURT:  All right.  Be seated.  We are back

11   on the record.

12   Mr. LoCoco, cross-examination?

13   MR. LoCOCO:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15   BY MR. LoCOCO:

16   Q   Good afternoon, Mrs. Anderson.

17   A   Good afternoon.

18   Q   We met about a year and a half ago over the internet; right?

19   A   Yeah.

20   Q   And that's when I had a chance to take your deposition under

21       oath to find out what happened.  Do you remember that?

22   A   Yeah.

23   Q   You were sitting in your house; correct?

24   A   Yeah.

25   Q   Okay.  I want to start with something pretty simple, I hope.

1        Mr. Warshauer was asking you questions about how to get out

2        of the compartment and he was using just this floor.  I want

3        to pick up with that.  So he was standing on the -- on the

4        floor of this compartment or this piece of foam core board

5        that has an image of the floor.  You with me so far?

6  A   Yeah.

7  Q   And he asked you whether -- how you stepped out, and I think

8        what you said, and then he demonstrated, is you stepped out

9        with your left foot, and then your right foot?

10  A   Yeah.

11  Q   That's not how you would do it, is it?

12  A   That's how I do it.

13  Q   So wouldn't you first get your foot off the deadman pedal?

14  A   You pick up that one.

15  Q   This is supposed to be the deadman pedal?

16  A   Yeah.

17  Q   Okay.  So you would take your foot off the deadman pedal?

18  A   Mm-hmm.

19  Q   Correct?

20  A   Yeah.

21  Q   And then you'd get out?

22  A   You get out.

23  Q   But only after your foot's off the pedal; correct?

24  A   Mm-hmm.

25  Q   You have to answer with words.

1   A   Yes.

2   Q   Thank you.  And that's because the pedal takes power -- once

3       you lift it up, takes the power away from the truck,

4       disconnects the battery; correct?

5   A   What you say?

6   Q   When you put your foot on the pedal, it connects the battery

7       power to the lift truck?

8   A   Yeah.

9   Q   And when you take your foot off the pedal, it disconnects the

10      battery?

11   A   Yeah.

12   Q   And it puts on the brake?

13   A   Yeah.

14   Q   Okay.  And you would not get out of the forklift in normal

15      operation?

16   A   Mm-mm.

17   Q   Unless your foot was off the pedal; agreed?  You agree with

18      that?

19   A   I didn't understand what you said.

20   Q   Yeah.  You wouldn't step out of the compartment unless your

21      right foot was already off of the pedal?

22   A   Yeah.

23   Q   Okay.  And Mr. Warshauer covered a number of things, so I

24      might be popping around a little bit.  FedEx Supply Chain,

25      that warehouse in Effingham, we haven't -- I don't think the

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | jury's heard what kind of warehouse it was.  It was a food   |
| 2  |   | warehouse for a grocery store chain; right?                  |
| 3  | A | Yeah.                                                        |
| 4  | Q | For Pinnacle Foods?                                          |
| 5  | A | Mm-hmm, yeah.                                                |
| 6  | Q | And that warehouse sometime, what, about a year after your  |
| 7  |   | accident, it closed?                                         |
| 8  | A | I think so.  They close down.                               |
| 9  | Q | Well, forget about the time.  It's closed now; correct?     |
| 10 | A | Yeah.                                                        |
| 11 | Q | Okay.  You said that you'd like to get back swimming; is that |
| 12 |   | true?                                                        |
| 13 | A | Yeah, I want to.                                            |
| 14 | Q | Have you asked Bryan King, Mr. King?  You know him; he was  |
| 15 |   | here this morning?                                           |
| 16 | A | Yeah.  I ask him one time.                                  |
| 17 | Q | Did you ask him about getting a swimming prosthetic?        |
| 18 | A | Yep.                                                        |
| 19 | Q | Do you know why he didn't make one for you?                 |
| 20 | A | I don't know.                                               |
| 21 | Q | Okay.  So when you started at FedEx Supply Chain, you started |
| 22 |   | as a picker?                                                 |
| 23 | A | Yeah.                                                        |
| 24 | Q | Which means you were filling orders for individual stores;  |
| 25 |   | correct?                                                     |

1   A   Correct.

2   Q   And then whatever you -- so you'd have -- you'd fill a pallet

3       with boxes; right?

4   A   Yes, product.

5   Q   And then the forklifts would put them into semitrailers to

6       get delivered to the stores?

