IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
------------------------------------------------------------------
ADELAIDA ANDERSON and JEFF ANDERSON,  |
                                      |
               Plaintiffs,            |
                                      |
v.                                    | Case No. 19-cv-800-SPM
                                      |
RAYMOND CORPORATION,                  |
                                      |
               Defendant.             |
------------------------------------------------------------------
```

Transcript of Jury Trial - Volume V
November 5, 2021

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East Saint Louis, Illinois

```
------------------------------------------------------------------
```

**REPORTED BY:**         **HANNAH JAGLER**, RMR, CRR, FCRR
                         Official Court Reporter
                         750 Missouri Avenue
                         East Saint Louis, Illinois 62201
                         618-482-9481
                         Hannah_Jagler@ilsd.uscourts.gov


Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**<u>APPEARANCES</u>**:

FOR PLAINTIFF:     **MICHAEL J. WARSHAUER**
**JASPER V. ABBOTT**
Warshauer Law Group, PC
2740 Bert Adams Road
Atlanta, Georgia 30339
404-892-4900
Mwarshauer@warlawgroup.com
Jasper@warlawgroup.com

**FRANK J. McCOY, JR.**
McCoy & McCoy, LLC
20 Church Street, Suite 1720
Hartford, Connecticut 06103
860-244-9100
Frank@mccoymccoy.com

**RYAN E. BRENNAN**
Brennan Law Firm PC
19 Bronze Pointe
Belleville, Illinois 62226
618-236-2121
Ryan@feladlc.com

FOR DEFENDANT:    **FRANCIS H. LoCOCO**
Husch Blackwell LLP
555 East Wells Street, Suite 1900
Milwaukee, Wisconsin 53202
414-978-5305
Frank.lococo@huschblackwell.com

**G. PATRICK MURPHY**
Murphy & Murphy, LLC
3415 Office Park Drive, Suite D
Marion, Illinois 62959
618-248-3236
Gpatrick@murphymurphyllc.com

**MARGARET KATHRYN HEITKAMP**
Husch Blackwell LLP
511 North Broadway, Suite 1100
Milwaukee, Wisconsin 53202
414-978-5373
Margaret.Heitkamp@huschblackwell.com

**INDEX**

**PAGE**

WITNESS: **ADELAIDA ANDERSON**

    Continued Cross-Examination By Mr. LoCoco............... 618

WITNESS: **LUKE ANDERSON**

    Direct Examination By Mr. Warshauer..................... 626

WITNESS: **MICHAEL ROGERS, PE**

    Direct Examination By Mr. LoCoco........................ 634

    Cross-Examination By Mr. Warshauer..................... 707

    Redirect Examination By Mr. LoCoco..................... 749

**INDEX OF EXHIBITS**

NO.  DESCRIPTION                                ID'D   RCV'D
573  Rogers' Direct Examination PowerPoint.......... 634   1109

1        **<u>TRANSCRIPT OF PROCEEDINGS</u>**

2        (Proceedings commenced at 9:08 a.m.)

3        THE COURT:  All right.  We're on the record in

4    Anderson v. Raymond, 19-cv-800.  We are outside the presence of

5    the jury.  There were two written motions that were filed.

6    First one was Defendant's motion for judgment, and the second

7    one is Plaintiff's motion to exclude evidence offered by Michael

8    Rogers.

9            We'll take up the defendant Raymond's motion for

10   judgment first.

11           MR. LoCOCO:  Good morning, Your Honor.

12           THE COURT:  Good morning.

13           MR. LoCOCO:  I don't know what the opposite of

14   nunc pro tunc is, but the plaintiff hasn't officially rested

15   yet.  But for purposes of efficiency, we're making this Rule 50

16   motion for judgment as if the plaintiff had rested.

17           THE COURT:  Because all that's left is

18   essentially damage witnesses.

19           MR. LoCOCO:  Right.  So we have a products

20   liability case here.  And as the Court knows, the law does not

21   make Raymond or any other manufacturer an insurer of its

22   products against all injuries.  It provides a narrow scope, at

23   least a scope of liability, where the plaintiff proves causation

24   between the condition allegedly unreasonably dangerous and the

25   plaintiff's injuries, and the evidence here falls far short.

1                Plaintiffs have spent four days presenting

2       evidence of an abstract design, abstract design complaint that

3       Mr. Warshauer has.  They haven't linked this abstract complaint

4       to Mrs. Anderson's injury, and now that -- injuries, and now

5       that experts have testified, that is crystal clear.

6                We'd refer the Court for purposes of efficiency

7       to our previous Document Number 79, Docket Number 79 pages 9 to

8       11 where we talk about the law on expert liability, expert

9       testimony for product liability claims, including the issue of

10      causation.  We also discussed the law at this stage in the

11      motion that we filed yesterday.

12               Candidly, Your Honor, I guess in some ways, this

13      is not terribly relevant, but I've represented Raymond since

14      1986, and since Daubert and Kumho Tire came out, I haven't had a

15      case go to verdict for this client in federal court.  I got

16      close once, and then it was dismissed at the Rule 50 stage.  And

17      there's -- it's just -- it's just a fact.

18               But let me get to the evidence.  We made the

19      point in our Daubert challenges, in our motions in limine,

20      regarding the issue of causation, that the plaintiff's experts

21      were not going to be able to tie the alleged defects to

22      Mrs. Anderson's injuries.  Two days ago, Mr. -- Dr. Meyer

23      testified in direct exam and did not give any causation

24      evidence.  I then tried to stay -- I thought I stayed away from

25      it in my cross, and then on redirect, Mr. Warshauer, now

1  understanding the problem with his case, he went right back to

2  the issue of causation, and we got from Dr. Meyer an ipse dixit

3  opinion.  Of course, if they had made this pedal design change,

4  we wouldn't be here.  She would have avoided her injury.

5           You know, when I was younger, I hated it when

6  older lawyers said, "You know, I've been doing this a long

7  time."  And I guess I'm there now.  There's one thing that I

8  still have not been able to figure out how to abide, and that is

9  dishonesty from witnesses.  Lay witnesses, less -- you know, I

10 get it, because people have different recollections.  But expert

11 witnesses who are well warned know exactly what they're doing,

12 and Dr. Meyer knew what he was doing on redirect when he changed

13 his testimony from his deposition.

14          In his deposition, which he admitted to, he said,

15 "It could have made a difference.  I can't tell conclusively.

16 I'd need more information.  Where were her feet?"  And then he

17 said on the stand, "Well, what I really meant was, could have,

18 to more probable than not," and engineers don't speak like that.

19          THE COURT:  "Conclusively," isn't that kind of an

20 absolute term?  Yeah, a hundred percent?

21          MR. LoCOCO:  I think the thing to look at, Your

22 Honor, is the verb he used was "could have" made a difference.

23 He didn't say it would have or it's more probable than not that

24 it would have.  He said "could," which is possible.  And

25 possibility is never enough under the evidentiary standard.  And

1  certainly he didn't give that testimony in his direct

2  examination.

3          And so with regard to the pedal claim, we do not

4  believe that a reasonable jury could conclude causation on this

5  evidence.  There is no evidence in the record.  And

6  Mrs. Anderson said this yesterday, when her hands came off the

7  controls, there's no evidence in the record as to when her left

8  foot came off of the floor, and that's what's critical for

9  looking at Dr. Meyer's design theory.  If the left -- you know,

10  would the accident have been avoided if when she picked up her

11  left foot, there had been a brake pedal under her left foot?

12          There was no analysis, no time motion study, no

13  physics analysis, nothing to say she took her foot off in this

14  range, and even a range.  And if it was in this range, the truck

15  would have stopped.  Right?  None of that was done.  It wasn't

16  diagrammed out.  When I asked Dr. Meyer about that, he pointed

17  to a drawing that he did in the courtroom, not to his file.  So

18  at best, that's a -- you know, it's another Rule 26 violation.

19  It's not something we were provided from his two reports or his

20  two depositions, because we relied, as you do, in discovery, on

21  him saying, "It's possible.  Could have made a difference.

22  Can't tell you."  So he changed his testimony here.  We do not

23  think there's evidence.

24          We also have cited for the Court Kirk v. Clark

25  Equipment, Seventh Circuit case from March of this year, which

1    stands for the proposition that experts in cases like this have

2    to do testing.  The Seventh Circuit says specifically, it

3    doesn't have to be the best testing, but they have to do

4    testing.  And over and over again, Dr. Meyer said he didn't do

5    any testing.  Dr. Kerrigan said he didn't do any testing.

6    Dr. Jeka said he didn't do any testing.

7              On the steer guard, Dr. Meyer gave no testimony

8    regarding the causation issue on the steer guard.  So that fell

9    to Dr. -- and neither did Dr. Jeka.  So it fell to

10   Dr. Kerrigan.  And he gave what I think the law would consider

11   an ipse dixit opinion, that if the steer guard had been in

12   place, the injury would have been prevented.  And then I dug

13   into that on cross-examination, and he explained that what he

14   intended by that was, she was either not going to be injured or

15   as injured.  And then we discussed it further, and he admitted

16   even without the steer guard, she could have been seriously

17   injured, and then he volunteered, or even killed.  So

18   Dr. Kerrigan --

19             THE COURT:  Yeah, but the question wasn't in the

20   absence of a steer guard.  The question was, "Well, if she fell

21   off the lift truck, could she have still been injured?"  That's

22   how I recall it.  So I was thinking, well, there's all kinds of

23   accident scenarios, that she could have fell off and hit her

24   head on concrete and suffered, you know, cranial bleed and died,

25   or there's all kinds of things.

1          MR. LoCOCO:  Well --

2          THE COURT:  But I didn't understand his testimony

3    to mean, well, yeah, she still -- this still could have

4    happened.  I understood his testimony as he pointed it out, that

5    with the guard in place, maybe the tip of a toe gets involved,

6    maybe a shoe gets pulled off, but the gloving -- the degloving

7    accident doesn't -- of the whole foot doesn't happen, because it

8    doesn't get under there.  That's how I understood his testimony,

9    although my notes were flooded last night.

10          MR. LoCOCO:  Then I showed him this picture, Your

11   Honor, where he had to admit that even a guard that goes down to

12   3 inches from the floor is going to catch the foot.  And he said

13   maybe the degloving wouldn't have started as high, but it could

14   have still been degloved.  And so this was in the presence of

15   this undesigned guard, he admitted that she could have had a

16   foot injury, a bad foot injury.  And then he gratuitously said,

17   "Could have been killed."

18          So, but the question, Your Honor, still is, if

19   the steer guard's in place, how do they prove that it would have

20   made any difference whatsoever with respect to this case?  Other

21   than Dr. Kerrigan saying it, there's no analysis.  They

22   presented no analysis.  They presented no testing.  There is

23   nothing for the jury to do other than speculate about how these

24   two potential design defects, if fixed, would have prevented her

25   injury.  And that's not -- that's not what is required by the

```
 1    law.
 2                In the absence of causation evidence, Your Honor,
 3    Raymond shouldn't have to face jury speculation that could
 4    result in a multimillion dollar verdict, not on these facts.
 5    Mrs. Anderson didn't provide the data for these experts on the
 6    plaintiff's side to explain how their alleged fixes would have
 7    prevented this accident.  The facts of the accident matter.  And
 8    for that reason, we would ask the Court to dismiss the
 9    plaintiff's case at this time.
10                Mr. Murphy has a couple of thoughts to add.
11                THE COURT:  Okay.
12                MR. MURPHY:  Judge, if you would give me about
13    three minutes, would that be okay?
14                THE COURT:  Sure.
15                MR. MURPHY:  Judge, the most important thing
16    about this case from somebody that's not an expert on
17    forklifts -- that would be me -- is this:  The brake worked.
18    The brake worked.  What happened in this case is, even according
19    to the last expert, the brake is what stopped this 4-ton
20    machine.  And there's no machine in the world that just freezes
21    in place.  It continues to move for just a little bit.  And I
22    think he said it moved, you know, 20 inches, something like
23    that, but the brake worked.
24                Whether you have a left-foot brake or a
25    right-foot brake, that's beside the point.  Her foot came off of
```

1    that right pedal and it stopped the machine.  And obviously,

2    obviously, if you had three pedals, it would not have made any

3    difference.  It's going to continue to move.  And that's what

4    happened in this case.  Brake works.  She gets out when her

5    right foot is already off the brake, and she gets terribly

6    injured.  The brake worked.

7              THE COURT:  Thank you.

8              Counsel?

9              MR. WARSHAUER:  Your Honor --

10             THE COURT:  The brake worked.

11             MR. WARSHAUER:  Not that it would have worked

12   earlier.  Before he starts, I will let the Court know,

13   Mr. Abbott wrote a wonderful brief.  I get a text that says, "I

14   lost the Word version.  It's crashed."  That's okay, Jasper.

15   You're brilliant.  I get another text.  "I've been up all night

16   throwing up."  That's okay, Jasper.  I'm brilliant.  No, he's

17   going to do the best he can, but I've reserved the right to fill

18   in, because I'm not sure we got a hundred percent of Jasper

19   today, but 70 percent of Jasper is more than enough.

20             THE COURT:  Well, if you need a cold shower, you

21   could step into my chambers.  Leaking from the roof.

22             MR. ABBOTT:  Thank you, Your Honor.

23             To begin, I want to go to the Seventh Circuit.

24   The Nanda v. Ford Motor case from 1974, which states experts

25   frequently must determine the cause of accidents by drawing

1    inferences about the event from such evidence as is available.

2    Frequently circumstances make it impossible to state all the

3    details of occurrence with absolute certainty.  It is enough

4    that the expert opinion be supported by a rational explanation

5    which reasonable men can accept as more probably correct than

6    not correct.

7              Your Honor, we don't know all the facts of how

8    Ms. Anderson's accident happened.  However, the facts that we do

9    have, based on the expertise of the -- what it says we

10   presented, based on Ms. Anderson's testimony, will allow this

11   jury to make reasonable inferences direct -- from direct

12   evidence and circumstantial evidence as to how the accident

13   occurred.

14             So starting first with the steered wheel guard,

15   this is the direct testimony from Dr. Kerrigan.  "So let's move

16   from your consideration of those to whether or not a -- whether

17   or not a guard -- whether or not a guard at the rear steered

18   wheel would have made a difference in the outcomes for her

19   injury.  So now we're looking at the forklift at the bottom of

20   Exhibit 81, I think.  If the guard had been put in this

21   location, do you have an opinion as to whether or not it would

22   have changed the outcome, based on your understanding of the

23   injuries that were suffered?"  His answer:  "Absolutely."

24             "So Mrs. Anderson's foot was injured because it

25   was allowed to pass through that recess and into the opening to

1    interact with the wheel?"  "So a guard like that or a guard like

2    that just covering that opening would have prevented her foot

3    from going in, at least as far in, understanding that can go all

4    the way to the floor.  If it did go all the way to the floor, it

5    would have prevented her foot from going inside at all.  But at

6    least a guard over the lower part would have prevented her foot

7    from going into the sort of recess there.  I call it a recess,

8    but the opening, and then the area where the wheel is.  It would

9    have prevented it from going in as far as I think it must have

10   gone in."

11         Dr. Kerrigan is a biomechanic engineer.  He

12   teaches at both the engineering school at University of Virginia

13   and teaches at the medical school there.  He explains and

14   understands how injuries occur, the mechanisms how those

15   injuries occur.  And he went into detail in his testimony

16   explaining based on the medical evidence, just analyzes the

17   medical evidence and where this wheel is.  She interacted with

18   the wheel.  They don't dispute that.

19         Dr. Rodowicz is going to say she interacted with

20   the wheel and explain that interaction allowed her foot to go

21   into that opening where the wheel is, and that's ultimately what

22   degloved her, caused the crush injury that led to her

23   amputation.  And his testimony is very simple.  You put a guard

24   over it in its current configuration, and even if it can't go

25   all the way to the floor, her foot would not go -- would not

1     physically be able to go all the way into that recess.

2             If you put it -- if you put the wheel further

3     back, as he explains, and are able to put a guard there, it

4     wouldn't have interacted with the wheel at all and she would not

5     have had this degloving foot crush injury.  And that's the

6     evidence regarding the steered wheel guard.  We've more than

7     satisfied the necessary elements on that defect.

8             Now going back to the brake.  Mrs. Boone

9     testified that Lidy told her that she slipped and the machine

10    would not stop.  What that tells us and what Dr. Kerrigan and

11    Dr. Meyer explained, what that tells us is that her foot has

12    left the platform, machine kept going.  And then Dr. Meyer

13    explains -- has a diagram -- what he showed on that picture

14    wasn't the first time he offered that testimony.

15            He has a diagram in his report that was shown to

16    the jury of a forklift as going straight down an aisle, this

17    13-year-experience forklift operator, and then makes a sudden

18    turn towards the racks, and they explain the most logical

19    explanation for that.  Given where the cracks are located, is

20    that's the time when she would have been slipping off the

21    forklift, losing her balance, and have her hands on the

22    controls.  And so she's moving controls during that time and is

23    making that turn.

24            And if you take the forklift back to that

25    location, at the speed she was driving, which Dr. Meyer said was

1    approximately 5 miles an hour, at that speed, it would have

2    stopped before it came to the point of rest.  And that's

3    important because Dr. Kerrigan explains that the point of

4    rest -- the last 10 to possibly up to 15 inches is where she was

5    injured.  If it doesn't get to that point, then she's not

6    injured.  It's no different than a rear-end collision.  If

7    someone -- if the brake comes -- if someone brakes sooner, the

8    fender-bender doesn't happen.  It's the same basic logic and

9    reasoning.  If the brake comes on sooner, she doesn't get to

10   this point where the injury occurs.

11              And their whole -- in their briefings, it's based

12   on the assumption that she was driving 8 miles an hour, and

13   therefore it had to be a 9-feet-3-inches clearance from when she

14   put on that brake.  But even with that, that curve is more than

15   10 feet away and still would have -- would have come on before

16   she was able to be injured at the end of the point of rest.  And

17   so that's the causation evidence that's before the jury.

18              They have -- and they also have it from Dr. Jeka

19   explaining how this shaking would have led to the loss of

20   balance.  And then they heard from Dr. Kerrigan and Dr. Meyer

21   explaining how that would have caused the sort of pulling on the

22   controls.  Because obviously these are moving controls, and

23   given the path that she was traveling, the most likely and

24   reasonable place, given the location of the controls and her

25   testimony, is that it occurred when that curve began to happen

1    10 feet from the point of rest.  And that's the causation

2    evidence.

3             We've met -- we've met our burden, and they

4    certainly have not met the highest standard that applies to a

5    Rule 50 motion.  Thank you.

6             MR. LoCOCO:  Your Honor, they just don't know the

7    "when" so they can't satisfy the "if."  Mr. Abbott finished up

8    with Dr. Jeka's testimony.  And just to remember it, Dr. Jeka

9    testified -- I'm going to do it so I'm facing you -- that

10   Mrs. Anderson for some reason perceives some balance challenge.

11   Maybe it was the cracks, whatever.  She perceived a balance

12   challenge, and she went to -- I guess Dr. Meyer affirmed this

13   too.  Went to broaden her base of support, and when she went to

14   put her left foot down, "Oh, there's no platform there," and

15   that's what precipitated the fall.

16            It's from that principal testimony of Dr. Jeka

17   that they have to explain how the pedal would have made a

18   difference, how the guard would have made a difference, and how

19   her foot got into the wheel.  They haven't done that.  You know,

20   if she gets off like this, how does it get into the wheel?

21   They've got no evidence of that.  And until you get that, the

22   jury can't get into, would the second pedal have made a

23   difference.

24            The evidence is such that the hands -- they don't

25   know when the hands came off.  They don't know when the left

1    foot came up.  They don't know when the left foot planted on the

2    ground.  So saying that if something happened earlier in the

3    curve, it would have been prevented, is irrelevant unless you

4    know these other "whens."  Because as I pointed out with

5    Dr. Meyer, the truck might have stopped someplace else.  Point

6    of rest might have been someplace else.  That doesn't mean she

7    wouldn't have been injured.

8            Mr. Abbott cites a 1974 case to support their

9    position.  This is before Daubert, way before Daubert, way

10    before Kumho Tire, way before Clark v. -- I mean, Kirk v. Clark

11    Equipment.  And the standards have gotten much more rigid for

12    expert testimony and for causation in the last 50, 48 years,

13    47 years.

14            The plaintiffs don't have the evidence from which

15    the jury can make reasonable inferences, and for that reason,

16    Your Honor, the Court should grant our motion.  Thank you.

17            MR. ABBOTT:  Your Honor, just to raise one more

18    point regarding Mr. LoCoco's last point.  The standard -- the

19    standards for the admissibility of expert evidence have

20    increased, but the standards for probable cause have been well

21    established for years.  So, I mean, proximate cause have been

22    well established for years.

23            MR. WARSHAUER:  If I may, briefly.  What we've

24    heard, Judge, is some great jury argument.  And I'm sure the

25    jury will consider it carefully, as they well should.  But at

the end of the day, they've just made a jury argument about credibility concerns that they have.

THE COURT:  The weakest link is Meyer.  That's what you have to address.

MR. WARSHAUER:  I can address --

THE COURT:  Does he -- does he link it up sufficiently that this evidence can be tendered to the jury for its consideration?

MR. WARSHAUER:  I think so.  Let me show you how he did that.  So the Court will recall Dr. Meyer's using this easel that we see.  The Court will recall that the law in Illinois, federal courts in general, is that circumstantial evidence is sufficient as well as direct evidence to take the case to a jury and in fact to support a verdict.

So what do we know about direct evidence first? We know that at the relevant speeds, first we know that the interaction with the wheel was the last 10 to 15 inches at the most, according to Dr. Kerrigan.  That's the evidence here.  It didn't slide her several feet.  It was at the very end when we have the interaction.

The second thing we know is that the brake that ultimately stopped this machine was the right-foot brake.  So we know when the right foot left -- because we can work backwards from the point of rest, knowing the speed.  This was offered by Dr. Meyer.  Then we know that's about 5 feet.  So we know

1       however she got out, the right foot didn't leave until 5 feet.

2       If the right foot had left at 7 or 8 feet, the forklift stops

3       earlier.

4                       So then we know -- some other things we know from

5       direct and circumstantial evidence that Dr. Meyer tied in for

6       us.  We know from Ms. Boone, direct evidence, she said at the

7       time that she slipped, could not stop the machine.  We know that

8       circumstantial and direct evidence is you cannot stop the

9       machine if you were pulling the multifunction towards the door

10      consistent with falling to your left.  As demonstrated in the

11      video that we saw, as demonstrated by Ms. Boone, as demonstrated

12      by Ms. Anderson, if you're falling to your left, you cannot

13      plug.  We know that.  That's direct evidence.

14                      We also know that if you're falling to your left

15      because your left foot has left the floor, that you cannot apply

16      the right-foot brake.  So -- unless you can fly.  Dr. Kerrigan

17      explained that to us.  Ms. Boone explained that to us.  You have

18      to have your left foot on the floor to lift your right foot.  So

19      those are direct evidence on why -- we know that cracks

20      institute balance problems.  We have that direct evidence from

21      Ms. Boone, who said when you go over cracks, she herself had

22      lost balance, and we know that Ms. Anderson said she lost her

23      balance from cracks.  We have direct evidence that there are

24      cracks before the instigation of the turn.

25                      We have direct evidence that if you were falling

1    out and using the tiller as an aide to balance, which is

2    certainly circumstantial evidence here, that she had her two

3    hands on the controls at the time, if she began falling, she

4    would instigate the turn.  So you would only begin to instigate

5    the turn if your left foot was out.  You would not begin to

6    instigate the turn before your left foot was out because you

7    would not be using the left handle as an aide to balance.

8         So we know that the turn was instigated 10 feet

9    from the point of rest.  Dr. Meyer provided that to us.  We know

10   that there was a balance challenge before that 10 feet occurred.

11   That's from his mapping and from others who said there were

12   cracks in the area.  That's direct evidence.  We know that had

13   the left foot -- circumstantial and direct evidence.  We know

14   that if the left foot had left up here, which we believe it did,

15   and if we know that the left foot should have had, pursuant to

16   the way the rest of the injury -- industry does it, a brake

17   under the left foot, we would have had braking instituted

18   immediately before the turn began.  Because remember, the turn

19   is instigated by the falling out.  That's in the -- that's in

20   the record from several people.  If you pull while you're

21   turning, it will cause the forklift to institute the turn.

22        So what Dr. Meyer then said -- and the Court will

23   recall I drew these lines as part of that.  I said, "Well,

24   Dr. Meyer, if the left foot came out in response to the cracks

25   that are upstream of the instigation of the turn, where does it

1   stop?"  "5 feet."  Okay?

2           We know that her falling process is the same,

3   whether the brake is applied by the left or right foot.  She's

4   still falling out.  She doesn't complete her fall to the point

5   of interaction with the wheel until the last 10 or 15 inches.

6   That's undisputed at this point.

7           So Dr. Meyer has shown using calculations in the

8   record that were always in his Rule 26 report.  In fact,

9   provided by Mr. Rogers.  He had a variety of sources.  He said

10  he considered Mr. Rogers, but he also considered the factory

11  specifications, their own testing, and we offered that evidence,

12  that it would have stopped back here, which is a full, it looks

13  like, 7 or 8 feet before the interaction with the person.  So

14  Dr. Meyer has provided that.

15          In addition, he said quite explicitly, had there

16  been a left foot, in his opinion, it would have stopped before

17  the interaction with the plaintiff.  Now if they want to say

18  that that's inconsistent with prior testimony, there's no rule

19  in the federal courts that says people who are impeached are no

20  longer valid evidence.  What the rule says is, it's for the jury

21  to decide whether they're believable or not and whether an

22  impeachment was successful.  In fact, I believe the Court

23  pre-charged the jury on that during your initial instructions.

24  If not, I know they're in the final instructions.

25          So Dr. Meyer gives us everything we need.  He

1     gives us duty.  You ought to have a left-foot brake for a

2     variety of reasons.  He talked about what the industry does,

3     what engineering standards do, and published standards.  He

4     gives us breach of that duty.  It's not there.  He gives us a

5     connection between that duty and the damages by showing to us

6     that based on circumstantial and direct evidence, if the fall

7     began 10 feet back at the beginning of the turn, this forklift

8     stops before we get interaction with the human and this is a

9     nonevent.  So that's Dr. Meyer's testimony.  It would be for the

10    jury to decide whether it's enough to carry the day for us, but

11    it's certainly all there in a very explicit way.

12                  THE COURT:  All right.  I'm going to give

13    Mr. LoCoco the last word, and we'll move on to the next.

14                  MR. LoCOCO:  Thank you.

15                  They don't know how she fell.  She doesn't know

16    how she fell.  So a lot of what Mr. Warshauer just said about

17    pulling on the control handle is complete speculation.  You

18    know, if she did this, if she did that.

19                  The other thing that I'm not sure is in the

20    record yet, it will be when our guys -- our people testify if we

21    go that far, which we think we shouldn't, is that once your foot

22    comes off that deadman pedal, Judge, the controller is

23    irrelevant.  And the steer tiller, you lose power steering;

24    right?  So none of those facts have been factored in by

25    Dr. Meyer.  This is about the left foot, not the right foot.

1    And as I said, the deadman pedal trumps the multifunction.

2              They haven't established -- and that's how I

3    started my rebuttal argument.  They haven't established how the

4    foot interacts with the steer tire.  Even if everything else

5    that Mr. Warshauer says is true is true, because right -- right

6    at that moment when she falls, her left foot is behind the

7    compartment.  How does it get into the steer tires?  They

8    haven't established that.  That takes time.  It takes time for

9    the brakes to act.

10             And this drawing, I mean, I could tell you, Your

11   Honor, there's nothing like this in his report.  This was ex

12   post facto made up for his redirect examination.  And it came in

13   redirect.  It didn't come in his direct examination.

14             And I guess the last comment I'd make is this

15   notion that people can change their testimony, you can comment

16   on the change of testimony, it's normal impeachment, I guess I

17   understand that argument as a lawyer, particularly with lay

18   witnesses.  This is an expert witness.  This is someone who

19   spent the last 30 years testifying in courtrooms.  He knew

20   exactly what he was doing.  And he was being dishonest with the

21   Court and with the jury.

22             He came up with this half-baked analysis after he

23   failed to do it in his direct exam, and they haven't tied the

24   pedal configuration to preventing these injuries.  You know, if

25   the foot comes off of the pedal, it's a left-foot pedal, how do

1      we know that she wouldn't have gotten into the tires, that the

2      truck would have stopped?  There's no analysis here, and the

3      analysis is doable.  Thank you.

4              THE COURT:  This started off as a case where it

5      appeared much of the plaintiff's arguments were tied to the

6      absence of a door, a door that is perfectly feasible.  It's

7      designed as an accessory if they wanted.  But ANSI in looking at

8      the engineers and experts, ANSI in looking at possible accident

9      scenarios that one might encounter with a forklift like this

10     said, look, in the event you've got impending tip-over where the

11     forklift is going to fall forks first, the operator has to make

12     a quick unimpeded exit out the compartment to get off and away

13     from the falling forklift.

14              And you convinced me that because of that, I

15     could not allow the plaintiff to say that it's an unreasonably

16     defective -- unreasonably dangerous defective design, because it

17     did not -- it did not have the door on.  Then I asked the

18     question, all right.  So what did you put in place to address

19     the safety of the operator in accident scenarios, not where the

20     forklift would be moving away from the exit area of the

21     compartment, but towards the exit area of the compartment?  And

22     that became the focus of this case.

23              And as the trial judge, while I certainly have

24     obligations under Daubert, I also have to keep in mind that I'm

25     ultimately not the finder of fact.  This is a jury trial.  And I

1    think that the plaintiffs have presented sufficient evidence

2    that reasonable jurors could conclude that this product was

3    defective.  Whether they'll do so or not, I don't know.  You

4    certainly can make the same arguments to them as you made to me.

5    But I -- so in your long career, you'll get to now say you've

6    taken this case to a jury, Mr. LoCoco.

7                    Next motion.

8                    MR. WARSHAUER:  So, Your Honor, we filed a

9    motion, in looking at the -- we filed a motion to exclude

10   certain evidence expected to be offered by Mr. Rogers.  There

11   were two primary topics, but now that I've been provided by

12   counsel this morning with some video -- with a slideshow that

13   they intend to use with Mr. Rogers, I think it's appropriate to

14   go and take that up too.  I'll do it simultaneously.

15                   MR. LoCOCO:  Your Honor, if I can just interrupt

16   for a second.  The slideshow they've had for weeks.  All I gave

17   Mr. Warshauer this morning was a substantially cutdown

18   slideshow, no new slides.

19                   MR. WARSHAUER:  Okay.  And I've objected for

20   weeks.

21                   MR. LoCOCO:  Okay.  But you made it sound like I

22   gave you new evidence this morning.

23                   MR. WARSHAUER:  No.  I've objected consistently

24   and that's fine.

25                   So the first thing, Your Honor, is the videotape

1    where Mr. Rogers is at the location in a forklift driving

2    through the path that the operator Ms. Anderson took.  The

3    purpose of this is quite clearly to show that there were no

4    balance challenges.  It is classic recreation evidence.  That's

5    a pretty high bar.  He is recreating the event path that she

6    followed.

7          Before I get there, however, we have to talk

8    about what the purpose of the evidence is.  The purpose of the

9    evidence is to backdoor what this Court has excluded Mr. Rogers

10    from doing, which was to offer evidence as to whether or not she

11    lost her balance.  The only possible reason you show a video of

12    a man riding this path is to show how smooth it is.  Look, there

13    are no balance challenges.  Now Dr. Rodowicz the Court has

14    approved to talk about balance challenges, but not Mr. Rogers.

15    Mr. Rogers was explicitly excluded from doing that.

16          THE COURT:  Can't she look at Rogers' video and

17    say, "Based upon that, here's my opinion.  She wouldn't have

18    lost her balance"?

19          MR. WARSHAUER:  Well, that's -- the answer is,

20    yes, if it meets the second part of my argument to exclude it.

21    So the first part is it can't come through Rogers no matter

22    what.  It's beyond the scope of what this Court allowed him to

23    do.  But the second --

24          THE COURT:  I'll short circuit you on that.

25          MR. LoCOCO:  Pardon me?

