IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
-----------------------------------------------------------------
ADELAIDA ANDERSON and JEFF ANDERSON,  |
                                      |
                 Plaintiffs,          |
                                      |
v.                                    | Case No. 19-cv-800-SPM
                                      |
RAYMOND CORPORATION,                  |
                                      |
                 Defendant.           |
-----------------------------------------------------------------
```

Transcript of Jury Trial - Volume VI
November 8, 2021

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East Saint Louis, Illinois

```
-----------------------------------------------------------------
```

**REPORTED BY:**      **HANNAH JAGLER**, RMR, CRR, FCRR
Official Court Reporter
750 Missouri Avenue
East Saint Louis, Illinois 62201
618-482-9481
Hannah_Jagler@ilsd.uscourts.gov

Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES**:

FOR PLAINTIFF:      **MICHAEL J. WARSHAUER**
                    **JASPER V. ABBOTT**
                    Warshauer Law Group, PC
                    2740 Bert Adams Road
                    Atlanta, Georgia 30339
                    404-892-4900
                    Mwarshauer@warlawgroup.com
                    Jasper@warlawgroup.com

                    **FRANK J. McCOY, JR.**
                    McCoy & McCoy, LLC
                    20 Church Street, Suite 1720
                    Hartford, Connecticut 06103
                    860-244-9100
                    Frank@mccoymccoy.com

                    **RYAN E. BRENNAN**
                    Brennan Law Firm PC
                    19 Bronze Pointe
                    Belleville, Illinois 62226
                    618-236-2121
                    Ryan@feladlc.com

FOR DEFENDANT:      **FRANCIS H. LoCOCO**
                    Husch Blackwell LLP
                    555 East Wells Street, Suite 1900
                    Milwaukee, Wisconsin 53202
                    414-978-5305
                    Frank.lococo@huschblackwell.com

                    **G. PATRICK MURPHY**
                    Murphy & Murphy, LLC
                    3415 Office Park Drive, Suite D
                    Marion, Illinois 62959
                    618-248-3236
                    Gpatrick@murphymurphyllc.com

                    **MARGARET KATHRYN HEITKAMP**
                    Husch Blackwell LLP
                    511 North Broadway, Suite 1100
                    Milwaukee, Wisconsin 53202
                    414-978-5373
                    Margaret.Heitkamp@huschblackwell.com

1                           **INDEX**

2                                                    **PAGE**

3    WITNESS: **TIMOTHY RHOADES, Ph.D., PE, CPE**

4        Direct Examination By Mr. LoCoco........................  762

5        Cross-Examination By Mr. Warshauer.....................  813

6        Redirect Examination By Mr. LoCoco.....................  830

7        Recross-Examination By Mr. Warshauer...................  832

8        Redirect Examination By Mr. LoCoco.....................  833

9        Examination By the Court...............................  833

10   WITNESS: **ROBERT KERILA, PE**

11       Direct Examination By Mr. LoCoco........................  840

12       Cross-Examination By Mr. Warshauer.....................  918

13       Redirect Examination By Mr. LoCoco.....................  959

14

15

16                      **INDEX OF EXHIBITS**

17
     NO.   DESCRIPTION                              ID'D   RCV'D
18   505   Features Brochure.............................  894   1107

19   512   1987 Test Photographs........................  907

20   537   Hermes 2006 12 07 Driving Email All Trucks...  875   1107

21   538   P10129 Ph5 PowerPoint Highlight..............  851   1108

22   542   Refresh Driving 100624 Pilot2 P3.............  882   1108

23   552   Fixture Video................................  878   1108

24   562   Principles of Safe Operation.................  917   1108

25   574   Rhoades' Direct Examination PowerPoint.......  762   1109

1                 **<u>TRANSCRIPT OF PROCEEDINGS</u>**

2            (Proceedings commenced at 9:01 a.m.)

3            (Jury enters at 9:01 a.m.)

4            THE COURT:  Good morning, all.  Have a seat,

5   please.

6            All right.  We are on the record in Anderson v.

7   Raymond Corporation, 19-cv-800.  We are in the defendant's case.

8            Counsel, call your next witness.

9            MR. LoCOCO:  Your Honor, Raymond calls

10   Dr. Timothy Rhoades.

11            (Witness sworn.)

12            THE COURTROOM DEPUTY:  Please state your full

13   name spell your last name for the Court.

14            THE WITNESS:  Timothy Rhoades, R-h-o-a-d-e-s.

15            THE COURTROOM DEPUTY:  Thank you.

16            THE WITNESS:  May I take my mask off?

17            THE COURT:  Yes, you may.

18            MR. LoCOCO:  May I inquire, Your Honor?

19            THE COURT:  Yes.

20            MR. LoCOCO:  Thank you.

21                DIRECT EXAMINATION

22   BY MR. LoCOCO:

23   Q    Good morning.

24   A    Good morning.

25   Q    Please tell the jury your name.

1    A    Timothy Rhoades.

2    Q    And where do you live?

3    A    Ann Arbor, Michigan.

4    Q    And for whom do you work?

5    A    I work for Applied Safety and Ergonomics, which for about the

6         past year has been one of the companies owned by Rimkus, a

7         consulting group out of Texas.

8    Q    And what's your current position there?

9    A    I'm a vice president of the human factors practice at Applied

10        Safety and Ergonomics.

11   Q    Could you make sure the mike is close to your mouth so we

12        can --

13   A    Sure.

14   Q    -- hear you?  Could you tell the jury about your educational

15        background?

16   A    Yes.  I have a bachelor's degree in industrial and operations

17        engineering from the University of Michigan.  I have a

18        master's degree from the same department and also a

19        doctorate.  The bachelor's degree being classical industrial

20        engineering, the master degree going into more safety

21        engineering, and the doctorate dealing with -- well, it was

22        taking a look at movement behaviors of auto haul drivers as

23        they moved about equipment and what they could do and how

24        they would use it in terms of how they would climb on

25        equipment, how they would reach, so it had a lot to do with

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | physical ergonomics about that job.                          |
| 2  | Q | You mentioned ergonomics.  Dr. Rhoades, what is ergonomics?   |
| 3  | A | Ergonomics, which is also called human factors engineering,   |
| 4  |   | takes a look at the capabilities and limitations of people as |
| 5  |   | they interact with equipment and their work environment.     |
| 6  | Q | Have you been a professor?                                    |
| 7  | A | I have been an adjunct at the University of Michigan.         |
| 8  | Q | In Ann Arbor?                                                 |
| 9  | A | In Ann Arbor.  It was for about 20 years.                    |
| 10 | Q | Okay.  What sort of courses did you teach when you were at    |
| 11 |   | Michigan?                                                     |
| 12 | A | Well, as a graduate student, I was the teaching assistant for |
| 13 |   | Don Chaffin's course in occupational biomechanics.  As an    |
| 14 |   | adjunct, I taught two courses in safety management.          |
| 15 | Q | All right.  Has your scholarly work included testing and     |
| 16 |   | research?                                                     |
| 17 | A | Yes.                                                         |
| 18 | Q | Can you tell the jury about some of that, a couple of        |
| 19 |   | examples?                                                    |
| 20 | A | Well, an early example had to do with developing -- this is  |
| 21 |   | older technology going back to the '80s, the -- a portable   |
| 22 |   | transportable force plate measuring system so that you could |
| 23 |   | evaluate the forces that people placed on a product as they  |
| 24 |   | were climbing around the equipment, for example, was the     |
| 25 |   | application.  But you could also use it for slip-and-fall    |

1    research.

2              Other research that I've done has to do with

3    more the cognitive side, about how people think and evaluate

4    products.  And that would have to do with personal

5    watercraft.  We help that industry develop uniform labels.

6    So if you ride a personal watercraft, you'll have similar

7    labeling if it's a Yamaha or a Kawasaki, for example.

8  Q  Now when you say "labels," you mean safety decals?

9  A  Yes.

10 Q  All right.  Have you published over the years?

11 A  Yes, I have.

12 Q  What sorts of things have you published?

13 A  Most of the work that I've published has been in the area of

14   instructions and warnings development, but there also have

15   been some work about slips and falls.

16 Q  All right.  Dr. Rhoades, as part of your professional work,

17   have you been retained to advise on various design and design

18   issues?

19 A  Yes.

20 Q  All right.  Has that happened within the forklift industry?

21 A  Yes.

22 Q  All right.  Has that happened relative to the Raymond

23   Model 4250?

24 A  Yes.

25 Q  All right.  Are you a member of any professional societies or

|    |   |                                                                        |
|----|---|------------------------------------------------------------------------|
| 1  |   | organizations?                                                         |
| 2  | A | Yes.                                                                   |
| 3  | Q | Can you tell the jury about that?                                      |
| 4  | A | Well, a couple of the more prominent ones would be the Human           |
| 5  |   | Factors and Ergonomics Society and the Society of Automotive           |
| 6  |   | Engineers would probably be the two that are most prominent.           |
| 7  | Q | All right.  Are you a licensed professional engineer?                  |
| 8  | A | Yes, I am.  I'm licensed and registered in the state of                |
| 9  |   | Michigan.                                                              |
| 10 | Q | Have you been a member of any safety committees?                       |
| 11 | A | Yes, I have.                                                           |
| 12 | Q | Can you tell us which ones?                                            |
| 13 | A | Well, for ten years, I was on a forklift subcommittee                  |
| 14 |   | designated as B56.11.  And I also served -- I think it was             |
| 15 |   | for ten years on the American Society of Safety Engineers,             |
| 16 |   | their standards development committee that oversaw the                 |
| 17 |   | development of many so-called national consensus standards.            |
| 18 |   | And currently, I'm a member of the ANSI Z535 committee, which          |
| 19 |   | has to do with safety signs and labels.                               |
| 20 | Q | All right.  I noticed looking at your CV, your curriculum              |
| 21 |   | vitae, that you're a CPE; is that right?                               |
| 22 | A | Yes.                                                                   |
| 23 | Q | What is a CPE?                                                         |
| 24 | A | That's a certified professional ergonomist.                           |
| 25 | Q | Ergonomist?  Again, that's your focus, ergonomics?                     |

1   A   Right.

2   Q   Doctor, do you have training, education, and/or experience

3       with respect to warnings and decals?

4   A   Yes.

5   Q   And training materials?

6   A   Yes.

7   Q   All right.  Have you been certified to operate the

8       Model 4250?

9   A   Yes, I have.

10  Q   Do you do consulting work like this on matters that are in

11      litigation?

12  A   Yes, I do.

13  Q   Prior to this case, had you and I worked on any litigation

14      matters in the past?

15  A   No.

16  Q   Does your company charge for your time?

17  A   Yes, it does.

18  Q   How much per hour?

19  A   450 per hour.

20  Q   All right.  Do you have an estimate, a recollection of when I

21      called you to ask for assistance in this case?

22  A   My best recollection was mid November of last year I believe

23      it was.

24  Q   All right.  Prior to that call, had you done any other work

25      for Raymond?

1    A    Yes.

2    Q    Was it related to a lawsuit?

3    A    No, it was not related to a lawsuit.

4    Q    All right.  What did that work involve?  Tell us what

5         happened.

6    A    So I was contacted by Raymond in August of last year, and

7         they were interested in having an ergonomic assessment done

8         of their 4200 series forklifts.  And so we prepared a

9         proposal and we worked in conjunction with another company,

10        Exponent, which had special expertise in remote data

11        acquisition.  And so we prepared a proposal, and during

12        basically the month of September was data collection, October

13        was analysis, and I wrote up a report.  I think it's dated --

14        I think it's November 9th of 2020.

15   Q    Who called you from Raymond?

16   A    Bob Kerila.

17   Q    Is he an engineer there?

18   A    Yes, I believe he's their chief engineer.

19   Q    All right.  So I want to talk about this study that you did

20        for Raymond last August, September, October.  This first

21        slide, is this the cover page to your report?

22   A    Yes, it is.

23   Q    All right.  This ergonomic assessment of Raymond standup

24        counterbalance lift trucks, how many phases were there in

25        your analysis?

1    A    Within the study itself, the assessment, there were two basic
2         phases.
3    Q    What were those two phases?
4    A    Well, I called it an initial assessment and then a
5         naturalistic study.
6    Q    All right.  I want to talk about the initial assessment.
7         What were you -- what was your goal in the initial
8         assessment?
9    A    Okay.  Well, this particular slide shows the overall
10        objectives, and that was to do an ergonomics assessment of
11        the 400 series.  And we were taking a look at, does it
12        accommodate a range of operator anthropometries, a small
13        person, a large person.  And does it allow for posture
14        changes as you operate the vehicle.  And again, we did it in
15        two stages, the initial ergonomics assessment and then a
16        naturalistic study of forklift operation.
17   Q    You used this term "anthropometries."  What's
18        anthropometries, or what's anthropometrics?  I can't even say
19        it.
20   A    Sure.  So anthropometric measures are measurements of people.
21        If you have a baby and there's a growth chart, that's based
22        on anthropometric data so that at a particular age, some -- a
23        certain proportion of kids will be 20 pounds.  And so there's
24        all sorts of data like this that is measured and available to
25        engineers to help design equipment so it -- and human factors

1    engineers use this to help make sure equipment fits people

2    well.  That's anthropometric data that you're using.  It's

3    measurements about people.

4  Q  So just tell us generally how you structured the first part

5    here, the initial ergonomics assessment.  What did you do?

6  A  Well, the first thing we did is we took forklift training so

7    that we would be certified to operate the forklift, and then

8    operate the forklift myself so that you would have some

9    exposure to the forklift firsthand.  Then you take

10   measurements of the forklift, certain critical measurements

11   about how a person would interact with the forklift, and you

12   compare that to anthropometric data about people to see if

13   there's a good fit.  So that was the basic procedure that was

14   used, and then there are various observations from that.

15 Q  Before we get further into both of these phases, I want to

16   ask you about this next slide, "Direction and Movement

17   Terms."  Tell us why you put this slide into your direct

18   examination.

19 A  Sure.  Well, this was a slide that I had in a slide

20   presentation when I was giving a talk about this to

21   engineers.  And it's important that we're talking the same

22   language in terms of orientation.  So what you see on the

23   right is a description of the operator orientation.  And so

24   if the operator is facing the forks, we call that 0 degrees.

25   And then if the operator's facing -- if the operator were to

1     face the other direction, that's 180 degrees.  And if he's

2     facing just between those, that would be 90 degrees.  Okay?

3     And then as far as the right-hand side, is the side that has

4     the back pad -- I'm sorry, there's a right on the -- over

5     here, Frank.  I can do it.

6  **Q**    You can draw.  There you go.

7  **A**    That's the right side.  And then we can -- the other side is

8     the left side.  If you're going in the direction of the

9     forks, then you're traveling either forward or forks leading.

10    If you're going the opposite direction, you're going rearward

11    or forks trailing.

12  **Q**   All right.  So we're talking now about your initial

13    ergonomics assessment.  You told the jury you got operator

14    training.  You examined a 4250 forklift.  What did you do

15    next?

16  **A**   Well, then I used various anthropometric data that I explain

17    in slides, but there are a couple SAE standards that take a

18    look at the size of people that use equipment in work places.

19    One of them has to do with reach capability, to reach

20    controls.  The other one just has to do with height, weight,

21    the size of your feet, just all sorts of anthropometric

22    measures that may be available.  NHANES, that's a national

23    database.  That's where you get the data about how kids grow.

24    And they also have adult data, and it's a nice dataset

25    because it gets reviewed very systematically.  It's a very

1    large dataset.  So as the population changes, the NHANES data

2    is good.

3                      I referred to MIL-STD 1472, which is the human

4    factors guide to equipment design that's used by the

5    military.  And I also looked at a book, *The Measure of Man*

6    *and Woman*.  It's currently published by a guy name Tilley

7    from 2002, but this book has been around for a real long

8    time.  *The Measure of Man* was first published and developed

9    by Henry Dreyfuss and Associates, who was a real important

10   person in the world of ergonomics back in the '70s.

11  Q   All right.  Then was part of what you did in the initial

12   ergonomics assessment was to take some photographs?

13  A   Yes.  I took a couple of photographs in parts to orient

14   people for presentation such as this to -- so that you can

15   kind of get oriented to the vehicle, and then I'm going to

16   give you some of the results.  So what we see here is the

17   perspective view of the operator's compartment on the left,

18   and you can kind of get a general orientation to it.  And

19   also a rear view, and this would be important for sort of

20   vertical measurements about how a person interacts with the

21   operator compartment.

22  Q   So based on your initial ergonomics assessment, did you draw

23   some conclusions?

24  A   Yes, I did.

25  Q   And are those listed here on this next slide?

1   A   Some of those conclusions are on this slide, and then it goes

2       on --

3   Q   So tell us about that.

4   A   In this slide, what we're seeing is -- so remember that

5       figure where you had the man standing there on the right-hand

6       side?  What we know is the floor to overhead guard clearance

7       accommodates beyond the 95th percentile male.  And what that

8       concept is, when we talk about the 95th percentile male, that

9       means the only people that are taller would be 5 percent of

10      males would be taller than that.  And so we often look at if

11      it -- does it accommodate the 5th percentile female, all the

12      way up to the 95th percentile male.  Sometimes we go even

13      further.  We'll go to even the 2.5 percent female all the way

14      up to the 97.5th percentile male.

15              This one -- I was looking at the data for the

16      95th percentile male, and it clearly has sufficient room for

17      a tall man to be in the vehicle.  Then I took a look at the

18      vertical placement of the back pad, and it accommodates the

19      5th percentile female to the 95th percentile male.  And what

20      you need is you need a back -- the back pad has to go low

21      enough so that a short woman can put her body against it

22      well.

23  Q   How is that determined?

24  A   Well, the figure that I used -- may I stand?  So what I

25      looked at was there is anthropometric data for the crotch

1    height of a 5th percentile woman, and that's 27 --

2    28.7 inches.  And the back pad goes low enough so that we're

3    confident that the woman can lean back against the back pad

4    and she'll hit the pad and not the curb at the bottom or not

5    the metal below the back pad.

6                    Similarly, for the 95th percentile male, here

7    we're looking at the hip pivot height of 40 inches for the

8    tall male, and so the tall male can also lean against the

9    back pad.  So these are a couple examples of using

10   anthropometric data to make sure that we have a good fit with

11   respect to the back pad.  Similarly --

12   Q   I got to ask questions.

13   A   Sure.

14   Q   Did you look at the heights of the controls to see if they

15       would accommodate people?

16   A   Yes.  Similarly --

17   Q   How'd you do that?

18   A   I did as well.  So the height of the steering tiller is

19       40 inches above the floor of the operator's compartment, and

20       the height of the multifunction control is 42 inches.  And so

21       the question is, are those reasonable?  Well, when you look

22       at elbow height, to take a look at that -- and the elbow

23       height for the 5th percentile woman is 37 inches and for the

24       95th percentile man, it's 45.6 inches.  And so both of these

25       controls are moderate in terms of their height with respect

| | |
|---|---|
| 1 | to these dimensions, so that's reasonable as well.  And the |
| 2 | data sources, the SAE standards, the NHANES and MIL-STDs are |
| 3 | all listed below the ones that I was using for this |
| 4 | evaluation. |
| 5 | Q   So what are we looking at here with this top view of the |
| 6 | compartment? |
| 7 | A   So this -- we lost it. |
| 8 | Q   Yeah, it does that periodically.  There it is.  Okay.  So I |
| 9 | think we were talking about observations from this top view |
| 10 | of the compartment. |
| 11 | A   Correct.  So this is just to get you oriented to the top |
| 12 | view, sort of a straight-down top view of this.  So then you |
| 13 | have -- you're oriented to the results that are related to |
| 14 | reach. |
| 15 | Q   All right.  So you -- so based on that, you formed an |
| 16 | opinion -- these opinions that we see on this next screen. |
| 17 | Tell us about that. |
| 18 | A   I'm sorry, could we go back to the -- |
| 19 | Q   Sure. |
| 20 | A   Okay.  What I -- |
| 21 |                   THE COURT:  I'm sorry.  He gets to ask the |
| 22 | question.  Are you -- are you rejecting his question -- |
| 23 |                   THE WITNESS:  No, no I'm not. |
| 24 |                   THE COURT:  So ask the question. |
| 25 | BY MR. LoCOCO: |

1   Q   Let me withdraw that question and go back to this slide here

2       and ask you what you were -- wanted to point out from this

3       slide.

4   A   Sure.  There are two -- in addition to where the controls

5       are, this view gives you a view of the -- where your feet

6       are, the floor of the compartment, and also the back pad.

7       And notice that the back pad is a little wider at the top

8       than it is at the bottom in terms of its functional width.

9   Q   Why is that important?

10  A   Well, the next slide helps explain that.

11  Q   All right.  Explain why the width up higher is more

12      important.

13  A   All right.  Well, so the functional width of the back pad is

14      about 16 inches toward the top and 14 inches toward the

15      bottom.  And that's really nice, because the shorter person,

16      the 5th percentile woman, has a seated hip width of

17      12.8 inches, and that compares well with that 14 inches at

18      the bottom, versus the taller man who has a hip width of

19      15.8 inches.  So the taller person gets a little bit more

20      functional width.  So that's a good attribute of the contour

21      of that back pad.

22  Q   Now you said "seated hip width."  The operator in this 4250

23      is standing.  Why are you using seated hip width data?

24  A   So the operator is leaning, so you're going to have a little

25      bit of soft tissue movement when you lean, just as you do

1       when you sit, but it's more extensive when you sit.  The

2       problem is is when you're using anthropometric data, there

3       isn't anthropometric data for every contingency.  So I looked

4       at this data as being essentially the best available data for

5       this particular part of the evaluation.

6   Q   What did you determine regarding the floor surface, the

7       surface area?

8   A   Well, I took a look at the 95th percentile shoe length, so

9       this is the length of a foot with a shoe, and that's

10      12.6 inches.  So only 5 percent of male shoes are longer than

11      12.6 inches.  And I looked at the width, 4.6 inches.  Only

12      5 percent of male footwear is wider than 4.6 inches.  And you

13      compare that to the surface area of the floor and there's

14      plenty of room to get both feet on the floor.

15  Q   So then you told us that you looked at the steering tiller

16      and multifunction control locations.  Tell us about that part

17      of the analysis.

18  A   Correct.  And so I looked at the SAE Standard 898 from 1994

19      about what they call the zone of comfortable reach.  And so

20      things are more comfortable to reach if it's directly in

21      front of you, and you can also reach it pretty well if it's a

22      little bit to the side.  So what we have here is a standard

23      that was originally developed for seated controls and reach.

24      And when you compare these -- this reach envelope to what the

25      operator has to reach with the tiller control and the

1    multifunction control, you're in a good zone for the

2    placement of those.  It's not the same as being seated in a

3    tractor, and so it's not the same as being seated, but this

4    is again the best data.  When you're standing, it tends to be

5    a little bit -- you have a little bit more freedom of

6    movement, so the placement of these controls is reasonable

7    with respect to the reach.

8  Q  Did you look at the armrests as well?

9  A  I did.  The multifunction control has an armrest right next

10    to it.  And the product that we were sent to evaluate that we

11    had available actually has wear patterns.  You can see wear

12    here, here, and here.  And that's an indication that they're

13    being used, that the armrest is a place where if you choose

14    to do so, you can rest your arm to help support your arm

15    while you're using the multifunction control.

16  Q  There looks to be like a rest there and a rest there and a

17    rest there.  Is that what you observed?

18  A  Yeah.  Well, there are three different rests, and those rests

19    are at different elevations.  So for the larger person,

20    that's the one that is furthest away from the compartment

21    here, that may fit better more for the large person.  And

22    then somebody that's a little bit shorter may like the one

23    that's nearer to the compartment.

24  Q  Did you also analyze the design of the deadman brake that's

25    inside the 4250?

1   A      Yes.

2   Q      So we're looking at the deadman brake pedal.  What were your

3          observations about that, Doctor?

4   A      Sure.  So --

5                      THE COURT:  Can we -- let's take a five-minute

6          break.

7                      MR. LoCOCO:  And figure this out.

8                      THE COURT:  And hopefully we'll get a handle on

9          modern technology.

10                     (Jury exits at 9:28 a.m.)

11                     (Recess from 9:28 a.m. to 9:34 a.m.)

12                     (Jury enters at 9:34 a.m.)

13                     THE COURT:  Please be seated.  All right.  We're

14         back on the record.  I think we figured out that there's a piece

15         of our equipment that was malfunctioning, not the lawyers'

16         equipment.  So we've changed a few things around and hopefully

17         that will get it done.

18                     MR. LoCOCO:  Okay.  Thank you, Your Honor.

19                     THE COURT:  Please continue.

20  BY MR. LoCOCO:

21  Q      So before we took the break, I was asking you about your

22         analysis of the deadman brake as part of your initial

23         ergonomic assessment.  Tell us about your analysis of the

24         deadman brake pedal on the 4250.

25  A      Well, as you can see from the photograph, the deadman pedal

1    is in the forward left corner as we defined those terms

2    before.  And that location is such that you can step on the

3    pedal, depress it with either foot, the left or the right

4    foot.  But it's also located so that pressing it with both

5    feet at the same time, which you're not supposed to do, but

6    it's unlikely that you would do that based on where it's

7    placed.  It takes 10 pounds to depress the pedal with your

8    foot.  But -- and you can depress it with the ball of your

9    foot, and that's really nice because then you can lift your

10   heel if you want to get some relief for your leg.  You don't

11   have to keep your heel down on the floor of the compartment.

12   And so that's kind of the findings about the deadman's pedal.

13   Its location is reasonable, you can use it with just the ball

14   of your foot, and depressing it with both feet at the same

15   time is unlikely.

16 Q I just want to ask you about this using Exhibit 157.  So what

17   you're just saying is if your right toe is on the deadman

18   brake pedal, on the brake pedal, you said the operator could

19   still lift up the right heel?

20 A Exactly.  You can do a heel lift.  And that helps --

21   basically you stay away from static postures.  You want to

22   avoid something where you make somebody stay in a fixed

23   posture for a long time.  Imagine if I had my arm out.  After

24   a while, it is really going to start to hurt if I just kept

25   my arm out to my side all day long.

1    Q    So did you also look at the floor and the back pad?

2    A    Yes.

3    Q    Tell us about those, that part of the analysis.

4    A    There's a back pad that we talked about earlier.  And the

5         back pad has a contour.  It's not just the functional width.

6         There's also what we call a hip return.  It helps cradle you

7         in that back pad.  But another thing is how the floor works.

8         The floor is tilted a little bit back toward the back pad to

9         help encourage operator interaction with the back pad.  It's

10        actually tilted just a little bit back toward the back pad

11        and a little bit forward to help make sure the person is

12        cradled in that -- with the back pad and the hip return.

13   Q    I want to go back to one of these pictures.  This one is

14        good.  You talked about the hip return.  Could you point that

15        out for the jurors?

16   A    Sure.  So the hip return is right here, this segment that

17        kind of goes out toward the opening.  Here's your functional

18        width and here's the hip return portion.  And there's also a

19        similar curve at the front as well.

20   Q    All right.  Anything else about the first part of your

21        analysis, the initial ergonomic assessment?

22   A    Yeah.  I think there's one more bullet on the previous slide.

23        So the hip returns, they provide support that reduces the

24        need to try to maintain your balance by shifting weight back

25        and forth between your legs, and it reduces the need to

1        adjust your stance like I was just doing, shifting back and

2        forth, to resist vehicle forces.  The back pad is really,

3        really helpful in terms of maintaining balance in the

4        vehicle.

5  Q    All right.  Then the second part of your analysis was what

6        you're calling a naturalistic study of forklift operation.

7        Why are you calling it a naturalistic study of forklift

8        operation?

9  A    Well, it's contrasted to a laboratory study or some other

10       sort of study.  A naturalistic study is where you try to

11       instrument a person and/or a vehicle in such a way that you

12       can get data, people using things in sort of a natural way,

13       in their normal work environment.  We're doing that more and

14       more with automotive research, where we're trying to figure

15       out like in the real world, how much do people use their

16       phones and how much do people text and how much time do

17       people spend taking their eyes off the road.  So that's where

18       the naturalistic data collection is very, very popular, and

19       we have technologies that are allowing us to do that now.

20  Q   So what technologies are allowing -- first of all, were those

21       technologies used in this analysis?

22  A   Oh, yes, we did use those sorts of technologies here.

23  Q   And what are those technologies that allow a naturalistic

24       study?

25  A   Well, in this particular study, what we have -- everybody's

