IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
-------------------------------------------------------------------
ADELAIDA ANDERSON and JEFF ANDERSON,  |
                                      |
                    Plaintiffs,       |
                                      |
v.                                    | Case No. 19-cv-800-SPM
                                      |
RAYMOND CORPORATION,                  |
                                      |
                    Defendant.        |
-------------------------------------------------------------------
```

Transcript of Jury Trial - Volume VII
November 9, 2021

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East Saint Louis, Illinois

-------------------------------------------------------------------

**REPORTED BY:**     **HANNAH JAGLER**, RMR, CRR, FCRR
                 Official Court Reporter
                 750 Missouri Avenue
                 East Saint Louis, Illinois 62201
                 618-482-9481
                 Hannah_Jagler@ilsd.uscourts.gov

Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES**:

FOR PLAINTIFF:      **MICHAEL J. WARSHAUER**
                    **JASPER V. ABBOTT**
                    Warshauer Law Group, PC
                    2740 Bert Adams Road
                    Atlanta, Georgia 30339
                    404-892-4900
                    Mwarshauer@warlawgroup.com
                    Jasper@warlawgroup.com

                    **FRANK J. McCOY, JR.**
                    McCoy & McCoy, LLC
                    20 Church Street, Suite 1720
                    Hartford, Connecticut 06103
                    860-244-9100
                    Frank@mccoymccoy.com

                    **RYAN E. BRENNAN**
                    Brennan Law Firm PC
                    19 Bronze Pointe
                    Belleville, Illinois 62226
                    618-236-2121
                    Ryan@feladlc.com

FOR DEFENDANT:      **FRANCIS H. LoCOCO**
                    Husch Blackwell LLP
                    555 East Wells Street, Suite 1900
                    Milwaukee, Wisconsin 53202
                    414-978-5305
                    Frank.lococo@huschblackwell.com

                    **G. PATRICK MURPHY**
                    Murphy & Murphy, LLC
                    3415 Office Park Drive, Suite D
                    Marion, Illinois 62959
                    618-248-3236
                    Gpatrick@murphymurphyllc.com

                    **MARGARET KATHRYN HEITKAMP**
                    Husch Blackwell LLP
                    511 North Broadway, Suite 1100
                    Milwaukee, Wisconsin 53202
                    414-978-5373
                    Margaret.Heitkamp@huschblackwell.com

1

<u>**INDEX**</u>

2

**PAGE**

3   WITNESS: **KATHLEEN RODOWICZ, Ph.D., PE**

4          Direct Examination By Mr. LoCoco........................   966

5          Cross-Examination By Mr. Warshauer.....................  1018

6          Redirect Examination By Mr. LoCoco.....................  1053

7

8   Jury Instruction Conference................................  1064

9

10

11                        <u>**INDEX OF EXHIBITS**</u>

12

      **NO.   DESCRIPTION                                    ID'D   RCV'D**
13    127   OCSS Patent....................................1060   1060

14    572   Rodowicz's Direct Examination PowerPoint....... 966   1109

15

16

17

18

19

20

21

22

23

24

25

1        **TRANSCRIPT OF PROCEEDINGS**

2                (Proceedings commenced at 9:02 a.m.)

3                (Jury enters at 9:02 a.m.)

4                THE COURT:  Please be seated.  Thank you.  All

5        right.  We're getting there.  All right.  We're on the record in

6        Anderson v. Raymond.  We're still in Defendant's case.

7                Call your next witness.

8                MR. LoCOCO:  Thank you, Your Honor.  We'd call

9        Dr. Kathleen Rodowicz.

10               THE COURT:  Okay.  Good morning.

11               THE WITNESS:  Good morning.

12               (Witness sworn.)

13               THE COURTROOM DEPUTY:  Please state your full

14       name and spell your last name for the Court.

15               THE WITNESS:  Kathleen Rodowicz, and that's

16       R-o-d-o-w-i-c-z.

17               THE COURTROOM DEPUTY:  Thank you so much.

18               MR. LoCOCO:  May I proceed?

19               THE COURT:  Please proceed.

20               MR. LoCOCO:  Thank you, Your Honor.

21                       DIRECT EXAMINATION

22       BY MR. LoCOCO:

23       Q    Make sure you speak into the mike.  Thanks.  Could you tell

24            the jury your full name again?

25       A    Kathleen Rodowicz.

1    Q    And where do you live, Dr. Rodowicz?

2    A    I live outside of Philadelphia, Pennsylvania.

3    Q    For whom do you work?

4    A    A company called Exponent.

5    Q    And what do you do at Exponent?

6    A    I am a biomechanical engineer.

7    Q    All right.  I'll ask you some followup questions, but I want

8         to go back in time and ask you to tell the jury about your

9         educational background after high school.

10   A    So I have a bachelor's degree in mechanical engineering from

11        Drexel University, which is a university in Philadelphia,

12        Pennsylvania.  I also have a doctorate degree in mechanical

13        engineering, where my thesis work was focused in

14        biomechanics.

15   Q    So the doctorate work, your focus was biomechanics?

16   A    That is correct, yes.

17   Q    Are you a licensed engineer?

18   A    I am, yes.

19   Q    In what state?

20   A    Maryland.

21   Q    All right.  Would you tell the jury a little bit about your

22        research experience?

23   A    I have research experience looking at injury potential to

24        occupants inside motor vehicles, so specifically performing

25        crash testing, sled testing, utilizing crash test dummies or

1      ATDs, and looking at occupant injury percentage.  I've looked

2      at potential of injury to human beings during

3      sporting-related impacts, specifically looking at injuries

4      associated with football impacts, lacrosse impacts.  I've

5      also looked at injury potential to operators of forklifts

6      involved in off-dock incidents.

7   Q  What is biomechanics?

8   A  Mechanics is a study of how an object responds to forces or

9      loads that are applied to it.  And then biomechanics is

10     simply the application of mechanics to a biological system or

11     to the human body, so the study of how the body responds to

12     forces that are applied.  So those can be external forces.

13     It can be what happens if somebody's hit with something.  It

14     could also be an internal force, so when you bend over, the

15     forces that are in your lower back due to your muscles

16     contracting.

17  Q  You mention that -- you mentioned that you've done some

18     research, automobiles, forklifts, using crash test dummies.

19     What do we see on the screen here?

20  A  This is a video from one of the tests that were conducted.

21     This is looking at a counterbalance truck, which is between

22     the dock and a trailer bed.  What we're going to see is that

23     trailer bed pull away and the forklift will go off the dock

24     or will fall, and there's a crash test dummy inside that

25     compartment of that lift truck.  This is a situation where

1       that operator was forced to remain with the truck during this

2       type of incident.  And what we're doing is we're utilizing

3       the crash test dummy to look at injury potential to an

4       operator that would have been inside that lift.

5                       (Video played.)

6    BY MR. LoCOCO:

7    Q    What's -- tell us what this view is.

8    A    So this is the same test.  So what we looked at before was in

9         realtime.  This view is from a high-speed camera, so it's

10        going to move a little bit more slowly.  But what we see here

11        is that truck again is going to go off the dock.  We'll see

12        the operator or the ATD's head strike the dock.

13                      (Video played.)

14   BY MR. LoCOCO:

15   Q    Just a couple of questions.  This black cord here and this

16        blue cord, what are those?

17   A    So those are the wires that connect the dummy to the computer

18        system.  So inside this dummy, we have load cells and

19        accelerometers where we can measure the forces acting on the

20        different parts of the body, so the head, the neck, the

21        lumbar spine, the chest, and the pelvis.  And so these

22        instrumentation, these accelerometers and these force

23        transducers are then connected to the computer through that

24        black cord, which we refer to as the umbilical cord.

25   Q    All right.  Dr. Rodowicz, do you have any publications?

1   A   I do, yes.

2   Q   Tell us about one or two of those.

3   A   Some of those publications resulted from motor vehicle crash

4       testing that I've done, some of the sporting impact, as well

5       as a publication resulting from the off-dock testing that was

6       conducted in 2019 as well as 2014.

7   Q   Have you received honors and awards in your professional

8       career?

9   A   I've received honors and awards in graduate school, during my

10      schooling, and during my education, yes.

11  Q   All right.  Are you a member of any professional

12      associations?

13  A   I am.

14  Q   What are those?

15  A   The Society of Automotive Engineers as well as the American

16      Society of Mechanical Engineers.

17  Q   Okay.  Let's talk about Exponent.  What is Exponent?

18  A   Exponent is a scientific and engineering consulting company.

19      We have about 900 or so consultants, predominantly in the

20      United States, but also over the world.  It's basically

21      comprised of scientists, engineers, people with different

22      backgrounds that help our clients solve their technical

23      problems.

24  Q   Where -- is there a home base, a headquarters for Exponent?

25  A   Yes.

1    Q    Where is that?

2    A    Menlo Park, California.

3    Q    And what office do you office out of?

4    A    I work outside of our Philadelphia office.

5    Q    All right.  What is your position with Exponent?

6    A    I am a principal within the biomechanics practice.  I'm also

7         the practice director.

8    Q    What does that mean, you're the practice director for

9         biomechanics?

10   A    That means I'm in charge of our biomechanics practice.  We do

11        have about 40 or so consultants within our biomechanics

12        organization, and I am in charge of the practice, in charge

13        of them.

14   Q    I want to follow up on something that came up yesterday.

15        Mr. Rhoades was here yesterday discussing his examination and

16        analysis, his naturalistic study of the 4250 compartment.  He

17        was asked some questions and testified that he had gotten

18        assistance from people at Exponent.  Were you involved in

19        that research?

20   A    I was not, no.

21   Q    All right.  How is biomechanics different from clinical

22        medicine?

23   A    So biomechanical engineers are predominantly focused in what

24        happens up to and including the time of the injury.  So we're

25        looking at how an injury was created, so how much force

1    needed to be applied to the body and what direction did that

2    force need to be applied.  So we're looking at the accident

3    environment and exactly what happened to someone to create

4    their specific injury pattern.  As a biomechanical engineer,

5    I am not diagnosing injuries.  I'm relying on the diagnoses

6    of the treating physicians or the medical doctors to tell me

7    what the injuries are, and then I can understand what

8    happened in order to create those injuries.  Medical doctors

9    are primarily concerned with things like the diagnosis and

10   then the treatment, so sort of everything that happens after

11   the injury, where a biomechanical engineer's interested in

12   what happens in the creation of the injury.

13   Q   Have you been trained to operate lift trucks like the 4250?

14   A   I have, yes.

15   Q   And you've already told us you've done testing and analysis

16       with the 4250?

17   A   I have, yes.

18   Q   Have you done testing with a 4250 in this case?

19   A   I have, yes.

20   Q   Now what were you asked to do in this case?

21   A   So in this case, I was asked to perform a biomechanical

22       analysis to look at how Ms. Anderson moved during the

23       incident, how her injuries were created.  I was also asked to

24       evaluate biomechanical aspects associated with the design of

25       the machine and also to respond to Plaintiff's experts'

1        biomechanical opinions.

2    Q   All right.  As part of what you did in this case, did you

3        review materials?

4    A   I did, yes.

5    Q   What types of materials did you review?

6    A   So as a biomechanical engineer, I'm interested in the medical

7        records, so again, understanding what the injuries are.  That

8        would also include looking at the radiology, so the images of

9        the injuries themselves.  I reviewed witness statements,

10       accident reports.  I've also looked at an exemplar lift

11       truck, so a truck that was substantially similar to the one

12       that Ms. Anderson was operating at the time of her accident.

13       I looked at Ms. Anderson's shoes, so the shoes that she was

14       wearing at the time of her accident.  And I also conducted

15       testing utilizing an exemplar forklift and also an operator

16       of that forklift.

17   Q   Mr. Rogers was here last Friday.  He said -- he told the jury

18       that he made an inspection at the FedEx facility on

19       September 18th of 2020 and January 13th of 2021.  Were you

20       at -- did you also inspect the facility and the exemplar at

21       that -- on those dates?

22   A   I did.  So Mr. Rogers and I were together for those two

23       inspections.

24   Q   All right.  Did you also review the reports and depositions

25       from Plaintiff's experts?

1    A    I did.  Yes.

2    Q    All right.  So first thing I want to do is ask you about your

3         analysis of the injuries.  You told us that you reviewed the

4         medical records.  Can you please tell the jury your

5         conclusions about the injuries based on your review of the

6         medical records?

7    A    Yes.  So what we're looking at on the screen here is an image

8         of a left foot.  So Ms. Anderson sustained multiple soft

9         tissue as well as bony fractures of her left foot.

10        Specifically, it was noted that she had degloving of the top

11        and the bottom of her foot.  A degloving injury is

12        essentially when you have the soft tissues, so the muscles

13        and the tendons, essentially ripped away from the underlying

14        structures, from the bones themselves.  She also had multiple

15        fractures of her first metatarsal.  So if you look at your

16        big toe, would be your first toe, and then goes down to your

17        pinky toe, would be number five.  The metatarsal is that long

18        bone that's connected to your first toe.  She had a fracture

19        of the head of the metatarsal, so the bone closest to the

20        toe, also of the shaft, and as well as the base.

21             She also had fractures of her metatarsals at

22        the base, and two, three, and four.  Her fifth toe was

23        fractured and dislocated here, and she also had a fracture of

24        the medial cuneiform, which is attached to that first

25        metatarsal as well, and multiple fractures of that medial

1       cuneiform.

2   Q  And what are we looking at here?

3   A  Here what we're doing is we're just highlighting the bones

4       that were injured, that Ms. Anderson sustained injuries.

5   Q  Did you observe any other injuries looking at the medical

6       records?

7   A  Yes.  So in addition to the soft tissue and fractures to her

8       left foot, she also sustained lacerations to her right shin.

9   Q  And what's a laceration?

10  A  A laceration is a cut.

11  Q  Okay.  Is that what we're looking at here?

12  A  Yes.  So this is an image of Ms. Anderson's right shin.  So

13      on the right side of this image would be where her foot was.

14      The left side would be where her knee is.  And you can see

15      that she has these two sort of parallel linear lacerations to

16      her right shin.

17  Q  Why was it important to you to account or to take notice of

18      those skin lacerations?

19  A  So when we perform a biomechanical analysis, it's important

20      that you're considering all of the injuries in order to

21      understand what happened to somebody in an accident.  And so

22      those injuries can be fractures, they can also be minor

23      injuries that tell us more about the accident environment and

24      more about how somebody interacted with their environment.

25  Q  Okay.  Are you trying to figure out what caused the injuries?

1    A    Yes.  Exactly.

2    Q    All right.  So there's a series here of slides that show

3         what?  Like what's this first one?

4    A    So this is an image of the x-ray of Ms. Anderson's left foot,

5         so this was taken after her accident.  And there are certain

6         things in this image that we can identify that show us where

7         the injuries were located.  So at the top here, we can see

8         there's evidence of a soft tissue injury, so we have

9         something that looks like some material towards the toes.

10        That's the soft tissue.  It's also a sock that had been

11        pulled off of her foot towards her toes.  We can see we have

12        a dislocation of her fifth toe, and then we also see that we

13        have some evidence of soft tissue injury even closer to the

14        heel area.  So that should be a smooth line that's

15        surrounding that foot, and we can see there's some jagged

16        edges, which is consistent with the tearing of that tissue.

17   Q    Anything else from this next image from the x-rays?

18   A    Yes.  So this is a different view.  So when you do x-rays,

19        oftentimes they'll do multiple views so you can see different

20        injuries.  In addition to dislocation, the soft tissue

21        injury, and the tissue by the sock -- I'm sorry -- the tissue

22        and the socks by the toes, we also see some of the metatarsal

23        fractures, so we can see that dark line in the bone.

24   Q    Can you circle that for us?

25   A    Do I just --

1    Q    Yeah, you just --

2    A    Okay.  So this area here, you can see there was a dark line.

3         That would be the fracture in the metatarsal, and that

4         fracture extends into the shaft.

5    Q    What are we looking at here?

6    A    This is again another view from the x-ray.  What we're seeing

7         here is this metatarsal, we can see this break in the bone at

8         this location.

9    Q    And what is this image from?  Is this an x-ray?

10   A    This is not an x-ray.

11   Q    So what are you doing with this image?

12   A    This is an image taken from the CT examination.  So a CT is

13        essentially a series of x-rays, where you take x-rays at

14        different levels throughout the body, and then you can stack

15        those images together to create a three-dimensional object or

16        three-dimensional structure.  So what we're looking at here

17        are two images taken from a CT examination of her left leg.

18        So on the left side of the screen, we're looking at the foot,

19        essentially if we were looking from -- towards the toes, and

20        on the left side of the screen we're looking at a side view

21        of the foot.  And so this yellow line here is showing us

22        where in the foot we are located, so we're looking at the toe

23        region essentially.  And we can see this line here would be a

24        fracture of our toe of that first toe.

25                         As now we're just sort of traveling up the

|  |  |  |
|---|---|---|
| 1 |  | foot, so we're moving up from the toes towards the heel.  And |
| 2 |  | we can see here we also have a fracture of our first |
| 3 |  | metatarsal.  So, you know, we would expect those lines to be |
| 4 |  | nice and clean, but we've got some breaks.  That would be the |
| 5 |  | metatarsal fracture.  We've also got a break here towards the |
| 6 |  | shaft of the metatarsal.  And we can see that fracture line |
| 7 |  | continues.  It propagates. |
| 8 | Q | So you're moving -- you explained to the jury that these are |
| 9 |  | slices moving back in the foot? |
| 10 | A | Exactly.  And so this yellow line tells us where we're |
| 11 |  | located within the length of the foot.  And so what we've |
| 12 |  | done, we've started at the toes and we're essentially looking |
| 13 |  | through the foot as we head back towards the heel. |
| 14 | Q | What are we looking at here? |
| 15 | A | That's the fracture off of the first metatarsal base, so at |
| 16 |  | this location, what we're seeing here is another little |
| 17 |  | break. |
| 18 | Q | And on this one? |
| 19 | A | These are the fractures of the medial cuneiform, which is |
| 20 |  | this bone here. |
| 21 | Q | Can you show us that again?  What's a cuneiform? |
| 22 | A | The cuneiform is this bone here.  The medial is on the inside |
| 23 |  | of the foot, so it's attached to our first metatarsal, so |
| 24 |  | essentially attached to our first toe.  It's this bone right |
| 25 |  | here.  And so there's multiple fractures of this bone as |

1     well.

2   Q   Now what are we looking at?

3   A   This is another view of the cuneiform fracture.  So we can

4       see that there's multiple lines that are essentially slicing

5       through that circular area.  Those are the fractures of the

6       cuneiform.

7   Q   And this slide, what are we looking at?  I'm sorry, on this

8       slide, is this another slice?

9   A   This would be another slice, so again showing the fractures

10      of the cuneiform.

11  Q   Again, you're showing the cuneiform fracture?

12  A   Again, we're showing the cuneiform fracture.  And you can see

13      that the fracture is also at the bottom of the foot as well.

14      So we've got the base of the fracture, or the fracture at the

15      base of the first metatarsal closer to the top.  We want --

16      the cuneiform fracture that extends to the bottom as well.

17  Q   So you looked at the medical records, determined the

18      fractures and the soft tissue injury.  What's the next thing

19      you did in your analysis?

20  A   So in the analysis, we're looking at the physical evidence.

21      So we're looking at how Ms. Anderson interacted with this

22      lift truck during her accident, so that involves looking at

23      the injuries.  It also involves looking at the shoe.

24  Q   So what are we -- what are we observing here in this slide?

25  A   So what we're observing here are Ms. Anderson's shoes, so

1    these are the shoes that she was wearing at the time of the

2    accident.  So what we can see is that her left heel had some

3    squeezing, so it looks like it was compressed sort of medial

4    to laterally.  We can see that left heel is pinched in

5    comparison to the right heel.

6  Q  Let me just stop you there.  Is that -- are you -- is this

7    where the squeezing is?

8  A  Exactly.  So we have more of a rounded structure on the right

9    shoe, but you can see that that left heel has been pinched or

10    been squeezed.

11  Q  What else did you observe on the shoes?

12  A  Well, this is another view showing the top of the shoe, so

13    again, you can see the pinching of the left heel.  What we're

14    looking at on the right is a pair of exemplar shoes, so these

15    are similar shoes to what Ms. Anderson was wearing, the same

16    model, the same size.  We can see that we don't have that

17    pinching.

18  Q  Now this photograph is a picture of which shoe, the exemplar

19    or the subject shoe?

20  A  This is Ms. Anderson's shoe that she was wearing at the time

21    of the accident.

22  Q  And what are you -- what do you want the jury to focus on in

23    this photograph?

24  A  So this is her left shoe.  What we're looking at here is the

25    inside of her left shoe.  There's a tear here that we'll be

1    focusing on.  There's also some fluid staining right above

2    that tear.  And then we can also see that there's a tear in

3    the shoe in this area as well.  So we've got some tearing of

4    the shoe in the vicinity of where that first metatarsal would

5    be, where that first toe would be.

6  Q   Anything else from this photograph that you're wanting to

7    show to the jury?

8  A   No.  This, we're just comparing the subject shoe to the

9    exemplar shoe.  So we can see again we've got the tear in the

10    leather at this location.  And we've also got some fluid

11    staining here, so some dark brown fluid staining of the shoe.

12    And that's all right in the vicinity of the tear to the top

13    of the shoe as well.  And again, that's all around where the

14    first metatarsal would be, where we have the fractures of the

15    first metatarsal.

16  Q   How about this photograph?  What are we seeing here?

17  A   This is a photograph of the top of the left shoe.  So again,

18    we can see the tear in the shoe.  We also can see that we

19    have some tear or some wear on the outside of the shoe.  One

20    of the things we notice here too is that the laces are still

21    tied and intact.  They haven't been torn.  And we do also

22    have some dark staining to the top of the shoe as well as to

23    other areas of the shoe.

24  Q   What's this -- tell us what this close-up is.

25  A   It's a close-up of the tear at the top of the shoe.

1  Q   What are we looking at here now?

2  A   So now we're looking at the outside of the left shoe.  Again,

3     we can see that we've also got a tear on the outside of the

4     shoe towards the toes in that area.  And then we've also got

5     some dark staining and some scuffing of the shoe in the

6     vicinity of the shoelaces, so in this area, as well as to the

7     back of the shoe.

8  Q   Is this just a close-up of that?

9  A   That's a close-up of the tear on the outside of the shoe,

10     yes.

11  Q   Anything else from this couple of images?

12  A   No.  Again, we're just comparing the exemplar shoe, or a

13     similar shoe to the subject shoe, so we can better appreciate

14     some of these changes to the shoe.

15  Q   Anything from this photograph that you need to point out?

16  A   In this photograph, we -- again, we can see that we've got

17     the dark staining up closer to the laces, closer to the

18     tongue of the shoe.  We've also got some scuffing of the

19     shoe, and that dark staining extends to the back of the shoe,

20     and we've got some scuffing at the back of the shoe as well.

21  Q   Okay.

22  A   That's a close-up of that scuffing and that staining and some

23     of the damage to the shoe.

24  Q   All right.  So you reviewed the medical records, you

25     inspected Ms. Anderson's shoes, compared them to an exemplar.

1      What else did you do?

2  A   So in order to understand how the shoe and the foot came

3      together and interacted with the truck, what I did was then

4      create a three-dimensional model of the subject lift truck or

5      of an exemplar lift truck, and then incorporated the -- a

6      human being along with that model in order to better

7      understand the interactions.

8  Q   So how did you go about creating the 3D model of the lift

9      truck and the human being?

10 A   So the three-dimensional model of the lift truck was created

11     utilizing 3D scan data.  So at the time of my inspection,

12     three-dimensional scans were performed, so essentially a

13     laser scanner was used in order to capture the geometry of

14     the truck.  So how a laser scanner works is it has a laser

15     inside with a set of mirrors, and the laser will send the

16     light beam out.  It will measure how long it takes for that

17     light to return and then it will note distances.  And so it

18     can take millions of measurements to create a geometry of a

19     defined area.  And so what we're looking at here is actually

20     the data that was taken or collected during my inspection,

21     showing the geometry of the truck.

22 Q   And then what's this next image?

23 A   This is a model that was then created utilizing that

24     three-dimensional scan data.  This was a model that was

25     created that has the same sizing, so the same scale as the

| | | |
|---|---|---|
| 1 | | exemplar lift truck. |
| 2 | Q | So what's the advantage of having a 3D model like this in a |
| 3 | | digital format? |
| 4 | A | So having a three-dimensional model allows us to look at the |
| 5 | | geometry of the truck in relation to the geometry of the foot |
| 6 | | and of the shoe to better understand how the interaction |
| 7 | | between the foot and the truck occurred. |
| 8 | Q | All right.  What's this next image? |
| 9 | A | This is another image from our 3D scan data, so you can see |
| 10 | | the digitized data.  And then this is our three-dimensional |
| 11 | | model, so again, our model was created based on the |
| 12 | | dimensions that were taken or the dimensions that were |
| 13 | | collected at the time of my inspection. |
| 14 | Q | What's this -- what's this view? |
| 15 | A | Now we're looking at the right side of the model. |
| 16 | Q | And this -- tell us what this is, then. |
| 17 | A | This is then our model.  So the previous slide was the scan |
| 18 | | data, and now what we're looking at is the right side of the |
| 19 | | model.  So again, what I'm showing here is that we've created |
| 20 | | the model based on the actual geometry, based on the |
| 21 | | measurements that were collected at the time of my |
| 22 | | inspection. |
| 23 | Q | So once you have this 3D model in the computer of the truck, |
| 24 | | can you rotate it, look from top, bottom, all the other -- |
| 25 | | all sides? |

1    A    Exactly.  So once we have the model in the truck, then we can

2         look at it from any angle.  We can put an operator in there.

3         We can look at potential interactions, and again, we can look

4         at this from any angle in different circumstances.

5    Q    Did you create any other 3D -- three-dimensional components

6         for use in your analysis?

7    A    Yes.

8    Q    All right.  So what are we looking at here?

9    A    So what we're looking at here is a three-dimensional

10        reconstruction of Ms. Anderson's CT examination.  So as I

11        mentioned before, a CT is essentially a 3D x-ray where you

12        take slices through an area of the body.  You can then

13        combine those slices, put everything together to create a

14        three-dimensional object.  And so what we're looking at here

15        is actually a reconstruction of the -- of the bones of

16        Ms. Anderson's left leg.  So again, this would be something

17        that would be to scale.  It would be the same size as her

18        bones, collected from her imaging that we were then able to

19        incorporate into the model to again better understand how the

20        truck and the foot interacted during the accident.

21   Q    And are these just different views?

22   A    Yes.  So what we're showing is just rotating around the model

23        to show that this is a three-dimensional model.

24   Q    So I want to ask you about these holes that we see on the

25        back.  First of all, what bone is that?

1    A    That's the calcaneus or your heel bone.

2    Q    Why are we seeing holes in the heel bone there?

3    A    So the bone will have different densities.  In order to

4         create this three-dimensional structure, we have to

5         essentially refer to things as on or off, or black or white.

6         Right?  So if we set a specific threshold and then everything

7         below that threshold would be white, everything above would

8         be black.  Now since the bone has different densities, some

9         of the bone actually wasn't captured when we did the

10        thresholding or when we created the three-dimensional model.

11        But those are not actual bones, or they're not actual holes

12        in the bones.  It's more a function of the thresholding.

13   Q    Is this another view of the 3D model of the left foot and

14        lower part of the leg?

15   A    Correct.  So what we're doing, we're just viewing around the

16        three-dimensional model.

17   Q    Calcaneus.  Does this image include the fractures?

18   A    It does.  The fractures are subtle and they can be difficult

19        to appreciate on the three-dimensional model, which is why we

20        were looking at them at the 2D slices.

21   Q    Okay.  What did you do with regard to the shoes?  Did you

22        create three-dimensional models of the shoes?

23   A    Yes.  So in addition, the -- a three-dimensional model was

24        created utilizing the exemplar shoes as well as

25        Ms. Anderson's actual shoes.  So in order to create this

1    model, we took a series of photographs and then created a

2    three-dimensional object from these photographs, and then

3    that was all able to be incorporated into the model with the

4    foot and with the truck.

5  Q  So on this photograph, on this image, the left side is what?

6  A  The left side is an image taken during the digitization of

7    the model, and the right side is an actual screenshot of the

8    three-dimensional model that was based on the photographs.

9  Q  And these -- are these to scale?

10 A  They are.  Correct.

11 Q  So what are we looking at here?

12 A  So the next thing that we did was incorporate a surrogate

13    operator, so somebody of similar size and stature as

14    Ms. Anderson, and put that into our model as well.  So on the

15    left side of the screen, we're looking at an image taken

16    during one of my inspections.  We had a woman who was about

17    the same size and same height as Ms. Anderson, had her stand

18    in the lift, put her hands in a position that Ms. Anderson

19    said she was in prior to her accident, and then we were able

20    to use that as a basis to then create a three-dimensional

21    operator, which we were able to then include into our model,

22    again to better appreciate how Ms. Anderson interacted with

23    her lift.

24 Q  All right.  And so that resulted in -- tell us what that

25    resulted in with respect to this image.

1   A   So this is an image from our three-dimensional model.  So now

2        we have our lift, we have our shoe, we have our operator, and

3        additionally, we're also including the radiology.

4   Q   So this next image, you take the shoe off and put the

5        to-scale left leg and foot in?

6   A   Exactly.  And the left leg and foot is always included.  It's

7        always linked with the model, but we're just turning things

8        on and off so we can see or we can appreciate different

9        things.

10   Q   So based upon all of this work that you've described to the

11        jury so far, were you -- did that put you in a position to

12        form an opinion as to how Mrs. Anderson's injuries occurred?

13   A   Yes.

14   Q   And what caused them?

15   A   Yes.

16   Q   Did you also take into account the geometry of the back of

17        the truck and the steer wheels?

18   A   I did, yes.

19   Q   Tell us about that.

20   A   And so what we're looking at here is a rearview of the truck,

21        looking at those steer wheels.  Specifically what we can

22        appreciate here is that there's a space between those two

23        wheels, and so this is -- plays a role in the injury

24        mechanism.

25   Q   All right.  Let me show you -- I forget which exhibit this

1    is.  I'll get the exhibit number, but it's a 3D print of the

2    wheel assembly.  Have you had a chance to look at this,

3    Dr. Rodowicz?

4  A    I have, yes.

5  Q    With this and your model of the foot, would you be able to

6    explain to the jurors how Ms. Anderson's injuries occurred?

7  A    Yes.

8              MR. LoCOCO:  Your Honor, could I have

9    Dr. Rodowicz step down?  Thank you.

10             You got to keep your voice up.

11             THE WITNESS:  Okay.

12  BY MR. LoCOCO:

13  Q    So could you explain to the jury how Mrs. Anderson's injuries

14    took place, using this model and the foot model?

15  A    Yes.  So again, Ms. Anderson had the degloving injuries to

16    both the top and bottom of her foot, consistent with her foot

17    being compressed against a rotating surface, so something

18    moving that was then pulling the tissues down towards her

19    toes.  And she also had the compression in this area here, in

20    the region of the base of the metatarsals.

21  Q    What was the orientation of her foot when this was happening?

22  A    So the orientation of her foot would be directed towards the

23    steer wheels, so with her foot essentially between these two

24    wheels and these wheels rotating, compressing the soft

25    tissues of her foot, and stripping the soft tissues from her

1       foot while also squeezing her midfoot.

2   Q   Was her foot still trapped after the accident was completed,

3       based on your work in this case?

4   A   It was not, no.

5   Q   All right.  So at some point, she got freed up?

6   A   At some point, she got freed up.  Correct.

7   Q   You can head back to the stand.  So all these digital images

8       that you explained to the jury, did that help you form an

9       opinion as to what happened, what movement, what body

10      movements Mrs. Anderson made to get in a position where she

11      sustained the injuries you just told the jury about?

12  A   Yes.

13  Q   Did you also take into account the right-shin lacerations?

14  A   Yes.

15  Q   And have you formed an opinion as to what caused those

16      right-shin injuries?

17  A   Yes.

18  Q   All right.  So what are we looking at here, Dr. Rodowicz?

19  A   So this is looking at our three-dimensional model and looking

20      at a position of our operator consistent with the injuries.

21      So what we see here is the left foot is in front of those

22      steer wheels, with the toes pointed to those steer wheels

23      prior to the interaction between the left foot and the steer

24      wheel assembly.  What we're also noticing in this image is

25      that we have the right shin interacting against the edge of

1       that bumper, creating the mechanism for the right-shin

2       lacerations.

3  Q   And the right shin is kind of covered up here, but it's

4       against the edge of the bumper, you said?

5  A   It is, correct.

6  Q   Now what are we looking at?

7  A   So we're looking at as the truck continues to move with

8       Ms. Anderson outside of the truck.  Now we're seeing the

9       initial engagement between the toe region of her shoe and

10      that steer wheel with the foot essentially getting in between

11      those steer wheels, compressing this first metatarsal area,

12      creating the tear of her shoe, as well as the fractures to

13      her first metatarsal.  We're also seeing some rotation of her

14      foot.  That's going to allow for her foot to essentially move

15      in between those two rotating surfaces to strip the tissues

16      on both the top and the bottom of her foot.

17  Q   Now you have this model of Mrs. Anderson facing the back of

18      the 4250; correct?

19  A   Correct.

20  Q   Did her body have to be in this position to create these

21      injuries?

22  A   Yes.  She had to be presented so that her foot was

23      essentially aligned with the steer wheel assembly so her foot

24      was interacting with the wheels, such that the tissues would

25      be stripped or pulled towards her toes.

1   Q   And now what's this next image?

2   A   This image we're showing the continued progression, so we're

3       showing the continued motion of the wheels against her foot,

4       resulting in the injuries to the metatarsals.

5   Q   All right.  So you showed us these three images, right before

6       interaction, at interaction, and this last image with

7       Mrs. Anderson on the ground; correct?

8   A   Yes.

9   Q   All right.  We talked earlier about how having this in 3D

10      allows you to look at it from different perspectives.  Is

11      that the next series of images we're going to see?

12  A   Yes.

13  Q   All right.  So what are we looking at here?

14  A   So this, we're looking at a close-up of the left foot and the

15      wheel interaction.  So this was -- if we look at the

16      sequences freeze, this would be Frame 1 in that sequence.  So

17      again, we've got the left foot in front of the steer wheel

18      presented so that the toes are pointed towards the steer

19      wheel.  Then we've got the continued motion of the truck.

20      We've got the interaction between the toes and the -- and the

21      steer wheel itself.  And then we've got the continued motion

22      resulting in the damage to the foot, the stripping of the

23      tissues.  And so again, we can see that we've got the

24      interaction between the two tires and the top and the bottom

25      of her foot.

1    Q    So what's this view?

2    A    Now we're looking at a rearview.  And so in this view, we can

3         appreciate the motion of the truck and the orientation of her

4         left foot with respect to the steer wheel, but also the

5         orientation or the impact between her right shin and the

6         bumper.  So in our first, we've got a couple of contacts.

7         Right?  So we have a couple of lacerations to that right

8         shin, consistent with multiple interactions between the right

9         shin and the bumper as the truck's continuing to move against

10        her right shin and push her rearward.

11   Q    What's this view?

12   A    This is a view from the right side of the truck, so again

13        looking at the interaction between the left foot and the

14        wheel, but also the right shin and the bumper of the truck.

15   Q    So this is the view that shows the opposite side so you can

16        see the shin lacerations?

17   A    Yes.

18   Q    And what's this view?

19   A    A top view.

20   Q    How about this view?  What is this view?

21   A    It was a rear top view as well.

22   Q    All right.

23   A    So again, different views to appreciate the interaction.

24   Q    Does this show the shin laceration?

25   A    Yes.  So this would show the shin laceration as well.

1   Q   Now based on your analysis in this case, Dr. Rodowicz, were

2        there external forces working on Mrs. Anderson's body or foot

3        that accounted for her coming out of the compartment?

4   A   No.

5   Q   All right.  How did she come out of the compartment based on

6        your analysis in this case?

7   A   This would be a volitional motion, so this would not be a

8        response of a loss of balance.  The position of her left foot

9        is located outside, below, and also to the left of the

10       compartment and turned, so that the toes are pointed towards

11       the steer wheels.  And this would be consistent with her

12       placing her foot at that location.

13   Q   Whoops.  I went the wrong way.  So what are we looking at

14       here in this image with these purple arrows?

15   A   So what we're looking at here would be the motion that the

16       foot would have to take in order to get in front of that