7   A   Yeah.

8   Q   Okay.  And then you wanted to take a forklift operating job?

9   A   Yeah.

10   Q   And that paid more money?

11   A   Yeah.

12   Q   Because it included more responsibility; correct?

13   A   Yeah.  And --

14   Q   You were going to operate heavy pieces of equipment?

15   A   Yes.

16   Q   And you knew you needed to be safe?

17   A   Yeah.

18   Q   And you knew that if you did get out of the forklift while it

19       was still moving, you could be seriously injured; correct?

20   A   What you say?

21   Q   You knew that if you stepped out of the standup forklift

22       while it was still moving, you could get seriously injured?

23   A   Yeah, you get injured if you get out.

24   Q   Yeah.  If you get out while it's moving?

25   A   No, you not get out when you're moving.

1  Q   But if someone did do that, you could get seriously hurt?

2  A   Yeah.

3  Q   Okay.  One of the jobs you had as an operator was to make

4      sure you stayed in the compartment while you were operating?

5  A   Yes.

6  Q   Okay.  Now when I took your deposition last year -- this is

7      page 50, line 3.  In fact, let me give you a copy of it,

8      Mrs. Anderson.

9              MR. LoCOCO:  Your Honor, may I actually go to the

10     page for her?

11             THE COURT:  Yeah.

12 BY MR. LoCOCO:

13 Q   So I asked you at line 3, "So tell us what happened, where

14     were you going, and then what happened."  And you answered:

15     "I was driving in my forklift.  I ran over some crack.  My

16     forklift was shaking and I lost my balance.  The next thing I

17     knew, I was on the ground, and the forklift ran over my leg."

18     You see that?

19 A   Yeah.

20 Q   And that was your testimony?

21 A   Yeah.

22 Q   Okay.  And then on page 52, which is the top of the next

23     column, line 9 -- tell me when you're there.

24 A   Yeah.  I'm there.

25 Q   I asked, question:  "Now when you say you lost your balance,

1      how did you lose your balance?"  And you answered:  "My
2      forklift was shaking."  Correct?
3   A  Yes.
4   Q  You didn't say "I slipped."  Correct?
5   A  No.
6   Q  All right.  You were trained to operate a Toyota standup when
7      you were at Krispy Kreme?
8   A  Yes.
9   Q  And then you got training again from FedEx?
10  A  Yeah.
11  Q  One of the things you mentioned with Mr. Warshauer is that at
12     the start of your shift for the forklift operators, you're
13     required to check it out to make sure it's operating
14     properly?
15  A  Yeah.
16  Q  So I want to talk about that for a minute or so.  You check
17     to make sure that the steering works?
18  A  Mm-hmm.
19  Q  Yes?
20  A  Yes.
21  Q  You check to make sure that the --
22  A  The horn work.
23  Q  The horn works.  That all of the --
24  A  The hose.
25  Q  Pardon me?

1    A     The hose.   The hose.

2                          THE COURT:   The hose?

3    BY MR. LoCOCO:

4    Q     The hose?   What hose?

5    A     The hose in the truck.

6                          MR. WARSHAUER:   She's talking about the

7          hydraulics.

8    BY MR. LoCOCO:

9    Q     You inspect the hydraulic hose --

10   A     Yeah.

11   Q     -- to make sure they're not leaking?

12   A     Yeah.

13   Q     And you check the tire to make sure it's not chunked out --

14   A     Yeah.

15   Q     -- correct?   You check the brakes?

16   A     Mm-hmm.   Yeah.

17   Q     You check both the brake you use with the handle; correct?

18   A     Yeah.

19   Q     Also the foot brake?

20   A     Yeah.

21   Q     And on the day of your accident, July 29, 2017, did you do

22         the daily check?

23   A     Yes.

24   Q     And was it working properly?

25   A     It's working.

1    Q    No malfunctions that day?  It was working the way you

2         expected it to?

3    A    Yeah, in the morning.

4    Q    Well, up to the time of your accident, did it work fine?

5    A    Yeah.

6    Q    And if you found something not working properly, what were

7         you supposed to do?

8    A    You had to bring to ship.

9    Q    To the maintenance?

10   A    Yeah, to fix it.

11   Q    And you'd stop using it?

12   A    Yeah.

13   Q    On Saturday, were there maintenance people there?

14   A    No, it's not there.

15   Q    So if you had a problem on a Saturday, would you just get a

16        different forklift?