```
 1                    THE COURT:  I'll short circuit you on that.  I'm
 2          not going to bar the video simply because I have determined that
 3          Mr. Rogers is not going to be able to testify as a balance
 4          expert.
 5                    MR. WARSHAUER:  Okay.
 6                    THE COURT:  All right?
 7                    MR. WARSHAUER:  Fine.  Let's move to the second
 8          one.
 9                    THE COURT:  If you want me to revisit every
10          argument --
11                    MR. WARSHAUER:  No.
12                    THE COURT:  -- about experts --
13                    MR. WARSHAUER:  No, I don't.
14                    THE COURT:  -- and about how I should
15          micromanage --
16                    MR. WARSHAUER:  No.
17                    THE COURT:  -- and not let jurors see the work of
18          these people --
19                    MR. WARSHAUER:  No, I don't.
20                    THE COURT:  But my advice to you is that that's
21          not a winning strategy.
22                    MR. WARSHAUER:  No.  This particular video,
23          however -- and we filed this timely when they identified it --
24          is unquestionably a recreation.  That has a high bar in this
25          circuit, a very high bar.  It has to be substantial similarity.
```

1    And they have that burden to show before the jury can do it, and

2    there's a very good reason for that.  These videotapes have an

3    extraordinarily high propensity to mislead jurors.  And that's

4    why the Courts are so strict on this.  And if we just go

5    through -- and the Court has my chart.  I don't need to go

6    through it.  They can't show any similarities.  I asked them,

7    other than it's the same model, that's where it ends.  It'd be

8    like comparing a car with 200,000 miles on it to one that just

9    drove off the showroom floor.  Maybe you can do it for certain

10   aspects of the car, but you have to explain away the differences

11   with science.

12          So I stated the hours on the forklift:  11,000 on

13   the subject one; unknown on the other one.  But he does know

14   that he doesn't know how that would affect the Comfort Ride

15   Suspension.  No idea.  Condition of the floating floor.  We know

16   the subject one was rebuilt because it was vibrating so

17   violently at that location that it stripped the screws out of

18   it.  We don't know anything about the exemplar.

19          The kind of tires.  He doesn't know what kind of

20   tires.  Tires come in various softnesses.  The Raymond catalog

21   itself has a range of 10 durometer.  That's a huge number on

22   softness.  He has to explain that away.  The maintenance

23   history.  That's a maintenance item.  There is no evidence at

24   all that the subject floating floor, which has a maintenance --

25   like a shock absorber kind of thing, that it was ever maintained

1    in the history of the forklift.  We don't know the maintenance

2    on the exemplar.

3          The weight of the driver is 15 percent less of

4    Mrs. Anderson and him.  When asked, he didn't do any testing to

5    see what difference that makes.  Distribution of the driver's

6    weight.  This is a hinged floor.  If you stand at one end of the

7    floor versus the other end of the floor, it could have a

8    substantial difference in the perceived and actual measurement

9    of shaking.  Again, he didn't do any testing and he doesn't

10   know.

11         The condition of the tires.  We don't know the

12   condition of the steered wheel tire on the subject forklift at

13   all.  We know the two back tires were new.  Don't know what

14   brand they are.  We don't even know what size they are.  Raymond

15   makes various sizes for the 4250.

16         The testimony shows that she hit a crack, but the

17   actual video doesn't show that.  And I understand the Court has

18   a very strong sort of preference for letting people just work it

19   out on cross.  But the Courts have a very strong preference for

20   not letting recreation videos in because of the damage they do

21   that can't be fixed with cross.  Now Dr. Rodowicz can say she

22   saw it, considered it, et cetera, if it passed the test of

23   substantial similarity.  Otherwise, it can't be a basis for her

24   opinions either.

25                    THE COURT:  All right.

1      MR. WARSHAUER:  But it's their burden to show

2   substantial similarity, not my burden to show differences.

3      THE COURT:  Substantial similarity?

4      MR. LoCOCO:  Well, first of all, it's not a

5   recreation.  I mean, I appreciate Mr. Warshauer trying to

6   describe what our evidence is, but it's not a recreation.

7      THE COURT:  It shows a guy operating a forklift,

8   moving through essentially the same paths, and not falling off.

9      MR. LoCOCO:  No.  But that's not the purpose of

10   it.  He won't -- it's not being used to say "I didn't fall off."

11   He's going to testify that he took this truck, which he

12   scientifically confirmed had the right -- that it was -- that it

13   was substantially similar to the subject truck.  We've got the

14   foundation for that.  He instrumented the truck.  So he did it

15   twice.  First he did it in September of last year.  He

16   instrumented the truck.  Dr. Rodowicz was there.  Right?

17   Instrumented the truck and drove the path to get data off of the

18   instrumentation.

19      THE COURT:  All right.  Was this at the --

20      MR. LoCOCO:  At the facility.

21      THE COURT:  All right.  So it was at FedEx.

22      MR. LoCOCO:  And my plan is to have him describe

23   what he did and to show the data and to explain what a g is.

24   Right?  Dr. Rodowicz is then going to be utilizing that evidence

25   to talk about the issue of balance.  I'm not going to say,

1      "Didn't this show you that there's no way Mrs. Anderson could

2      have fallen off?"  First of all, your Daubert order said he

3      couldn't do that, so we're not going to do that.  So he's

4      establishing scientific data that will then be connected with

5      Dr. Rodowicz.  It's as simple as that.  And I'll make sure my

6      questions are within the Court's order.

7              THE COURT:  So the video, while it's not accident

8      reconstruction in the sense that "Here's what happens as she's

9      falling out," it's a video that is designed to show there

10     couldn't have been an accident?

11             MR. LoCOCO:  No.

12             THE COURT:  Couldn't have been falling out; she

13     must have been voluntarily trying to exit for her own purposes,

14     not because of the lack of balance?

15             MR. LoCOCO:  Dr. Rodowicz will explain that she

16     couldn't have fallen out, and her analysis will show that

17     scientific analysis.  This video was simply done to collect

18     data.  What does the floor do to a truck like this?  What kind

19     of g loads do you get in the X, Y, and Z direction?  That's the

20     purpose of it.  That's it.  And then Dr. Rodowicz takes it from

21     there on the issue of balance.  And everything we've prepared is

22     completely within your prior rulings, Judge.  And he can

23     cross-examine on all this other stuff.  We've had to do that.

24             THE COURT:  All right.  I'll reserve ruling on

25     that.  Let's -- we'll see how the evidence foundation for it is

1    laid out and I'll make a determination.  All right.  Five

2    minutes to 10.

3                    MR. WARSHAUER:  Judge, while we have them,

4    because it might be the best time to take this up, if I can,

5    just some slides.  Maybe the best is if they gave the Court the

6    slides and --

7                    MR. LoCOCO:  Can we turn our screen on?  We can

8    put them up.

9                    MR. WARSHAUER:  Yeah.

10                   THE COURT:  Or you can send them to Alex and we

11   can pull them up.  Can't do that?  All right.  Let's turn it on

12   and tell me what --

13                   MR. WARSHAUER:  So what I'm --

14                   THE COURT:  What particular slides are offensive

15   to you?

16                   MR. WARSHAUER:  The slides that I find --

17                   THE COURT:  Are we going to show the whole video

18   or just excerpts or just slides?

19                   MR. LoCOCO:  Just slides right now.  Some other

20   slides.  I don't know what he's complaining about.

21                   MR. WARSHAUER:  What I'm complaining about is,

22   for example, Number 7.  Now Number 7 is, they have some guy's

23   statement, and they just want to show a statement of a guy who

24   I've never talked to.  It's patent hearsay.  They're just going

25   to publish hearsay.  Now 703 allows a witness -- an expert

```
1    witness to rely on hearsay, but that doesn't mean he gets to
2    show the written statement.  That's true for 8, 9, 10, 11, 12 --
3    11, 13, 14, 15, and 32.  They're just publishing statements of
4    witnesses who aren't here.
5                    THE COURT:  How do you get to do that?
6                    MR. LoCOCO:  This is, "What did you review?  What
7    was important to you?"  And the important stuff is in bold on
8    the left side.  We're just showing what he was reviewing.  This
9    is already in evidence, this one.
10                   MR. WARSHAUER:  I didn't complain about that one.
11                   MR. LoCOCO:  All right.  This one, this is Rechel
12   Boone's statement, which there's already evidence of.  All he's
13   getting out of this is the lift compartment was approximately
14   1 foot from the rack upright.  We're going to go through them
15   like this.  Shoe under lift, unwedged shoe, one shoe was caught
16   in the metal frame, which Dr. Kerrigan talked about.  It's
17   showing he picked it up by reviewing the evidence.  Lift
18   crooked, shoe was wedged under the lift.  And then this was
19   already discussed with Mrs. Anderson, and with -- yeah, with
20   Mrs. Anderson yesterday.  And that's in evidence anyway.  That's
21   a medical record.
22                   MR. WARSHAUER:  I don't have a problem with that.
23   That wasn't one I was complaining about.
24                   MR. LoCOCO:  This one we talked about yesterday
25   with Mrs. Anderson.
```

1          MR. WARSHAUER:  I'm not complaining about that

2     one.

3          MR. LoCOCO:  All right.  So it's --

4          MR. WARSHAUER:  I just don't think --

5          THE COURT:  Which one -- let's get back to --

6     there's three you're complaining about?

7          MR. WARSHAUER:  No, there are multiple.  If you

8     could pull up Number 7.

9          THE COURT:  Let's go to the ones you're

10    complaining about.

11         MR. LoCOCO:  This is 7.

12         MR. WARSHAUER:  7.  "We are publishing a

13    statement of Michael W. Began," who I don't know.  He is an

14    out-of-court witness.  This statement's offered for the truth of

15    what he's saying, and I have no opportunity to cross-examine

16    him.  702 allows witnesses to base -- have good bases.  I'm not

17    complaining about that.  703 says that they can rely on hearsay.

18    That doesn't mean they can publish it.  Number -- you just can't

19    read someone's statement into evidence, and that's what this

20    does.

21         MR. LoCOCO:  We're not going to read it.

22         MR. WARSHAUER:  You're showing it to the jury.

23    The jury will read it.  It doesn't change the fact that somebody

24    else reads it.  It will be read.  The person who voices it is

25    irrelevant.  You can't just publish hearsay.

```
 1                    THE COURT:  All right.  I agree with that.
 2                    MR. WARSHAUER:  So that's true --
 3                    THE COURT:  I sustain it.
 4                    MR. WARSHAUER:  Number 8 is the same thing.
 5                    MR. LoCOCO:  So let me just go back.
 6                    THE COURT:  You can't publish the hearsay.
 7                    MR. LoCOCO:  So --
 8                    THE COURT:  He can say "I've read it."  You can
 9       say "I've read his statement," but then that doesn't allow it to
10       come into evidence.
11                    MR. LoCOCO:  Understood, Your Honor.  So on this
12       one, for example, I just want to know whether we take the
13       statement itself out of the slide or we take the part of the
14       statement that has the information.  In other words, we just
15       include Michael Began, the data, the statement.
16                    MR. WARSHAUER:  I think a witness can say "I have
17       learned from reading statements," but he can't publish the
18       statement.
19                    MR. LoCOCO:  All right.  So we'll just --
20                    THE COURT:  I think the witness can say, "I have
21       read different statements from whatever employee there.  Michael
22       Began, I read his statement."
23                    MR. LoCOCO:  So my plan, Your Honor, would be to
24       take down the right side of each of these slides, just take them
25       out, but keep the rest of the slide.  "What did you learn from
```

1    Cathy Mason?  What did you learn from Kimberly Clark?  What did

2    you learn from Cary Mason?  Michael Began?"  They're relevant to

3    his analysis.

4              THE COURT:  I think cross-examination -- you

5    never talk to them.  It's classic hearsay.  You don't know

6    whether they --

7              MR. LoCOCO:  Sure.

8              MR. WARSHAUER:  Right.

9              THE COURT:  All right.

10             MR. WARSHAUER:  So there were some additional

11   ones, if we look at Number 1.

12             MR. LoCOCO:  I don't have to put up the title

13   slide.

14             MR. WARSHAUER:  No, the --

15             THE COURT:  We're going through the ones that

16   you're objecting to.

17             MR. WARSHAUER:  Yes, sir.

18             MR. LoCOCO:  This one.

19             MR. WARSHAUER:  This one.

20             MR. LoCOCO:  So this is just a slide.  It's

21   during his qualifications.  "Have you -- do you have any

22   publications in the area of forklifts?"  This is a publication.

23   We're not going to go into the specifics of it.  It's just to

24   show that.

25             MR. WARSHAUER:  All right.

```
 1                    THE COURT:  Is this the one that came after this
 2      litigation started, or?
 3                    MR. LoCOCO:  Yes.  I think he's okay with how I
 4      said it.
 5                    MR. WARSHAUER:  I don't think you can say it's
 6      fairly peer-reviewed, though.
 7                    MR. LoCOCO:  I'm just going to say, "Do you have
 8      any --"
 9                    MR. WARSHAUER:  All right.
10                    MR. LoCOCO:  Are we going to micromanage each of
11      my questions?
12                    MR. WARSHAUER:  I actually have a motion on that
13      particular one.  The answer is no, I'm not.  But I do have a
14      motion on that one, Number 5.
15                    MR. LoCOCO:  This one?
16                    MR. WARSHAUER:  702, investigation conclusions.
17                    MR. LoCOCO:  Which we blacked out.
18                    MR. WARSHAUER:  Okay.  That's okay.
19                    THE COURT:  What --
20                    MR. LoCOCO:  He's okay with this one now.  He
21      didn't realize that we blacked out what he was concerned about.
22                    THE COURT:  Okay.
23                    MR. WARSHAUER:  And then I think I already have
24      the Court's ruling on this, but I'm not sure because it's
25      reserved, but we'll see.  38, 39, 40, 41 show these graphs about
```

```
 1        how much -- the energy was there.

 2                    MR. LoCOCO:  Tell me when we're there.  This is

 3        the data from the drives.

 4                    MR. WARSHAUER:  Right.  And I think without

 5        showing of substantial similarity, none of that can come in.

 6        Number 21.

 7                    MR. LoCOCO:  I don't know what that is.

 8                    MR. WARSHAUER:  I'm sorry.  31 is a declaration

 9        of Scott Pieper.

10                    MR. LoCOCO:  Which just stands for the -- he's

11        the maintenance guy, who said everything was set to high.

12        That's not even an issue anymore.

13                    MR. WARSHAUER:  Still don't think you get to

14        publish somebody's declaration.  He can say he got the

15        information.  I haven't challenged that it was accurate

16        information.  I just don't think you can publish the

17        declaration.

18                    THE COURT:  Because it's hearsay?

19                    MR. WARSHAUER:  Yes, sir.

20                    THE COURT:  All right.  I agree with that.

21                    MR. LoCOCO:  Anything else?

22                    MR. WARSHAUER:  Yeah.  When we go down to like

23        43, step-off distance; 44.  So these are biomechanical opinions.

24        Look at --

25                    MR. LoCOCO:  They're not biomechanical opinions.
```

1    Dr. Rodowicz had this done.  Dr. Rodowicz will explain the

2    biomechanical import of this.  This has to do with dealing with

3    their theory about what happened here.  And he can cross-examine

4    the hell out of it, Your Honor.  But this has to do with

5    somebody of Ms. Anderson's size and stature stepping out of the

6    compartment the way Dr. Jeka described to the jury.  What's the

7    stepoff distance?  And testing was done to determine that.  It's

8    completely legitimate.  And Rodowicz was there.  It has an

9    impact on Rogers' work and it has an impact on Rodowicz's work.

10                   THE COURT:  All right.  Look --

11                   MR. WARSHAUER:  It's Dr. Rodowicz --

12                   THE COURT:  This is not the first time Courts

13   have grappled with a situation involving a products liability

14   case in which there is no eyewitness that's considered

15   definitive or there is no video of it.  You have cases where

16   people have been injured on products, people have been killed on

17   products, and we have to try to reconstruct what happened, and

18   we try to make it as scientific as possible.  But in the end,

19   we're trying to come up with circumstantial evidence that we

20   think points us in a particular direction so we can understand

21   what happened.

22                   I don't think this jury is going to conclude

23   something other than that Ms. Anderson lost her balance and fell

24   out.  Now you can argue it.  I'm going to let them put in

25   evidence and say, "Well, we've studied this and we don't

think -- we don't think the version of events that the plaintiff
is advocating is the accurate version of events."  I think that
this information gets in with Dr. Rodowicz.

The only thing I did with respect to Rogers was
conclude that he did all this testing.  It's going to come in.
He did a lot of this stuff, but he himself did not have the
expertise to offer opinions about whether she lost her balance.
But from the defendant's standpoint, big deal, because they got
Rodowicz that is an expert that's going to come in and offer an
opinion.

Any other slide -- knowing that I'm going to let
them present this, any other slide that is problematic?

MR. WARSHAUER:  No.  Based on the Court's ruling,
I think I've said all I need to say this morning.

THE COURT:  All right.  Ten after 10.  I was only
ten minutes --

MR. WARSHAUER:  Given the fact that you had a
flood, we're ahead of schedule.

THE COURT:  That's right.  100-year flood.

MR. LoCOCO:  Can I ask Mr. Warshauer one other
question?

THE COURT:  Yeah.  Do you want this on the
record?

MR. WARSHAUER:  The only other thing was that
Mr. Rogers cannot opine about whether they complied with 7.20.2.

1          It never appears in his report.

2                    MR. LoCOCO:  That's just false.

3                    MR. WARSHAUER:  Do a word search.  I can't find

4     it.

5                    THE COURT:  All right.  Well, he's this

6     afternoon, isn't he?

7                    MR. WARSHAUER:  Yeah.

8                    MR. LoCOCO:  He's going to get started this

9     morning, Your Honor.  This issue is early.  I could tell you

10    what's in his report.  He's the only guy who's on the committee,

11    the B56.1 committee.  And in his report, he says specifically

12    under "Opinions and Conclusions," the subject truck met all

13    applicable standards and industry regulations.  Mr. Warshauer

14    deposed him for hours, asked him about all sorts of --

15                   THE COURT:  I know.  I got to read it.

16                   MR. LoCOCO:  Yeah.  All sorts of sections from

17    the standard.  He chose not to ask him about 7.20.2.

18                   MR. WARSHAUER:  Oh, my goodness.  You know, we

19    put in a report on February the 21st, February 1, 7.20.2.  It's

20    quoted.  We do it again later.  We quote it.  We file a

21    seven-page supplement that is explicitly "This is what it is."

22    Months before his opinion, they take his deposition where they

23    spend pages talking about 7.20.2.

24                   THE COURT:  They take his deposition or you do?

25                   MR. WARSHAUER:  They did.  They took Meyer's

 1    deposition.

 2              THE COURT:  Oh, I thought you were talking

 3    about --

 4              MR. WARSHAUER:  No.  We have told them multiple

 5    times before the Rule 26 of Meyer goes out, that this is a case

 6    about 7.20.2.  And I'm supposed to guess from a single catch-all

 7    line that he's going to do 7.20.2?  No.  The things that he was

 8    going to talk about, he explicitly talked about and quoted.  He

 9    talked about the notes at 7.41.  That's fine.  I crossed him on

10    that.  But if he doesn't put -- if there's a gazillion things in

11    there -- I asked him in his deposition, "Are all of your

12    opinions in the face of your report?"  He said yes.  7.20.2 has

13    never ever been mentioned by this man.

14              MR. LoCOCO:  That's just not true.

15              THE COURT:  We -- I'll take -- let's get started.

16    I'll look at disclosures.  We'll have a break between when you

17    rest and they get to Mr. Rogers.

18              MR. WARSHAUER:  Thank you, Judge.

19              THE COURT:  All right.  Let's -- let's -- I'm

20    going to give the court reporter a break.  Let's do a -- let's

21    come back at 20 after.  Jackie, we're in recess.  If you want to

22    go back and tell them we've had some problems and we'll be

23    getting started at 20 after.

24              (Recess from 10:10 a.m. to 10:19 a.m.)

25              THE COURT:  We are on the record.  We're outside

1     the presence of the jury.

2               One of our jurors, Juror Number 4, called and

3     left a message this morning that he was having car trouble, that

4     he was putting gas in his car, he went to start it, and there

5     was no power.  Moments ago, I had Jackie reach out to him to get

6     a followup on if he's been able to successfully address his car

7     problems.  He says no and he will not be able to come in today.

8               My inclination, because we have two alternate

9     jurors, my inclination is to simply release him from jury

10    service and proceed with the trial.  I don't -- I don't want to

11    delay the trial a day in hopes that by Monday, we have our full

12    accompaniment of jurors and alternates, keeping in mind that

13    Thursday is a court holiday.

14              Plaintiff have any position with respect to the

15    unavailability of Juror Number 4?

16              MR. WARSHAUER:  This is why we have alternates.

17    It happens.

18              THE COURT:  Mr. LoCoco?

19              MR. LoCOCO:  Same position, Your Honor.  It's

20    fine with us if you release him.

21              THE COURT:  All right.  Let's bring the remaining

22    jurors in.

23              MR. LoCOCO:  But I guess, don't give the other

24    ones any ideas.

25              THE COURT:  Yeah.  The excuse of car trouble has

```
 1    already been used.
 2                    (Jury enters at 10:21 a.m.)
 3                    THE COURT:  Thank you.  Please be seated.
 4                    All right.  We're back on the record in Anderson
 5    v. Raymond Corporation.  One of our fellow jurors was unable to
 6    make it in today.  Instead of recessing until Monday, I decided
 7    that we would just soldier on with the group that we still have.
 8                    With that, Ms. Anderson, you are still -- you're
 9    still on the witness stand and you are still under oath.  If you
10    want to come on back up.  The court security officer will lend a
11    hand as she navigates up the stairs.
12                    All right.  Thank you.  Have a seat.  As I say,
13    you're still under oath.  And again, try to speak loud enough
14    that you think you could be clearly heard in the back of the
15    courtroom.  Thank you.
16                    Counsel?
17                    MR. LoCOCO:  May it please the Court.  Thank you,
18    Your Honor.
19                    CONTINUED CROSS-EXAMINATION
20    BY MR. LoCOCO:
21    Q    Good morning, everyone.  Good morning Mrs. Anderson.
22    A    Good morning.
23    Q    So the good news is, having overnight, I was able to slim
24         down my questions, so I don't think we'll have you up there
25         too very long, at least I hope.  I do have one kind of final
```

1       forklift question.

2                This is Exhibit 157 again. I just want to

3       make sure it's clear to the jurors. As an operator, with all

4       the experience that you have, when you take your right foot

5       up off the deadman pedal, off that brake pedal, the truck

6       stops, comes to a stop; correct?

7 A   Yeah.

8 Q   But it takes -- depending on how fast you're going, it takes

9       some distance for it to stop?

10 A   Mm-hmm.

11 Q   Yes?

12 A   Yes.

13 Q   Okay. And once your foot is off, if you don't put your foot

14       on the pedal, the truck won't move -- when you get in, it

15       won't move forward or reverse?

16 A   No.

17 Q   You've got to have your foot on the pedal?

18 A   Yeah.

19                THE COURT: Ma'am, would you -- let's redirect

20       your microphone so that you're actually speaking into your

21       microphone as opposed to it being over your shoulder.

22                THE WITNESS: Sorry. Okay.

23                THE COURT: Thank you.

24 BY MR. LoCOCO:

25 Q   It's probably my fault because I was standing on the side of

1       you there.  Mrs. Anderson, you told us on direct examination

2       that you hadn't returned to work since the accident; correct?

3   A   No.

4   Q   And you haven't done anything to look for a new job; true?

5   A   No.

6   Q   What I said is correct?  You haven't looked for a new job?

7   A   No.

8   Q   Okay.  Your accident happened in July of 2017.  You were

9       returned -- cleared to return to work for light-duty

10      sedentary work in January of 2018; correct?

11  A   No.

12  Q   Okay.

13                  MR. LoCOCO:  Can I have the document camera,

14      please?

15  BY MR. LoCOCO:

16  Q   This is from Exhibit 129, page 71.  So this is a record

17      from -- you see this here, January 29th, 2018?  You see that,

18      Mrs. Anderson?

19  A   Yeah.

20                  THE COURT:  Could you take the exhibit down?

21      Approach the bench.

22                  (Sidebar begins.)

23                  MR. LoCOCO:  Did I miss something, Your Honor?

24                  THE COURT:  Yes.  One more document you put up

25      that says "work comp" on it, and there will be a sanction

```
 1        imposed.