```
 1          familiar with Fitbit, and you can attach that to your wrist
 2          or your belt.  And the Fitbit can tell how far you've walked
 3          and it can tell how many stairs you went up and down and so
 4          on.  And that's because that little Fitbit has all of this --
 5          all of these -- has gyroscopes and accelerometers in it that
 6          can help take all those measurements.  And so that has
 7          evolved in such a way that we can take Fitbit-like devices
 8          and attach them to a person and we can have the person move
 9          around and keep track of how they're moving around without
10          having them attached to umbilical cords or being wired up in
11          order to take that data.  That's a big advancement.  You can
12          take data without having somebody so wired up, and that's an
13          example of the technologies that were used in this study.
14     Q    All right.  So where does the actual data collection -- where
15          did it take place?
16     A    It took place at Raymond's Greene, New York, warehouse.
17     Q    And were you out there when the data was actually getting
18          collected?
19     A    No, I was not at the facility.  There were COVID travel
20          restrictions.  We were collecting all of this data in the
21          middle of COVID, so no, we could not travel to the facility.
22     Q    So tell us what steps you took to move forward with this
23          study.
24     A    So we had a kit that was developed with the forklift that we
25          had available in the Ann Arbor area.  It was actually at
```

1    Exponent's facility near Ann Arbor.  And we were able to get

2    all of the equipment set up.  And there are going to be

3    pressure pads that are used, there are going to be different

4    power units, all sorts of equipment that are used in order to

5    collect this remotely.  And they pack it all up and they give

6    instructions about how to do it on a forklift at the Raymond

7    facility.  And that's exactly what they did.  They made

8    basically a test kit of equipment with instructions about how

9    to set it up on another forklift at the Raymond facility, and

10   that's how we proceeded.

11 Q  Who was in charge of this program, this test program?

12 A  Overall, I was in charge of the program.  I -- Exponent has a

13   tremendous amount of experience and expertise with this kind

14   of equipment, so they were doing a lot of the work developing

15   this.  I had one of my employees go over and help watch and

16   so that we understood how the equipment was being set up,

17   then it was shipped over to Exponent -- I'm sorry -- to

18   Raymond.

19 Q  You said that operators were instrumented as part of this?

20 A  Yes.

21 Q  What did you do with respect to -- strike that.  Did you just

22   pick one operator?

23 A  No.

24 Q  What did you do there?

25 A  Well, the goal was to try to get a range.  So when you do a

1      study like this, you would like to not just do the average

2      man, but you want to get somebody that might be shorter, you

3      might want to get somebody that's larger.  And so we set up

4      some goals, if you will, in terms of the people we would like

5      to get.  I think I have that on a slide.

6   Q  Yeah.  So what were the goals as far as size of operators

7      that you --

8   A  Sure.

9   Q  -- that you requested?

10  A  So what I asked is, please try to get a small operator no

11     taller than 64 inches, preferably 61 inches or less; medium

12     size operator, one or more medium operators, 64.5 inches to

13     70.5 inches; and a large operator, over 72 inches, preferably

14     over 74 inches.  And that's -- they were able to do that for

15     me.

16  Q  So down here at the bottom of this slide, the participants

17     are numbered 1 through 4.  Are those the actual operators

18     that you used for your study?

19  A  Yes.

20  Q  And tell us about their anthropometries.

21  A  So we got for the small person, we have a woman who was

22     61 inches tall.  These are all measurements with shoes.  For

23     the medium size, we had two operators that were 70 inches,

24     both male.  And then we had a male who was 75 inches.  So we

25     got the -- we're in the preferred range for getting both the

1  small and the large covered, and we also got the middle

2  covered as well.

3  Q  So the 70-inchers were 5-foot-10.  The 61-inch woman was

4  5-foot-1?

5  A  Yes.

6  Q  And the 75-inch man was 6-foot-3?

7  A  Yes.

8  Q  All right.  And you also recorded their range of experience.

9  A  Right.  So --

10  Q  Why is that?

11  A  Because we didn't want to have an effect that was related to

12  somebody who was a novice or unfamiliar with the vehicles, so

13  we had the years of experience.  And it ranged from seven

14  years' to 30 years' experience.

15  Q  So you said that you also instrumented the truck.  Let's talk

16  about that.  Tell us how you instrumented the truck for this

17  analysis.

18  A  Well, this slide involves all the pressure mats, and so there

19  are five different kinds of pressure mats:  One on the floor

20  that you're standing on, a separate pressure mat that's on

21  the deadman pedal, a pressure mat on the back pad and hip

22  return area, one on the armrest area, and then also one on

23  the vertical surface on the left side of the vehicle, so this

24  is on the opposite side of the back pad on the lower area.

25  And I was interested if anybody was hitting their knees on

1    this or if they would be using that in some way.  I just

2    suspected that that might be something we would want to take

3    a look at, so we put a pressure pad on that.  In addition,

4    this slide also talks about pressure pads.  There were also

5    pressure insoles that would be put in the operator's shoe.

6                    MR. LoCOCO:  Your Honor, may I just have a moment

7    to confer with Mr. Warshauer?

8                    (Discussion off the record.)

9  BY MR. LoCOCO:

10  Q   Dr. Rhoades, did you bring a strip of those pressure circles?

11  A   Yes.

12  Q   If you could hold that up.  Just tell the jury what we're

13      looking at here.

14  A   This is the pressure pad material, and each one of these can

15      detect pressure.  And so in the sum of this, we can get a

16      sense of where the foot is, where there's contact, and you

17      can also aggregate that and try to -- you can do -- try to

18      find out the amount of force in aggregate and where the

19      center of pressure is.  So this is the pressure pad.  In the

20      photos, you won't see green material like this because it was

21      covered with tape.  We didn't want people to feel like they

22      were surrounded by measurement instruments, so we covered it

23      with black tape.

24  Q   So if we go to the floor of the test truck compartment, what

25      are we looking at here?

1   A   We're looking at the pressure mat with the -- you can just

2       see, if you look very carefully, little tape strips here, so

3       it's covered with the tape.  And this is after it's been used

4       a little bit, so you can see some areas where it's

5       particularly worn is areas where people have been stepping on

6       it.

7   Q   Did you do something similar then with the back pad?

8   A   Yes.  There were the pressure -- the pressure pad, and then

9       it was covered with tape.

10  Q   And up in this area, what is that?  Tell us what area that

11      is.

12  A   Well, now we're getting past the back pad area into the

13      armrest area.

14  Q   All right.  So what are we looking at in this photograph, the

15      next one?

16  A   These are pressure pads covered by tape over the armrest

17      area.

18  Q   All right.

19  A   And --

20  Q   Whoops.

21  A   I noticed this could become a little bit important later.

22      This area is -- there's an area below which it's not covered

23      by pressure pad.

24  Q   All right.  Then what area of the forklift are we looking at

25      here?

1   A   Now we're looking at that vertical wall that's opposite of
2       the back pad.  So if you were to bend your knees forward or
3       move your knees forward, you would hit that -- hit that wall,
4       and so we have the pressure pad.  It's covered by tape.  And
5       then you have -- all the data moves up here, and then it
6       gets -- it moves through wires and gets stored.
7   Q   Is the steering tiller up here?  Just to orient the jury.
8   A   Yes.  The steering tiller would be right up here.
9   Q   All right.  Again, using 157, orient ourselves.  That picture
10      that we're looking at, there is the wall that's in front of
11      the operator when he or she is -- has his right arm or her
12      right arm to the forks, left arm to the opening?
13  A   That's correct, although your indications were a little high.
14      It's low.
15  Q   Right.  Okay.  You mentioned pressure insoles.  Is that what
16      we're looking at here?
17  A   Yes.
18  Q   And where did those go?
19  A   They go right in the operator's shoe, so you slip those in.
20      And there were different sizes available so that you could
21      get one that would be -- fit well in your shoe.  And again,
22      no wires are connected to anything with this.  The data is
23      stored right in little storage units at the bottom of this.
24  Q   All right.  You told the jury that you also put devices on
25      the operators when they were operating?

1   A   Yes.

2   Q   And so what are we looking at here?

3   A   Well, these are these -- they're called IMUs.  These are

4       these Fitbit-like devices.  And there's one on the toe of

5       each foot, there's one on each ankle, there's one at the low

6       back, and there's one at the upper back.

7   Q   All right.  And then you said there's -- these ones here.

8       Near forklift, CG captures forklift motion.  What's that?

9   A   Well, it's -- we have a Fitbit that would -- it's right here,

10      and I think there was another photo.  Well, this is the --

11      where the pad that was -- could measure knee contact.  At the

12      top of that pad, to the right of it, or to the forward area

13      of the vehicle, we put an IMU unit in order to track the

14      motion of the forklift.  Because the forklift -- the operator

15      could do their normal job and go anywhere they needed to go,

16      and so this was to keep track of where the forklift was.

17  Q   So then these four operators, what were they told to do?

18  A   They were told to just go about their normal day.  They could

19      contact somebody if they had any concerns, but they were just

20      to go about their normal day doing their job.

21  Q   If someone's operating in this truck, aren't they going to

22      know that it's, you know, that it's collecting data and

23      there's other -- this other equipment there?

24  A   You know, perhaps for a few minutes, but this naturalistic

25      data, the whole idea is that after a while, you aren't

1    conscious of it.  It's like if you wear a watch, you're not

2    always conscious of wearing a watch or a wedding ring or if

3    you wear a Fitbit.  So in this case, the idea -- that's the

4    whole idea of naturalistic study.  You're not hooked up with

5    a bunch of wires.  All these things are lightweight.  And

6    hopefully we're getting as close to the natural behavior of

7    these participants as they would have on any other day.

8  Q  And how often are you sampling data while the operator is

9    operating?

10 A  It depends on what kind of data that we're looking at.  So

11   the floor mats, you don't need to sample quite as much, but

12   they were doing that eight times a second.  The IMUs, they

13   were sampling over a thousand times per second.  And the

14   insoles of the shoe, I think that was at 10 hertz or 10 times

15   a second.

16 Q  So you sampled at a thousand times per second.  One hour is

17   3,600 seconds?

18 A  Yeah.

19 Q  So that's 3.6 million bits of data?

20 A  It's a lot of data.

21 Q  It's a lot?  All right.  So I want to talk about some of the

22   data that you gleaned from conducting these tests.  Let's

23   talk about each of these participants and what you learned

24   from their operation during their -- each of their shifts.

25 A  Okay.  Let's just go through Participant 1.  The naturalistic

1    observation time from the time we're saying, "Okay, you're

2    good to go, you can go about doing their job," they were

3    observed for 464.9 minutes.  Of that time, they're going

4    about their normal business doing their normal job.  So

5    266 minutes was time on the forklift.  But when you're on the

6    forklift, some of the time the forklift isn't moving.  So

7    200.9 minutes, the forklift was moving.

8              For Participant 2, we again had a full shift.

9    And the time on the forklift was 272 minutes, but the

10   forklift was only moving 137 minutes.

11  Q   A little over two hours?

12  A   A little over two hours, yeah.

13  Q   All right.

14  A   Two hours and 20 minutes, approximately.

15             And then for Participant 3, again, a full

16   shift.  Time on the forklift:  254 minutes.  And time moving:

17   148 minutes.  And so we're focusing on this time when the

18   operator's actually moving the forklift.

19             Participant Number 4 -- this is the

20   short-statured woman -- 348 minutes was the length of her

21   shift that we were taking the observations.  And she spent

22   more time as a percentage on the forklift.  She spent

23   395 minutes essentially on the forklift, and she was

24   operating it 211 minutes.  So even though she was observed

25   for the least amount of time in terms of the overall

1    observation, she actually had the most time actually moving

2    the forklift.

3  Q  Did you videotape all this movement per shift?

4  A  We had a video feed so that we could make sure that we were

5    actually getting data, but we did not have a videotape

6    recording of all this.

7  Q  Why not?

8  A  Well, the idea was to get quantitative data.  And so if you

9    are just watching people, that's not going to be

10   quantitative.  So I can tell that somebody might be touching

11   the back pad, but how much force are they applying?  By

12   having pressure pads, we can measure forces and be

13   quantitative about our analysis.

14 Q  If you put a camera on the overhead guard down into the

15   compartment, does that have an impact on the type of video

16   you're able to get?

17 A  Sure, it does, because then you also get a big problem of

18   data getting obscured.  So if your camera's on top so you get

19   a good view of what's happening with one part of the body,

20   then you can't see, if you will, the contact at the back

21   lower part of the back pad because the upper body will be

22   blocking it.  So that's another problem that happens with

23   video.

24 Q  All right.  So did you determine the direction of travel that

25   these operators went in when they were actually moving on the

| | | |
|---|---|---|
| 1 | | forklift? |
| 2 | A | Yes. |
| 3 | Q | All right.  And is that represented by this next slide? |
| 4 | A | Yes.  Actually, all the time that they were on the forklift |
| 5 | | is represented. |
| 6 | Q | Explain that to us. |
| 7 | A | So in the middle, we have a big pie chart, and it's |
| 8 | | explaining what the average was for all of the subjects or |
| 9 | | all of the participants.  And the blue is the time when |
| 10 | | you're just not moving.  And on average, 37 percent of the |
| 11 | | time, they're in the forklift but they're not moving.  They |
| 12 | | might be talking to somebody who's passed by and they stop |
| 13 | | and chat.  They might be trying to get information about the |
| 14 | | next order they're supposed to pick or the next thing they're |
| 15 | | supposed to do.  But for whatever reason, 37 percent of the |
| 16 | | time on average that these operators were in the forklift, |
| 17 | | the forklift wasn't moving.  13 percent of the time, it was |
| 18 | | going rearward, which I've labeled as "Reverse."  And 50 -- |
| 19 | Q | Let me just stop you.  When you say "reverse," you mean forks |
| 20 | | trailing? |
| 21 | A | Forks trailing. |
| 22 | Q | Compartment first? |
| 23 | A | That's right.  That's right. |
| 24 | Q | Okay.  And then forward? |
| 25 | A | Forward or forks leading, 50 percent of the time.  So on |

1      average, people go forward more than they go in reverse.

2  Q  And then the corners of this slide, you show the same data

3      but by participant?

4  A  Correct.  Participant 1, Participant 2, 3, and 4.

5  Q  All right.  Did you also obtain data on the operator's

6      foot -- feet position during their time on the forklift?

7  A  Yes.

8  Q  And so what are we looking at here?  "Position of Operator

9      Feet on Floor."

10  A  What we're looking at -- you might recall the photo before

11      where there was some dirt on it, and that was one indication

12      of where people placed their feet was just where the dirt

13      was.  But we also have these pressure pads, and so what we

14      have is a heat map.  So if you have these bright-colored

15      areas, that's an area where there's contact more frequently

16      than --

17  Q  You mean like this here?

18  A  That would be an area of frequent contact, yes.  But if it's

19      illuminated but not colored green or orange, then there's

20      contact there as well, it's just not as frequent.  And what

21      we see in this figure is all of the data, and this is for the

22      left-foot positions, and this is on the other side for the

23      right-foot positions.  And we see that some operators were

24      depressing the pedal with their left foot, and we also had

25      other operators, three of the operators, use predominantly

1    the right foot to depress the pedal.  And the other things

2    that are noteworthy are that we see that a good amount of the

3    floor is being used at some time or another by the left foot

4    and the right foot, depending on that operator's preference,

5    or they might shift their position throughout -- during the

6    shift.

7              The other thing that's noteworthy about this,

8    even though the pressure pad covers the entire floor area --

9    apologize for my not quite straight lines.  You see this

10   strip where it's still black.  There isn't that little blue

11   area.  And that's because as the computer was assessing this

12   data, they found no data along this black strip here

13   underneath the back pad, nor was -- there was no data found

14   here, and there's a little area up here where there's no data

15   as well.  And you see that as well for the right foot.

16   There's certain areas where there was no data found at any

17   time for the rows or the columns of this array of pressure

18   sensors.

19 Q  Now you mentioned that one of the operators used a left foot

20   principally on the deadman pedal; the three others used the

21   right foot.  Did you capture that as a percentage of time?

22 A  Yes.  So Operator 1 exclusively used the right foot on the

23   pedal, as did Operator 3.  Operator 2 almost always had the

24   right foot on the pedal, but just on -- just less than

25   1 percent of the time used the -- used their left foot on the

1    pedal.  Operator 4, the smaller stature woman, she liked to

2    basically face forward as her overall posture, and she had

3    her left foot on the brake almost all the time.  But a little

4    over 1 percent of the time, she too used her right foot.  So

5    this is -- this demonstrates that the pedal can be used by

6    the left foot or the right foot.

7  Q   All right.  Did you also study the position of the feet with

8    regard to those operators who only used the right foot on the

9    pedal?

10 A   Correct.  To help clear this up in terms of analyzing it, I

11    separated out the data so that we could take a look at only

12    when the right foot is used.  Now what patterns do we see?

13    And so here are left-foot positions.  And you might -- you

14    see a lot of contact here, which might be like the left heel,

15    but sometimes you see contact here and sometimes you see

16    contact here, so there could be a different orientation of

17    the foot.  Some -- and here, on the right-hand side, of

18    course we have contact because the vehicle's in motion.  We

19    know that the deadman pedal is depressed.  But we don't see

20    just one spot for the heel.  We see an area, different areas

21    where the heel may be placed.

22 Q   So then you -- did you come to court today to show the jury

23    how you cut up this data?  For example, left foot only on the

24    pedal?  Is that what we're looking at here?

25 A   Well, it's the same thing I just did when the right foot was

|    |   |                                                            |
|----|---|------------------------------------------------------------|
| 1  |   | on the pedal, but now this slide shows it.  What about when |
| 2  |   | the left foot is on the pedal?  So if somebody has their -- |
| 3  |   | they're using the left foot on the pedal -- so here's the   |
| 4  |   | ball of the foot -- I'm sorry.  I don't know how that       |
| 5  |   | happened, that pink mark.  We'll start again.  Okay.  So    |
| 6  |   | here -- I did it again.  There's the ball of the foot and   |
| 7  |   | here's the heel, and we don't see as much variance.  But over |
| 8  |   | here with the right foot, we do see something that is a     |
| 9  |   | little bit more varied in terms of where the foot is placed.|
| 10 | Q | And this is Participant 4?                                  |
| 11 | A | This is -- almost all of this is from Participant 4.        |
| 12 | Q | All right.  Did you also look at position of feet on the    |
| 13 |   | floor by each operator so that you've got it split up by    |
| 14 |   | operator here?                                              |
| 15 | A | Yes.  So we could see it all at the same time.  And what we |
| 16 |   | did, something here, we put them all on the same slide so you |
| 17 |   | can see it at the same time.  The other thing we did is we  |
| 18 |   | put a circle around that area that represents 95 percent of |
| 19 |   | the contacts.  And we do that to try to take out something  |
| 20 |   | that's maybe just very un-commonplace, so you could see --  |
| 21 |   | helps see the data a little bit better, if you will.        |
| 22 |   | And so Operator 1 is a person that uses the                 |
| 23 |   | right foot on the pedal and has a little bit of variance    |
| 24 |   | about where they have their heel.  Notice Operator 2 is also |
| 25 |   | somebody that uses their right foot, and they have a        |

1   different orientation of where they have the heel compared to

2   Operator 1.  Similarly, Operator 3 uses the right foot on the

3   pedal and has fairly different pattern for where the left

4   foot is compared to Operator 2.  And finally, we have

5   Operator 4.  She uses her left foot on the pedal and her

6   right foot is toward the right side of the vehicle.  And now

7   this is a little bit different than what we said before,

8   because we took out that 5 percent of the data that was in

9   the previous slide.  Sometimes she would have her foot a

10  little bit closer, sometimes a little bit further away from

11  the pedal.

12  Q   All right.  So then I don't want to spend time on these next

13      two slides, but you did foot position during reverse travel;

14      correct?

15  A   We separated it out so that you could then see the same sort

16      of slide, but looking at it in reverse and then looking at it

17      forward.  And if you flip back and forth a couple times

18      between these, you can see that the pattern changes forward

19      versus reverse.

20  Q   Okay.  Did you also determine data regarding the rate of heel

21      lift events over a shift?

22  A   Yes.

23  Q   Tell us about that.

24  A   Okay.  So I was interested in trying to find out these

25      posture relief events, when people would lift their heel to

1    try to -- may I stand?  So sometimes when you're standing,

2    you put a knee forward and you kind of stand hipshot as

3    opposed to standing perfectly straight, and that's a posture

4    relief.  And what's subtle about that is I'm lifting my left

5    heel.  So I was interested in heel lifts, right-heel lifts,

6    and lifts to try to get a sense of how do people do posture

7    reliefs like this during the course of the day, so we look at

8    it by what hour of their shift it is occurring.

9              We saw no particular pattern in terms of time

10   of day when these happen, but they do happen, but with a big

11   asterisk.  And the asterisk is that in a forklift, a heel

12   lift, or what we think of as a heel lift, this is coming from

13   the insole data.  So the insoles in the shoe may see no

14   pressure at the heel, but you may still have your heel on the

15   ground.  And if I could demonstrate?

16             MR. LoCOCO:  Is that all right, Your Honor?

17   Okay.

18             THE WITNESS:  Because you're leaning against the

19   back pad and there might be a vehicle motion, a turn, for

20   example, that you're doing, and so you may press on your toes,

21   and you press on your toes, which puts more weight into the back

22   pad.  And you press on your toes so much that there's no

23   pressure at the heel, and so that's included here as a heel

24   lift, even though the heel isn't coming off of the ground.  In

25   order to really see if the knee movement was going forward, like

1     standing hipshot, I would have to put -- I could put more IMUs

2     on the person, but we didn't put IMUs on the knees.

3   BY MR. LoCOCO:

4   Q    All right.  You then looked at stance changes over shift.

5        Tell us how you accommodated for stance change or how you

6        considered stance change.

7   A    So normally when we think about a stance change, we think

8        about a posture change, where like we're just talking about a

9        heel lift and you put your knee forward, you stand hipshot.

10       Where there's something that -- about your limbs that are

11       changing, it turns out that we can also look at heel shifts

12       or stance changes in terms of where the center of pressure is

13       in the feet.  And so we're taking a very close look at what's

14       happening with the pressure mat underneath the feet.  And may

15       I stand again?

16                   So if you have a stance and you're not

17       changing your stance, the center of pressure will remain the

18       same under each foot.  And what we're looking at to -- what

19       we call a stance for this part of the analysis is where the

20       center of pressure under each foot is within a

21       2-inch-diameter circle.  And so you might have just a little

22       shift.  We're not going to call that a stance change.  But if

23       you move your foot or if you move your toe or if you move

24       your heel and it moves that center of pressure more than

25       2 inches as recorded by the pressure mat, we're going to call

1    that a stance change.

2                   And then what we're looking at is how -- there

3    will be a moment in time, there will be a period of time that

4    passes before you establish another stance.  So we start with

5    our first stance, and then at some point, we establish a new

6    position for 10 seconds, and now we have a stance change.  We

7    went from one position to a new position, and we have a

8    stance change.  So that -- that's how we recorded stance

9    changes.

10                   But there's a little asterisk with respect to

11   this as well.  And that is, recall that I was talking about

12   when you push down on the ball of your foot, well, you can

13   easily change the center of pressure more than 2 inches just

14   by pushing down on the ball of your foot in order to react to

15   a vehicle motion, such as a turn, and that gets recorded here

16   as well.  And so you could have a stance change that involves

17   pressing down with the -- on the ball of your foot, which

18   creates a new stance, and then you settle right back down to

19   the same position.  So not all of these stance changes

20   involve overt movements of the foot.  In fact, most of them

21   don't.

22   Q   All right.  Did you also look at the orientation of the

23       operators' feet while they were operating?

24   A   Yes.  This was really cool.

25   Q   Tell us about that.

1   A    So because we have an IMU at the ankle and we also have one

2        at the toe, we can get the orientation of the foot.  Is the

3        foot pointed forward?  Is it pointed rearward?  Is it pointed

4        at 90 degrees?  Remember 0 degrees, 90 degrees.  But we could

5        also look at it with respect to the other foot.  Are the feet

6        parallel, or is it toe-in, or is it toe-out?  And what we see

7        is that a lot of data occurs either with the toes out from

8        each other and other data happens with the toes in.

9        Relatively little data is right at 0 or plus or minus

10       10 degrees.  There's a lot of data that's outside of that

11       range.

12                       And that's an important consideration if

13       you're going to place controls on the floor, if you're going

14       to place additional controls on the floor.  Can they hit

15       that?  Are you going to be impacting where their preferred

16       place is and their preferred orientation of their feet?  This

17       design allows for people to have either their toes face --

18       their toes out, their toes in, or parallel.  Also what this

19       does not capture is sometimes one foot will be more forward

20       of the other, so you can have a lot of different combinations

21       in terms of exactly how the feet are oriented with respect to

22       each other.

23  Q    This compartment, does it permit a variety of stances?

24  A    Yes, it does.

25  Q    All right.  You also looked at body segment orientation.  I

1    want to just pick out one of these to try and have you

2    describe what we're looking at here.  And I'm going to be the

3    body segment person.  Tell us what we're looking at here.

4  A    Okay.  Well, let's take a look at Person Number --

5    Participant 3.  The right foot, what we're seeing here is his

6    right foot has a range.  Sometimes it's not at 0 degrees, but

7    it's close to 0 degrees straightforward.

8  Q    Like this?

9  A    Pretty close.  Yeah.  That's good.  And then -- but on

10   average, it's more than -- it's more than 45 degrees.  Turn

11   it more.  There you go.  So there's a range where that

12   operator put his right foot.  And then with his left foot, he

13   had quite the range too, that he could be as much as

14   30 degrees, where -- like this.  And then he could also be at

15   90 degrees, like that.  And even a little bit beyond

16   90 degrees.  Yes.  So it was a range of orientations for this

17   operator with the left foot.

18            Now with the IMU at the lower back, he

19   sometimes would orient his hips as you are now so that it

20   would be at about 60 degrees.  On average, the median --

21   that's what this line is.  This is the median line.  Half the

22   time, the measurements are on one side; half the measurements

23   are on the other side.  His median position was 90 degrees.

24   But other times, he would turn toward the rear and so he had

25   a range that went over 60 degrees.

1        And in fact, for each of these operators, if

2    you look at what they do with their feet and how that impacts

3    what they could do with their hip, they could orient their

4    hips so that they could be toward the front or toward the

5    rear.  And this range with the hips is over 60 degrees for

6    each one of these operators.

7  Q  Dr. Rhoades, did you also look at the amount of percentage of

8    time that he had contact with that back pad and the level of

9    force?

10 A  Yes.

11 Q  Is that what we're looking at here?

12 A  Yes.

13 Q  So tell us about what you found regarding contact with the

14   back pad and force against the back pad.

15 A  So contact time with the back pad was very high, close to but

16   not exactly 100 percent for Participants 1, 2, and 3.  And

17   Participant 4, she also had a lot of contact with the back

18   pad.  She's the smaller-statured woman that faces forward.

19   And she may have also had a little bit more contact below

20   the -- where the pad was.  There might -- her actual contact

21   time with the forward hip return may not be captured here

22   some of that time.

23        In terms of the force that was measured, the

24   aggregate force was the median force.  So half the time it's

25   going to be lower; half the time it's going to be higher.

1    Was 10.1 for the Participant 1, 16.1 pounds for Participant

2    2, and 12.8 for Participant 3.  Participant 4, remember, she

3    has a pretty different posture.  She -- her median force on

4    the back pad was 3.3.

5  Q  Did you look at whether the force against the back pad

6    changed when the lift truck was either accelerating or

7    decelerating?

8  A  Yes.

9  Q  And is that captured in what we see here on this slide?

10 A  Yes, it is.  And what we have is the maximums, the maximum

11   total force applied to the full back pad under different

12   conditions.  Forward acceleration, so that would put force on

13   that rear return; rear deceleration; forward deceleration;

14   and rear acceleration.  Four different conditions.  And you

15   can see that these maximum values vary a little bit depending

16   on what the condition is.  But the other thing that you see

17   is the magnitude of these values.  So these values, these

18   maximums, are on the 20- to 30-pound range, which is well

19   above that -- those pressure -- those median values that we

20   had before.

21       So depending on what you're doing with the

22   vehicle, you apply more force to the back pad, and that helps

23   you maintain stability in the vehicle.  It's very, very

24   important.  And particularly the hip return, you can use that

25   as well to help stay in a stable position in the vehicle.

1    Q    So I want to go back.  On Participant 1, you said that the

2         median contact force with the back pad was 10.1 --

3    A    Correct.

4    Q    -- pounds.  But then if we go here, forward acceleration, the

5         max force was almost 30 pounds.

6    A    Correct.

7    Q    If we go to Participant Number 3, the median contact was how

8         much?

9    A    12.8 pounds.

10   Q    But forward acceleration --

11   A    Well, that's about 55 pounds.

12   Q    All right.  So does that -- so what's the operator doing when

13        you're getting 50 or 60 pounds into the back pad?

14   A    Well, you're using the back pad.  You're leaning against it.

15        And it could either be that you're pushing into it or that

16        the turn of the vehicle is in such a direction that your body

17        weight is going into the back pad.  So it could either be

18        that you're actively pushing into the back pad or that the

19        vehicle motion applies more force to the back pad.

20   Q    In collecting all of this data, were you -- did any of the

21        operators fall out of the compartment?

22   A    No.

23   Q    You also did an analysis of armrest contact?

24   A    Yes.

25   Q    Is that what we're looking at here?

1    A    Yes.

2    Q    And you also did an analysis of knee contact?

3    A    Yes.

4    Q    And knee contact is with the -- that left side of the

5         compartment, what's ahead of the operator?

6    A    Yes.

7    Q    And which participant was Number 3?

8    A    He was the tall guy.  He's very, very tall.  And on occasion,

9         what he would do is he would kind of slide his back down the

10        back pad and have his knees in contact with the other side.

11        He's that tall that he can do that.  And he was doing that --

12        that was a form of posture relief for him.

13   Q    Doctor, did you form some opinions and conclusions based on

14        this naturalistic study?

15   A    Yes.

16   Q    Let's talk about those.  With regard to the Raymond's

17        single-pedal design, what did you conclude?

18   A    It allows operators to shift body weight position, and it

19        improves comfort by helping people avoid static postures that

20        can create discomfort and fatigue.

21   Q    Let me just stop you there.  Is comfort related to safety?

22   A    You can think of comfort as being -- there's comfort and

23        performance, but there's also a scale of comfort, discomfort,

24        fatigue, and there can be cumulative trauma disorders or

25        musculoskeletal disorders that can develop if you repeatedly

1  get into situations with static postures, awkward postures,

2  high force.

3  Q  What else did you conclude about the compartment on the 4250?

4  A  It allows flexibility.  The right or left foot could be used

5  to depress the deadman pedal.  No -- at no time did we ever

6  identify both feet being on the pedal.  Again, that's

7  unlikely because of the size and location of the pedal.  And

8  we had no operator depressing the pedal with the heel of the

9  shoe.

10  Q  What else did you conclude?

11  A  The operator compartment design allows for heel lift and

12  stance change, and we did see instances where there was a

13  stance change where somebody could rotate about the heel of

14  their shoe.  You could also rotate about the ball of your

15  shoe, or you can move your entire foot.  But normally those

16  movements were small in terms of distance.

17  Q  And what did you conclude about the back pad?

18  A  Well, the back pad is very important with respect to reducing

19  the amount of effort that's required to maintain your balance

20  in the vehicle.  It's -- imagine if you were riding a subway

21  and the subway comes to a stop, and you had -- you weren't

22  holding onto anything.  That's going to take a lot more

23  effort to maintain your balance than if you're holding onto

24  something.  And the back pad is that point of contact that's

25  above your feet that helps provide a lot of support.

1  Q   You mentioned flexibility and hip orientations.  Why is that
2      a conclusion?
3  A   Well, the -- you can orient your body, and people do want to
4      orient their body, and that helps with your vision, because
5      you need to either look to the front, you need to look to the
6      back.  And so one of the ways you can do that more easily is
7      instead of doing everything with your neck, you can start
8      with your -- you could start with your feet and up your body
9      to help orient and make all these turns of your body less
10     than if you had to do all the work necessarily with just your
11     neck, for example.
12 Q   All right.  And you told us earlier the design accommodates a
13     range of body types?
14 A   Yes.
15 Q   And what's this last point here about lower posture -- body
16     posture flexibility?
17 A   Well, it allows a lot of flexibility with respect to your
18     lower body posture, and that increases comfort, as opposed to
19     having everything static or forced into a very particular
20     position for long periods of time.
21 Q   Dr. Rhoades, were these conclusions presented to the Raymond
22     engineers?
23 A   Yes.
24 Q   All right.  And you've mentioned posture relief a couple of
25     times.  Why is that important?

1   A   Again, what you want to avoid are static postures for a long

2       period of time.  I gave the example of, I just had my arm out

3       here for a long period of time.  That would be very fatiguing

4       and wouldn't be too long before it really hurt.  And so you

5       want to be able to have posture relief.

6   Q   Did you make -- form an opinion to a reasonable degree of

7       certainty in your field of expertise as to whether the

8       compartment on this 4250 represents a reasonable ergonomic

9       design?

10  A   Yes.

11  Q   And what was that opinion?

12  A   I believe it's reasonable.

13                  MR. LoCOCO:  Just a moment, Your Honor.

14                  MR. MURPHY:  Thank you.

15                  MR. LoCOCO:  Nothing further.  Thank you, Doctor.

16                  THE COURT:  This is a good time to take a

17      15-minute break.  We'll start back at 20 minutes to 10 [sic].

18      All right.  We're in recess.

19                  (Jury exits at 10:24 a.m.)

20                  (Recess from 10:24 a.m. to 10:41 a.m.)

21                  THE COURT:  All right.  We're back on the record

22      in Anderson v. Raymond.  The jury is not in the courtroom.

23                  Mr. LoCoco, you wanted to make a record about

24      something?

25                  MR. LoCOCO:  Yeah.  Further I guess explanation

1    for the worker's comp issue that came up last week.  Just so the

2    record's clear, I was using the plaintiff's own medical record

3    exhibit when I was getting ready and when I was using those

4    records.  And my understanding was that the plaintiffs had paid

5    someone to scrub the records of worker's comp, which is not a

6    hundred percent excuse.  I should have still checked it myself.

7    But I thought it was clean and I -- again, I wasn't making any

8    efforts to get that in front of the jury and I want the record

9    to be clear about that.  Thank you.

10           THE COURT:  Well, that's important.  Is that

11    accurate, Counsel?

12           MR. WARSHAUER:  It is accurate that I assumed

13    that our records that we intend to go out will and should be

14    scrubbed or they're not going out, so absolutely.  I don't think

15    Mr. LoCoco intended to do it.  I think it's a certain degree of

16    carelessness that we all do at one time or another.  I'm not

17    overly aggravated about it.  It's just we all have to be

18    careful.  I'm sure I've done similar things unintentionally.

19           MR. LoCOCO:  Thank you.  I appreciate that.  But

20    those are the records that are in evidence, so.

21           MR. WARSHAUER:  No, they've got to be cleaned up.

22    And you recall when I said -- I think they have -- I told people

23    to do it, but we will triple-check.

24           THE COURT:  That's important we cleared that up.

25           MR. WARSHAUER:  Yes, sir.