17       steer wheel.

18   Q   Which foot?

19   A   The left foot.

20   Q   All right.  So these arrows are just for the left foot?

21   A   These arrows are just for the left foot, and they're

22       essentially starting at a normal position in the track, with

23       her left foot outside the operator compartment.  And again,

24       we're showing the foot has to come --

25                 (Interruption by court reporter.)

1           THE WITNESS:  The left foot has to come outside,

2     down, to the left, and then rotated so that the toes are pointed

3     toward the steer wheels.

4  BY MR. LoCOCO:

5  Q   What are we looking at here?  What did you -- what part of

6     your analysis are we looking at in this image?

7  A   So on the left, we're looking at a photograph that was from

8     the OSHA report.  This is the truck positioned in the aisle

9     with respect to the racking, consistent with how witnesses

10    recalled it being positioned post-accident.  And what we're

11    looking at on the right is a three-dimensional model of the

12    accident site, as well as the truck and our operator

13    demonstrating the position of our operator with respect to

14    the truck and with respect to the racking.

15 Q   Now the distance between the rack and the truck on the

16    photograph on the left side and the rack and the truck in

17    your 3D model on the right side looks like a larger distance.

18    Why is that?

19 A   So this would be before the injury.  And so what we're

20    showing is that truck would continue to move towards that

21    racking.  So this is mostly focused on just the orientation

22    of the truck with respect to the aisle and with respect to

23    the racking to provide some insight as to why Ms. Anderson's

24    foot would have been in that position.

25          MR. LoCOCO:  Can I have the document camera for a

1    second?

2    BY MR. LoCOCO:

3    Q    Dr. Rodowicz, have you seen this image?  This is from

4         Dr. Meyer's report.

5    A    I have, yes.

6    Q    And you see the path of travel that he's put into this image?

7    A    Yes.

8    Q    So based on your analysis, your biomechanical analysis, how

9         these injuries occurred, have you formed an opinion as to how

10        Mrs. Anderson got into the position she was in?  Which we saw

11        in that last photograph or that last image.

12   A    Yes.

13   Q    Facing the back?

14   A    Yes.

15   Q    Explain that to the jury, please.

16   A    So the position of her body, given the orientation of the

17        truck and the location of the racking, is consistent with her

18        attempting to get out of the truck, and essentially move her

19        body between that space between the truck and the racking, so

20        essentially to get within that space, get out of the truck,

21        and into the aisle way.

22   Q    So the truck's moving in this direction?

23   A    Yes.

24   Q    And she's moving away from there?

25   A    Correct.  Yes.

1          MR. LoCOCO:  Can I have my screen back?

2     BY MR. LoCOCO:

3     Q    Now did you look at Dr. Kerrigan's analysis of the injury

4          mechanism?  Oh, I'm sorry.  I missed this.  This is just

5          another view of the same images?

6     A    Yes.  So again, utilizing the three-dimensional model, we can

7          now look at things from any angle, so this is another view of

8          that same image.

9     Q    So did you look at Dr. Kerrigan's injury mechanism?

10    A    I did, yes.

11    Q    Dr. Kerrigan testified that Mrs. Anderson was -- sustained

12         her injuries during the subject accident by getting caught by

13         the widest part of the wheel, that the skin above her ankle

14         was pulled down and it was pulled over her -- pulled off her

15         foot toward the steer wheels or to the outside edge of the

16         steer wheels, where it was subsequently pinched against the

17         rear skirt.  Do you agree with this opinion?

18    A    No.

19    Q    All right.  So what in there do you agree with and what don't

20         you agree with?

21    A    So I agree -- Dr. Kerrigan and I agree with respect to the

22         orientation of the foot with respect to the steer wheel, so

23         we both agree that the toes had to be pointed towards the

24         steer wheels at the time of the injury.

25    Q    Okay.  But you -- your opinion is that for the injuries to

1    occur, it had to get caught between the two steer wheels?

2  A  Yes.  So there had to be compression of the foot as well as

3    both the top and the bottom of the foot had to be against a

4    rotating surface or a moving surface in order to pull the

5    tissues down towards the toes.  And so what Dr. Kerrigan is

6    depicting here shows that the bottom of the foot isn't

7    against anything, and so that would not create the degloving

8    injury to the bottom of the foot.

9          What Dr. Kerrigan is also showing is he has

10   the initial contact between the ankle area and the widest

11   part of the wheel.  If the wheel then had continued to

12   rotate, it would have injured areas sort of up closer towards

13   the knee.  Right?  So we disagree with the starting location

14   of the injury as well.

15  Q  Did Dr. Kerrigan take into account these lacerations on the

16   right shin?

17  A  No, not to my knowledge.

18  Q  All right.  So what are you trying to depict for the jury on

19   this slide?

20  A  So Dr. Kerrigan put his position of Ms. Anderson's left leg

21   in his report.  And so what we're looking at is then

22   utilizing the three-dimensional model and Dr. Kerrigan's left

23   leg position, how the rest of her body would have to be

24   positioned.  So Dr. Meyer believed that her right foot was

25   still on the deadman pedal and her hands were on the

1      controls, turning the steering tiller and controlling the

2      multifunction control.  And so in order for all of those

3      things to occur, so for the hands and the right foot to be

4      where Dr. Meyer says they were and the left foot to be where

5      Dr. Kerrigan says they were, this would be the body

6      orientation that she would have had to have been in.

7  Q   Did you ask the surrogate when you did your surrogate study

8      to put herself in that position?

9  A   I did, and she was not able to do this.

10  Q  All right.  What's this next image intended to depict for the

11     jury?

12  A  So this image is looking at, on the bottom, a position

13     consistent with a compensatory step.  So if somebody were to

14     lose their balance and simply take a step to their left,

15     that's what we would be looking at at the bottom.  Right?  A

16     step out of the truck, to the left, sort of straight out the

17     back.

18  Q  So Dr. Jeka testified last week that in his opinion,

19     Mrs. Anderson experienced some balance challenge, took a

20     compensatory step out into an area where there was no

21     compartment, and then that's how she was injured.  You're

22     aware of that -- I mean, I don't know that you're aware he

23     testified to that, but you read that in his deposition

24     materials?

25  A  Yes.

1  Q   All right.  Based on your analysis of the injury, could

2      Mrs. Anderson's injury have occurred from this type of

3      movement of the left foot?

4  A   No.

5  Q   All right.  I want to talk about that with you.  How did you

6      go about determining that?  What did you have to study?

7  A   So I had to look at how one would step to the left, what

8      their body orientation would be, and then also the timing of

9      the truck, how much motion of the truck we would expect, and

10     how the interaction would occur, so how the truck would move

11     or to interact with the body, had she just simply stepped to

12     the left.  So part of my analysis was looking at the bases of

13     support that the truck provides, so what's available for an

14     operator in order for them to maintain their balance.  I was

15     also looking at what types of accelerations or perturbations

16     did Ms. Anderson experience prior to her moving out of the

17     truck, and then again, also looking at the injury position or

18     the injuries in looking at whether or not the injuries would

19     have been created, had she just simply taken a step out to

20     the left.

21  Q   All right.  So the jury's seen these images before of the

22     controls and the compartment.  What are we looking at here?

23     What are you -- actually, let me back up for a second.  By

24     the way, if Ms. -- did you form an opinion to a reasonable

25     degree of certainty in your field of expertise as to whether,

1    if Mrs. Anderson had stayed in the compartment, she would

2    have been injured?

3  A  Had she stayed in the compartment, she would not have been

4    injured, no.

5  Q  All right.  Did you formulate an opinion as to whether

6    Mrs. Anderson's left leg moved outside the compartment as a

7    result of her loss of -- as a result of a loss of balance?

8  A  I did.

9  Q  And what's that opinion?

10 A  That the position of her foot is not consistent with a loss

11   of balance, and also again that the subject truck provides an

12   operator with a base of support or enough points to hold on

13   to to prevent a loss of balance during normal operation of

14   the truck.

15 Q  All right.  I want to talk about that latter point, that the

16   truck gives the operator sufficient stability to stay in the

17   truck.  Have you been a part of actual testing at Exponent of

18   braking and steering?

19 A  Yes.

20 Q  All right.  And tell us about that.

21 A  So I've been involved in testing where we've had forklift

22   operators perform normal operations, so applying the brake,

23   applying plugging, doing turns, and measuring the

24   accelerations on the truck that the operators were exposed

25   to.

1   Q   And did you use fore-aft trucks, sidestance or dockstance

2       trucks, both, something else?  What'd you use?

3   A   The operators in the testing were able to use different

4       stances, so they were able to stand so that they were facing

5       out the back, so that they were facing towards the forks, as

6       well as a dockstance or a sidestance.  And they did these

7       different obstacles essentially going through cones, slalom

8       testing, and also just going straight up and back, and again

9       looking at what are the accelerations or what are the motions

10      of the truck during these normal operations, and looking at

11      the response of the operators during these operations as

12      well.

13  Q   Did you also look at the literature on balance and

14      compensatory steps?

15  A   Yes.

16  Q   All right.  So what are we looking at here?

17  A   So what we're looking at here are studies that were done

18      looking at perturbations or how much acceleration was

19      eliciting steps in volunteers.  And so the subject forklift

20      allows an operator to have five points of stability, so they

21      have both feet on the operator compartment, they can put

22      their backrest on the -- or their backs, excuse me, on the

23      backrest, they have their two hands on the controls.  So they

24      have essentially five points of contact with the machine.

25      What we're looking at here are studies that were done

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | utilizing volunteers where they were subjected to            |
| 2  |   | perturbations or to accelerations and they were looking at   |
| 3  |   | what accelerations were associated with a step, so how much  |
| 4  |   | acceleration before these volunteers took a step.  And the   |
| 5  |   | volunteers in these studies only had two points of contact.  |
| 6  |   | They were standing with their hands either to their sides or |
| 7  |   | crossed in front of them.                                    |
| 8  | Q | So they weren't holding on to anything?                      |
| 9  | A | They were not holding on to anything.                        |
| 10 | Q | They weren't leaning back on anything?                       |
| 11 | A | No.                                                          |
| 12 | Q | So in this Wu study, the first one, how many volunteers were |
| 13 |   | there?                                                        |
| 14 | A | There were 27 volunteers.                                    |
| 15 | Q | And the level of accelerations that were experienced by these |
| 16 |   | volunteers?                                                   |
| 17 | A | Was about 0.8g.                                              |
| 18 | Q | So eight-tenths of a g.  And did any of them take a          |
| 19 |   | compensatory step?                                           |
| 20 | A | Not in that study, no.                                       |
| 21 | Q | The Jensen 2001 study, how many volunteers were there?       |
| 22 | A | 18 -- I'm sorry.  16.                                        |
| 23 | Q | And the level of the accelerations got to how high?          |
| 24 | A | Close to a g.                                                |
| 25 | Q | And how many took a compensatory step?                       |

1    A    Two of the 16.

2    Q    The Runge 1998 study, how many volunteers were there?

3    A    There were seven.

4    Q    And what was the level of acceleration experienced by those

5         seven?

6    A    Close to 2g.

7    Q    And then the Runge '99 study, how many volunteers?

8    A    Seven volunteers.

9    Q    All right.  And what was the acceleration?

10   A    About 2g.

11   Q    And in the Runge study, did anyone take a compensatory step?

12   A    No.

13   Q    I'm sorry, the '99.  How about the 1998 study?

14   A    One volunteer took a step.

15   Q    And then what's this next plot that we see?

16   A    So what we're looking at, this blue column, are the range of

17        accelerations associated with normal operation of the truck.

18        So from the testing that I participated in back in 2013 as

19        well as a study that was done in two-thousand -- 2005,

20        basically showing that during braking and turning maneuvers,

21        the forklift accelerations ranged from about a tenth of a g

22        to about a half a g, and so well within accelerations

23        associated with balance retention.

24   Q    All right.  Did you do testing with the exemplar?

25   A    I did, yes.

1    Q    Tell the jury about that, please.

2    A    So the testing that was done with the exemplar was performed

3         at the facility where the accident occurred, where Mr. Rogers

4         rode the exemplar forklift into the aisle, taking a path

5         similar to the path that Ms. Anderson took prior to her

6         incident, including traveling over the cracks.  And what we

7         had done was we took -- we utilized IMUs, which are inertial

8         measurement units, to measure the accelerations or motions of

9         the forklift, as well as the motions of the operator as we're

10        performing this travel path and going over these cracks.  And

11        the purpose for this was to measure what would happen to the

12        truck when you travel within this warehouse as well as over

13        these cracks.

14   Q    So is this what the jury's about to see, one of the tests?

15   A    This is one of the tests, and this is where the speed of the

16        forklift was around 5 miles an hour.  And what we'll see here

17        is Mr. Rogers, he will turn into aisle F/G and again taking a

18        path similar to the path that Ms. Anderson took prior to her

19        accident.

20   Q    Well, it worked yesterday.  The jury's seen it, though.

21        Mr. Rogers comes down here; correct?

22   A    Correct.  Yes.

23   Q    Now you said that you had -- you used these IMU units, which

24        Dr. Rhoades explained yesterday are like Fitbits.  They've

25        got gizmos inside.  So this first plot we're looking at, what

1  plot is this?

2  A  So this is what we're referring to as a longitudinal

3     acceleration, so these would be accelerations that would be

4     along the -- along the path of travel of the forklifts.  So

5     these would be accelerations that would tend to move somebody

6     either towards the back of the forklift or towards the

7     controls of the forklift.

8  Q  All right.  So say I'm in the 4250.  The forks are to my

9     right, the back of the courtroom.  The opening to the

10    forklift is to my left toward you.  Is that X?  Which way is

11    the longitudinal?

12 A  It would be, if you were to stick your hands out, so from

13    the -- yep, those would be the direction.

14 Q  So it's this direction, in the direction of getting out of

15    the forklift?

16 A  Exactly.

17 Q  All right.  And what did you observe about the plots that we

18    see here?  First, for the -- well, let me withdraw that.

19    You've got two plots, a blue line and a gray line.  The blue

20    line is for what?

21 A  The blue line is for the forklift body, so this was an

22    accelerometer that was placed on the body of the truck close

23    to the CG of the truck.

24 Q  And then the gray line is for what?

25 A  It's an accelerometer that we had placed on the floor of the

1    truck.

2  Q    So on the blue line regarding the forklift body, there's a

3       0.1g peak in one direction and a 0. -- almost 0.3g peak in

4       another direction.  Why is that?

5  A    So the first peak is associated with the acceleration of the

6       truck as the truck's getting up to speed.  So it's starting

7       at rest, so the acceleration is 0.  We then travel up to that

8       5 miles an hour.  We can see we get this peak in the

9       acceleration.  Once Mike reached a constant velocity, that

10      acceleration essentially went back down to 0.  And then at

11      the braking at the end, we see we have another spike at 0.3g.

12      That's when he applied the deadman brake.  And so the travel

13      in between, we can see we have a little bit of motion of the

14      truck, but certainly less than what was associated with

15      starting up the truck.  And we can see that that motion is --

16      you know, we've got little oscillations throughout, but

17      there's no discernible motion of the truck as it's traveling

18      over the cracks.

19 Q    Is it your opinion to a reasonable degree of certainty in

20      your field of expertise as to whether these accelerations

21      that we see here are enough to cause someone to lose their

22      balance?

23 A    So these are low-level accelerations.  These are certainly

24      below normal operation.  And again, the forklift has five

25      points of stability for an operator to utilize.  So no, these

1  levels of acceleration, we would not expect anyone to lose

2  their balance.

3  Q  What plot is this?

4  A  This is looking at the lateral accelerations, so these are

5  the accelerations that would be acting sort of -- exactly.

6  Q  All right.  So into my stomach and out my back?

7  A  Exactly.

8  Q  All right.  What did you observe about the accelerations

9  from -- in that direction?

10  A  Again, we're seeing some smaller accelerations up from tenth

11  of a g almost to two-tenths of a g, so fairly minimal motion

12  of the truck, sort of in this lateral direction.  We're

13  seeing some of that as he's turning, as Mr. Rogers was

14  turning the truck.

15  Q  So this is the first turn and this is the second turn into

16  the aisle?

17  A  Yes.

18  Q  All right.  And then what's this last plot?

19  A  These would be the vertical accelerations, so these would be

20  the up-down accelerations.

21  Q  Up-down?

22  A  Exactly.

23  Q  And what did you observe about these vertical accelerations?

24  A  Again, everything's fairly minor, fairly small, consistent

25  throughout, so there's no -- nothing discernible about

1    traveling over the cracks.  You know, everything basically

2    looks the same for the entirety of the path of the travel.

3  Q   Are any of these accelerations that you see here consistent

4    with a loss of balance?

5  A   These are all fairly minor accelerations, and we can see that

6    in the video.  There's really no observable motion of

7    Mr. Rogers as he's traveling through this path.

8  Q   All right.  Did you also look at another piece of literature

9    called the Zettel study?

10 A   I did, yes.

11 Q   And is that something that -- I just don't remember.  Is that

12   something Dr. Jeka referenced as well, the Zettel study?

13 A   I don't believe Dr. Jeka referenced that study.  But that is

14   looking at one of the things that Dr. Jeka had mentioned in

15   his report and in his testimony, is somebody taking a

16   compensatory step or Ms. Anderson taking a compensatory step

17   to the left, sort of outside the confines of the truck.  And

18   so what this study is looking at is that, you know, people,

19   when they're responding to a loss of balance, they will

20   consider their environmental constraints.  So there's --

21   which would be inconsistent with his testimony that she may

22   have just stepped to the left, even though there was no floor

23   left.  So people are going to be paying attention to their

24   environment.

25 Q   All right.  So what -- this image on the right side, explain

1   what the study was.

2   A   So on the right side the image, we have two feet, so a left

3       foot and a right foot.  These were the feet to represent the

4       positions of the feet of the participants in this study.

5       These participants were then -- experienced a perturbation or

6       a postural disturbance that elicited a step forward.  So as a

7       response to that perturbation, they stepped forward, and this

8       is indicating where they would step.  Right?  So there was

9       nothing in their way.  They could step freely.  That's where

10      they positioned their foot.

11  Q   So let me just -- is this a topdown view that we're looking

12      at?

13  A   Yes, this is a topdown view.

14  Q   So the first compensatory step was nothing in the way, and

15      they just went from here to here?

16  A   Exactly.

17  Q   All right.  What's the next phase of the testing?

18  A   So the next phase of the testing, they put an obstacle in

19      front of the participant, so they essentially put a little

20      wall in front of the participants.  And so when they then

21      subjected them to that same perturbation or that same

22      disturbance, they had to step over that wall in order to not

23      trip.  And so what we're looking at here is when there was

24      this wall in front of them, and this wall is that line there,

25      the participants actually took a bigger step.  So they

1    stepped a little bit further forward, they stepped a little

2    bit higher, and they also stepped a little bit to the right.

3  Q  All right.  And then the third part of this test was what?

4  A  So in the third part of that test, they kept the wall but

5    they also added these lateral constraints, and so they were

6    limiting the area that the subjects could step.  And so what

7    they found, in order to maintain their balance during this

8    disturbance, they stepped -- again, they stepped a little bit

9    higher, a little bit longer than without the obstacle, but

10   they also stepped inside.  Right?  So they were accounting

11   for their environment.  They were accounting for the

12   obstacle.  They were accounting for the constraint when they

13   were making these balance adjustments.

14 Q  All right.  Now you mentioned a few minutes back that you

15   also did -- let me withdraw that.  I want to move on in your

16   compensatory step analysis to what you did next.  What did

17   you do next in the compensatory step analysis, analyzing

18   Dr. Jeka's theory?

19 A  This is looking at, again, if Ms. Anderson had just lost her

20   balance and taken a step to her left, what would we have

21   expected to see, what would her injuries have been.  And so

22   what we're looking at here are images or photographs taken

23   from my surrogate study, where I had the surrogate inside the

24   lift in a nominal position, similar to how Ms. Anderson said

25   she was standing, and asked the surrogate to step to her left

1    as if she was responding to a disturbance in balance.  And so

2    when our surrogate did that, she stepped outside of the truck

3    an average distance of about 4 and a half inches from her

4    normal position within the truck.

5  Q  All right.  What did you then do with that information?

6  A  So then we took that step and then we looked at, okay, how

7    would then the truck have interacted with her body, had she

8    just stepped over to the left?  So the first part of that is

9    looking at how much time would it take for the bumper of the

10   truck then to engage with the inside of her left ankle, and

11   so that's going to be in part dependent upon the speed of the

12   truck.  And so if the truck was traveling 3 miles an hour and

13   she took a step out and down, the truck, essentially the

14   bumper of the truck, would be interacting with her ankle

15   within 0.08 seconds or 80 milliseconds.

16 Q  If it was at 4 miles an hour?

17 A  It would be 0.06, and at 5 would be 0.05.  So the faster the

18   truck's going, the quicker it would be where it's interacting

19   with her left ankle, with her left foot.

20 Q  Did you bring the jury a slide part of this PowerPoint to try

21   and explain how quick 0.08 seconds is?

22 A  Yes.

23 Q  All right.  So what are we looking at here?

24 A  So this is a video on -- it's to give you a better sense as

25   to what the timing would be.  So what we're showing is blue

1    circle's going to appear on the screen for a tenth of a

2    second, so this would be a hundred milliseconds.  This would

3    actually be longer than the time for the truck to contact the

4    left ankle.

5                     (Video played.)

6                     MR. LoCOCO:  I think I messed that up, so let me

7    just...

8                     (Video played.)

9                     THE WITNESS:  So again, that's that fraction of a

10   second.  So the time for the truck to travel to contact her left

11   ankle, had she just taken a step to the left, is going to be

12   within that time period.

13   BY MR. LoCOCO:

14   Q    So even if her left foot had been on a brake, based on this

15        analysis, have you formed an opinion as to whether the truck

16        is still going to hit her in that compensatory step?

17   A    Yes.

18   Q    And would it have?

19   A    It would have, yes.

20   Q    So what are we looking at next in this analysis?

21   A    So on the left here, this was taken from Mike Rogers'

22        analysis.  So he was looking at what the path of the truck

23        would have been with respect to the foot, had Ms. Anderson

24        stepped out to the left and had also turned the wheel

25        180 degrees, so input of steer consistent with what

1    Dr. Meyer's opinion was, so essentially turning the truck

2    onto her.  And so Mr. Rogers is positioning just the foot in

3    his analysis and looking at the path of the truck.  I then

4    positioned the entire body.  So again, what we're looking at

5    is the truck is going to be turning in a manner consistent

6    with how a truck would turn, had the wheel been turned

7    180 degrees, and how it would have interacted with her body,

8    had she just simply stepped out to the left and turned the

9    truck onto her foot.

10   Q   So what are we looking at here?

11   A   So this is an image from the three-dimensional model.  This

12       is just her initial position, so this is her left foot

13       outside the truck at a distance of about 4 and a half inches.

14       And now we're seeing what that first contact would be.  So

15       within that split second, we would then see the truck

16       interact with the inside of her left foot and left ankle.

17   Q   Would you have seen injuries consistent with the injuries

18       that you observed in your analysis in this case?

19   A   No.  So in this instance, what we would then have would

20       essentially be the ankle rolling or interacting with that

21       bumper.

22   Q   And then this image --

23   A   Yes.

24   Q   Explain this to the jury.

25   A   And then we're showing the continued motion of the truck

1  would then have the wheel come over the forefoot.  Right?  So

2  we would essentially be knocking the foot over, we would be

3  pinning the foot, because it would be underneath that bumper,

4  and then exposing the wheels to travel over the forefoot.

5  But we would not have the foot in a position where the toes

6  were pointed towards the steer wheels and we would expect a

7  different injury pattern.

8  Q  So in this area of the lift truck, the frame comes down to

9  within 3 inches of the ground.  Is it your opinion that

10  Mrs. Anderson -- she would have seen different injuries,

11  you're telling us, but would they have been serious?

12  A  She would have sustained different injuries.  She still would

13  have sustained fractures.  Her wheels -- the wheels still

14  would have gotten over her foot so we would still expect some

15  degloving injuries as well.

16  Q  Is this just another view?

17  A  This is another view where we're showing the back, and we can

18  see the interaction between the inside of her left foot and

19  ankle and the bumper, and then the continued motion of the

20  truck.

21  Q  Is this just a close-up then?

22  A  It's a close-up.  This one is highlighting the contact then

23  that we would see between the wheel and the foot.  And again,

24  the orientation of the foot wouldn't be such that the foot

25  would not be positioned in the direction or oriented along

1    the length of the steer wheels.  Instead we would have that

2    inboard wheel going over her forefoot, crushing her foot,

3    potentially degloving that foot as well.

4  Q  What do these slides show us?

5  A  On the top, we're showing what the orientation would be and

6    what the interaction would be like had she just stepped out

7    to the side and turned that wheel 180 degrees, which is

8    different than what we have here, where we have the foot

9    between those steer wheels with the toes pointed towards

10    those wheels.  So we would have expected a different injury

11    pattern had she just stepped out to the left and had the

12    wheel turn onto her foot.

13  Q  How about the top and bottom of this slide?  Explain to the

14    jury here.

15  A  So in the top, again, we're looking at what the interaction

16    would have been had she just stepped out to the left.  And

17    the bottom, we're showing where Dr. Kerrigan has the foot

18    positioned.  So Dr. Kerrigan has the foot positioned even

19    further outboard, even further away from the interaction that

20    we would have had expected, had she just stepped out the back

21    of her truck and the truck ran over her foot.

22  Q  So is this interaction that Dr. Kerrigan has consistent with

23    a compensatory step theory?

24  A  No.  And you can appreciate that by looking at that bottom

25    left image.  What we're showing is this is again the body

1    position that would be consistent with how Plaintiffs believe

2    she was oriented at the time, with the hands on the controls,

3    the right foot on the deadman, and her left foot all the way

4    to the outside of that wheel.  And we can see that's not

5    consistent with her just taking a simple step to the left in

6    response to a loss of balance.

7  Q  Just a couple of other things.  And this is again Figure 7

8    from Dr. Kerrigan's report overlaid here.

9  A  Yes.

10 Q  All right.  Last area.  Dr. Meyer suggested that the 4250

11   should have some sort of a guard over the steer tire.  And

12   Dr. Kerrigan offered the opinion that if there had been a

13   steer tire guard in that area, the guard would have

14   eliminated or mitigated Ms. Anderson's injury.  Do you agree

15   with that opinion?

16 A  I do not, no.

17 Q  Why not?

18 A  So had there been something going across that bumper, still

19   with that 3-inch clearance, what we're seeing here is the

20   foot would still get underneath that bumper structure, so we

21   would still have a situation where the truck is moving over

22   the foot.  In this instance, we might not have the turning of

23   the foot, the eversion of the foot, but we would still have a

24   situation where the bumper would be interacting with the

25   ankle.  We would get the wheel itself over the foot, over the

 1          top of the foot.  We would still get some degloving, and we

 2          would have -- I would expect we'd have more extensive

 3          fractures in this instance as well because the weight of the

 4          truck would essentially be being applied to the foot.

 5     Q    And those opinions are based on analysis you've done in this

 6          case, as well as your background, education, and experience?

 7     A    Yes.

 8     Q    Dr. Rodowicz, have all the opinions you've offered today to

 9          the jury been to a reasonable degree of certainty within your

10          fields of expertise?

11     A    Yes.

12                    MR. LoCOCO:  Your Honor, just a moment.

13                    Thank you, Your Honor.  Nothing further.

14                    THE COURT:  All right.  Let's take a 10-minute

15          recess.  We've been going for an hour and 15 minutes.  We'll

16          come back in ten minutes.

17                    (Jury exits at 10:24 a.m.)

18                    (Recess from 10:24 a.m. to 10:29 a.m.)

19                    (Jury enters at 10:29 a.m.)

20                    THE COURT:  Please be seated.  Thank you.

21                    All right.  Back on the record.  Cross?

22                    MR. WARSHAUER:  May it please the Court.  Good

23          morning, everyone.

24                            CROSS-EXAMINATION

25     BY MR. WARSHAUER:

1  Q   So, Dr. Rodowicz, you work for Exponent?

2  A   I do.

3  Q   You don't know how many times Exponent has been retained by

4      the Raymond Corporation to help it defend cases in which the

5      operator has suffered a left-leg amputation, do you?

6  A   I do not, no.

7  Q   Nor do you know how many cases you have reviewed on --

8      reviewed and worked on involving left-leg amputations

9      involving Raymond standup forklifts, do you?

10 A   I would estimate that I've been involved in about ten or so,

11     somewhere probably between ten and 15 cases involving a

12     forklift with an injury to a left lower extremity.

13 Q   And Raymond has certainly never told you how many left-leg

14     amputations operators of its 4000 series forklifts have

15     suffered, has it?

16 A   I do not have that information, no.

17 Q   Correct me if I'm wrong, but Exponent's never been asked by

18     Raymond, has never been asked by the Raymond Corporation, to

19     help it come up with a solution to reduce or eliminate the

20     likelihood of left-leg amputation injuries to operators of

21     Raymond 4000 series forklifts; is that true?

22 A   I don't know everything that Raymond has ever asked of

23     Exponent.  Personally the cases that I've been involved in

24     have been specific to individual accidents, so looking at

25     what happened to somebody during a specific accident and

1        analyzing the mechanisms of the injuries.  I've also been

2        involved in testing looking at operator injury potential

3        during other types of accident modes, such as off-dock

4        accidents.

5  Q     Correct me if I'm wrong, but in at least the ones I'm

6        familiar with, on every one of these left-leg amputation

7        cases, at the end of the day, your opinion was that it was a

8        volitional action by the operator that got his foot into

9        harm's way; is that true?

10  A    I don't recall the specifics of all of the accidents that

11      I've worked on.  But certainly in this case, the position of

12      the foot was not consistent with the loss of balance, but

13      rather with her putting her left foot in front of that steer

14      wheel.

15  Q    In all these cases that Exponent's reviewed, has Exponent

16      ever said that -- involving left-leg amputations, to your

17      knowledge, has Exponent ever said, you know, "Maybe our

18      design contributed to this; maybe Raymond's design

19      contributed to this in some way"?

20  A    So I can only speak to the cases that I've been involved in,

21      which again, my scope or my task was to look at the injury

22      pattern, to look at how the injuries were created, to look at

23      the position of the body at the time of those injuries, and

24      also to evaluate biomechanical aspects associated with the

25      design.

1  Q  Dr. Rodowicz, I'll take that as a no.  Is that okay?  Is that
2     fair?
3  A  Again, I can't speak to everybody at Exponent, but in my role
4     on these projects, it's been as a biomechanical engineer
5     looking at the injury mechanisms.
6  Q  Have you offered them a single idea, a single thought, on
7     what they could do to reduce or eliminate left-leg crush
8     injuries suffered by operators of standup forklifts?
9  A  So again, in the instance that I've been involved in, I've
10    been looking at biomechanical issues associated with designs,
11    so things like, are the accelerations of the truck going to
12    throw operators out, what is operator injury potential during
13    collision modes as well as during off-dock events, and then
14    investigating individual accidents and the mechanisms of
15    injury.
16 Q  Dr. Rodowicz, when I asked you that question in this case,
17    your answer was, "I have not, no."  Does that remain true?
18 A  I have not provided any design opinions.  And again, I am a
19    biomechanical engineer.  Design is a different engineering
20    discipline.  There -- it is an extensive discipline.  It is
21    not something that I was asked to do in this case or in the
22    other cases that I worked with Raymond on.
23              THE COURT:  Doctor, he gets to ask you questions.
24    He gets to ask you questions.  If he asks you a question, if you
25    don't know the answer, you don't understand the question, you

1  can say "I don't understand your question."  But I'm going to

2  ask that you do your best to answer the question posed to you

3  and limit your answer to the question posed to you.  Mr. LoCoco

4  will be able to get up after cross-examination and ask you

5  questions.  All right?

6                    THE WITNESS:  Understood.

7  BY MR. WARSHAUER:

8  Q   Dr. Rodowicz, it's true that you've never analyzed forklifts

9      that have a sensor or brake under the operator's left foot.

10     That is, when the left foot is the one closest to the exit or

11     entry into the forklift, to disconnect the power or apply the

12     brake if the operator leaves the operating position.  You

13     haven't ever analyzed that design, have you?

14 A   Have I ever worked on a case where there was a brake

15     underneath a left foot?

16 Q   Yes, ma'am.

17 A   Not for Raymond.

18 Q   And you're certainly not offering an opinion on whether this

19     particular forklift, the 4250 that Mrs. Anderson was driving

20     on July the 29th of 2017, complies with B56.1 Section 7.20.2?

21     You're not making an opinion on that; right?

22 A   No.  Again, my role was with respect to the injury mechanisms

23     and biomechanical aspects associated with the design.

24 Q   You showed us a video of a forklift going off a loading dock.

25     Now you recall that?

1  A    Yes.

2  Q    You will agree that a left-foot brake, like the one I see on

3       the floor of a Crown forklift, wouldn't make going off a

4       loading dock any more likely, would it?

5  A    Would a left-foot brake make the likelihood of going off a

6       dock any more likely?  No, I would -- I would agree that a

7       brake would not influence --

8  Q    And it wouldn't make it any more a bad day for the operator

9       if they had that left-foot brake there either, would it?

10 A    So the presence of a brake under the left foot would not

11      change the kinematics or the way that the truck fell.

12 Q    And similarly, if we had a guard over the steered wheel at

13      the rear of the forklift, that wouldn't make it more likely

14      that you would go off-dock either, would it?

15 A    I don't see how it would, no.

16 Q    While I'm thinking about some of your demonstrations, all of

17      the tests that you did with people driving forklifts around

18      and Mr. Rogers driving forklifts around and even the studies

19      that you showed us, the list of authors, all of those

20      volunteers knew a disturbance was coming; right?

21 A    Well, all of those operators were controlling the truck, so

22      they were inputting the steering, they were inputting the

23      braking, they were in control of the truck.  Not -- or

24      similar to in the cases where I've worked where the operators

25      were controlling the truck.

1  Q   Back to that off-dock event, we saw two views, one from the
2      rear and one from the side.  In fact, weren't there like four
3      cameras to record that, four or six?  I can't remember
4      exactly.
5  A   I don't recall how many cameras exactly were involved in that
6      testing.  I do believe we had one overhead.  I don't recall
7      if we had any more than three in that series of testing.
8  Q   Well, three.  And Exponent -- those were Exponent's cameras?
9  A   The video that we saw earlier, those were not Exponent
10     cameras, no.
11 Q   Okay.  But whenever you've needed a camera like a GoPro or a
12     little camera to document something, you've not had any
13     trouble getting that through your sources at Exponent, have
14     you?
15 A   No.  Certainly when I've needed video or I've needed cameras
16     for a specific purpose, I've been able to acquire them.
17 Q   I mean, Exponent has offices all over the country and 800
18     professionals.  They have lots of equipment.  That's true;
19     right?
20 A   Certainly we do have professionals all over the country, and
21     I would say we do have equipment that we utilize in the
22     testing.
23 Q   Some of those professionals, people like you in biomechanics,
24     but there are also a lot of mechanical engineers; right?
25 A   Well, I am also a mechanical engineer.  So yes, there are

1    mechanical engineers that work at Exponent.  Some of them are

2    within our biomechanics practice.  Some of them may be in

3    other practices as well.

4  Q  In this case, the task that you were assigned to do, that you

5    were hired to do, was to prove that Mrs. Anderson didn't lose

6    her balance; isn't that true?

7  A  No.

8  Q  The slides you produced -- let me ask you this.  Are those

9    slides you produced accurate as to dimension and shape, those

10    3D renderings, the 3D rendering of the forklift and the

11    surrogate and the height off the ground and the location of

12    the wheel and the forklift?  All of that was accurate; right?

13  A  Yes.

14  Q  So if we look at that stuff later carefully, we would expect

15    all of those dimensions and interactions to be accurate and

16    credible and help us form our own decisions if we look at

17    your slides?  We ought to be able to do that; right?

18  A  Yes.  So the geometry of the -- the objects within the model

19    were to scale.

20  Q  Mm-hmm.  Your opinions -- back to the balance issue for a

21    moment.  You take any exceptions to Dr. Jeka's qualifications

22    as an expert in the field of human balance?