17   A    Yeah.

18   Q    Okay.  When you're standing in the compartment -- I'm going

19        to do it this way now.  You told Mr. Warshauer -- we talked

20        about your feet and we talked about your hands.  I'm not sure

21        we talked about your backside, but you would lean against the

22        back pad; correct?

23   A    Mm-hmm.  Yeah.

24   Q    Yes.  Okay.  And you had operated that type of forklift for

25        three years before your accident?

1   A   Yeah.

2   Q   Had no problems in those three years; correct?

3   A   Some people do.

4   Q   No, but you had no problems operating?

5   A   I don't have problem.

6   Q   Pardon me?

7   A   I don't have problem.  The other person next my ship, he had

8       problem.

9   Q   I want to talk about you.  You never had a problem staying in

10      the compartment; correct?

11  A   No.

12  Q   Never fell out before?

13  A   Never.

14  Q   Never lost your balance before?

15  A   No.

16  Q   And you had been going over the cracks on that floor for

17      three years?

18  A   Yeah.

19  Q   Okay.  Now --

20              MR. LoCOCO:  Could I have the document camera?

21      I'm sorry, the computer thing.

22              THE COURTROOM DEPUTY:  Oh, mm-hmm.

23              MR. LoCOCO:  503, please.  We used to just make

24      big pictures to show.  Right, Your Honor?

25              THE COURT:  Yep.

1          MR. LoCOCO:   Okay.

2    BY MR. LoCOCO:

3    Q    So we're looking at 503, first page of 503.  Do you see that

4         picture, Mrs. Anderson?

5    A    Yeah.

6    Q    And I think what you did, you told Mr. Warshauer that that's

7         the aisle that you were going down when your accident

8         happened?

9    A    Yeah.

10   Q    And that's the F/G Aisle?

11   A    Mm-hmm.

12   Q    Yes?

13   A    Yes.

14   Q    So you took a curve so that you would avoid the pick aisle;

15        correct?

16   A    Don't have curve.

17   Q    Pardon me?

18   A    You don't have curve.  It straight go shipping.

19   Q    I understand that.  You drove into this aisle instead of

20        going down the other side of this?

21   A    Yeah.

22   Q    Because you wanted to stay out of the pick aisle?

23   A    Yeah.

24   Q    Just before your accident, was there someone there picking?

25   A    No.  No picker because it's Saturday.

1    Q    So no one was in your way?

2    A    No.

3    Q    But you decided to take this curve and go down F/G?

4    A    They don't have curve.  It's straight.

5    Q    But from where you were coming -- we saw that video of you

6        with Dr. Meyer -- you went straight down, and then turned to

7        the right, and then turned back to go straight into the

8        aisle?

9    A    It's not that way.  It was straight.

10                MR. LoCOCO:  Can I have the next picture?  Next

11    one.  Keep going.  Keep going, please.  Let's go back to the

12    first one.  Now can I switch to the document camera?

13  BY MR. LoCOCO:

14    Q    So you remember this drawing that Dr. Meyer had up?

15    A    Yeah.

16    Q    All right.  And all he was saying is you came into this aisle

17    and then you -- your testimony is you straightened out;

18    correct?

19    A    Yeah, straight.

20                MR. LoCOCO:  All right.  Now if we go back to the

21    computer.

22  BY MR. LoCOCO:

23    Q    So when you came down this aisle that we see in 503, you were

24    going straight down the aisle?

25    A    Yeah.

1    Q    You never turned?

2    A    No.

3    Q    Always stayed straight?

4    A    Yeah.

5    Q    And after the accident, the forklift was still straight down

6         the aisle?

7    A    Yeah.

8    Q    Okay.  Few other questions about the accident.  You don't

9         remember when you let go of the control handle during this

10        accident; correct?  You told us that you lost your balance,

11        that you fell out.  You don't remember during the accident

12        process when your hands came off the controls; correct?  You

13        have no memory of that?

14   A    No.

15   Q    You agree with me, you don't remember?

16   A    I don't remember because I was on the floor already.

17   Q    Right.  So you don't remember when your left hand came off

18        the steering tiller; correct?