 2                    MR. LoCOCO:  It was an accident, Your Honor.  It

 3        was an accident.

 4                    THE COURT:  You look at your -- as I say, one

 5        more time...

 6                    MR. LoCOCO:  Yes, sir.

 7                    THE COURT:  Because yesterday, because yesterday,

 8        the one you were going to put up, it was all throughout it.

 9                    MR. LoCOCO:  Yeah.

10                    THE COURT:  It was all throughout it.  And you

11        even said, "Well, here, I scratched out the stuff at the top."

12        But if you would have been able to put that up in a split second

13        like I just did, somebody would have been able to see "work

14        comp."  Now when I heard you saying release to work, we're not

15        going to get into -- that's a term of art in work comp.  And so

16        we're not going to -- I can't let you get in that there's a comp

17        case, unless you want to let it in.

18                    MR. LoCOCO:  Obviously that wasn't my intent.  I

19        really do apologize to you and to Mr. Warshauer.

20                    THE COURT:  All right.

21                    (Sidebar ends.)

22   BY MR. LoCOCO:

23   Q    Okay.  I want to focus just on the bottom here, where it says

24        "Work."  Do you see that?  It's -- look on your screen.

25   A    It's not working here.
```

```
 1                    MR. WARSHAUER:  May I approach?

 2                    THE COURT:  Okay.

 3                    (Sidebar begins.)

 4                    MR. WARSHAUER:  The last sentence, Frank, just

 5       look at the last sentence.  What does "WC" mean?

 6                    THE COURT:  What's the last sentence?

 7                    MR. LoCOCO:  "Workplace has to accommodate her WC

 8       needs."

 9                    MR. WARSHAUER:  Worker's comp needs.

10                    MR. LoCOCO:  Can it be shown just to her?  Yes.

11       It could be shown just to her.

12                    MR. WARSHAUER:  I think you have to stop this

13       line.  That's the sanction.  Move it along.

14                    THE COURT:  You can show it just to her.

15                    MR. LoCOCO:  Thank you.

16                    (Sidebar ends.)

17                    MR. LoCOCO:  Just want to show it to the witness.

18       Thank you.

19                    THE COURT:  Wait a minute.  You were going to

20       show it to her.  You're not going to show it on the screen.

21                    MR. LoCOCO:  They can put it on just her screen,

22       I understood.

23                    THE COURT:  All right.  Okay.

24                    MR. LoCOCO:  Otherwise I can walk up there.

25                    THE COURT:  All right.  Why don't you just walk
```

1        it up there?

2                        MR. LoCOCO:  Okay.

3                        THE COURT:  So we don't have any more problems.

4    BY MR. LoCOCO:

5    Q    Mrs. Anderson, you see the date here is January 29, 2018?

6    A    Yes.

7    Q    And then it says, "Clear patient to return to part-time light

8         duty work if her employer can find a position that is

9         suitable to her.  Up to 15 hours per week.  Can be adjusted

10        as tolerated."  Did I read that correctly?

11   A    Yeah.  I don't return to work.

12   Q    You don't remember that?

13   A    No.  Nobody told me return to work.

14   Q    No, that you could return to work.  You don't remember that?

15   A    No, nobody told me.

16   Q    All right.  I have another document from May 1st of 2018.

17        It's Exhibit 129.  Page 110.  It's another medical record.

18                        MR. LoCOCO:  Could I do the same thing, Your

19        Honor?

20   BY MR. LoCOCO:

21   Q    You see the date here, Mrs. Anderson, May 1st, 2018?

22   A    Yes.

23   Q    And it says, "Social worker contacted patient via telephone

24        on this date.  Social worker spoke with patient's husband on

25        this date.  Social worker introduced self, explained role,

1    and offered support and services.  Social worker discussed

2    referral reason and husband reports that the plant that

3    patient is employed at is closing.  Social worker discussed

4    the option of vocational rehab through the Department of

5    Human Services.  Husband would like to review the

6    information, and information on DRS vocational rehab mailed

7    to patient's home per husband's request.  Husband states they

8    are working with an attorney and they want to talk to their

9    attorney before considering any options.  Husband denies

10   additional needs at this time.  Husband encouraged to call

11   social worker with any questions when the information is

12   received.  Social worker available upon request." Did I read

13   that correctly?

14   A    Yes.  Nobody contact me that.

15   Q    Okay.  Oh, I guess -- the medical records are Exhibit 119,

16        not 129.  Mrs. Anderson, are you in pain today?

17   A    A little bit.

18   Q    Maybe you remember we did this at your deposition.  On a

19        0-to-10 scale, what would you put your pain at right now, as

20        you're sitting there?

21   A    Right now just 3.  It's not bad.

22   Q    3?

23   A    Yeah.

24   Q    And then sometimes it does get to 10?

25   A    Sometimes it go to 8 and 7.

1   Q   8 and 7.  Does it ever get to 10?

2   A   No.  When I was in the hospital.

3   Q   Okay.  All right.

4                    MR. LoCOCO:  Thank you very much for your

5       patience.  Thanks for your time.  Nothing further, Your Honor.

6                    THE COURT:  Hold on.  You may -- there may be

7       further questions that your lawyer wants to ask.

8                    THE WITNESS:  Sorry.

9                    THE COURT:  You don't have to apologize.

10                   MR. WARSHAUER:  We have no questions.  I think we

11      can let Ms. Anderson down.

12                   THE COURT:  All right.  Thank you.

13                   All right.  Call your next witness.

14                   MR. WARSHAUER:  Luke Anderson.

15                   (Witness sworn.)

16                   THE COURTROOM DEPUTY:  Please state your full

17      name and spell your last name.

18                   THE WITNESS:  Luke Anderson, A-n-d-e-r-s-o-n.

19                   THE COURTROOM DEPUTY:  Thank you.

20                   THE COURT:  All right.  As you heard me explain

21      to your mother and other witnesses, try to speak in a tone of

22      voice loud enough that you know you can be clearly heard

23      throughout the courtroom all right.

24                   THE WITNESS:  Okay.

25                   THE COURT:  Thank you.

```
 1                      DIRECT EXAMINATION

 2    BY MR. WARSHAUER:

 3    Q    Good morning, Luke.

 4    A    Good morning.

 5    Q    How old are you?

 6    A    I'm 15 years old.

 7    Q    Who are your parents?

 8    A    Jeffrey Anderson and Adelaida Anderson.

 9    Q    What grade are you?

10    A    I'm a sophomore.

11    Q    What kinds of activities do you do in school?

12    A    I play baseball, basketball, and maybe track.

13    Q    Are you a reasonably good student?

14    A    Yes, I am.

15    Q    I understand you have your learner's permit?

16    A    What'd you say?  Pardon me?

17    Q    You have your learner's permit for driving?

18    A    Yes, I do.

19    Q    Where do y'all live?

20    A    Effingham, Illinois.  702 East North Avenue.

21    Q    How do y'all get here every day?

22    A    We drive here every day and back home.

23    Q    Do you participate in that process?

24    A    I do.

25    Q    Is your dad able to do the whole trip?
```

1  A    He's able to drive here, but I drive back home.

2  Q    Are mornings better for him?

3  A    Yes, they are.

4  Q    Now we know your father is quite ill.  Is Mrs. Anderson, your

5       mother, able to help him and take care of him?

6  A    No, not really.  No.

7  Q    How about your mom?  I want to focus on your mom a little

8       bit, before she was injured.  Now how old were you then, four

9       years ago?

10 A    11.

11 Q    How involved was she in your life as a mom?

12 A    I mean, she helped me do everything.  You know, if I needed

13      help, she'd help me.  If I need -- she was always there to

14      help me, so.  I mean, just every day, always there.

15 Q    You've obviously been in sports as an active kid?

16 A    Yes.

17 Q    Was she the kind of mom who went to the games or the kind of

18      mom who stayed home if she wasn't --

19 A    She went to the games.

20 Q    Was she the kind of mom who cheered from the sidelines or

21      stayed quiet?

22 A    She stayed quiet.

23 Q    Take care of your uniforms?

24 A    Yeah, she did.

25 Q    All of them?

1   A   Yeah.

2   Q   Did you ever go to a game in a dirty uniform?

3   A   No.

4   Q   What kind of physical things did you observe your mom do

5       before her injury?  Was she an active woman?

6   A   Yes, she was.  She golfed, she bowled, she ran treadmill,

7       jogged, like our family used to walk around town, bicycle

8       riding, just a lot of stuff, swimming, and yeah.

9   Q   How would you describe your family with respect to how active

10      it was compared to your friends' families?

11  A   To my friends' families?  I'd say more active compared to

12      other families.  Yeah.

13  Q   I mean, you -- motorcycle rides?  We saw a picture of you on

14      a motorcycle?

15  A   Yep.

16  Q   Did you ever -- did your mom ride motorcycles?

17  A   Yeah, she did.

18  Q   Do you recall when y'all had horses?

19  A   Not really, because I was really young at the time, so it's

20      not a very clear memory of mine.

21  Q   How about things like going to church?  Did your -- when did

22      you attend church with your mother?

23  A   Every Sunday.

24  Q   Was she a, I guess this is a phrase, a religious church goer?

25      Someone who did it literally every Sunday?

1    A    Yes.

2    Q    Even when she worked?

3    A    Yes.

4    Q    How much did she work?

5    A    I remember that, you know, she used to work a lot, like a lot

6         of overtime, you know.  I mean, she liked to work, so.

7    Q    Let's talk about now.  How's your mom doing now?

8    A    Nothing compared to before the injury.

9    Q    Are you able to tell if she's feeling well from your

10        observations and knowledge of her?  I mean, can you look at

11        her and say, "You're having a bad day" versus a good day?

12   A    Yes, I can tell.

13   Q    How often are there bad days?

14   A    I'd say very often.

15   Q    Now we saw her use her prosthetic to walk up to the witness

16        chair.

17   A    Yes.

18   Q    Has she been -- have there been times when she's been able to

19        use it better than we observed, or is that about it?

20   A    Yeah, I'd say that's about it.

21   Q    When does she use it mostly?

22   A    You mean the prosthetic?

23   Q    Yes, sir.

24   A    Just -- just when she -- like explain a little bit more.

25        Like --

1    Q    Well, does she use it mostly around the house, like when
2         she's cooking?
3    A    Yes, she does.
4    Q    Does she use it to go to the mall?  What are the times you
5         see her relying on that as opposed to the wheelchair the
6         most?
7    A    Yeah.  Basically she wears it when she goes out.  When she's
8         home, if she's, you know, cooking or doing stuff like that,
9         or -- but if she's relaxing, she'll take it off.
10   Q    Can she walk very far with it?
11   A    No, she cannot.
12   Q    I told you I was going to ask you this question, for you to
13        think about it.
14   A    Yeah.
15   Q    What do we need to know to understand how this injury has
16        changed your mother?  What would you -- what would you want
17        us to really understand?
18   A    You know, I mean, it kind of -- after she got injured, it
19        kind of changed roles a little bit, like I became the adult
20        and she's the child, because I got to take care of her now.
21        Basically I got to be with her at all times.  She needs help
22        doing almost everything, you know, which takes time out of my
23        day.  I mean, I can't go hang out with my friends.  I got to
24        stay with her.  So yeah, I got to help her pretty much all
25        the time.

1          MR. WARSHAUER:  Thanks, Luke.

2          THE WITNESS:  Yep.

3          MR. WARSHAUER:  Any questions?

4          MR. LoCOCO:  Thanks for coming.  We don't have

5     any questions, Your Honor.

6          THE COURT:  Okay.

7          MR. WARSHAUER:  Thank you.

8          THE COURT:  That was quick.  Thank you, young

9     man.

10          All right.  It's 20 to 11.  Do you have any

11     further witnesses?

12          MR. WARSHAUER:  We do not.  We'll make a

13     technical offer of proof with you in a few minutes, subject to

14     getting the exhibits that we had marked and used, make sure

15     they're in the record, and write a rebuttal and Plaintiff rest.

16          THE COURT:  All right.  So we are about to embark

17     on the defendant's case in chief.  So there's always a few

18     things that we do when we are transitioning from the time when

19     the plaintiff rests its case until the time the defendant is

20     going to present its first witness.  So let's take a quick --

21     we'll come back at ten minutes to 11.  All right?  So that's

22     about an 8-minute break.  All right.  We are in recess until ten

23     to 11.

24          (Jury exits at 10:41 a.m.)

25          THE COURT:  All right.  What is it you need to --

1      what did you want to do?

2                     MR. WARSHAUER:  So what we will do is --

3                     THE COURT:  Let it show for the record we're

4      outside the presence of the jury.

5                     MR. WARSHAUER:  As the Court is aware, the Court

6      granted a Daubert motion striking the opinions of Dr. Meyer

7      relating to the door.  Had Dr. Meyer testified, he would have

8      testified that a door was a feasible alternative design, that

9      the absence of a door made the product unreasonably dangerous,

10     that a door would have prevented this accident, and the injuries

11     associated with it.  Dr. Kerrigan would have followed up on that

12     and said that the door would have held her in from a

13     biomechanical point of view preventing this accident.

14                    And obviously there's a lot more detail than

15     that, but I just need to make a record that had they testified,

16     it would have been consistent with their reports.  And I'm

17     not -- obviously not rearguing, but I think the law requires me

18     to at least mention that we would have put that evidence up, so

19     that's what I've done.

20                    THE COURT:  All right.  Much of that is set out

21     in great detail in the Daubert motions and the exhibits that

22     were offered in support of your support of the testimony of your

23     experts in that regard.

24                    Anything else we need to take up with the defense

25     before we start off?

```
 1                    MR. LoCOCO:  No.  I don't think so, Your Honor.
 2       You rested.  Subject to getting the exhibits --
 3                    MR. WARSHAUER:  And subject to a rebuttal.
 4                    MR. LoCOCO:  Otherwise -- of course.  Otherwise,
 5       we're ready, Your Honor.
 6                    THE COURT:  And I'll treat your -- that you renew
 7       your --
 8                    MR. LoCOCO:  Right.
 9                    THE COURT:  -- motion to dismiss at this point,
10       so that there's no argument that you somehow waived it by not
11       re-raising it at the close of their evidence.
12                    All right.  Well, we got a five-minute break.
13       We'll see you back in five minutes.
14                    MR. LoCOCO:  Thank you.
15                    (Recess from 10:43 a.m. to 10:52 a.m.)
16                    (Jury enters at 10:52 a.m.)
17                    THE COURT:  Please be seated.  Thank you.
18                    Okay.  Call your first witness.
19                    MR. LoCOCO:  Thank you, Your Honor.  At this
20       time, Raymond calls Michael Rogers.
21                    (Witness sworn.)
22                    THE COURTROOM DEPUTY:  Please state your full
23       name and spell your last name for the Court.
24                    THE WITNESS:  It's Michael W. Rogers,
25       R-o-g-e-r-s.
```