```
 1                      MR. LoCOCO:  Thank you, Your Honor.

 2                      THE COURT:  All right.  Are we ready for the

 3           jury?

 4                      MR. WARSHAUER:  I think I have it just right.

 5           When this pops up, we'll know.  Should be two seconds.  Yes,

 6           sir.

 7                      (Jury enters at 10:44 a.m.)

 8                      THE COURT:  All right.  Please be seated.

 9                      All right.  Cross-examination?

10                      MR. WARSHAUER:  Thank you, Your Honor.

11                            CROSS-EXAMINATION

12      BY MR. WARSHAUER:

13      Q    Dr. Rhoades, you do understand that this lawsuit is about

14           whether this product is unreasonably dangerous, not

15           excessively comfortable?  You do understand that; right?

16      A    I understand your allegations are that it's unreasonably

17           dangerous.

18      Q    And when you did this work in August of 2020 and September of

19           2020, when you were retained, your retention agreement did

20           not include an analysis to determine whether or not this

21           product was safe.  That's true, isn't it?

22      A    The retention was from the engineering department.  It wasn't

23           about this lawsuit in August of 2020.  And it was an

24           ergonomics assessment, yes.

25      Q    In fact, Raymond did not ask you to help make -- help them
```

1   make their product safer, did they?

2  A   No, that wasn't a stated function of it.

3  Q   Nor did Raymond tell you about the number of left-leg

4      amputation cases users of this product had suffered before

5      they asked you to analyze the fact that it has one pedal and

6      one pedal only.  That's true too, isn't it?

7  A   It's true that they did not give me statistics about the

8      number of accidents.

9  Q   In fact, they didn't even tell you the most common form of

10      accident suffered by operators of their standup forklift

11      products, did they?

12  A   I don't recall them saying that.

13  Q   Now when you worked putting together the materials for the

14      PWCs, Yamaha and Kawasaki and Coast Guard was involved in

15      that?

16  A   Yes.

17  Q   You gathered accident reports as part of your work; right?

18  A   We looked at BSAC data which is data that is collected by the

19      Coast Guard.  So it doesn't tell you who the manufacturer

20      was, but it tells you a little bit about the craft, and it's

21      data that they collect on an ongoing basis.

22  Q   But Raymond didn't give you any accident reports, did it?

23  A   No.

24  Q   In fact, Raymond didn't even give you any tabulations of

25      accident reports, did it?

1  A  No, they did not.

2  Q  Did Raymond tell you that what it does with accident reports

3     is they collect them by their general counsel to use as

4     advance warning of litigation, not to make their products

5     safer?  Did they tell you that too?

6  A  They did not tell me that.

7  Q  Did Raymond tell you that after this product was on the

8     marketplace, that they did not have a pattern, practice, and

9     procedure in place to monitor it in a formalized way, to see

10    how it's performing and what kinds of injuries it's causing?

11 A  We didn't discuss that one way or the other.

12 Q  The fact is that in your work for Raymond, this one project

13    that you did, there was no goal at all to reduce or eliminate

14    the likelihood of left-leg amputation injuries suffered by

15    operators, was there?

16 A  The focus of the work was an ergonomics assessment, not

17    focused on a reduction of left-leg injuries.

18 Q  Your adult life has been spent to some degree helping

19    corporations make their products safer; you'll agree with

20    that?

21 A  To some degree, yes.

22 Q  And the companies that you've worked with generally have

23    procedures in place, that formalized system of monitoring

24    their product, to see how it performs so that they can find

25    out injury trends and things like that, because you got to

1    know what's happening before you can react.  You agree with

2    that, don't you?

3  A    The practices of corporations can vary depending on what kind

4    of corporation it is.  An automotive company versus the --

5    like the PWC manufacturers, they looked at the BSAC data,

6    which is -- combines the data among manufacturers.  So the

7    practices among corporations varies.

8  Q    And one of the things they do when they're trying to make

9    their products safer is to consider both hazards and risk?

10  A    Correct.

11  Q    What's a hazard?

12  A    A hazard is a characteristic of a product or a situation that

13    can cause harm.  Like exposed wiring can cause harm, a fire

14    or electrical shock, for example.

15  Q    Falling out of a forklift is a hazard?

16  A    Yes, it could be hazardous to fall out of a moving forklift,

17    yes.

18  Q    Losing your balance is a hazard?

19  A    Yes, if you lose your balance, you can -- you can be injured,

20    even if you're not in a forklift.

21  Q    And then the other side of that equation is the risk, that

22    is, the likelihood that the hazard will result in an injury?

23  A    Risk looks at the likelihood and also the severity too.  Many

24    risk measures include both the likelihood and severity.

25  Q    So for example, when you were working with the watercraft

1       manufacturers, you made a list of things and balance was one

2       of the things that was considered, loss of balance by the

3       operator; right?

4  A  Loss of balance was on the list because as we reviewed all of

5       the information prepared by all the manufacturers, one of

6       them had that in the manual, so we put that on the list of

7       topics to discuss in our meetings.

8  Q  But the Raymond Corporation never even told you that loss of

9       balance was something they had on their radar, did they?

10  A  I don't believe that they told me expressly that loss of

11      balance was on their radar as you're saying, but it was

12      evident from my analysis that was part of the ergonomics

13      analysis, are those features that help people remain in a

14      stable position in the vehicle.

15  Q  This stable position that you talked about is illustrated

16      here in one of your slides.  It's called the operating

17      position; right?

18  A  Well, that is a stable position, and that's a pretty typical

19      position too in the vehicle.

20  Q  Right.  But there's -- you would agree that what we see on

21      the right-hand image, the man in the blue shirt and the

22      khaki-ish pants, is a man in the operating position, two feet

23      on the floor --

24  A  Is an operating position.

25  Q  Right.  An operating position is two feet on the floor?

1    A    Correct.

2    Q    Left hand on the tiller?

3    A    Correct.

4    Q    Right hand on the multifunction?

5    A    Yes.

6    Q    And back against the backrest?

7    A    Yes.

8    Q    And your normative study of four people indicated that

9         indeed, people working at the Raymond Corporation, while

10        they're being watched by Raymond people, who you would expect

11        would take the right positions, indeed almost universally

12        kept two feet on the floor, left hand in the tiller, right

13        hand on the multifunction, and their back against the

14        backrest; right?

15   A    That's true, although the nature of the study when we were

16        collecting the data, they weren't being constantly watched by

17        Raymond Corporation.  They were going about their normal day.

18        There was a setup period in the morning and then it was "Go

19        about your day."

20   Q    It was "Go about your day" after you have been put into a

21        forklift that is covered with sensors, you have an insole in

22        your shoe, and you have six sensors glued to you, and you

23        have a management person, Mr. Kerila, told you, "We're going

24        to be watching your feet over the next four hours.  Make sure

25        you do it right."

1  A   No, sir.  That is not the instruction that we had as part of

2      the instructions to Mr. Kerila.  And I have no understanding

3      whatsoever that that's what he told operators.

4  Q   You didn't provide him a script, did you?

5  A   We did provide him instructions about what to tell the

6      operators.

7  Q   You didn't provide him a script?

8  A   I think we didn't give him a word-for-word script, but there

9      were instructions about what to tell the operator.

10 Q   And you didn't record any of what he told the operators, did

11     you?

12 A   No, we did not.

13 Q   Okay.  One would expect that an operator who has insoles in

14     their boots, standing on a floor covered with sensors, might

15     well figure it out that the thing they're going to be watched

16     during their shift is the movement of their feet.  That makes

17     sense, doesn't it, Dr. Rhoades?

18 A   No, I don't really believe so.  For example, when we do the

19     automotive studies and you are watching people, they still

20     have -- people still text in these studies, these

21     naturalistic studies after a while.  They basically are

22     getting back into your normal behavior patterns.

23 Q   When someone is in the operating position as we see here on

24     the Raymond 4250 -- this is one of your slides, isn't it?

25 A   Yes.

1   Q   And their left foot moves down and out.  That forklift
2       doesn't stop, does it?
3   A   Excuse me, that is not -- now that is not my slide.  You've
4       manipulated it.
5   Q   I did manipulate it.
6   A   Okay.
7   Q   And the question is, when that left foot moves down and out,
8       you'll agree with me that forklift does not stop, does it?
9   A   That's correct.
10  Q   Okay.
11  A   So long as the control is still rearward, you haven't taken
12      your foot off the deadman pedal.
13  Q   Just to be sure, this normal operating position is two feet
14      on the floor, left hand on the steering tiller, right hand on
15      the multifunction, contact with the backrest.  You told me
16      before, yes, that's typically the normal operating position,
17      and you agree with that; right?
18  A   I agree with that, although it's not an exact angle of the
19      hips, so you have flexibility with that posture in terms of
20      where the feet are on the floor, in terms of your hips
21      against the back pad.  And it's almost a hundred percent, not
22      absolutely a hundred percent.
23  Q   So this man that we see on the right, if he's separated from
24      the backrest, which you say needs to be in contact to be in
25      the operating position, there's no sensor there like there is

1   on the seat of a riding lawn mower, is there?

2   A   No, there's no sensor on the back.  And I don't think that

3   would be a good idea.

4   Q   So in fact, on the 4250, if you break contact with the normal

5   operating position, back against the backrest, it doesn't

6   apply the brakes or disconnect the power, does it?

7   A   That's true.  It does not.

8   Q   Nor does it apply the brakes or disconnect the power if the

9   left foot leaves the floor if his right foot is holding down

10   the brake.  That's true, isn't it?

11   A   That's true.

12   Q   Now we talked a little bit about the recording that you did,

13   these millions and millions of points of data; right?

14   A   Correct.

15   Q   But at the end of the day, what we really have is four people

16   for roughly seven-plus-hour shifts, so that's about 28 hours

17   of video total?

18   A   There was about 28 hours of observation, yes.

19   Q   Okay.  So 28 hours.  Couple of terabytes at the most?

20   A   You mean if we had preserved video?

21   Q   Yeah.

22   A   Yeah.  And the problem is you have these problems with it

23   being obscured.  You can't tell how much force is below -- in

24   the sensors and so on, so there are a lot of limits to video

25   data, including after the fact, syncing it up so you have it

1    same-time synced with everything.  So there will be some

2    challenges.

3  Q  There would be some challenges, but let's assume you just

4    put -- I've got one, two, three blue squares that could be

5    cameras.  I mean, it's possible to put cameras on this

6    machine for multiple angles; right?

7  A  It would be possible.  There are now these little lipstick

8    lenses that are very small lenses, so it would be possible to

9    put lenses in various positions.  There may be some problems

10    with it needing to be wide angle because you don't have much

11    distance that you're working with.  So there would be some

12    challenges if you wanted to go with a video approach.

13  Q  But you don't own that equipment, but Exponent, the company

14    that you worked with to do this, with its multiple offices

15    throughout the country and more than 800 engineers employed

16    by it, they probably do own a bunch of cameras, don't you

17    think?

18  A  I'm sure they have some GoPro cameras.  Yeah, I mean, the

19    technology isn't that expensive even if you had to go out and

20    just buy it.

21  Q  And this work you did was $91,000 after the $5,000 courtesy

22    discount?

23  A  That sounds about right.  I don't have that figure with me

24    right now.

25  Q  So if we were to buy another hundred dollars' worth of thumb

1    drives to record all this, it was possible, wasn't it?

2  A  But it wouldn't be just another hundred dollars, because then

3    you have to sync all of that with this other data to be

4    meaningful.  It would be -- it's -- so if you're looking at

5    something at a particular point in time, a snapshot on a

6    video, then the question becomes, well, what are the forces

7    against the back pad at that exact moment?  How does that

8    correlate with the quantitative data?  And syncing that up,

9    now that would be more expensive.

10 Q  Well, I really didn't ask you about those questions.

11 A  Okay.

12 Q  But it would have allowed us to see operators swaying back

13    and forth in the normal use of this machine, but because you

14    didn't do that, we can't even see their body movements and

15    how they moved and what they're doing on these forklifts.  We

16    don't have any ability to see that.  And at the end of the

17    day, it was your choice not to record that; right?

18 A  We did not make a video recording of this.  We were -- the

19    objective was to get quantitative data.  And as far as

20    swaying back and forth, there's this contact with the back

21    pad that you don't have -- you can have swaying above the hip

22    level, but where you have the contact with the back pad, the

23    back pad pretty much keeps you in contact with the back pad.

24    You're not swaying at the hip level, if you will.

25 Q  Dr. Rhoades, your opinion was, and I wrote it down, but it's

1    a comfortable place, comfortable forklift; right?  Allows

2    flexibility.  But you didn't ask these four people, "Hey,

3    were you comfortable today?"  You didn't ask a single one of

4    them, did you?

5  A  No, no, we did not do a structured interview.

6  Q  You didn't do a survey of going into a FedEx warehouse where

7    there might be 20 of these forklifts going and say, "Hey, on

8    a scale of 1 to 7, what's your comfort scale?"  You didn't do

9    that, did you?

10  A  No, I did not.

11  Q  But most importantly for my curiosity is you also didn't do

12    any work at all about whether or not the Crown floor or the

13    floor made by other manufacturers, like Clarke or Hyundai or

14    Mitsubishi, which is one of your old clients, were equally as

15    comfortable to the operator.  You didn't do that, did you?

16  A  No.  This did not involve a comparison to other designs.

17  Q  In fact -- now this is a little larger than scale.  You

18    didn't do anything at all --

19           MR. LoCOCO:  I'm sorry, could I see?

20           MR. WARSHAUER:  It is a little larger than scale.

21    That's why we haven't used it other than this big picture.

22           THE COURT:  Wait, is there an objection?  It

23    looks like a blowup of the Crown.

24           MR. WARSHAUER:  Blowup of the Crown floor.

25           MR. LoCOCO:  I just hadn't seen it before.

1          MR. WARSHAUER:  I thought you had when we showed

2     it.  That's what it looks like.

3               MR. LoCOCO:  Do you know what the scale is?

4               MR. WARSHAUER:  It's about an inch too wide.

5               MR. LoCOCO:  Thank you.

6  BY MR. WARSHAUER:

7  Q   I'm telling you it is bigger than their floor.  Okay?  But

8      what you did not do, you never went and looked at a Crown

9      forklift, did you?

10 A   Not for this -- not for this project.

11 Q   And you never got any indication from Raymond why it doesn't

12     have an orange bar, so if the left foot creeps to the left.

13     Unknowingly, the operator would be encouraged to put it back.

14     Didn't do any work on that either?

15 A   I did not assess the orange bar in the Crown.

16 Q   And you didn't do any work on Crown to see how the operator's

17     left foot can be in a variety of ways as long as part of it

18     is on that pedal; correct?

19 A   So long as part of it's on the pedal, although that seems to

20     be -- with the orientation that you have, it seems to have

21     the heel down.  You're using it with the heel.

22 Q   Okay.  Well, but you didn't do any work on that; right?

23 A   No, I didn't.

24 Q   You didn't look at this other design of pedal that's a series

25     of arcs, that the foot can literally be anywhere as long as

1    it's on the floor?  You didn't evaluate that for safety

2    either, did you?

3 A  I didn't evaluate that.  I'm not sure that I would call that

4    a pedal.  It doesn't move up and down.

5 Q  It's a sensor of proximity that the foot is there.  Not a

6    pedal because it doesn't move.  I'll agree with you.  But you

7    didn't evaluate that either?

8 A  No, I did not.

9 Q  The fact is, you did no testing whatsoever to determine how a

10    brake pedal under the left foot would affect comfort or an

11    operator's ability to move or assume stances that are

12    comfortable to suit their individual preferences.  That's

13    true, isn't it?

14 A  That's true.  I did not evaluate that design.

15 Q  You didn't test how a properly designed second pedal would

16    affect the ability to shift body weight.  That's true too,

17    isn't it?

18 A  Correct.  I was looking at the Raymond design.

19 Q  Now Raymond never even told you why that pedal's up in the

20    upper left-hand corner of the operator's compartment, did

21    they?

22 A  No, I don't recall talking about the placement of the pedal

23    in the corner with Raymond.  I don't recall that being

24    discussed.

25 Q  You did consider other available safety systems, but you

1       didn't do any work on those either, did you?  For example,

2       did you do any work to decide whether or not the Operator

3       Compartment Sensor System presents any ergonomic issues to

4       the operator?

5    A  No, I did not evaluate the sensor system.

6    Q  Did Raymond tell you that they have a patent on Operator

7       Compartment Sensor System that has lasers on it, that if the

8       operator leaves the compartment, it can be programmed to

9       apply the brake?  Did they tell you to check into that?

10   A  No, that was outside the scope of my work.

11   Q  Did they show you -- so they didn't tell you and ask you to

12      evaluate this optional product that could put lasers across

13      the door and prevent the left foot from going outside and

14      applying the brake if it did?

15   A  I did not evaluate lasers at the face of the door.  That was

16      outside the scope.

17   Q  But yet we know, because it's in your slides, that you were

18      aware at least that the Operator Compartment Sensor System

19      actually exists; right?

20   A  Correct, that there are options available.

21   Q  Now the FedEx facility at which Mrs. Anderson was working is

22      2.5 million square feet.  How big is the warehouse that your

23      work was done at?

24   A  I don't know.

25   Q  Mrs. Anderson and others, Mrs. -- Ms. Boone, told us that

1    there were cracks in that warehouse sufficient to cause

2    balance challenges and shaking of the forklift.  Do you know

3    whether there are cracks at the warehouse at Raymond that are

4    sufficient to cause shaking and balance challenges?

5  A  I did not evaluate the flooring at the Raymond facility.  I

6    do know that part of the data that we collected involved

7    crossing dock locks to go in and out of trailers, so there

8    would be permutations related to that -- perturbations

9    related to that.

10 Q  Did your operators ever hit any defect in the floor or debris

11   on the floor that they did not expect?

12 A  Not that I'm aware of.

13 Q  Dr. Rhoades, I may have asked you about this when we met via

14   Zoom.  I can't be sure.  But I recall taking statistics in

15   college.  And they talked about sample size, confidence

16   intervals.  You will agree with me that four operators is not

17   a reasonable sample size to derive to -- upon which to base

18   an opinion as to how many people use their right foot?

19 A  I'm sorry, the --

20 Q  Or their left foot on the brake?

21 A  Could you please -- there was a word I didn't catch.

22 Q  Yeah.  You would agree with me that a sample size of four is

23   not a sufficient sample size to formulate an opinion as to

24   how many people use their left foot on this brake as opposed

25   to their right?

1   A   Oh, that's correct.  You cannot do that, because we have four
2       participants.  One predominantly used the left foot on the
3       pedal.  You can't say with only four subjects, that if I did
4       a hundred subjects, that 25 would have that.  There's no way
5       you could do that because you don't have enough data to make
6       that kind of conclusion.  But other conclusions you can make
7       fairly even with four people, that people basically have
8       their feet in different positions of the floor, that the
9       amount of force base that's used.  Those kind of things, you
10      don't expect that to change if I collect more data.
11  Q   But one of the things you did not do was to look at any of
12      these competing companies to see whether or not people can
13      adequately move around on their products too; correct?  You
14      didn't look at those, nor did you -- I'm sorry.  Go ahead and
15      answer.
16  A   I just think you advanced your slide.
17  Q   I did, but it was a bunch of logos, and I think we
18      established you didn't look at anybody else's product to see
19      if they were ergonomically appropriate.
20  A   For this subject, no, I did not.
21  Q   And you're not offering an opinion as to whether the Raymond
22      4250 involved in this case did or did not comply with a
23      standard published in B56.1 Standards, 7.20.2.  You're not
24      offering that opinion, are you?
25  A   No, I haven't looked at this particular section.

1    MR. WARSHAUER:  Okay.  Well, that is my curiosity

2    for now.  Thank you.

3                    THE COURT:  Redirect?

4                    MR. LoCOCO:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. LoCOCO:

7    Q    Dr. Rhoades, just a few questions.  From an ergonomics

8         perspective, did you conclude that the 4250 is a good

9         operator compartment?

10   A    Yes, I did.

11   Q    All right.  And did the data that you collect show any

12        evidence of falling out or losing balance?

13   A    No, it did not indicate that.

14   Q    You were asked about whether Raymond even talked to you about

15        their interest in -- whether they were interested in balance.

16        And you answered Mr. Warshauer's question, that you hadn't

17        discussed that.  But what were you able to conclude based on

18        your analysis of the 4250's compartment on the issue of

19        balance?

20   A    The design of this system affords the operator an ability to

21        be stable in the operator's compartment on the forklift,

22        particularly the back pad.  It's very important in terms of

23        having something that helps keep you stable and takes some --

24        a lot of the effort out of remaining stable.  You don't have

25        to try to balance like you're on a subway without a handhold.

| | | |
|---|---|---|
| 1 | Q | You were asked a number of questions about things related to |
| 2 | | the naturalistic study that you did.  For example, |
| 3 | | Mr. Warshauer showed you a photograph with three blue boxes |
| 4 | | indicating I guess video cameras that he would have |
| 5 | | preferred.  Do you recall that, those questions? |
| 6 | A | I recall the questions.  I really don't recall the three |
| 7 | | boxes, but. |
| 8 | Q | All right.  Did you see any testing from Dr. Meyer, Dr. Jeka, |
| 9 | | Dr. Kerrigan, where they did anything like the analysis that |
| 10 | | you shared with the jury today? |
| 11 | A | No, I saw nothing like that from them. |
| 12 | Q | Did you see any videotape from them of operators and how they |
| 13 | | operate in the 4250? |
| 14 | A | No. |
| 15 | Q | You talked about the difficulty with actual video versus the |
| 16 | | data that you collected, and you mentioned something about |
| 17 | | sync or syncing.  Could you describe what you're getting at |
| 18 | | there? |
| 19 | A | So you have data from different sensors and you have to sync |
| 20 | | it up to make sure that at a given point in time, you know |
| 21 | | what data you're collecting from where, you know where the |
| 22 | | forklift is and so on.  So you sync up all this data.  And so |
| 23 | | if you have, let's say, a video clip or a screenshot, and |
| 24 | | then in order to know what's going on quantitatively, you'd |
| 25 | | have to sync it up.  You'd have to know where you are with |

1    respect to, well, what are we measuring at the back pads, at

2    the pressure pads, what does the insole say and so on, if you

3    want to have both video and quantitative data at the same

4    time.  Our emphasis was on the quantitative data.

5  Q  And so with the foot insoles, the IMUs, the sensor pads,

6    at -- I'm just going to pick a date -- you know,

7    September 5th, 2020, 10:51, 30 seconds and 0.22 seconds, was

8    all the rest of the data synced up to whatever timeframe that

9    was?

10 A  Yes.  The data would be synced up, including the vehicle IMU,

11   because we were focused on when the vehicle is moving, so

12   we're not concerned if that particular spot in time the

13   person was off the vehicle.

14 Q  You were asked about the Operator Compartment Sensor System

15   that Raymond makes available to customers such as FedEx.

16   Were you aware of the fact that FedEx chose not to purchase

17   that option for the 4250 involved in this case?

18 A  That's my understanding, that they did not choose that.

19 Q  And after the accident, they chose not to purchase that

20   feature?

21 A  That's my understanding.

22 Q  All right.

23             MR. LoCOCO:  Thank you, Your Honor.  Nothing

24   further.

25                    RECROSS-EXAMINATION

BY MR. WARSHAUER:

Q It's true that Dr. Meyer, Dr. Jeka, and Dr. Kerrigan never opined that this compartment was uncomfortable, did they?

A I don't recall them ever calling it uncomfortable.

Q But you will agree that giving up a little comfort in exchange for safety is a reasonable tradeoff?

A It can be.

MR. LoCOCO: Just one, Your Honor.

REDIRECT EXAMINATION

BY MR. LoCOCO:

Q Dr. Rhoades, were you only looking at comfort in your analysis?

A Well, I was -- there's comfort, there's discomfort, and then after discomfort and fatigue, then you're looking at a safety and health issue at that point as well, if you don't want people that spend their whole careers doing a job like this ending up with a musculoskeletal disorder or some other sort of problem. So it wasn't just about comfort.

MR. LoCOCO: All right. Thank you. Thank you, Your Honor.

THE COURT: I have a quick question for you.

THE WITNESS: Sure.

EXAMINATION BY THE COURT

BY THE COURT:

Q Do you know what the maximum speed was for the test

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | forklifts?                                                   |
| 2  | A | I'm speaking from just memory now.  I think it was 8 miles   |
| 3  |   | per hour.                                                    |
| 4  | Q | And did you -- was your measurement synced to the speed of   |
| 5  |   | the forklift at the time the data points were coming in?     |
| 6  | A | We could sync it, because there was the IMU that was attached|
| 7  |   | to the truck itself, so.  And that has accelerometers so that|
| 8  |   | you could not -- you could track the velocity of the vehicle,|
| 9  |   | and we were focused on those periods of time where the       |
| 10 |   | vehicle was moving.                                          |
| 11 | Q | So you did track that data or you did not track that data?   |
| 12 | A | We have it available.  I did not show slides correlating a   |
| 13 |   | particular speed to a particular behavior.                   |
| 14 |   | THE COURT:  Thank you.                                       |
| 15 |   | In light of the Court's questions, any further              |
| 16 |   | questions, Mr. LoCoco?                                        |
| 17 |   | MR. LoCOCO:  No, I think I'm good.  Thank you,               |
| 18 |   | Your Honor.                                                  |
| 19 |   | THE COURT:  Counsel, any further questions?                  |
| 20 |   | MR. WARSHAUER:  No, sir.                                     |
| 21 |   | THE COURT:  All right.  Sir, you're free to go.             |
| 22 |   | THE WITNESS:  Thank you.                                     |
| 23 |   | THE COURT:  All right.  It's 20 after 11.  Do you           |
| 24 |   | have another witness --                                      |
| 25 |   | MR. LoCOCO:  Yes, sir.                                       |

 1                    THE COURT:  -- to call?

 2                    MR. LoCOCO:  Yes, sir.

 3                    THE COURT:  All right.

 4                    MR. LoCOCO:  Your Honor, we call Mr. Robert

 5      Kerila.

 6                    THE COURT:  All right.

 7                    (Sidebar begins.)

 8                    MR. WARSHAUER:  I just want to remind Counsel

 9      that there's been no expert disclosure for this witness.  We

10      have a motion in limine.  We have a ruling that there are no

11      opinions for this guy.

12                    MR. LoCOCO:  No opinions related to this case,

13      absolutely.  He's here to describe the design and why it's

14      designed the way it is, which necessarily includes some

15      engineering concepts, but he's not here to talk about

16      Mrs. Anderson's accident.

17                    THE COURT:  Wouldn't that be opinions?

18                    MR. LoCOCO:  No, Your Honor.

19                    MR. WARSHAUER:  For example, can he say it

20      complies with 7.20.2?

21                    MR. LoCOCO:  I'm going to say, "Did Raymond

22      design the truck so as to be in compliance?"  I think that's

23      perfectly appropriate.  It's in the materials.

24                    MR. WARSHAUER:  That's fine.

25                    THE COURT:  That's an opinion.

 1                   MR. WARSHAUER:  Well --

 2                   THE COURT:  You didn't -- he can -- it's a lay

 3         witness who has -- who has some level of expertise, and he can

 4         testify consistent with that as long as he's not giving

 5         opinions.  And I think the rule specifically limits -- let's do

 6         this.

 7                   (Sidebar ends.)

 8                   THE COURT:  Why don't we take a quick five-minute

 9         break, and we'll start back in five minutes.

10                   (Jury exits at 11:20 a.m.)

11                   THE COURT:  All right.  We are outside the

12         presence of the jury.

13                   Counsel, are you guys ready to discuss the --

14         this witness's testimony and his opinions?

15                   MR. LoCOCO:  Do you want Mr. Kerila out of here

16         or not?  I don't care, but --

17                   MR. WARSHAUER:  I think it's best if he's out.

18                   THE COURT:  All right.  If you'd step outside,

19         sir.

20                   THE WITNESS:  Sure.

21                   THE COURT:  Thank you.

22                   MR. LoCOCO:  Your Honor, maybe it would help if I

23         explain what I intended to do.

24                   THE COURT:  All right.  Let's go on the record.

25                   MR. LoCOCO:  I'm sorry.

1          THE COURT:  Again, we're outside the presence of

2     the jury.  The witness has left the courtroom.  This gentleman

3     was not disclosed as one offering expert opinion testimony.  And

4     my previous ruling was that pursuant to Rule 701, if a witness

5     is not testifying as an expert, testimony in the form of opinion

6     is limited to one that is, (a), rationally based on the

7     witness's perception; (b), helpful to clearly understanding the

8     witness's testimony or to determining a fact in issue; and (c),

9     is not based on scientific, technical, or other specialized

10    knowledge within the scope of Rule 702.  The scope of 702,

11    testimony is based on sufficient facts and data.  Witness who's

12    qualified as an expert by knowledge, skill, expert experience,

13    training, or education may testify in the form of an opinion and

14    sets out the basis.

15          So let's talk about what you anticipate eliciting

16    from this witness.

17          MR. LoCOCO:  So Mr. Kerila is here to describe

18    the 4250, describe the design process that led to the design

19    that is at issue in this case, to describe the things that go

20    into that design process, you know, the testing they do, whether

21    they look at standards as part of the process.  The manuals that

22    we produced to the other side, the operator's manual, in fact,

23    says it's designed in compliance with B56.1.  He would factually

24    say that was their design intent and what they did to try and

25    confirm that, and -- but he would not be offering testimony

1     about Mrs. Anderson's accident, about whether in his opinion the

2     truck is reasonably safe, about whether Mrs. Anderson was

3     negligent.  I mean, none of those opinions have been put out or

4     will be offered.  His sole testimony will be about the design,

5     why it's designed the way it is, and what went into Raymond's

6     decisionmaking.  So I think those are facts.

7                    MR. WARSHAUER:  I would agree --

8                    THE COURT:  Sounds like an opinion.  He's

9     saying --

10                    MR. WARSHAUER:  Some are facts and some are not

11    facts.  The process:  Fact.  Testing is fact.  The intent to

12    comply probably is a fact.  Whether they do comply is exactly

13    what 701 addresses, which is something based on technical

14    knowledge.  That's an opinion.  And that's what we would

15    disagree with.  I do think he probably can say, "It's our intent

16    to make these compliant."  And my cross on that will be, "You

17    are the judge, jury, and prosecutor as to whether you do

18    comply."  And that would be it.  I'm not going to elicit whether

19    they do from him or not.  I'm not going to open that door.  Just

20    to talk about the process, whether you're in compliance or not,

21    and there's no outside organization that checks it.  I'm sure

22    this will now be part of direct.  But --

23                    MR. LoCOCO:  Probably not, I mean, because I am

24    going to stay tight to what I said to the Court.

25                    THE COURT:  I think if he's -- I think if he

1    offers an opinion as to whether or not equipment complies with

2    certain standards is an opinion.

3                    MR. LoCOCO:  He's --

4                    THE COURT:  Now if you say the intent was to --

5    there are engineering standards, there's -- that they were

6    trying to -- they hoped this product complied with, there are --

7    there's all kinds of things that go into it.  But if you're

8    going to ask him, "Does this comply with the standards that

9    we've been talking about?" I think those are -- that's an

10   opinion.  He can't say, "Well, I'm so involved in the process,

11   that's no longer an opinion.  It's a fact."  Can't say that.

12   It's not a fact.  It's an opinion.

13                   MR. LoCOCO:  The plan, Your Honor, is exactly

14   what I've said, to ask him whether Raymond utilizes the B56.1

15   during its design process, and "What is your intent?"  "The

16   intent is to comply with the process -- with the standard."

17                   THE COURT:  All right.  So then does he get to

18   cross-examine him on, did they intend to comply with other

19   standards that you didn't ask?

20                   MR. LoCOCO:  I assume.

21                   THE COURT:  All right.  All right.  Let's bring

22   the witness back in and the jury back in.

23                   MR. LoCOCO:  I mean, subject to relevancy.

24                   (Jury enters at 11:28 a.m.)

25                   THE COURT:  All right.  Please be seated.