23              MR. LoCOCO:  Objection.  Improper question.

24    Experts aren't supposed to comment on other experts'

25    qualifications.

1    THE COURT:  Sustained.

2  BY MR. WARSHAUER:

3  Q    Dr. Jeka, do you know what he does for a living?

4  A    I believe he works at a university, University of Delaware.

5  Q    Do you know what he teaches?

6  A    I -- I'm not familiar with the courses that he teaches, no.

7  Q    Have you read over -- any of the over 130 papers he's written

8       on human balance?

9  A    I have read some of them, yes.

10  Q    Okay.  He showed us and talked to us about the human

11       automatic balance system.  He drew this chart for us.  Do you

12       understand what he's talking about here?

13  A    I see the chart.  I'm not sure what those letters stand for.

14  Q    Well, the top word is "brain."  Okay?  If the top word is

15       "brain," does that help you understand any of it at all?

16  A    I see the top word is "brain."  I see that there's an

17       "automatic" in there.  I'm not sure, it looks like "SC," "M,"

18       and "MS," and I don't see what that bottom box is saying.

19  Q    Did you ever meet Dr. Jeka at any of the meetings around the

20       world where he has presented papers on human balance?

21  A    I have not met Dr. Jeka, no.

22  Q    In fact, you've never been to a meeting of balance experts,

23       have you?

24  A    I'm not sure what you mean by "balance experts."  But

25       certainly I have been to biomechanical conferences,

1    biomedical conferences where biomechanics and balance has

2    been discussed.  I've presented a paper at a conference on

3    postural control strategies and humans' responses to a

4    perturbation or a disturbance.

5  Q    That was a paper where you took other people's work and

6    summarized it; right?

7  A    That was a review article, so I was looking at the research

8    and looking -- compiling that research and summarizing what

9    is known, what is the latest in the science with respect to

10   how somebody would respond to a balance challenge.

11 Q    I think when I asked you when we talked about this -- again,

12   correct me if I'm wrong.  But when we talked some months ago,

13   you couldn't identify a single class that you had had in

14   college or in your graduate studies where the title of the

15   class had the word "balance" in it.  Does that remain true?

16 A    I don't recall if I've taken any classes where the title was

17   "balance."  But certainly in biomechanics and in the study of

18   biomechanics, again, we're studying how people respond to

19   forces.  Right?  And that can be postural disturbances,

20   accelerations, things that would make one move.  And I have

21   taken courses in human kinematics, dynamics, human mechanics.

22 Q    So the answer that I just heard, it is true that you don't

23   recall any classes you took where the word balance was in the

24   title of the class?  That's true, isn't it?

25 A    That is true.

1  Q  Okay.  Now Dr. Jeka's had about $20 million in research on

2     human balance.  How much money have you received from the

3     Federal Government or the National Institutes of Health or

4     anybody other than the Raymond Corporation to do research on

5     human balance?

6  A  I am not a researcher.  So again, my role at Exponent is a

7     biomechanical engineer, so I am hired to assist with

8     biomechanical analyses.  And that might be looking at injury

9     creations, might be also evaluating a product for potential

10    injury to somebody who's utilizing that product, or misusing

11    that product.

12 Q  So I'll take that to be 0.  Is that fair for me to do?

13 A  I have not received any funding from the National Institute

14    of Health with respect to balance studies.

15 Q  You and Mr. LoCoco talked about this compensatory step.  When

16    Dr. Jeka shared his opinions with us, when I was asking

17    questions, he wasn't saying there was a compensatory step.

18    That was first brought into the case on cross-examination.

19    Did you know that?

20 A  I did not know that, no.

21 Q  What you disagree with Dr. Jeka in his interpretation of the

22    literature as well as his professional experience is that

23    that combination convinces him that it's an easy answer -- or

24    easy question to answer, whether or not the kind of

25    disturbance like a crack can cause an automatic balance

1  response that could lead to a loss of balance.  He says it's

2  easy.  And you disagree with that; right?

3  A  I'm not sure I completely followed that question.  But my

4  testing was looking at the mechanical response, so actually

5  measuring the accelerations associated with traveling in the

6  warehouse including over those cracks.  And what we see from

7  the data is that the travel over the crack was indiscernible

8  from traveling over other areas in the warehouse.  So the

9  chance of someone losing their balance from traveling over

10  those cracks is equivalent or the same as the chance of

11  losing the balance during normal travel.  And this is again

12  somebody who's been traveling in this warehouse for four

13  years operating forklifts.

14  Q  The opinion you just shared with us is based on the

15  assumption that Mr. Rogers actually traveled over the same

16  cracks, divots, and holes that Mrs. Anderson traversed, isn't

17  it?

18  A  Well, I was --

19  Q  Can you answer yes or no first, please?  And then go on.  I

20  just want to know whether or not that opinion is really based

21  on the assumption that Mr. Rogers went over the same cracks,

22  divots, and holes that Mrs. Anderson did.  Yes or no, and

23  then talk for a while.

24  A  Well, it's not an assumption.  So I was there.  I had the

25  accident information.  So we know what aisle Ms. Anderson was

1    in.  We know the location of where the accident took place,

2    and that's where Mr. Rogers rode the forklift over, so those

3    were the cracks.

4  Q  Okay.  But I guess if we looked at the video ourselves --

5    there's nothing magical about your skills at looking at that

6    video.  If we look at that video later together, we can see

7    whether he was to the right or the left of the major cracks,

8    divots, and holes, or whether he actually tried to get a path

9    that would impart the greatest disturbance to the forklift

10   and operator and the operator's automatic balance system.  We

11   ought to be able to see that ourselves if we look; right?

12 A  I'm not sure if you could glean all of that from the video,

13   but there's photographs of that area as well that were taken

14   at the time of the inspections.  There were scans, and so the

15   geometry of the cracks, the shape of the cracks, those things

16   were captured in the photographs.  And so certainly you could

17   look at the video and see approximately where you would

18   expect those cracks to be in the floor, whether the

19   resolution in that particular video is of a quality where you

20   could discern the individual cracks.  But certainly that's

21   the area of the warehouse consistent with the incident

22   information and the testimony.

23 Q  Well, again, your skills at looking at that video and our

24   skills, you don't have special video-looking skills?  In

25   other words, if we look at it, we ought to be able to see the

1    same things that you're telling us about; right?

2  A  Oh, some of you may have better eyes than I do.  Looking at a

3     video, what I can provide is the additional information.  So

4     I was there when the videos were taken, I can explain where

5     we were in the warehouse, and where approximately those

6     cracks would be in the video.

7  Q  And you also disagree with Dr. Jeka where he says that what

8     Mrs. Anderson reported as shaking implies a perceptual

9     stimulus that could influence one's sense of stability, and

10    that if one feels uncertainty at the automatic balance level,

11    regardless of the actual forces imposed on the body, an

12    automatic balance response will be initiated.  You disagree

13    with that too, don't you?

14 A  Again, what I was doing in the testing was actually measuring

15    the physical response.  I wasn't looking at the perception

16    that one might experience but actually the accelerations, the

17    motions associated with travel, associated with going over

18    the cracks in the warehouse.

19 Q  Now you further disagree with Dr. Jeka that the loss of

20    balance is a very dynamic event, that everybody who loses

21    their balance might fall a different way.  You disagree with

22    that.  You believe it's a predictable set of movements; is

23    that right?

24 A  Well, the testimony was that Ms. Anderson -- or the testimony

25    from Jeka was that she took a step to her left, and again,

1   the injuries are not consistent with her simply taking a step

2   to the left.  A step to the left would be consistent if

3   somebody were to experience a balance challenge that would

4   essentially move their body, then what we would refer to that

5   as increasing your base of support.  Right?  So if something

6   moves your body where you feel unsteady in this direction and

7   you take a step, you're going to step in the direction of the

8   perturbation.  You're going to try to increase your base of

9   support in order to stay upright, in order to maintain your

10  center of gravity within that base of support.

11  Q  Okay.  Let me try again.  Yes or no:  Is loss of balance, the

12     movements of a human who has lost their balance, a

13     predictable set of responses?  We always know how they're

14     going to land?

15  A  We can't always predict how they're going to land, but we can

16     predict how they're going to move based on the disturbance.

17     So if something is to disturb you to the left, you're going

18     to move to the left.  And what might happen then is if your

19     center of mass starts to move, you might elicit a step to the

20     left as well to increase that base to gain that stability

21     back.  Now someone might be successful in doing that and

22     maintain their balance.  Someone else might fall over.  So we

23     don't always know exactly what's going to happen.  But the

24     motion is going to be in the direction of the perturbation.

25  Q  So, Dr. Rodowicz, I run a lot.  There's a place at about the

1      7-mile mark on one of my runs -- I have no idea why -- it's

2      caught me twice.  It's a crack in the sidewalk, where the

3      sidewalks elevate.  One time, I ended up in the grass on my

4      stomach.  Didn't get hurt.  Another time, I bet I took seven

5      or eight steps and saved myself.  How did those two trips

6      over the same sidewalk crack end up so wildly different?  How

7      is that possible?  How is that possible if it's predictable?

8  A   So again, the -- when you are running, for instance, you're

9      going to have forward momentum.  So if you're running and you

10     experience a trip or something catches your foot, what's

11     going to happen is your body's going to continue to want to

12     move forward.  Now your foot that was impeded can then take a

13     big step to try to catch yourself, or maybe you won't be able

14     to catch yourself and you'll fall over, but your momentum is

15     going to continue to carry you forward.  So the fact that you

16     were running and you had two different responses could just

17     be a function of how you interacted with that crack, it could

18     be a function of where you were with your state of the gait,

19     but your momentum's going to carry you in the same direction.

20 Q   Well, was it foreseeable that I would struggle to try to not

21     lose my balance?  Was that foreseeable that I would struggle

22     once I lost my balance, instead of just giving up and ending

23     up on my face?

24 A   I don't have an opinion as to whether that's foreseeable or

25     not.  But certainly when human beings have a balance

1   disruption, they will engage in different strategies in order

2   to maintain their balance.  And so some of those are what we

3   would call fixed support, where they stiffen their joints,

4   maybe they hold onto things a little bit tighter.  Some of

5   those would be change in support, where you might take a step

6   again, to increase your base of support in order to increase

7   your balance or regain your balance.

8   Q   Yeah.  Those -- that struggling to regain your balance and

9       avoid injury isn't unique to my experience as a runner.  It

10      would apply to people in forklifts too.  We agree on that,

11      don't we?

12  A   I'm not sure I understand what the struggle would be in

13      operating a forklift.  Again, so the forklift has a base of

14      support that allows an operator to respond to the motions of

15      the machine during normal operations.  So if you're seeing a

16      tenth of a g, a quarter of a g when you're braking and doing

17      things, we have a base of support where an operator can

18      maintain their balance.

19  Q   Yeah.  I was just wondering how long you have opined Adelaida

20      Anderson, once her foot was out, struggled in an effort to

21      avoid injury.  You didn't put any number to that in your

22      report, did you?  Because I didn't see it.

23  A   Are you talking about how much time the entirety of the event

24      was after she removed her foot?

25  Q   Yeah.

1  A   I did not look at the timing specifically, but Mr. Rogers has

2      looked at the travel distance of trucks once brakes are

3      initiated, and that's in part going to be dependent on the

4      speed of the truck at the time that the brake is initiated.

5  Q   So let's talk about your surrogate for a moment.  Was your

6      surrogate -- I asked this to Mr. Rogers, but I'm not sure it

7      was the same person.  Was your surrogate a trained actor on

8      how people act when they lose their balance?

9  A   Our surrogate was not a trained actor, no.

10 Q   Not a trained stunt person?

11 A   She was not a stunt person, no.

12 Q   And in fact, it was the first time she'd ever been on a

13     sidestance forklift to your knowledge; is that right?

14 A   I believe that's correct.

15 Q   So what you asked her to do was a completely volitional

16     action, "Move your foot," and she did what you told her;

17     right?

18 A   Yes.  So I asked her to move her foot to the left as if she

19     was responding to a disruption in balance.

20 Q   So I asked Mr. Rogers about this forklift that was used in

21     your testing versus the forklift that Mrs. Anderson was on at

22     the time of her injury.  Do you have a sense of how many

23     hours were on either of the forklifts?

24 A   Not off the top of my head, no.

25 Q   Well, do you know that the one she was on was quite used, at

1     11,485 hours, which is almost 4,000 hours a year for its age,

2     about twice the normal use of a standup forklift?  Did you

3     know that?

4  A  I don't recall that information.

5  Q  But the one that we saw in the video didn't even have a

6     scratch on it, did it?

7  A  I don't recall if there was scratching to that forklift.

8  Q  We saw a bunch of slides.  I think the last -- the highest

9     number was up into the 130s, 140s, maybe.  134, something

10    like that.  But am I correct that we did not see a slide

11    where you had actually placed a guard on the -- over the

12    steered wheel and had a foot interact with that guard?  You

13    never did that, did you?

14  A  So there was not a guard design, a specific guard design to

15    evaluate.  So the opinions from Plaintiff's expert was if

16    there was something blocking that steer wheel -- there was a

17    drawing in one of the reports.  The drawing just had a bar

18    essentially going straight across, which you could not put

19    over that cover because it would have interacted with the

20    steer wheels.  So there wasn't a specific design that we

21    could then place onto the forklift in order to evaluate.

22  Q  Didn't even try Scotch-taping a piece of foam core onto the

23    wheel and then putting a foot under it?  I mean, I just want

24    to see if you did that.  You didn't do that; right?

25  A  I did not Scotch-tape foam to the bumper.  No.

1  Q    Okay.  And you don't know where her right hand was when her
2       left foot first hit the ground?
3  A    I do not know the exact placement of her right hand when her
4       left foot hit the ground, no.
5  Q    You don't know where her left hand was when her left foot
6       first hit the ground?
7  A    I do not know the exact placement of her left hand, no.
8  Q    You don't know where her right foot was when her left foot
9       first hit the ground?
10 A    I do not know the exact placement of her right foot, no.
11 Q    You don't know the speed of the forklift when her left foot
12      began the process of moving from being on the floor to being
13      where we -- where it eventually got?
14 A    There are certainly limits to what that speed may have been,
15      but I do not know the exact speed, no.
16 Q    When her left foot first touched the ground, you don't know
17      whether it touched toe first, heel first, or flat?
18 A    I do not know the exact orientation of her foot when it first
19      touched the ground, no.
20 Q    You don't know how long it took her foot to get from the
21      height of the floor of the forklift to the ground of the
22      warehouse?
23 A    Mr. Rogers had done some testing looking at the timing to get
24      from the operator compartment outside the truck or onto the
25      floor, which was about a half a second.  But I do not know

1  exactly how long it took for her to get her foot over to that

2  steer wheel area.

3  Q  Well, I asked you this exact question when we spoke before.

4  How long did it take her foot to get from the height of the

5  floor of the forklift, where it is in the position shown in

6  page 1, to the position in page 2?  We were referring to your

7  13 photographs.  And your answer was, "I don't have an

8  opinion with respect to timing."  Does that remain your

9  answer?

10  A  Yes.

11  Q  And you don't have any studies specifically that track people

12  falling out of forklifts, do you?

13  A  No, I do not have any studies that have looked at people

14  falling out of forklifts.

15  Q  You've never watched someone fall out of a forklift either,

16  have you?

17  A  No.  In the studies that I've done involving forklift

18  operators and looking at those operators again during normal

19  operation, turning, braking, none of those operators had

20  demonstrated that they were experiencing a loss of balance.

21  Again, it was similar to what we saw in Mr. Rogers' testing,

22  where there was minimal motion of the operators in the truck

23  during these maneuvers.

24  Q  So we were talking about Exponent a few minutes ago and its

25  various supplies.  One of the things it has is a huge like

1    testing facility.  Where is that?

2  A  We have a testing facility in Phoenix, Arizona.

3  Q  I mean, it's one of the largest testing facilities of its

4    kind in the world, and your company takes a great deal of

5    pride in having it; is that right?

6  A  I don't know if it's one of the largest in the world, but

7    certainly we do have a test facility out in Arizona where we

8    do biomechanical testing.

9  Q  So one of the things you have out there is you have harnesses

10    and things like that that you can put people in and then do

11    all kinds of testing; right?  Helmets and padding and all

12    kinds of stuff available for surrogates?

13  A  We can do a bunch of different testing and we do do a bunch

14    of different testing at our facility in Phoenix.

15  Q  But you never did a testing where you took a forklift out to

16    Arizona and put somebody in it and watched what happens when

17    people genuinely lose their balance who don't know a

18    perturbation or disturbance is going to happen.  You never

19    did that testing; right?

20  A  Well, I've done testing out in Arizona with forklifts, again

21    having them traverse different courses, slalom testing, going

22    around turns, coming back, braking.  None of those operators

23    again experienced a loss of balance.  None of them fell out

24    of the truck.  They were all able to maintain their position

25    within the truck, again utilizing four or five contact points

1    with the truck.

2  Q   All of those people were driving a prescribed course you told

3    them to drive; right?  No surprises to any of them; correct?

4  A   There were no surprises to the operators in that we didn't

5    attempt to surprise them.  Again, these operators were in

6    control of the truck, so they were inputting the steering,

7    they were inputting the braking.

8  Q   But you never tried to -- while you had the forklifts out

9    there, you didn't try to see what would happen if somebody

10   was caused to lose their balance and see how they fall out,

11   see how long they hold on to the tiller, and whether they

12   turn the wheel on their way out.  You didn't do that; right?

13  A   So again, in all of the testing, none of them lost their

14   balance.  So during the normal operation, during the turning,

15   during the braking, none of them experienced a loss of

16   balance so there wasn't anything to observe from that

17   perspective.

18              THE COURT:  I'm going to remind you again.

19   Mr. LoCoco gets to ask you questions and to follow up.

20              THE WITNESS:  Okay.

21              THE COURT:  And you're not answering the

22   questions.  So we have the right to have you answer the

23   questions.

24  BY MR. WARSHAUER:

25  Q   So, Dr. Rodowicz --

1    THE COURT:  I will strike answers that are not

2    responsive.  So I would ask you, please...

3  BY MR. WARSHAUER:

4  Q    So, Dr. Rodowicz, I'll take that as a no; is that fair?

5  A    Can you repeat the question?

6  Q    Sure.  You had the forklifts out there.  You never harnessed

7    anybody up to actually see the dynamic event of someone who

8    has an unexpected loss of balance and how they fall out, how

9    long they hold on to the tiller, how they manipulate the

10    multifunction.  You never did that; right?

11  A    I never did that, no.

12  Q    Now one of the other things you don't know is how long

13    Mrs. Anderson held on to the tiller before she separated from

14    it.  You don't know that either, do you?

15  A    I do not know how long she had her left hand on the steering

16    tiller.

17  Q    You don't even know one way or the other whether, as part of

18    her falling out from loss of balance, she turned that tiller

19    to cause the forklift to move, do you?

20  A    I don't know, but that's certainly something that was

21    considered in the analysis when looking at the potential or

22    the injuries, what they would have been, had she stepped out

23    to the left.

24  Q    And you're not going to offer us an opinion as to how many

25    wheel revolutions occurred between the initial impact with

1  her left foot and the point of rest?

2  A  No.

3  Q  Now your fundamental opinion is that Mrs. Anderson's movement

4     out of the forklift was volitional, intentional; right?

5  A  My opinion is that it was volitional, that she moved her body

6     such that her left foot was facing the steer wheels prior to

7     the interaction with the wheel.

8  Q  The word you used was "volitional"?

9  A  Correct.

10 Q  Intentional?

11 A  The word I used I believe was "volitional."

12 Q  I see.  Did you consider she was a safe operator?

13 A  I do not have an opinion with respect to what kind of

14    operator she was.  Again, I was looking at this incident

15    specifically.

16 Q  Did you consider that she had been awarded numerous awards

17    for her safe operation of forklifts?  Did you consider that?

18 A  That was not considered in the biomechanical analysis of this

19    specific incident.

20 Q  Did you consider that her team leader Ms. Boone told us, or

21    agreed with my question, that she had what are called "mad

22    skills" as an operator?  Let me take one step back.  If I

23    said somebody had mad skills, would you know what that meant?

24 A  No, not necessarily in the context of forklift operation.

25 Q  All right.  Well, we defined that in the courtroom as

1  somebody whose skills are above and beyond anybody else's,

2  like really, really good at it.  Like a skateboarder would

3  have mad skills if they could do a 720.  Okay?  Ms. Boone

4  agreed she had mad skills.  Did you consider that in your

5  analysis?

6  A  I was not aware of that testimony.  But again, I was looking

7  at this specific incident, not the entirety of her experience

8  as a forklift operator.

9  Q  Did you consider the fact that Mrs. Anderson said she liked

10  to drive slowly, at less than full speed?

11  A  Yes, that was something that was considered in the analysis.

12  Q  Did you consider the fact that the path she was driving from

13  a steering point of view, leaving the office, making a right,

14  then back left to go down F/G, was not what anybody would

15  describe as a challenging path for an experienced operator?

16  A  I'm sorry, could you repeat that?

17  Q  Did you consider the fact that the path she was going, before

18  you say she intentionally or volitionally stepped out, was

19  not a challenging path?

20  A  I certainly considered the path that she was traveling in,

21  yes.

22  Q  And you considered it an easy path for an experienced

23  operator to negotiate, didn't you?

24  A  I don't necessarily have an opinion as to whether that's easy

25  or challenging.  Certainly Mr. Rogers seemingly was able to

1    do it easily.

2  Q  And he doesn't have near the skills that she has.  You'll

3     agree with that?

4  A  I don't know.

5  Q  Got it.  While you were there, on two occasions, you didn't

6     measure the depth of these holes and divots in the path that

7     she traveled, did you?

8  A  No, I did not measure the depth of the divots or holes.

9  Q  Did you consider the fact that she had been trained to stay

10    on her forklift at all times while it was moving, unless it

11    went off a loading dock?  Did you consider that fact in your

12    analysis?

13 A  I was aware based on her testimony that that was the training

14    that she sustained.  Correct.

15 Q  I might have asked this, but you didn't measure the depth of

16    any of those holes; right?

17 A  I don't believe so, no.

18 Q  Did you consider the fact that other operators of forklifts

19    at that facility said that when they went over cracks, it

20    caused shaking and jarring to them?  Did you consider that

21    fact?

22 A  So again, I was looking at the path that Ms. Anderson

23    traveled and the cracks that she went over.  I did not do

24    testing throughout the entire facility or analyze each crack.

25 Q  Did you consider the fact that Ms. Boone told us that she had

|    |   |                                                                    |
|----|---|--------------------------------------------------------------------|
| 1  |   | been over cracks and nearly lost her balance?                      |
| 2  | A | Again, I was looking at the travel path that Ms. Anderson          |
| 3  |   | took and the cracks in the warehouse that she went over at         |
| 4  |   | the time of her incident.  I did not make any attempt to look      |
| 5  |   | at every crack within the warehouse.                               |
| 6  | Q | Well, let's just focus on the location and where she was.          |
| 7  |   | You did have in your file the OSHA report, didn't you?             |
| 8  | A | I did, yes.                                                        |
| 9  | Q | Well, did you look for the 2-inch-deep divot that was              |
| 10 |   | reported in the OSHA report as being in her path?  Did you         |
| 11 |   | look for that and try to find it to see whether it could have      |
| 12 |   | contributed or been the cause of this?                             |
| 13 | A | We identified the location of where the incident occurred         |
| 14 |   | based on the scene photographs as well as the geometry and        |
| 15 |   | the layout of the facility and knowing which aisles were, and      |
| 16 |   | we identified the cracks in the warehouse.                         |
| 17 | Q | I'll take that as a no.  You didn't look for the 2-inch-deep       |
| 18 |   | divot?                                                             |
| 19 | A | I did not specifically measure for a 2-inch divot, but again,      |
| 20 |   | identified the cracks in that path and in the vicinity of          |
| 21 |   | where the accident occurred.                                       |
| 22 | Q | Speaking of records, you shared with us your review of the         |
| 23 |   | medical records and you just told me that you had looked at        |
| 24 |   | the OSHA record.  Did you do any analysis on what would have       |
| 25 |   | occurred to her had there in fact been a piece of wood that        |

1    she hit?  Did you do any analysis of that at all?

2  A  I believe you're talking about the initial records which

3    indicated that she may have interacted with a piece of wood

4    prior to the incident.  There was no other indication that

5    there was a piece of wood involved.  No wood was found after.

6    And Ms. Anderson's deposition testimony just talked about the

7    shaking of her going over the cracks.  So there was no

8    analysis done specific to a piece of wood, no.

9  Q  So we should believe Mrs. Anderson when she said there was

10    shaking when she went over the cracks?  Because that's what

11    you told us.  We can eliminate the wood because she didn't

12    mention it in her deposition, therefore we ought to believe

13    the shaking.  Makes sense; right?

14              MR. LoCOCO:  Objection to the form of the

15    question.  That's an improper question to have another witness

16    comment on the veracity of another witness's testimony.

17              THE COURT:  Well, why don't you rephrase your

18    question.

19  BY MR. WARSHAUER:

20  Q  You did consider her testimony that she said it was shaking

21    when she went over a crack; right?

22  A  I did consider her testimony, yes.

23  Q  All right.  Now we talked a little bit about her training.

24    You do understand that she knows how plugging on a 4250

25    forklift works; right?

1    A    I don't recall the specific testimony regarding her training,

2         but certainly plugging would be a way for an operator to

3         bring the forklift to a stop, and she had driven that

4         forklift for four years.

5    Q    Yeah.  One would expect that someone who's described as

6         having mad skills would certainly know that they could push

7         the control handle the opposite direction and stop the

8         forklift, called plugging; right?

9    A    I would expect that a trained operator would know how to plug

10        a truck, yes.

11   Q    So did you consider the fact that, had she indeed somehow

12        found herself aiming towards a set of racks, that all she

13        needed to do was plug and this forklift would have stopped?

14        Did you consider that fact?

15   A    So again, I was looking at what happened in this accident,

16        which is she was outside of the -- of the forklift with her

17        toes pointed towards the steer wheel at the time of her

18        injury.

19   Q    All right.  Did you consider the fact that if she found

20        herself heading towards a rack on this straight path that she

21        was going down, F/G, that if she chose not to plug, she could

22        have just lifted her right foot off the deadman pedal and

23        this forklift would have stopped before impact?  Did you

24        consider that fact?

25   A    Well, she did lift her right foot off the brake and the

1    vehicle did stop before impact, yes.

2  Q   Your testimony about her foot being lifted off the brake

3       happens during the exit sequence.  My question was, isn't it

4       true that if she found herself -- this woman who had used

5       standup forklifts at the Krispy Kreme and had four years of

6       standup forklifts at the FedEx supply facility in Effingham

7       could have simply lifted her right foot and stopped this

8       forklift with no problem if she knew it was happening, as you

9       say she did?

10 A   And again, she did lift her right foot.  And so I don't know

11      the timing of when she moved her right foot with respect to

12      when she moved her left foot.  She may have moved her right

13      foot first prior to exiting the truck while it was still

14      moving.  All we know is that she got out of the truck while

15      it was still moving.

16 Q   Mm-hmm.  You'll also agree that she could have simply steered

17      away?  Did you consider that as a explanation, that if she

18      was in control and intended to jump out, as you claim, that

19      she could have just steered away?

20 A   There might have been other things that she could have done,

21      you know, again, applying the brakes.  She did apply the

22      brake.  Ultimately she avoided an impact between the truck

23      and the racking.  There might have been other things that she

24      could have done as well.  But what she did do in this

25      incident was put her left foot -- or step in front of that

1  steer wheel while the truck was still moving.

2  Q  Did you consider the fact that she has told us that she would

3     never, ever step off a moving forklift because that would be

4     dangerous?  Did you consider that in your analysis, that she

5     did so intentionally?

6  A  So again, I'm looking at the physical evidence, which has her

7     left foot in front of that steer wheel with her foot position

8     towards those wheels at the time of the injury, so that's

9     what the physical evidence tells us.  That's where it tells

10    us that the foot was positioned.  So the thought process that

11    she experienced to put her foot there, I don't have an

12    opinion about.  But the physical evidence tells us that she

13    moved her foot while the foot -- while the truck was still

14    traveling in order to create those injuries.

15 Q  Now you'll agree she had no duties or business need to get

16    off this forklift there?  In other words, she wasn't stopping

17    the forklift there to get lunch, she wasn't picking a product

18    there to put on her forklift and carry somewhere.  You know

19    that to be true; right?

20 A  My understanding is that she was returning to the charging

21    area, which was in the aisle adjacent to where her injury

22    ultimately occurred.

23 Q  Now you'll agree that all the evidence shows that as she lay

24    in an ever-growing pool of blood, she told Ms. Boone, the

25    first responder there, that she slipped off this forklift.

1    That's true, isn't it?

2  A  I don't recall seeing the word "slipped."  I know

3     initially -- again, there was discussion about a chunk of

4     wood that she had impacted that resulted in a loss of

5     balance.  Her testimony then was the cracks resulted in a

6     loss of balance.  I don't have a specific recollection about

7     slipping.  But again, the position of her foot is consistent

8     with those multiple directions of motion where she's stepping

9     in front of that steer wheel.

10 Q  So, Dr. Rodowicz, let me make sure I understand this

11    correctly.  Your opinion that her exit from this forklift was

12    volitional, did not include the fact that as she lay on the

13    floor, she said "I slipped off."  Is that true?

14 A  Again, my opinions, based on the physical evidence -- I don't

15    recall the specific description that you are saying with

16    respect to slipping.  But again, the position of her foot is

17    consistent with a step in front of the steer wheel.

18 Q  So this fundamental fact of what Mrs. Anderson said as she

19    was on the floor at the scene, that she slipped, was just not

20    in your equation, was it?

21 A  So again, my analysis is based on the physical evidence,

22    which has her outside in front of that steer wheel.  When I

23    was evaluating the alternative scenarios, I was specifically

24    focused on the positioning or the descriptions of Plaintiff's

25    experts, specifically Jeka, who said that her foot got

1    outside because she took a step to the left, so he did not

2    mention anything about a slip.  So my analysis, again, in

3    looking at alternatives, was focused on the alternatives of

4    the other experts and whether or not they made sense and

5    whether their explanation was consistent with the evidence.

6  Q    So, Dr. Rodowicz, what you're telling me is, this was a fact

7        you just didn't know?

8  A    I don't recall the description of a slipping.

9  Q    So not only did she say that she slipped, but she told

10       people, Ms. Boone and Mr. Granger, that it wouldn't stop.

11       Did you consider that fact --

12                  MR. LoCOCO:  I'm sorry, can I have that question

13       back, please?

14  BY MR. WARSHAUER:

15  Q    Not only did she say she slipped --

16                  THE COURT:  Are you repeating the question, or

17       what?

18                  MR. WARSHAUER:  Yes.  That's what he asked.  I'm

19       sorry.

20  BY MR. WARSHAUER:

21  Q    Not only did she say she slipped, but she also told two

22       people who reported that she said it wouldn't stop.  That's

23       consistent with someone falling out and being unable to stop;

24       right?

25  A    Well, the truck did stop.  Right?  So it ultimately did stop.

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | It did not impact the racking.  It stopped prior to that.            |
| 2  | Q | So from a biomechanical point of view, would you agree,              |
| 3  |   | standing on 157 with her right toe on this brake, as she             |
| 4  |   | falls to the right and she is using her right hand as an aide        |
| 5  |   | to balance to try to pull herself in, she's pulling on it.           |
| 6  |   | She cannot plug while she's doing that.  You can't push away         |
| 7  |   | from the direction you're falling, can you?  That makes              |
| 8  |   | biomechanical sense, doesn't it?                                     |
| 9  | A | If she were falling and her momentum was taking her towards          |
| 10 |   | the back, and I believe -- and she's holding on to something,        |
| 11 |   | then that would tend to pull it towards her.                        |
| 12 | Q | Okay.  You've looked at these 5,000 pages of medical records        |
| 13 |   | and the OSHA report.  The fact is, there's not a line               |
| 14 |   | anywhere where anyone ever said she tried to intentionally          |
| 15 |   | step off this forklift, is there?                                   |
| 16 | A | I would have to take another look at the medical records.           |
| 17 |   | Briefly, if I may?                                                   |
| 18 | Q | Where she told someone she tried to step off this forklift.         |
| 19 | A | I don't believe that was in the medical records that I             |
| 20 |   | received, no.                                                       |
| 21 | Q | Okay.  In order for us to accept your opinions in this case,        |
| 22 |   | we have to accept your assumption that Mrs. Anderson                |
| 23 |   | intentionally stepped off the moving forklift for no reason         |
| 24 |   | and allowed herself to be run over; isn't that true?              |
| 25 | A | Well, I don't believe it was for no reason.                         |

1  Q   Fact of the matter is, for us to believe your opinion, we

2      have to believe that that woman right there wasn't telling us

3      the truth when she said she was not intentionally getting off

4      this forklift; isn't that true?

5              MR. LoCOCO:  Your Honor, this is completely

6      improper.  I object.  Witnesses aren't --

7              THE COURT:  Well, I'm going to overrule it

8      because she's been testifying that the step was intentional or

9      volitional.

10 BY MR. WARSHAUER:

11 Q   One of you's right and one of you's wrong.  That's the bottom

12     line, isn't it, Dr. Rodowicz?

13 A   Again, my opinion is based on the physical evidence, which is

14     consistent with her stepping in front of the steer wheel.  I

15     don't have an opinion with respect to her recollection of the

16     event.

17              MR. WARSHAUER:  Thank you.  Thank you.

18              THE COURT:  Does that mean you're finished with

19     cross?

20              Redirect?

21              MR. LoCOCO:  Thank you, Your Honor.

22                       REDIRECT EXAMINATION

23 BY MR. LoCOCO:

24 Q   For the record, this is Exhibit 582, the assembly.

25     Mr. Warshauer asked you whether in all those medical records,

1    there's any entry that says Mrs. Warshauer [sic]

2    intentionally stepped out.  Is there any entry in those

3    medical records that Mrs. Anderson said she lost her balance?

4  A  I don't believe so, no.

5  Q  Are the injuries that Mrs. Anderson suffered consistent with

6    a loss of balance?

7  A  No.

8  Q  Are they consistent with stepping out of the compartment to

9    avoid running into that post?

10  A  Yes.  If we're meaning stepping out in front of the steer

11    wheel, yes, to avoid running into the post.

12                MR. LoCOCO:  All right.  That's all I have, Your

13    Honor.  Thank you.

14                MR. WARSHAUER:  No further questions, Your Honor.

15                THE COURT:  Thank you.  You may step down.

16                All right.  It's 11:30.  Do we have any

17    additional witnesses?

18                MR. LoCOCO:  We do not, Your Honor.  Subject to

19    getting our exhibits in order, Raymond rests.

20                THE COURT:  All right.  We'll do that outside the

21    presence of the jury.  Rebuttal?

22                MR. WARSHAUER:  We may have one question.  Let me

23    check.

24                (Discussion off the record.)

25                MR. WARSHAUER:  Judge, we're not going to have a

1   human being.  If we could approach the bench and just get some

2   direction on one piece of evidence, I think we'll be done.

3   Won't take but a moment.

4                    (Sidebar begins.)

5           MR. WARSHAUER:  So what we would -- what we would

6   like to offer as a rebuttal exhibit, I believe it's Number 127,

7   it's the patent for the OCSS system, and it rebuts Mr. Kerila,

8   who says it makes a chime and it slows it down.  The patent

9   actually says that it can be set to apply the brake, which is

10  what we said.  So it rebuts his testimony.  We have a copy of it

11  provided by the defendant.  Appears to be an original copy, you

12  know, a copy of the original.  We think it's relevant.  But

13  that's what's going to be it.  But I don't want to do it in

14  front of the jury.

15          MR. MURPHY:  It's not rebuttal, Judge.  A patent

16  is a long way from a design product.  A patent is just simply

17  intellectual property.  It doesn't mean that it can be

18  manufactured and put into the stream of commerce.  It's just

19  intellectual property.  That's it.  The particular testimony in

20  this case was that this is used as a training device.  He's

21  saying, "Well, if you can use it as a training device, you can

22  go back and design a product that would utilize this system and

23  that could do this."  Such a system has never been tested.

24          THE COURT:  I don't know it's been tested, but if

25  it's in the patent and the -- your expert, he's -- he was the