19   A    No.  What are you talking about?

20   Q    Once you're on the floor, your hands are off the controls?

21   A    Yeah.  I was holding both my hands, the right and left.

22   Q    And at some point, you were on the floor then?

23   A    Not on the floor.  It was -- I remember my -- I ran some

24        crack and my forklift was shaking, and I know I was on the

25        floor already.

| | | |
|---|---|---|
| 1 | Q | Right.  So the forklift -- you went over a crack, the |
| 2 | | forklift was shaking, and the next thing you knew, you lost |
| 3 | | your balance and the next thing you knew, you were on the |
| 4 | | ground? |
| 5 | A | Yeah.  I lose my balance.  Next thing I know, I was on the |
| 6 | | floor. |
| 7 | Q | Right.  And all I'm asking you is, do you remember when |
| 8 | | during this process your hands came off the controls? |
| 9 | A | Cannot remember. |
| 10 | Q | Okay.  And you don't remember when your foot came up off the |
| 11 | | pedal, do you? |
| 12 | A | No. |
| 13 | Q | Okay.  Now your accident happened on July 29 of 2017; right? |
| 14 | A | Yes. |
| 15 | Q | And we've looked at your medical records and I want to ask |
| 16 | | you some questions about some entries that are in the medical |
| 17 | | records. |
| 18 | | MR. LoCOCO:  Now the document camera, please. |
| 19 | BY MR. LoCOCO: |
| 20 | Q | This is Plaintiff's Exhibit 129.  It's in evidence.  This is |
| 21 | | page 5,290 of 5,406.  So this is a document from |
| 22 | | St. Anthony's Hospital.  You see it's dated July 29, 2017. |
| 23 | | Do you see that? |
| 24 | A | Yes. |
| 25 | Q | And then this highlighted part says, "50-year-old female |

1    presenting to the emergency department with left lower

2    extremity degloving injury.  Patient was operating a standup

3    forklift when it tipped over for an unknown reason.  Upon EMS

4    arrival, patient was laying down approximate 5 feet away from

5    the forklift."  You see that?

6  A  Yeah.  I see that.

7  Q  Did you tell the EMS people that the forklift --

8  A  No, I never talk nobody.

9  Q  I know your answer, but I, for the record, I have to get the

10   question out.  Did you tell the EMS people or the doctors at

11   the emergency room that the forklift tipped over?

12 A  No, because I'm not wake there.

13 Q  Okay.  Next one I want to ask you about is this.  This is

14   still 129, Exhibit 129, page 351.  This is from Carle

15   Hospital.  So you went to St. Anthony's Memorial in Effingham

16   first; correct?  Or do you remember that?

17 A  I don't know.  I don't remember I was in St. Anthony.

18 Q  Yeah.  And I think Mr. Warshauer asked if you remembered the

19   helicopter ride.  Do you remember that?

20 A  No, I don't remember either.

21 Q  You do remember being at Carle?

22 A  When I wake up, I remember.

23 Q  Okay.  So this is a record from Carle.  Again, the

24   highlighted part here says, "Ms. Anderson was involved in a

25   forklift accident on Tuesday, 7-29.  Today is her 18th day in

1  the hospital.  She says she was at work driving the forklift,

2  as she has been doing for ten years at FedEx.  She has worked

3  on forklifts overall 13 years or so.  Has never had an

4  accident.  A good safety record.  The truck jerked and threw

5  her off, then ran over her foot."  Did you tell the doctors

6  or the nurses at Carle that the truck jerked and threw you

7  off?

8  A    No.

9  Q    So the accident was September -- or July 29.  18 days later

10  is like August 16th.  All right?  So that was that record.

11  Next record is from the FedEx file, which is Exhibit 583, but

12  it's Bates Ray_Anderson 135.

13           MR. LoCOCO:  I guess Mr. Warshauer wants to ask

14  you a question.

15           (Sidebar begins.)

16           MR. LoCOCO:  Want to ask her about this one.

17  It's a document with her signature, her --

18           THE COURT:  Work comp form?

19           MR. LoCOCO:  Yeah, but I scratched out "work

20  comp."

21           THE COURT:  It says, "Work Comp Act,

22  occupation --"

23           MR. LoCOCO:  I'll cover it up.  All I'm focusing

24  on is "driving forklift, thrown out of forklift."  That's all I

25  want to ask her about.  She signed it.

 1          THE COURT:  All right.  What's your objection?

 2          MR. WARSHAUER:  Well, it's really a signature

 3   that's really a document completed by her attorney.  It's the

 4   attorney who chooses the words.  We're going to have to explain

 5   all of this stuff that Fred chose.

 6          THE COURT:  Petitioner's attorney.

 7          MR. WARSHAUER:  We know the petitioners don't do

 8   any of this.  The lawyers choose the words.

 9          MR. LoCOCO:  It doesn't matter.  She signed it.

10   You can redirect on that.

11          MR. WARSHAUER:  Then we got out a whole thing

12   about, who is Mr. Johnson.