```
 1                    THE COURTROOM DEPUTY:  Thank you.
 2                    MR. LoCOCO:  Thank you, Your Honor.
 3                         DIRECT EXAMINATION
 4    BY MR. LoCOCO:
 5    Q    Mr. Rogers, please make sure you speak into the mike for us.
 6         So could you please tell the jury your name again?
 7    A    Yes.  My name is Michael Rogers.
 8    Q    Where do you live?
 9    A    I live in the town of Ashburn, Virginia, which is a suburb of
10         Washington DC.
11    Q    And for whom do you work?
12    A    I work for a company called Fusion Engineering, which is a
13         engineering consulting company actually located in
14         Naperville, Illinois, where I used to live before I moved to
15         Washington about four years ago.
16    Q    And what's your position at Fusion Engineering?
17    A    I'm one of the principal engineers there.
18    Q    Could you tell the jury about your educational background?
19    A    Sure.  I have a bachelor of science degree in mechanical
20         engineering from Iowa State University, and also a master's
21         degree in mechanical engineering from University of Illinois,
22         Chicago campus.
23    Q    Can you give the jury just an idea -- you mentioned
24         mechanical engineering -- the types of coursework that a
25         mechanical engineering student would go through?
```

| | | |
|---|---|---|
| 1 | A | Well, mechanical engineering is a fairly broad field.  I |
| 2 | | personally focused a lot of my coursework in the area of |
| 3 | | machine design and machinery, looking at things like |
| 4 | | dynamics, kinematics, stress analysis, other things related |
| 5 | | to design of different types of machinery. |
| 6 | Q | What's kinematics? |
| 7 | A | Kinematics is the study of the motion of objects, dealing |
| 8 | | with things like displacement, velocity, acceleration, |
| 9 | | understanding how things move and behave in response to |
| 10 | | various forces and accelerations. |
| 11 | Q | Have you continued to do research and testing over the years? |
| 12 | A | I have. |
| 13 | Q | Can you tell us a little bit about that work? |
| 14 | A | Yes.  So some of the work that I do involves research and |
| 15 | | testing on -- typically involving a variety of different |
| 16 | | types of machinery or vehicles.  So I've done things like |
| 17 | | testing of different types of forklifts, testing and analysis |
| 18 | | of other types of machinery, so for example, things related |
| 19 | | to heavy trucks, aircraft deicing equipment.  Those are just |
| 20 | | some of the types of equipment and vehicles I've worked on in |
| 21 | | the past. |
| 22 | Q | Mr. Rogers, have you published any papers? |
| 23 | A | I have. |
| 24 | Q | Is there one that you've published recently? |
| 25 | A | Yes. |

1  Q   Is that the -- at least the cover sheet with the title for
2      the paper?
3  A   It is.
4  Q   And what did this generally have to do with?
5  A   Well, this is a paper that I participated in and wrote with
6      several other people, including Dr. Kathleen Rodowicz.  You
7      can see the names on the left there, and she'll be I think
8      here early next week.  But this research focused on
9      evaluating the effect of a rear operator guard on a standup
10     lift truck, similar to the type involved in this case.  And
11     it entailed doing testing, looking at particular accident
12     modes to determine whether or not you'd expect an operator to
13     be injured if they stayed in the forklift during this
14     accident.
15 Q   And we're going to go to what we have on this next slide.
16     But the lower right-hand corner here, what are we looking at
17     there?
18 A   That is a photograph taken during an OSHA inspection of the
19     FedEx Supply Chain facility in December of 2017, and it's
20     intended to represent the proximate rest position of
21     Mrs. Anderson's forklift following the accident.
22 Q   And what model of Raymond forklift is that?
23 A   That's a Model 4250 or 425.
24 Q   Do you have prior experience with the 4250?
25 A   Yes.

1    Q    The paper that we -- that you were just talking about, did

2         the testing that you did there involve at least a 4250?

3    A    Yes.

4    Q    And we see that the forklift in this slide, the lower

5         right-hand corner, shows an open compartment.  Why is that

6         open on trucks like the 4250?

7    A    Well, it's open for a number of reasons.  One is operators of

8         this type of truck quite often are very frequently getting on

9         and off the truck throughout their shift.  It's also open

10        because -- as I mentioned, some of the testing that I have

11        done -- participated in and that resulted in that recent

12        paper, is dealing with certain accident modes where it's

13        better for an operator to be able to get off the truck

14        quickly and move away so that they don't get injured.  For

15        example, if the truck's tipping over or if it's falling off a

16        loading dock, you want the operator to be able to get out and

17        get away.

18   Q    The jury's heard some testimony about an ANSI Safety

19        Standard, the B56.1.  Are you familiar with that standard?

20   A    I am.

21   Q    How are you familiar with that standard?

22   A    Well, I actually am a member of that committee that deals

23        with and writes and modifies that standard.

24   Q    And how long have you been a member of the committee?

25   A    I've been a member of the committee since 2014.

1    Q    And is that when you started to attend meetings?

2    A    No, I had attended meetings for a number of years prior to

3         that.

4    Q    And how did you become a member?  Did you have to apply?

5    A    Yes.  You have to apply for a membership.  You have to

6         provide your background and experience and knowledge with

7         respect to lift trucks, forklifts.  And then there also has

8         to be an opening on the committee within your area of

9         specialization or your status, if you will, your job.  In

10        other words, the committee's made up of some people who work

11        directly for the forklift manufacturers.  It's made up of

12        people who have what they call a general interest, which

13        would be people like myself who are consultants.  And then

14        there's also a portion of the membership that are people from

15        users of forklifts, companies that use forklifts.  There's a

16        representative there from OSHA.  There's a representative

17        there from the US Army.  You know, the US Military uses a lot

18        of forklifts to move equipment within the military -- for the

19        military needs.  And so you have to have an opening for

20        someone like myself.

21   Q    One last question about this open compartment.  Does the

22        standard have language that addresses the open compartment

23        issue?

24   A    It does.

25   Q    And what does the standard say?

1    A    The standard says that a forklift of this type of standup

2         counterbalance truck has to have an open compartment that

3         allows for easy egress and ingress, getting in and off the

4         forklift.

5    Q    Are you a member of any professional societies or

6         organizations?

7    A    Yes.

8    Q    Can you tell the jury about that, please?

9    A    I'm a member of Society of Automotive Engineers, as well as

10        the American Society of Mechanical Engineers, and I'm also a

11        member of some accident reconstruction societies.

12   Q    When Dr. Meyer was here, we learned that he was a licensed

13        professional engineer.  Are you a licensed professional

14        engineer?

15   A    I am.

16   Q    Where are you licensed?

17   A    I'm currently licensed in the state of Illinois as well as

18        the state of Michigan, Virginia, where I now live, and also

19        Alabama.

20   Q    And how do you get a professional engineering license?

21   A    Well, that's kind of a multistep process.  You have to have

22        an education in engineering.  You have to pass what's called

23        the Fundamentals of Engineering test.  It's sort of a

24        multi-question test to test your basic knowledge of

25        engineering concepts.  And then after you work and get some

1      experience in the engineering field for four or five years,

2      then you can sit and take the actual -- what they call the PE

3      Exam, or the Professional Engineers Exam, which is a little

4      more specific to your area of specialization, whether you're

5      a mechanical engineer or electrical engineer.  There would be

6      slightly different tests.

7 Q   Getting back to the committee and attending meetings.  So you

8      attended meetings before you were a member?

9 A   Correct.

10 Q   Can anyone attend meetings of the B56.1?

11 A   They can, yes.  They're definitely open to the public and we

12      quite frequently have guests who come to the meetings.

13 Q   Have you ever seen Dr. Meyer or Dr. Kerrigan or Dr. Jeka at

14      any meetings?

15 A   No.

16 Q   Can anyone make recommendations for changes to the standard?

17 A   Yes, they sure can.

18 Q   So I could?

19 A   Anybody can submit a request or a proposal for changes to the

20      committee, yes.

21 Q   Have you been certified to operate forklift trucks?

22 A   I have.

23 Q   Tell us about that.

24 A   Well, I was first trained and certified many, many years ago,

25      probably 25 years ago, on a variety of different types of

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | forklifts.  You know, this truck, the 4250, is one type of   |
| 2  |   | forklift -- many of you may have seen what a lot of people   |
| 3  |   | consider a typical forklift, which is the sitdown            |
| 4  |   | counterbalance type.  There's pallet trucks.  There's what   |
| 5  |   | they call order pickers, where a forklift operator goes up in |
| 6  |   | the air with the load.  There's a lot of different types.  So |
| 7  |   | I've been trained on most all of those types of forklifts.   |
| 8  | Q | Have you also been responsible over the years for training   |
| 9  |   | others on how to use forklifts?                              |
| 10 | A | Yes.                                                         |
| 11 | Q | Including standup trucks?                                    |
| 12 | A | Yes.                                                         |
| 13 | Q | All right.  Mr. Rogers, do you do consulting work on matters |
| 14 |   | that are in litigation like this one?                        |
| 15 | A | I do.                                                        |
| 16 | Q | All right.  Have you and I worked on matters together in the |
| 17 |   | past?                                                        |
| 18 | A | Yes, we have.                                                |
| 19 | Q | Do you charge for your time?                                 |
| 20 | A | Fusion Engineering, yes, charges for my time.                |
| 21 | Q | And how much does Fusion charge for your time?               |
| 22 | A | $385 an hour.                                                |
| 23 | Q | Mr. Rogers, do you have experience doing accident            |
| 24 |   | reconstruction?                                              |
| 25 | A | I do.                                                        |

1   Q   What is accident reconstruction in the -- in your area of

2       mechanical engineering?

3   A   Well, accident reconstruction is utilizing the available

4       information that provides sort of the backdrop or the

5       background of what that particular accident entails.  So for

6       example, the type of vehicle.  In this case it's a forklift.

7       There's often -- there's investigative materials, statements,

8       photographs, measurements, things of that nature,

9       specifications.  And then gathering that information and then

10      utilizing engineering principles and the laws of physics, we

11      try and piece back together how did an accident occur and

12      what ultimately was the cause of the accident.  So to

13      reconstruct the accident, you want to look at putting back --

14      or determining, rather, the movements of the vehicles, things

15      like speed, steering, braking, other driver inputs is quite

16      often what's a part of that reconstruction.

17   Q   So to do reconstruction, to figure out what happened, you

18       need data on the front end?

19   A   Correct.

20   Q   All right.  What were you -- what did we ask you to do in

21       this case, Mr. Rogers?

22   A   Well, you asked me to really do three things.  One is to

23      evaluate the design of the operator's compartment of the

24      4250, also to reconstruct the accident, and then lastly, to

25      evaluate some of the design issues that -- and alternative

|    |   |                                                                    |
|----|---|--------------------------------------------------------------------|
| 1  |   | designs that the experts for Mrs. Anderson have proposed.          |
| 2  | Q | So for example, you understand -- well, let me withdraw that        |
| 3  |   | and actually ask you a different question.  So as part of          |
| 4  |   | your work in this case, Mr. Rogers, did you evaluate the           |
| 5  |   | design of the operator's compartment on the Model 4250?            |
| 6  | A | I did.                                                              |
| 7  | Q | Did you form an opinion about the cause of Mrs. Anderson's          |
| 8  |   | accident?                                                           |
| 9  | A | Yes, I did.                                                         |
| 10 | Q | Did you also evaluate the two defect allegations put forth by       |
| 11 |   | the plaintiff's experts?                                            |
| 12 | A | Yes.                                                               |
| 13 | Q | All right.  Mr. Rogers, as part of your work and analysis in       |
| 14 |   | this case, including your background and experience, have you       |
| 15 |   | formed an opinion to a reasonable degree of certainty in your       |
| 16 |   | field of expertise as to whether a left-foot deadman pedal or      |
| 17 |   | a left-foot brake as proposed by Dr. Meyer would have made         |
| 18 |   | any difference in the outcome of this accident?                    |
| 19 | A | I have.                                                            |
| 20 | Q | And what did you conclude?                                          |
| 21 | A | It's my opinion that a left-foot brake pedal would not have        |
| 22 |   | made any difference in this particular accident and               |
| 23 |   | Mrs. Anderson would still have been injured.                       |
| 24 | Q | And we're going to go into the details, but just generally,        |
| 25 |   | what did you do to be able to arrive at that opinion?              |

1  A  Well, I evaluated the braking capabilities of this type of

2     forklift at this particular facility, so I did some brake

3     testing.  I looked at the path of travel of the forklift with

4     respect to where Mrs. Anderson's foot likely would have

5     landed on the floor and where would the truck have

6     intersected with that foot placement, collected data with

7     respect to the braking system on the forklift, things of that

8     nature.

9  Q  All right.  Mr. Rogers, again, as part of your work in this

10    case and also based on your background and experience, have

11    you formed an opinion to a reasonable degree of certainty in

12    your field of expertise as to whether the 4250 needed a guard

13    over the steer tire as proposed by Dr. Meyer?

14 A  Yes.

15 Q  And what is that opinion?

16 A  I don't believe that the -- a guard over the steer tire is

17    needed nor appropriate for this model of forklift, and it's

18    not feasible in terms of the operating environment that this

19    type of truck typically would work in.

20 Q  When you say "not feasible," you're not saying you couldn't

21    put a guard there?

22 A  Oh, you definitely could, but it would inhibit some of the

23    functionality of the forklift.

24 Q  All right.  So what's your opinion about the issues that

25    would be caused by having a guard over that steer tire?

1    A    Well, you -- first of all, the operator and/or mechanics need
2         to be able to observe and look at the condition of the steer
3         tire as part of a daily inspection that's required to be
4         done.  Operators would need to determine whether -- what the
5         condition of the tires is, so putting a guard over that makes
6         that much more difficult to do.
7                        There also has to be sufficient clearance
8         between the bottom of that guard and any object or
9         transitions that the truck drives across.  For example, this
10        type of truck's quite often used to load and unload trailers,
11        so it needs to go over a dock plate or dock leveler, and that
12        change in contour, if you will, going over that plate,
13        could -- if the guard's too low, can -- it can get hung up on
14        that guard.  So there's some functionality issues with
15        respect to that type of guard.
16                        MR. WARSHAUER:  Can I just -- I need to ask you
17        something.
18                        (Discussion off the record.)
19   BY MR. LoCOCO:
20   Q    So I'm not going to put this up on the -- but the jury's seen
21        this before.  It's a photograph from the side of the 4250.
22        And when you're talking about clearance, do you mean this
23        clearance between the bottom of the forklift and the floor?
24   A    Exactly.
25   Q    Okay.  So let's go back to -- did I ask you to put together

1      some slides to kind of help summarize the things you looked

2      at and reviewed as part of your work in this case?

3   A  Yes, you did.

4   Q  All right.  So what did you -- let's start talking about the

5      things you learned by reviewing materials in the case.

6   A  Okay.

7   Q  So what do we see here in this first slide that is important

8      for your analysis of the incident?

9   A  Well, this first slide talks a little bit about or describes

10     a little bit sort of the overall general facts of the case.

11     And some of this you may have already seen.  Basically, we

12     have an accident that occurred in late July of 2017 at a

13     FedEx Supply Chain location in Effingham, Illinois.  It's a

14     big warehouse that FedEx, which part of their business -- you

15     know, most people think of they just ship packages, but they

16     also do what they call third-party logistics work where they

17     will run a warehouse like this.  And this particular

18     warehouse dealt with grocery-type products.

19                    And so it's a large facility.  2 and a half

20     million square feet.  They had a fleet of about 11, as I

21     understand, 4250s, along with some other types of sitdown

22     forklifts and some pallet trucks to help move product in and

23     around the warehouse.

24  Q  Couple other questions about the information we have here.

25     You've got something here, S/N, with a bunch of numbers.

1    What is that?

2  A  That's the serial number for the subject, what I will call,

3     the subject 4250, or the one Mrs. Anderson was operating at

4     the time of her accident.

5  Q  And what -- does that tell you anything, that serial number?

6  A  It does.  The 14 -- well, let me back up.  The 425 is a

7     designation for the Model 4250, and then the next two

8     numbers, the 14 is the year that that forklift was

9     manufactured.

10  Q  And then the 40467 is just that particular truck number?

11  A  Right.  That's sort of a sequential number specific to this

12     truck.

13  Q  All right.  Did you then try and collect some information

14     about Mrs. Anderson?

15  A  I did.

16  Q  And is that what we see here now?

17  A  Yes.

18  Q  And tell us what you learned in learning about Mrs. Anderson.

19  A  As shown there, at the time of the accident, she was

20     approximately 50 years old.  She had worked at FedEx Supply

21     Chain for about ten years.  The last three years, the most --

22     at the time of the accident, at least, she was a standup lift

23     operator, meaning operating this 4250.  Prior to that, she

24     had operated sitdown forklifts and pallet trucks at this

25     location.  I also learned that she had operated standup lift

1    trucks at another employer, at Krispy Kreme, I think it was,

2    back in 2005.  And that she had received training from FedEx

3    in the operation of the 4250, starting in 2014 with refresher

4    training every year after that.

5  Q  Then as part of your work in this case, did you review the

6    OSHA file?

7  A  Yes.

8  Q  Did you review the FedEx Supply Chain file?

9  A  I did.

10  Q  Did you review photographs from the scene?

11  A  Yes.

12  Q  So for example, the document we see up here is from the FedEx

13    Supply Chain investigation?

14  A  Correct.

15  Q  And how was this helpful to you?

16  A  Well, it described generally what they -- "they" being FedEx,

17    investigators had found in talking with some of the personnel

18    who were there that day, that basically described generally

19    what occurred, that Mrs. Anderson had -- was heading from

20    basically the shipping office to the battery charging area,

21    because the forklift battery was running low.  She needed to

22    change out the battery.  And that she initially had started

23    down what they designated as Aisle G, at some point

24    transitioned from Aisle G to what they call Aisle F/G or the

25    replenishment aisle is what they called it.  And that then

1    her accident occurred and her forklift was found at an angle

2    relative to that F/G aisle near the beginning of it.

3  Q  Did you then -- were you then provided in this FedEx file a

4    series of statements from people who were in the area?

5  A  Yes.

6  Q  So for example, Ms. Boone was here.  We see on the right side

7    a copy of Ms. Boone's statement.  The jury's heard about

8    that.  On the left side, there's some information including

9    some information in bold.  Is that what was important to you?

10 A  Yes.  So I've identified on the left there generally whose

11   statement it is and some of the things that I thought were

12   important to my work.

13 Q  So Ms. Boone, that she asked someone to move the forklift and

14   that she was caught under the steer wheel?

15 A  Correct.

16 Q  Then you read a statement from somebody named Michael Began.

17   What did you take from that one?

18 A  Well, the important thing to me was that the lift compartment

19   was approximately 1 foot from the rack, and that she was

20   laying near the back of the forklift.

21 Q  Someone named Cary Mason, what information did you get from

22   that statement?

23 A  That Mrs. Anderson's shoe was underneath the lift and that

24   this individual I think assisted in what they call unwedging

25   or removing the shoe from underneath the forklift.

1    Q    Someone named Kimberly Clark, another confirmation of where

2         the shoe was caught?

3    A    Correct.  Up in between the, what they'd say, the tire.  They

4         mean the steer tire, which is at the rear of the forklift.

5    Q    All right.  Someone named Cathy Mason, "Lift crooked."  You

6         took that the truck was at an angle?

7    A    Correct.

8    Q    Jason Evans, "Shoe was wedged under the lift."  Again,

9         similar witness statement?

10   A    Correct.

11   Q    You looked at some of the medical records; is that right?

12   A    Yes, uh-huh.

13   Q    And in this medical record, you've highlighted some

14        information.  This is already in evidence.  What did you

15        glean from this particular record?

16   A    Well, this record indicated that at some point, I guess it

17        was October of 2018, Mrs. Anderson had told her treating

18        physician that she was driving a forklift and that she

19        believed there was a piece of wood or an object in the path

20        that caused the forklift to jerk and throw her off.  As you

21        can read, that she then said she was thrown from the

22        forklift, hit her head, and her foot landed in front of the

23        machine, and the machine continued to roll over her foot.

24        That's a different description than what I understand

25        Mrs. Anderson described in her -- at least in her deposition

|    |   |   |
|----|---|---|
| 1  |   | that I read. |
| 2  | Q | And then this is another document.  It's from the OSHA file, |
| 3  |   | which is in evidence.  And you've highlighted the "Hit chip |
| 4  |   | chunk of wood, was thrown out."  Correct? |
| 5  | A | Correct. |
| 6  | Q | All right.  So you collected that information that was |
| 7  |   | available about the incident, where it happened.  What did |
| 8  |   | you do next? |
| 9  | A | So next I began at least a preliminary investigation and |
| 10 |   | documentation of some of the other accident facts.  So one of |
| 11 |   | the things I did was I pulled up a Google Earth image or an |
| 12 |   | overhead aerial view of the FedEx Supply Chain facility that |
| 13 |   | you see there on the screen.  And I have superimposed onto |
| 14 |   | that some areas of interest, such as the shipping office, |
| 15 |   | which is along the back of the warehouse on the left as we're |
| 16 |   | looking at it. |
| 17 | Q | You can circle yours too. |
| 18 | A | Oh, can I?  Okay. |
| 19 | Q | Yeah. |
| 20 | A | So yeah.  In green there is the shipping office.  Oops.  I |
| 21 |   | guess I need to -- how do I clear that then?  Thank you.  So |
| 22 |   | the red "X" I put on there is the approximate location of |
| 23 |   | where the accident occurred, because as we know, she was |
| 24 |   | heading from the shipping office to over here in the battery |
| 25 |   | charging area. |

1    Q    So this is a bird's eye view down onto the building?

2    A    Correct.

3    Q    All right.  And what did you do here with this photograph?

4    A    So this is really the same picture and I've simply just

5         rotated it, because many of the diagrams that were done as

6         part of the investigation and some of the other things, that

7         it kind of at least mentally helps me to maintain the same

8         orientation.  So now the back of the warehouse is at the top

9         of this diagram.  Again, there's the shipping office in

10        green, the location of the accident, and down here is the

11        battery charging.  So she was generally heading from top to

12        bottom in this view of the picture, or of the aerial photo.

13   Q    So what are we looking at here?

14   A    So at my -- one of my inspections, I found on the wall this

15        drawing that showed the layout of the facility, because I

16        should mention that at the time that I was there, this

17        facility had closed.  The building of course was still there.

18        But on the inside, there was -- it was basically an empty

19        warehouse with no racking, no product, no nothing.  So this

20        diagram kind of helps show generally how the area was laid

21        out and some of the racking, which is in green --

22   Q    We're having a gremblance.

23   A    But again, I've got back of the warehouse here at the top,

24        that we've got shipping office that I've kind of surrounded

25        in green, the red "X" indicates the area where the accident

| | | |
|---|---|---|
| 1 | | occurred, and down here is the battery charging area. |
| 2 | Q | All right.  You mentioned one of your inspections.  Did you |
| 3 | | go to the facility more than once? |
| 4 | A | I did. |
| 5 | Q | All right.  So is this a drawing that you did, Mr. Rogers? |
| 6 | A | It is not. |
| 7 | Q | It's marked as Plaintiff's 30.  It was from I believe |
| 8 | | Dr. Meyer's deposition.  Tell us what we're looking at here. |
| 9 | A | So this is a diagram that Dr. Meyer had done.  As I |
| 10 | | understand it, it was basically to plot the path of |
| 11 | | Mrs. Anderson's forklift based on Dr. Meyer's visit to the |
| 12 | | scene along with Mrs. Anderson.  And at that inspection, she |
| 13 | | described for him how her forklift moved from the shipping |
| 14 | | office up here to at least towards the battery charging area, |
| 15 | | which would have been way down here at the bottom.  And that |
| 16 | | she transitioned from the G aisle, which is really not |
| 17 | | described here per se, but over to this other aisle.  And so |
| 18 | | the red line that's moving from sort of top to bottom |
| 19 | | describes that change in the aisle, and then down in here is |
| 20 | | sort of showing where the forklift was found at an angle |
| 21 | | within that F and G Aisle. |
| 22 | Q | All right.  And then you had some other information from the |
| 23 | | OSHA file; is that right? |
| 24 | A | Yes. |
| 25 | Q | Tell us about that. |

1  A   So the OSHA investigation kind of happened in a couple of

2      pieces.  They did some talking to some of the folks and to

3      Mrs. Anderson later summer, in the fall, into October of

4      2017.  But it wasn't until December of 2017 that they

5      actually came out and did a site visit.  And at that time,

6      it's my understanding they took a number of photographs and

7      measurements and then also did this drawing.  So in this

8      little sketch, you can see up here at the top is this

9      shipping aisle, shipping office I think is what they sort of

10     meant.  And then they -- she came down.  And there's a couple

11     of different things.  It's a little hard to understand.  But

12     if we look at this area, you know, it looks like there's a

13     forklift sitting at an angle, and then EE is where the --

14     Mrs. Anderson was laying near that racking.

15 Q   So the next series of pictures the jury's seen.  I don't

16     remember the exact exhibit now.  But they're the OSHA

17     photographs; correct?

18 A   Correct.

19 Q   All right.  So how was this important to your analysis?

20 A   Well, this was important because it helped me understand

21     generally where the forklift was found.  I mean, at the time

22     of the accident, there was no pictures taken, no

23     measurements.  Of course, their concern on-site there was

24     assisting Mrs. Anderson, so there was really no documentation

25     from the moment or shortly thereafter of the accident.  But

1    in December, they repositioned a different forklift, same

2    model but a little bit different unit, near where they recall

3    the forklift being positioned.  So it shows me proximity of

4    the forklift to the racking, it shows me the angle of the

5    forklift with respect to the aisle, things like that.

6  Q  One of the things I just want to ask you about, we've seen --

7    Mr. Warshauer showed some video from a Raymond training video

8    that had a 4250 in it.  But my recollection is that that one

9    didn't have a rear -- I mean, a back -- the right side of the

10   compartment, so the back pad part.  That was as tall as this

11   one.  Are you familiar with this particular feature?

12  A  Yes.

13  Q  And is that an option that a company like FedEx can get, a

14   higher backrest?

15  A  Yes.

16  Q  All right.  So I'm going to just kind of go through these

17   photographs.  You can tell us anything as I go through them

18   that was important to your analysis.

19  A  Well, again, this is a similar view to the last one we

20   showed, but it shows again that the forklift was found at an

21   angle relative to the aisle.  If you consider that this line

22   on the floor here is basically parallel to the racking system

23   and that the forklift was similarly found a couple of feet,

24   maybe a foot or two from the rack upright, but that it had

25   never actually collided with anything.

1    Q    What about this one?

2    A    This is another view from sort of within the rack, looking

3         out at the aisle way.  You're kind of looking directly into

4         the operator's compartment.  So the operator's floor where

5         the operator would stand is generally in this area.  The

6         steer wheel's over here to the left of that.  And then kind

7         of in the background, you can begin to see some cracks and

8         seams in the floor that we'll talk about a little more here

9         in a minute.  There's another one that runs kind of along the

10        lower left corner, along with, you know, some white -- sorry,

11        yellow striping on the floor and some -- these gray lines

12        that go across the aisle, those look like they're old markers

13        of some kind.  But we'll see those again in some of the -- my

14        stuff, because again, all the racking was gone by the time I

15        got there.

16   Q    All right.  So different view?

17   A    Different view.  This is kind of looking down, straight down

18        Aisle F/G in the direction that Mrs. Anderson was going

19        before her accident, and again, showing where the -- her

20        forklift generally came to rest.  And again, you can see --

21        begin to see some of the cracks in the floor.  There's some

22        over -- I'm going to kind of highlight next to them.  There's

23        some cracks and lines, seams in the floor that run sort of

24        parallel to the aisle or along the length of the aisle.  But

25        there's also some that run across or perpendicular to the

1   aisle.  For example, right above the pink line I've just

2   drawn, there's this -- there's a floor seam that comes off of

3   this.  These big yellow I-beams over here on the left are

4   holding up the roof, and they're -- these big I-beams are

5   spaced all throughout the warehouse to support the roof.  So

6   that provides sort of a reference point for us.

7   Q   Is that a better photograph of that?

8   A   That's actually the same photograph, and I've inserted that

9   red oval to again identify one of these cracks that run sort

10   of perpendicular to the path of travel.

11   Q   So another OSHA photograph?

12   A   Another OSHA photo.  Yes.  Looking again basically down aisle

13   F and G.  And obviously the forklift is now missing, but its

14   rest position was, you know, generally right about in here

15   that we were looking at earlier.

16   Q   What are you showing us -- what's important to your analysis

17   from this photograph?

18   A   Well, this is a photo now kind of turned around looking back

19   the other direction.

20   Q   Towards the shipping office?

21   A   Towards the shipping -- yeah.  So the shipping office would

22   be off behind where this individual's standing quite a ways.

23   But again, we've got a series of cracks and seams in the

24   floor, and these run all throughout the entire warehouse.

25   Not that unusual for a facility like this.  I've been in

1    many, many warehouses and quite often you have cracks and

2    certainly seams in the concrete, because they pour the

3    concrete in sections at a time.

4    Q   Another photograph of the cracks?

5    A   Yes.

6    Q   And what are you circling here?

7    A   And again, that's that same perpendicular floor seam.  And so

8        the yellow beams that we talked about would be just off to

9        the left of the picture.  And you can -- up in the upper left

10       corner, you can see the first upright of the racking, and so

11       her forklift would have come to rest just beyond that, up off

12       of the picture there.

13   Q   Okay.  So what did you do next?

14   A   Well, after I gathered that --

15   Q   Well, actually let me move on.  So what are we looking at

16       here, Mr. Rogers?

17   A   So one of the things that I did at the first inspection of

18       the facility is I did a bunch of photographs and

19       measurements, and also took what are commonly referred to as

20       laser scans.  So a laser scanner is a device that sits on a

21       tripod and it spins around and it shoots out laser beams,

22       just literally millions of points, and it's collecting

23       dimensional or geometric data so I can then go back in the

24       computer and have a 3D model of any objects it measures.  In

25       fact, I think Dr. Meyer used the same sort of device.

1          But what we're looking at here is a, what at

2    least engineers call, a plan view or a bird's eye or overhead

3    view of the area of the warehouse where Mrs. Anderson's

4    accident occurred.  And so this is a scale diagram of --

5    representing some of the racking.  You can see some of the

6    yellow marks on the floor that we were looking at earlier in

7    the OSHA pictures.  The racking itself is sort of combination

8    of blue for the uprights and orange for the horizontal

9    support pieces that the pallets would go in at various

10   levels, and then of course the position of the overhead view

11   of the forklift as was shown in those pictures we were just

12   looking at.

13   Q   Okay.  Couple of followup questions.  So this blue item

14       there, what is that?

15   A   That's actually one of the vertical rack uprights.

16   Q   Is that the rack upright that the truck was found nearest to,

17       the back of the truck was found nearest to?

18   A   Yes, exactly.

19   Q   All right.  And then you've got a -- you said this was a

20       scale drawing.  You've got an image of a forklift.  Tell us

21       how that came about.

22   A   So that here looks like it's just a two-dimensional -- well

23       it is in fact a two-dimensional representation.  But I used

24       the same laser scanner to scan the entire exemplar forklift,

25       and so actually I've got three-dimensional information, but

| | | |
|---|---|---|
| 1 | | here it's just representative of an overhead view of a 4250. |
| 2 | Q | Couple of items I want to make sure that the jury's aware of |
| 3 | | that you reviewed.  Did you review the operator's manual for |
| 4 | | the 4250? |
| 5 | A | I did. |
| 6 | Q | So this booklet you're familiar with? |
| 7 | A | Yes. |
| 8 | Q | All right.  Did you -- have you reviewed a DVD in the owner's |
| 9 | | manual called "Principles of Safe Operation"? |
| 10 | A | Yes. |
| 11 | Q | Did you review the warning decals on the forklift? |
| 12 | A | Yes. |
| 13 | Q | Did you inspect the actual forklift that was involved in the |
| 14 | | incident? |
| 15 | A | I did not. |
| 16 | Q | Why not? |
| 17 | A | Well, as I mentioned a little bit earlier, that -- at some |
| 18 | | point, a year or so, I forget exactly when, after |
| 19 | | Mrs. Anderson's accident, this facility was closed.  All the |
| 20 | | racking was taken out and the fleet of forklifts were sold or |
| 21 | | gone, so we don't know where that forklift went to. |
| 22 | Q | So did you have a forklift at the facility when you did your |
| 23 | | inspection? |
| 24 | A | Yes. |
| 25 | Q | And I think you used the term "exemplar"? |

1   A   Yes.

2   Q   We'll talk about the exemplar.  Was it in your opinion

3       substantially similar to the subject forklift?

4   A   It was.

5   Q   All right.  Now when a design engineer like yourself is

6       trying to design a product, what are you trying to do with

7       respect to the issue of the overall design as it relates to

8       hazards and risks?  What's the goal?

9   A   Well, the goal is to try and reduce that risk to the lowest

10      possible level yet still allow the machine to perform its

11      function, to do what it needs to do.  Because you can't --

12      you can never totally eliminate any risk to -- with any

13      object or any device or machine.

14   Q   Now are you familiar with the brake pedal design on the 4250?

15   A   I am.

16   Q   It's got a single deadman pedal, single brake pedal; correct?

17   A   That's correct.

18   Q   All right.  Dr. Meyer was here a couple of days ago.  He

19      offered the opinion that standup forklifts like the 4250

20      should have brakes under both feet, right and left.  Based

21      upon your experience in the industry, your experience as a

22      mechanical engineer, your membership on the B56.1, are you

23      aware of a single standup lift truck manufacturer that uses

24      two brake pedals?

25   A   No, I've never seen that, and I don't know of any

1   manufacturer who offers that.

2   Q   Based on your experience, background, education, experience

3       with lift trucks, would the use of two brake pedals create

4       any operational issues?

5   A   I believe they would.

6   Q   What are those?

7   A   Well, when you require an operator to stand with both feet on

8       specific pedals and never allow them to move, you may run

9       into -- or I believe will run into situations where operators

10      are moving around in the compartment, either because they're

11      turning to look in a certain location or they want to get a

12      little posture relief.  You know, you can't stand in the same

13      exact position all day long, and so any time one of the feet

14      would be moved and lifted, you could have an inadvertent

15      brake actuation.  That could cause problems with the

16      operation of the truck.  It could cause instability of the

17      truck.  It could result in sort of nuisance stopping that may

18      result in tipping of the truck if you have a load up in the

19      air, depending on how quickly you're going, things of that

20      nature.

21  Q   All right.  So I want to get back to what you did at your --

22      as part of your analysis.  Was one of the issues you studied

23      the available top speed for the subject 4250?

24  A   Yes.

25  Q   Why is that an issue?

1    A    Well, as part of the -- I mentioned earlier, in accident

2         reconstruction, we're trying to understand movement of an

3         object or a vehicle, in this instance, a forklift.  So we

4         want to understand how fast could it have been going, how

5         fast was it going, try to make a determination how fast was

6         it going at the time of the accident.  That plays into things

7         like how long does it take for it to stop once brakes are

8         applied.  So what's the braking distance?  Well, faster

9         you're going, the longer it's going to take to stop.

10   Q    So on a 4250, off the factory floor, what's its maximum

11        speed?

12   A    Approximately 8 miles per hour.

13   Q    Can that be governed or limited?

14   A    Yes.  So this forklift has a number of what they call

15        performance settings, so a mechanic or a supervisor can go in

16        and reduce the top speed or they can reduce the acceleration

17        rate, how quickly does the forklift speed up.  There's a

18        number of settings that can be changed.

19   Q    So did you undertake something called a top speed analysis to

20        determine what the top speed was for the subject forklift?

21   A    I did.

22   Q    All right.  How did you go about doing that?

23   A    Well, again, because we didn't have the subject forklift

24        available to look at to measure what its top speed was, we

25        kind of had to do it indirectly.  So again, one of the things

1    we -- what I had was the specifications that indicate that

2    this truck's capable of traveling 8 miles an hour, which is

3    kind of shown there on the right side.  But one of the other

4    pieces of information I had was that Mrs. Anderson at her

5    deposition indicated it was her belief that the top speed had

6    been set or reduced down to 5 miles per hour.

7    Q    So what else did you do to figure out whether this truck was

8         actually a 5 or at 8?

9    A    Well, so what I did was I had a work order from the Raymond

10        dealer, and the Raymond dealer had an individual who was

11        basically a resident technician at this facility, so he was

12        there all the time to work on this fleet of trucks.  And he

13        was asked to specifically check this truck two days after the

14        accident to determine whether or not -- primarily whether it

15        was operating properly.  And one of the things that he did

16        was he tested the brakes by measuring the stopping distance.

17   Q    All right.  I'm going to stop you there.  So the record we

18        have up here shows a date of July 31st, 2017; right?

19   A    Correct.

20   Q    And Mrs. Anderson and I think Ms. Boone both testified that

21        the accident happened on the 29th, which was a Saturday?

22   A    I think it's --

23   Q    It was a Saturday.

24   A    Yes.  But it's the 28th or 29th?

25   Q    29th.

1   A   Okay.

2   Q   Right.  So two days later would have been the first Monday?

3   A   Yes, it was just a couple days after the accident.

4   Q   And so this technician, I think his name was Pieper, was

5       asked to check the truck out?

6   A   Correct.

7   Q   Did he find any problems with the truck, any malfunctions?

8   A   No, none that I'm aware of.  Certainly not -- everything

9       reflected in his work order indicates that the truck was

10      working properly.

11  Q   All right.  So let's get back to your top speed analysis.

12      What kind of information did this provide you to help in that

13      analysis?

14  A   So over on the right, you can see on the actual work order --

15      I've sort of highlighted with a red box there his measurement

16      of the stopping distance in what we call the tractor-first

17      direction, or some people would consider it reverse, but it

18      was the direction that Mrs. Anderson was traveling at the

19      time of her accident.  And he noted that that measurement was

20      102 inches from where he applied the brake to where the

21      forklift came to a stop.

22  Q   All right.  Which is 8.5 feet?

23  A   Right.  Down here in the lower -- I just did the conversion

24      from inches to feet.  A little -- sometimes a little easier

25      to talk in feet.

1   Q   Were you also provided with a statement from Mr. Pieper that
2       helped this analysis?
3   A   Yes.
4   Q   And what did you glean from having read his statement?
5   A   Well, he had indicated that to his knowledge, the forklift's
6       speeds were not turned down or not adjusted, that they were
7       capable of traveling the full 8 miles per hour.
8   Q   But you went ahead and did this analysis to confirm it for
9       yourself?
10  A   Correct.
11  Q   All right.  So what'd you do next?
12  A   So what I did was I had some stopping distance data available
13      from the Raymond Corporation as part of their development
14      work on the 4250, so that engineering lab report that Raymond
15      had done.  And in that report, they measured what they called
16      deadman tractor-first stopping distances from a couple
17      different speeds.  On the top box on the right there, it
18      looks like they did three runs at nominally 5 miles per hour,
19      just a little over.  But on average, found that the truck
20      required about 5 feet to stop, so that's this number here.
21      And then --
22  Q   Which is 60 inches?
23  A   Correct.
24  Q   Okay.
25  A   And then I also pulled from that an average deceleration

1    rate.

2  Q   What's that?  What's a deceleration rate?

3  A   So deceleration or acceleration is really a measure of how

4      quickly the speed of something is changing.  So if I'm

5      sitting still, of course there's 0 acceleration because the

6      speed's not changing.  Similarly, if I'm driving down the

7      road in my car at 30 miles an hour, steady speed, there's 0

8      acceleration because it's a constant speed.  But as soon as I

9      begin to slow down, it's that rate at which I'm slowing in

10     this example that would be the acceleration.  So it's the

11     rate of change of velocity is really kind of the technical

12     definition of acceleration.

13 Q   And even slowing down is considered -- engineers call

14     acceleration -- it's just negative --

15 A   Correct.

16 Q   You don't call it deceleration.  You just call it negative

17     acceleration?

18 A   Yeah, technically it's all acceleration, but, you know, lay

19     people, it's sometimes easier to talk about decelerating,

20     meaning slowing down versus accelerating.

21 Q   And what is this 0.18g?

22 A   So acceleration is one of the units that's often used to

23     describe acceleration, what we call a g, and g stands for

24     gravity.  And that comes from really Newton's Laws of Motion,

25     and if the -- here on Earth, if I have an object and I drop

1      it, it's going to begin to accelerate or speed up because of

2      the force of gravity.  And it's the rate at which it's

3      speeding up is defined as 1g.

4  Q   Okay.  What else did you take from this report from Raymond?

5  A   So that was some data at 5 miles an hour.  The lower box on

6      the lower right there is data from roughly 7 miles per hour.

7      And you can see that at 7 miles per hour, it took, you know,

8      on average about 9 feet for a 4250 to stop, and again, an

9      average deceleration of about 0.19g.  So the higher that

10     average deceleration number, the quicker it's slowing down or

11     the faster it's stopping.

12  Q   Well, and 9 feet is 108 inches?

13  A   Yes.

14  Q   All right.  Just going back to this 102 to keep things --

15  A   Yep.

16  Q   -- straight.  So what was the next part of your analysis?

17  A   So that's data from Raymond.  One of the other factors that

18     has to be considered is, what surface are we doing the

19     testing on?  Because that's going to affect how quickly

20     something slows down.  So --

21  Q   How does the surface impact that?

22  A   Well, it's essentially kind of like coefficient and friction.

23     So here in Southern Illinois, you know, on a dry summer day,

24     you can stop at a certain distance from a certain speed.  But

25     in the wintertime, of course, or rain or snow, the slipperier

1        it is, the longer it takes to stop, so.

2   Q    So what did you do to figure out the impact of the floor on

3        the deceleration rate and the speed?

4   A    So one of the things I did was at the time of my inspection

5        at this facility, I had a similar 4250 available and I

6        actually did some brake testing of my own at this FedEx

7        facility on that same floor, actually in the same aisle that

8        Mrs. Anderson's accident occurred in.

9   Q    And how did you do that testing?

10  A    I did it by utilizing an accelerometer, fancy term for device

11       that measures acceleration.  It has three accelerometers in

12       it and it's measuring acceleration in what we call the X

13       direction, which would be kind of parallel to the forks or in

14       the direction she was traveling generally.  It's a wide

15       direction, which would be side to side, and then there's a Z

16       acceleration or vertical acceleration.  So X, Y, and Z would

17       be the three axes that accelerometers are being measured, and

18       I mounted that in the operator's compartment of this 4250.

19  Q    What's the name of that device?

20  A    The company that makes it is called Vericom is the name of

21       it.

22  Q    Is that the device that we're looking at there in this

23       photograph?

24  A    Exactly.  So it's the model VC4000 DAQ.  Kind of sounds all

25       fancy, but it's basically a device that's got the

1      accelerometers in it and it allows you to determine the speed

2      and the distance mathematically from this acceleration data.

3      Because kinematic equations, those things are all related.

4  Q  Now you've got a couple close-ups of the middle picture and

5      the right picture.  We see this picture here on the left.

6      What does that picture show the jury?

7  A  Well, so it shows the location of where I had mounted this

8      Vericom device.  And what I was attempting to do was to

9      position it close to what we call the center of gravity of

10     the forklift, and it happens to be very close to where the

11     operator would be positioned as well.  Of course that's in on

12     the front wall of the operator's compartment.

13  Q  You've said "center of gravity."  What's center of gravity?

14  A  Well, the center of gravity, any object has a center of

15     gravity.  And it's basically where the center of all of the

16     weight is, so if --

17  Q  Let's use me.  Do I have a center of gravity?

18  A  You do.

19  Q  Right?  My gut?

20  A  It's -- everybody's is in that general area.  Yes, so it's

21     basically -- and where all the mass could be boiled down to,

22     if you will.  And it influences motion of objects under

23     certain conditions.

24  Q  All right.  So you did this testing, and did you obtain data

25     from doing the testing?

1    A    I did.

2    Q    Is that what we're looking at here?

3    A    Yes.

4    Q    Explain this data to the jury, please.

5    A    So this is data again that I collected on my first inspection

6         back in September of 2020, using an exemplar 4250.  And I did

7         a couple different stopping tests.  Some of them used what we

8         call plugging, which you may or may not have heard, but

9         that's using the directional control to slow the truck as

10        opposed to deadman braking, which would be these two runs,

11        which is where you would -- the operator would lift their

12        foot from the deadman pedal.  So focusing on those two

13        entries, I was able to establish again an average

14        deceleration rate from my data, calculate what the speed was

15        at the time that the braking began, and then establish what

16        the stopping distance was at those two speeds on this floor.

17   Q    And this is done all by obtaining data and calculation; it's

18        not through measurements?

19   A    Correct.

20   Q    All right.  Then what was your next step?

21   A    So then this page here utilizes -- on the top part is some of

22        the data that I collected that we just looked at.  In trying

23        to extrapolate from that data what the expected speed of the

24        truck would be for a 102-inch or 8-and-a-half-foot stopping

25        distance, which again was the distance measured by the

1   mechanic couple days after the accident with Mrs. Anderson's

2   forklift.  And so using the data that I collected on the top

3   and then the data that Raymond collected or had in their

4   engineering test lab to kind of compare, because again,

5   theirs was different facility, but it still gives us some

6   general idea of what this truck might be capable of.

7                  At the end of the day, so to speak, for an

8   8-and-a-half-foot stopping distance, which again is what the

9   Huebel mechanic, now Huebel's the name of the forklift

10  dealer, found when he checked the truck out after the

11  accident, is that at the time of his testing, the truck was

12  traveling about 6 and a half to 7 miles per hour when he did

13  his brake tests.

14  Q   Now so we know it wasn't limited to 5?

15  A   Correct.

16  Q   How do we know it wasn't limited to 6 and a half or 7?

17  A   Well, we have Mr. Pieper, the mechanic's document that he

18      said that he -- it was not limited.  And I think the reason

19      that in his testing it didn't get up to 8 miles per hour is

20      it takes quite a distance to get all the way up to top speed,

21      and I believe he just didn't let it go long enough to really

22      get up to 8 miles an hour.  But it clearly shows to me that

23      it was not limited to 5 miles an hour.

24  Q   All right.  Now you mentioned the exemplar forklift that you

25      used.  You told us earlier you thought it was substantially

| | | |
|---|---|---|
| 1 | | similar.  How did you make that determination? |
| 2 | A | Well, I looked at the specifications for Mrs. Anderson's |
| 3 | | truck and the one that I was using.  Again, they were both |
| 4 | | Model 4250. |
| 5 | Q | Is this -- does this show a side by side on the |
| 6 | | specifications? |
| 7 | A | It does.  So in the box on the left, sort of the middle |
| 8 | | column is Mrs. Anderson's subject 4250, that you can see the |
| 9 | | serial number there is from 2014.  And then the exemplar |
| 10 | | truck that I used, if you can read, this is the spec plate, |
| 11 | | if you will, actually off of the exemplar that I tested.  You |
| 12 | | can see that one was made in 2018, but they're both model |
| 13 | | 4250s, they both had the same rated capacity, they're both |
| 14 | | nominally the same top travel speed.  They weighed within a |
| 15 | | little less of 300 pounds of each other. |
| 16 | Q | Let me just stop you there.  I think Mr. Warshauer and I both |
| 17 | | have been -- both sides have been telling the jury that this |
| 18 | | truck weighed with the battery 4 tons; is that correct? |
| 19 | A | No, it's actually closer to 5 tons.  So this second yellow |
| 20 | | box is the weight of the truck with a maximum weighted |
| 21 | | battery.  So it's over 10,000 pounds. |
| 22 | Q | All right. |
| 23 | | THE COURT:  All right.  We are bumping up against |
| 24 | | what I call a hard break.  It's five minutes to 12.  And is |
| 25 | | there one or two more questions in this -- |