```
 1                        (Witness sworn.)
 2                   THE COURTROOM DEPUTY:  Please state your full
 3        name and spell your last name for the Court.
 4                   THE WITNESS:  Robert James Kerila.  K-e-r-i-l-a.
 5                   THE COURTROOM DEPUTY:  Thank you.
 6                   MR. LoCOCO:  May I proceed, Your Honor?
 7                   THE COURT:  Yes, you may.
 8                        DIRECT EXAMINATION
 9   BY MR. LoCOCO:
10   Q    Mr. Kerila, tell the jurors your full name again.
11   A    It's Robert James Kerila.
12   Q    And please make sure to kind of scoot up so you can speak
13        into the mike.  Where do you live?
14   A    I live in Endwell, New York.
15   Q    Which is where?
16   A    It's upstate New York, farm country part of New York.
17   Q    Who do you work for?
18   A    I work for the Raymond Corporation.
19   Q    How long have you worked for Raymond?
20   A    Just over 30 years.
21   Q    What do you do for Raymond?
22   A    I am the engineering director for product and custom
23        engineering.
24   Q    And is that your title?
25   A    Correct.  That's my title.
```

1   Q   Dr. Rhoades was here earlier and he told the jurors he

2       thought you were chief engineer.  Are you chief engineer?

3   A   No.

4   Q   Okay.  Tell the jury about your educational background,

5       please.

6   A   I have a bachelor's of science in mechanical engineering from

7       the Rochester Institute of Technology from 1991.  It's my

8       formal education.

9   Q   Are you a member of -- I'm sorry.  Are you a licensed

10      professional engineer?

11   A   Yes, I'm also a licensed professional engineer.

12   Q   In what state?

13   A   In New York state.

14   Q   Now you told us that you work for Raymond.  Can you give the

15      jury just a brief history of the jobs you've held over the

16      years to current?

17   A   Sure.  So I started at Raymond while I was still in college.

18      Part of the curriculum at my college is cooperative

19      education, so you go out and you work at some companies to

20      get some practical real world experience, and Raymond is one

21      of the places I did that at back in 1990, and then got

22      offered to come and work there full-time when I graduated.

23      So I took the job and started in the new product development

24      department, just as an entry level engineer, doing mechanical

25      design work, some component designing assemblies, working on

1    development of new trucks.  One of the first ones I worked on

2    was actually the first dockstance counterbalance truck that

3    Raymond ever designed.  I was responsible for a number of the

4    components of that truck, the design, the transmission, the

5    handle, did the vehicle dynamics analysis, did some of the

6    development designs, some of the mast elevating design.

7  Q  Let me just interrupt you for a second.  So this case

8    involves the 4250.  What you're telling the jury is that you

9    were working on a predecessor version?

10 A  Correct.  Not the 4250.  That didn't come out until many

11   years later, but this is back in the early '90s.  This was --

12   we had made standup counterbalance trucks before that, but

13   they were of a different style.  This was the first time that

14   we had made one of that style.

15 Q  All right.  So if you could just again briefly go through the

16   rest of your jobs.

17 A  Sure.  That wasn't the only truck I worked on.  I worked on a

18   variety of different models that we make.  Progressed through

19   the ranks, you know, promoted to higher levels, more

20   responsibility.  Eventually I started running portions of

21   projects where I would have designers and drafters reporting

22   to me.  I would have certain assemblies, components I was

23   responsible for all the engineering on.  Eventually running

24   into higher projects that way.  And then I moved to the

25   program management office where we have a fairly complex

```
 1        process for running a development project.  I was the person
 2        responsible for the entire process.  So obviously there's
 3        lots of other people involved in that, but I've got to make
 4        sure, you know, each group is doing what they're supposed to
 5        do, things are going to get done on time, handoffs are
 6        happening properly between groups, everything's getting
 7        checked off.
 8   Q    What year is this?
 9   A    Probably '96, '97, something like that.
10   Q    Okay.  Next?
11   A    Started Raymond full-time in '91.  So around '99, I moved
12        into engineering management.  I'd been leading groups before
13        that.  Now I had direct reports, other engineers that I was
14        responsible for hiring for their career advancement for their
15        assignments, the things they were working on.  Still in new
16        product development, still running, you know, new product
17        creation of new trucks in different categories.
18                    So our industry is divided into different
19        classes of trucks.  Raymond manufactures trucks in three of
20        those classes at one point or another in that progression.  I
21        managed the development groups for every one of those
22        different classes.  So I've kind of had my fingers on the
23        design of pretty much everything we make at one point or
24        another.
25   Q    In 2014, what was your job?
```

1    A    In 2014, I was in development for Class 3 products, which is

2         a different class than this truck.

3    Q    Okay.

4    A    And then shortly after that, I moved to product engineering,

5         somewhat like the role I have now but at a lower level, where

6         I was responsible for -- product engineering is our group

7         that's responsible for trucks that are presently being

8         manufactured or trucks that have gone out of manufacture but

9         the customers are still using, when there's any design

10        concerns with those trucks.  So I moved into product

11        engineering shortly after that.  I managed liability engineer

12        group for a while after that and then ultimately now I came

13        over to manage the entire product engineering and custom

14        engineering group in Greene at the director level.

15   Q    All right.  This -- as the jury knows, this case involves a

16        4250.  Are you familiar with that model?

17   A    Very much so.

18   Q    When did it go on the market?

19   A    It was first introduced in 2010.

20   Q    Were you involved in that design?

21   A    I was, yes.  I was involved in the design of a lot of the

22        components of it earlier on that were adopted into the 2010

23        version, the 4250.  But then I was involved in the project as

24        well in 2010.

25   Q    All right.  Could you tell the jury a little bit about the

1    history of Raymond?

2  A    Sure.  So we're in upstate New York in Greene, New York.

3    It's about halfway between Pennsylvania and Canada.  Not the

4    New York City part of New York, but the middle of cow country

5    New York.  We've been in existence almost a hundred years

6    now.  We were founded by a man named George Raymond.  He had

7    bought a local company that made farm implements, and then

8    eventually around the World War II era, when material

9    handling became a much bigger industry, he converted the

10    company over to material handling.

11         Still in Greene.  We have been there our

12    entire time, and we've been kind of an innovator in the

13    industry ever since then, inventing entire parts of the

14    material handling industry that exist today, like

15    narrow-aisle trucks, narrow-aisle reach trucks, you know, the

16    wooden pallet, which you see -- if you go into any warehouse

17    or Home Depot or something, the wooden pallet, we invented

18    that way back in the day and then donated it to the industry

19    for free so that people could have some commonality on how

20    they picked up loads and moved them around.  And we continue

21    there today, still technology innovator.  We're still coming

22    out with things that, you know, other companies haven't done,

23    doing research, new product development continuously.

24  Q    Where does Raymond have plants?

25  A    Our primary plant is in Greene, New York.  That's where the

1      headquarters is and we have another manufacturing facility in

2      Muscatine, Iowa.

3   Q  How many people work at the Greene facility?

4   A  There's about 1,100 people in Greene.

5   Q  And how about at the Muscatine facility?

6   A  Roughly 400 more people in Muscatine.

7   Q  How would you characterize Raymond in the forklift industry?

8   A  We're a leader in North America for sure, a technology leader

9      for sure.  You know, we are -- we're at the leading edge of

10     the changes that are occurring in the industry.  We kind of

11     have been for the entire time we've been in existence.

12  Q  Where does the design engineering take place, Greene or

13     Muscatine?

14  A  All the design engineering takes place in Greene.  Muscatine

15     is a manufacturing facility.

16  Q  Does Raymond have an engineering staff?

17  A  Yes.

18  Q  How large is it -- how large was it back in the 2010

19     timeframe?

20  A  Roughly 140, 150 engineers back then.

21  Q  And how about today?

22  A  We're closer to 200 now.

23  Q  What type of engineers does Raymond employ?

24  A  Wide variety.  It takes a lot of different disciplines to

25     create a forklift, so mechanical engineers like myself,

1    electrical engineers, software engineers, you know,

2    industrial and manufacturing engineers, because we're

3    manufacturing the trucks ourselves in Greene and in Iowa, and

4    there's a lot that goes into how to do that.  You know,

5    systems engineers that can look at how all the pieces come

6    together, hydraulics engineers, test engineers, reliability

7    engineers, field service engineers, application engineers.

8    There's just a -- a lot of different moving parts that have

9    to come together to design and test and market a forklift

10   truck.

11 Q  You mentioned software engineers.  Why does the -- first of

12   all, do you need software engineers for the 4250?

13 A  Oh, yes.

14 Q  Why?

15 A  Well, it's an electric battery-powered truck.  Everything we

16   make actually is electric battery-powered.  It's intended for

17   indoor use in warehouses.  The controls on it, they may be

18   electrical, they may be hydraulic, but the operator, you

19   know, with single control handle and a steering wheel, they

20   give inputs to the truck, the software needs to interpret

21   those inputs.  Then there's other controllers for the

22   electric motors.  For instance, if the operator commands a

23   50 percent travel speed -- there's an onboard brain,

24   essentially a computer.  That software has to be written for

25   that to interpret what the customer or what the operator's

1    asking for, and the command to the motor controller which has

2    its own software that then sends a current demand to the

3    battery to send so much current to the motor to cause the

4    motor to spin to ultimately get that speed that the

5    operator's asking for.

6  Q  Does Raymond have any facilities in the Greene plant that

7    assist the design engineers?

8  A  Yes.

9  Q  What?

10 A  We have a full-blown test lab there, actually a couple of

11   them.  One right in the main facility, another lab off-site

12   at a different facility down the road, where we do -- we do

13   all the development testing of the trucks that we're

14   developing for either manufacture in Greene or in Iowa.

15 Q  Does the test lab include different types of environments?

16 A  Sorry.  Yes, it does.

17 Q  Like what?

18 A  Well, you know, a good portion of our customers are in

19   seafood manufacturing or distribution, so things like a blast

20   freezer.  We sell all over the country, so, you know, things

21   where we can simulate hotter conditions like you might have

22   in the south or humid conditions, that kind of thing.  And

23   then lots of different ways to simulate different customer

24   warehouse applications and how they're going to use the

25   truck.

1    Q    All right.  At times, does Raymond ask other engineering

2         firms to assist in design efforts or testing?

3    A    We do, yes.

4    Q    Why would you do that sort of thing?

5    A    There's an awful lot we can do ourselves at our facility, but

6         we can't do everything.  You know, there's just some areas

7         where we don't have the tools.  We don't have, say, a

8         standing electron microscope, or just don't have the

9         expertise where it makes more sense to find another

10        engineering firm out that that concentrates on that thing.

11        You know, RF testing, radiofrequency testing, for instance,

12        where they have the facilities to do that, they have the

13        skill set to do that, it's what they do all the time.  Yes,

14        we want to design our truck for that, we want to make sure

15        it's tested to comply with that.  It's just better to partner

16        with people who are experts in that area.

17   Q    Now just before you testified this morning, Dr. Rhoades was

18        here and we heard from him earlier this morning.  He talked

19        about a project involving the 4250, and I believe he said

20        that you called him.  Did you call him and ask him for his

21        assistance?

22   A    I don't know if I called him directly.  I was working through

23        another group that I think reached out to him initially.

24   Q    All right.  Tell us how that work that Dr. Rhoades did for

25        Raymond came about.

A    Sure.  So the 4250 had already been existence for quite some
     time.  But, you know, part of the process that we go through
     in developing a truck is we test it at customer sites, and
     that involves going out, watching trucks, you know, following
     people around the warehouse, what are they doing,
     interviewing operators, that kind of thing.  We get a lot of
     feedback that way.

          But I had learned that there was some new
     technology available, that you could outfit an operator with
     wireless technology.  Very, you know, benign things that the
     operator wouldn't even notice, they were wearing.  And you
     could gather a lot of -- a lot more rich data on what they
     were doing.  Instead of just following them around a
     warehouse, interviewing them to get their feedback, you could
     actually get hard engineering data on, you know, where their
     feet are, how hard are they pressing here, or are they
     leaning, are they doing -- how do they react when the truck
     does different things.

          I learned about that technology from another
     firm, and I said, "Sounds like a neat way to either confirm
     or deny the things that we've learned from talking to
     operators over the years."  So I decided I wanted to pursue
     that.  I asked them if they could find an ergonomist then to
     interpret the data that we were going to gather from that
     exercise.

1  Q   All right.  I want to switch gears and talk a little more
2      specifically about the design process at Raymond, which you
3      mentioned earlier.  First of all, does Raymond follow a
4      prescribed process for designing products?
5  A   Yes, we do.
6  Q   And is that a process that's followed just on new designs, or
7      something other than new designs?  Tell us when the process
8      is followed.
9  A   We have different processes for pretty much everything we do
10     there.  For new designs, we have a new product development
11     process, very detailed process.  We'll follow that for any
12     new truck design.  If it's, you know, clean sheet of paper or
13     if it's just a variation on a prior truck, we'll follow that
14     process for a new clean sheet of paper, we'll do everything
15     in that process for something that's a variation on a prior
16     one.  We may just do portions of it.
17 Q   All right.  I want to pull up Exhibit 538-7.  So what are we
18     looking at here from the perspective of the design process,
19     Mr. Kerila?
20 A   So this is a high-level -- basically a schedule chart showing
21     the different major phases of the development process that we
22     follow.
23 Q   All right.  Could we blow that up, please?  All right.  So on
24     the far left side, it starts with something called Phase 0,
25     and on the far right, it's Phase VI.  So what is Phase 0?

1  A  Phase 0 is concept evaluation.  It's basically -- it's the

2     back of the envelope part of the project.  You know, what

3     ideas do we have for a new product?  You know, it could be

4     somebody from sales or marketing that went out and talked to

5     customers, what is it you're trying to do?  It could be

6     something that came out of the engineering research

7     department.  Hey, we have this new technology.  Is there a

8     way to commercialize this and make it useful?  Phase 0 is

9     where all that -- all the ideas kind of get thrown out on the

10    table.  What is it that the companies interested in trying to

11    explore, commercializing into a product?

12  Q  Was this process that we see here followed for the 4250?

13  A  It was.  In fact, this slide at the top, it said it was a

14    summary of the 4250 itself.

15  Q  All right.  And then Phase II is what?  I'm sorry, Phase I.

16  A  Phase I.  Sorry.  Yeah.  Is feasibility.  So in Phase 0, kind

17    of anything goes.  You know, you can put any kind of idea out

18    on the table.  In Phase I, that's when we sharpen the

19    pencils.  We sit down and say, "Okay, we can't do a flying

20    lift truck.  We can't do this.  We can do this.  Maybe we're

21    going to change that a little bit from the original concept."

22    But that's where we're -- or, you know, "Maybe we can do

23    that, but it's going to cost so much and take so long to

24    develop that it's not going to be worth it in the end," kind

25    of thing.  So that's kind of like the phase where we filter

1      the parts of the -- or the ideas that we can do from the ones

2      that probably don't make sense to commercialize.

3                  Or sometimes, actually in that one, we'll say,

4      "You know what?  It's kind of a neat idea, but we really --

5      it's more like research.  We don't want to do research in the

6      development -- or in the middle of a development project."

7      So sometimes we'll take an idea in the feasibility phase and

8      send it off to the research department so you guys kind of

9      game that out more before it comes back to be commercialized.

10   Q   Actually, I'm not going to write everything down because we

11      got it right here.

12   A   Yeah.

13   Q   So what's the next phase, which is known as Phase II?

14   A   It's the planning phase, so --

15   Q   Which involves doing what?

16   A   Now we create what's called a functional specification.  This

17      is exactly what the project's going to accomplish.  These are

18      the parts that are going to change.  These are the

19      performance levels that the customers want.  The truck has to

20      pass these -- you know, has to be able to lift so fast and

21      move so many loads an hour and very specific on what the

22      expectations are for the customer, so that when we come out

23      of that phase, we know what we have to do in order to

24      succeed, and then also put together the hard schedule and the

25      budget.  What's it going to take to do this thing, how long

1      is it going to take, how much is it -- how much is it going

2      to cost, how many people will it take to accomplish and what

3      kinds of people, you know, what kinds of engineers, what

4      other departments will need to be involved, that kind of

5      thing.

6   Q  The way your system is set up, can Raymond move to Phase II

7      before finishing Phase I?

8   A  We can start Phase II.

9   Q  Right.

10  A  But this is what's called a phase-gate process.  So at the

11     end of each phase is a gate, a virtual gate, that there's a

12     list for each phase.  These are all the things that have to

13     happen in this phase before the phase can close.  So we may

14     get started on some of the pieces of the next phase, but we

15     have to have a formal meeting before the executives to end

16     each phase.  And I think this particular slide here is the

17     end of Phase IV, where they were meeting to say, "Hey, we

18     think we've checked off everything that's going to be

19     necessary to launch this, to introduce it to the market so

20     they can start talking to customers about it."  This was

21     the -- they were asking permission of the executives for the

22     okay to do that.

23  Q  All right.  So the first three phases, has any testing been

24     done yet?

25  A  Actually I'm sorry, this is permission to ship.  We are here

| | | |
|---|---|---|
| 1 | | in this step point. |
| 2 | Q | Yeah. |
| 3 | A | So at Phase III -- I'm sorry, say it again. |
| 4 | Q | So through the first three phases, which is actually |
| 5 | | Phase II -- |
| 6 | A | Yes. |
| 7 | Q | -- have you done any testing yet? |
| 8 | A | No.  It's all paper and concept. |
| 9 | Q | What's Phase III, which is actually the fourth phase? |
| 10 | A | Phase III is the longest phase.  That's when we turn the |
| 11 | | ideas into designs to, you know, electronic models, to |
| 12 | | prototypes.  We do all the testing.  We do redesigns after |
| 13 | | the testing.  We do field testing.  We do, you know, |
| 14 | | everything from a piece of paper at the beginning to a fully |
| 15 | | functional truck that will ideally do exactly what the |
| 16 | | functional specification wanted us to get done. |
| 17 | Q | All right.  So that's all in Phase III? |
| 18 | A | Right. |
| 19 | Q | I'm going to come back to that.  What's the next phase?  IV? |
| 20 | A | Phase IV, after we've completed the test phases, Phase IV is, |
| 21 | | get the documentation ready so this thing can be mass |
| 22 | | produced, essentially.  Right?  We've only made a few dozen |
| 23 | | trucks up to that point that we've used for our own |
| 24 | | engineering purposes.  In Phase IV, we're getting all the |
| 25 | | manufacturing documentation, getting the manufacturing line |

1          prepared, getting all the standard work for how it's going to

2          be put together and tested on the line, completed in that

3          phase.

4      Q   That's Phase IV, which is actually the fifth phase.  Now you

5          said in the prototype in this design, develop, test,

6          Phase III, you've only made a couple of dozen trucks?

7      A   Usually, right.

8      Q   By the way, how many trucks -- how many 4250s have been made

9          since 2010?

10     A   About 31,000.

11     Q   All right.  So then what's Phase V?

12     A   Phase V -- the other thing I forgot to mention in Phase IV is

13         launch.  So while the engineers are busy, the manufacturing

14         people are busy, the people who are going to market are busy

15         as well putting together their material to explain this new

16         thing to customers, that's what permission to launch is.

17         Have we checked all the boxes?  Are we ready to let the

18         market know this truck exists?  Once that's accepted, we move

19         to Phase V, production, and we start taking orders and we

20         start making trucks and selling trucks.

21     Q   And the last phase, Phase VI, what is that?

22     A   Phase VI.  So after Phase V, or in Phase V, we are in full

23         production.  We're selling the trucks to the market.  But six

24         months to a year after we've started building trucks is

25         Phase VI.  We stop, we go back, we look at the people who

1   have been early purchasers of the trucks.  We go out, we

2   interview them, we get feedback from them.  And then we look

3   at the entire process back to Phase 0 and say, what did we do

4   well, what did we do poorly, what can we do better next time,

5   what can we learn from the customers, are they happy with

6   what -- you know, they told us in Phase 0 that they wanted.

7   They got it in Phase V.  Or ultimately, did they enjoy what

8   they got?  Are they going to, you know, come back and buy

9   additional ones?

10  Q   All right.  So I want to focus back now on Phase III when you

11      get to the point where you're actually making some

12      prototypes.  Is that the phase where you do prototyping and

13      lab testing?

14  A   Yes.

15  Q   All right.  What kind of testing is done with the prototypes?

16  A   Lots of different things.  So, you know, performance testing

17      probably is the first thing.  Right?  Customers are going to

18      use these trucks.  They're going to want them to be eight,

19      ten hours a day or three shifts a day.  They're going to want

20      the battery to last a certain amount of time.  They're going

21      to carry certain loads, so many of them an hour, loading this

22      many tractor-trailers, that kind of thing.  Truck wants to go

23      this fast, it's got to stop that quick, it's got to lift this

24      fast, so that kind of performance testing.  We'll do

25      endurance testing of components or some assemblage of the

1    truck.

2                    So part of the challenge in Phase III, we've

3    got, you know, six, eight, 12 months to do all the testing

4    for a truck that's going to last ten years.  You can't put

5    ten years of testing on a single component in eight months,

6    so we'll do accelerated life testing.  We'll overload things.

7    We'll build fixtures that just run day and night, beating

8    stuff up and seeing, are we going to crack a weld, are we

9    going to break a part, that kind of thing.  So performance

10   testing, that endurance testing.

11                   And then standards compliance testing.  So

12   there's a number of different industrial standards the truck

13   needs to comply with.  We can do that testing for the most

14   part.  Some of those other -- we hire can do some of that for

15   us too, but is the truck -- you know, some of those things

16   you don't need to test.  Other things, you need to perform a

17   test to say yes, the truck is going -- looks like it's going

18   to comply with that part of the standard.

19   Q    Does --

20                   THE COURT:  Let me stop you.  It's five minutes

21   to 12.  And so I know we have a while to go with this witness.

22   I think now is a good time to break for lunch.  We will come

23   back at 10 after 1.

24                   So remember, ladies and gentlemen, you're not to

25   discuss this case amongst yourselves or with the parties.

1     You're not to do independent research, get on the internet and

2     try to look up matters or individuals relevant to this case.

3              We are in recess until 1:10.

4              (Jury exits at 11:55 a.m.)

5              (Recess from 11:55 a.m. to 1:11 p.m.)

6              THE COURT:  Let the record reflect that we are

7     outside the presence of the jury.  I inquired before we went on

8     the record if this witness was going to testify with respect to

9     the matters contained in Matthew Darney's deposition and FedEx's

10    consideration of whether or not to, after this accident,

11    retrofit its equipment with laser devices that would deploy the

12    brake if, because I understand it, part of the body was moved

13    through the laser itself.

14             MR. LoCOCO:  Yeah.  So he's not going to talk

15    about the post-accident part.  He will testify that that feature

16    is available to customers, that it was made available to FedEx,

17    and that FedEx didn't buy it when the truck was purchased.

18    That's it.

19             THE COURT:  Well, how is it relevant that FedEx's

20    negligent?

21             MR. LoCOCO:  Pardon me?

22             THE COURT:  How would it be relevant that FedEx

23    declined to purchase a safety feature?

24             MR. LoCOCO:  Well --

25             THE COURT:  Isn't that burden-shifting?  Aren't

1    you trying to say, "Well, it's all FedEx's fault"?

2              MR. LoCOCO:  Mr. Warshauer opened the door when

3    he was asking questions of both Mr. Rogers and Dr. Meyer about

4    having a laser, and then Mr. Warshauer also opened the door this

5    morning with Dr. Rhoades talking about this as an available

6    feature.

7              THE COURT:  That doesn't open the door to -- that

8    doesn't open a door to FedEx's decision not to have a safety

9    feature for its employees.  The only relevance is that -- as I

10   see it, the only relevance is that it establishes that having

11   this feature is feasible on this piece of equipment.

12             MR. LoCOCO:  Well, it does --

13             THE COURT:  So you can't come in and say that's

14   not feasible, that was -- because your criticism of their point

15   was they didn't do any testing.  They didn't even do design.  If

16   you have it on your equipment, if you have it on your equipment,

17   then they don't have to do a bunch of testing and stuff to prove

18   that it's feasible.

19             MR. LoCOCO:  We were never challenging the

20   feasibility, Your Honor.  Secondly, Mr. Kerila will explain that

21   it's a training tool.  It's not seen as a safety feature per se.

22   And I think it is relevant that it was available in this

23   circumstance.  Now they can --

24             THE COURT:  But it's -- but here's what -- how is

25   it relevant that after the fact, FedEx -- nobody's come in here

1   and testified, "Here's what FedEx did and it's X investigation."

2   And because we don't have that kind of foundation, I don't know

3   how it's relevant that they -- whatever their conclusions were

4   after the fact.  And how does it not violate the subsequent

5   remedial measures rule or Rule 407, the fact that FedEx decides,

6   "Well, there was a safety -- there was safety equipment we could

7   have had on here, but we didn't buy it to begin with, and we

8   elect not to spend the money to retrofit all of our stuff."

9              MR. LoCOCO:  Your Honor, that's why we filed the

10  brief we did last night.  Ms. Heitkamp can speak more to the

11  law, but the law is very clear that Rule 407 doesn't apply with

12  respect to a nonparty like FedEx.  It just doesn't apply.  The

13  case law in the Seventh Circuit and six or seven other circuits

14  are clear that Rule 407 is not a reason to keep this information

15  out.  So that can't be a basis for excluding it.

16             As far as the -- the foundation is being laid by

17  Matthew Darney.  He's their person in charge of environmental --

18  environment health and safety.  He's going to testify that they

19  looked at this in the context of this accident and chose not to

20  put it on.  The best warning in the world they could have had

21  was Mrs. Anderson's accident, and they still didn't want it.  I

22  think that's extremely relevant because it goes to further

23  support Mr. Rogers' claim -- Mr. Rogers' opinions that a

24  second -- that this laser or a second pedal would have made no

25  difference whatsoever in this circumstance.  It's extremely

1    relevant.

2              MR. ABBOTT:  Your Honor, just to have a quick

3    response on that.  For the subsequent remedial measure on the

4    cases where they say a nonparty subsequent remedial measure is

5    relevant, the issue is that the nonparty has to sort of be

6    acting independently of one of the parties.  That's where you

7    have the circumstance where the policy considerations under 407

8    wouldn't apply, if you have a nonparty making a subsequent

9    remedial measure that's independent -- that could be made

10   independent of the parties in litigation.  That's not the case

11   here.

12             Exploring the option of this laser, the OCSS,

13   necessarily involves those discussions with Raymond.

14   Additionally, any relevance it has is substantially outweighed

15   by the risk -- by the risk of prejudice, because Raymond has a

16   nonnegligible duty to produce a machine that is not unreasonably

17   dangerous.  To try and sort of shift the burden to FedEx on what

18   features to include to make this machine not unreasonably

19   dangerous is trying to skirt under from where their legal

20   obligations are under a strict liability product case.

21             And their -- and even the Southern District -- I

22   don't have the citation in front of me, but Southern District of

23   Illinois case that they cited, there they discuss the fact that

24   a nonparty subsequent remedial measure may not violate 407, but

25   their Court even noted there, under relevancy, at a risk of

1    unfair prejudice, you still have to consider whether or not this

2    evidence should come in.  And there's no one here that can offer

3    evidence as to FedEx is somehow negligent for not including this

4    feature.  And that's essentially what they're trying to argue to

5    this jury.

6              MS. HEITKAMP:  So, Judge, that -- a couple of

7    things.  One, that's not true.  We're not -- this evidence isn't

8    being offered to show any negligence by anybody.  Plaintiffs

9    have put in front of this jury through multiple witnesses

10   information about a light curtain, laser lights, talking about

11   the open operator compartment.  That's not a design defect

12   that's actually in this case.  The two design defect issues that

13   are before this jury are the steer tire guard and the second

14   pedal.  Nothing's been addressed with respect to light lasers as

15   far as what the jury's actually going to have to consider, and I

16   think that is important to consider when you're doing the 403

17   balancing that they're referencing.

18             The Seventh Circuit case, that's the Lolie case,

19   that's 502 F.2d 741, is the case that we discussed in the trial

20   brief we filed last night.  There's simply nothing in there that

21   talks about the involvement or uninvolvement of one of the

22   parties to litigation.  That case actually did involve a

23   post-accident investigation and ultimate conduct by a nonparty,

24   and that's where the Seventh Circuit addressed it and said that

25   nonparty conduct after an accident is not barred by 407.  407

1   simply has no application there.  There's no basis for

2   Mr. Abbott's argument that Raymond had any involvement in FedEx

3   Supply Chain's post-accident decisions.  And the -- I think the

4   Lolie case along with the seven or eight other circuits that

5   find that nonparty conduct is not subject to Rule 2 -- subject

6   to exclusion under Rule 407 simply shows that 407 doesn't apply

7   here.

8           MR. ABBOTT:  Your Honor, I'll just point you to

9   the case from this Court that they cited, the DWK v. Abbott

10  Labs, 87 F. Supp. 3d 916.  And there the Court noted, even if

11  you take away the 407 analysis, the 407 analysis we think still

12  applies because the only way to get into this light curtain is

13  for it to come from Raymond.  They can't get this light curtain

14  just on their own.  They can't make this modification on their

15  own.  They have to go through Raymond in order to get the

16  modified machines that they're -- we're discussing.

17          Even if you discount that, under the 403 analysis

18  including this, essentially puts into evidence the idea that

19  FedEx somehow breached some duty or obligation to consider the

20  safety features for this machine, which only Raymond has --

21  Raymond's the one with the duty here to produce a machine that's

22  not unreasonably dangerous.

23          I'm not finished.

24          MR. LoCOCO:  I'm sorry.

25          MR. ABBOTT:  And by putting in this evidence, if

1     the evidence is going to show FedEx's negligence, what's the

2     relevance of it?  What is the purpose of this evidence if it's

3     not to show FedEx's negligence?  Especially as it relates to --

4     if they want to get something as to when they purchased the

5     machine, we think that's also not relevant, but there might be

6     some argument there.  But as to specifically what they did

7     afterwards, how is all of that relevant, unless you're trying to

8     put in FedEx's duty or lack of due care in terms of their

9     decision -- their purchasing decisions on these machines?

10          And that's particularly concerning because one of

11    the reasons that Mr. Darney pointed out in his deposition as to

12    why they didn't purchase this is because the machines, it seems

13    to indicate, belonged to the Pinnacle Foods, who they had the

14    contract with, and not necessarily FedEx itself.  That was one

15    of the factors that actually went into why they didn't make this

16    change.

17          MR. LoCOCO:  We've designated all of that, all

18    that explanation.

19          MS. HEITKAMP:  Yeah.  And, Judge, what I think

20    hasn't been addressed here from the plaintiffs is they've put in

21    front of the jury evidence that leaves the impression that this

22    is a defect, and there's no evidence that they've presented --

23    they didn't present any expert evidence from Dr. Meyer,

24    Dr. Jeka, Dr. Kerrigan about this light laser as it relates to

25    this accident.  And so they've left the jury with nothing but

1    something that can confuse the jury when it's sitting there

2    trying to answer the questions that it's actually going to be

3    charged with answering in this case.  And I think that Raymond

4    is entitled to present evidence that responds to this issue that

5    plaintiffs have raised over and over and over with multiple

6    witnesses, without actually explaining to the jury anything

7    about how it relates to this accident, their claims here.  And

8    that's where Mr. Kerila's testimony and the designations from

9    Mr. Darney marry up to reduce this confusion that the jury

10   likely has.

11              MR. LoCOCO:  And at the very least, Your Honor --

12   I think Mr. Abbott almost said this himself -- we should be able

13   to explain our process for making this feature available to

14   customers who can then decide -- again, Raymond presents it as a

15   training tool, not as something to prevent something like

16   Mrs. Anderson's accident.

17              THE COURT:  But what happens if somebody's foot

18   goes through the laser?

19              MR. LoCOCO:  Mr. Kerila would explain that the

20   truck would sound an alarm, put a display on the operator

21   display, and begin to slow.  It doesn't have the brake come on.

22              MR. WARSHAUER:  It can have the brake come on.

23   It says it right in the patent.  That's a design choice.

24              MR. LoCOCO:  That's his cross-examination.  But

25   what -- what actually works in the real world, Your Honor, is

1    that it will start to slow, the same way the Crown present

2    sensor switch works, that there's no brake there.  Right?

3              MR. WARSHAUER:  On the right foot.

4              MR. LoCOCO:  On the right foot.  On the right

5    foot, the Crown presence sensor is a one-second delay, and then

6    it starts to slow.  It doesn't slam the brakes on.  Raymond has

7    this feature available, where the laser is broken or the photo

8    beam is broken, and the truck sounds an alarm, it starts to

9    slow.  It's a training tool.  "Hey, get your foot back in the

10   compartment."  That's what Mr. Kerila would explain to the jury.

11   And he'd explain the process for making sure that every customer

12   has access to this information before they buy a truck.

13             MR. WARSHAUER:  That doesn't answer the question

14   of Mr. Darney.  In fact, it pretty much does answer the question

15   in the plaintiff's benefit, which is to the extent the process

16   by which it gets on the truck is left to the customer.  It's at

17   the front end, not the back end, Judge, and they don't have

18   anyone from -- involved in the sale who did the explanation for

19   why or why you would not get it, why the actual owner of the

20   truck, which is not FedEx, made that purchasing decision.  Were

21   they misled as to its characteristics?  Were they told not to

22   buy?  Were they told it was a service hassle?  None of that is

23   there.

24             Our defect isn't the lack of a pedal.  Our defect

25   quite clearly is a machine that does not stop when the operator

1    leaves the operating position.  That's been our case.  This is

2    simply a feature that can be, according to the patent, which is

3    in their exhibit file, according to the abstract and the actual

4    words of the patent, it can be programmed to stop.  That's an

5    available thing the jury might want to consider when deciding

6    whether or not the design as delivered was unreasonably

7    dangerous, given how simple it was, since 1980 when they got

8    their patent, to change the operating characteristics.

9              MR. ABBOTT:  And Mr. Darney wasn't even at FedEx

10   when this machine was purchased.  He can't offer any information

11   to the jury as to the circumstances behind --

12             THE COURT:  But my understanding is that it's

13   owned by Pinnacle, not by FedEx.

14             MR. ABBOTT:  Yeah.

15             MR. WARSHAUER:  Right.

16             THE COURT:  And is it true that Pinnacle, not

17   FedEx, purchased it?

18             MR. WARSHAUER:  They own the machines.

19             MR. LoCOCO:  They're just saying that, Your

20   Honor.  I don't think --

21             MR. ABBOTT:  Mr. Darney says that.  It's part of

22   the analysis of the discussion is the fact that Pinnacle is the

23   one who owns the machines.

24             MR. LoCOCO:  Which gets to the point we're

25   making, Your Honor.  We don't care whether it's Pinnacle or

1    FedEx Supply Chain.  The purchaser did not want this feature.

2    And after --

3                    MR. WARSHAUER:  I'm sorry.  Call the purchaser.

4                    MR. LoCOCO:  We know that the purchaser didn't

5    buy the feature so this feature was not on the truck when it was

6    shipped, and another feature that's in the brochure was on the

7    truck when it was shipped.  So we have circumstantial evidence

8    at the very least that -- plus they have an ironclad process for

9    making sure this brochure gets out to customers.  After the

10   accident, Mr. Darney, who's their environmental health and

11   safety guy, said, "We looked at this feature and we decided

12   against it for cost because we thought Pinnacle owned it, owned

13   the truck anyway, and because we didn't think it would have made

14   a difference on high-speed accidents."

15                   So we're really talking about two different

16   things, what happened pre-accident when the truck was sold and

17   then what happened after the accident.  We're not trying to

18   claim that Pinnacle or FedEx was negligent.  We're saying that

19   this feature was available and it wasn't on the truck.  Now they

20   can ding us for it not having it be a standard feature, but, you

21   know, that's cross-examination.

22                   THE COURT:  All right.

23                   MR. ABBOTT:  And --

24                   THE COURT:  Hold on.

25                   MR. ABBOTT:  Okay.

1          THE COURT:  Federal Rule of Evidence 407 reads:

2     When measures are taken that would have made an earlier injury

3     or harm less likely to occur, evidence of the subsequent

4     measures is not admissible to prove negligent, culpable conduct,

5     a defect in the product or its design, or a need for a warning

6     or instruction.  But the Court may admit this evidence for

7     another purpose, such as impeachment or, if disputed, proving

8     ownership, control, or the feasibility of precautionary

9     measures.

10          I don't know what information Raymond gave after

11     this accident in which someone loses a leg operating a Raymond

12     forklift.  I don't know if they undersold this safety feature.

13     We just don't know.  FedEx -- do we have anybody coming in and

14     saying that this was a high-speed incident?  I don't think we've

15     had anybody testify to that.  And if it's high speed, that opens

16     up another can of worms, it seems to me.

17          MR. ABBOTT:  I --

18          THE COURT:  But to allow this guy to come in --

19     how is it not hearsay?

20          MR. LoCOCO:  Because he's more than a hundred

21     miles away.  He's in Iowa -- Ohio.

22          THE COURT:  So a hundred miles away is an

23     exception to the hearsay rule?

24          MR. LoCOCO:  It's a use of a deposition in court,

25     Your Honor, which is permitted if the witness is unavailable.

1     "Unavailability" is defined as being more than a hundred miles

2     from the courthouse.

3                    MR. ABBOTT:  Your Honor --

4                    THE COURT:  Making retrofits to a truck he

5     doesn't own or FedEx doesn't own?  I'm not -- it seems to me

6     that the impact of this could cut one of two ways.  It could

7     say, "Well, look, the ones who are at fault were the people that

8     bought this equipment to begin with and they didn't have the

9     safety device on it.  And then when we brought it to their

10    attention after or reminded them after their accident, that,

11    yeah, there is this safety feature, they still decided they

12    didn't want to retrofit the trucks and incur those additional

13    costs."  I think it's more likely to confuse the jury or be more

14    prejudicial than it is probative.  So I'm just inclined to allow

15    it.

16                   I mean, what -- I mean, it's relevant to the

17    issue that the safety equipment was feasible, but you're not

18    putting it in for that reason.  You want to put it in and -- is

19    he going to say, "Well, this is really just a training aide;

20    it's really not a safety feature.  It's just a training aide.

21    It's like training wheels for a forklift operator, and once he

22    got a hang of things, we can take it off"?  I mean, you have a

23    non -- the safety issues are nondelegable.

24                   MR. LoCOCO:  We're confusing negligence and

25    strict liability at this point.

1          THE COURT:  I'm not confusing negligence and

2     strict liability.  The -- it's -- if there's a safety feature

3     that makes the product safe and you decide not to put it on, the

4     standard equipment absence is showing that there was a

5     compelling reason not to put it on there.  I mean, the jury

6     could consider that to be a defect at the time delivered.  I

7     mean, I -- go ahead.

8          MR. LoCOCO:  Mr. Warshauer brought up this

9     feature of the Operator Compartment Sensor System this morning

10    with Dr. Rhoades, knowing that Dr. Rhoades didn't look at it.

11    All we want to do, Your Honor -- I mean, I understand I guess

12    your ruling that you don't want your -- your dispose not to

13    allow Darney's testimony, so I'm putting that in a box for a

14    second.  But certainly Mr. Kerila should be able to address this

15    feature, what it does, what its intent is, and how Raymond

16    markets it and how it was marketed here, instead of it just

17    sitting there like a lump of coal based on Mr. Warshauer's

18    innuendo.  That's just not fair.  We need to be able to put it

19    into context for what this feature is and what it isn't.

20          The last thing I'd add, Your Honor, Mr. Rogers

21    was here Friday.  He was very clear that a brake under the left

22    foot would have made absolutely no difference in this case,

23    so --

24          THE COURT:  But they can accept that or reject

25    that.

1          MR. LoCOCO:  Exactly.  But the -- exactly.  But

2     the point, Your Honor, is that this OCSS, the Operator

3     Compartment Sensor System, doesn't give you that much -- it

4     doesn't give you the braking performance that Mr. -- Dr. Meyer

5     wants is giving you.  So we're not -- they're not even saying

6     that this feature would have prevented Mrs. Anderson's accident,

7     because they want a brake under that foot.  And Mr. Warshauer's

8     point is, the patent, which we didn't identify as an exhibit --

9     he certainly can cross-examine with it, the patent.  His point

10    is the patent is set up so you could have made this become a

11    brake.  Right?  Again, if he gets to cross-examine on this

12    feature, we get to explain it.

13         THE COURT:  I think -- I think the -- he can

14    explain to the jury what the feature is.  My concern is putting

15    into evidence that after the fact, FedEx looked at retrofitting

16    equipment that belonged to a different customer.  We have no

17    context of what that cost would be.  Was it 5 bucks per unit, or

18    was it 5,000 per unit?  We don't have any context in that.  And

19    so that's what -- that's what -- and that's what I'm concerned

20    about.

21         MR. LoCOCO:  All right.  So look, I -- so the

22    record's clear, we disagree with the Court's ruling, but I

23    understand it.  And we will not get into with Mr. Kerila any

24    question of what happened post-accident or post-sale, really,

25    with regard to this feature.  And I think that probably also

1    handles the motion we filed to overcome their objections,

2    because the key things were the items that the Court's concerned

3    about.  So I think having put it up on -- we'll look at this to

4    see if we have to put it actually in the record as an offer of

5    proof.  But we understand the Court's ruling, and so I'll stay

6    away from that with Mr. Kerila.

7                    MR. ABBOTT:  And we have no problem with those

8    parameters.  Our issue was simply, have it in the record,

9    post-accident discussion as to the facts with Mr. Darney, you

10   know, so.  If they want to limit it to --

11                   THE COURT:  Well, was there any objection to just

12   using your -- you had highlighted in your -- what you had

13   submitted to the Court, certain pages of -- I guess that you

14   were going to read, wasn't every page of Mr. Darney, but you

15   were going to read in highlighted portions into the record.  Was

16   that how you were going to do it?

17                   MR. LoCOCO:  Yes, Your Honor.

18                   THE COURT:  All right.

19                   MR. LoCOCO:  We'll take another look at it to see

20   in the context of your order if there's anything else we want to

21   read in.

22                   THE COURT:  All right.  Let's bring the jury out.

23                   MR. ABBOTT:  Thank you, Your Honor.

24                   (Jury enters at 1:38 p.m.)

25                   THE COURT:  All right.  Please be seated.  Thank