```
 1    Raymond engineer.  He doesn't say that even though the patent
 2    refers to that, that it's not -- it's not possible to do that.
 3    I think -- why wouldn't it come in?
 4                    MR. LoCOCO:  I didn't think he testified that you
 5    couldn't do it that way.
 6                    MR. WARSHAUER:  What he said is what it does.
 7                    MR. LoCOCO:  Yeah, which is what it does.  That
 8    doesn't mean -- he didn't disagree with you that you couldn't
 9    set it that way.  So I don't know how you bring in an exhibit at
10    this stage with no testimony to explain --
11                    THE COURT:  Well, it's a government -- it's
12    foundational, it comes in.
13                    MR. LoCOCO:  Right.  But then what?  What does
14    the jury do with it?
15                    MR. WARSHAUER:  They read it.
16                    THE COURT:  You get to argue it.  Is there
17    anything in there that you think confuses the jury?
18                    MR. LoCOCO:  I haven't looked at it, Your Honor.
19    I mean --
20                    MR. WARSHAUER:  I got it from the defendant, and
21    so the record -- so the record will reflect it says when objects
22    are sensed, meaning a leg, either brake can be applied.  That's
23    our point.
24                    MR. LoCOCO:  I don't think we -- I don't think we
25    challenged that, so I don't see how it's rebuttal.
```

1        THE COURT:  I think it's -- my recollection of

2   Kerila's testimony was suggesting that you can use it for

3   training.

4        MR. LoCOCO:  Right.

5        THE COURT:  But he kind of poo-pooed the idea

6   that it would have made a difference in this case.  And I did

7   not allow in the analysis by FedEx, whether they wanted to

8   purchase it or not.  But it's a document -- it's a recorded

9   document.  There's no foundational problems with it.  Is it

10   irrelevant?  I don't think it's irrelevant.  I think it's

11   relevant.  And I -- you guys can argue it.

12        MR. MURPHY:  One more thing, Judge.  If this is

13   being used as one of the ways that this product is defective,

14   this certainly hasn't been disclosed as an expert opinion.  It's

15   not in their papers or any of their proof, and we certainly

16   didn't defend against it.  This case comes down to two things.

17   I read all this last night.  I'll have you know that -- yeah.

18   Two pedals, that's what Dr. Meyer said, and a guard.  Now at

19   this stage of the game, to put in another way that this product

20   was defective, namely that it didn't have a -- whatever you call

21   it, a laser across it, requires a whole different kind of a

22   defense.  And, I mean, you would have come in here --

23        THE COURT:  Well, what is your response to that?

24        MR. WARSHAUER:  I think they're confusing our

25   obligation to offer a reasonable alternative design which is

1    explicitly not required, and our obligation to identify an

2    unreasonable danger and offer evidence as to why that decision

3    is unreasonable.  So we offered a variety of pieces of evidence.

4    The danger is, you could exit without the forklift stopping.

5    That's the danger.  Why is it unreasonable?  Because there's so

6    many ways that you can prevent it.  Now one of the ways we

7    wanted to prevented it was a door.  The Court excluded that.

8    But other ways we wanted to prevent it was a better pedal

9    design.  That's clearly in the evidence.

10             But then their witness, Mr. Rhoades, put before

11    the jury the document called their features brochure.  I didn't

12    publish their features brochure.  They did.  In that features

13    brochure was a line, Occupant Compartment Sensor System.  That

14    put it into evidence, and from then on, it was fair game.  They

15    opened the door, and where that door led them is where they

16    don't want to be right now.

17             THE COURT:  Are you acknowledging that in the

18    disclosures in discovery that -- because I remember some of

19    these reports being 30 pages long with a bunch of attachments.

20    Are you saying that nowhere in there -- would you agree that

21    nowhere in there does any of your experts opine that it was

22    defective because it was not equipped with the laser sensing

23    system that would cause the vehicle to brake if that line is

24    crossed by a body part?

25             MR. WARSHAUER:  As actually asked by this Court

1    completely out of context, the answer would be, we absolutely

2    talked about a laser system because we talked about the

3    Hyster-Yale system.  It's a laser system.  Did we talk about the

4    OCSS as being a laser system?  I can't remember if we did.  I

5    could do a word search of the 130-plus-page report.  But keep in

6    mind, I didn't bring it up.  They put it into evidence.

7                MR. LoCOCO:  No.  The record is going to show

8    that the first time you asked about that feature was in

9    cross-examination of one of our witnesses.  I did not ask any --

10   I didn't ask Dr. Rhoades anything about the brochure.

11               MR. WARSHAUER:  But you put it up.

12               MR. LoCOCO:  No, I didn't.

13               MR. WARSHAUER:  You put the page up.

14               MR. LoCOCO:  I did not.  I stopped his direct

15   examination with his naturalistic study and I told you I was not

16   using any of the other slides.  Then you put it up.  So I didn't

17   get into the OCSS.

18               THE COURT:  Here's my ruling.  I'm going to allow

19   them to get it in.  We are going to have an instruction

20   conference.  And the instructions may address specifically your

21   objections or what -- or maybe a limiting instruction, but it's

22   a document prepared by Raymond.  It's formally recorded with the

23   US Patent Office.  I think it's relevant and I'm going to allow

24   that.

25               MR. LoCOCO:  Okay.

1    (Sidebar ends.)

2         MR. WARSHAUER:  Your Honor, the plaintiff offers

3    Plaintiff's Exhibit 127, which is the patent from the US Patent

4    and Trademark Office for the Occupant Control Sensor System --

5    Occupant Compartment Sensor System as our rebuttal evidence.

6         THE COURT:  All right.

7         MR. LoCOCO:  And I've already made my record,

8    Your Honor.

9         THE COURT:  All right.  All right.  So admitted.

10        Anything else?

11        MR. WARSHAUER:  Subject to making sure we have

12   all the exhibits correct, Plaintiff rests.

13        THE COURT:  Anything else from the defense?

14        MR. LoCOCO:  No, Your Honor.  Thank you.

15        THE COURT:  All right.  Ladies and gentlemen, at

16   this point, the evidence has been completed.  We've ordered you

17   lunch.  We probably have -- the Court and the lawyers probably

18   have several hours of things that we do, get jury instructions

19   together, that sort of thing.  And I've made the determination

20   that instead of having you wait around until 3 o'clock or so and

21   then hear closing arguments, that I will release you today.

22   We'll come back, we'll start right at 9 o'clock, we'll have all

23   of our paperwork ready, you'll have -- you'll hear closing

24   arguments, you'll hear my instructions, then you'll get to

25   deliberate.  All right?

1    Okay.  So you're excused for the day.  And you

2  can stay here and eat your lunch.  You can take it home.  It's

3  up to you.  Thank you.

4    (Jury exits at 11:38 a.m.)

5    MR. MURPHY:  Judge, can I present real quick the

6  renewal of our Rule 50 motion at this time, subject to all the

7  exhibits?

8    THE COURT:  I'm sorry.  Yeah, you want to put on

9  your motion?

10   MR. MURPHY:  At this time, yes.

11   THE COURT:  All right.

12   MR. MURPHY:  And I understand all the exhibits

13  are not in.  It's Rule 50 motion for judgment.  We're at the

14  close of all the evidence now.  There's two things left in the

15  case.  There's the dual pedal theory.  I'll just point out to

16  you the two things about that.  The uncontradicted evidence is

17  that the left -- the right-foot brake worked just exactly as it

18  should have.  Would have made no difference if there were a

19  left-foot brake.  None at all.  It wouldn't stop it any sooner.

20  That's what the evidence is.  We have that.

21   Insofar as the rear guard is concerned, there's

22  no evidence, really, that that would have prevented the injury.

23  But more fundamentally -- and this is where we're all going to

24  have to come to grips with this -- the Seventh Circuit in Kirk

25  said in these kinds of cases where you have a design defect, you

1    have to at some level test it, and that hasn't been done.  And

2    that's particularly true in a case like this where there is no

3    guard on any of these products.  That's the uncontradicted

4    testimony.  There is none.  So if you're going to come up with a

5    new idea, you have to -- you have to test it.  You have to build

6    it.  You have to have a prototype, at least.  Hasn't been done.

7              And the same thing on the two-pedal theory.  The

8    uncontradicted evidence is, it doesn't exist.  So if you're just

9    going to come in here and say, "My case is based on the idea

10   that this is a better way to build it," no one else does it, you

11   have to do it.

12             And finally -- and I guess we'll come to grips

13   with this when we do jury instructions, but this patent that

14   just got in here, no one's ever testified that because it didn't

15   have this, that this product was defective and unreasonably

16   dangerous.  I mean, I'll grant you that if you have a patent

17   theoretically, you can put something in the manufacturing

18   process and put it out there.  But you have -- but you have to

19   do it.  And of course, if that's going to be a charging

20   allegation, the defense would have prepared their case

21   differently.  Thank you.  That's all I have.

22             THE COURT:  All right.  Mr. Warshauer?

23             MR. WARSHAUER:  Your Honor, I will incorporate in

24   all of our arguments from the argument at the close of our case,

25   and further point out that I think our case got better.  Our

1    case got better in a variety of ways.  We absolutely establish

2    stopping distances and when -- if that stopping distance that

3    Mr. Rogers says was attributable -- if the stopping distance

4    Mr. Rogers describes had been initiated at the beginning of the

5    turn, which I think the direct and circumstantial evidence shows

6    was initiated by her falling out, this forklift stops before she

7    gets to the point of impact.  And the point of impact was shown

8    to us by two witnesses, actually.  We got another one from

9    Dr. Rodowicz today where she showed us a slide, the point of

10   impact way downstream from where the curve began.  So we believe

11   the brake would have started applying there and Dr. Rodowicz'

12   case made it better.

13           Furthermore, Judge, Dr. Rodowicz actually offered

14   us a slide today that shows that had there been a guard, there

15   would not have been connection with her toe at all with the

16   wheel, and it would -- there would be no reason to expect any

17   injury at all.

18           So we've shown every element of our case -- duty,

19   breach, causation, and damages -- and this case ought to go to a

20   jury.  And I don't think there's belaboring the point unless you

21   have any questions.

22           THE COURT:  Nope.  I'll take the motion under

23   advisement.

24           It's a quarter to 12.  Why don't we come back at

25   quarter after 1 to take up jury instructions.  That gives you