13          MR. LoCOCO:  This is --

14          THE COURT:  All right.  Here's my ruling.  As was

15   going to be presented to this witness, it showed at the top of

16   the page, "Work Comp Act, occupational disease, fatal case, yes

17   or no."  It gives a case number.

18          MR. LoCOCO:  Your Honor --

19          THE COURT:  It says -- wait.  It says "Employee's

20   name, employer's name, average weekly wage."

21          MR. LoCOCO:  I think I have a solution, Your

22   Honor.

23          THE COURT:  Okay.  But let me -- I'm making the

24   record as to why I'm ruling the way I'm ruling, and then I'm

25   going to hear your suggestion and see if it changes my ruling.

1    "What is the nature of the injury?"  And then there's a return

2    to work date.  It's empty.  "Is there a petition for immediate

3    hearing attached?  Is the injured employee currently receiving

4    temporary total disability benefits?  Yes.  If a prior

5    application was ever filed by this employee, give the case

6    number.  Attention, Petitioner:  This is a legal document.  Be

7    sure all blanks are completed correctly and you understand the

8    statements before you sign it.  Refer to the commission's

9    handbook on worker's compensation and occupational disease."

10             This document is so loaded with references to

11   work comp.  I don't know how it can be presented -- and then at

12   the bottom it shows who her attorney is, and it makes specific

13   reference -- anybody who's had a work comp case themselves, if

14   they're on the jury, are going to know what this is.  Any of

15   these people who may have had safety their employment maybe have

16   to fill out some of this stuff.  So I think the document as it

17   is, it puts into evidence that there's a work comp claim.

18             Now how do you propose to --

19             MR. LoCOCO:  The way I would do it is I would

20   never show the document to the jury.

21             THE COURT:  Okay.

22             MR. LoCOCO:  I'm going to ask Mrs. Anderson,

23   "Didn't you sign a document in which when you were asked how the

24   accident occurred?  You said 'driving forklift, thrown out of

25   forklift.'"  If she says "I don't recall that," I will then show

1    her and only her the document to refresh her recollection, and

2    we'll see what she says.  That way, the jury doesn't see the

3    document at all, and that's perfectly proper impeachment.

4              MR. WARSHAUER:  Or she might well say, "My

5    worker's comp attorney helped me fill that out."

6              MR. LoCOCO:  If you prepped her right, she

7    shouldn't have.  She shouldn't.

8              MR. WARSHAUER:  You really expect her to be

9    sophisticated enough to not do that?

10             THE COURT:  She filled that out and her lawyer

11   just said, "Here, I typed this out, and then you sign it and

12   then I'll sign it."

13             MR. LoCOCO:  Your Honor, first of all, it's

14   consistent with the last two documents, the last document I

15   showed her.

16             THE COURT:  Well, first of all, it's not.  The

17   first document you showed her, the next sentence read, "Patient

18   could not give a clear history as to how the accident happened."

19   So the second document was entitled "PSTD [phonetic] Dreams,"

20   and it is not necessarily her writing.  It is -- it's just a

21   consult from her -- from a psychiatrist or something, that -- so

22   I think that you can ask, "Do you recall signing a document in

23   which it said that you were driving a forklift and you were

24   thrown out of the forklift?"

25             MR. LoCOCO:  Okay.

 1                    THE COURT:  I think you can ask that.  And --

 2      but --

 3                    MR. LoCOCO:  That's fine.  I can live with that.

 4                    THE COURT:  All right.

 5                    MR. LoCOCO:  I'll have to, but I can live with

 6      that.

 7                    THE COURT:  You'll have to.

 8                    MR. LoCOCO:  Just from a timing perspective, I'll

 9      try to get to a natural break point, which is probably a couple

10      minutes.  I don't know.  I can't finish her today.  I mean, I'd

11      like to, but isn't it after 4?

12                    THE COURT:  All right.  Well, then we're on the

13      subject now of her statements, how the accident happened, what

14      she remembers, what she doesn't remember.  What's the next

15      subject --

16                    MR. LoCOCO:  Damages questions.  Damages.

17                    THE COURT:  So let's finish this up and cut them

18      for the day.

19                    (Sidebar ends.)