```
1              MR. LoCOCO:  This is a good spot, Your Honor.
2              THE COURT:  It's a good time to stop?
3              MR. LoCOCO:  It's fine.
4              THE COURT:  All right.  So folks, let's -- it's
5    five minutes to 12.  Let's come back and try to be ready to
6    restart at 1 p.m.  We are in recess.
7                   (Jury exits at 11:54 a.m.)
8                   (Recess from 11:54 a.m. to 1:05 p.m.)
9              THE COURT:  Be seated.  Thank you.  Back on the
10   record in Raymond -- Anderson v. Raymond.  Witness is in the
11   witness box, but the jury's not yet present.
12             There were several documents that were shown or
13   attempted to be shown to the jury that had this reference to
14   work comp.  And I want to make sure that I have a sufficient
15   record to -- so that if one looks at this record, the evidence
16   that -- or documents or items that were attempted to be
17   presented to the jury will be clear for anyone who's rereading
18   this transcript, looking at the record.  There was also an issue
19   that came up yesterday with respect to work comp.
20             I find the issue of work comp would be very
21   prejudicial to the plaintiff.  I also am very concerned that
22   there were repeated efforts made to get that issue in front of
23   the jury.  And it doesn't take much.  One document that
24   clearly -- that reflects worker's compensation is enough I think
25   with this jury to remind them, if they're not, if they don't
```

1    know, that much of her -- her medical may be covered by work

2    comp.  So we really can't have any more mistakes made with

3    respect to, "Oh, I didn't realize I was putting work comp in

4    front of the jury's consideration."

5              I'm going to let Defense Counsel know that it

6    should inform each of its prospective witnesses that they should

7    not accidentally show anything to a jury or convey anything that

8    suggests that some of the injuries suffered by the plaintiff may

9    be compensated by worker's compensation.

10             MR. LoCOCO:  Your Honor, if I could just again, I

11   did at sidebar, but apologize to the Court and Counsel.  I

12   wasn't making efforts to get it in front of them.  I just made a

13   stupid mistake by not catching it.

14             THE COURT:  A couple times.

15             MR. LoCOCO:  And I apologize to the parties.  And

16   anything else we're going to use, I will scrub so that you can

17   sufficiently sanction me if I make that mistake again.  So I

18   appreciate the Court's comment.

19             THE COURT:  All right.  Let's get the jury in

20   here.

21             Yes, sir?

22             MR. WARSHAUER:  Did have the two things we didn't

23   rule on yet about those 7.20.2.  Yesterday, my life care planner

24   had mentioned the word "cost" and wasn't allowed to do it.

25   Here, he mentions all kinds of specific rulings, standards that

1     he's going to opine about, but the single one that clearly we're

2     going to talk about, he does not say it in his report.

3                    THE COURT:  Which it's -- that standard is what?

4                    MR. WARSHAUER:  7.20.2.

5                    MR. LoCOCO:  B56.1.

6                    MR. WARSHAUER:  Yes.

7                    MR. LoCOCO:  And I've rewritten the question.

8                    THE COURT:  Wait.  I thought he started off by

9     referencing B56.1?

10                   MR. WARSHAUER:  He can talk about lots of

11    sections in B56.1.  It's this thick.  But the specific one he

12    should not be allowed to opine about is 7.20.2.

13                   THE COURT:  Which says what?

14                   MR. WARSHAUER:  That's the one that says there

15    shall be a disconnect if the operator leaves the operating

16    position.  He should have --

17                   THE COURT:  You don't want to cross-examine him

18    on that?

19                   MR. WARSHAUER:  I don't want him to opine on it.

20                   THE COURT:  Okay.

21                   MR. WARSHAUER:  If he was going to opine on it --

22                   THE COURT:  I don't -- there's no grab handle.

23    There's nothing.  There's nothing outside of this forklift that

24    has anything to do with safety.  Nothing.  And he's opined it's

25    perfectly safe.  He started off by saying, "We don't have a door

1    there to stop him, because what might happen if there's an

2    injury going in the opposite direction?"  Which begs the

3    question, "Oh, boy, what have they done to protect against an

4    accident scenario that's happening in the other direction, not

5    the fork side, but the exit side?"  You don't want to talk about

6    that?

7              MR. WARSHAUER:  Well, I think we can talk about

8    that, but I don't think that that is the same as a specific

9    reference to a specific paragraph that was not put in the

10   specific report.

11             THE COURT:  Wasn't there -- you're saying

12   there's -- in none of his -- look.  You take depositions.  The

13   report isn't supposed to be so exhaustive that it's every word

14   they would ever speak.  The report is to put you on sufficient

15   notice about the opinions they have, what they're going to talk

16   about.  Then you get to take their deposition and inquire.  You

17   did inquire of this witness in your -- in the deposition, did

18   you not?

19             MR. WARSHAUER:  I did, about pedal design in

20   general.  But because he had not mentioned 7.20.2, in

21   anticipation of this very kind of potential ruling, well, you

22   know about it, there's no harm done, you don't put it there.

23   They do have a duty to put me on notice that I'm supposed to

24   inquire about it.  When they didn't, I didn't see a point of

25   bringing it up.  They had lots of sections that we talked about.

```
 1    We did talk about, for example, the note that prohibits doors,

 2    because doors were a major thing.  We talked about other

 3    specifics --

 4                    THE COURT:  But I did not prohibit you -- I

 5    specifically did not prohibit the parties from talking about the

 6    fact that there is a door, that the door is a -- is an item that

 7    could be an accessory that can be purchased, and that I didn't

 8    prohibit the parties from talking about the relevance of the

 9    fact that without a door, then in the absence of a door, what do

10    you have that will really protect against --

11                    MR. WARSHAUER:  Right.

12                    THE COURT:  -- this sort of injury, knowing that

13    the first line of defense, a door, is not there because of other

14    accident scenarios.

15                    MR. LoCOCO:  Your Honor --

16                    THE COURT:  Are you -- why don't you read to me

17    or show me something that sufficiently alerts them that.

18                    MR. LoCOCO:  In his report, Mr. Rogers wrote,

19    "The subject truck met all applicable standards and industry

20    regulations."  I intend to ask him that, period.  He's entitled

21    to say that it did, and then if he doesn't want to cross-examine

22    on 7.20.2, that's his choice.