```
 1        you.  All right.  Thank you for your patience, ladies and
 2        gentlemen.  All right.
 3                      Sir, you are still under oath.  And we are still
 4        in your direct examination of the witness.
 5                      Mr. LoCoco, please proceed.
 6                      MR. LoCOCO:  Thank you, Your Honor.
 7   BY MR. LoCOCO:
 8   Q    So I think where we left off this morning was we were talking
 9        about some of the testing that was done in the lab
10        prototype -- with prototypes.  Let's take a look at -- really
11        want to just focus on the form of Exhibit 537.
12   A    Okay.
13                      MR. LoCOCO:  And, Your Honor, Mr. Warshauer knows
14        what's coming up, so.
15   BY MR. LoCOCO:
16   Q    There we go.  So what is this form that we're looking at?
17        It's got a lot of stuff on it.  I just want to focus on the
18        form.
19   A    Right.  This is a night driving sheet.
20   Q    Okay.  So you can take it down now for a second.  So what is
21        a night driving sheet?
22   A    So it was one of the other things about testing we didn't
23        quite get to this this morning that we do.  We have drivers
24        employed second and third shift and on the weekend as well.
25        So we'll work on design, putting prototypes together during
```

1    the day, and then we have drivers do customer-simulated

2    driving, second shift, third shift, weekend shift.  While

3    we're doing the development, we put the prototypes through

4    that testing.  After, you know, we've gone out and looked at

5    what actual customers do, you know, measure how many loads

6    they're moving, the weight, and that kind of thing, and then

7    our operators will put the trucks through those paces in our

8    own lab.

9    Q    Now is the facility where they're doing this driving, is it

10        a -- describe it.  Is it concrete floors?

11   A    Yeah.  It's like a typical warehouse.  There's other parts of

12        it that have, you know, specialized test equipment, but then

13        the part where the drivers drive is just like a regular

14        warehouse.  It's concrete floors.

15   Q    Do they have cracks?  Does it -- do the floors have cracks

16        and seams?

17   A    Absolutely.

18   Q    Do these drivers know they're going to be going over those

19        things?

20   A    I mean, in that every concrete floor in a warehouse kind of

21        has cracks and seams, yes, but not, you know, exactly where

22        they are or when they're going to go over them or anything

23        like that.

24   Q    All right.  So the form that we were looking at, is that --

25        who fills that out?

| | | |
|---|---|---|
| 1 | A | The drivers fill one of those out for each shift that they |
| 2 | | drive. |
| 3 | Q | And what are they supposed to do? |
| 4 | A | They'll get some instruction at the beginning of the shift. |
| 5 | | We want you to do a simulated tractor-trailer load, we want |
| 6 | | you to do a lot of lifts this shift, that kind of thing, |
| 7 | | whatever their instructions are.  And then any observations |
| 8 | | that they have with the truck, if there's any anomaly, |
| 9 | | anything that's odd to them, anything out of the ordinary, |
| 10 | | error codes, batteries draining too fast, it seems like |
| 11 | | something's overheating, any kind of feedback.  And then in |
| 12 | | the morning, the engineers will gather up those, they'll have |
| 13 | | a meeting in the morning, go through the results of the night |
| 14 | | driving, and then that informs how the engineers are going to |
| 15 | | spend their time looking at tweaking design changes. |
| 16 | Q | Are there any specialized tracks in the lab for the night |
| 17 | | drivers to do their work? |
| 18 | A | There are some, yes. |
| 19 | Q | Like what? |
| 20 | A | Well, one that we used extensively on the 4250 project is |
| 21 | | basically a rumble strip.  It's a big set of steel bars, |
| 22 | | different heights and different widths, that we lay down on |
| 23 | | the floor.  When we really want to accelerate the testing of |
| 24 | | a component that's, you know, being driven on bad floors or |
| 25 | | being driven into and out of the over-the-road trailers a |

1    lot, we have the drivers go over this because it -- we can

2    get a lot of cycles of, you know, whatever part of the truck

3    we're trying to test in those very hard vibration kind of

4    applications.

5  Q    All right.  Let's take a look at 552.

6              (Video played.)

7              MR. LoCOCO:  Can you stop it, please?

8  BY MR. LoCOCO:

9  Q    So what are we seeing here in this video here, 552?

10  A    So the top half of it is a tractor weldment, the back half of

11    the Model 4250.

12  Q    When you say "top half of it" -- you can draw on this thing.

13  A    Okay.  This here is a 4250, the back of a 4250.  The steer

14    tire's here, the operator compartment is here, or at least

15    part of it is, and this is on what's called a dynamometer.

16    So the dynamometer is this silver rolling thing here that's

17    embedded in the floor that rolls around, and that way, you

18    can essentially do simulated travel testing on a truck that's

19    sitting still.  And in this particular one, the dynamometer

20    also has those kind of bars attached to it so that we're, you

21    know, essentially simulating the truck going over -- really

22    over dock boards.  Dock board is the transition between a

23    building and an over-the-road trailer.  That's where these

24    things are used a lot.  That's where we're trying to get a

25    lot of cycles at a time on this endurance fixture, to test,

1      is any of the welds going to break or any of the components

2      of the operator suspended floor going to break, that kind of

3      thing.  If you run it, you see the operator floor is going up

4      and down with each bump too.  It's -- it's an isolated

5      operator floor.

6                         (Video played.)

7                         THE WITNESS:  That weight is simulating the

8      weight of the operator.  So we welded in a weight that's the

9      weight of an average operator so that you get the proper

10     response of the system that you would if there was a real person

11     standing there.  And this isn't even a prototype.  I would call

12     this like a breadboard kind of truck.  It's very roughly put

13     together.  There's -- you know, some components probably aren't

14     completely there in the weldment, just so that it's easier to

15     instrument and test it.

16  BY MR. LoCOCO:

17  Q   You mentioned that this is a way to get a lot of cycles done?

18  A   Right.

19  Q   Ultimately how many cycles were done with this test fixture?

20  A   This one, we ran multiple samples, at least a million cycles,

21     and I think the longest one went 2.7 million cycles.

22  Q   All right.  And --

23                         (Video played.)

24                         MR. LoCOCO:  Okay.  Stop it again.

25  BY MR. LoCOCO:

1   Q   So we see the steel plate under this weight going up and

2       down.  What's being tested there?

3   A   The steel plate, oh, well --

4   Q   Under the weight.

5   A   Right.  So this plate here, that's the operator compartment

6       floor.  So as you see it go, you see the tractor frame, this

7       piece is getting a hard shock.  The operator floor, not all

8       of that force gets through the operator floor.  That's one of

9       the innovations that was a primary component of the 4250

10      project is this isolation of the floor.  So that floor shock

11      loads get attenuated, they get dampened out.  They don't all

12      get through to the operator.  So that piece that you're

13      asking about is the operator floor.  That's where the

14      operator would stand.  There would be a pad there, a lot of

15      other niceties, but.

16  Q   So the jury's heard the term "floating floor."  Is that this

17      feature?

18  A   Yes, this is the floating floor feature.  That's right.

19  Q   What was the design purpose for the floating floor?

20  A   This kind of truck, the standup counterbalance truck, is used

21      very frequently for loading over-the-road trailers.  Right?

22      And over-the-road trailers are going to be different heights.

23      The building is a fixed height.  When an over-the-road

24      trailer backs up to the building, there's transition plates

25      that you can put between the building and the trailer called

1    dock plates.  Right?  It can be at an upward angle, downward

2    angle, straight ahead.  Any time you enter a truck to --

3    every time you enter or exit the truck when you're unloading

4    a trailer, you're hitting these dock plates that's causing

5    this kind of shock to the truck and to the operator on an

6    older truck.

7  Q  And so what was the purpose of this floor?

8  A  Operators don't like to feel all that all day long for eight

9    or ten hours, so the purpose of the floor is to try to cut

10   down the amount of force that's coming up from the ground and

11   actually getting to them so they're not as tired at the end

12   of the day.

13  Q  Does the weight of individual operators affect the function

14   or operation of the floating floor?  You know, 135-pound

15   operator versus a 220-pound operator?

16  A  Right.  Not that much.  That's part of the thing that makes

17   our design unique as well.  There's other competitive designs

18   out there, but you need to make adjustments depending upon

19   the weight of the operator.  Part of what makes ours unique

20   is that floor that you're seeing moving up and down is also a

21   very large counterweight.  It's very heavy so that when you

22   add the operator's weight to it, when they stand on it, their

23   weight doesn't contribute very much to the entire system, so

24   that's that attenuation.  Pretty much the same thing

25   regardless of whether the operator's a small person or a big

1      person.

2   Q   Okay.

3   A   Without any adjustment required.  That's the benefit.

4   Q   Can you hit the lower left corner?

5   A   Thank you.

6   Q   Can we move to 542?  Just blow up this, where it says

7       10:45 p.m.  So was this another night driving sheet?

8   A   Yes.  Another night driving sheet from the project.

9   Q   And this note here says "I did 6,000 bar hits."  What does

10      that mean?

11  A   That's how many of the -- on the rumble strip.  I know

12      there's ten or 12 strips you go over every time you go down

13      one.  So they -- clearly they've asked the operator to count

14      how many times they're hitting the bar each night, and

15      someone's adding all of that up so we can figure out for each

16      prototype truck how many times has it seen that kind of load.

17  Q   Why is Raymond doing all of this testing?

18  A   Well, on prototypes, you know, we do design work, we create

19      things electronically and computer models, but, you know,

20      it's not enough just to do the analytical work, not enough

21      just to create the model.  You have to create the device and

22      then you have to close the loop.  You have to do the

23      empirical testing.  You've got to see if, yes, the stress

24      analysis was correct, or, no, something's breaking sooner

25      than we thought it was going to break.  And we do all this

1    because we always find something in this prototype testing.

2    You know, the real world, you can only simulate so much.  You

3    have to do real-world stuff and you'll find stuff that needs

4    to be adjusted.  And we want to make sure we find as much of

5    that as we can on the prototypes before we let any customers,

6    drivers get on these trucks and drive them.

7  Q   Is Raymond making changes to the design as a result of this

8    testing?

9  A   Yes.  Absolutely.

10 Q   Then when the prototype testing is done in the lab, do you

11   just take those trucks and ship them out out to the field for

12   testing?

13 A   No.

14 Q   What happens next?

15 A   Well, we throw those away because they don't really represent

16   prototypes, don't represent what's going to production.

17   Right?  So we'll take the findings from that, create a big

18   list called a technical problem list.  We address each of

19   those often with redesigns.  We throw the prototypes away.

20   We scrap those and we build a whole new set of trucks.  We

21   call those pilot trucks that are much closer to production

22   intent.  Those are the ones that we're ultimately going to

23   test at customer sites.  They've got the changes to the

24   design that came out of the in-house testing.

25 Q   On the prototype testing that was run in the lab, did any of

1     the operators report falling out of the compartment or losing

2     their balance and falling out?

3  A  No, they did not.

4  Q  All right.  How does Raymond go about then figuring out who

5     gets field test trucks?

6  A  Well, you know, we've got a lot of customers we have good

7     relationships with.  There's a lot of things we can do in our

8     own lab.  There's some things that we can't do as well in our

9     lab as a customer's going to be able to do.  So we can

10    simulate a lot of what customers do.  We have a blast freezer

11    but it's not, you know, 50,000-square-foot blast freezer, so

12    we may go to a freezer site where the truck is going to be

13    saturated and driving around the freezer all day.  We may go

14    to Arizona and, you know, site in the summer time that's very

15    hot that it's harder to simulate in upstate New York.  We

16    might go to, on this product, like an animal-rendering plant

17    where the truck is going to be washed down with chemicals

18    every day to keep it clean.  Not that we can't do the

19    wash-down, but we're just not going to be subjecting the

20    truck to the same kind of environmental things that a

21    customer will.  And it's important to do it because we always

22    learn things from the other environments out in the real

23    world that, you know, you can't simulate perfectly in the

24    lab.

25                    We also tend to look for customers that are

1    going to put -- that are going to work the trucks hard.

2    Right?  They're going to put a lot of hours on that are going

3    to get multiple shifts of operators, so we can get lots of

4    different opinions and feedback from people.

5  Q  And then how do you get feedback from the field testing?  I

6    mean, do you have people there who are watching it, or how is

7    that done?

8  A  A few different ways.  So if a customer agrees to be a field

9    test site, we're essentially loaning them a truck for free

10   and asking them just to insert it into their fleet and use it

11   like they would any other truck that they use.  But the

12   agreement is, we'd like to get a sheet back from you every

13   week on how the truck was used, did it have issues, did

14   anybody have any problems, error codes, how many hours did it

15   get.  And then we'll go out, we'll -- the reliability

16   engineering group is who runs field tests.  The reliability

17   engineer will go out every couple weeks to visit each of the

18   field test sites, talk to the operators, talk to the service

19   people, you know, talk to the trainers, talk to everybody

20   there that has something to do with the truck to get

21   feedback.  And, you know, we'll stay and watch them too while

22   they're out there.  We'll get that feedback ourselves by

23   watching.

24 Q  As part of the field test work, do you also test the

25   training -- the informational materials, the manuals,

1   et cetera?

2   A   Yes.  So one of the -- we looked at the project process

3       before -- one of the requirements before you can go to field

4       trial is you have to have draft training material available,

5       and that's because we want to test the training material as

6       well as the truck.  Right?  So we'll go out to the field test

7       site.  Whichever operators are going to be the ones using the

8       truck, they're going to get trained on this particular truck

9       with the new material and we're going to ask for feedback

10      there too.

11  Q   Do the customers who do the field testing for you, do they

12      keep those trucks when the field test is done?

13  A   They don't keep the trucks.  They have to come back to us and

14      get destroyed as well.  We'll usually bring them back and

15      we'll take them apart, because you can see a lot from an

16      assembled truck.  But we'll take them apart, take the

17      bearings out.  Are the bearings wearing too quickly?  Are

18      there any cracks in welds that you can't see?  So we'll kind

19      of do like a forensic analysis before we throw it away too to

20      really get down into the nitty-gritty of whether anything is

21      starting to fail.

22  Q   So we talked about the seven phases of the design process.

23      How long does that process take from start to finish?

24  A   It depends on the complexity of the project.  You know, the

25      shortest project may be a year; the longest projects can be

1   three, four years long, if it's a complete clean sheet of
2   paper.
3  Q   All right.  During the design process, is the issue of safety
4   addressed?
5  A   Throughout, yes.
6  Q   What's the goal?  What's Raymond's goal on the issue of
7   safety?
8  A   Well, I guess a few things.  And I'm one of the old guys now
9   who teaches the engineers what to think about when it comes
10  to these things when they're going into a project.  So one of
11  the mantras I was taught from day one and that I pass on now
12  is you have to be thinking about safety every time you're
13  making a design decision.  You have to think about, what are
14  the downstream effects of the decision I'm making?  But
15  generally, the truck has to be safe.  The truck has to be
16  able to perform its function, and as long as it's being used
17  the way the instructions say to use it, there shouldn't be
18  anything an operator can do with the truck to get injured.
19  So we're trying to make sure that before a truck goes out to
20  a field trial, that we've designed it to make sure that's
21  going to be the case.
22 Q   All right.  So I want to talk specifically about the
23  operator's compartment on the 4250.  What did Raymond do to
24  address the -- or to minimize the risk of somebody hurting a
25  leg or a foot in that context?

1  A    Okay.  A lot of things.  I mean, I think I would start with

2       the truck itself.  The frame of the truck is a heavy steel

3       welded frame.  I think five-eighths-thick skin, very thick

4       steel.  The operator's surrounded on all six sides.  And as

5       long as they're in that compartment, it won't deflect.

6       Doesn't matter what they run into.  The truck is designed to

7       withstand extremely high forces without any deformation.

8  Q    Let me stop you for a second.  Okay.  So you started with the

9       frame of the truck.  When you say "the frame of the truck,"

10      what are we talking about?

11 A    The orange part and then the black bumper part below the

12      orange part.  But then again, there's an overhead guard,

13      there's steel underneath the floor, so there really --

14      there's steel on every side of the operator.  And yes,

15      there's open areas as well, but in most of the environments

16      this truck goes into, there's really nothing that can come

17      into those open areas.  So as long as they stay in there,

18      they're protected.

19 Q    What's the next thing you did to assist the operator to stay

20      safe in the compartment?

21 A    Well, then they have to be able to stay in there, so there's

22      a number of different things we do.  I guess the first is the

23      floor pad.  It's a nonslip Ergomat floor pad, kind of like

24      the ones you see at the checkout line at the grocery store,

25      where somebody's going to be standing all day long so it's

1    not as tiring to stand there.  And it's a nonslip surface, so

2    they won't slide off of it.

3            And then they're surrounded with padding as

4    well.  You can't see it so well in this picture, but there's

5    a back pad that they have that they can lean against.  And

6    then there's wrap-arounds about both their hips as well that

7    they can lean left or right into to support themselves.

8    Those are also nonslip surfaces.  There's an elbow pad they

9    can lean on.  It's got different tiers for different height

10    operators, so a tall person can lean up high; a short person

11    is a little lower.  And then there's a steering wheel.

12    That's also got a nonslip rubber grip on it.  And the control

13    handle, those are the other points of contact.

14            So when the operator's in the truck, using it,

15    they've got two feet on the floor and a solid stance, they've

16    got their two hands on the control handles, and they've got

17    their backside leaned up against the pad or on the hip guard

18    or hip returns.

19  Q   Anything about the floor?  How is the floor --

20  A   Yeah.

21  Q   -- constructed to assist the operator?

22  A   Right.  So it's got the nonslip pad, but we also tip it.  So

23    the back pad here, the floor is here, but then we tip the

24    floor up and we tip it towards the elbow pad as well.  So

25    it's pretty subtle, but the operator, just by standing in the

1    truck, isn't standing perfectly upright.  They're actually

2    leaned backwards into the back pad and into the truck toward

3    the elbow pad too.  It encourages them to take up a stance

4    where they're using the pads, and then they use the pads to

5    help them stay inside.  They use the feet and the hands to

6    help them stay inside.  This is like a -- it's called a

7    five-point stance:  One hand, two hands, two feet.  And your

8    backside -- or six or seven, if they're using the elbow pad

9    or the hip return.  And they can push themselves into things.

10   They can hold on there and that's how they stay inside the

11   truck.

12              I guess the next thing is then, what's the

13   truck going to be allowed to do?  We have to program which

14   software, how fast is the truck going to be allowed to go,

15   how quickly is it going to be stopping, what kind of forces

16   will that apply to the operator when it accelerates, when it

17   decelerates, when it turns.  And we tune those very carefully

18   so that the operator never has a force applied to them, no

19   matter what they can do with the truck that causes them to

20   have any balance issues, to have any part of them come out of

21   the truck.

22  Q  Let me stop you there.

23  A  Okay.

24  Q  So the jury's heard that the maximum speed on a 4250 is

25   8 miles an hour.

1   A   Right.

2   Q   All right.  Could you have designed -- could Raymond have --

3       could Raymond have designed the 4250 to go faster than

4       8 miles an hour?

5   A   Sure.

6   Q   Why didn't you?

7   A   Because these trucks are going to be used in warehouses.

8       There's only, you know, so much room in warehouses.

9       Customers want to use most of their warehouse space for

10      product, not for big aisles and long stopping zones.  So just

11      to operate practically indoors in a warehouse, you only have

12      so much room to stop the truck.  If we wanted to go 20 miles

13      an hour, we could go 20 miles an hour, but we would need a

14      whole lot more distance to stop the truck because we're not

15      going to apply a greater force on the operator that would

16      cause them to come out.  We're only going to have the same

17      amount of deceleration force, which means we need more space

18      to stop.  So this is kind of practically about as fast as

19      this thing can go safely in a warehouse.

20  Q   So could you -- kind of the flip side.  Could the truck have

21      been designed to brake harder when you take your foot off the

22      deadman brake?

23  A   It's an interesting question.  Not really.  You could put a

24      stronger brake on than what's on there.  But the way the

25      truck stops when the brake is applied, there's two driven

1    wheels at the front of the truck, the brakes are on those

2    wheels.  When the truck is braked, we use motor power to do

3    that, basically trying to turn the motor backwards to stop

4    the truck.  If you try to do it harder, if you try -- it's

5    called torque.  If you try to apply more torque to it to stop

6    faster, what actually happens is the tire locks up, and

7    instead of a rolling stop, you get a skid just like with your

8    car if you're hydroplaning or something.  You can try to

9    apply more torque, but instead of getting a shorter stop, you

10   end up skidding and getting a longer stop.  So it's

11   practically as strong as it can be, practically speaking.

12 Q All right.  We talked about the deadman brake.  We talked

13   about the compartment.  How else is the operator -- how else

14   can the operator bring the truck to a stop or brake the

15   truck?

16 A So the primary way is the handle.  You see -- if I can draw

17   on here.  This is the control handle -- oh, it moved.  That's

18   the control handle there.  It's in the operator's right hand.

19   And it rotates, so you use your wrist to rotate it either

20   towards the back of the truck or towards the front of the

21   truck.  You push or rotate it in the direction you want to

22   go.  So if I want to go forks first, I rotate it this way.

23   If I want to go 50 percent speed, I rotate it 50 percent.  If

24   I want to go 100 percent speed, I rotate it all the way.  If

25   I want to slow down, I just rotate it back the other way.

1              And what the truck does, it says, how hard do

2      you want to slow down.  That's proportional to how far you've

3      rotated it back.  And it says, okay, I'm going to reverse the

4      polarity of the motor.  Essentially the motor's spinning this

5      way to drive me forks first.  I'm going to reverse the

6      polarity and use the motor itself as the brake to slow the

7      truck down, so that's the normal way of stopping.  It's very,

8      very fine control that way.

9              Operators can stop the truck literally within

10     a half an inch of where they're trying to stop.  That way,

11     it's very easy to control, very fine control, which is

12     important.  Right?  You're in narrow aisles.  You don't have

13     a lot of extra room to maneuver.  You can't be overshooting

14     where you're trying to put a load down by 3 inches or you're

15     going to drop the load out the back of the rack or something

16     like that.

17  Q   So if you've got Amazon or FedEx Supply Chain or Pinnacle

18     Foods or, you know, Acme Bread Company, and they want to buy

19     a standup forklift, does Raymond sell them, you know,

20     basically the same way cars are?  You go to a showroom and

21     you pick something out that's on the showroom floor?

22  A   No, that's not how we do it.

23  Q   What's the process in the lift truck industry?

24  A   Pardon me.  So we have dealers, which I guess is not unlike

25     automobiles, around the country, so Raymond doesn't actually

1    sell trucks to anybody.  We have dealers around the country.

2    The dealers are the ones that are interface to the customer.

3    And they essentially -- the dealers go and they establish

4    relationships with customers.  What is it you're trying to

5    accomplish in your warehouse?  What kind of products might

6    you be interested in using?  And between the dealer and the

7    customer, they'll figure out, well, you know, for my

8    warehouse, configured this way, I need, you know, this kind

9    of truck, I need it to lift this load, I need it to go this

10   fast.

11             And then, you know, probably 60, 70 percent of

12   our trucks are customized somehow for each customer because

13   of their particular way they're going to use it.  Are they

14   going to put an attachment on the front, or do they have

15   different hazards in their environment that are, you know,

16   kind of odd or out of the norm, whether they may want to add

17   a different feature for something like that.

18  Q  All right.  Let's look at Exhibit 505.

19  A  We don't build something unless a customer has ordered it and

20     it's very specifically configured.

21  Q  So you build it to the order?

22  A  Always, yes.

23  Q  So we're looking at the first page of Exhibit 505.  What is

24     this, Mr. Kerila?

25  A  This is our features brochure.

1   Q   And just generally, what is the features brochure?

2   A   It's a document that Raymond created that we've instructed

3       dealers to give to customers when they're having this

4       conversation about what kind of truck they want and how they

5       want to configure it.  It's got a bunch of information in it

6       on certain features that we feel is important for customers

7       to really understand how these features work, when these

8       features might be a good thing, when they might not be a good

9       thing.  And in most cases, they're not necessarily going to

10      be a good thing because if they were, we would make them

11      standard features.

12  Q   All right.

13  A   So this brochure explains, hey, for your environment, you may

14      think -- for you, it's going to reduce the risk to your

15      operators to add this.  You may think otherwise.

16  Q   How does Raymond make sure that customers have been provided

17      with this brochure?

18  A   We provide it to the dealers.  The dealers provide it to the

19      customer.  Oftentimes, dealers just make that part of the

20      quote so that they know that the customer's seen it.  But

21      then Raymond makes sure through our order entry process -- so

22      when a dealer -- again, customers can't order directly from

23      us.  They work through the dealer.  When the dealer comes to

24      order a truck, there's a series of questions they have to

25      answer, and one of them is, has the customer received and

1   reviewed the features brochure?  And if they haven't, we

2   won't build the truck.  We'll call the dealer up and say,

3   "You've got to go back.  You've got to give them the features

4   brochure and finish this conversation."

5   Q   All right.  Let's look at 505-12, and we blew up this

6   Operator Compartment Sensor System.  All the way down, right

7   there.  So the jury heard this term this morning during

8   Dr. Rhoades' testimony.  Does Raymond offer a feature called

9   the Operator Compartment Sensor System?

10  A   Yes, we do.

11  Q   What is this feature?

12  A   This is a training tool that we have.  The way it works is --

13  you can't see it so well in the picture, but here there's a

14  set of laser beams, and here there's a set of receptors, and

15  the lasers are aimed at the receptors on the other side.  And

16  the intent of this is for customers who have a desire to have

17  a reminder for operators of what their training is, about

18  staying inside the compartment, about getting into the

19  compartment in the first place in the right position, and

20  about staying there.  So what this tool will do is give the

21  operator a reminder:  Hey, you know, you broke this -- you

22  broke the beam.  Get your foot back where it belongs.  Get

23  your ankle back in where it belongs.  It's a reminder to the

24  operator, sounds a tone, puts a message up on the display

25  that says "Remember your training."

1    Q    And if the truck is moving when the operator breaks the beam,

2         what does the truck -- you said it sounds a tone, there's a

3         message.  Does the truck do anything else?

4    A    It sounds a tone, it puts a message on the operator display,

5         and then it limits the speed of the truck so the truck starts

6         to slow down.

7    Q    Does it have the brake come on fast or hard?

8    A    No, no.  And if the operator, you know, sees a message and

9         brings their foot back in, it will remove the limit as well.

10        And -- but the brake doesn't come on hard.  It starts to slow

11        the truck down, gives the operator a chance to fix the

12        problem.

13   Q    The truck that was involved in Mrs. Anderson's accident, the

14        4250, was it sold with this feature?

15   A    It was not.

16   Q    All right.  Did this truck, did the subject forklift -- was

17        it sold with any other features that were -- that were in the

18        brochure?

19   A    It was, yes.

20   Q    All right.  Can we take a look at 503-15?  So does this

21        photograph -- this is of a -- it's not the subject truck, but

22        it's one of the other ones that were at FedEx Supply Chain.

23        Does this photograph show one of the other features available

24        from Exhibit 505, the features brochure, that was on the

25        trucks at this facility?

1   A   Yes.  The raised operator backrest here is one of the other

2       features in the brochure.

3   Q   So if we -- I'm not going to put it on the document camera,

4       but if we look at this photograph of the 4250, it doesn't

5       have that extended backrest?

6   A   Correct.

7   Q   What is this extended backrest?  What does Raymond sell that

8       for?

9   A   It's for a different kind of hazard.  It's hard to explain

10      without a picture.  But you see vertical posts here in this

11      picture.  Right?  The loads then are placed on horizontal

12      beams that span between those vertical posts.  Most places,

13      that horizontal beam is about here.  Right?  So that the

14      truck, if it -- if the operator's not paying attention and

15      they back up too close to a rack, that beam will run into the

16      tractor frame.  In some applications, and apparently in this

17      application, that beam might be up quite high.  In that case,

18      that beam can come over the top of the tractor frame, the

19      standard tractor frame, and the operator can accidentally

20      back right up on the rack if the storage slot is empty.  So

21      we have this optional feature, this raised operator backrest,

22      that will keep the truck from getting underneath the rack.

23  Q   Now you mentioned early in your testimony that one of the

24      things that Raymond does is, it's aware of safety standards

25      that apply to the design of its forklifts?

1  A  Yes.

2  Q  What's the main standard that you all refer to?

3  A  It's the ANSI B56.1 Standard.

4  Q  And is it Raymond's goal to comply with the requirements of

5     that standard?

6  A  Yes, it is.

7  Q  All right.  Getting back to the design process, as part of

8     that process, are there design reviews or safety design

9     reviews that are done during the process?

10 A  Yes, both.  Technical design reviews where we'll get a group

11    of engineers together, and we'll have at least three

12    different versions of those initial, intermediate, and final

13    ones.  So initial technical design review, the engineer

14    responsible for a particular component or assembly is going

15    to get a group together.  They'll do a presentation on, you

16    know, "I've got three, four different ideas of how to solve

17    it."  We'll talk about which ideas have the most merit, how

18    might you go about testing that or analyzing it.  They'll go

19    off and do some work, maybe build a prototype.

20             In intermediate review, what's the result of

21    the testing kind of thing.  "I've narrowed it down to two

22    options."  But, you know, trying to get a cross-sectional

23    group, different disciplines, more senior engineers, some of

24    their peers as well, to make sure that, you know, we're

25    getting a lot of different eyes on each design.  It's not

1   just one person in a room designing anything by themselves.

2   So those are technical design reviews.

3   Q   How about safety design reviews?  What are those?

4   A   Safety design reviews are a little bit more focused.  They're

5   not just on a particular part or component.  They're really

6   on the entire truck.  So there's two primary -- we'll often

7   hold more than that, but there's two primary safety design

8   reviews.  The initial one is done before the truck's allowed

9   to go to field trial, because we want to make sure before we

10   put a truck in customers' hands that we're comfortable as a

11   company that it's going to be safe to operate.  And then the

12   final one is done before the truck's allowed to go to

13   production, because again, we usually learn things during

14   field trial that are going to change the design.  And we'll

15   do testing, you know, to show the truck is safe in a lot of

16   different ways.  Some of it's going to be compliance to

17   standards, that kind of thing.  We'll do that testing on

18   prototypes for the initial safety review.  After those trucks

19   have been destroyed, we'll repeat a lot of that testing for

20   the final safety review on production on ten trucks as well.

21   Q   Who attends the final safety design review?  And I don't need

22   names of people, but types of people.

23   A   Right.  Okay.  It's a good cross-section.  It's not just

24   engineering.  It's a good cross-section of engineering.

25   There's going to be test and reliability engineers there.

1    There's going to be, you know, systems and software

2    engineers.  There's going to be, you know, senior engineers

3    like me, people that have been around, that have seen a lot

4    of things, that can ask a lot of questions.  There will be

5    marketing and sales people that know the market, that know

6    how customers are going to use the trucks.  There will be --

7    somebody from legal will be there.  Somebody from field

8    service will be there.  Somebody from manufacturing

9    engineering will be there.  It's not just the safety of the

10   operator.  It's the safety of the people who are going to be

11   working on the truck.  That's why field service is there, the

12   people who are going to be assembling the trucks.  They have

13   to be around the truck.  There will be somebody there from

14   training.  The people who are making the training material

15   and the technical publications group will be there, because

16   we're going to review all that stuff.  We're going to make

17   sure we've addressed all the hazards associated with the

18   truck through the design, through the training material,

19   through the instructions.

20 Q  As part of the safety design review, is reference made to the

21   B56.1?

22 A  Yes.

23 Q  All right.  As part of the design work, do you and other

24   engineers make visits to customers' facilities?

25 A  We do at a number of different points.  So in Phase 0, where

1    we're just trying to figure out what the project's going to

2    be, that's when it starts.  What are customers doing with

3    trucks, where can we help them do something better, where do

4    we have an innovative idea that's going to make their job

5    easier, their life easier, and then how are they using the

6    existing products?  If there's something they're using

7    similar, a competitive unit, are they, you know, carrying

8    4,000-pound loads, doing 30 cycles an hour, 60 cycles an

9    hour?  Are they doing a lot of travel?  Are they doing a lot

10   of lifts?  Because we want to be able to simulate those

11   things when we come back and test our prototypes.  So we'll

12   go out, we'll watch them, we'll take measurements, we'll take

13   videos so that we can come back and simulate what's going on

14   at the customer as well as we can in the lab when we're doing

15   prototype testing.

16 Q  All right.  I'm going to move on to something new, but I have

17   one kind of last question about this design process.  Given

18   the whole process you've discussed, Phases 0 through VI, the

19   field testing, the lab testing, the prototype testing, can

20   you give the jury an estimate of how many hours were spent on

21   the design of the 4250?

22 A  Oh, tens of thousands of hours.  Between the engineers and

23   the testing and the driving and the field testing, certainly

24   tens of thousands of hours.

25 Q  All right.  In Raymond's design efforts, does Raymond take

1        into account the comfort of the operator?

2  A    Yes.

3  Q    Why do you do that?

4  A    Well, the truck is -- by design, it's meant to be operated

5        standing for eight, ten hours at a time.  That can be tiring,

6        that can be, you know, fatiguing over an entire shift, so.

7        And the 4250 in particular with the suspended floor is all

8        about operator comfort.  Right?  They're driving over dock

9        boards all day long.  Can we limit how much of the force is

10       getting to the operator so at the end of their shift, they're

11       not tired, they're not fatigued, they're not, you know,

12       making bad decisions because they're exhausted.  A safe -- or

13       a comfortable operator who's not fatigued is a safer

14       operator.

15  Q    So does Raymond value comfort over safety?

16  A    They're one and the same.  They're inter -- you know, you

17       can't have one without the other, really.

18  Q    The 4250 the jury's been hearing about, it's got an open-back

19       design.  Why does it have an open back?

20  A    Well, at the highest level, because that's the safest way to

21       design the truck.  It's where the operator gets on and off

22       the truck, but it's very important because of the hazard of

23       tipping over the truck or having an off-dock accident.  These

24       trucks are used a lot on docks.  It's very important for the

25       operator to be able to get off the truck and away from that

1      danger as fast as they can, so that's why the safest

2      configuration is with an open back.

3 Q   Does Raymond take into account concerns over operators

4      keeping their balance in the compartment?

5 A   Absolutely.  Yeah.

6 Q   How do you do that?

7 A   Well, a lot of the features that we talked about earlier.

8      Right?  We put a lot of physical features in place to help

9      the operator maintain their position.  We tune the speeds and

10     the decelerations and the forces on you in turning so that no

11     matter what you can do -- and we test the truck more extreme

12     in the lab than any customer's going to test it.  Whatever

13     you can do with the truck, it's not going to apply a force to

14     you that's great enough to cause you to come outside the

15     compartment.

16             In addition, I forgot to mention earlier, just

17     the range of motion, how the steering wheel moves, how the

18     control handle moves, is such that your parts don't come out

19     of the truck either.  Right?  There's nothing an operator

20     needs to do with the truck in normal operation where they're

21     ever going to come outside the protective confines of the

22     compartment.

23 Q   The jury's seen this Exhibit 157.  So this is a topdown view.

24     The brake pedal is up here.  Did Raymond design this pedal so

25     that it was only going to be operated by the right foot?

1    A    No.

2    Q    What was Raymond's design intent with this pedal here?

3    A    So it's kind of an innovation in the way we do trucks.  We

4         used to have a different design when we came out with this

5         back in the early '90s.  It's called a dockstance-style

6         truck.  What dockstance means to Raymond is there isn't one

7         particular stance that you have to be in.  We don't want the

8         operator to be standing still in one place for eight or ten

9         hours.  We want them to be able to move around.  We want them

10        to find whatever stance is most comfortable for them for

11        whatever they're doing, which could be different going in one

12        direction than it is going in another direction.  It could be

13        different from one operator to the next operator.  The pedal

14        was designed very intentionally to allow customer -- or

15        operators to take a variety of stances, either between

16        operators or over their shift, so that they're not getting

17        tired, so that they're moving around, so that their legs

18        aren't getting tired.  And so that ultimately as the shift

19        wears on, they're not as exhausted and hopefully making

20        better decisions.

21   Q    If an operator is using his or her right foot on the pedal

22        and it does an emergency brake, the operator -- the truck

23        stops in X feet?

24   A    Right.

25   Q    At 8 miles an hour, how long will a truck take to stop if

1    you're going forks trailing?

2  A  So full speed, full load, which on this truck is

3     5,000 pounds, or at least on the 4250 series is 5,000 pounds,

4     somewhere between roughly 12 or 13 feet.

5  Q  All right.  But if the operator is using his or her left foot

6     on the deadman pedal, it's going 8 miles an hour full speed,

7     full load, and takes a foot off the deadman pedal, using the

8     left foot, how long does it take for the truck to stop?

9  A  The same.  12 to 13 feet roughly.

10 Q  So no matter which foot you're using, it's the same stopping

11    distance?

12 A  Correct.  And it's not exactly 12, 13 feet.  It's going to

13    depend on the floor conditions.  Right?  You know, that

14    concrete's a little different, whatever, but it's roughly 12

15    to 13 feet.

16 Q  Now are you familiar with the Crown pedal design?

17 A  Yes, I am.

18 Q  All right.  The switch that's under their right foot, does

19    that activate the same braking performance as you get with

20    the pedal that's under the left foot?

21 A  No, it doesn't.

22 Q  All right.  So Dr. Meyer was here last week and he testified

23    that he wants brake pedals under both feet.  My question is,

24    are you familiar with any standup lift truck that has two

25    brake pedals, one under each foot?

1  A    Nobody has a design like that, no.

2              MR. LoCOCO:  The -- could you pull up 512-13 --

3       or 503-13?  That's 13.  I gave you the wrong number.  3.  Let's

4       try 3.  There we go.  No, the one you had just last.

5  BY MR. LoCOCO:

6  Q    All right.  So my drawer isn't working for some reason.  Can

7       you show us where the steer tires are?

8  A    The steered tire's here.

9  Q    All right.  And where is the drive -- at least one of the

10      drive tires?

11 A    Right.  So this is the left-side drive tire, and there's one

12      just like it on the opposite side of the truck, so

13      three-wheel truck.

14 Q    Could you clear that now?  All right.  So the steer tires,

15      there's an opening for the steer tires.  Why does Raymond

16      have that opening?

17 A    For a number of reasons.  Probably the first one is these

18      are -- these are solid tires.  They're not like a car tire.

19      They're not inflated with air.  They're solid.  You can kind

20      of see it a little bit on this picture on the front tire.

21      They crack over time, they wear out over time, they start to

22      chunk over time, and parts of them will come off.  So part of

23      the daily operator checklist, preoperational, is to check all

24      the tires out and see, are they going to have a bond failure,

25      where the bond of the tire to the hub comes off entirely, or

1    are they so chunked out that they're running the risk of

2    losing a steering tire while they're in the middle of a turn.

3              So the first reason for that cutout is the

4    operator needs to be able to look at that every day.  They

5    need to be able to see the tires and make sure that they

6    don't need service.  I think the second reason is, in case

7    they need service, you can see just the tires there, but

8    that's mounted on a set of bearings to take the steering

9    loads, that's -- you know, the whole assembly, probably

10   couple feet tall that goes up under the counterweight that's

11   in that back left corner.  That's very tall.  It's far too

12   tall to be able to jack a truck up that far to take that out

13   to service it.  So in order to get the steer tire assembly

14   out to replace the steer tire, you'd need to have that cut

15   out so you can undo the bolts and rotate it out through that

16   hole to replace it.

17             And then I guess the third reason is for

18   stability, which is a little more subtle and a little harder

19   to explain.  But it's a three-wheeled truck.  There's two

20   wheels in the front, just this one in the back.  We want that

21   tire to be as far back as possible, just like, you know, the

22   legs on your chair.  You want to be as far out as possible to

23   have as steady a chair as you can.  We want that tire as far

24   to the back of the truck as we can, because it increases the

25   backwards stability of the truck so it won't tip over

1       backwards.  So that tire is actually so far back for

2       stability purposes that when it rotates, it comes out through

3       that opening a little bit, corners when it is turning.  The

4       corners of that can come out through the opening a little

5       bit.  That allows us to push the tire even further towards

6       the back of the truck and improve the stability.

7    Q  Okay.  How is an operator of the 4250 protected from the

8       steer tires?

9    A  Well, the operator of course is on the right-hand side, the

10      opposite side in the compartment, and it's a solid steel wall

11      between them and the steer tire.  There's no physical way for

12      them to make contact with any of the tires, actually.

13   Q  As long as they stay in the compartment?

14   A  As long as they stay in the compartment, correct.

15   Q  All right.  Mr. Kerila, do you have experience yourself with

16      driving forklifts including the 4250?

17   A  A lot.  Yes.

18   Q  Are you certified as a forklift operator?

19   A  Yes.

20   Q  Have you personally observed the operation of the 4250?

21   A  Many times, yes.

22   Q  Does Raymond use the 4250 in its own facilities?

23   A  Yes, we do.

24   Q  All right.  Let's pull up Exhibit 500, please.  So when a

25      forklift is shipped out, does every truck get one of these,

| | | |
|---|---|---|
| 1 | | what we see, Exhibit 500, the operator's manual? |
| 2 | A | Yes, it does.  Yep.  Ships with every truck. |
| 3 | Q | Can we go back to the last page?  Does this photograph, which |
| 4 | | is 503-15, indicate -- are you able to show the jury where |
| 5 | | the manual is kept on this truck? |
| 6 | A | Yep.  There's a manual compartment here, this black thing |
| 7 | | here.  It's a plastic compartment.  It's right inside the |
| 8 | | truck.  It's just behind the operator's cab.  That's where |
| 9 | | the manual is when the truck ships. |
| 10 | Q | All right.  If we could go back to 500-41.  So what are we |
| 11 | | looking at here from the operator's manual, Mr. Kerila? |
| 12 | A | This is one page from the operator's daily checklist, their |
| 13 | | preinspection checklist. |
| 14 | Q | So what's the daily checklist?  What's the intent of that? |
| 15 | A | Well, the intent of it is to make sure that the truck is safe |
| 16 | | to operate before you start operating it.  You don't know |
| 17 | | what happened the shift before you.  You want to make sure |
| 18 | | the truck operates properly before you get on it and start |
| 19 | | doing things.  So there's a couple of parts to it.  The first |
| 20 | | is, before the key's even turned on, you do things like the |
| 21 | | tires inspection and inspect the chains, look at the forks, |
| 22 | | make sure nothing's cracked. |
| 23 | Q | Let me stop you there.  Let's go to 500-39. |
| 24 | | THE COURT:  All right.  I'm going to need to give |
| 25 | | my court reporter and jury a break -- |