```
 1    guys time to eat lunch.  Think about -- unless somebody wants to
 2    come back later.  But I think that's probably enough to
 3    decompress, evaluate your evidence, look over your instructions,
 4    confer, so that we can have a productive conference on
 5    instructions.
 6                 MR. LoCOCO:  Ms. Heitkamp e-mailed to you, Your
 7    Honor, and to the group kind of an updated -- where we're at
 8    right now, and maybe that's a document people can work off of.
 9                 THE COURT:  All right.  And then --
10                 MR. LoCOCO:  On instructions, yeah.
11                 THE COURT:  Then, Jackie, do we have -- have we
12    got all their exhibits in, or do we need to go through that?
13                 THE COURTROOM DEPUTY:  Well, we need to go
14    through and make sure that both sides agree.  I understand
15    there's a couple objections, and there's a couple partial
16    documents.  We need to know if those are still going to remain
17    partial or if those are going to go as complete documents.  And
18    Ms. Heitkamp was supposed to let me know on that.
19                 MR. LoCOCO:  We'll talk about that --
20                 THE COURT:  All right.  So we'll talk about that
21    when we come back.  All right.
22                 (Recess from 11:44 a.m. to 1:22 p.m.)
23                 THE COURT:  We're on the record in Anderson v.
24    Raymond.  We're going to go through instructions.
25                 The first instruction, Joint Jury Instruction
```

1   Number 1, Defendant wants added what was originally added to the

2   original proposed instructions to include language that says,

3   "It is your duty to resolve this case, determine the facts based

4   on the evidence and following the law given in the instruction.

5   Your verdict must not be based on speculation and prejudice or

6   sympathy."  That new language was added, or the defense wants to

7   add that.  Is there any objection to giving that instruction?

8              MR. ABBOTT:  Your Honor, I think our position is

9   that the Seventh Circuit pattern instruction more than covers

10  that, given your second duty is to "Apply the law I give you to

11  the facts, must follow these instructions, even if you disagree

12  with them."  Each of the instructions are important and you must

13  follow all of them.  Seventh Circuit pattern instruction already

14  covers any issues or concerns that they might have, and I think

15  as much as we can, we should try to align ourselves with the

16  pattern instructions from the Seventh Circuit.  So that's

17  Plaintiff's position on the issue.

18             MR. MURPHY:  Judge, I think in this case in

19  particular, is there anyone here that doesn't have sympathy for

20  this family?  The jury needs to be instructed they just can't

21  consider that.

22             THE COURT:  And that's not included anywhere else

23  in these instructions?

24             MR. MURPHY:  That's the only place we looked, and

25  that's the only...

1    THE COURT:  All right.  I will agree to allow

2    Defendant's Jury Instruction Number 1 to be given with the

3    addition of language set out in Illinois Pattern Instruction

4    Number 1.01C.

5    Jury Instruction Number 2, both parties agree on

6    Instruction 2?

7    MR. MURPHY:  Agree.

8    THE COURT:  And Number 3?

9    MR. MURPHY:  Agree.

10    THE COURT:  And Number 4?

11    MR. MURPHY:  Agree.

12    THE COURT:  All right.  Jury Instruction

13    Number 5, there's an objection -- let's see.  We didn't read any

14    depositions in this case.  We played one.  Do we need to give 5?

15    MR. MURPHY:  Judge, I don't think so, in light of

16    how -- the way you handled that.  You've already instructed them

17    really.

18    THE COURT:  Yeah.

19    MR. ABBOTT:  I think just a standard instruction,

20    "You saw some testimony by video," rather than -- rather than

21    "read."

22    THE COURT:  Well, it says that "During the trial,

23    certain testimony was presented to you by reading of

24    depositions."  Is there another one that talks about -- there

25    isn't one specifically that talks about video?  But I don't see

1    an issue with simply saying "presented to you by video" because

2    they heard testimony presented by video.  "Give this testimony

3    the same consideration you'd give live testimony."  I think

4    that's appropriate.

5            MR. MURPHY:  Judge, I'm not going to die on this

6    hill for this instruction, but, I mean, you gave a pretty

7    good -- really a good instruction before they heard it, already

8    explaining to them why we were doing this.  So whatever you

9    think.  I mean, you looked at the jury and heard that, but it

10   just seems to me like it serves no purpose in this case now.

11           MR. ABBOTT:  Whatever the Court considers

12   appropriate, but we think it's a simple instruction.  You gave

13   that instruction as related to Mr. Anderson's video testimony,

14   explaining why we were playing it, but we also --

15           THE COURT:  We saw his video testimony and we

16   also saw the doctor.

17           MR. ABBOTT:  Dr. Low.  And I don't believe that

18   instruction was given before Dr. Low was played.

19           THE COURT:  I think we should give an instruction

20   that just reads, "During the trial, certain testimony was

21   presented to you by recorded video or by video recording."

22           MR. MURPHY:  That's a good disposition for the

23   issue, Judge.  That's fine.

24           THE COURT:  All right, so I'll give that.  Jury

25   Instruction Number 5 will be, "During the trial, certain