20      BY MR. LoCOCO:

21      Q    Okay.  Mrs. Anderson, in September of 2017, not quite two

22           months after the accident, do you recall signing a

23           document -- in which you signed a document that said that the

24           accident occurred as follows, quote, "Driving forklift,

25           thrown out of forklift"?

```
 1   A    Sign?  I never sign nobody.  What's that mean, you say?
 2                    MR. LoCOCO:  May I approach the witness to just
 3        ask her to verify the signature, Your Honor?
 4                    THE COURT:  Yeah.
 5                    All you're asked to do, ma'am, is to verify
 6        whether or not that's your signature.
 7   BY MR. LoCOCO:
 8   Q    Is this your signature, Mrs. Anderson?
 9   A    Never remember sign.
10   Q    But is that your signature, ma'am?
11   A    It's different sign.
12   Q    That's -- is this your signature?
13   A    Yeah.
14   Q    Okay.  You just don't remember signing it; right?
15   A    No.
16   Q    Okay.
17                    MR. LoCOCO:  That's a good place, Your Honor.
18                    THE COURT:  All right.  One of the things that we
19        talked about when we met at the other side of my bench -- was
20        that -- do you have another one?
21                    MR. LoCOCO:  Yeah, I did, I'm sorry.
22                    THE COURT:  Go ahead.
23   BY MR. LoCOCO:
24   Q    Mrs. Anderson, after the accident at some point, you did give
25        an interview to an OSHA investigator; correct?
```

1  A    About six months later.

2  Q    Yes.  Where you sat with the investigator and he asked you a

3       number of questions; correct?

4  A    Yeah.  I was in medication and suicidal.

5  Q    This is Ray_Anderson 196.  Do you recall telling him, "Went

6       down G Aisle and turned right and then left on F/G"?  That

7       sound right?  You went down the G Aisle, turned right, and

8       then left to go down F/G?

9  A    I don't remember to say that.

10 Q    Okay.  But that's what you did that day; right?

11 A    In G, it's straight.

12 Q    "Hit a chip chunk of wood, was thrown out"?

13 A    I never remember to say that one either.

14 Q    You don't remember saying that?

15 A    Nope.

16             MR. LoCOCO:  All right.  Now I'm ready.  Thank

17      you.

18             THE COURT:  All right.  At the last sidebar, one

19      of the things we talked about was the fact that since it's about

20      quarter after 4, and Mr. LoCoco was finishing up with line of

21      questions with respect to her memory about how the accident

22      happened, was going to move on to a different subject.  But we

23      thought it would take some time, and so I decided that this

24      would be a good time to break for the day.  And we can pick up

25      that line of questioning or continue the cross-examination of

1      the plaintiff tomorrow.

2                  I do expect tomorrow morning, we will have

3      lawyer-judge things to take up.  So I am going to -- I'm going

4      to say be here by 10.  And that way, I'll make sure we've got

5      all that stuff out of the way.  I won't have you getting up

6      earlier and sitting around for an hour thinking, "I could be

7      sleeping through this."  So if you're here by 10, we should be

8      good to go tomorrow.

9                  Thank you, ladies and gentlemen.  We are

10     adjourned for the day.

11                 (Jury exits at 4:13 p.m.)

12                 THE COURT:  If we come back tomorrow at 9, that

13     should give us enough time to argue whatever motions and

14     everything we need to take up?  Fair to say?

15                 MR. LoCOCO:  Yes.

16                 THE COURT:  Okay.  Do you agree with that,

17     Mr. Warshauer?

18                 MR. WARSHAUER:  I don't think there's --

19                 THE COURT:  Pardon me?

20                 MR. WARSHAUER:  I can't imagine it taking an

21     hour.  If he talks for 55 minutes, it will take an hour, because

22     I'll have five minutes.

23                 THE COURT:  Well, as I say, I'll err on giving

24     this jury a break.  So tomorrow, we have you and -- I mean, we

25     have Plaintiff, we have young Luke.

1           MR. WARSHAUER:  That's it.

2           THE COURT:  And that's it.  Then you close --

3           MR. LoCOCO:  And then we put Mr. Rogers on.

4           THE COURT:  Then we put Mr. Rogers.  Okay.  All

5     right.

6           MR. LoCOCO:  Thank you, Your Honor.

7           (Recess at 4:14 p.m.)

8

9                    ° ° ° ° ° ° ° ° ° ° °

10                   COURT REPORTER'S CERTIFICATE

11           I certify that the foregoing is a correct
      transcript from the record of proceedings in the above-entitled
12    matter.

13           Dated this 21st day of December, 2021

14

15           /s/ Hannah Jagler

16           _____

17           Hannah Jagler, RMR, CRR, FCRR
             Official Court Reporter

18

19

20

21

22

23

24

25