23                    THE COURT:  All right.  I --

24                    MR. WARSHAUER:  I --

25                    THE COURT:  I think there's sufficient disclosure
```

1      for him to ask that question.

2                          MR. LoCOCO:  Thank you.

3                          THE COURT:  Let's go ahead and bring the jury in.

4                          (Jury enters at 1:12 p.m.)

5                          THE COURT:  Thank you.  Please be seated.  All

6      right.  We're back on the record in Anderson v. Raymond.  The

7      witness is in the witness box.  Sir, you are still under oath.

8                          MR. LoCOCO:  Thank you, Your Honor.

9                          CONTINUED DIRECT EXAMINATION

10     BY MR. LoCOCO:

11     Q    Mr. Rogers, a couple of followup questions from this morning.

12          Based on your educational background, your work in the area

13          of forklifts, your membership on the B56.1 committee, and

14          your work and analysis in this case, have you formed an

15          opinion to a reasonable degree of certainty in your field of

16          expertise as to whether the design of the Model 4250 met all

17          applicable standards and entity regulations?

18     A    I have.

19     Q    And what's that opinion?

20     A    I believe that it does.

21     Q    You also this morning told the jury that no manufacturer uses

22          two brake pedals in the compartment; is that -- did I hear

23          you correctly?

24     A    You did, yes, that's correct.

25     Q    Was that the case back in 2014 when the -- when this 4250 was

1      manufactured?

2  A  Yes.

3  Q  You talked about contacts of the tire, the pre-shift

4      inspection.  When an operator does a pre-shift inspection, is

5      that just a visual inspection, is it operational, is it both?

6      Tell us about that.

7  A  There's -- it's both.  There's components that are purely

8      visual in looking for leaks, condition of tires, missing

9      parts, but it's also operational.

10  Q  Including the brake?

11  A  Correct.

12  Q  Plugging and the deadman brake, the emergency brake?

13  A  Correct.

14  Q  All right.  When you were using the exemplar forklift for

15      your inspection and your analysis and your data collection,

16      did that forklift have the pedal located where the jurors see

17      it on the other 4250s?

18  A  Yes, it's an identical layout in the compartment.

19  Q  And when you were using the forklift to do this work, were

20      you using your right foot or your left foot on the pedal?

21  A  I believe I was using my right foot.

22  Q  Okay.  So if we go back to where we were just before the

23      break, you were telling us how you compared the subject

24      forklift to the exemplar to determine whether they were

25      substantially similar for the purposes of the rest of your

1    analysis?

2  A  Correct.

3  Q  What did you do next in that regard to compare the exemplar

4    to the subject forklift?

5  A  Well, the other thing that I did was I looked back at the

6    maintenance records of the subject forklift, the one

7    Mrs. Anderson had been operating at the time of her accident,

8    because again, we didn't have an opportunity to inspect it.

9    And I was looking for things that could influence the

10    operation of the truck and things like the stopping distance

11    and maneuvering of the truck.

12  Q  So on the screen now, is this what you put together to show

13    the important maintenance items, maintenance items that were

14    important to your analysis?

15  A  That's correct.

16  Q  All right.  So what are we looking at here?

17  A  So what we're looking at here is basically a summary of the

18    available maintenance records for the subject truck, which

19    went back roughly a year before the accident.  And in the red

20    entries are repairs specifically done on the subject truck

21    that dealt with the tires, because one of the things that can

22    influence the truck's ability to drive and steer and stop is

23    the condition of the tires.  So I looked back through the

24    maintenance records and noted several instances where tires

25    were being replaced.  And if you look on the right side, sort

1    of the second column over in green, there's a couple of dates

2    there.  One is June 19, 2017, and the other is July 28th,

3    2017, which happens to be the day before the accident.

4              And in June -- on June 19th, rather, it

5    appears based on these records that the subject truck's steer

6    tires were both replaced.  And then the day before the

7    accident, it appears as though the -- both of the drive tires

8    on the subject truck were replaced.  And so based on that, I

9    was confident that the condition of the tires on the exemplar

10   I was using, which were basically new or newer tires, were

11   very similar to the condition of the tires that were on the

12   subject truck at the time of the accident.

13  Q  I went back a slide because you talked about drive tires and

14     steer tires.  Which tires are those that I just circled?

15  A  So what I would refer to as the rear of the truck or opposite

16     the forks, those are the steer tires.  So all those tires do

17     is, besides support the weight of the rear of the truck, is

18     they rotate and steer the truck.

19  Q  So steer tires were replaced June 19th, 2017, on the subject

20     truck?

21  A  Correct.  About a month before the accident.

22  Q  All right.  And then the drive tires -- let me find a picture

23     from the front.  Whoops.  There we go.  The drive tires, are

24     they -- at least one side of them shown in this photograph?

25  A  Yes.  So the drive tire, there's one kind of at each front

1    corner and there's another one around this corner over here,

2    but you can't see it.  There's the other side.

3  Q  Right here?

4  A  Correct.

5  Q  Those are the drive tires?

6  A  Right.  So those front tires have the motors attached to

7    them, and so it actually propels the forklift.  And also, the

8    brakes act only on those two front tires, not on the steer

9    tire.

10 Q  And those tires were replaced on the subject truck the day

11   before the accident?

12 A  Correct.

13 Q  All right.  What did you do next during your visit at the

14   facility in September of 2020?

15 A  So then I conducted some driving tests to collect data with

16   respect to the accelerations that the truck experienced and

17   also the stopping distance that I think we touched on a

18   little bit earlier, as far as at least some of the data.  But

19   this is going to little bit better describe how that data was

20   collected.

21 Q  Now what we're looking at here, one of them says

22   September 18th, 2020, one of them says January 13th, 2021.

23   What are these two?

24 A  So these are both videos taken of me driving.  So in the

25   background kind of, you can see the forklift sitting there

1       near the shipping office, so we're again looking towards the

2       rear of the warehouse.  You can see the yellow building

3       support column.  But as I mentioned earlier, when I was at

4       the inspection, all of the racking and everything had been

5       cleared out and it was basically a big empty warehouse, and

6       you can see that it's essentially just empty cement floor

7       except for the markings on the floor that we saw in some of

8       the OSHA pictures.  But I put these little orange cones down

9       to kind of represent where the rack uprights were located at

10      the time of Mrs. Anderson's accident.

11  Q   And when you did this driving, were you trying to recreate

12      her accident?

13  A   No, I was not trying to recreate her accident.

14  Q   You said you were just collecting data?

15  A   I was collecting data, yes.

16  Q   All right.  So we're going to -- the left-side video, we're

17      going to see one run.  How many runs did you do that day?

18  A   Oh, gosh, I think I did maybe half a dozen.

19  Q   All right.  And this one says it was done at 5.8 miles an

20      hour.  How do you know it was 5.8 miles an hour?

21  A   Well, that's again from the Vericom data, and that would be

22      the speed at the time that the brakes were actually applied,

23      which was at the very end of this -- actually you won't even

24      really see that on the video, because it happens once I pass

25      the camera, is I then took my feet off the deadman pedal and

1        the truck came to a stop.  And then that's that stopping

2        distance data that I collected and used that we talked about

3        earlier.

4    Q   Okay.  I think I messed this up.  Sorry.  I'll handle it.

5                      (Video played.)

6    BY MR. LoCOCO:

7    Q   Now on that video, we saw that Vericom box inside the

8        compartment.  On January 13th, did you use the Vericom box

9        again?

10   A   I did.

11   Q   Did you do -- did you or did Dr. Rodowicz do anything else

12       that day?

13   A   Yes.

14   Q   What did Dr. Rodowicz have you do?

15   A   So Dr. Rodowicz, who was in attendance actually at both

16       inspections, but at this second one in January of '21, she

17       brought along some additional instrumentation, which were

18       really just additional accelerometers.  And those she mounted

19       to me personally on my body at various locations, and then

20       also put one on the forklift next to the Vericom.

21   Q   Okay.

22                      (Video played.)

23   BY MR. LoCOCO:

24   Q   So the Vericom was giving you data.  So what are we looking

25       at here?  Is this -- tell us what this is.

1    A    This is six charts of acceleration data captured by the

2         Vericom in September of 2020 for the various runs that I did.

3         And you can see labeled on some of these, there's some that

4         are plugging and some that are deadman braking, that

5         pertaining to the method in which I stopped the truck, again

6         after it had already passed the camera.

7    Q    So -- I'm sorry.  So I want to focus on this one here.

8         5.8 miles an hour, deadman braking.  Is that the video we

9         just saw?

10   A    Yes, the first one that we saw.

11   Q    So on the bottom axis of this chart, we see time and seconds.

12        Tell -- what is that -- explain that to us.

13   A    So the accelerometer and the Vericom was started, meaning it

14        started to collect data.  And at some point, I began to drive

15        the truck as you saw in the video, and so that's really just

16        the time as the truck is traveling from its initial point in

17        the video where it stopped up until it comes to a rest --

18        comes to rest after I applied the brake.

19   Q    All right.  And then the left side axis is accelerations in

20        g.  Explain that.

21   A    Correct.  So that's again the data collected by the

22        accelerometer within the Vericom.  I mentioned earlier that

23        there were three different axes of measurement, the X

24        direction, which is parallel to the forks or in the direction

25        of travel; the Y is sort of left to right or what we call

1    lateral direction; and Z is vertical direction.  And you can

2    see the different colors as noted by the legend down here at

3    the bottom.  So the AX, which would be acceleration in the X

4    direction, is the green trace, the acceleration in the Y

5    direction is the blue trace on the chart, and then the Z

6    acceleration is the orange trace.

7  Q  All right.  So if you're standing in the operator's

8    compartment.  You've got the Vericom there.  I just want to

9    be clear on using this visual.  Which direction is the X?

10 A  Well, as you're standing, the forks would be facing the back

11   of the courtroom.  The direction of the travel or the rear of

12   the compartment opening would be towards me, and so the X

13   would be kind of this direction long way, if you will, in the

14   courtroom here.

15 Q  And Y is which way?

16 A  Would be across the courtroom, perpendicular to the X.

17 Q  All right.  And Z is which way?

18 A  Would be up and down.

19 Q  Up and down.  Okay.  As long as I got this up, by the way,

20   when you as an operator are standing in the compartment with

21   two feet on the floor, is it your instruction to people you

22   train in your operation to stick your back against the back

23   pad?

24 A  Yes.  It's certainly there and provided for that purpose and

25   does increase stability of the operator.

1  Q   And then you've got a left hand on the steering tiller?

2  A   Correct.

3  Q   Right hand on the travel lever?

4  A   Correct.

5  Q   Is there -- I know Mr. Kerila will be here to talk about the

6      design of it more, but how is the floor set up on the 4250?

7  A   Well, this particular model has what they -- Raymond refers

8      to I think as a floating floor.  So it's essentially got a

9      suspension in it that gives some shock absorption and

10     cushioning, if you will, to the operator.

11 Q   And if we're looking at the back of the floor, is it

12     perfectly flat or is it tipped?

13 A   It is angled slightly towards the backrest, so that it's a

14     little more natural to lean and support yourself against the

15     back of the backrest, which would be kind of the right side

16     of the forklift, if you will.

17 Q   And is it also tipped a bit toward the forks direction?

18 A   Slight amount, yes.

19 Q   All right.  And as an operator, how are all those features we

20     just discussed utilized, or what do they help you do?

21 A   Well, it helps make the operator more comfortable, and as I

22     think I mentioned, increases their postural stability within

23     the compartment by providing them with a place to lean

24     against and support themselves.

25 Q   And is postural stability, is it related to safety?

1   A   Yes.

2   Q   How?

3   A   Well, it helps keep the operator in the safest place of the

4       truck, which is within the compartment under most

5       circumstances, except for things like off-dock and tip-overs

6       which I mentioned earlier today.

7   Q   All right.  So let's go back to your data here.  Let's focus

8       on the X first.  We see a bottom peak at -- what's the

9       g level here that we see on the bottom?

10  A   That's about 0.1g.

11  Q   Is there any way to describe that to the jury?

12  A   Well, it's -- I mentioned earlier that here on Earth, all

13      objects are experiencing 1g all the time.  That would be

14      about 10 percent of that or one-tenth of it.  Maybe the way

15      to try and relate that a little bit is in a car, when you go

16      to stop at a traffic light, let's say, and you apply the

17      brake, you feel that force tending to make you move forward.

18      That's an acceleration force.  You're experiencing

19      acceleration because again, you're slowing down.

20      Acceleration is that rate of change of velocity.  A normal,

21      quote-unquote normal, stop might be 0.2g, so it's even less

22      than that, and a full brake application in your car might be

23      something in the order of 0.8g, if it's dry asphalt.

24  Q   And you slam your brakes on?

25  A   And you slam on the brakes, yes.

1   Q   All right.  And then there's a peak here at, you know, 0.25

2       and 0.3g.  What do these two peaks correlate with on your

3       drive?

4   A   So the one on the left is the acceleration that is

5       experienced when the forklift is first speeding up.  So if

6       it's sitting there stationary, there's 0 acceleration.  So as

7       I move the control lever and the forklift begins to drive,

8       there's an acceleration as the forklift comes up to speed.

9       And then once it gets up to roughly a constant speed, you'll

10      see the green line sort of flattens out along 0 there.  It's

11      a little jumbled up with some of the other colors.  But it's

12      essentially 0 up until the end when I then take my foot off

13      the brake pedal.  And that's when we see this spike in

14      acceleration, which is the forklift suddenly stopping, going

15      down from 5.8 miles an hour down to 0.

16  Q   All right.  Then the blue, we see a decrease here and then an

17      increase here.  What is accounting for that as you drive

18      through the facility?

19  A   So the blue is lateral, left to right, and lateral

20      acceleration would be generally experienced while turning

21      around -- going around a curve or turning.  So back to the

22      car analogy, if you will, if you go around a turn,

23      particularly if you go around a little too fast, you feel

24      yourself kind of leaning.  That's a lateral acceleration that

25      you're experiencing.  And so if you remember in the video, I

1   started out going down Aisle G, and then it kind of jogged

2   over, so it's initially a right turn if I'm looking in the

3   direction of travel.  But as we look at the video, it's

4   really moving to our left.  But nonetheless, it's turning one

5   direction and then turning back the other direction to

6   transition over to that other aisle.  And so the general

7   nature of that blue is initially 0, and then you see it come

8   down below.  That's the turn one direction.  And then it goes

9   back up positive.  That's the turn back to the other

10  direction.  And then it goes back to basically 0 again

11  because it's no longer turning.

12  Q   And then the orange is up and down?

13  A   Orange is the Z axis or vertical, yes, so that's vertical

14  accelerations.

15  Q   And these are -- look to be running between, you know,

16  between 0.05 and 0.1, up and down; is that right?

17  A   Correct.  And very rapidly.  And, you know, accelerometers

18  are kind of by nature very sensitive.  And so what we're

19  seeing in all of these traces is, you know, not a nice smooth

20  curve, if you will, but it's picking up a lot of vibration

21  and almost noise, if you will.  But in terms of the vertical

22  acceleration, it's a relatively small amount, 0.05g, which is

23  very, very small.  And the rapid positive-negative nature

24  indicates to me that, as an engineer, that that's essentially

25  noise or ringing or vibration that's going to have no effect

1      on the forklift or the operator.

2   Q   All right.  Now I want to turn to Dr. Meyer's theory.

3      Remember when I started asking you questions, I asked you

4      what did we ask you to do, and one of the items you said you

5      analyzed was whether, you know, a second deadman brake or a

6      left-foot deadman pedal would have made any difference here?

7   A   Right.

8   Q   So you undertook that analysis?

9   A   Correct.

10  Q   All right.  Well, I -- we also have traces from the

11     January 13th; correct?

12  A   Yes, which is the second video.

13  Q   Similar data?

14  A   Very similar data, yes.

15  Q   All right.  So would the left-foot brake pedal have prevented

16     Mrs. Anderson's injury, and you've got four factors to

17     consider that I want to talk about.

18  A   Okay.

19  Q   First, the distance behind the compartment where the foot

20     contacts the ground.  Why is that important?

21  A   Well, that's important because you need to understand where

22     does her foot land on the ground, how far behind the truck is

23     that, and then combine that, if you will, with how far does

24     the truck need in order to stop.  Because in order for a

25     left-foot brake pedal to have made any difference, the truck

1     would have to stop before it gets to her foot.

2  Q  All right.  And part of your work in this case was to review

3     Dr. Jeka's testimony and opinion?

4  A  Correct.

5  Q  And you understand that his testimony is that Ms. Anderson

6     felt some challenge to her balance, went to broaden her base

7     of support, and then when she went to re-weight her left

8     foot, her left foot was not in the compartment anymore?

9  A  Correct.

10 Q  All right.  So what did you do to determine this first issue,

11    distance behind the compartment where the foot contacts the

12    ground?  And is -- well, what did you do?  Is this something

13    you did with Dr. Rodowicz?

14 A  Yes.  So at the second inspection in January, Dr. Rodowicz

15    primarily, but I was there and observed this as well, but we

16    basically had an individual that we call the surrogate, which

17    is a term meaning we had a person of the same proximate

18    height and weight as Mrs. Anderson, who was present with us

19    at the inspection, and we used her to simulate Mrs. Anderson

20    as an operator.  And so one of the things that was done was

21    to have her stand in the compartment with her back against

22    the backrest, right hand on the tiller, left hand on the

23    steering wheel, and then go to move her -- widen her base of

24    support, and then re-weight that foot, which caused of course

25    her foot to go down to the warehouse floor.  And then we --

1    so we asked her to do that several times and measured how far

2    behind the forklift did her foot land when she stepped out.

3  Q  And what was the average step distance?

4  A  So the average step distance was about 4.3 inches, as noted

5    there in the slide.  And that's the distance between the

6    inside of her foot and the -- or the closest part of her foot

7    and the rear bumper of the forklift.

8  Q  What did you do next?

9  A  So then the next question that needed to be answered was, how

10   long does something like that take?  And that being someone

11   widening their base of support and then stepping down.  It

12   takes some time for the foot to move from the compartment

13   floor out and down to the warehouse floor.

14  Q  Why is that important?

15  A  Well, because during that process, the forklift is traveling

16   at whatever speed it was going when the foot was first

17   lifted, and then at some point, the forklift brakes come on

18   and the forklift begins to slow down, but it hasn't stopped

19   yet.  So we need to know how far does the forklift travel and

20   what speed is it going once the foot lands on the ground.

21  Q  At 5 miles an hour, how fast is the forklift traveling?  I

22   mean, I'm sorry, at 5 miles per hour, how many feet per

23   second is it traveling?

24  A  5 miles per hour is one unit.  You can convert that to feet

25   per second.  That's about 7 and a half feet per second at

| | | |
|---|---|---|
| 1 | | 5 miles an hour, so. |
| 2 | Q | All right.  So you've got this slide called "Stepoff Timing." |
| 3 | | Why did you -- you told us why you needed to do this.  What |
| 4 | | did you do? |
| 5 | A | So after we determined that a surrogate, someone the same |
| 6 | | size as Mrs. Anderson, her foot would land on average about |
| 7 | | 4.3 inches behind the forklift, we -- I had ten people from |
| 8 | | our office all perform that same sort of stepoff test, if you |
| 9 | | will.  But rather than worrying about where their foot |
| 10 | | landed, we kind of gave them a target, which is the blue |
| 11 | | tape, which represents the 4.3-inch number.  And then we just |
| 12 | | used them to determine on average how long did it take for |
| 13 | | them to move their foot from up on the compartment floor to |
| 14 | | out and down to the warehouse floor. |
| 15 | Q | And the average amount of time was what? |
| 16 | A | 0.48 seconds or just a little under a half a second. |
| 17 | Q | So if a truck is moving at 5 miles an hour, 7 and a half feet |
| 18 | | per second, in a half a second, it's going half that? |
| 19 | A | Correct.  Three and three-quarters feet. |
| 20 | Q | All right.  What did you do next? |
| 21 | A | So then the next thing we did was we looked -- well, again, |
| 22 | | we had the stopping distance data, so how long does it take |
| 23 | | the truck to stop and at what rate is the truck stopping? |
| 24 | | And then we ultimately kind of compared -- I'm sorry.  I'm |
| 25 | | going to skip the step. |

1          So the next thing we did was we had to

2     determine at what point does the brake actually begin to

3     apply.  So when a person's first lifting their foot off the

4     pedal, there's some brake -- what I call brake reaction time,

5     or, you know, the pedal itself has to mechanically begin to

6     come up, which actuates a switch that then tells the control

7     system on the forklift to apply the brake.  All of that takes

8     some small amount of time, and so I needed to measure what

9     was that time period.

10  Q   And while that's happening, the truck is still moving?

11  A   Right.  Because until the truck actually -- the brakes come

12    on and the truck actually begins to slow down, it's still

13    traveling at its original speed.

14  Q   So what data are we looking at here, "Brake Reaction Time"?

15  A   So this is an example of some brake reaction time data that

16    was collected using the same exemplar truck with the Vericom.

17    But I had added to the brake pedal a switch that allowed me

18    to know exactly when the foot began to come off the pedal and

19    then I used that data and compared it to the acceleration

20    data, which tells me when the brakes apply.

21          So for example, on this chart, we've got this

22    orange line here that -- that's the brake pedal switch.  So

23    initially, the brake switch is on, which is up above, you

24    know, up in this area.  And it's simply an on-off switch, so

25    it's either on or off.  And so you can see that at this point

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | in time is when the pedal -- or the foot came off the pedal.  |
| 2  |   | And then the blue squiggly line is the acceleration, which is |
| 3  |   | again measuring when does the truck begin to slow down.  And  |
| 4  |   | so you can see initially, it's essentially 0.  And then it's  |
| 5  |   | at this point where I've noted braking begins.  You begin to  |
| 6  |   | see that acceleration increase, which means the truck is now  |
| 7  |   | slowing down.  So it's the difference between these two       |
| 8  |   | points where the arrows are pointing is the time period that  |
| 9  |   | it takes for the brake to react and begin to slow the truck   |
| 10 |   | down.                                                         |
| 11 | Q | So even after the operator's foot comes off the pedal, at     |
| 12 |   | least according to this work you did, the brake doesn't begin |
| 13 |   | to initiate for 0.137 seconds?                                |
| 14 | A | Correct.                                                      |
| 15 | Q | Okay.  And the truck's still moving during that time?         |
| 16 | A | Well, it's moving the -- during the entire time.  It's        |
| 17 |   | certainly moving at the same speed until the brakes begin to  |
| 18 |   | apply.                                                        |
| 19 | Q | All right.  So how did you use all of that analysis and data  |
| 20 |   | to figure out whether putting the pedal under the left foot   |
| 21 |   | would have made any difference here?                          |
| 22 | A | So then we kind of did some additional math with all of this  |
| 23 |   | data and looked at, depending on how fast the truck is going, |
| 24 |   | you know, it takes a certain amount of time for the foot to   |
| 25 |   | come down.  Some portion of that is the brake reaction time.  |

1    The truck then begins to slow down, and again, based on

2    initial speed, the truck takes some distance to stop.  And so

3    I compare how long does the truck need to stop to how far

4    does the foot move behind the forklift.

5                 And at slow enough speeds, it may make a

6    difference, but in this case, if I look at 3 or 4 miles an

7    hour, which is what you're seeing on the chart here, I've got

8    two different initial speeds.  It takes roughly 36 inches or

9    about 3 feet to stop from 3 miles an hour based on the data I

10   had collected.  And at 4 miles an hour, it takes 55 inches,

11   which is, you know, 4 and a half feet or thereabouts.  And so

12   I look at these different distances, which this first one

13   here is, how far does the truck move during that brake

14   reaction time before the brakes come on.  Once that occurs,

15   the truck is still going 2 to 3 miles an hour.  You know,

16   initially it was going 3 or 4.  Those are my two examples.

17   But now it's going 2 or 3 once the foot hits the ground.  So

18   really, the -- this is after that, what, 0.48 seconds, which

19   is the time period that it takes for the foot to get down to

20   the ground.  And so from --

21 Q  Why does it matter when the foot contacts the ground?  What

22   happens between the forklift and the person at that point?

23 A  Well, at that point in time, prior to that, you know, the

24   person's basically going the same speed as the forklift.  If

25   I'm the operator and I'm riding along and the forklift's

1    going 4 miles an hour, I'm going 4 miles an hour as well,

2    relative to the floor.  But once that foot comes out and

3    touches the ground, the foot essentially goes to 0 almost

4    instantly.  And so the foot's no longer traveling along the

5    floor, but now the forklift's trying to catch up to it.  And

6    so the question is, how long -- how far behind the truck is

7    it when the foot comes down, and how fast is the truck going,

8    and really more importantly, how long does it take before the

9    truck will stop and will it -- the big question is, will it

10   stop before it gets to the foot, or does it stop beyond the

11   foot?

12   Q   So what's this next column here?

13   A   So once the foot lands on the ground, this next column that

14       you've got with the green dot, that's the distance that the

15       forklift still needs to be able to stop.

16   Q   And at 3 miles an hour, it's 13 and a half inches, and at

17       4 miles an hour, it's 24.2 inches?

18   A   Correct.

19   Q   At 5 miles an hour, what would this number be?

20   A   Oh, it would go up quite a bit more, because, you know, it's

21       really not a linear thing.  It's as the speed goes up, the

22       distance is going to go up a lot more.

23   Q   So instead of 2 feet at 4 miles an hour, it might be --

24   A   It might be 3 and a half.

25   Q   Okay.  And then this last column, you know, is -- what are

1    you indicating here between the second to last column and the

2    last column?

3 A  So what I'm indicating there is that the distance needed for

4    the truck to still stop once the foot lands on the ground, if

5    that's greater than 4.3 inches, then the left-foot brake

6    pedal would not have made a difference.

7 Q  And Mrs. Anderson's foot would still have been caught?

8 A  Correct.

9 Q  All right.

10 A  So yes -- it's a little confusing, so the yes is answering

11    the question essentially, is this distance greater than

12    4.3 inches, and yes, these are both greater than 4.3.  So

13    therefore, the left-foot brake pedal will not have prevented

14    contact with her foot.

15 Q  Going back to what Dr. Jeka opined, this compensatory step to

16    broaden your base of support, did you also analyze whether

17    just geometrically Mrs. Anderson's foot could have gotten

18    into the steer tires using that hypothetical that Dr. Jeka

19    opined?

20 A  I did.

21 Q  How did you go about studying that?

22 A  So I did that by looking at how the forklift would move after

23    the foot began to come out, and that was -- a couple of

24    things.  One is we knew from the witnesses that

25    Mrs. Anderson's truck came to a rest at an angle in that

1    aisle.  She was not going straight down the aisle.  But

2    Dr. Meyer had suggested that one of the reasons why the truck

3    was at an angle is because -- could be that as she's coming

4    out of the forklift and her left hand's on the steering

5    tiller, that she rotates the steer tiller as she's coming out

6    of the compartment.  So I considered how far would the truck

7    steer if I rotate -- if that handle rotated at 180 degrees,

8    which in my opinion would be the worst case scenario, because

9    if she's initially got the steer tiller pointed towards the

10   forks and she falls out and, you know, kind of brings that

11   tiller around with her as she's going out, the most it could

12   go would be 180 degrees.  You wouldn't expect that she's

13   going to swing it back around to the front again as she's

14   falling out.

15 Q  So what are we looking at here from a -- is this a test

16   setup?

17 A  It is.  So this is the same exemplar that we had down at the

18   warehouse but now it's back at our lab facilities in

19   Naperville.  And so what we're doing here is we've got a --

20   just took a piece of conduit and taped it to the back of the

21   truck in line with the steer wheel.  And if we drop a piece

22   of chalk in there, like a kid would use to write on the

23   sidewalk, and we drive the truck, it will leave a --

24   physically leave a path on the asphalt parking lot that we

25   can then go in and measure and plot what that curve path

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | looks like.                                                          |
| 2  | Q | So this is the path that was traced with the steering tiller         |
| 3  |   | turned quickly 180 degrees from two different speeds?                |
| 4  | A | Correct.                                                             |
| 5  | Q | The left one is what?                                                |
| 6  | A | 3 miles an hour.                                                     |
| 7  | Q | And the right one is?                                                |
| 8  | A | 5 miles an hour.                                                     |
| 9  | Q | And what did you do next then with this information?                 |
| 10 | A | So we went and we measured that curve path and those two            |
| 11 |   | curve paths and really they were very, very similar.  And we        |
| 12 |   | used that to then bring into a CAD program and plot the path        |
| 13 |   | of the truck as it goes through that turn and compared that         |
| 14 |   | to where a foot would be if someone were to widen their base        |
| 15 |   | of support and step down to the warehouse floor as Dr. Jeka         |
| 16 |   | described.                                                           |
| 17 | Q | And so what are we looking at here?                                  |
| 18 | A | So the one on the left is again back to this kind of overhead        |
| 19 |   | or plan view of the exemplar truck.  And what we're seeing is       |
| 20 |   | a position of a foot 4.3 inches directly behind the                 |
| 21 |   | operator's compartment.  And then superimposed below is             |
| 22 |   | some -- a path of the steer tire, which I've kind of               |
| 23 |   | highlighted in green on each -- sorry -- pink on each side.         |
| 24 |   | And so that would be the expected path of the steer wheel,          |
| 25 |   | assuming that the steer tiller was turned exactly -- began to       |

```
1    be turned at the same time that the left foot first came off
2    of the compartment floor, number one.  Number two is that the
3    tiller was again turned 180 degrees.  And so based on that,
4    we can plot where we would expect the steer tire to intersect
5    with the foot under this sort of scenario.
6                   And so the picture on the right is a little
7    more of a perspective view of -- and you can again see the
8    expected path of travel of the steer tire, and you can see
9    that it would -- it may catch just the toes, but only with
10   the right edge of the steer tire, and not -- the foot would
11   not be within the opening.  The opening of the steer wheel is
12   actually over here.
13                   MR. LoCOCO:  Could we switch to the document
14   camera for a second?
15   BY MR. LoCOCO:
16   Q    You read Dr. Kerrigan's report?
17   A    Yes.
18   Q    So this is Figure 7 from Dr. Kerrigan's report, where he has
19        Mrs. Anderson's left leg placed outboard of the second -- of
20        the outboard steer tire.  Do you see that?
21   A    Yes.
22   Q    Is that placement consistent with what we see -- what we see
23        with your plot on this slide?
24   A    No, it is not consistent.  He shows that the foot is way over
25        here to the left of the steer tire.
```

1    Q    All right.  So this is at 3 miles an hour.  Did you do a

2         similar analysis at 5 miles an hour?

3    A    I did.

4    Q    And what did that show us?

5    A    And as you can see, it showed that the steer tire would be

6         expected to intersect the foot in about the same location,

7         again just catching the toes, and not even frankly within the

8         area of the cutout because the steer tire isn't -- is

9         partially behind the bumper on the right side.

10   Q    All right.  And then this next slide tells us what?

11   A    This slide's -- rather than assuming that the steer tiller

12        was turned 180 degrees, this has a shallower steer angle so

13        this is only a steer angle of 5 degrees.  I think the other

14        one was -- I don't know that we had it on the chart, but it

15        was something on the order of maybe 17 degrees.  It was kind

16        of a worst case scenario, again meaning turning that tiller a

17        full 180 degrees.

18                      But I got information from Dr. Rodowicz, who's

19        done the injury reconstruction, and it's her opinion that the

20        steer tire was turned 5 degrees.  So if I showed that

21        position of the steer tire, which is again the 5-degree steer

22        angle, the truck doesn't shift over as much, and so the foot

23        still comes straight out the back, 4.3 inches.  But now you

24        see that the dashed yellow lines over here don't even

25        intersect with the foot.  And maybe it's a little bit easier

1    to see over here on the right side.  But this area, the steer

2    tire would not even come close to running over the foot.

3  Q  All right.  What do we see here with regard to the steer

4    wheel guard?  What are you trying to convey here?  What were

5    your opinions with regard to the steer wheel?

6  A  Well, this is sort of switching topics a little bit.  This is

7    looking at the steer wheel guard, which we touched on a

8    little bit earlier.  So this is just some of my thoughts, if

9    you will, my opinions relative to the steer guard and some of

10    the reasons why it would not be workable or feasible to -- in

11    terms of utility of the truck to have such a guard.

12  Q  The photograph we see in the upper right with the cardboard

13    taped over both sides, is that something you did?

14  A  No.

15  Q  Is this a Dr. Meyer picture?

16  A  That is.  That's his proposed alternative design, I guess, or

17    at least an example of that.

18  Q  All right.  Mr. Rogers, based upon on all your work in this

19    case, your background, your experience, your education, your

20    longtime involvement with forklifts, and your analysis of

21    this incident, have you formed an opinion to a reasonable

22    degree of certainty within your field of expertise as to the

23    cause of Mrs. Anderson's accident?

24  A  Yes.

25  Q  And what is that opinion?

1   A   It's my opinion that she failed to follow her training,

2       warnings, and instructions and stay within the operator's

3       compartment of the forklift while it was moving.

4   Q   If she had stayed within the compartment, do you have an

5       opinion as to whether she would have been injured?

6   A   I do.

7   Q   And what's that opinion?

8   A   I don't believe she would have been injured.

9                    MR. LoCOCO:   Just a moment, Your Honor.

10  BY MR. LoCOCO:

11  Q   So just one last question.  Based on your analysis and -- I

12      guess two questions -- your analysis and work in this case,

13      whether the brake pedal is under the right foot or the left

14      foot under these circumstances, Mrs. Anderson is still going

15      to get hit by the lift truck?

16  A   Yes.

17  Q   All right.  Mr. Rogers, have all of the opinions you've

18      offered during your examination been to a reasonable degree

19      of certainty within your fields of expertise?

20  A   Yes.

21  Q   Any evidence that this forklift malfunctioned at the time of

22      the accident?

23  A   No.

24  Q   And does the evidence show that the brakes actually did work?

25  A   It does, yes.

1    Q    All right.

2                    MR. LoCOCO:  Thank you, Your Honor.  Thank you,

3         Mr. Rogers.  Nothing further.

4                    (Sidebar begins.)

5                    MR. WARSHAUER:  To sort of paraphrase Mark Twain,

6         if I can have a couple of minutes, I can make my thing shorter.

7         His speech, "I'm sorry, I didn't have enough time to make this

8         short."

9                    MR. LoCOCO:  Are you asking for a quick break?

10                    THE COURT:  Five-minute break.

11                    MR. WARSHAUER:  Five, six minutes.  I'll

12         guarantee I'll save us 15 if I get five minutes.

13                    (Sidebar ends.)

14                    THE COURT:  Let's take a five-minute recess.  We

15         are just after lunch, and so I always try and make our first

16         break after lunch a pretty quick one or early on in the

17         afternoon.  So five minutes.  In recess.

18                    (Jury exits at 1:59 p.m.)

19                    (Recess from 1:59 p.m. to 2:14 p.m.)

20                    (Jury enters at 2:14 p.m.)

21                    THE COURT:  All right.  Please be seated.

22                    Cross?

23                    MR. WARSHAUER:  Yes, sir.

24                         CROSS-EXAMINATION

25    BY MR. WARSHAUER:

1    Q    Good afternoon, Mr. Rogers.

2    A    Good afternoon.

3    Q    Good afternoon.  You've worked with Dr. Meyer before, haven't

4         you?

5    A    Yes, Dr. Meyer and I -- Dr. Meyer and I used to work together

6         at the same company, yes.

7    Q    You believe he's a well-educated and skilled mechanical

8         engineer, don't you?

9                        MR. LoCOCO:  Objection, Your Honor.  That's not a

10        proper question.  Other witnesses can't comment on each

11        other's...

12                       THE COURT:  He commented on his opinions.  You

13        asked him to comment on his opinions.

14                       MR. LoCOCO:  Yes, sir, I did.

15                       THE COURT:  All right.  Overruled.

16   BY MR. WARSHAUER:

17   Q    You agree with me that Dr. Meyer is a well-educated,

18        well-credentialed, skilled mechanical engineer?

19   A    Well, he certainly has significant engineering credentials,

20        yes, sir.

21   Q    Has a Ph.D. from MIT, which is widely considered one of the

22        premier engineering schools in the world; you'll agree with

23        that?

24   A    I am aware that he has a Ph.D. from MIT, yes, sir.

25   Q    Okay.  You do not profess to be a biomechanical expert, do

1     you?

2  A    Correct, I am not.

3  Q    You've read the report of Dr. Jason Kerrigan, haven't you?

4  A    Yes.

5  Q    And Dr. Jason Kerrigan does appear to be a biomechanical

6     engineer teaching also at an elite university, University of

7     Virginia; that's true too, isn't it?

8  A    Yes.

9  Q    Dr. Meyer was asked a number of questions about his

10    experience designing forklifts and in the forklift industry.

11    Let me just see if you guys are sort of on the same plane, if

12    you will.  You've never worked for a forklift manufacturer,

13    have you?

14  A   Not as an employee, no.

15  Q   All right.  You've never designed a forklift, have you?

16  A   I have not designed a forklift in total, no.  I've certainly

17    analyzed and consulted on aspects of forklifts many, many

18    times.

19  Q   But if I ask you if you had ever created a computer-aided

20    drawing, a CAD drawing of a forklift part, your answer would

21    be, "No, Mr. Warshauer, I haven't."  That's true, isn't it?

22  A   Correct.  I have not done that specifically, yes.

23  Q   Now you've been a retained expert to help the Raymond

24    Corporation since about 1986 or so; is that right?

25  A   I don't know that I've been a retained expert.  I've

1        certainly worked on cases for Raymond for quite some time,

2        yes.

3  Q   Let's just talk about part of that work.  It's been good work

4        for you and your company; that's true, isn't it?

5  A   I'm not sure what you mean by "good work."

6  Q   It's a reliable client?  You enjoy doing their work?

7  A   I believe they're a good company, and enjoy the people that I

8        interact with, yes.

9  Q   You hope to continue to do their work in the future as

10       needed; that's true too, isn't it?

11  A   Well, I think that's true for anybody that I work for.

12  Q   Well, let's just talk, one of the kinds of cases you've

13       worked for them.  How many cases have you worked for the

14       Raymond Corporation where the injury to the person involved a

15       left-leg amputation?

16  A   I don't recall how many that's been.

17  Q   More than you can remember; is that fair?

18  A   No, I don't know that it's more than I can remember.  I just

19       don't remember specifically how many it's been.

20  Q   Well, let's narrow it down.  This is a 4250 forklift.  We'll

21       just narrow it to the 4000 series.  How many cases have you

22       worked for Raymond where the injury suffered by the operator

23       was a left-leg amputation for Series 4000 forklifts, 4250,

24       4150s?

25  A   I can think of two or three off the top of my head.

1  Q   All right.  Well, let's broaden it back out.  Since 2010,

2      since the 4250 was first designed and put on the market, how

3      many left-leg amputation cases have you helped the Raymond

4      Corporation defend to operators?

5  A   I don't recall.

6  Q   Share with us the work that you have done with the Raymond

7      Corporation where your primary task was to help it reduce

8      left-leg amputation injuries suffered by operators.

9  A   Well, I've been asked to evaluate the design of Raymond

10     forklifts, as I said, for a long time.  That involves looking

11     at all different types of accident modes, not only left-leg

12     or leg injuries, but also other potential accident modes that

13     can result in different injuries.

14  Q   Okay.  Let me try that question again.  I don't mean to beat

15     a dead horse.  It's only my second time on it.  Tell me about

16     the time that the Raymond Corporation has asked you to help

17     them where your primary task was the rejection of left-leg

18     injuries, left-leg crush injuries, left-leg amputation

19     injuries suffered by operators?  You can't name a single

20     time, can you?

21  A   I don't recall a specific project, if you will, where that

22     was the sole focus.  Again, the focus has always been trying

23     to reduce the overall risks to operators in all different

24     accident modes.

25  Q   So you've gotten lots of paperwork from the Raymond

1    Corporation over the years, document production, case design

2    files, things like that; that's fair to say, isn't it?

3  A  That's quite often materials that are produced in a case like

4    this, yes.

5  Q  And in all that paper, thousands of pages, you can't show me

6    the minutes of a single meeting or the creation of a single

7    task force where the Raymond Corporation put together a group

8    to try to reduce left-leg amputations suffered by operators,

9    can you?

10  A  No.  All of the paperwork again focuses on the overall design

11    and doesn't necessarily focus on one specific type of

12    accident or injury.  I mean, frankly, it's -- it could be

13    doable potentially to focus solely on one thing, but I don't

14    think that's primary -- or a correct way of designing an

15    overall piece of equipment like this.

16  Q  Mr. Rogers, you do know that we're here today to talk about a

17    left-leg amputation suffered by Mrs. Anderson; right?

18  A  I'm aware that that's the injury she sustained, yes, sir.

19  Q  And left-leg amputations have -- you've been involved in so

20    many of those cases, that you can't tell me the number;

21    that's true too, isn't it?

22           MR. LoCOCO:  Your Honor, may we approach, please?

23           (Sidebar begins.)

24           MR. LoCOCO:  Your Honor, we had a motion in

25    limine on this.  He's gotten what he needs to get to from the

1    issue of bias.  He's now asking questions about other incidents

2    without any information about them, and he's trying to leave the

3    impression with the jury of a quantitative number of incidents

4    involving left-leg lower amputations.  And this is -- this is --

5              THE COURT:  Do we know how many cases he's been

6    retained as a consultant on, or asked to testify that involved

7    left-leg amputations or crushes?

8              MR. LoCOCO:  He asked them that.  He answered it.

9              THE COURT:  He says he doesn't recall offhand.

10             MR. LoCOCO:  Right.  And I don't know --

11             THE COURT:  And you're telling me the Raymond

12   Corporation has no idea?

13             MR. LoCOCO:  We have no idea, Your Honor.  We

14   don't keep records --

15             THE COURT:  You've been --

16             MR. LoCOCO:  He said two or three that he

17   recalls.

18             THE COURT:  He said two or three that he recalls.

19             MR. WARSHAUER:  On the 4250.

20             THE COURT:  They have a motion in limine saying

21   that you're routinely getting this stuff after five years.  If

22   this forklift went into -- if it was put in the stream of

23   commerce beginning in 2010, it would be relevant.  And if this

24   guy's worked on -- I don't know what the number is.  Everybody

25   in here from Raymond seems to have a bad memory about other