```
1                          MR. LoCOCO:  This is a good spot.
2                          THE COURT:  -- before you segue to the next
3        section.  Or are you winding up with --
4                          MR. LoCOCO:  We've got a ten-minute video to show
5        right at the end, probably about ten minutes more of
6        questioning.
7                          THE COURT:  Ten minutes of questioning?  Then why
8        don't we just go ahead and take a break right now.  We'll
9        take -- we'll come back at 20 minutes to 3.  We're in recess.
10                          (Jury exits at 2:32 p.m.)
11                          (Recess from 2:32 p.m. to 2:44 p.m.)
12                          (Jury enters at 2:44 p.m.)
13                          THE COURT:  Please be seated.  Thank you.
14                          MR. LoCOCO:  May I proceed, Your Honor?
15                          THE COURT:  You may.
16                          MR. LoCOCO:  Thank you.
17     BY MR. LoCOCO:
18     Q    So we were looking at -- well, as long as this is up here,
19          let me ask you about this.  What do we see here, Mr. Kerila?
20          This is from the operator's manual.
21     A    Yeah, it's a picture in the operator's manual, but it's of
22          the main warning decal for the truck.
23     Q    All right.  Are you able to point the jury to where the decal
24          is on the truck?
25     A    Sure.  So you see there's a couple of black bars that go up
```

1       to hold up the overhead guard above the operator compartment

2       on the left-hand side.  There's two bars that old that up.

3       This is what's on the backside of the front bar, so it's

4       right where the operator's standing so they can read it.

5   Q   All right.  And then it's also reprinted in Exhibit 500?

6   A   In the operator manual, yes.

7   Q   All right.  So let's go back to 39, Exhibit 500-39.  So you

8       started talking about the daily check.

9   A   Right.

10  Q   This first section is called "Visual Inspection."

11  A   Right.

12  Q   What does that involve just generally?

13  A   So again, this is done pre-shift, before you start using the

14      truck, and this first part before you even turn the key on.

15      Right?  If you can find a problem with the truck before it's

16      got power to it, it's a safer way to find it.  So does the

17      control handle return to neutral like it's supposed to?  If

18      it's got a broken swing and doesn't return, you can figure

19      that out without having the truck turned on.  So there's a

20      series of checks here like that, including looking at the

21      tires, looking for chunking or bond failures.  That's in V-2,

22      Visual 2.  So you go through these visual pieces with the key

23      off first and then you do an operational check to make sure

24      the truck is actually behaving the way it's supposed to

25      before you get going.

1  Q  All right.  I want to stop you there for a second.  On the

2     visual check, you mention that the wheels and the tires are

3     supposed to be checked?

4  A  Yes.

5  Q  All right.  Is that something that is required across the

6     industry, that, you know, all your competitors say check the

7     wheels and tires?

8  A  Yes.

9  Q  Is a daily check something that's required?

10 A  It is required by OSHA, yeah.

11 Q  All right.  And the steer tire opening that we talked about,

12    is that on the Crown truck, the Nissan, the other trucks that

13    you may get asked about?

14 A  It is.  There are slightly different shapes, but the trucks

15    are all three-wheel trucks.  They all have a steered wheel in

16    the back and the driven tires in the front and they all have

17    an opening for the same reasons that we have it.

18 Q  Now you mentioned the truck frame, the steel part.  Does

19    Raymond test to see how much force that steel can take?

20 A  Yes.

21 Q  How do you do that?

22 A  We have a big hydraulic fixture, hydraulic rams that are like

23    the hydraulic cylinders you see maybe on a backhoe.  Right?

24    That can apply very, very high forces.  And we essentially

25    clamp the truck and then squeeze it with these hydraulic

1    rams.  And we load it with two and a half times the weight of

2    the truck when the truck has got the largest battery and

3    carrying the full load.  So it's around 45,000 pounds of

4    force applied to the back of the truck.  And it's -- the

5    objective is to have no deformation.  Right?  So if an

6    operator runs into something with 45,000 pounds of force, the

7    truck's not going to bend at all.

8  Q   Okay.  The jury's heard the term "dockstance" from you today,

9    but they've also heard the term "sidestance."

10 A   Mm-hmm.

11 Q   At Raymond, is there a difference between sidestance and

12    dockstance?

13 A   Yes, there is.

14 Q   What's the difference?

15 A   Sidestance is more straight 90 -- standing straight

16    90 degrees to the direction of travel, forks first or tractor

17    first.  Sidestance is complete 90 degrees.  Dockstance is a

18    Raymond thing.  That says 90 degrees is fine, 45 degrees this

19    way is fine, 45 degrees that way is fine, a little bit

20    further this way is fine.  As long as you're fully in the

21    compartment, you've got two feet on the floor, you've got one

22    of your feet on the pedal and not the other one, and you've

23    got -- you know, your two hands are safely on the controls,

24    you can take up a variety of stances.  That's what dockstance

25    is.  It's about allowing the operator to find the place

1       that's most comfortable for them.

2   Q   Now looking again at this overhead of the Crown floor, we

3       talked about these upside down "U"s and the pedal.  There's a

4       line down the middle here.  What's that?

5   A   It's a steel bar that sticks up out of the floor.

6   Q   And have you operated this type of truck?

7   A   I have.

8   Q   All right.  What does that steel bar do?

9   A   The intent is to try to keep an operator from stepping on

10      both the sensor and the pedal with one foot.

11  Q   All right.

12  A   So it comes up under your -- the inside of your shoe, if

13      you've got flat feet anyway.  If you've got a decent arch on

14      your shoe, you could straddle it.

15  Q   So does that bar limit your ability to do more dockstance in

16      the Crown?

17  A   It does.  Right?  You -- your feet are much more in one

18      position on the Crown.  There's, you know, there's space

19      there to hit that bigger sensor where you can move your feet

20      around a little bit, but they're much more constrained on

21      that design than in dockstance design.

22  Q   When someone's on the Raymond 4250 and, you know, they're

23      holding down the emergency brake, the brake pedal, and they

24      just go to get out while the truck is still moving, what does

25      the pedal do?

1  A    The pedal is spring-loaded, so it pops up.  In order to
2       activate the truck, you have to depress that spring, so if
3       you step out of the truck, the pedal pops up, the brake
4       applies, the truck comes to a stop.

5  Q    With the same stopping distances that you talked about
6       before?

7  A    Correct.

8  Q    Let's say you've got this truck and you're going 5 miles an
9       hour and you don't have a load.  How quickly does it stop?

10 A    It's a lot quicker.  It's probably 5 or 6 feet, because
11      velocity is squared to stopping distance, so as velocity
12      comes down, it's not linear, it comes down.  Stopping
13      distance comes down faster.

14 Q    But it's not 6 inches?

15 A    No, it's probably 5 or 6 feet, again, depending upon the
16      floor conditions.

17 Q    When the truck is sent out to a customer, in addition to the
18      operator's manual and the decals, is anything else sent to
19      the customer?

20 A    Yes.

21 Q    What else is sent?

22 A    Well, it comes -- it's an innovation we came out with, I
23      don't know, 15, 16 years ago.  Instead of just having a
24      visual operator manual, we've added a video version of it as
25      well.  So it's got some of the -- doesn't have everything

1       that's in the manual, but it's got some of the key things for

2       the operator to understand.  It's an insert in the manual

3       that you can watch or should need to watch to understand

4       what's in the content of the manual.

5   Q   And what's the title of that video?

6   A   It's called "Principles of Safe Operation."

7                    MR. LoCOCO:  All right.  We'd like to show that,

8       Your Honor, at this point.

9                    (Video played.)

10  BY MR. LoCOCO:

11  Q   Just a few final questions, Mr. Kerila.  We saw in the video

12      that there were some trucks like the 4250, and some where the

13      operator was standing in the sidestance, dockstance, but

14      others where they were standing either toward the forks or

15      away from the forks.  What's the that stance called?

16  A   That's a universal or fore-aft stance.

17  Q   That's not what we have here?

18  A   No, this truck doesn't have that stance.

19  Q   And this video that we just saw is sent with these trucks --

20  A   Yeah, lots of different kinds of trucks, that's right.

21  Q   If the customer orders "Safety on the Move," are those

22      specific to the particular truck they're purchasing?

23  A   Yeah, "Safety on the Move" is Raymond 's training material

24      that we've created if customers want to use our training

25      material.  Those are model specific, so those will be