```
 1    testimony was presented to you by video recording.  You should

 2    give this testimony the same consideration you would give had

 3    the witness appeared and testified here in court."

 4              All right.  Jury Instruction Number 6, nobody's

 5    objected to?

 6              MR. MURPHY:  Agree.

 7              THE COURT:  Jury Instruction 7?

 8              MR. MURPHY:  Agree.

 9              THE COURT:  How about Number 8?

10              MR. MURPHY:  Agree.

11              THE COURT:  Number 9, "You will recall that

12    during the course of the trial, I instructed you that I admitted

13    certain evidence for a limited purpose."  I don't think we had

14    any of those in this case, did we?

15              MR. ABBOTT:  Yeah, we --

16              MR. MURPHY:  That's true.  In spite of my best

17    efforts, I did not --

18              THE COURT:  Is that going to be withdrawn or you

19    just want me to deny it?

20              MR. ABBOTT:  Our position would be that, yeah, it

21    should be withdrawn.  There's no reason that instruction needs

22    to be given.

23              THE COURT:  Do you agree with that, Pat?

24              MR. MURPHY:  I do.

25              THE COURT:  All right.  Number 10, there's no
```

 1      objection?

 2                      MR. MURPHY:  Agree.

 3                      THE COURT:  Number 11, no objection?

 4                      MR. MURPHY:  Agree.

 5                      THE COURT:  Number 12, no objection?

 6                      MR. MURPHY:  Agree.

 7                      THE COURT:  Number 13 and 14, no objections?

 8                      MR. MURPHY:  Agree.

 9                      THE COURT:  Number 15, no objection?

10                      MR. MURPHY:  Agree.

11                      THE COURT:  Number 16, no objection?

12                      MR. MURPHY:  Agree.

13                      THE COURT:  And now we get to Number 17.

14                      MR. MURPHY:  17.

15                      THE COURT:  "Witness was mentioned at trial but

16      did not testify.  You may but you're not required to assume that

17      witness's testimony would have been unfavorable to Anderson or

18      Raymond."

19                      MR. ABBOTT:  Yeah, we don't think -- that was

20      just in case we had some as to that, and I think we said on the

21      combined instructions, whether -- if it's applicable, that

22      should be given, but I don't think we have anything like that.

23                      THE COURT:  During jury instructions -- I mean,

24      during the -- we picked a jury, I don't think anybody went down

25      their listed witnesses and asked if they knew them.

1    MR. LoCOCO:  You did.

2    THE COURT:  I did?

3    MR. LoCOCO:  You did.

4    MR. ABBOTT:  Yes, Your Honor.

5    THE COURT:  Okay.  So it's my own darn fault.

6    But do we need to give this instruction?

7    MR. MURPHY:  No.

8    THE COURT:  All right.  Number 18, the accident

9    report, destroying records.  What evidence do we have that the

10   jury could conclude the -- what's the basis --

11   MR. ABBOTT:  Your Honor, we will withdraw the

12   instruction.

13   THE COURT:  All right.  Jury Instruction 19 is

14   not objected to.  Joint?

15   MR. MURPHY:  Agree.

16   THE COURT:  Then Jury Instruction 20.  All right.

17   What's the -- is this a pattern jury instruction?  What's the

18   basis for this one?

19   MR. ABBOTT:  So, Your Honor, this instruction's

20   given in cases where there's some evidence as to whether or not,

21   for example, an employer has some ability to affect the design

22   of the machine.  And our position is, particularly through

23   Mr. Kerila who testified yesterday about the features brochure,

24   that they don't build any machine unless the customer sees a

25   feature brochure.  The customer gets to determine whether or not

1    they put on these features in the features brochure.  We even

2    heard testimony from him about the fact that certain features

3    that aren't standard were decided to be included by Pinnacle

4    Foods on this machine.  And we feel that given that light and

5    coupled with the testimony regarding the OCSS, that that

6    entitles us to an instruction that Raymond is the one who has

7    the duty to manufacture this machine in a condition that isn't

8    unreasonably dangerous, that there's no one else who has that

9    nondelegable duty.  So we feel this instruction is appropriate.

10            MR. MURPHY:  Judge, comments to that instruction

11   are very clear.  We've never made the argument nor presented any

12   evidence whatsoever that we thought that somebody else had to do

13   something to our product to make it safe.  That's just not in

14   the record in this case.  Insofar as -- insofar as this laser is

15   concerned, we've never said that somebody needed to use this to

16   make our product safe.  We're just saying what that option is

17   for.

18            THE COURT:  I'm remembering the witness's

19   testimony about the relationship between Raymond Corporation and

20   the dealers, and that it sounded like the common practice was

21   that the customers would be -- would work with the dealers, and

22   it was the dealers' duty to give them the list of options and to

23   go over their intended uses and make recommendations, and there

24   was some checklist.  Maybe there was two checklists.

25            MR. MURPHY:  And to provide training.

1           THE COURT:  Training.  And to provide training.

2           MR. MURPHY:  But this -- this is a design defect

3      case.  We're not saying that, you know, they need to come in

4      here and change the design or do something to fix the problem

5      that they say we have with the machine.

6           MR. ABBOTT:  I'll read you, Your Honor, the notes

7      on the use for this instruction.  "This instruction may be used

8      in cases where the product manufacturer seeks to avoid liability

9      with evidence that the owner of the product, such as the

10     plaintiff's employer, selected features of the product."  We

11     have evidence in this case that they went over in detail about

12     the numerous features that they offered to their customers, and

13     their customers get to select those features and that fact that

14     they could have selected this OCSS feature before they purchased

15     this machine.  This is --

16          MR. MURPHY:  Nothing about two pedals or a guard.

17     I mean, we're not saying that the dealer needs to put on a guard

18     or two pedals.

19          THE COURT:  Yeah.  I would agree -- one of the

20     problems is -- over lunch, I reread the complaint, and there

21     isn't anything in the complaint that talks about the system

22     which, by light or laser, if it senses a person's moving outside

23     the operator compartment, that it would trigger a braking

24     mechanism.  I'm going to -- I'm going to tab this one.  I'm

25     going to think about it.  Let's move on to the next one.

1          All right.  Jury Instruction Number 21, nobody's

2     objected to that; right?

3               MR. MURPHY:  Agree.

4               THE COURT:  And Number 22, no objection?

5               MR. MURPHY:  Agree.

6               THE COURT:  All right.  Plaintiff's Jury

7     Instruction Number 23.  It's the same -- Plaintiff's instruction

8     leaves out Raymond Corporation's allegation that Ms. Anderson

9     failed to keep the forklift under control and keep in the

10    operating compartment.  And I think I have to give the

11    defendant's instruction, because they're entitled to have that

12    language in there.

13              MR. ABBOTT:  Your Honor, just for clarification,

14    on the first paragraph of their instruction, I don't see a

15    reference to proximate cause on the defects, revised Number 23,

16    that they submitted this morning.

17              THE COURT:  Okay.

18              MR. ABBOTT:  And so I think that -- obviously

19    that language needs to be incorporated if we're going to --

20              THE COURT:  That has to be incorporated, you're

21    right.  Thank you.  It's a good catch.

22              MR. MURPHY:  Judge, it's possible we overlooked

23    that, but I think 23's the issues instruction, and then the --

24    and then under the next one, it says the plaintiff has the

25    burden of proving, then you get to proximate cause.  In other

1    words, the next instruction -- 23 is just the classic common law

2    issues instruction, but certainly we're not -- I mean, we can

3    put proximate cause in there, but we followed the pattern I

4    think.

5                    MS. HEITKAMP:  Yeah, 25 is where the proximate

6    cause instruction falls.  And there are competing instructions

7    in front of the Court on that one too.

8                    MR. ABBOTT:  I'm just looking at the instruction

9    on the issues.  The second point on the instruction on the

10   issues in the standard instruction is, "The plaintiff further

11   claims that one or more of the foregoing was a proximate cause

12   of his injuries," so proximate cause is obviously in the pattern

13   on the issues instruction.

14                   MR. MURPHY:  Judge, I don't want to die on that

15   hill either or waste your time, because there's no question that

16   the jury has to be told about proximate cause.

17                   THE COURT:  Yeah.

18                   MR. MURPHY:  If it needs to go in there, we'll

19   put it in.

20                   THE COURT:  It needs to go in there, because I'm

21   not seeing it -- I'm seeing preponderance of the evidence, but

22   I'm not seeing proximate cause in your -- Instruction 25?

23                   MR. MURPHY:  I think so.

24                   THE COURT:  Oh, there's a revised 25.  In your

25   revised you have "This condition was a proximate cause of her

1    injuries."

2                    MR. MURPHY:  Yeah.

3                    THE COURT:  All right.  I think because it's

4    covered in the other one, I'll give -- or give the revised

5    Defendant's Jury Instruction Number 23.

6                    All right.  No objection to 24; is that correct?

7                    And 25, other than -- do you have -- let's see.

8    Plaintiff's Jury Instruction Number 25, Defendant's Jury

9    Instruction Number 25.  All right.  I think I have to give the

10   defendant's because it has their claim of contributory fault.

11                   MR. MURPHY:  Yep.

12                   MR. LoCOCO:  Yep.

13                   THE COURT:  Are there any -- are there any other

14   objections or problems that Plaintiff sees in revised

15   Defendant's Jury Instruction Number 25?

16                   MR. ABBOTT:  I haven't seen any, Your Honor.

17                   THE COURT:  All right.  So we'll give that.

18                   Number 26 is not objected to?

19                   MR. MURPHY:  Agree.

20                   THE COURT:  And then Number 27, we have

21   Plaintiff's 27 and we have Defendant's.  What are you leaving

22   out -- what's the defendant leaving out on the plaintiff's jury

23   instruction?

24                   MR. MURPHY:  Judge, I'm trying to catch up here.

25   You're on Number --

1    THE COURT:  I'm looking now at Jury Instruction

2    Number 27.  The plaintiff submitted one that's based on the

3    Illinois pattern jury instructions, and you --

4                   MS. HEITKAMP:  I think it's Bullet 2, 3, and 4.

5                   MR. MURPHY:  I don't have it.  What is it?

6                   THE COURT:  Is there any evidence on shortened

7    life expectancy?

8                   MR. MURPHY:  We objected to that.  I couldn't

9    find any evidence on shortened life expectancy in the record.

10                  MR. ABBOTT:  There's not on short life

11   expectancy, but as far as disability or loss of normal life

12   experience, I think amputation carries that, and the risk of

13   increased injury with the life -- with the life care plan of

14   fall risk and all of that, I think that covers that.  So if

15   they --

16                  THE COURT:  Covers shortened life expectancy?

17                  MR. ABBOTT:  Not shortened life expectancy,

18   but --

19                  THE COURT:  If we take out shortened life

20   expectancy, I think that there's evidence to support all the

21   other ones in the plaintiff's instruction.

22                  MR. MURPHY:  Judge, the -- you've just ruled on

23   shortened life expectancy; right?

24                  THE COURT:  I have.  I've just ruled on it.

25   There wasn't any evidence.  No doctor said that.

1      MR. MURPHY:  And we had said, you know, on the

2  loss of a normal life or disability, the plaintiff has to

3  prove -- select one or the other.  You can't have both.  That's

4  in the comments.  You pick either one, but you can't have both.

5      MR. ABBOTT:  Okay.  We will --

6      THE COURT:  Disability, loss of normal life,

7  which would you --

8      MR. ABBOTT:  We can --

9      THE COURT:  You have disfigurement.  That goes

10  in.  Breach risk of harm, pain and suffering, emotional

11  distress, medical expenses, caretaking expenses, lost earnings.

12  Which would you rather have, disability or loss of normal life?

13      MR. ABBOTT:  We'll do loss of normal life.

14      THE COURT:  And so we throw out disability and

15  keep loss of normal life?

16      MR. ABBOTT:  Yeah.  So Number 2 now reads, "The

17  loss of normal life experienced and reasonably certain to be

18  experienced in the future."

19      THE COURT:  All right.  So I'll give that as

20  amended.

21      MR. MURPHY:  And, Judge, one other -- in the

22  damages instruction, and I think we mentioned this, either the

23  plaintiff, Mrs. -- can recover her medical expenses --

24      MR. ABBOTT:  We agree on that.

25      MR. MURPHY:  Okay.  Well, they both can't recover

1    for the same expenses, so.

2              MR. ABBOTT:  There was a medical expense in the

3    loss of consortium, and we'll take that out.

4              THE COURT:  All right.

5              MS. HEITKAMP:  Judge, there's one more issue with

6    respect to their pattern instruction -- or their Instruction

7    Number 27, and that's the reference to increased risk of future

8    harm.  They've misstated the law on that.  That's not a line

9    item of damage that's recoverable, as far as I'm reading the

10   pattern jury instructions from Illinois.  That's a type of

11   instruction that the Court can give under appropriate

12   circumstances when the law allows the plaintiff to not have to

13   prove to a reasonable -- or that it's reasonably certain for

14   future damages to occur.  And we don't think that that's

15   appropriate here, given the evidence that's come in at trial.

16             THE COURT:  Well, the evidence is that it's been

17   recommended that she get further surgery.  Where does that -- is

18   that -- what's your position on Number 3, the increased risk of

19   future harm resulting from the injury?

20             MR. ABBOTT:  I mean, obviously she needs to

21   get -- there's -- as to getting revision surgery, whether or not

22   that would exasperate the nerve issues, those type of things.

23             THE COURT:  You know what, I think you're better

24   off not throwing that in there.

25             MR. ABBOTT:  Okay.  That's fine.

1    THE COURT:  With your instructions, you don't
2    want to invite error.
3    MR. ABBOTT:  Yeah.
4    THE COURT:  And I think Number 3, I think that
5    should be out as well.
6    MR. ABBOTT:  Okay.
7    THE COURT:  I guess I don't have to do
8    Defendant's Number 27, because we've -- I'm giving the other
9    one.
10    Plaintiff's Number 28.  When I use the expression
11    "loss of normal life," what's wrong with that instruction?
12    MR. MURPHY:  Nothing now that they selected.
13    THE COURT:  All right.  So that will be given.
14    Then we have Jury Instruction 29.  No objection
15    to that, is there?
16    MR. MURPHY:  No, that's agreed.
17    THE COURT:  All right.  Plaintiff's Number 30?
18    MR. MURPHY:  30?
19    THE COURT:  Plaintiff's Number 30 is objected to.
20    MR. MURPHY:  Just trying to find that real quick,
21    Judge.
22    THE COURT:  Yeah.
23    MS. HEITKAMP:  The issue with that one was the
24    selection of disability or loss of normal life language.
25    MR. MURPHY:  Solved.

1          THE COURT:  All right.  So we'll just remove the

2     word "disability" and it would go -- and it would go in as

3     amended; right?

4          MR. ABBOTT:  Yeah.  And just amended to say loss

5     of normal life -- just amended to say loss of normal life rather

6     than disability.

7          THE COURT:  Yeah.  So we just ex out the word

8     "disability" and it's fine.  All right.

9          Plaintiff's Number 31, and the defense has a

10    competing Number 31.

11         MR. MURPHY:  Okay.

12         MS. HEITKAMP:  So there is a couple of issues in

13    Plaintiff's Jury Instruction Number 31 that they submitted

14    pretrial, and it has to do with the reference to the Andersons

15    in the last sentence rather than Mrs. Anderson individually.

16         MR. ABBOTT:  Yeah, we can --

17         MR. MURPHY:  I thought he conceded it.

18         THE COURT:  All right.  So we're just going to

19    make Anderson singular?

20         MR. ABBOTT:  To Mrs. Anderson.

21         MR. LoCOCO:  Life expectancy of Mrs. Anderson.

22         THE COURT:  All right.

23         MS. HEITKAMP:  There may have been one other

24    typo.  I've got to pull it up.

25         THE COURT:  So if we just give -- so I'll just

     1    give the Defendant's Instruction Number 31, which is based on

     2    IPI 34.04.

     3                    MS. HEITKAMP:  Yeah.  Defendant's Jury

     4    Instruction Number 31 that I e-mailed this morning is actually

     5    Plaintiff's instruction with the couple of corrections,

     6    including the Mrs. Anderson.

     7                    THE COURT:  All right.  Let's talk about -- so

     8    we'll give Defendant's Number 31, and I'll refuse Plaintiff's

     9    31.

    10                    Instruction Number 32, we've got competing

    11    instructions.

    12                    MR. MURPHY:  That's what we just mentioned too,

    13    Judge.  Just Mrs. Anderson can recover or Mr. Anderson can

    14    recover for medical expenses, but they both can't recover for

    15    them.

    16                    THE COURT:  All right.  And does yours address

    17    that?

    18                    MS. HEITKAMP:  Our proposed just takes out

    19    Number 1 from Plaintiff's instruction, since it's included in

    20    Mrs. Anderson's.

    21                    MR. ABBOTT:  As I previously stated, we're fine

    22    with that, Your Honor.

    23                    THE COURT:  All right.  Defendant's 32 will be

    24    given.

    25                    33, loss of society.  No objection to that.

1    Number 34, no objection.

2    35, no objection.

3    Joint Jury Instruction 36?

4    MR. MURPHY:  Judge, the only thing about that

5    instruction is we ordinarily don't give that with the initial

6    jury instructions, but when the foreman comes in and says, "We

7    can't do it," the judge blasts them, so you have it.  That's an

8    invitation to hang right there.

9    THE COURT:  I think that that's -- that is our

10   practice.

11   MR. ABBOTT:  Okay.

12   THE COURT:  This court and in state court, so.

13   I'll reserve -- my ruling is it won't go -- it won't go with the

14   initial group of instructions, but at the appropriate time, you

15   may reoffer it.  Otherwise, it looks like it's in the proper

16   form.  All right.  Do you have a problem with that?  Counsel?

17   MR. ABBOTT:  No, Your Honor.

18   THE COURT:  All right.  Defendant's 37, is there

19   an objection to this one by Plaintiff?

20   MR. ABBOTT:  I haven't had a chance to look at

21   their revised.  If I can have a moment to sort of review the

22   revised to their original.

23   THE COURT:  Sure.  Oh, I see.  That's right.

24   There is a revised.

25   MR. MURPHY:  We just revised it to make sure it

1    comported with the IPI.  I think in the original, there was a --

2    wasn't stated correctly.

3                    MR. ABBOTT:  We're fine with that, Your Honor.

4                    THE COURT:  All right.  The revised Number 37

5    will be given.

6                    All right.  Now we move to --

7                    MS. HEITKAMP:  Defendants had a revised 38 too,

8    and it was revised to deal with the same -- to make it conform

9    with the pattern instruction.

10                   MR. ABBOTT:  Fine with the revised.

11                   THE COURT:  Okay.  So Defendant's revised

12   Number 38 will be given.

13                   Okay.  Why is there an objection to duty of care

14   as defined --

15                   MR. ABBOTT:  That was originally with -- we want

16   them to be able to establish contributory negligence as an

17   element in the case.  We believe they at least have evidence for

18   it to go to the jury, so no objection to 39.

19                   THE COURT:  All right.  39 will be given,

20   Defendant's 39.

21                   Raymond submits Number 40, duty to mitigate

22   damages.  All right.  What's your position on the first one,

23   Jury Instruction Number 40?

24                   MR. ABBOTT:  Well, it's the first time we've seen

25   the instruction was when it was given this afternoon, so I'd

1    like to know what they claim is the evidence for -- to support a

2    mitigation of damages instruction.

3                THE MR. MURPHY:  Judge, the life care planner, their

4    witness, came in here and testified that the best thing she

5    could do, what she needed to do, was go back to work.  No

6    physical reason she can't go back to work.  Looks to me like

7    it's for a jury to decide.

8                THE COURT:  Well, there's evidence that further

9    surgery was recommended, that she's declined to do that, but

10   that's her duty to do so.  There was a medical record that said

11   she was released to return to work on a limited basis, but I

12   think she testified that when she was released to return to

13   work, the plant had closed down.

14               MR. LoCOCO:  She also testified she hadn't done

15   anything other than -- you know, other than going back to FedEx,

16   that she had done nothing else to go back to work.

17               MS. HEITKAMP:  Mr. Anderson provided similar

18   testimony as Mrs. Anderson on that -- in that regard too.

19               THE COURT:  All right.

20               MR. ABBOTT:  I think our position is, she --

21   she's released to go back to work on a limited basis, and the

22   place where she worked no longer existed.  They've offered no

23   evidence as to her ability to -- or the possibility for her to

24   find gainful employment given the nature of what her career was

25   as a forklift operator and a warehouse worker, given her

1    amputation.

2              MR. WARSHAUER:  So I just have a question.  In

3    lots of places where I've talked about this instruction, the

4    rule of law has been that damages are an -- economic damages are

5    an item of special damages.  Therefore, they have to be proved

6    with specificity.  I just can't throw up on the wall, "We want

7    $500,000 of lost wages" without proving the underlying basis.

8    And we did that through both the economist, and Mrs. Anderson

9    testified to her hourly wage and how much she made.  So it would

10   seem to me -- and again, I don't know Illinois law on this.  But

11   the failure to mitigate is a reduction of those special damages.

12   It too would have to be proved with specificity.  And I've seen

13   that charge in many places.

14              And if indeed that is the law -- again, I don't

15   know, but I'm trying to figure it out as we speak.  They didn't

16   prove the value of a job she could return to.  In other words,

17   in everywhere I've ever been, if they say the plaintiff should

18   have gone back to work, they say the plaintiff should have gone

19   to work, and had they done so, they would have made $17 an hour.

20   Here, they just want to throw out a "She should have gone back

21   to work" without any evidence whatsoever as to the value of that

22   work she should have gotten.  So they want to attack our special

23   damage, which we would prove with specificity, with a general

24   complaint about failure to do it.  I don't -- again, it's

25   something I need to look up real quick.  But if indeed that's

1    the law, that it's special damages, I think you have to attack

2    it with a similar degree of specificity.  So I just -- just came

3    to mind while y'all were thinking about it.  I don't --

4    unfortunately, I'm not an expert on the law on that.

5              MR. MURPHY:  Judge, an injured party is under

6    legal obligation.  The burden is on the plaintiff to mitigate.

7    We cited the case --

8              MR. WARSHAUER:  No --

9              MR. MURPHY:  The pattern instruction says that.

10             MR. WARSHAUER:  The duty is on the plaintiff.

11   The burden to prove she didn't is on you.

12             MR. MURPHY:  No, it's not.  This is the pattern

13   instruction.  This is what the jury is told when there's

14   evidence.  An injured party is under a legal obligation.  It's

15   not an affirmative defense in a personal injury case.

16             MR. WARSHAUER:  The --

17             MR. MURPHY:  It's not.  If there's evidence that

18   she hasn't mitigated her damages, then that's something for the

19   jury to consider.  And this comes from --

20             THE COURT:  But here's the thing, though, Pat.

21   There was one reference to it, and that was the person was --

22   she was being released to return to work with all kinds of --

23   that I think it was 16 hours a week with all kinds of

24   restrictions.  Aren't we asking the jury just to speculate as to

25   what she would have earned had she gone back 16 hours a week at

1    a job that no longer existed, but she could have found something

2    else?

3              MR. MURPHY:  No more than what we're asking the

4    jury to speculate in light of her testimony that she will never

5    work again.  And that's where we are in this case.  This is just

6    something else that has to be argued out.

7              THE COURT:  All right.  I want to -- I'm going

8    to -- I'm going to reserve ruling on this one.  I want to reread

9    the notes on IPI 33.01.

10             MR. WARSHAUER:  To respond to Mr. Murphy --

11             MR. MURPHY:  I misstated something, Judge.  I

12   want to correct it real quick.  My co-counsel just said that

13   that's an affirmative defense, and I told you it wasn't.  And I

14   thought it was just an affirmative defense in contract cases.

15   It's an affirmative defense in a personal injury case.  And I

16   was just wrong.

17             THE COURT:  All right.  Was that in your

18   pleadings?  They asserted affirmative defense.

19             MR. WARSHAUER:  Somewhere down there I actually

20   read in their 72,000 affirmative defenses, I pretty much

21   believe -- I'd be shocked if they didn't.

22             MR. LoCOCO:  There's a failure to mitigate in

23   there, Judge.

24             MR. WARSHAUER:  It's almost always there.  It's

25   on their boilerplate, push a button, there's your answer.  But

1    the difference between duty and burden to prove breach of that

2    duty is much like negligence.  They have -- we have a duty to

3    exercise reasonable care at all times we're using the machine,

4    according to them.  The burden of proving we didn't is on them.

5    We have a duty to mitigate.  The burden of proving we didn't is

6    on them, which is why it's an affirmative defense, which is

7    my -- raises -- which is the basis of my question, the level

8    with which they must prove that.

9            THE COURT:  I want to reserve it.  I'm going to

10   do a little bit of research on it.

11           MR. WARSHAUER:  I just wish I knew the answer off

12   the top of my head.  It's very commonly required.

13           THE COURT:  I know I don't know the answer off

14   the top of my head.

15           MR. WARSHAUER:  I absolutely don't.

16           THE COURT:  I don't want to shoot from the hip on

17   this because it's important.

18           Fixing -- Defendant's additional Number 41, "In

19   fixing the amount of money which will reasonably and fairly

20   compensate the plaintiff, you are to consider that a person must

21   exercise ordinary care to obtain medical treatment.  Damages

22   proximately caused by failure to exercise such care cannot be

23   recovered."

24           MR. MURPHY:  Judge, that is --

25           MR. ABBOTT:  I think our response on that would