```
 1    cases that he may have been retained to work on.  And so how
 2    many more questions are you --
 3                   MR. WARSHAUER:  Just a couple.
 4                   THE COURT:  Do you have reason to believe that
 5    he's -- do you have reason to believe that he's testified in,
 6    say, ten leg-off cases?
 7                   MR. WARSHAUER:  He's elite.
 8                   MR. LoCOCO:  On a 4250?
 9                   MR. WARSHAUER:  Left-leg sidestance forklifts,
10    absolutely.  On a 4250, at least three or four.
11                   MR. LoCOCO:  He said two or three.
12                   MR. WARSHAUER:  All right.  My point is to show
13    is this bias.  I'm moving along, but this really shows bias.
14    These guys are heartless.  This is a life-changing event.
15                   MR. LoCOCO:  You know what?  Your Honor, this is
16    not a negligence case.  He wants to say we're heartless, fine.
17    The Court wants to be incredulous about that, that's fine.  But
18    we got a jury deciding the case.
19                   THE COURT:  Look, I am incredulous, if -- because
20    I defended manufacturers.
21                   MR. LoCOCO:  Yeah, and --
22                   THE COURT:  And when Chrysler was sued and they
23    said, "All right, how many of these kind of cases you have?"
24    they had a way to come up with it.  And that's before we have
25    all this stuff on computer.
```

1          MR. LoCOCO:  Because --

2          THE COURT:  Same with Ford.  Same with Suzuki.

3          MR. LoCOCO:  Right.  Because NHTSA requires car

4    accidents to be kept.  There's no requirement to keep that.

5    Secondly, you raise 2010, Your Honor --

6          THE COURT:  He mentioned 2010.

7          MR. LoCOCO:  He got seven years of accident

8    reports in this case.

9          THE COURT:  All right.

10          MR. LoCOCO:  And he hasn't tried to use a single

11    one of them.  And there's a motion in limine there that if -- in

12    an order from you, that if he was intending to get into any

13    accidents, he was supposed to raise it so we could do something

14    outside the presence of the jury.

15          THE COURT:  But my understanding was that once

16    you're talking about -- my understanding was you were concerned

17    that he was going to bring in other individuals who had lost

18    their legs who were going to testify, and that if he was going

19    to do that, I said that we should know who they are because

20    maybe it's similar instances; maybe it's not.  It certainly

21    would be powerful evidence.  And depending on what the situation

22    was, I might say you can't give the jury that information

23    because it's -- it would be unduly prejudicial, and because the

24    accident scenario or the problem was not sufficiently similar,

25    it had limited probative value.

1        MR. LoCOCO:  This is unduly prejudicial, Your

2   Honor, because in these other cases, they dealt with theory --

3   the door theory; right?  And in this case, the question is,

4   would the pedal or the steer tire guard have made a difference.

5   And unless he can connect these other cases to his defect

6   theories in this case, it's completely irrelevant, and it's only

7   prejudicial.

8        And secondly, when he took -- when Mr. Warshauer

9   took Mr. Rogers' deposition, he had his Rule 26 list, which goes

10  back four years.  And in the last four years, I think he

11  testified four times, maybe three cases, because once was at

12  trial.

13       THE COURT:  Okay.

14       MR. LoCOCO:  Involving a 4250.  And you know who

15  was the questioner for each and every one of them?

16  Mr. Warshauer.

17       THE COURT:  All right.

18       MR. MURPHY:  Can I say something?  I'm just going

19  to ask for a limiting instruction.  You're admitting this

20  because it's impeachment.  You're not admitting this to show

21  that there were other similar accidents, but we're literally

22  impeaching the witness.  And I think that that's probably a

23  correct ruling.  But it does mean we're entitled to an

24  instruction to the jury that you're admitting this evidence, not

25  to show that there were other similar accidents like this, but

```
 1        that the witness is a biased witness.
 2                    THE COURT:  No.  If the witness has testified
 3        that this is fully compliant with applicable standards and that
 4        you're of the opinion that there's nothing about this product
 5        that was defective, and that that defect resulted in the
 6        injuries sustained by the plaintiff, I think he has a right to
 7        say, you know, of other instances with left-leg amputations with
 8        these type of trucks.
 9                    MR. LoCOCO:  And then on redirect, I get to say,
10        "What did the jury do in that --"
11                    MR. WARSHAUER:  No.
12                    MR. LoCOCO:  This is where it leads, Your Honor.
13        Each of those cases, the jury found for Raymond.
14                    THE COURT:  Different theories.
15                    MR. LoCOCO:  Exactly.  Exactly.  Right.  Those
16        were door cases.  The last one was door and pedal.  But not
17        pedal -- but we didn't have pedal.
18                    MR. WARSHAUER:  Judge, I'm moving along.  I want
19        to get my cross --
20                    MR. LoCOCO:  And I tried to sit down as long as I
21        could, but it was clearly trying to make a quantitative argument
22        about how many accidents are out there.
23                    MR. WARSHAUER:  I'm going to move along, Judge.
24        I want to keep some rhythm here.  I've got a couple questions
25        similar, but I'll move along.
```

1          THE COURT:  All right.  It's -- it's not

2     irrelevant that there are other -- because we're talking about

3     safety.  The standards we're talking about are safety standards.

4     And these are not insignificant situations if someone's losing a

5     leg.

6          MR. LoCOCO:  All I'm saying, Your Honor, is that

7     this is a hard evidentiary issue, though, too, and there are

8     standards for when information comes in and when it doesn't,

9     even if it is relevant.

10          THE COURT:  I've got you.

11          (Sidebar ends.)

12          THE COURT:  All right.  Where were we?  Go ahead.

13   BY MR. WARSHAUER:

14   Q    Mr. Rogers, since you've been working with the Raymond

15        Corporation, can you identify any work they told you where

16        your primary goal was to reduce injuries associated with the

17        operator's loss of balance?  To reduce injuries, where they

18        said to you, "Mr. Rogers, help us modify our machines so that

19        it's less likely that someone who loses their balance will

20        get hurt"?  Have they ever asked you to do that?

21   A    I don't recall them asking me to recommend any specific

22        changes.  There have been changes made to the truck over the

23        years to help with operator stability.

24   Q    Okay.  Now you were talking about your work on the B56.1

25        committee.  Tell me about the times that since you have been

1   on the committee, that you have suggested that it create a

2   subcommittee or task force with the goal of reducing left-leg

3   injury to operators of standup forklifts.

4 A I have not made that suggestion to anyone on the committee,

5   because I think that the committee is -- sorry -- that the

6   standard, like a design, has to consider lots of different

7   safety aspects of forklifts, for lots of different accident

8   modes, and I think it appropriately covers all of those.

9 Q Tell me about since you've been on the B56.1 committee, where

10   you've suggested that the committee create a task force or

11   subcommittee, the goal of which is to prevent amputation

12   injuries to people who lose their balance as operators.

13   You've never done that either, have you?

14 A Correct.  I've not suggested such a task force.

15       MR. WARSHAUER:  Can I get the presenter?

16 BY MR. WARSHAUER:

17 Q So we're going to go through your slides for just a moment.

18   This first paper, the rear guard you were talking about is a

19   door; right?

20 A It could take the form of a door and often does, yes.

21 Q You have not ever published anything about the benefit of a

22   deadman pedal under the operator's left foot, have you?

23 A Correct, I have not.

24 Q You have not ever published anything about the benefit of

25   guarding the rear wheel, the steered wheel, if you will, to

1       prevent it from crushing an operator's foot who inadvertently

2       finds themselves in its path?  You've not written about that

3       either, have you?

4  A   Correct, I have not.

5  Q   There is a virtual universally accepted operating position

6       for the operator of a sidestance forklift.  Let me see if

7       you'll agree with me.  The operating position for the

8       operator of a sidestance forklift, in particular the 4250, so

9       right foot on the floor, the left foot on the floor, the left

10      hand on the steering tiller, the right hand on the

11      multifunction, and some degree of contact with the backrest,

12      that's the universally accepted operating position, isn't it?

13  A   Well, it certainly requires both feet on -- somewhere on the

14      floor, yes, and left hand on the steering tiller, right hand

15      on the direction control, yes.

16  Q   It certainly requires both feet on the floor to be in the

17      operating position; correct?

18  A   Under most circumstances, yes.

19  Q   On the 4250 that was being operated by Adelaida Anderson on

20      July the 29th of 2017, you will agree that it was possible to

21      operate that forklift with your left foot in the air?  That's

22      true, isn't it?

23  A   It would be possible to do that.  It's certainly contrary to

24      the warnings and instructions.

25  Q   You will agree with me that the forklift being operated by

1    Adelaida Anderson on July the 29th of 2017 did not disconnect
2    the power or engage the brake if her right foot was holding
3    down the pedal, even if her left foot was on the floor of the
4    warehouse?  That's true too, isn't it?
5  A  That's correct.
6  Q  Mr. Rogers, you have operated a number of standup forklifts
7    in your life I'm told, by you and others.  That's true, isn't
8    it?
9  A  That's correct.
10  Q  Am I correct that when you get on a standup forklift,
11    including a 4250, the way you get on is you step up like it's
12    a step, you get in, you find your comfort position, generally
13    your right foot holding down the pedal; right?
14  A  That's up to the operator.  It does not have to be.  The 4250
15    allows a number of configurations.  Could be right foot on
16    the pedal; could be left.
17  Q  You would agree with me on prior occasions when we talked
18    about this, that what you see from the majority of operators
19    is the right toe holding down the emergency brake pedal, the
20    deadman pedal; correct?
21  A  Well, I think certainly many.  I don't know if it's -- it's
22    certainly not all, but many people do use the right foot,
23    yes.
24  Q  It's most.  Really?  We're going to argue about that?
25  A  Well, that's something I think you'll talk to Dr. Rhoades a

| | |
|---|---|
| 1 | lot more about next week.  But for many people, yes, |
| 2 | absolutely. |
| 3 Q | Now, Mr. Rogers, when you get off of a forklift, you step off |
| 4 | like this, don't you?  With your -- you turn so that your |
| 5 | back goes towards the forks, your left shoulder rotates |
| 6 | towards the backrest, sort of a counterclockwise rotation, |
| 7 | and you would typically step out with your left foot first |
| 8 | after the parking brake or emergency brake's engaged; right? |
| 9 A | No.  I don't know that I would agree with that.  Again, |
| 10 | that's up to the individual -- |
| 11 Q | I'm just asking you. |
| 12 A | -- how they would do it.  You're asking me specifically? |
| 13 Q | Yeah.  You step out like this; right? |
| 14 A | Not in every instance, no. |
| 15 Q | Sometimes -- |
| 16 A | Sometimes you kind of back out.  You know, it depends on what |
| 17 | your intention is.  Are you -- |
| 18 Q | You back out like this?  It's a 9-and-a-half-inch step and |
| 19 | you back out like this?  That's what your testimony is? |
| 20 A | Sure.  Yeah.  It's not a very tall step.  Yes. |
| 21 Q | All right.  Okay.  You're telling us that when you get out of |
| 22 | the forklift, you back out like you're getting down a ladder? |
| 23 A | Sometimes.  I'm not saying I do that exclusively.  Again, it |
| 24 | depends on what your intentions are.  Are you getting all the |
| 25 | way out, are you going to go that way, going to go this way, |

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | going to -- what is it you're intending to do?               |
| 2  | Q | Let's talk about intentions.  If you intended to leap out,   |
| 3  |   | would you leap out like this, or would you leap out like     |
| 4  |   | that?                                                        |
| 5  | A | I don't know that I've ever intentionally leapt out of a     |
| 6  |   | forklift like that.                                          |
| 7  | Q | When you come to conclusions, do you think it's important to |
| 8  |   | consider all of the data, or just pick it?                   |
| 9  | A | Well, I think it's important to at least have considered all |
| 10 |   | of it.  Yes.                                                 |
| 11 | Q | So when you considered Adelaide Anderson and gave us this    |
| 12 |   | list here we see, did you note that she was considered a     |
| 13 |   | forklift operator with superior skills?  Did you include that |
| 14 |   | in your analysis of her actions?                             |
| 15 | A | No, I don't -- I did not.                                    |
| 16 | Q | Did you consider the fact that she had accommodation after   |
| 17 |   | accommodation for safety and performance in your work?       |
| 18 | A | I didn't note that specifically here, no.                    |
| 19 | Q | And when you considered the statements of various employees, |
| 20 |   | you showed us the statements of Cathy and Kimberly Clark and |
| 21 |   | Cary Mason and Jason Eaves [phonetic].  You considered those. |
| 22 |   | Did you consider Mr. Doug Gregory who was there and said, "I |
| 23 |   | did hear that she said the lift would not stop" as something |
| 24 |   | Ms. Anderson said while she was on the floor?  Why didn't you |
| 25 |   | put that quote in your work?                                 |

1    A    I don't recall that particular statement.

2    Q    Okay.  With respect to the location of pedals on the floor of

3         a forklift, the truth is that the vast majority of the

4         sidestance forklift industry that sells forklifts in the

5         United States has a pedal so that when the operator is

6         standing sidestance, their left foot is depressing a deadman

7         pedal.  That's true, isn't it?

8    A    I think in many instances, yes, other manufacturers utilize a

9         left-foot deadman pedal.

10   Q    I mean, all the way back in 2019, I asked you what the

11        percentage in the industry was, and you said you didn't know.

12        Do you know now what percentage of the industry has a deadman

13        pedal under the left foot so that if it leaves the

14        compartment, the machine stops?  Do you know?

15   A    I don't know what that number is, no.

16   Q    Did you consider UniCarrier?  Did you look at their design

17        with the left-foot pedal?

18   A    I have looked at UniCarrier in the past, yes.

19   Q    You didn't tell UniCarrier the idea of a pedal under the left

20        foot was unsafe or a bad idea, have you?

21   A    I have not contacted UniCarrier, no.

22   Q    Did you consider the Schaeff left-foot pedal?

23   A    I'm not sure.  Schaeff has been -- hasn't been selling

24        forklifts for quite some time, I don't think.

25   Q    But they did and had a left-foot pedal; right?

1    A    I don't recall.

2    Q    Did you consider Nissan and the left-foot pedal?

3    A    I don't recall Nissan specifically.  They became UniCarrier,

4         so I presume it may be similar to that.

5    Q    Mitsubishi is an international company.  Did you consider

6         that they have a left-foot pedal that applies the brake if

7         the left foot leaves the operator position?

8    A    I have seen those before, yes.

9    Q    Linde, did you consider they have a pedal primarily to be

10        used under the left foot in your analysis today?

11   A    You said primarily used left-foot --

12   Q    Left foot.  If you stand sideways, it's under your left foot.

13        Did you consider that?  Did you look into their design?

14   A    I didn't look at the specifics of that.

15   Q    Jungheinrich is a German company.  Did you consider the fact

16        that they have a pedal under the left foot?

17   A    Yes.

18   Q    Hyundai, Clarke, all left pedals, but there's one other one

19        that comes to mind, and that's Crown.  You're aware that

20        Crown has two pedals, two sensors for the feet; right?

21   A    There are many manufacturers including Crown that have two

22        sensors for the feet.  Again, they're not two brake pedals,

23        though.

24   Q    Right.  But that left one's a brake pedal; right?  Correct?

25   A    On the Crown?

1  Q    Yeah.

2  A    It is a brake pedal, yes, sir.

3  Q    On the Crown, if your left foot leaves the operator position,

4       the most aggressive braking of the braking available in that

5       machine is applied.  That's true, isn't it?

6  A    Yes, that's correct.

7  Q    In addition to that, Crown has a little strip to discourage

8       you from having your foot too close to the edge called the

9       entry bar that will also change the operating characteristics

10       to encourage you to keep that foot further to the right.

11       That's true too, isn't it?

12  A    Crown does have what they call an entry bar that will send a

13       signal to the operator that their foot is on that threshold

14       of the entrance.

15  Q    The forklift we're here about today was marketed in 2010,

16       give or take; is that correct?

17  A    The specific one?

18  Q    Specific one is 2014.  But the big design was first put out

19       in 2010; right?

20  A    Yes, I believe that's correct.

21  Q    Well, Crown has had those two pedals and that entry bar since

22       at least 1998.  That's true too, isn't it?

23  A    They have had that for quite some time, yes.

24  Q    So the technology was certainly available; you'll agree with

25       that?

1   A   The technology for adding another pedal?

2   Q   Yeah.

3   A   Sure.

4   Q   All right.  And Crown is a big seller.  It's about 50 percent

5       of the counterbalance market, so people are accepting it as

6       something that seems to be safe.  You'll agree with that,

7       won't you?

8   A   Well, it's certainly -- I'm familiar that they do have a fair

9       percentage of the market, yes.

10  Q   And in fact, you've actually worked for Crown as a

11      consultant, much like you're doing here for the Raymond

12      Corporation.  That's true too, isn't it?

13  A   I have in the past, yes.

14  Q   But you never told Crown, "Hey, this two-pedal design you

15      have is not safe.  It's not a good idea.  You ought to do the

16      one pedal so that the operator's left foot can go anywhere it

17      wants."  You never told Crown that, did you?

18  A   I don't believe Crown's design is unsafe.  It's certainly

19      different than the Raymond design.  But again, in either

20      case, there's only one brake pedal, and in neither case, if

21      an operator doesn't follow their training and instructions

22      and gets out of the forklift before it stops, they can be

23      injured.

24  Q   So I'm curious.  You said that your concern was that two

25      pedals would make the operator somehow trapped.  So I'm going

1    to put this yellow sheet of paper on Exhibit 157.  And I'm

2    going to ask you -- only thing I'm changing is adding this

3    left pedal to 157.  The fact is, I could put my foot where my

4    heel is holding it, I could put my foot like this, I could

5    put my middle, I could put my foot here, I could put my foot

6    here.  There's like an infinite number of places I can do,

7    but the only thing I can't do is lift it up because that

8    applies the brakes.  What I did makes sense to you, doesn't

9    it?

10   A   No.  What you demonstrated, there was picking it up and

11   repositioning that foot multiple times.

12   Q   No, I can slide it around.

13   A   And every time you do that, you run the risk of inadvertently

14   applying the brake while traveling.

15   Q   If I raise my toe or slide it back a little bit, I could

16   inadvertently apply the brake on the Raymond right now?

17   A   That's correct.

18   Q   So if we look at the Crown design, we have that sort of

19   half-moon.  You can slide your foot anywhere you want on

20   there; right?

21   A   Within limits.  I mean, it's not -- doesn't cover the entire

22   section of the front section of the compartment, and there is

23   a raised ridge in between the brake pedal and the operator

24   present sensing pedal, so it does further constrain where you

25   can position your feet and how you can position your body.

1  Q   Let's talk about this wheel guard for a second.  Wheel guards
2      are certainly allowed by B56.1 standards.  They are allowed,
3      aren't they?
4  A   They are, yes.
5  Q   In fact, two brake pedals are allowed by the standard.
6      That's true too, isn't it?
7  A   I think there's nothing that comes to mind in the standard
8      that would prohibit someone from using two brake pedals, if
9      they so chose.
10 Q   All right.
11 A   But no one thus far that I'm aware of has ever done that.
12 Q   Well, all these other people have a pedal under the left
13     foot.  That's true, isn't it?
14 A   Yes.  Again, a single pedal.
15 Q   Okay.
16 A   Just a different location.
17 Q   Okay.  So let's talk about the wheel guard.  You have a slide
18     here where you have Dr. Meyer's just simple guard over the
19     wheel.  As we see it here on the right-hand side of our
20     screens, wouldn't change the underclearance at all, would it?
21     It's at the same 3-inch height as the rest of the skirt.
22     That's true, isn't it?
23 A   That's correct.
24 Q   And with respect to the ability to do your daily inspection,
25     you can look under it and you can look over it; correct?

1   A   In this configuration, yes.

2   Q   Now to do that daily inspection absolutely properly, to see

3       360 degrees of the wheel, you got to move the forklift

4       anyway, because even without this wheel guard in place, you

5       still got to see the back of the wheel; right?

6   A   Well, you can either drive the truck so that the wheel rolls,

7       or you can rotate the steering tiller and so that the steer

8       tire turns sideways and then you can see the periphery of one

9       side and turn around the other.  But there are multiple ways

10      to accomplish that.

11  Q   And even with this guard in place, that's still possible,

12      just a little less convenient; right?

13  A   It would still be possible to see majority of the tire, yes.

14  Q   And one thing you did not do is take a shoe or a foot and see

15      how it would change the interaction with a human being if

16      there was a guard there.  You didn't do that, did you?

17  A   I did not.  I was not asked to do that aspect of it.  I think

18      Dr. Rodowicz certainly has done that, and I expect she'll be

19      discussing that next week.

20  Q   I want to talk to you a little bit about these videos that

21      you did that we see on Slide 39 of the slides that you used

22      this morning.  The subject forklift had 11,485 hours on July

23      the 30th or 31st, when it was inspected after the event.

24      That's right, isn't it?

25  A   I think that's pretty close, yeah.  It certainly was a lot of

1    hours.

2  Q  Yeah, for a 3-year-old forklift, that's over 3,000, almost

3     4,000 a year; correct?

4  A  Correct.

5  Q  The average is closer to 2,000 a year, or even less?

6  A  Possibly.  I don't know that I know that number off the top

7     of my head, but that's a lot of hours for sure.  They were

8     running three shifts a day, five days a week at least.

9  Q  So when we look at the forklift you used, nice bright red

10     paint, back is in good condition, it's pretty pristine.  The

11     forklift that was involved in this event is a whole different

12     animal, isn't it?  It's clearly lived a rougher life.  You'll

13     agree with that, won't you?

14  A  Well, the forklift pictured shown in this picture certainly

15     has.  This is not the subject forklift.  This is a similar

16     one, but not the specific unit.

17  Q  Right.  It's a forklift that lives at the FedEx facility in

18     Effingham?

19  A  It did, and yes, I would expect that most all of their trucks

20     were fairly heavily used, yes.

21  Q  All right.  So this forklift has what Raymond has called in

22     their marketing materials, the ComfortStance Suspension.  I

23     want to know, how does the ComfortStance Suspension

24     performance change between a forklift with 3,000 hours and

25     one with 11,000 hours?  You don't know, do you?

1    A    Well, I would not expect there to be any significant

2         difference, unless there was some specific component that was

3         broken or missing that are part of the floor.  But I don't

4         see any suggestion of that, that that was the case, in the

5         maintenance records, and certainly nothing was found in the

6         post-accident inspection done two days after the accident.

7    Q    When I asked you that under oath, what you told me was, "I've

8         not done any kind of evaluation or testing to know that."

9         That remains a truthful answer, doesn't it?

10   A    It is true that I've not done specific testing.  But based on

11        my understanding of the design of the floor, it's not made up

12        of components that are going to wear out, if you will, other

13        than they may break or fall apart or separate.  Certainly not

14        suggesting that it wouldn't need maintenance at some point.

15   Q    Well, Mr. Rogers, the ComfortStance floor is indeed an item

16        that must be maintained.  But you don't know the maintenance

17        history on the subject Comfort Floor, or even on the one you

18        were using to simulate it, do you?

19   A    Well, I'm not aware of the maintenance -- of any maintenance

20        or need to do maintenance on the exemplar.  I do see in the

21        maintenance records from the subject forklift, a reference

22        that you have up on the screen there, of an issue with the

23        floor about a year before the accident, that a nut fell off

24        basically and they replaced it, and that was all that was

25        done.

1   Q   And what that indicates to you is that at this warehouse,

2       there's enough vibration that the parts on the ComfortStance

3       Floor can actually vibrate off to the point where you have to

4       re-tap and clean up the threads; right?

5   A   Well, this particular truck needed that repair, yes.  I don't

6       know that it's unique to this warehouse per se, but like any

7       component, you're going to have to do maintenance

8       periodically, sure.

9   Q   And in fact, at this warehouse, you can put new drive tires

10      on in April.  In just a little over three months, you've got

11      to get new ones because they're already grooved and chunked

12      out; right?

13  A   Yes.  That's what the records would indicate, that they

14      needed to replace the drive tires in April and July of 2017.

15  Q   So you're a mechanical engineer.  What does "durometer" mean?

16  A   Durometer refers to the hardness of a rubber typically, or a

17      plastic material.

18  Q   What was the durometer of the tires that were on

19      Ms. Anderson's forklift on July the 29th of 2017 when she

20      says she went over a crack and it shook her to the point she

21      lost her balance?  Do you know the durometer of those tires?

22  A   I don't.  I don't see in the repair records that they

23      specified exactly what type of tire they put on and what

24      durometer that would be.

25  Q   What were the durometer of the tires on your exemplar that

| | | |
|---|---|---|
| 1 | | you used for your testing? |
| 2 | A | I don't know. |
| 3 | Q | You don't know if they were harder or softer? |
| 4 | A | Correct.  As compared to what was on the subject truck? |
| 5 | Q | Yes, sir. |
| 6 | A | I do not know. |
| 7 | Q | In fact, you don't even know if they were the same material? |
| 8 | | There were several materials available, and you don't know if |
| 9 | | they were the same material, do you? |
| 10 | A | Right.  There's typically -- there's polyurethane.  There's |
| 11 | | rubber tires.  I do know that the -- both the subject and the |
| 12 | | exemplar I used had black rubber tires.  And at least that's |
| 13 | | quite often how you determine what the material is, is by the |
| 14 | | color of the tire itself. |
| 15 | Q | Now your weight was 175 pounds on the date you did your |
| 16 | | testing? |
| 17 | A | Correct. |
| 18 | Q | Ms. Anderson's testified that she weighed under 150, so |
| 19 | | that's 15 percent difference.  Tell me the testing you did |
| 20 | | that shows how the ComfortStance ride differs for someone, |
| 21 | | let's say, 147 pounds versus 175 pounds. |
| 22 | A | I have not done any testing that's that specific to the |
| 23 | | operator's weight. |
| 24 | Q | Yeah.  So this Comfort system is on sort of a hinge, if you |
| 25 | | will; right?  With a shock absorber and a hinge?  That's sort |

1      of the way it works?

2  A   Yes.  It's really a spring, not really a shock absorber.  A

3      set of springs.

4  Q   Okay.  Where did your feet on that system compare to where

5      Ms. Anderson's feet were at the time you went over the path

6      that you followed?

7  A   Well, I was positioned in the operator's compartment based on

8      her description of how she was positioned, that being left

9      hand on the tiller, right hand on the direction control,

10     right foot on the pedal, and left foot on the other portion

11     of the compartment.  But I don't know specifically where her

12     feet were --

13  Q   Well, how --

14  A   -- beyond that.

15  Q   How did the percentage of weight on your right foot compare

16     to the percentage of weight on Ms. Anderson's right foot,

17     10 feet back from the location in which she exited the

18     forklift?

19  A   I would have no way to know that.

20  Q   Well, how about her left foot?  How did your percentage of

21     weight on your left foot compare to Ms. Anderson's percentage

22     of weight on her left foot at any time during your use of

23     this forklift on any of your runs?

24  A   Again, I don't know that I would have any way to know that.

25  Q   Your exemplar forklift had standard steering, but you don't

1     know whether the subject forklift had standard or reverse

2     steering, do you?

3  A   Correct, I don't right now as I sit here.  I don't know that.

4  Q   You and Counsel went over some paperwork that showed there

5     might have been a chip of wood.  Would you agree with me that

6     if someone was to hit a chip of wood, it could indeed impart

7     a force that could cause them to lose their balance?  Would

8     you agree with that?

9  A   Possibly.  A lot of variables there that need to be

10    considered, but I suppose that's possible.

11  Q   You didn't do any testing to see what happens if this

12    forklift hits a chip of wood, though, did you?

13  A   I did not, no, because, I mean, there's -- while there's a

14    reference there to her possibly hitting a chip of wood,

15    that's certainly not what Mrs. Anderson testified to.

16  Q   Then why did you bring it to our attention other than to

17    mislead us?

18  A   It was not to mislead anybody.  It was to simply be inclusive

19    of the information that I had available that was based on the

20    investigation done close to the time of the accident.

21  Q   So you just wanted us to know that someone, who you don't

22    have any reason to believe, said there might have been a chip

23    of wood, but you're not buying it?  It was just something you

24    threw out there for what reason?

25  A   Again, because it was a piece of information that was

1    available.  And I think it certainly is -- directly

2    contradicts Dr. Meyer and Dr. Jeka's assertion that she just

3    perceived she might lose her balance and caused her foot to

4    come out that way.

5  Q    But, Mr. Rogers, Doug Gregory signed a statement.  That was a

6    piece of information that was available.  He said, "I did

7    hear her say that she said the lift would not stop."  You

8    didn't include that piece of information from someone who was

9    at the scene in your analysis, but you included the piece of

10   wood that you tell us "Just ignore"?  That's true, isn't it?

11   You pick and chose what supports your opinions to help your

12   client?

13 A    That's certainly not the reason.  I just -- I don't frankly

14   recall seeing Mr. Gregory's statement.

15 Q    You did some work with your surrogate and your people where

16   you said, "Step out."  Did you do that so that they genuinely

17   lost their balance first, or did they -- were they under

18   complete control when they stepped out?

19 A    Well, it was -- the instructions at least were to move your

20   foot outside the compartment as if you lost your balance.

21   It's pretty difficult to instruct somebody to lose their

22   balance, if you will.

23 Q    So how many of these people had been trained on how people

24   move when they lose their balance?  Were they trained stunt

25   people?

1    A    No, they were not.  That was not the intention.

2    Q    But you said you're supposed to act as if you lost your

3         balance.  I'm just curious how they knew how to do that in a

4         way that had scientific validity.  The fact is, they didn't,

5         did they?

6    A    Well, the purpose of the study that I asked people at my

7         office to do was to establish the time needed to move the

8         left foot from the operator's compartment of the forklift

9         down to the floor.  I could do that very, very slowly.  I can

10        do it relatively quickly.  The instruction again was to move

11        their foot out and down as if they lost their balance,

12        meaning don't try and slow yourself down or do it gingerly,

13        is to just let yourself fall as if you lost your balance.

14   Q    Did you bring us videotape of that?

15   A    I did not.

16   Q    Did you make videotape of that?

17   A    I think there was, and that was used to establish the time

18        that it took by analyzing the frames of the videos.

19   Q    And then you destroyed it?

20   A    I destroyed the video?

21   Q    Yeah.

22   A    No, I didn't destroy it.  I just didn't bring it here to show

23        to the jury.

24   Q    When they were stepping out, were they holding the handles?

25   A    I believe they were.  It's been a long time since I've looked

1    at those, so I don't remember off the top of my head, but I

2    think they were.

3  Q  How many of them moved the handles as they were stepping out?

4    Did you record that?

5  A  It was probably recorded in the video.  Again, I just don't

6    remember.

7  Q  These kind of cracks on warehouse floors, there's nothing

8    particularly unusual about that?  Raymond knows its forklifts

9    are going to be used in places that have cracks like the ones

10    at FedEx; right?

11  A  I expect that people at Raymond know that, yes.

12  Q  This is Photograph Number 25, or I'm sorry, 28 in your slide

13    pack.  This is a crack that is perpendicular to the path of

14    travel that you traveled in your multiple runs; is that

15    right?

16  A  Correct.

17  Q  How far back is this crack from the point of rest?

18  A  Right off the top of my head, I don't know.  The next slide

19    is the scale diagram.  We could probably estimate it from

20    that.

21  Q  Except you didn't put it on the scale diagram, did you?

22  A  No, I did, because it's basically the seam in the concrete --

23  Q  How far back is it?

24  A  Well, I forget I can draw on this.  So this is the big tall

25    yellow building support column.  And as is typical in a

1  warehouse like this, these slabs of concrete are poured in

2  sections, and so that crack that we were just looking at

3  actually comes off of the corner of that building support

4  column base.  And so it's just to the right, that gray line,

5  just to the right of what I've just drawn in purple there is

6  that seam which is kind of broken up and has developed into

7  the quote-unquote crack that's shown in Slide 28.

8  Q  And how far back is that from the point of rest?

9  A  That is -- up here is our scale.  So it's maybe on the

10  order -- I guess it depends on relative to what, but relative

11  to the back of the forklift, it might be 12 feet or so, 12,

12  13 feet.

13  Q  Relative -- 12 to 14 feet from this point right here; is that

14  right?

15  A  Probably 12 or 13 approximately.  Yes.

16  Q  Okay.  When we look at Slide 40, these are -- this is the 0

17  line, and then you have negative and positive accelerations

18  so that --

19  MR. LoCOCO:  Lower left corner.  Just touch on it

20  to get rid of that purple.  Thank you.

21  MR. WARSHAUER:  Thank you, Mr. LoCoco.

22  BY MR. WARSHAUER:

23  Q  So this is the 0.05 line?

24  A  Correct, 0.05g, yes.

25  Q  So anything that we see above that is an acceleration

1    measured in g that exceeds 0.05; is that true?

2  A  That's correct.

3  Q  Going back to look at 157, which is this floor, would you

4    agree with me that if my left foot is in the air, I cannot

5    apply the emergency brake by raising my right foot, unless I

6    had the ability to levitate?

7  A  Yes, or support yourself through your arms or hands, yes.

8  Q  And would you agree with me that if I am falling to my right

9    and I'm pulling on the multifunction as an aide to balance,

10    it would be difficult if not impossible to plug, meaning to

11    push the multifunction towards the forks?

12  A  I don't know that it would be impossible, but it --

13  Q  Exceedingly difficult, while you're pulling on it, to push it

14    backwards?

15  A  Well, if you're pulling on it, you can't be pushing at the

16    same time.  But there's no requirement that you pull on it as

17    you're -- exiting out the --

18  Q  Unless you're using it as an aide to keep you from falling

19    out?

20  A  Under what circumstance?

21  Q  You're falling to your left.  If I'm falling to my left and

22    trying desperately to stay in by pulling with my right hand,

23    I can't make the brake work, at least with my hand, can I?

24  A  While that foot's in the air?

25  Q  Yeah.

1  A    I would agree, but again, there's no requirement that you

2       pull on it.  By pulling on it, I'm assuming you mean rotating

3       it?

4  Q    I'm talking about, I'm falling and I want to stay in.  I've

5       got to pull on something.  What's in my right hand to pull

6       on, sir?  If I'm going to my left and I want to pull myself

7       back in, what would be in my right hand in the operator

8       position?

9  A    Well, the multifunction control handle is in your right hand,

10      but there's -- again, way it's designed, that doesn't

11      necessarily mean you're going to rotate it.  There are ways

12      to hold it such that you can still provide some means of

13      support without rotating.

14 Q    If I was on a Crown forklift, as I fall to my left and pull

15      towards the door, it's in neutral.  Because on a Crown

16      forklift, to go towards the forks, I'm pushing --

17                   MR. LoCOCO:  Your Honor, can we approach, please?

18                   (Sidebar begins.)

19                   MR. LoCOCO:  In his original complaint and his

20      experts, they testify to a defect in the Raymond handle

21      operation.  None of those experts testified to that defect in

22      this trial.  So it's -- at this point, it's an irrelevancy.  He

23      can't put it back into the case by cross-examining our witness

24      on something that's not a defect issue in the case anymore.

25      It's improper.

1    MR. WARSHAUER:  First off, it's just a fact.

2    Second off, the case isn't over until it's over.  The jury

3    considers all of the evidence when they eventually make their

4    decisions, whether product's unreasonably dangerous.  But it's

5    simply a fact of life, that as you fall to your left in a Crown,

6    it goes to neutral and you fall to your left.  And I'm not going

7    to say it's defective.  It's a fact that exists in the

8    difference in the products.

9    MR. LoCOCO:  So he's encouraging the jury then to

10   speculate that this is some additional defect, which we've

11   already decided in the case, and you have, that the jury needs

12   expert testimony to make a decision about defects.  They can't

13   speculate.

14   THE COURT:  I think this jury could easily

15   understand if an operator suddenly loses balance and starts

16   falling to the left -- and I'm trying to remember if any of the

17   balance experts talked about this -- but they're likely to hold

18   what's in your hands.

19   MR. WARSHAUER:  Yes.  Two of them did.

20   THE COURT:  You're trying to maybe recapture some

21   or maintain your balance through your hands now as opposed to

22   your left -- your left foot.

23   MR. LoCOCO:  But they didn't --

24   THE COURT:  Having said that, the question is, I

25   mean, you've established that if on this forklift, if you pull

1       back, you accelerate in the direction of travel as opposed to

2       being able to plug and push forward, so I think you've got

3       enough.  I don't want to wander into areas of -- that --

4                        MR. WARSHAUER:  Okay.

5                        THE COURT:  -- create too much of a problem.

6                        MR. LoCOCO:  Thank you.

7                        (Sidebar ends.)

8    BY MR. WARSHAUER:

9    Q   We were talking a little a few minutes ago about the

10       importance of considering all of the facts.  Did you also

11       consider the testimony of Mr. James Mulvany, who recounted

12       the fact that employees told him that when forklifts went

13       over cracks, they were shaken?  Did you consider that?  Is

14       that in the slides you shared with us?  The plant manager?

15   A   It is not in the slides.  I do recall him testifying

16       generally to that effect, yes.

17   Q   And Mr. Michael Gruszka also recounted the fact that people

18       would talk about rough rides from hitting cracks.  You didn't

19       put that in your slide deck either, did you?

20   A   Correct, I did not.

21                        THE COURT:  Is there anything on the screens?  I

22       have something on my screen --

23                        MR. WARSHAUER:  I've got this crazy thing that

24       popped up.  It keeps coming up.  Can't get rid of it, Judge.

25       They are insistent that I join the internet here.

1          THE COURT:  All right.

2    BY MR. WARSHAUER:

3    Q   Mr. Rogers, in all the times that you've operated the Raymond

4        4250, have you ever moved your foot, your left foot, towards

5        the left to broaden your stance?

6    A   Not that I can specifically recall.

7    Q   In fact, when I asked you that question before, didn't you

8        tell me, "I may have.  I don't know.  I don't as I sit here

9        have a specific recollection of doing that, but I'm certain

10       that my feet are positioned in a variety of orientations

11       while operating that type of truck."  That would be true,

12       wouldn't it?

13   A   Well, I presume you're reading from my answer to my

14       deposition, and if that's what I said, that's what I said.

15       I'm not going to dispute that.

16   Q   You don't watch your feet while you're operating this truck,

17       do you?

18   A   No.  I'm focused on where the truck's going and where the

19       load is and things of that nature.

20   Q   And you had access to a study done by Dr. Rhoades.  Do you

21       recall that?

22   A   I do.

23   Q   Four employees?

24   A   I do recall studying it.  I do recall reviewing it, yes.

25   Q   So Dr. Rhoades went to the Raymond warehouse and instrumented

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | up a truck and four employees for four four-hour shifts were         |
| 2  |   | watched and their feet were moving.  Do you recall that?             |
| 3  | A | Generally.  I don't have the specifics of the findings               |
| 4  |   | necessarily in mind.                                                 |
| 5  | Q | Do you recall that these people, even while they were being          |
| 6  |   | watched in this clearly obviously instrumented truck, were          |
| 7  |   | still moving their feet two to three times a minute                  |
| 8  |   | throughout their entire shift?  Do you recall that?                 |
| 9  | A | Well, again, I don't recall the specifics of the data, but if       |
| 10 |   | that's what it shows, I won't dispute that.  Sure.                  |
| 11 | Q | And you don't know whether they were doing it because of             |
| 12 |   | balance or comfort or a combination thereof, do you?                |
| 13 | A | Correct, I do not.                                                  |
| 14 | Q | But what you do know is that Exponent helped do that work.          |
| 15 |   | You know that; right?                                               |
| 16 | A | I am aware that Exponent, the company that Dr. Rodowicz works       |
| 17 |   | for, provided the instrumentation, yes.                            |
| 18 | Q | And Exponent, you've worked with them before, a large company      |
| 19 |   | that helps Raymond defend cases like this?  You've worked          |
| 20 |   | with them on occasion; that's true?                                |
| 21 | A | I have, yes.                                                        |
| 22 | Q | And they have lots of equipment.  I mean, they have no             |
| 23 |   | shortage of GoPro cameras.  You'll agree with that?  I mean,       |
| 24 |   | they are a big company?                                            |
| 25 | A | They are a big company.  I don't know how many GoPro cameras       |

1        they have, but they certainly have lots of capabilities, yes.

2  Q  Well, you would think a project that cost $91,000, someone

3        could come up with a handful of GoPros to record it, wouldn't

4        you?

5  A  I suppose.  I wasn't involved.  I wasn't -- so I --

6  Q  I mean, you did some testing where you were in charge,

7        pushing some forklifts off loading docks, and you had like

8        five or six cameras, including ultra high-speed, didn't you?

9  A  I did, yes.  We documented that testing, which was more

10       than -- we weren't literally pushing forklifts off, but I

11       understand what you're saying.

12  Q  Sure.  Multiple cameras.  But Dr. Rhoades, when he was doing

13       the testing to see how people move their feet, had video, but

14       it was destroyed and not recorded.  That's true, isn't it?

15                 MR. LoCOCO:  Objection.  Foundation.

16                 THE WITNESS:  I have no idea --

17                 THE COURT:  Wait.  Let me rule on the objection.

18      There's an objection as to foundation.  Your response?

19                 MR. WARSHAUER:  My response is that Dr. Rhoades

20      said that he had a video feed and it was lost.

21                 THE COURT:  Well, the question is --

22                 MR. LoCOCO:  That's not his testimony.  The

23      question is, does he have foundation.

24                 THE COURT:  The question is -- you can lay a

25      foundation for -- is Dr. Rhoades one of the defendant's experts?

1          MR. WARSHAUER:  Yes, sir.

2          THE COURT:  All right.

3          MR. WARSHAUER:  Let me just go back one question

4     and I think I can short-circuit this.

5          THE COURT:  You used the term "destroyed."  If

6     he -- if it was destroyed as opposed to -- I don't know what his

7     testimony is, but there's an objection as to foundation, and

8     there should be sufficient foundation to ask that question as

9     you asked it.

10         MR. WARSHAUER:  Okay.  Well, Dr. Rhoades will

11    perhaps be with us.  I'll hold it to him.  I'm going to ask this

12    witness this.

13 BY MR. WARSHAUER:

14 Q   You never saw any videotape that would have shown these four

15    operators in specially-instrumented forklifts, how their feet

16    moved throughout their shift, have you?

17 A   I have not seen any videotape, no.  All I know was that they

18    had the ability to move their feet throughout their shift

19    based on the design of this compartment.

20 Q   Since 1986, working for Raymond, the truth is, you can't

21    identify a single modification of their design that had as

22    its goal the reduction or elimination of left-leg amputation

23    injuries, can you?  That you championed?

24 A   There is not any specific design change that I championed,

25    but certainly there have been many, many design changes to