```
 1          training operators just on the model that the customer wants
 2          to.
 3                    MR. LoCOCO:  All right.  Just a moment, Your
 4          Honor.
 5                    That's all I have.  Thank you, Mr. Kerila.
 6                    THE WITNESS:  You're welcome.
 7                    MR. WARSHAUER:  May it please the Court.
 8                    If I can get the presenter, that would be great.
 9                         CROSS-EXAMINATION
10     BY MR. WARSHAUER:
11     Q    Hey, Mr. Kerila.
12     A    Hello.
13     Q    Couple things here.  You early in your testimony were talking
14          about the Raymond Corporation being in upstate New York,
15          being founded by George Raymond.  The fact of the matter is,
16          it's a wholly owned subsidiary of one of the largest
17          industrial corporations in the world, isn't it?
18                    MR. LoCOCO:  Your Honor, can we approach, please?
19                    THE COURT:  Yep.
20                    (Sidebar begins.)
21                    MR. WARSHAUER:  I did not name a company, Judge.
22                    MR. LoCOCO:  I didn't hear what you said.
23                    MR. WARSHAUER:  I did not name a company.
24                    MR. LoCOCO:  Your Honor, we had a motion in
25          limine on this not to get into -- it's irrelevant, the ownership
```

1    of the Raymond Corporation.

2              THE COURT:  I don't remember granting that

3    motion.  You were talking about in jury -- you were asking about

4    it in jury selection, shouldn't talk about that, it didn't come

5    up.

6              MR. LoCOCO:  I don't recall you --

7              THE COURT:  Okay.  So he's talked about this

8    company in upstate New York, and -- but it's irrelevant that

9    it's a wholly owned subsidiary of Toyota.  Why is that

10   irrelevant?

11             MR. LoCOCO:  What is it relevant to?  It's like

12   saying who owns General Motors, or some dealership of General

13   Motors?  It's irrelevant.  And I agree that the Court hadn't

14   ruled on that, but the Court had said if you were going to ask

15   about that, approach so we could argue about it.

16             THE COURT:  Okay.

17             MR. LoCOCO:  Well, that never happened.

18             MR. WARSHAUER:  I did not ask if they were

19   related to Toyota.  I said they described themselves as a

20   1,500-person mom-and-pop company in this little town in New

21   York.  There's no question about that.  Including the man's

22   name, George, as if it's a family company.  All I said is, "The

23   reality is, you are a wholly owned subsidiary of one of the

24   largest industrial corporations in the world."  That's it.

25   That's a true statement.  He wanted to go into their history.

1           THE COURT:  Yeah.

2           MR. WARSHAUER:  He said, "Let's talk about the

3    history of the Raymond Corporation."  You can't start that

4    history and not let me finish it.  The finish of that history is

5    where you are today.

6           THE COURT:  I think you opened it up.  You're

7    moving on to your next question after that?

8           MR. WARSHAUER:  I am.

9           MR. LoCOCO:  I'm just -- I want to say something

10   on the record right now.  If we're going to get into prior

11   accident reports, we're going to have to be heard on that.  I

12   don't know what you intend to do on that, but we'll be back up

13   here, because that was a motion in limine, and it's significant

14   legal issues.

15          THE COURT:  Okay.  But you have this guy being

16   equal part steps in design and safety, which he says is every

17   step of the design, and then you went through the factor of once

18   it's out in the field, what do you do to follow up.  And so, but

19   what you -- what you want to prevent him from doing is saying,

20   "Have you -- are you aware of any other incidences with where

21   somebody had their leg cut off?"

22          MR. LoCOCO:  Yeah, because that's not a relevant

23   inquiry, Your Honor.  To get into that, they have to establish

24   substantial similarity, because this case isn't about somebody

25   getting a leg cut off.  This case is about somebody losing their

1    balance and falling out.  At least that's their claim.

2                    THE COURT:  But this guy, if he's the safety --

3    if one of the things he's doing is evaluating safety at each

4    step and follow up with what's happening out in the field, and

5    you're saying that any -- that similar injuries or serious

6    injuries is not something that these engineers put on the chart

7    that he put out?

8                    MR. LoCOCO:  I'm saying that the law is very

9    clear as to what the plaintiff has to establish or any other

10   party has to establish to get into other substantially similar

11   incidents.  You can't just generically talk about incidents.  I

12   mean, that's just the law.

13                   THE COURT:  All right.  I'll let you be heard on

14   that.

15                   MR. LoCOCO:  Thank you.

16                   (Sidebar ends.)

17   BY MR. WARSHAUER:

18   Q   Mr. Kerila, as I was saying, the fact of the matter is, it's

19       not a mom-and-pop corporation; the fact of the matter is, the

20       Raymond Corporation is owned by one of the largest industrial

21       conglomerates in the world.  That's true, isn't it?

22   A   I don't really know who owns the Raymond Corporation.

23   Q   You told us you were a registered professional engineer?

24   A   I'm a licensed professional engineer, yes.

25   Q   That's not true either.  You haven't been registered in the

1          state of New York since 2008 based on the Secretary of
2          State's records as of midnight last night.  That's true,
3          isn't it?
4     A    I'm licensed.  Not registered presently.
5     Q    Now your only job as an adult has been the Raymond
6          Corporation.  It's all you know; right?
7     A    For 30 years, yes, all I've done is design lift trucks.
8     Q    When you were in college, this is where you went; right?
9     A    It's one of the places I worked while I was in college.
10    Q    So if you were to come and tell us that this company that
11         you've spent your entire adult life on was not interested in
12         safety, that would have made a pretty bad life to have lived,
13         wouldn't it?
14    A    I wouldn't be working for the Raymond Corporation if they
15         weren't interested in safety.
16    Q    You know, there's a lot of literature out there on balance
17         loss in forklift usage.  The Raymond Corporation doesn't have
18         a library where it keeps such things, does it?
19    A    I'm not aware of what you're talking about.
20    Q    Well, for example, an analysis of standup forklift accidents
21         from the '70s to 2006, published in the International
22         Mechanical Engineering Congress and Exposition on November
23         the 11th through 17th in Denver, Colorado, you're not aware
24         that you have a copy of that, do you?
25    A    Maybe.  I don't know.

1  Q   Or document called "Forensic Engineering Assessment of Safety

2      for Standup Forklifts," National Association of Forensic

3      Engineers, 308F/17 -- 713M.  You don't know if you have a

4      copy of that either, do you?

5  A   I don't know.

6  Q   "Hazard Analysis and Risk Assessment for Operators of Standup

7      Forklifts," proceedings of the International Mechanical

8      Engineering Congress and Exposition presented in Boston,

9      Massachusetts.  Do you know if you have a copy of that?

10 A   I don't know.  Sorry.

11 Q   Well, how about this:  "Failure Rate Studies and Design

12     Alternatives for Standup Forklift Trucks" presented to the

13     Masters Panel in order to get a master's thesis, the

14     University of Kentucky, by Mr. Jagarlamudi.  Do you have a

15     copy of that?

16 A   It doesn't ring a bell, no.

17 Q   Well, you know all of those documents that I read talk about

18     the loss of balance in standup forklifts, but you've told me

19     you've never heard of that, losing your balance on standup

20     forklifts; is that right?

21 A   I've never heard of a report of that from our testing during

22     the development of this truck, no.

23 Q   You've told us that it is your goal to comply with the B56.1

24     Standards published by the ANSI and managed by the Industrial

25     Truck Standards Development Foundation.  That is your goal;

1        right?

2    A   Yes.

3    Q   And you would agree that sections of that standard that say

4        "shall" are particularly your goal to comply with; right?

5    A   Sure, yes.

6    Q   The fact is that the Raymond Corporation and the Raymond

7        Corporation alone decides whether or not you have met that

8        goal of complying with B56.1.  That's true, isn't it?

9    A   I don't know who decides whether we've met it.  It's our

10       objective to meet it.  If we -- you know, if somebody, a

11       customer, say, gets an OSHA citation that says we haven't met

12       it, then ultimately OSHA would be the one to decide whether

13       we've met it or not.

14   Q   But when a product leaves your door, when the subject

15       forklift left your factory --

16   A   Right.

17   Q   -- there's not been an outside company that came in and

18       certified it as compliant with B56.1.  That's true, isn't it?

19   A   That's true, yep.

20   Q   There hadn't been a governmental agency that said your

21       forklift met the requirements of B56.1.  That's true, isn't

22       it?

23   A   That's true.

24   Q   The person or entity that said your company's forklift that

25       was used by Mrs. Anderson on July the 29th of 2017 complied

1         with all of the standards of B56.1, was an employee of the

2         Raymond Corporation.  That's true, isn't it?

3                   MR. LoCOCO:  I'm sorry.  I missed the end of the

4         question.

5 BY MR. WARSHAUER:

6 Q   The person who decided that it complied with the standards

7     was a Raymond employee.  That's true, isn't it?

8 A   That's part and parcel of what our safety review process is.

9     We go through the B56.1 Standard line by line in a group of

10     people and we discuss each line, and what have we done to

11     make sure the truck complies with each and every line of the

12     standard that's applicable to that kind of truck.

13 Q   You don't hire any outside engineers, outside consulting

14     engineers to come in and say, "Hey, this forklift meets all

15     the standards."  You just don't do that.  That's not the

16     practice; correct?

17 A   Correct.  We've got decades of experience doing that.  And

18     again, OSHA's the ultimate arbiter of that if they were to

19     decide we weren't compliant.

20 Q   OSHA has not been to your factory for purposes of deciding

21     whether a 4250 --

22 A   No.

23 Q   -- is compliant or not; that's true?

24 A   That's correct.

25 Q   You spent some time with us today talking about the phases:

1       O, I, II, III, IV, V, VI?

2   A   Yes.

3   Q   If you wanted to test the reliability and suitability of a

4       floor pedal design that disconnected the power or applied the

5       brake when the operator's left foot or any foot went outside

6       the compartment, you would do it in Phases III or IV; right?

7   A   I guess I don't understand.  That's what our truck does

8       when -- if that's the foot you have on the pedal, when you

9       pick your foot up, that's what our truck does.

10  Q   If you wanted to consider a new design of your brake

11      system --

12  A   Yes.

13  Q   -- the phase at which you would do it is III and IV; right?

14  A   Well, no, it's every single phase is part of that --

15  Q   Okay.

16  A   -- process.

17  Q   But in the six phases, I, II, III, IV, V, VI, including 07 --

18  A   06.

19  Q   If we looked at all of the paperwork, we wouldn't find a

20      single line that said "Let's try two pedals"?

21  A   If that's what the objective of the project was, you would,

22      yes.

23  Q   I'm talking about the 4250, Mr. --

24  A   No, we didn't look at two pedals on the 4250.  That wasn't

25      part of the scope of the project.

1   Q   The only thing you ever looked at on the 4250 was a single

2        pedal in the upper left-hand corner of the operator's

3        compartment.  That's true, isn't it?

4   A   Yeah.  The deadman pedal design on the 4250 was a single

5        pedal.  There's a lot of other things that were looked at in

6        the 4250 project, the suspended floor we talked about

7        earlier, other things as well.

8   Q   You never considered a sensor in the backrest either, did

9        you?

10   A   No.

11   Q   And I believe you've told me on prior occasions, and as we've

12        heard from other witnesses, particularly Dr. Rhoades this

13        morning, leaning against the backrest is an operating

14        position, isn't it?

15   A   Is an operating position?  Yes.

16   Q   Two feet on the floor is an operating position also; correct?

17   A   It's part of an operating position.  I guess I don't

18        understand what you're asking.

19   Q   Let's go back to the phases.  Tell me about the eighth phase,

20        where you gather accident data, accident reports, and use

21        them to see how people are being injured once that product's

22        out there for a couple of years or three years.  Tell me

23        about that phase.

24   A   Right.  It's not -- there's not an eighth phase in the

25        development process.  But we have a process whereby our

1     dealers, who have got the relationship with the customer, who

2     have that rapport with the customer -- when they find out

3     there's been an accident with the truck, we have a form that

4     we have them fill out.  They try to get as much data about

5     the accident as they can from the customer, and they send

6     that in to let us know that there's been an accident.

7 Q    Well, O, Roman numeral I, II, III, IV, V, VI, those are

8     design processes; right?  Part of the design phase?

9 A    Design, production, and audit, yeah.

10 Q   But what you have told me on other occasions is that you

11     gather these accident reports, not for design, but for early

12     warning of litigation?

13 A   That's one of the reasons, yes.

14 Q   In fact, these accident reports don't come to you in your

15     role as someone interested in safety; they go to the general

16     counsel's office.  That's true, isn't it?

17 A   They go there first, and then some of them will come to me.

18 Q   Yeah.  Where a non-engineer decides whether or not it's an

19     engineering issue and may or may not send it to you; correct?

20 A   They'll look at it and decide if it's something that might be

21     an indication of a quality issue or a reliability issue or

22     something wearing out sooner, or if there's, you know, an

23     indication that there might be a hazard that we haven't

24     accounted for in the design of the truck.  And those have

25     come right to me and I'll get, "Hey, can you read this?  Can

1      you tell me, does this look like -- does this look like a

2      hazard you guys accounted for?  Is this something we need to

3      go back and reconsider?"

4   Q  Mr. Kerila, I mean on multiple occasions, you have told me

5      accident reports go to general counsel's office for early

6      warning of litigation.  That's what you've told me; right?

7      That's the primary purpose of collecting them?

8   A  No.  That's one of the purposes of collecting them.  And then

9      the other purposes are what I just explained to the jury.

10  Q  Now once they get there, nobody tabulates them, nobody says,

11     "This is how many left-leg amputations we have.  This is how

12     many pinched fingers we have."  That's true, isn't it?

13  A  I don't think that that happens.  The reports we get are what

14     customers are willing to share with us, so they're not a

15     complete picture of what happened in that particular

16     accident.  There's certainly not a complete picture of what's

17     happening in the entire industry of -- or of the entire

18     environment of where the trucks are used.  So they really

19     don't often have the kind of details you're talking about

20     that would allow you to sort them if you wanted to.  But the

21     important thing really, Mr. Warshauer, is that we're

22     considering the hazards that may have led to those accidents,

23     and that the design accounts for the hazards and that the

24     training accounts for those hazards.

25  Q  Tell you what.  See if we can have a deal.  If I ask you a

1      yes-or-no question, if you answer yes or no, I'll let you

2      prod along about anything you want.  Does that sound fair?

3                      MR. LoCOCO:  Objection to the form, Your Honor.

4      It's argumentative.

5                      THE COURT:  Sustained.

6   BY MR. WARSHAUER:

7   Q   Yes or no:  You do not tabulate the injuries that come into

8      the general counsel's office, do you?

9   A   No, I don't think they do.

10  Q   Okay.  Yes or no:  You do not have all of the accident

11     reports since the 4250 was first marketed for sale by use

12     like people -- for use by people like Mrs. Anderson in 2010?

13     You've destroyed lots of those, haven't you?  That's true

14     too, isn't it?

15  A   We have a record retention policy for accident reports, and

16     every other document that we have that we use in the

17     business, and yeah, I'm sure some of those reports are no

18     longer retained because of the record retention policy.

19  Q   In fact, as we sit here right now, you can't tell me how many

20     left-leg amputation injuries have been suffered by users of

21     4250s, can you?

22  A   I don't think anyone can tell you that.  We've talked about

23     that before.  I can explain it, if you'd like, to the jury.

24  Q   You can't tell me what the most common injury is on a 4250,

25     can you?

| | | |
|---|---|---|
| 1 | A | No, I don't think anyone can.  So the challenge here is that |
| 2 | | there is no entity, there's no government entity.  It's not |
| 3 | | like, you know, an automotive or an airplane accident. |
| 4 | | There's nobody gathering information on what happens with |
| 5 | | forklifts.  Forklifts are used inside customer warehouses. |
| 6 | | We learn what we can when an accident occurs, what the |
| 7 | | customer tells our dealer, is willing to tell our dealer. |
| 8 | | There's no way to get the entire picture of everything that's |
| 9 | | happening inside warehouses, so there's no way to get the |
| 10 | | information to answer the question you're asking. |
| 11 | Q | As you sit here today, in this courthouse in East Saint |
| 12 | | Louis, Illinois -- |
| 13 | A | Yes. |
| 14 | Q | -- you can't even tell me how many people have been run over |
| 15 | | by your machine after they fell out of it, can you? |
| 16 | A | I don't think anyone can tell you that.  I can tell you I |
| 17 | | haven't heard about it before. |
| 18 | Q | But what you can tell me is that you haven't reached out to |
| 19 | | the major users of your product in a systemized, organized |
| 20 | | fashion to ask them, "Amazon, how many loss-of-balance |
| 21 | | amputation cases do you have?"  Lowe's, Home Depot, FedEx. |
| 22 | | You've never done that in a systemized fashion, have you? |
| 23 | A | No.  That is what we do.  That's what our accident reporting |
| 24 | | process is.  Our dealers -- Raymond doesn't interact directly |
| 25 | | with customers.  That's what our dealers do.  They develop |

1    that relationship, that rapport, and that's our process for

2    getting information on accidents.  Customers -- some will

3    share, you know, a lot of detail; others less.  I'm confident

4    that the big customers, the long-term customers, the Amazons

5    and FedExes, they're not shy customers.  They're very, very

6    willing to call the dealer and say "I've got a problem with

7    this.  I've got a problem with that.  We, you know, want your

8    help doing this.  I've got a service issue with that."  Our

9    customers are not shy at all about reaching out and letting

10   us know what they're feeling.

11 Q  Mr. Kerila, the question was and remains, you can't identify

12   a systematic practice, policy, and procedure where you are

13   actively reaching out to major users of your products and

14   saying to them, "How are people getting injured using our

15   4250?"  That's the truth, isn't it?

16 A  No, that's exactly what we do with our accident reporting,

17   and not just the major customers, any customer.  Our dealers

18   have these relationships.  If they find out about accidents,

19   we have a process for reporting that.

20 Q  So the extent of your effort to find out how many injuries

21   associated with the loss of balance and being run over by the

22   unguarded steered wheel on a 4250 are gathering accident

23   reports, which you've told me before aren't reliable; is that

24   true?

25 A  They can -- they can have, you know -- oftentimes when a

1    dealer tries to get information on an accident, they're not

2    allowed to talk to the person who's involved in the accident.

3    Maybe not even that person's supervisor.  They have to talk

4    to a, you know, safety manager or a plant manager.  So

5    usually the information is third-, fourth-hand.  Sometimes

6    you can get a lot of detail out of those.  Sometimes you

7    can't even get if somebody was injured, let alone how they

8    were injured, what led to it.  That kind of detail is not

9    something you can always get from customers.

10   Q    Identify for me a letter that you have sent to any major

11        user, somebody who owns more than five of your machines,

12        where you said, "Dear Director of -- whatever you are --

13        Safety, at Amazon, FedEx, UPS, et cetera, my name is Robert

14        Kerila.  I'm interested in the safety of our products."

15   A    Right.

16   Q    "Please tell me about every injury that you've had so that I

17        can make good design decisions and protect people like

18        Mrs. Anderson."  Tell me about those letters that you've

19        sent.

20   A    Yeah.  I haven't sent a letter that says that.  But I think

21        we make good design decisions based upon making sure we know

22        what all the hazards are associated with using the truck.

23        Not the accidents resulted necessarily, but the hazards that

24        exist even before the truck has been designed, what hazards

25        are an operator going to encounter, and have we addressed

1       those hazards in the design, have we addressed them in the

2       training, have we addressed them in the testing.

3                   THE COURT:  Sir, your lawyer gets to ask you

4       questions.  And I'm going to ask you to listen to the questions

5       that are asked and answer the question that's asked.  If it's an

6       improper question, I'm sure Raymond's lawyer will object.

7                   THE WITNESS:  I'm sorry if I was.

8                   THE COURT:  But it's not fair if we have these

9       run-on answers that go well beyond the question that was asked.

10      Mr. LoCoco's going to get the opportunity to ask you questions

11      once this attorney's done cross-examining you.  All right?

12                  THE WITNESS:  Yep.

13                  THE COURT:  Thank you.

14      BY MR. WARSHAUER:

15      Q   On September the 25th of 2013, you were asked how many

16          left-leg amputations have been suffered by users of

17          sidestance forklifts, Raymond sidestance forklifts.  That was

18          eight years ago.  You didn't know the number then and you

19          don't know the number then now, do you?

20      A   I don't have a memory of that question, no.  I don't know.

21      Q   You have talked about your design process, and you've told us

22          you have about 180 trained engineers -- or was it 200?

23      A   It's about 200 degreed engineers now.

24      Q   All right.  What I'm interested in, Mr. Kerila, is a meeting

25          or a task force, documented by paper, where a group of these

1   engineers got together and had as their primary -- primary

2   goal, not one of multiple goals, but their primary goal, the

3   reduction or elimination of left-leg amputation injuries to

4   operators of sidestance forklifts.  Can you identify a single

5   meeting where there's documentation?

6  A  Not the way you've asked that, no.  We don't just design for

7   one type of accident or injury.

8  Q  Well, I'm here to ask about one type of accident or injury.

9   And I just want to know --

10 A  Understood.

11 Q  -- whether or not you can identify a time when you in your

12   role as a manager said to one of these 200 engineers, or any

13   two of them, "You two, y'all go figure out how we can reduce

14   or eliminate left-leg amputations."  Have you ever done that?

15 A  Not in those words, but that's -- I think that's encompassed

16   in the instructions when we start a project.  We don't -- we

17   don't design for one accident.  We don't design to protect

18   one part of an operator.  That's not responsible.

19 Q  It's pretty difficult for your engineers to focus on left-leg

20   amputation injuries for people who have lost their balance

21   and fallen out, if they don't know the number --

22 A  Not at all.  I disagree.

23 Q  Your company has not directed your people, who are in the

24   Industrial Truck Association, to ask that organization to

25   create a task force to reduce the number of left-leg

1     amputations, has it?

2  A   I don't -- I don't know.

3  Q   You have representatives on the B56.1 committee, and your

4     company's employees who are members of that have not been

5     asked to suggest to that committee that it investigate how to

6     reduce or eliminate left-leg amputations, have you?

7  A   What the B56.1 committee does is, again, not unlike Raymond,

8     we -- they worry about all the hazards, including left-leg

9     injuries for sure.

10  Q   I just wanted to know if you had suggested to your member

11     who -- your employee who's a member that it say to the rest

12     of the group, "Hey guys, these left-leg amputations are a big

13     deal.  Let's focus on it."  And the fact is, you never told

14     anybody to do that, did you?

15  A   No, not in those words.  That's not that specific.

16  Q   And when you get an accident report that goes to the legal

17     department, you don't have a practice, policy, procedure

18     where you reach out to the injured worker and say, "Hey, my

19     name's Robert Kerila.  I'm trying to help Raymond make safe

20     products.  Tell me how this happened so it doesn't happen

21     again."  You haven't done that before the year 2014, have

22     you?

23  A   Before the year 2014?

24  Q   Yeah.  This machine was sold in 2014.  I just want to know if

25     you did it before 2014, where an accident report comes in and

1      somebody got their left leg cut off and you call them and

2      say, "Hey, what can we do to make this not happen again?"

3  A  Well, I've investigated accidents.  I've gone out in person

4      and talked to operators sometimes.  I can't remember the

5      details of the accident or the injury necessarily, or whether

6      it was before 2014.

7  Q  Mm-hmm.  This product was first put out in about 2010; is

8      that right?

9  A  Yes.

10 Q  Well, we saw a video that was 8 minutes and 32 seconds, if I

11     recall correctly.  You watched it with us; right?

12 A  Yes.

13 Q  Did you notice the copyright of that?

14 A  2005.

15 Q  Yeah.  That video didn't have a single image of this

16     forklift, did it?

17 A  No.  But it had --

18 Q  In fact --

19 A  -- images of standup counterbalance forklifts similar to this

20     one.  But not this truck, no.

21 Q  And it had lots of reach trucks too; right?

22 A  Yes, it did.

23 Q  A reach truck is of course the one that has outriggers out

24     front and has the ability to reach out?

25 A  Correct.

1  Q   When we saw people standing backs to the forks or facing the

2      forks, that wasn't the way that this forklift was designed to

3      be used; that's not the way the 4250's designed to be used,

4      is it?

5  A   Correct.  Those are reach truck pictures.

6  Q   In fact, what this forklift says, it's designed to be used,

7      looking at the operator manual, which I believe to be

8      Exhibit 500, the operator compartment is where you stand to

9      operate the lift truck.  Raymond Models 4150/4250

10     counterbalance lift trucks are manufactured with a sidestance

11     compartment.  That's what it says; right?

12 A   I believe it does, yes.

13 Q   And you had some discussion about whether people use their --

14 A   But it doesn't say you must stand sideways.  Right?

15 Q   You expect people to follow the operator's manual?

16 A   Yeah, of course.

17 Q   That is your goal, that people follow the operating manual?

18 A   Yes, it doesn't -- what you read is just the description.

19     It's not an instruction.

20 Q   Can you show me where in any advertisement, in any operator

21     manual, in any photograph anywhere, other than what

22     Dr. Rhoades showed -- shared with us this morning, where you

23     have an operator standing any other way than the right toe on

24     the brake?

25 A   I -- maybe.  I don't know.  But they -- the manual doesn't

1    say to stand with your right foot on the brake.  It says to

2    stand with one foot.  I mean, it's much like every other

3    manufacturer, most manufacturers.  It says stand on the pedal

4    with one foot.  That's actually an OSHA instruction.  The

5    point is not to have two feet on the pedal in case you need

6    to lift one up in an emergency and the other one's not still

7    holding it down.  Doesn't matter which one, though.

8  Q  You'll agree with me, all your marketing materials for the

9    4250 show operators in what could only fairly be described as

10   a sidestance with their toe on the pedal.  That's true, isn't

11   it?

12 A  I don't know.  I don't think so.  No.

13 Q  And you'll agree with me that all of the operating -- the

14   marketing materials laud this idea of comfort, but never use

15   the word "safety," do they?

16 A  I don't know.

17 Q  Now you have had various outside entities involved in both

18   litigation and design; is that true?

19 A  Yes.

20 Q  For example, if we just consider design, there's a company in

21   upstate New York called Brownlie?

22 A  Yes.

23 Q  And your contact there is a man named Scott Ryan; is that

24   right?

25 A  Scott Ryan, yes.

1    Q    And Mr. Ryan is an ergonomics expert?

2    A    Yes.

3    Q    You never told this outside company that is helping you

4         design your product that left-leg amputation injuries were a

5         serious problem, did you?

6    A    No, I don't -- I don't -- we told them -- when they helped us

7         design the compartment of the truck, we told them we want to

8         design a compartment that protects the operator, that's

9         comfortable, that has features in it to help the operator

10        stay within the compartment to protect themselves.  We're not

11        just trying to design for a single accident.  We're not just

12        trying to protect one part of an operator.  It's -- that's an

13        irresponsible way to engineer a truck.

14   Q    You never told Mr. Ryan at this outside entity that's helping

15        you make your products that loss of balance was something

16        that Raymond Corporation was concerned about for its

17        operators.  You didn't tell them that, did you?

18   A    No, because I'm not concerned about it.  I've got no

19        indication that there is a loss of balance problem, because

20        we've designed the truck, we've designed the forces that the

21        operator can feel, no matter what they do, so that they're

22        not going to have a loss of balance.

23   Q    Did you just tell me there's no -- no one's ever told you

24        they had a loss of balance as part of the explanation for

25        their amputation of their left foot?  Is that what you just

1     said?

2 A    The first time I've heard that was from you in a deposition,

3     sir.

4 Q    You haven't seen that in lawsuits, multiple lawsuits, for

5     multiple people --

6 A    Mm-mm.

7 Q    -- who lost their balance?

8 A    No, just from you.

9 Q    You didn't see that in Mr. Hampton, Mr. Jones, Ms. Dezoete?

10 A    No.

11 Q    Mr. Vazquez?

12                 MR. LoCOCO:  Your Honor, can we approach, please?

13                 THE COURT:  Yeah.

14                 (Sidebar begins.)

15                 MR. LoCOCO:  This is exactly what we raised with

16     our motions in limine.  Dezoete was not a loss of balance.  She

17     stepped out and Mr. Warshauer knows it.  Now are we going to

18     really litigate each of these?  And then we can tell the jury in

19     Dezoete, the jury found against Mr. Warshauer's claim?  I don't

20     know what the other cases are he mentioned.  We could do it with

21     Vazquez.  We can do it with Young.  None of those had to do with

22     loss of balance.  Those were door cases, Your Honor.  How much

23     more innuendo -- I'd ask you to cut Mr. Warshauer off at this

24     point.  How much more innuendo are we going to --

25                 THE COURT:  You didn't object.  As I'm listening

1   to the evidence, nobody at Raymond seems to know how many

2   instances in which an operator suffered a serious injury to the

3   left leg or an amputation.  This guy -- it seems to me that,

4   when we get to it, people, they don't remember, or, "Oh, we

5   don't keep track of that."  I think it's relevant to this guy's

6   testimony, because you put him forward to say that it's the

7   intent of Raymond to make sure their products are safe, to

8   comply with applicable standards, and that there's some

9   followup, that -- and so --

10              MR. LoCOCO:  But he's saying things that are

11   untrue, Your Honor.

12              THE COURT:  Okay.

13              MR. WARSHAUER:  About what wasn't true?

14              MR. LoCOCO:  That Dezoete had anything to do with

15   anything other than a door.  He's got to prove it.

16              THE COURT:  Hold on.  Wait.

17              MR. WARSHAUER:  She said she lost her balance,

18   Frank.

19              THE COURT:  I don't know where we are in the

20   question.  He can -- if he's saying there's different ways, he

21   hasn't asked the question, "Are you aware of anyone that has

22   suffered a leg amputation while operating a Raymond forklift?"

23   Whatever this model is, and then can inquire about that.  If

24   Raymond's not on notice, if this is such a fluke, not aware of

25   these things, okay, that's important.  Because that's a picture

1    that you're kind of trying to paint.  But why don't we let

2    the -- why don't we let the jury go -- we'll let you guys

3    argue --

4                 MR. WARSHAUER:  That was my question.  He said he

5    never heard of it.  I impeached him with cases where people made

6    that allegation.

7                 MR. LoCOCO:  They're all cases where he came up

8    with the theory --

9                 MR. MURPHY:  But there's a rule of law that

10   covers this question.  When you impeach a witness, now he has to

11   follow that through.  It's not enough when you put this in front

12   of a witness, and he says, "No, I've never heard of any of

13   that --"

14                THE COURT:  It has --

15                MR. MURPHY:  Now he has to come in and prove

16   this.

17                MR. WARSHAUER:  I asked a good faith question.

18   Basis for my question, which I do --

19                MR. MURPHY:  Well, and he's saying it's not a

20   good faith question.

21                THE COURT:  All right.  I don't know the

22   evidence.  You guys know these cases more than I do, other

23   instances.  This is a case that I know about.  The -- if he is

24   aware of other instances in which people suffered a catastrophic

25   loss of a limb in circumstances that are similar to this, where

1    an operator is in this kind of forklift and they lose their

2    balance or move forward of the operating -- I guess it would be

3    rearward --

4              MR. LoCOCO:  Yeah.

5              THE COURT:  -- of the operating compartment, and

6    this is what happens, that's not -- that's not irrelevant,

7    because he's -- because you're using this guy to bolster that,

8    this is the design, and they've done tens of thousands of hours

9    of examination, and they believe this is safe.

10             MR. LoCOCO:  I think we should --

11             THE COURT:  "And there's no way you can fall out

12   of this compartment, because we -- the way we designed it."

13             MR. LoCOCO:  I think you should ask the question,

14   Your Honor, because you said it exactly the way it's okay, that

15   it's from losing your balance or falling out.  He's mishmashing

16   all these other instances.

17             THE COURT:  I think --

18             MR. LoCOCO:  And then Pat's right.  He's got --

19   Mr. Murphy said he's got to be able to prove the underlying

20   assumption he's trying to make.  I'll just start making

21   objections.

22             THE COURT:  Let's do this.  This is important

23   enough that I don't want to handle it in just a sidebar, because

24   I might want to look at a case or two.  So I'm going to -- I'm

25   going to let the jury take a ten-minute break and we can argue.

1        Will it be longer than ten minutes to argue this?

2                    MR. LoCOCO:  I would hope not.

3                    THE JURY:  Trying to finish him today; right?

4                    MR. WARSHAUER:  I would like to.

5                    THE COURT:  I understand.

6                    (Sidebar ends.)

7                    THE COURT:  Folks, we have some -- a matter that

8        I have to take up.  And so I'm going to give you -- let's do a

9        ten-minute recess.  I hope we'll certainly -- we'll try to

10       get -- finish with this witness today.  But let's take -- let's

11       come back at ten minutes to 4 and hopefully we'll be able to get

12       it wrapped up soon.  Thank you.

13                   (Jury exits at 3:41 p.m.)

14                   MR. LoCOCO:  Should the witness step down?

15                   THE COURT:  Yes, please.

16                   Hannah, do you need a break?

17                   THE COURT REPORTER:  I'm okay.  Thank you.

18                   THE COURT:  All right.  Let the record reflect

19       that the jury is out of the courtroom.  The witness has left the

20       courtroom.

21                   The question is about asking about other injuries

22       or other instances.  It's my understanding this is not the only

23       case that Mr. Warshauer has had against the Raymond Corporation,

24       so he may be aware of some.  I have no idea how many this

25       witness may not be aware of.  Mr. Warshauer asked a question

that he says he has a good faith basis in asking.  There's an

objection.  And it's asserted that he does not have a good faith

basis.  It's actually bad faith.

So let's start with you, Mr. Warshauer.  Why is

the line of questioning relevant, and what is the good faith

basis that you have in asking questions of this witness that

there are other similar cases where people have lost their left

leg?

MR. WARSHAUER:  Thank you, Judge.

So the Court might recall that I sort of did a

two-step preface before I asked the question.  And that is, "Are

you aware," and then I made sure that he said he was not aware

of anyone ever alleging that.  I double-checked.  So now I'm

impeaching him.  It's not to prove the OSIs, other similar

instances, as much it is to simply impeach the fact that he's

never heard of it.  Because the reality is, he has heard of it,

or his company has just got their head in the sand.

I asked, if I recall correctly, and the record

will reflect, about, "You haven't heard of Dezoete, Jones,

Pogue, Hampton or Vazquez."  All right.  Mr. Hampton, there's

videotape of him losing his balance.  I don't think anybody

denies that.  That case was resolved in a manner that

Mr. Hampton was satisfied with.  Mr. Vazquez --

THE COURT:  This is -- there's a video of the guy

operating a Raymond forklift, same model?

 1              MR. WARSHAUER:  It's a 4000.  The operating

 2    compartment is similar.

 3              THE COURT:  There's a video that shows him

 4    falling out of --

 5              MR. WARSHAUER:  He partially falls out and before

 6    he gets all the way out, it collides with a guardrail and

 7    crushes his foot.  But it's a balance incident and the

 8    allegation in that case was it should have had two pedals.  That

 9    was part of the allegations.

10              MR. LoCOCO:  It does not have -- he does not get

11    hit by the wheels.  So it's not the same accidents.  It's a

12    different model.  It's a 4200 that doesn't have this floating

13    floor that's been talked about out.  That's Hampton.

14              THE COURT:  So what's the next one?

15              MR. WARSHAUER:  It is the loss of balance and the

16    lack of a second pedal that we complained about.  Mrs. Dezoete,

17    unquestionably we talked about the lack of a second pedal --

18              THE COURT:  Let me ask, how old was the Hampton

19    case?  You say this is a 4000 model.  Did it come out 20 years

20    ago?

21              MR. WARSHAUER:  No.  All of these are 4000 models

22    to my recollection.

23              THE COURT:  All right.

24              MR. WARSHAUER:  And I'm virtually positive they

25    are.  Dezoete was a woman in Dallas.  We alleged that had it had

1    a left-foot pedal, she came in to park before lunch, she says

2    she lost her balance right at the very end by being distracted,

3    whether they believe it or not.

4                    MR. LoCOCO:  That's not what she said, though,

5    Your Honor.

6                    MR. WARSHAUER:  I believe that's exactly what she

7    said.

8                    MR. LoCOCO:  She said, "I stepped out because the

9    truck had come to a stop."  And then we had -- we had videotape,

10   surveillance videotape from Amazon, that showed that her

11   testimony about what happened was not true.  And I'm not calling

12   her a liar.  She just had a different recollection.  It showed

13   that she stepped out while the truck was still moving toward

14   this post, and she crushed her left foot between the back of the

15   forklift and the post.  She never said she lost her balance.

16                   MR. WARSHAUER:  Our argument was that she lost

17   her balance.  Ms. Pogue was run over by the wheel.  Lost her

18   balance in a 4250.

19                   THE COURT:  All right.  What about Pogue?

20                   MR. LoCOCO:  Pogue testified -- so if we're going

21   to do Pogue, Pogue testified to that.  And her boss said right

22   after, as an excited utterance, she said "Angel --" name's

23   Aponte -- "Angel, I messed up.  I stuck my foot out."  So are we

24   going to read Ms. Pogue's testimony and Angel Aponte's?

25                   And one other thing about Dezoete, she said her