```
1   be similar to our last response, which is they have to show
2   Mrs. Anderson's negligence, and I don't think we heard any
3   testimony saying Mrs. Anderson was negligent in her -- in her
4   efforts to obtain medical treatment.  Separately from showing
5   her negligence, they have to show that the damages resulting to
6   the plaintiff from that failure to exercise due care are
7   separable from her other damages.  They have to meet both of
8   those burdens in order for this instruction to be given.
9               THE COURT:  I have a recollection from either
10  having read her deposition, but I don't think it was in her
11  trial testimony.  I remember her previously -- I saw somewhere
12  she said that essentially, the earlier surgeries were
13  traumatizing and that she's afraid of complications, and that's
14  why she's not elected to go forward with the revision, even
15  though the doctors are recommending it.  Did she testify to that
16  at trial, or am I just remembering that from --
17              MR. LoCOCO:  It was something like that.
18              MR. MURPHY:  It was in trial.
19              MR. LoCOCO:  Yeah.  In trial.
20              THE COURT:  I want to look at this one too, so
21  I'm going to reserve on your 40 and 41.
22              MR. LoCOCO:  Your Honor, I'd just add on 41 that
23  the life care planner did testify that she thought that
24  Ms. Anderson should get the surgery and should get psychiatric
25  help, and she told her those things.  So that's in the record.
```

1    THE COURT:  That's true, and that there's

2    medicines, she said she did get an antidepressant, but the

3    antidepressant made her suicidal.  All right.  I want to look at

4    that too.

5        All right.  The plaintiff's proposed verdict form

6    revised, Defendant's verdict form.  All right.  What is the --

7        MR. ABBOTT:  The major issue is the contributory

8    negligence.  Obviously we wanted them to lay that foundation

9    with the evidence.  Obviously with the Court's rulings regarding

10   that, we think there should be some modifications to the

11   defendant's verdict form as is -- with the contributory because

12   we think it's rather confusing, just to be quite honest, given

13   its current state.  And so we would be okay with -- obviously

14   the contributory negligence is going to go there, but we think

15   that some of the -- the way some of the questions are

16   structured, particularly Question Number 3.

17       So we -- so the first two questions on verdict

18   forms are essentially the same, which the first question being

19   essentially, "Is there unreasonably dangerous condition in the

20   machine?"  Yes or no.  Second question being, "Did the

21   unreasonably dangerous condition proximately cause the

22   plaintiff's injuries?"  Yes or no.

23       And we get to Question Number 3, and they get

24   into this whole thing, if you answered to Number 2 above as yes,

25   you continue with this line of questions.  But it's sort of

1    unnecessary, given the bold language that's included, that if

2    you get past Question Number 1 and 2 and both questions aren't

3    yes, you need to skip to the bottom and find for Raymond.  So

4    we -- our position currently is that we feel the verdict forms

5    should be -- sort of be tightened up a bit from where it

6    currently is, given -- if it's given.

7                   MR. MURPHY:  Judge, it's possible the jury could

8    see things the plaintiff's way.  They could answer -- they could

9    answer -- for instance, theoretically, they could answer

10   Number 1 that the product was unreasonably dangerous.  They

11   could answer Number 2 that the injuries were proximately caused.

12   And if that's the case, then they have to go to Number 3 to see

13   if she failed to exercise ordinary care.  What we've done is

14   just absolutely track the instructions.  Then if she answers --

15   she failed to exercise ordinary care, then they have to parse it

16   out, how much, and if it's 50 percent or less, they keep going

17   and give her money.

18                   THE COURT:  All right.  The other thing is, did

19   we do -- we chose, what, normal life as opposed to disability?

20   What was the --

21                   MR. LoCOCO:  Yes.

22                   MR. ABBOTT:  Loss of normal life.

23                   THE COURT:  All right.  So instead of having

24   disability passage here, we should have loss of normal life;

25   right?

 1          MS. HEITKAMP:  That would need to be added into

 2    Question 6.

 3          THE COURT:  And we're getting rid of shortened

 4    life expectancy?  Mr. Anderson, we'll be getting rid of medical

 5    expenses.

 6          Okay.  I do think we have to have in the verdict

 7    form apportionment -- so I think revised -- the Defendant's

 8    revised proposed verdict form is the one closest to what we're

 9    going to use.  But there has to be a loss of --

10          MR. MURPHY:  We need to put all the jurors' --

11          THE COURT:  -- normal life.  All right.  Is there

12    anything else we need to -- from the plaintiff's standpoint, the

13    verdict form, the defendant's revised verdict form, anything

14    else that should be deleted from that?

15          MR. ABBOTT:  I think that's our only concern.

16    Obviously we only got this like this morning, but on the revised

17    form, we believe it's a significant improvement over the

18    previous form that was submitted.  So in light of the Court's

19    ruling on the contrib, we believe it's appropriate.

20          THE COURT:  Don't we have all the jurors sign the

21    verdict forms?

22          MR. MURPHY:  Yes, that's what I said, we need to

23    put a space --

24          THE COURT:  Okay, I was reading --

25          MR. MURPHY:  Yeah.  So we'll need seven.

1      THE COURT:  Okay.  So give you a quick -- we'll

2  take a quick break, and I'll come back, I'll give you my ruling

3  on the proposed Instruction Number 20, and then 40 and 41.

4      MR. BRENNAN:  Your Honor, I just have a quick

5  comment, that the mitigation the Court's going to consider.

6  When you're first -- Illinois Pattern Instruction 33.00, with

7  regard to mitigation of damages in personal injury cases, the

8  comments to that instruction read that, "No instruction should

9  be given with reference to the plaintiff's duty to submit to

10  major surgical operations.  Whether the plaintiff is to undergo

11  a serious operation is a matter for him to decide."  So I think

12  part of the Court's consideration ought to be whether or not,

13  given where she is mentally and physically, whether or not this

14  is in fact a major surgical operation in the context of

15  Mrs. Anderson's situation.  There's -- she can't be forced

16  with -- given her duty to mitigate, she can't be forced to

17  undergo a major surgical operation.

18      THE COURT:  Right.  And the jury can't ding her

19  for that if she elects not to.

20      MR. BRENNAN:  Right.

21      THE COURT:  All right.  Take a look at that.

22  Anything else --

23      MR. MURPHY:  Just as a logistical question,

24  Judge.  So in light of the very few changes that we're going to

25  have here after you rule, would it be -- could we just maybe

1    print these off today and you have complete instructions when we

2    come in, or try to bring them in tomorrow morning at 8, or

3    what -- what do you think --

4              THE COURT:  Well, it's only ten after 2.  Let

5    me -- if we can get it all done today and we know --

6              MR. MURPHY:  Me too, yeah.

7              THE COURT:  Yeah.

8              MR. MURPHY:  Yeah.

9              THE COURT:  Why don't we try to -- if you want to

10   work on the changes we know have to be made, I'll research this

11   stuff and let you know my rulings on the three.

12             We're off the record.

13             (Recess from 2:11 p.m. to 2:36 p.m.)

14             THE COURT:  All right.  Let's go back on the

15   record.  After a brief recess, I've revisited -- beginning with

16   Jury Instruction Number 20.  It is based on IPI 400.07C.

17   However, I think because I excluded the reading of the testimony

18   of a particular witness, that the defendant wanted to advance

19   along with an argument that FedEx had taken a look at

20   retrofitting these -- retrofitting the forklifts and opted not

21   to.

22             I don't think this instruction is necessary.  And

23   I don't think that there's anything in there -- may be more

24   likely to confuse than anything else.  Generally there has to

25   be -- for this instruction to be presented, there has to be some

1    evidence advanced by -- or opinion advanced by the defendants

2    that somebody else was -- somebody else failed to properly equip

3    this forklift with necessary equipment or failed to properly

4    train.

5              Was there another basis on which your -- the

6    defense was going to argue that somebody else should have made

7    this less dangerous or was somebody else's job to figure out

8    what should have been or not on there?

9              MR. MURPHY:  No.

10             THE COURT:  I don't think so.  All right.

11             Let's talk about Defendant's Instructions

12   Number 40 and 41.  First of all, the mitigation of damages was

13   an affirmative defense, and I don't think there's instructions

14   anywhere in the other instructions in which it identifies the

15   affirmative defense of mitigation of damages advanced by the

16   defendant.  So if I were to allow these mitigation of damage

17   instructions, there would also have to be somewhere else an

18   instruction that it is the defendant's burden to prove the

19   plaintiff failed to mitigate her damages.

20             With respect to 41, that a person must exercise

21   ordinary care to obtain medical treatment, in reading the

22   comments and the cases that talk about this particular issue,

23   Mr. Brennan is correct when he says these are -- this

24   instruction is improper when we're talking about someone's

25   decision not to undergo major surgery.  That leaves, could you

1    be taking stronger pain pills?  What difference that would make?

2    And could you be taking other antidepressants?  I think we are

3    asking -- we would be asking the jury to speculate on that.  We

4    don't have any doctor coming in.  The defendant didn't offer

5    anybody that says, "Look, she did respond well to certain --

6    this certain medication, which is an antidepressant, and we

7    think that that would enhance her quality of life, and that she

8    would be much more likely to go back to the things she enjoyed

9    or go back to trying to work."  And so I'm going to deny

10   Number 41.

11            It's an affirmative defense minimizing economic

12   loss.  Who on the defense wants to address the question, whether

13   or not, if I were to allow this instruction to get to the jury,

14   that there has to be other instructions that identify the

15   mitigation as an affirmative defense that the defense has the

16   burden to prove?

17            MR. MURPHY:  You know, Judge, on further review,

18   we're not -- we will withdraw that instruction.

19            THE COURT:  All right.

20            MR. MURPHY:  So you don't -- that takes care of

21   that problem.

22            THE COURT:  Yeah.  The jury's got a pretty good

23   feel, I think, for those issues, and I don't want to -- I don't

24   want to invite error, and I think that we would be -- that's one

25   of those ones where -- all right.  So I'll treat that -- those

1    two withdrawn, and Number 20 as denied.

2              All right.  Do we have anything else that we need

3    to take up?

4              MR. LoCOCO:  So, Your Honor, the expert witnesses

5    that we had, Dr. Rhoades, Mr. Rogers, and Dr. Rodowicz had

6    exhibits that we presented through the PowerPoint.  Your system,

7    which is perfectly fine with us, needs PDFs of those slides as

8    opposed to the PowerPoint, which can show video.  So I've handed

9    up to your staff replacement 572, 573, 574, with just

10   screenshots, and we'd like those to be part of the -- well, they

11   are part of the record, but we'd also like those to be available

12   to the jury.  There will be no video available from the videos

13   that we did show.  And I think the plaintiffs have an objection

14   to that.

15             MR. WARSHAUER:  We did object.  We objected both

16   when they were on the list, when we filed our objections, when

17   they filed their list, and we do so now.  A common phrase that

18   I've heard for this -- and weirdly I can't ever find it in the

19   literature -- it's called continuing witnesses.  Basically what

20   we have in these slideshows is a summary of these experts'

21   testimony.  And now what they want to do is take that summary of

22   their testimony -- it's not real evidence, a computer simulation

23   of a surrogate standing there with a foot under a

24   computer-simulated forklift or even a surrogate human with their

25   foot under that.  It's the physical manifestation or embodiment

of the oral words that we have.  It is no different than if we let these experts go back into the jury room and say, "Hey, in case you forgot what we said, here's a summary of all of our opinions."

That's just not allowed.  This isn't real evidence.  It's not a photograph of something.  It's not a map of something.  It is simply continuing testimony.  It'd be the same as letting a deposition transcript go out.  So it really sort of falls to the extent there are rules involved.  It's probably in the 800s, hearsay.  You just can't let that kind of thing go out with the jury, any more than we could say, "Hey, make sure you write a great Rule 26 report, because the jury's going to have it with them."  We never let Rule 26 reports for the same reason we shouldn't let these slides go out, because at the end of the day, all it was was a fancy summary of their opinions.

MR. LoCOCO:  I think, just use Dr. Rodowicz for example, when she had -- she had image after image after image that she created based on her analysis.  It'd be no different than -- I mean, with technology, we don't have to do this anymore, but, you know, it'd be no different than putting those on foam core boards, 30 by 40, numbering each of them, and they go into evidence, and they're available to the jury.  And that's all this is.  It's an electronic version of the evidence that she created to help describe her analysis.  I think that's

```
 1    perfectly proper.  That's different than a Rule 26 report, which
 2    is 80 pages of hearsay, that gets, you know, gleaned down into
 3    whatever the witness says on the stand.
 4               THE COURT:  So are you suggesting that, for
 5    instance, if there are photos taken of an accident
 6    reconstruction, that doesn't get back to evidence?
 7               MR. WARSHAUER:  Some do.  Some don't.
 8               THE COURT:  All right.  And what's the magic?
 9               MR. WARSHAUER:  If we had a photograph of an
10    accident scene, the roadway, sure.  It's the roadway.  But the
11    critical difference here is, and I wrote this down, evidence she
12    created.  It is a summary of her opinions.  With respect to the
13    analogy to foam boards, I don't think foam boards would go out
14    either.  He can use this in closing.  It's going to the
15    demonstrative evidence.  I don't in any way think it's not
16    demonstrative evidence.  But I don't think it rises to the level
17    of real evidence, and that's the difference.  I just think it's
18    a summary of the expert's testimony.
19               THE COURT:  All right.
20               MR. WARSHAUER:  It's evidence she created.
21               THE COURT:  Let me think about that one.  It's
22    the sort of thing they might -- if we don't send it back, they
23    might send a note asking to see it.  Let me think about that,
24    and I will give you a ruling tomorrow.
25               MR. LoCOCO:  Just -- but to be clear, wherever
```

1    your ruling is, there's no problem to use some of this stuff in

2    closing from the plaintiff's perspective.

3                 MR. WARSHAUER:  I'm a big believer in once it's

4    shown for the jury, we can use it for any reason we want out

5    here.  My difference is, back there.

6                 THE COURT:  Did we clean up the medical records?

7                 MR. WARSHAUER:  We decided to just put a summary

8    sheet in.  It's 5,000 pages.  Somewhere, we would screw up.  I

9    mean, we've tried, and clearly the important pages we didn't

10   even get.  So we're just going to do the summary sheets.

11                MR. LoCOCO:  Which is fine with us, Your Honor.

12   I mean, to the extent I need to refer to something from the

13   medical records, they're still in the record, they're just not

14   going to go back.

15                MR. WARSHAUER:  Yeah.  And if they ask for it,

16   particular parts, I guess we'll clean up what they need and send

17   it to them.  It's typically not the kind of thing they ask, but

18   if they do, they do.

19                THE COURT:  All right.  What else do we need to

20   take up?  How long -- how long do you think you will argue?

21                MR. WARSHAUER:  Let me ask the Court this before

22   I answer.  So if I have a finite amount of time -- I'm just

23   going to say, 100 units, 100 minutes, we'll just say.  I can

24   divide that any way I want.  If I use 30 of those units, I still

25   have 70 available for rebuttal, assuming that I did a full and

1  complete -- I mean, I do understand the federal rules require me

2  to do a full and complete closing.  I can't not talk about

3  damages or liability.  I got to cover all of the essential

4  issues.  But what I've typically done and what I'm most

5  comfortable with is, you give me a certain amount, and then I'll

6  say -- you know, when they get the equivalent amount to go in

7  the middle and how I use mine up, you know, if I say, "Well,

8  gosh, I'd really like my opening to be 30 and it goes 40,"

9  that's ten minutes I don't get on the back end.  So, you know,

10  an hour total?

11            THE COURT:  Yeah, no, I think an hour for both

12  sides is -- each side, an hour.  I've always required that the

13  rebuttal not be longer than the opening.

14            MR. WARSHAUER:  Okay.  I can live with that rule.

15            THE COURT:  You weren't thinking 30-70, were you?

16            MR. WARSHAUER:  As I said --

17            THE COURT:  "Here's my itemized damages, ladies

18  and gentlemen of the jury.  I'll be back to talk to you after."

19            MR. WARSHAUER:  I think the rule and the spirit

20  of the intent of the rule, as I understand it, is that I have to

21  do a full closing.  It can't just be a "Hey, it's their fault,

22  you owe us money, I'll be back" and use my other 59 minutes.  I

23  have to talk.

24            THE COURT:  And you run the risk that rebuttal

25  has to be actual rebuttal to his argument, not just --

 1      MR. WARSHAUER:  It will be my intent to do more

 2  likely than not.  Certainly every reason to believe it would be

 3  longer than rebuttal, and if that's the Court's direction,

 4  that's what it absolutely will be.

 5      THE COURT:  Yeah.

 6      MR. WARSHAUER:  And that makes sense with me.  I

 7  think that makes sense.

 8      MR. LoCOCO:  I'm hoping not to use an hour.  But

 9  will you say, "Hey, knucklehead, you've done 45 minutes, you got

10  15 left"?  I like getting those --

11      THE COURT:  I will.  And the other thing is that

12  I don't have a hard stop.  I'm going to -- I'll say something

13  like "Finish your thought," and -- there's a lot here.  Also, I

14  don't have a problem if you want two lawyers to argue, if you're

15  going to break it up.  "I'm going to argue this part of it and

16  he's going to argue --"  I don't have a problem with that.

17      All right.  Anything else?

18      MR. LoCOCO:  I guess the last thing, Your Honor,

19  and you're terrific at this, but depending on how long the first

20  part of his argument is, I might need five minutes just to get

21  my things set up before my closing.

22      THE COURT:  Oh.  Yeah, I would -- I anticipate

23  there being a -- giving the jury a break, because it's going to

24  be the first thing out, and I like to give the court reporter a

25  break too.  And if we're doing two hours, it's not fair to the

1    jury to have them sit through all of it.

2              MR. LoCOCO:  Yeah.

3              THE COURT:  Because if somebody needs a potty

4    break, they're going to start resenting it.  So we only have --

5    yeah.  I would probably do at least a ten-minute, maybe more

6    like a 15-minute break, just to make sure that everybody has a

7    chance to go to the restroom or whatever.

8              MR. LoCOCO:  Okay.

9              THE COURT:  All right.  Anything else?

10             MR. WARSHAUER:  No.

11             MR. LoCOCO:  No.

12             MR. WARSHAUER:  I assume that we'll be getting a

13   copy of this final instruction probably e-mailed to us or

14   something before the close of business or something?

15             MR. MURPHY:  We're trying to finish it --

16             MS. HEITKAMP:  I think I'm done.  I think I've

17   got everything that the Court instructed.

18             THE COURT:  Okay.

19             MS. HEITKAMP:  But that's certainly been my

20   intention to make the revisions that the Court has referenced on

21   the record.  So I can circulate this clean Word version to

22   everybody, including the Court, and if there's an issue, I guess

23   somebody can raise it.

24             MR. LoCOCO:  By e-mail even.

25             MS. HEITKAMP:  By e-mail.