```
 1        the compartment over the years that have assisted with

 2        operators remaining in the compartment, which is the safest

 3        place for them to be.

 4   Q    How many left-leg amputation cases will there have to be

 5        before you think it's appropriate to suggest to Raymond that

 6        they change their design?

 7                      MR. LoCOCO:  Objection to form.  It's

 8        argumentative.

 9                      THE COURT:  Sustained.

10                      MR. WARSHAUER:  That's all I have.

11                      THE COURT:  All right.  Gentlemen?

12                      (Sidebar begins.)

13                      THE COURT:  How much longer do you think you

14        have?

15                      MR. LoCOCO:  Five minutes.

16                      THE COURT:  Okay.  And then you don't have

17        anything else today?  All right.  We keep pushing on.

18                      MR. LoCOCO:  Maybe ten.

19                      THE COURT:  That's all right.  But it's not 45?

20                      MR. LoCOCO:  No.

21                      (Sidebar ends.)

22                          REDIRECT EXAMINATION

23   BY MR. LoCOCO:

24   Q    Mr. Rogers --

25                      MR. LoCOCO:  May I proceed, Your Honor?
```

1          THE COURT:  Yes, sir.

2     BY MR. LoCOCO:

3     Q    Mr. Rogers, just a few questions.  First of all, you have

4          talked about the -- Mr. Warshauer asked you about the -- some

5          of the testing that you did.  In looking at Mrs. Anderson's

6          accident, you told the jury toward the -- as part of your

7          direct and also in your cross-examination that the subject

8          truck never hit the vertical post, that it actually stopped;

9          correct?

10    A    Correct.

11    Q    What stopped the truck?

12    A    Well, what stopped the truck was her right foot coming off

13         the deadman pedal and the brakes come on.

14    Q    Mr. Warshauer asked you whether you'd ever been asked by

15         Raymond or tasked by Raymond to assist with the primary goal

16         of dealing with operators in a potential loss of balance.

17         Based on your experience, has balance in your experience as

18         an operator ever been an issue?

19    A    No.

20    Q    Have you ever had trouble staying in the compartment of a

21         4250?

22    A    No.

23    Q    You were asked some questions about points of contact, two

24         feet, two hands, back pad.  If an operator is utilizing the

25         brake pedal as an emergency, they now have four points of

1     contact, or how many points of contact --

2  A  Well, at a minimum, yes.  I mean, if they choose to lift

3     their foot up off the platform, they could slide their foot

4     back to release the brake pedal and still maintain both feet

5     on the platform floor.

6  Q  All right.  But if they pick up their foot in an emergency,

7     the right foot, and the brake comes on, the left foot is

8     carrying the weight of the body?

9  A  The majority of it, yes.

10  Q  And the left foot can't get out of the compartment then?

11  A  Correct.

12  Q  You were asked whether you knew that Mrs. Anderson was known

13     for having superior forklift operating skills.  Do you

14     remember that?

15  A  I do.

16  Q  Even assuming she did, does that mean she didn't make a

17     mistake on the day of the accident?

18  A  No, it does not.

19  Q  You were asked questions about left-foot deadman pedals on

20     Crown and Linde, Schaeff, whatever.  Did you offer an opinion

21     criticizing the design of forklifts that have a left-foot

22     pedal?

23  A  No, I did not.

24  Q  All right.  Your analysis is that, left foot or right foot,

25     Mrs. Anderson is still going to have this injury?

1  A    Correct, unless she stays within the compartment.

2  Q    Right.  Okay.  Are you aware -- well, I'll withdraw that.

3       You were asked questions about your weight versus

4       Mrs. Anderson's, the status of the floating floor from a

5       maintenance perspective on the exemplar truck versus the

6       subject truck.  Do you recall that?

7  A    Yes.

8  Q    The data that we looked at from the Vericom that then was

9       reduced into those plots with the orange, blue, and green

10      lines, did that have anything to do with what you, the

11      operator, was experiencing?

12 A    No.

13 Q    Because it was coming from what?

14 A    It was actually measuring the acceleration that the truck was

15      experiencing, because the Vericom was stuck to the frame of

16      the forklift.  Had nothing to do with the Comfort Floor or

17      floating floor feature.

18 Q    So for purposes of what you were doing, the differences in

19      weight, the questions about the floating floor were

20      irrelevant to the data you were collecting?

21 A    Correct.

22 Q    As part of your analysis, you were asked a number of

23      questions about the testing that you did and showed to the

24      jury.  Have you seen any testing from Dr. Meyer or Dr. Jeka

25      or Dr. Kerrigan in this case?

1   A   No, none.

2   Q   You were asked about Dr. Rhoades' study.  Is it fair to say

3       that he knows the most about what he did?

4   A   Yes.  Certainly does.

5   Q   You were asked about whether you watched your feet when you

6       were operating a 4250.  What do you make sure you do when

7       you're operating a 4250 with respect to your feet?

8   A   Well, you make sure that they're retained in the operator's

9       compartment, and it's really not something you have to pay

10      particular attention to.  You know, it's a pretty

11      well-defined area and not something that you have to focus on

12      and watch where your feet are.

13  Q   All right.

14                  MR. LoCOCO:  Just a moment, Your Honor.

15  BY MR. LoCOCO:

16  Q   The stopping distances that you measured and analyzed and

17      presented to the jury, whether the brake pedal was on the

18      left foot or the right foot on the 4250, would the stopping

19      distances all have been the same?

20  A   Yes.

21  Q   All right.

22                  MR. LoCOCO:  That's all I have.  Thank you, Your

23      Honor.

24                  MR. WARSHAUER:  This witness can be excused.

25                  THE COURT:  All right.  You may step down, sir.

1          It is 3:30.  We do not have -- we're not going to

2    start with a new witness, so we will recess until Monday morning

3    at 9.

4          I have to remind you that until the trial is

5    over, that you are not to discuss this case with anyone,

6    including your fellow jurors, members of your family, people

7    involved with the trial, or anyone else.  You may not

8    communicate with anyone about this case on your cell phone,

9    through e-mail, iPhone, text messaging, Twitter or Facebook, or

10    any blog or website or chat room.

11          If anyone approaches you and tries to talk to you

12    about this case, do not tell your fellow jurors, but advise me

13    about it immediately.  Do not read or listen to any newspaper

14    reports of the trial.  And finally, remember to keep an open

15    mind until all the evidence has been received and you have heard

16    the views of your fellow jurors.

17          All right.  Thank you.  Enjoy your weekend.

18          (Jury exits at 3:31 p.m.)

19          THE COURT:  All right.  Are we -- do we need to

20    take up anything before we break for the weekend?

21          MR. LoCOCO:  I just -- I guess I want to just

22    cover scheduling.  So we have -- we're going to probably start

23    with Dr. Rhoades on Monday morning.

24          THE COURT:  All right.

25          MR. LoCOCO:  And then go to Mr. Kerila, who's the

1    Raymond engineer.  I think that may last the whole day.  Our

2    last witness is Dr. Rodowicz, and our plan is to put her on

3    first thing Tuesday.  But --

4              THE COURT:  Do you have a problem with that?  All

5    right.

6              MR. WARSHAUER:  No.  That's fine.  I mean --

7              MR. LoCOCO:  So I was also just going to throw

8    out, if we do end up a little short on Monday, maybe that would

9    be a good time to get the instructions and the verdict form

10   done.

11             THE COURT:  All right.

12             MR. LoCOCO:  And then if we finish Dr. Rodowicz

13   on -- just thinking ahead, on Tuesday at noon, would you want to

14   then move to closings in the afternoon?

15             THE COURT:  Well, is there going to be any

16   rebuttal, you think?

17             MR. LoCOCO:  Oh, yeah, I forgot.  I'm sorry.

18             MR. WARSHAUER:  I find it unlikely, but one never

19   knows.  I think -- on a scale of 1 to 10, it's a 0.5, Judge.  If

20   that's --

21             THE COURT:  All right.  I will tell you my

22   personal preference and personal practice.  There's always stuff

23   for us to do before closing arguments.  And my preference is --

24   I'm going to let you guys argue your case.  There's a lot to

25   talk about.  My preference would be to -- I'd like to do

1        closings in the morning, to give the jury a full day to

2        deliberate.

3                    MR. LoCOCO:  Okay.

4                    MR. WARSHAUER:  All right.

5                    THE COURT:  And so if I'm going to err -- I

6        hate -- I hate sending a case, certainly a case that's this

7        complex -- you know, if we start closing arguments at 1 o'clock,

8        by the time you go through the closing arguments, you read all

9        the instructions, the jurors get down and sit and start to

10       deliberate, it's closer to 4 o'clock than it is to 3 o'clock.

11                   MR. LoCOCO:  Yeah.

12                   THE COURT:  And I like people coming in fresh so

13       they can hear what you say.  The other thing is, when I was a

14       trial lawyer, I'd like to have the evening to think about my

15       closing as opposed to a lunch that I probably wasn't going to

16       eat anyway.  And just all that running around, just being able

17       to collect your thoughts makes for a better advocacy.  And this

18       is a very important case and this case is worth it.  So that's

19       how I am thinking about proceeding.

20                   MR. LoCOCO:  Well, I appreciate that, Your Honor.

21                   THE COURT:  Anybody have a problem with that?

22                   MR. WARSHAUER:  I think I speak rarely for LoCoco

23       and I.  We enjoy a judge who recognizes the reality of trying a

24       case.

25                   MR. LoCOCO:  Yeah.  I mean, sometimes you get

1    Courts who will say, "No, no, no.  We're just going to keep

2    going."  And I actually appreciate, you know, we come back first

3    thing in the morning.

4                    THE COURT:  So I can raunch back to my swampy --

5                    MR. WARSHAUER:  You're going to get Legionnaires'

6    disease back there.

7                    THE COURT:  I prefer being back here.

8                    THE COURTROOM DEPUTY:  Are we going to move

9    courtrooms?

10                   THE COURT:  There is a chance -- you can leave

11   your stuff -- to the extent you're willing to leave stuff here

12   over the weekend, it's safe.  The water problems are on the

13   other side of that wall.

14                   THE COURTROOM DEPUTY:  They were at least today.

15                   THE COURT:  The -- Pat probably knows this just

16   as well.  I'm not necessarily worried about this courtroom

17   because that was the original ceiling and the pipes and

18   everything don't run over that.  Now if you go up there on that

19   fourth floor, you're going to look over and look down on this

20   part, so I don't think we're going to have the water problems

21   here.  There could be a chance that we would relocate.  I don't

22   think it's a great chance.  But if we do, I probably -- we'll

23   either go over to Judge Dugan's courtroom, which is just on the

24   other side of this floor, or up to the third floor, the visiting

25   judge's courtroom.  But I think that's something we have to --

1    we'll know Monday morning, but not sooner.  If I find out

2    sooner -- I won't find out sooner.  I won't find out sooner.

3                    All right.  Anything else we need to take up?

4                    MR. WARSHAUER:  No, sir.

5                    MR. LoCOCO:  No.  Thank you.

6                    THE COURT:  All right.  Enjoy your weekends,

7    everyone.

8                    (Recess at 3:36 p.m.)

9

10                    ° ° ° ° ° ° ° ° ° ° °

11                    **COURT REPORTER'S CERTIFICATE**

12                    I certify that the foregoing is a correct
     transcript from the record of proceedings in the above-entitled
13   matter.

14
                     Dated this 21st day of December, 2021
15

16                    /s/ Hannah Jagler

17                    _____

18                    Hannah Jagler, RMR, CRR, FCRR
                      Official Court Reporter

19

20

21

22

23

24

25