```
 1   vest -- her safety vest caught on another part.  It's completely
 2   different from this case.
 3               Back to Pogue.  We've got two versions.  We've
 4   got Mrs. Pogue's version after she's been represented by
 5   Mr. Warshauer, saying that she lost her balance, and then Angel
 6   Aponte, her trainer, testified that in the moment, pre-lawsuit,
 7   she said, "I stuck my foot out.  I shouldn't have done that."
 8               MR. WARSHAUER:  I've already mentioned
 9   Mr. Hampton, and Mr. Vazquez unquestionably lost his balance.
10   Five witnesses talked about him losing his balance, struggling
11   to stay in.  Again, Judge, I'm not going into the details of
12   these.
13               THE COURT:  No, but, I mean, you ask a
14   question -- you're suggesting to this jury that this is the most
15   common injury that people suffer in operating a forklift.  I
16   don't know where that comes from.
17               MR. WARSHAUER:  We believe --
18               THE COURT:  And I don't -- and are you prepared
19   to tell me where that comes from?  Where do you know that, if
20   Raymond --
21               MR. WARSHAUER:  Where do I know that left-leg
22   amputation injuries associated with balance loss?  Now that's
23   the difference in opinion as to whether it's associated with
24   balance loss or intentional conduct.  The manufacturers, as is
25   here, always say it's intentional conduct.  The plaintiffs
```

almost always say they lost their balance.

THE COURT:  My question to you was, you were suggesting that this is the most common injury --

MR. WARSHAUER:  The --

THE COURT:  -- to operators of this forklift.

MR. WARSHAUER:  There is published literature by Tom Berry who have done an accident review.  And the Crown corporation, which does keep every accident report going back to 1974, their director of safety, Ron Griset, testified just three weeks ago that the number one most common injury suffered by an operator of a standup sidestance forklift -- which Crown makes exclusively.  So every one of their accidents is a sidestance, as is a 4250.  They are substantially similar in that, two feet on the ground -- the only difference being the pedals and the entry bar, which makes it less likely to get hurt.  But he said unquestionably, it's their belief that left-leg amputations are the most common injury.

THE COURT:  Let's talk about Raymond.  Are you going to be able to show that Raymond has received a number of incident reports that put them on notice that there are people who are falling out of the operating compartment and suffering left-leg injuries?

MR. WARSHAUER:  I think Jones, Pogue, Hampton, Vazquez unquestionably, and to a lesser extent, Dezoete, unquestionably establish that these folks have established the

1    lack of a left-foot pedal that would have stopped the machine

2    and the reason they got out was balance.  Not one of those

3    people said they intentionally stepped in harm's way.

4                THE COURT:  Isn't this witness -- he's

5    suggesting, "The way we've designed this, the way we fit the

6    operator like a glove, and the way the floor is, they're just --

7    there's no way you're going to be outside of the operator

8    compartment."  There's not enough.  As he said, it's designed so

9    that operators stay in and they don't experience any factors

10   that would cause them to lose their balance.  All right?  So

11   that opens up whether he's on notice or the design team's on

12   notice that there are things that are happening that are causing

13   people, A, to lose their balance, and B, so much so that they

14   exit the compartment and they lose their left leg by getting run

15   over.

16               MR. WARSHAUER:  So I agree.  Where we were

17   going --

18               THE COURT:  This isn't a crash sequence.  There's

19   a difference, I think, between the guy crashes against a fixed

20   object and his foot is in the way, as opposed to what we have

21   here, where the operator actually falls out and is run over or

22   impacted by the forklift in such a way that she suffers a leg

23   off.

24               MR. WARSHAUER:  I agree and disagree

25   simultaneously.

1          THE COURT:  Okay.

2          MR. WARSHAUER:  They are all triggered by the --

3          THE COURT:  I grant and deny sound the same way.

4          MR. WARSHAUER:  They are all triggered by the

5     loss of balance.  They are exacerbated and allowed to continue

6     by the lack of a compliance with 7.20.2, which would have

7     applied the brake.  And then where they end up is really more of

8     a matter of happenstance.  If you -- if the machine never hits

9     anything, it may well end up being a benign event.  If the thing

10    hits something while you are struggling out, that's where the

11    crush injury occurs, if, as occurred here with Ms. Anderson and

12    Ms. Pogue, you can get under the wheel.

13          But the triggering things that make them similar

14    from our point of view is, loss of balance; machine that could

15    have been, should have stopped, had it been built like the rest

16    of the industry; a subsequent injury that resulted in an

17    amputation, always of the left leg.  So I'm not going into the

18    details of any of these.  But I do believe that when someone

19    says --

20          THE COURT:  Because if you do, it sounds like --

21          MR. WARSHAUER:  You've never heard of it, I get

22    to impeach them.  That's the purpose of the question, was to

23    impeach them with the fact that how could they not have been

24    aware of that with these allegations.

25          THE COURT:  All right.

1          MR. MURPHY:  Judge, I'll just say one thing.

2     Case is Michaelson v. The United States, and it took me a while

3     because of my advanced years to bring that case up.  And a good

4     faith basis in this case means that somebody lost their balance

5     and got under that steered wheel.  And if he puts it in front of

6     the witness, then he has to prove that's the case, not some

7     other accident.  That's all I want to say.

8          MR. LoCOCO:  And --

9          THE COURT:  All right.  How much -- how much more

10    questions are we fighting over on this?

11         MR. WARSHAUER:  That was the end of that.  I've

12    already gone through the lack of accident report collection.

13    I'm finished with that.

14         My next series of question was, "You've produced

15    5,400 pages of documents in this case, and not a single one of

16    them uses the word 'balance.'"  So we're moving on.  Had he not

17    risen to the bait, if you will, I gave him two chances to say,

18    "Yeah, I may have heard of it."  But when you give me an out and

19    out denial, I get a chance to do an out and out impeachment.

20         MR. LoCOCO:  Not, Your Honor, when you can't

21    prove what you're trying to prove.  You asked Mr. Warshauer,

22    "How are you going to prove this?"  And he starts talking about

23    Tom Berry.  Well, his experts have already been on the stand and

24    off.  He's not having any of these other people testify.  How is

25    he going to prove that Pogue or Dezoete or Hampton or Vazquez,

1    unless he puts himself on the stand, and --

2                THE COURT:  I mean, I don't know what's in the

3    deposition necessarily or if he's deposed them in other cases.

4                MR. LoCOCO:  Deposed this witness.

5                THE COURT:  In other cases?

6                MR. LoCOCO:  He has.  I mean, there is a context

7    to all this, Your Honor.  I mean, the context is, Mr. Warshauer

8    has been trying theory after theory, and now he's lighted on

9    malice.  Right?  And none of these accidents that he's talked to

10   you about -- Dezoete had nothing to do with balance, Vazquez,

11   Hampton, Jones, Pogue, and Anderson.  That's how Mr. Warshauer

12   has constructed the cases.  But what Mr. Kerila said is exactly

13   true.  "Before you asked me about balance, no one's ever

14   complained about balance on our truck."

15               And the last comment is, the case law is clear,

16   that unless the incident about which he wishes to inquire is

17   substantially similar to this incident, same model of truck,

18   same type of facts, same type of injury, then he can't inquire.

19   And of course he doesn't want to get into the details of any of

20   this, because then his whole purpose for bringing it up falls

21   apart.

22               THE COURT:  I do think if he's aware of instances

23   where operators claim that they lost their balance while

24   operating the forklift, and that in doing so, some or all of

25   them exited the operating compartment, that's similar enough

1    that I'm not going to give the jury an instruction to disregard

2    the last question and answer.  But you haven't -- -- some of

3    those cases are not similar enough.  Some of them are.  And --

4    but the one thing that I'm hearing is that questions that

5    suggest that there's a massive number of leg-off cases that this

6    guy is aware of or that Raymond's aware of, that doesn't seem

7    like you can tie that up.

8                    MR. LoCOCO:  Mm-mm.

9                    THE COURT:  And I know you're saying, "Well, it's

10   because they destroy their records after five years."  But if

11   it's not an infrequent situation, maybe the records from the

12   previous four and a half years would point you to at least one,

13   or one of these guys could have been deposed that said, "Yeah,

14   I've testified in 30 different cases that involve claims of

15   losing their balance and leg-off."

16                   MR. WARSHAUER:  The problem, Judge, is these

17   people refuse to even remember how many times they've testified.

18                   THE COURT:  I understand.

19                   MR. LoCOCO:  But I'm going to add for the record

20   that we produced 36 accident reports in discovery.  A third and

21   40 percent deal with off-docks or tip-overs on 4250s.  The

22   remaining appear to indicate some sort of leg or foot injury.

23   Not a one of them talk about a loss of balance, and that's why

24   he's not trying to use those.

25                   MR. WARSHAUER:  I believe if they were

 1     investigated, every one of them would show loss of balance.  I

 2     don't think people intentionally stick their foot in harm's way.

 3                    THE COURT:  He also testified that the accident

 4     reports weren't necessarily prepared by Raymond, that they

 5     weren't -- so it's not an admission against interest.  The sum

 6     of them are thorough; some of them are not.  It sounds like it's

 7     kind of hit or miss.

 8                    MR. LoCOCO:  My point --

 9                    THE COURT:  I think we need to move on.  I think

10     we need to move on.  I'm not going to -- I'm not going to give

11     an instruction to the jury to disregard the last question and

12     answer, but.

13                    MR. WARSHAUER:  We're moving on.

14                    THE COURT:  It doesn't seem like going into

15     greater detail, probably not going to dig a deeper hole than you

16     are.  Or am I going to have problems?  How much longer do you

17     have?

18                    MR. WARSHAUER:  I can't finish in ten minutes.

19                    THE COURT:  I didn't ask if you could finish in

20     10 minutes.  I asked you --

21                    MR. WARSHAUER:  15, maybe 10.

22                    MR. MURPHY:  Is it dark outside yet?

23                    THE COURT:  Let me go look out the window.

24                    MR. WARSHAUER:  We're getting -- I see.  Yeah,

25     I'll probably finish in ten, Judge.

1          THE COURT:  It's nice and sunny.

2          (Jury enters at 3:59 p.m.)

3          THE COURT:  All right.  Please be seated.

4          All right.  Thank you for your patience again,

5     ladies and gentlemen.  Sir, you are still under oath and we are

6     still in Plaintiff's cross-examination.

7          Next question.

8  BY MR. WARSHAUER:

9  Q   This idea of keeping two feet on the floor, let me ask, is

10     there any time that an operator can operate this machine

11     without both feet on the floor?

12  A   When they're applying the emergency brake, they can, yes.

13  Q   Otherwise, they should have both feet on the floor, one of

14     those on the pedal, both hands on the controls, and their

15     entire body inside the confines of the compartment; correct?

16  A   I didn't hear everything you said.  I'm sorry.  You're not

17     close to the microphone.

18  Q   If they are not applying the emergency brake intentionally,

19     they should have both feet on the floor, one of those on the

20     pedal, both hands on the controls, and their entire body

21     inside the confines of the compartment.  That's what you've

22     told me in the past, and you agree to that today; correct?

23  A   That's correct.  Yes.

24  Q   I asked you about Brownlie.  Those are your ergonomics

25     people.  You've also asked Exponent to help you over the

1    years; is that right?

2  A   Yes.

3  Q   Exponent is a nationwide organization of all kinds of

4    engineers and experts; right?

5  A   Yes.

6  Q   You have never asked Exponent to help reduce left-leg

7    amputations associated with loss of balance, have you?

8  A   No, not that specific phrase.  No.

9  Q   And we talked to Mr. Rogers yesterday.  He's been with

10    various companies, some of which had 20 or 30 engineers at

11    various times.  And you never asked him to help you solve a

12    problem or reduce the likelihood of a loss of balance leading

13    to a left-leg amputation, have you?

14  A   Not that specific question, no.

15  Q   And you agree with Dr. Rhoades that his role today was not to

16    give you an opinion about the safety of your product, but to

17    give you an opinion about the comfort of your product.

18    That's true, isn't it?

19  A   Well, to analyze the data gathered with this new technology.

20    I'm not sure what Dr. Rhoades said.  I wasn't here when he

21    testified.

22  Q   But what Raymond has done, instead of asking any of these

23    folks for solutions, what Raymond has done on every single

24    occasion when there's been a left-leg amputation, regardless

25    of how they got there, is to say it was the operator's choice

1    to stick their foot into harm's way.  That's true, isn't it?

2  A  No, not at all.

3  Q  Every time, you've said they failed to comply with their

4    training; right?

5  A  No, not at all.  No.

6              MR. WARSHAUER:  Thank you.

7              THE WITNESS:  Thank you.

8              MR. LoCOCO:  Just a few things, Your Honor.

9              THE COURT:  Mm-hmm.

10              MR. LoCOCO:  Could I have the document camera,

11    please?

12                    REDIRECT EXAMINATION

13  BY MR. LoCOCO:

14  Q  Mr. Kerila, you were asked some questions about dockstance

15    versus sidestance.  This is Exhibit 500, the operator's

16    manual.  This is page 6.  We see the representation of the

17    operator in that --

18  A  Yes.

19  Q  -- pictorial?  Is the operator standing in complete sideways

20    in that?

21  A  No, they're in a 45.

22  Q  Page 15 of Exhibit 500.  Again, does this show the operator

23    standing in a complete sidestance, 90 degrees to the forks?

24  A  No, it doesn't.

25  Q  Mr. Warshauer asked you about a number of cases right at

1    the -- before the last break.  Those cases you mentioned are

2    all cases where he represented the plaintiff?

3  A  I wasn't keeping track of everything he said.  But probably,

4    I suppose.

5  Q  The first time that you had ever heard that there was an

6    issue with balance in operating the 4250 was when you were

7    asked about it in a deposition by Mr. Warshauer --

8                    MR. WARSHAUER:  I object.  Leading.

9                    THE COURT:  You can clean it up.

10  BY MR. LoCOCO:

11  Q  When is the first time that you heard anyone complain about

12    balance as an issue on the 4250?

13  A  In a deposition with Mr. Warshauer.

14  Q  All right.  Is Mrs. Anderson's case the first one you've ever

15    heard of where someone sustained a foot or leg amputation,

16    like getting caught in the steer tires?

17  A  Yes, it is.

18  Q  Mr. Kerila, are you aware that OSHA investigated

19    Mrs. Anderson's accident after it occurred?

20                    MR. WARSHAUER:  Your Honor, I object.

21                    THE COURT:  The reason is?

22                    MR. LoCOCO:  It's a foundational question.  He

23    either knows or doesn't.

24                    MR. WARSHAUER:  We know where the next question

25    goes, which would be improper to seek hearsay.  Not to mention

1    the 702 issue.

2                     THE COURT:  He was identified -- was not

3    identified as an expert witness.  He was identified as someone

4    who was going to come in and talk about Raymond's process in

5    making the -- this product.  So I think that it's beyond the --

6    it's beyond what he's entitled to talk about.

7                     MR. LoCOCO:  I was going to ask a factual

8    question.  It's two questions.  It's the foundation question,

9    and the second question --

10                    THE COURT:  All right.  Ask it and if it's

11   improper, I'll instruct the jury to disregard it.

12                    MR. LoCOCO:  Okay.

13   BY MR. LoCOCO:

14   Q    Are you aware that OSHA investigated this accident?

15   A    Yes.

16   Q    All right.  Are you aware of whether OSHA found a citation or

17        a violation for failing to comply with B56.1?

18                    MR. WARSHAUER:  Your Honor, that's not what OSHA

19   does.  It's a ridiculous question.

20                    THE COURT:  I -- sustained.

21                    MR. LoCOCO:  All right.  Just a moment, Your

22   Honor.

23   BY MR. LoCOCO:

24   Q    You were asked about studying the left-foot pedal versus a

25        right-foot pedal.  Was the braking performance -- if Raymond

1        had had a left-foot pedal, would the braking performance have

2        been the same, no matter the pedal?

3  A   We do have a left-foot pedal or a right-foot pedal and it is

4        the same.

5  Q   Pedals under both feet as Mr. Warshauer --

6  A   If they were both deadman pedals, then the braking would be

7        the same, yes.

8                MR. LoCOCO:  All right.  That's all I have, Your

9     Honor.

10              MR. WARSHAUER:  Nothing further.

11              THE COURT:  All right.  Thank you.

12              All right, ladies and gentlemen.  I'm going to

13    send the jury home for the day.  Is there anything else we need

14    to tend to off the record -- I mean, out of the presence of the

15    jury?

16              MR. LoCOCO:  I don't think so.

17              THE COURT:  All right.  Ladies and gentlemen,

18    thank you for your patience.  We will be back here and start at

19    9 a.m. tomorrow morning.  We are adjourned until tomorrow.

20              (Jury exits at 4:09 p.m.)

21              (Recess at 4:09 p.m.)

22

23

24

25

° ° ° ° ° ° ° ° ° ° °

## COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 21st day of December, 2021

/s/ Hannah Jagler

_____

Hannah Jagler, RMR, CRR, FCRR
Official Court Reporter