```
1              MR. LoCOCO:  Call first, and --
2              MR. ABBOTT:  Okay.
3              MR. MURPHY:  I wouldn't let anybody leave until
4     they're done.  Judge, I'm just -- I'm serious.
5              THE COURT:  Well, let's -- why don't we circulate
6     it.  It won't take long to look through it.  How much longer do
7     you think you need?
8              MS. HEITKAMP:  About five minutes.
9              THE COURT:  All right.  I mean, it's five minutes
10    to 3, so.  We'll take a -- all right.  And then we do need to go
11    on the record with the exhibits.
12              Jackie has it in front of her.  Do you want to
13    read down the list, Jackie, and just get them on the --
14              THE COURTROOM DEPUTY:  Ms. Heitkamp can confirm
15    the exhibits -- can someone else confirm the exhibits as I go
16    down the list for me?  Because I know we still have a question
17    on a couple of them, and I just want to make sure that we're all
18    in agreement on which ones we have.
19              MR. LoCOCO:  Start with Plaintiff's?
20              THE COURTROOM DEPUTY:  So I have Plaintiff
21    Number 1 exhibit that has been marked and admitted and that's
22    going to the jury.
23              Number 4:  Marked and admitted, going to jury.
24              5:  Marked, admitted, and going to jury.
25              6:  Marked, admitted, going to jury.
```

1            9:  Marked, admitted, and going to jury.

2           10:  Marked, admitted, and going to jury.

3           24:  Marked, admitted, and going to jury.

4           THE COURT:  Just to be clear, silence is

5   tantamount to saying the clerk is correct.

6           THE COURTROOM DEPUTY:  29:  Marked and admitted,

7   going to jury.

8           30:  Marked, admitted, and going to jury.

9           Then we have 42 through 62 all marked, admitted,

10  and going to jury.

11          MR. LoCOCO:  On 61, that's that video that we

12  objected to that the Court let in.  Are they going to have

13  access to the video?  Because it's a small enough video that --

14          THE COURT:  What's the video?

15          MR. LoCOCO:  It's of Mrs. Anderson being in pain

16  from that spasm.

17          THE COURT:  Oh, well, no, because it's -- when it

18  was admitted, it was admitted within the deposition.  It wasn't

19  admitted separately, was it?  So that video doesn't go back, nor

20  does his deposition go back.  If they ask for it, we could take

21  it up.

22          THE COURTROOM DEPUTY:  Okay.  61 is not going to

23  jury.

24          Then we have 67:  Marked and admitted, going to

25  jury.

1    71:  Marked, admitted, and going to jury.

2    73:  Marked, admitted, and going to jury.

3    80 and 81 are marked and admitted, but not going

4    to jury.

5    85 is marked, admitted, and not going to jury.

6    86 is marked, admitted, and going to jury.

7    87:  Marked, admitted, and going to jury.

8    88:  Marked, admitted, going to jury.

9    90 through 92 are all marked, admitted, and going

10   to jury.

11   MR. LoCOCO:  Just again, whatever objections we

12   made during the case, they carry over here.  You don't need

13   anything new?

14   THE COURT:  That's correct.

15   MR. LoCOCO:  Okay.

16   THE COURTROOM DEPUTY:  110 is marked, admitted,

17   and going to jury.

18   119 is marked, admitted, and going to jury.

19   MR. LoCOCO:  I think that's the one -- only the

20   top cover sheet is going to the jury.

21   THE COURTROOM DEPUTY:  Just one page.  Right.

22   120, 121, and 122 are all marked, admitted, but

23   not going to jury.  Those are CVs.

24   129 is marked, admitted, and going to jury.

25   157 is going in as a physical exhibit to jury.

1      It's marked and admitted.

2                      500 is marked, admitted, and going to jury.

3                      MR. LoCOCO:  Just a second.  Okay.

4                      THE COURT:  Yeah, hold on.

5                      THE COURTROOM DEPUTY:  Sorry.

6                      MR. LoCOCO:  Okay.  All set.

7                      THE COURTROOM DEPUTY:  502 is marked, admitted,

8      but not going to jury.  Correct?

9                      MR. LoCOCO:  Correct.  That's the OSHA report.

10     You guys agree; right?

11                     MR. ABBOTT:  Correct.  Not going.

12                     THE COURTROOM DEPUTY:  503:  Marked, admitted,

13     going to jury.

14                     505 is marked, admitted, going to jury.

15                     MR. LoCOCO:  Nope, that one is just 505, first

16     page.

17                     THE COURTROOM DEPUTY:  Partial.

18                     MR. LoCOCO:  And 12.

19                     THE COURTROOM DEPUTY:  Correct.  I need a new one

20     on that one.  Page 1 and 12, you said?

21                     MR. LoCOCO:  Yes.

22                     THE COURT:  How about Pat telling me "I wouldn't

23     let these guys leave" and he walks out the door.  Makes you guys

24     stay in here and work.

25                     THE COURTROOM DEPUTY:  537 is marked, admitted,

1    and going to jury.

2              538:  Marked, admitted, and going to jury.

3              542 is marked, admitted, and going to jury.

4              552 is marked, admitted, and going to jury.

5              558 is marked and admitted, but I understand it's

6    a partial and I don't have --

7              MR. LoCOCO:  Actually, it can be marked and

8    admitted.  It doesn't have to go to the jury because that's a

9    duplicate of their B56.1.

10             THE COURTROOM DEPUTY:  So it's not going to jury?

11             MR. LoCOCO:  Right.

12             THE COURTROOM DEPUTY:  Okay.  Perfect.

13             562:  Marked, admitted, and going to jury.

14             563:  Marked, admitted, and going to jury.

15             MR. LoCOCO:  No, well, 563 was not shown.

16             THE COURTROOM DEPUTY:  Oh.  Well, I have 562 and

17   563 both as CDs and they only have the covers on those.

18             MR. LoCOCO:  Yeah, so the covers can go.  Yeah.

19             THE COURTROOM DEPUTY:  The covers, but are we

20   doing any audio on either one of those?

21             MR. LoCOCO:  I guess if they ask for it, we can

22   take it up.

23             THE COURT:  We'll take it up.

24             THE COURTROOM DEPUTY:  So we won't send those.

25   Well, they'll go to jury but they'll just be the covers.  Okay?

1     MR. LoCOCO:  Right.

2     THE COURTROOM DEPUTY:  572, 573, we're waiting on

3  that one.

4     MR. LoCOCO:  And 574.

5     THE COURTROOM DEPUTY:  And 574, correct.

6     Last we have 583 [sic]:  Marked, admitted and

7  going to jury.  And we have a picture.  We don't need the

8  physical on that one.  That's the wheel thing; right?

9     MR. LoCOCO:  But back to 583, the FedEx Supply

10  Chain production, I think that doesn't go back either.  That's

11  in the record, but that's -- it's got -- it's filled with

12  hearsay.

13     MR. ABBOTT:  Agree.

14     THE COURT:  What document are we talking about?

15     MR. LoCOCO:  583 was the OSHA production.

16  There's a different number for this thing.  I thought that

17  was --

18     THE COURTROOM DEPUTY:  I didn't have a 583.

19     MR. LoCOCO:  The exemplar wheel assembly is 582.

20  I thought you said 583.

21     THE COURTROOM DEPUTY:  No.  But we do have a 583?

22     MR. LoCOCO:  Yeah, but we didn't put it in.

23     THE COURTROOM DEPUTY:  Right.  We kind of brought

24  it up and came right back down I think.  We didn't do

25  anything --

1          MR. LoCOCO:  582, they just have a picture of

2     that thing.

3          THE COURTROOM DEPUTY:  That's everything I have.

4          MR. LoCOCO:  So we just have to get you 501,

5     pages 1 and 12.

6          THE COURTROOM DEPUTY:  505.

7          THE COURT:  As to Plaintiff, was there an exhibit

8     that you believe was marked, admitted, and supposed to go to the

9     jury that was not referenced by the clerk?

10          MR. ABBOTT:  We don't, Your Honor.

11          THE COURT:  All right.  And same is true for

12     Defense?

13          MR. LoCOCO:  Correct.

14          (Recess from 3:00 p.m. to 3:31 p.m. )

15          THE COURT:  All right.  We're back on the record

16     in Anderson v. Raymond.

17          The defendant has shared a revised copy of the

18     proposed jury instructions in light of the hearing that we

19     conducted, but Plaintiff wants to be heard on a matter.

20          MR. ABBOTT:  Yes, Your Honor.  There was a change

21     that was made to the revised one.  Obviously, my notes were

22     based on the combined.  I hadn't had a chance in detail to look

23     at all the revisions of all the changes they had made.

24          But there's an issue with Instruction Number 23.

25     So Defendant's original Instruction Number 23 as relates to the

1    pedal design included this language, an operator compartment

2    design that didn't -- that part of our -- one of our theories

3    was that an operator compartment design that did not disconnect

4    the power to the forklift or apply the brakes when

5    Ms. Anderson's left foot went outside the operator compartment.

6    And that's based on the violation of the B56.1 Standard,

7    Section 7.20.2 that Dr. Meyer testified about, testified that it

8    violated that standard, and also testified that had they -- in

9    violation of what the industry practice is, and also had it

10   complied with that standard, that this accident would have been

11   prevented.

12            The language on the revised version simply

13   changes that to a second deadman pedal, rather than the language

14   that actually addresses the specific section of the B56.1

15   Standard that is at the heart of our defect theory as relates to

16   the pedal design.  And so we feel that the -- that that language

17   should be changed to reflect what our actual claim is, which is

18   the reason why it was a design defect, is because they violate

19   this industry standard and that violation caused Mrs. Anderson's

20   injuries.

21            THE COURT:  Well, is that language in your

22   complaint?  I think the language in the complaint suggests that

23   your theory was that the -- it didn't have two pedals.  I

24   understand what you're arguing.  Is that specific language in

25   your complaint?

1      MR. WARSHAUER:  Well --

2      MR. MURPHY:  Paragraph 76, Judge, in the

3  complaint.

4      THE COURT:  All right.

5      MR. LoCOCO:  It doesn't.

6      MS. HEITKAMP:  It doesn't say that.

7      MR. MURPHY:  It doesn't say that.  What I'm

8  saying is the language is Paragraph 76.

9      THE COURT:  All right.  Go ahead.

10      MR. WARSHAUER:  Well, Your Honor, first off, we

11  do -- even though it's a very long complaint, it is noted in the

12  pleading.  More importantly, it's going to be to be conformed to

13  the evidence.  Here the evidence is that -- our complaint is

14  that this forklift failed to stop or failed to have a power

15  disconnect secondary when the left foot left the operating

16  position.  So to the extent somebody gets to choose that

17  language, it ought to be the plaintiff.  What they want to do is

18  make it the most narrow of the various interpretations of the

19  evidence.  That's not fair to the plaintiff.  Dr. Meyer never

20  said it had to be two brakes.  He said comply with the industry

21  standards was one way, and we pointed out how the entire

22  industry has a left-foot brake.  And then he admitted they have

23  a sensor under the right foot, and that would have changed the

24  outcome.

25      Again, the point being we don't have to identify

1    specific alternative design.  What we have to use those

2    alternative designs, which we offered several, is to show that

3    the present design is unreasonably dangerous.  So we think that

4    as we originally wrote, that is the right way to do it.

5              Right?  Isn't that our argument, Jasper?

6              MR. ABBOTT:  Yeah.

7              MR. WARSHAUER:  I've got to check.

8              THE COURT:  All right.

9              MR. MURPHY:  Judge, just two -- I'll say just two

10   things.  First, when they say that this is changing, we didn't

11   change this today after we went through this.  That didn't

12   happen.  We start out with the complaint.  That is the -- we use

13   the language from the complaint.  But Dr. Meyer's testified, and

14   that was his preferred method of altering the problem.  And yes,

15   you do have to have an alternative design.  You can't just say

16   that, "Well, you know, you've got to make this thing stop

17   immediately."  Nothing can stop immediately.  And his preferred

18   design, in his transcript, at page I think it's about 68, that

19   is his only alternative.  That's what this expert said.  His

20   alternative.  That's the testimony.  A two-pedal design.  Yeah.

21   That's --

22             MR. WARSHAUER:  He never said that was his

23   alternative design.  And the fact that he --

24             MR. MURPHY:  Judge, it's in the record.  We've

25   got the transcript.  I read this stuff last night.  That's what

1    he said.

2                    THE COURT:  I'll let you --

3                    MR. WARSHAUER:  He offered multiple options.  The

4    jury can choose from the various options they heard.  The

5    problem with what they've suggested, it traps the jury, and

6    basically is a find by the Court that there's only one option,

7    one thing that can make it unreasonably dangerous.  They don't

8    have to believe Dr. Meyer, even if he said "I only agree with

9    one design," which he didn't.  But he also altered -- offered

10   the entire industry does it a different way, and they can say

11   that's evidence of the unreasonable danger, but you can't just

12   trap us into one.  The jury gets to choose from the totality of

13   the evidence.

14                   THE COURT:  Well, he did testify that he

15   preferred that both feet be sensing a deadman brake, but he

16   didn't limit himself to that.  He did say that if the -- the

17   right foot should be sensed to something, not necessarily a

18   deadman switch, but the left foot should be sensed to a brake.

19                   Now I interpret the way we're going is kind of

20   late in the game.  There were more discussions about the laser

21   and the lights that could be used to sense something exiting the

22   compartment, the operator compartment, and that that would

23   trigger a brake to depress or could trigger a brake to depress.

24   And the question is, can the jury -- should a jury be allowed to

25   consider that in light of what was in the pleadings or not in

1    the pleadings, and is this a new theory that is introduced at

2    trial?  As opposed to something the defendants were properly put

3    on notice of and the like.

4                 MR. WARSHAUER:  Well, I don't think --

5                 THE COURT:  Doesn't it come down to that?

6                 MR. WARSHAUER:  No, it was never new.  Absolutely

7    not new.  Throughout his Rule 26 report and deposition, he

8    talked about the Crown design as a design that would have

9    changed this outcome.  Then he said -- and talked about how the

10    entire industry uses a design similar to that, the brake under

11    the left foot.  No question he did.  And the jury heard that

12    testimony.  They even saw all the logos of all the various

13    companies that do it that way.  And he talked about the Crown

14    design is actually that -- he actually shows on his report, this

15    is the Crown design.  This is the Raymond design.  If it had

16    been the Crown design, we'd have a different result.  So the

17    Crown design doesn't have two brakes --

18                 THE COURT:  All right.  You're good on the brake

19    issue.  I'm asking specifically now about this -- the lasers

20    that would detect movement outside the operating compartment

21    while it's moving, and that that sensoring would have triggered

22    the braking mechanism earlier and so that that would have had a

23    different outcome.

24                 MR. WARSHAUER:  Well, I --

25                 THE COURT:  It's not specifically in the

1    pleadings.

2              MR. WARSHAUER:  No, it is not.

3              THE COURT:  So I have two questions.  Parties are

4    allowed to amend their pleadings to conform with the evidence,

5    even at the close of the evidence.  But you're saying that that

6    is included in the -- his Rule 26 report and that he was

7    questioned about it and cross-examined about it when he

8    submitted the deposition?

9              MR. WARSHAUER:  And the pedals, absolutely.  With

10   respect to the OCSS, the Operator Compartment Sensing System,

11   the pleadings sort of automatically are adjusted to fit the

12   evidence when it comes time for the jury instructions.  The jury

13   instructions have to match the evidence the jury heard.  And

14   here what the jury heard was that there was other alternatives.

15   And again, we don't have to prove a specific alternative.  What

16   we use the alternatives for under Illinois law is to show the

17   unreasonableness of the danger.  So we offer multiple

18   alternatives.

19              But the language that we are championing here, an

20   operating compartment design that did not disconnect the power

21   to the forklift or apply the brakes when Mrs. Anderson's left

22   foot went outside the operator compartment, is both consistent

23   with the law and the evidence the jury heard.  And that's why we

24   think that's what we should get, as opposed to the defendant

25   wanting to trap us into two brakes, which we never said was the

1    only one to do this.

2              MR. LoCOCO:  The biggest problem with the

3    language they want, Your Honor, is this notion that it's,

4    disconnect the power or apply the brake.  And I don't care

5    whether you're talking about a laser or a switch under the left

6    foot.  I mean, this gets to the problem, that they never proved

7    causation.  There is no one who has testified that Raymond's

8    Operator Compartment Sensor System or Crown's Operator Sensor,

9    you know, Present Sensor System would have made one wit of

10   difference.  Mr. -- Dr. Meyer testified that if you switched the

11   Crown, the Operator Present Switch under the right foot and the

12   pedal on the left foot -- I mean, that was his testimony a month

13   ago.  That's what you needed to do.  Here it was.  You got to

14   make them both brakes.  Right?

15             So their language that says that we didn't have a

16   design that disconnected the power circuit is irrelevant to the

17   happening of this accident.  They have not tied it to

18   Mrs. Anderson's accident.  And again, it gets back to this time

19   motion study.  How fast is it stopping if it's just

20   disconnecting the power and coasting?

21             MR. MURPHY:  Judge --

22             THE COURT:  The only video we saw of someone

23   stopping a moving forklift was in the training video.  And

24   the -- as soon as the operator lifts his right foot, the thing

25   stops.  It doesn't coast for another 10 feet.  It doesn't coast

1    for another 5 feet.

2              MR. LoCOCO:  It --

3              THE COURT:  It doesn't coast for another foot.

4              MR. LoCOCO:  It depends on the speed, Your Honor.

5              THE COURT:  I understand that.  You also have the

6    issue of the -- you do have Rodowicz today who avoided trying to

7    allow for maneuvers that the plaintiff may have made to try to

8    regain her balance in the process of falling.  And the video was

9    very clear.  It just shows a step out with -- at the moment the

10   foot lands, her left arm is down by her side.  You don't have --

11   she doesn't say, "Well, I factored in that maybe she was able to

12   hold on a little bit with the tiller while it turned, or maybe

13   she could have grabbed something else."  Or if she did grab

14   something, would that have actually changed where her left foot

15   actually ends up?

16             If she's trying to hold on with her left hand,

17   does she move her foot more towards the drive wheels?

18   There's -- a lot of people are speculating -- I shouldn't say

19   "speculating."  But they're offering what they think are the

20   most plausible ways this could have happened.

21             I've heard more than one plausible explanation of

22   how this accident sequence could have happened, enough that a

23   jury could conclude that the accident scenario, what happens to

24   her from the moment her left foot starts to leave the operator's

25   compartment and when it actually is caught up in the wheel is --

1    I mean, you guys are going to be able to argue that.  But there

2    are plausible variations.

3         You also have the fact that this -- 10 feet, it

4    didn't run over and keep running over her leg.  It stopped

5    before it got to her ankle.  There's a distance of whatever that

6    foot is, the length of her foot, and it's not 5 feet or 10 feet.

7    Nobody offered an explanation how -- if she got to a point where

8    she was so rigid, where the forklift, instead of continuing to

9    crush, just merely pushes her butt and leg and foot along until

10   it eventually comes to a stop.

11        Now getting to the issue that's at hand, can the

12   plaintiff -- is the plaintiff entitled to an instruction that

13   says that their theory is, it should have been designed so that

14   however it was designed -- and we threw out a bunch of different

15   ways you can do it, but as soon as her left foot leaves the

16   operating compartment, the machine should have at that moment

17   started the process of stopping itself.  And it's not until her

18   right foot comes off the brake, the deadman switch, that the

19   forklift starts to stop itself.

20        So the way I'm looking at it is, is one, there's

21   an issue of pleadings.  The pleadings are fairly specific.  And

22   then the second thing is, was there a fair disclosure about

23   these opinions that would allow the plaintiff disclosure in the

24   Rule 26 that was covered when he was deposed, and that it would

25   not be unfair to allow the plaintiffs at the close of their

1       evidence or close of the case to amend their pleadings to have

2       this kind of broader notion.  That's what I'm focusing on and

3       thinking about.  What's the proper language of this instruction?

4       I don't think it's proper to say that the only theory they have

5       is that both the left and the right foot had to have braking

6       sensors under -- or deadman switches under both feet.

7                    So I'm going to allow a -- I'm going to allow a

8       change to that.  The question is, am I going to make it as broad

9       as what the plaintiff has offered?

10                   So back to you, Mr. LoCoco.  Now that you've had

11      the benefit of at least where I'm going with it, of either

12      disabusing me of that notion or highlighting why it would be

13      unfair to give this broader instruction.

14                   MR. LoCOCO:  Yeah.  So I guess there's agreement

15      on what's in the pleadings.  On the issue of the Rule 26 report,

16      as you can imagine, you work very hard to get a professional

17      expert witness to be pinned down.

18                   THE COURT:  Right.

19                   MR. LoCOCO:  And I worked very hard to try and

20      get Dr. Meyer pinned down on this issue, because I used this

21      example in my opening statement.  They could think that the

22      truck's defective because it's red.  If it's got nothing to do

23      with the accident, who cares?  Right?  So in discussing with

24      him, even here on the stand, this issue of 70.20.2 [sic], all

25      that says is you got to disconnect the travel circuit, meaning

1    it will coast.  No brake.  And he then went on to say, "That's

2    not what I want.  I want brakes under both feet so that no

3    matter which foot leaves the compartment, the brake comes on."

4    That's their claim.

5              Now he talked about it in terms of two pedals.

6    He did not talk about it in terms of using Raymond's OCSS,

7    Operator Compartment Sensor System, but with a tweak to it.  You

8    know, let's use Raymond's OCSS, but let's say when you break the

9    laser, the brake comes on, because that's not -- as Mr. Kerila

10   explained, that's not how it works.

11             So they have always been, no matter which foot

12   comes up, the brake comes on, and that's why we wrote it the way

13   we wrote it.  This language that, you know, we had to have

14   something that disconnected the travel circuit is not their

15   claim.  Their claim is that no matter what foot comes up -- call

16   it a pedal, a switch, you know, call it an ice cream cone, I

17   don't care -- the brakes come on.  That's what they need for

18   their case, and that's the proof that they tried to put into the

19   case, and that's why we wrote it the way we wrote it.

20             And I don't know how the language gets changed in

21   a way that takes into account the pleadings, the Rule 26 report,

22   and most importantly, what we heard here in court, which is he

23   wants brakes under both feet, and it's his view that a brake

24   under the left foot, however it's done, would have prevented

25   this injury.  I mean, we disagree with that, but that's his

1  opinion.

2  THE COURT:  All right.  Back to you.

3  MR. WARSHAUER:  I just really think that what

4  they're trying to do is unfairly trap us into the most narrow

5  reading of the evidence.  It is for the jury to decide from the

6  entirety of the evidence whether we've proved our case.  And

7  charging them in a way that is a little broader than just

8  knocking -- narrowly tying us to two brakes is consistent with

9  the law.  It's consistent with the facts that the jury heard.

10  At the end of the day, the most important thing about a jury

11  instruction is not what somebody pled to years ago before

12  motions in limine were granted and all -- before experts were

13  involved.  At the end of the day, the most important thing for a

14  jury instruction is to correctly instruct the jury to -- with

15  what they're supposed to do with the evidence they heard.

16  And here what they're supposed to do with the

17  evidence they heard is decide whether the present design is

18  unreasonably dangerous.  And the proposal that we have always

19  had allows them to do that, whereas theirs is a prejudgment that

20  only one of the many things the jury heard is the one they can

21  do.  And I think that's the Court getting into the jury's

22  business.  It's certainly the defendant trying to do so.

23  MR. LoCOCO:  Your Honor, you've said this a few

24  times during this discussion of the instructions today.  Nobody

25  wants to -- nobody wants to retry a case over an instruction.

1    What about this.  I'm suggesting that we modify the plaintiff's

2    language, which is kind of where I think the Court was going

3    anyway, so that the language then says, "An operator compartment

4    design that did not apply the brakes when Mrs. Anderson's left

5    foot went out of the operator compartment."  That's their claim.

6                    MR. WARSHAUER:  I can live with that.

7                    THE COURT:  Done.  Done.

8                    MR. LoCOCO:  Make sense?

9                    THE COURT:  I'll grant that.  That modification

10   is fine.  I think it addresses your objection.  It makes it --

11   yeah.  All right.

12                    MR. ABBOTT:  Thank you, Your Honor.

13                    MR. WARSHAUER:  Our work here is done.  See you

14   in the morning, Judge.

15                    MR. LoCOCO:  Thank you.

16                    THE COURT:  Pat's saying no.

17                    MR. MURPHY:  I think until everybody says the

18   instructions are agreed on and the Court says this is how the

19   jury will be instructed -- at 9:15, somebody will come in and

20   say, "I thought of this, Judge."

21                    THE COURT:  Why don't you send that language --

22   we're just doing one.  If they see it and they say it's fine,

23   then I think we're done.

24                    (Recess at 3:55 p.m.)

25

° ° ° ° ° ° ° ° ° ° °

### COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 21st day of December, 2021

/s/ Hannah Jagler
_____

Hannah Jagler, RMR, CRR, FCRR
Official Court Reporter