IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

---------------------------------------------------------------
ADELAIDA ANDERSON and JEFF ANDERSON,   |
                                       |
                    Plaintiffs,        |
                                       |
v.                                     | Case No. 19-cv-800-SPM
                                       |
RAYMOND CORPORATION,                   |
                                       |
                    Defendant.         |
---------------------------------------------------------------

Transcript of Jury Trial - Volume VIII
November 10, 2021

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East Saint Louis, Illinois

---------------------------------------------------------------

**REPORTED BY:**       **HANNAH JAGLER**, RMR, CRR, FCRR
                   Official Court Reporter
                   750 Missouri Avenue
                   East Saint Louis, Illinois 62201
                   618-482-9481
                   Hannah_Jagler@ilsd.uscourts.gov


Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES**:

FOR PLAINTIFF:     **MICHAEL J. WARSHAUER**
**JASPER V. ABBOTT**
Warshauer Law Group, PC
2740 Bert Adams Road
Atlanta, Georgia 30339
404-892-4900
Mwarshauer@warlawgroup.com
Jasper@warlawgroup.com

**FRANK J. McCOY, JR.**
McCoy & McCoy, LLC
20 Church Street, Suite 1720
Hartford, Connecticut 06103
860-244-9100
Frank@mccoymccoy.com

**RYAN E. BRENNAN**
Brennan Law Firm PC
19 Bronze Pointe
Belleville, Illinois 62226
618-236-2121
Ryan@feladlc.com

FOR DEFENDANT:    **FRANCIS H. LoCOCO**
Husch Blackwell LLP
555 East Wells Street, Suite 1900
Milwaukee, Wisconsin 53202
414-978-5305
Frank.lococo@huschblackwell.com

**G. PATRICK MURPHY**
Murphy & Murphy, LLC
3415 Office Park Drive, Suite D
Marion, Illinois 62959
618-248-3236
Gpatrick@murphymurphyllc.com

**MARGARET KATHRYN HEITKAMP**
Husch Blackwell LLP
511 North Broadway, Suite 1100
Milwaukee, Wisconsin 53202
414-978-5373
Margaret.Heitkamp@huschblackwell.com

1

### <u>INDEX</u>

2                                                                      **PAGE**

3

4      Closing Argument By Mr. Warshauer....................... 1127

5      Closing Argument By Mr. LoCoco......................... 1149

6      Rebuttal By Mr. Warshauer.............................. 1180

7      Closing Instructions................................... 1189

8      Verdict Read........................................... 1207

9      Jury Polled............................................ 1208

10

11

12                          <u>**INDEX OF EXHIBITS**</u>

13

**NO.  DESCRIPTION                                    ID'D   RCV'D**
14          None........................................

15

16

17

18

19

20

21

22

23

24

25

1   **TRANSCRIPT OF PROCEEDINGS**

2   (Proceedings commenced at 9:08 a.m.)

3   (Jury enters at 9:08 a.m.)

4   THE COURT:  All right.  Please be seated.

5   Good morning, everyone.  The evidence and

6   testimony has been submitted.  We're at that stage of the

7   proceedings for final argument.  The plaintiff gets to go first.

8   Defense then goes.  The plaintiff gets to make a rebuttal

9   argument because the plaintiff has the burden of proof.

10   So what you're about to hear is argument.  And if

11   they argue something that -- or suggest something is a fact that

12   isn't, you should disregard it.  You should base your

13   evidence -- or base your decision on the facts of the case as

14   you understand them.  They certainly are able to argue what one

15   can reasonably draw from the evidence that you've heard.  And

16   this is an important matter, and I'm going to give the lawyers

17   the opportunity to spend not insignificant time making their

18   arguments to you.

19   So, Plaintiff, ready to proceed?

20   MR. WARSHAUER:  We are, Your Honor.

21   THE COURT:  All right.  Defense?

22   MR. LoCOCO:  Yes, Your Honor.

23   THE COURT:  All right.  Please proceed.

24   MR. WARSHAUER:  Good morning.  My name is Michael

25   Warshauer.  And I'm proud to represent Lidy and Jeff Anderson

1     and I'm proud to represent families like it, my friends, my

2     neighbors, people I know, people we all know who work in

3     warehouses.  I'm proud of my role in helping make their job

4     safer, and making it more likely that they'll return home to

5     their loved ones whole.

6                    What you do matters.  I don't know if y'all have

7     noticed this, but every human in this courtroom stands up when

8     you come into this room.  This is a big deal to me.  The Seventh

9     Amendment of the Constitution of the United States says we have

10    a right to trial by jury.  You are part of the constitution of

11    the United States.  Judge McGlynn stands up for you.  You are

12    unbelievably powerful and important.  You can right a wrong.

13                   You can make decisions that make warehouses

14    safer, that make factories safer, that make forklifts safer.

15    What we do here protects our friends and families, and their

16    friends and families.  You can tell the Raymond Corporation that

17    words are not enough, that action matters.  And you can ensure

18    that what they took away through their design choices from Lidy

19    and Jeff Anderson and their family, they have to pay for it,

20    completely and entirely.  Not any more.  Not any less.

21                   Now I told you at the beginning of this case that

22    our focus would be on two design choices.  We never wavered from

23    that.  All of my testimony that we elicited focused on those two

24    design choices.  First one was a choice that allows a forklift

25    to keep moving when the operator is out of it, and the second

1    one is there's no guard over the wheel.  And I told you that

2    what we would do together is decide whether those were

3    unreasonable dangers.

4              And what the judge is going to tell you, as I

5    mentioned in my opening and as I mentioned when we were choosing

6    the jury, for us to establish that it's an unreasonable danger,

7    we just have to prove that it's more likely true than not that

8    their design choices were unreasonable and that their design

9    choices caused Lidy and Jeff's injuries.

10             Now when we think about more likely true than

11   not, you can think of the scales of justice, just enough to tilt

12   a reasonable mind one way or the other.  But a fellow who taught

13   me how to try cases, my first boss, if you will, lived in

14   Alabama.  And you could imagine that everything he had had a big

15   "A" on it for Alabama, so all of his analogies were football.

16   And he said, "Mike, you just have to get the nose of the ball

17   over the 50-yard line."  "So, Mr. Birch, we don't have to score

18   a touchdown?"  "That's not the law."  "Mr. Birch, we don't have

19   to get a first down?"  "That's not the law.  We just have to

20   tilt the scales ever so slightly."  We did that in this case.

21   And then we scored first downs, and then we got long passes, and

22   then we scored touchdowns, over and over.

23             The forklift keeps moving after the driver is out

24   of the compartment.  That's a danger.  There's no guard over the

25   wheel to prevent it from crushing an operator's foot.  That's a

1   danger too.  I reminded you in the opening that one of the

2   things I wanted you to bring to this courtroom is your common

3   sense.  Does it make common sense that Lidy would lose control

4   for no reason and then jump off a forklift for no reason,

5   backwards?  Does it make common sense that an entire industry

6   does it one way, but Raymond's the right one?  Does it make

7   common sense that when there's a written standard on how to do

8   something, Raymond gets to do it different from everybody else?

9            Now the law gets -- allows you to make

10  inferences.  Nobody watched this happen.  There's no video.

11  Sometimes there's video in warehouses and we can see it happen.

12  We can see the loss of balance and fall out and watch this

13  forklift run over them.  But in this case, what we have is

14  inferences.  We know there were cracks.  We know cracks cause

15  shaking.  We know shaking causes balance responses.  We know

16  balance responses cause people's feet to move.  We know when

17  people's feet move, one of the things they might do is move too

18  far to the left automatically and unknowingly.  And we know that

19  if someone is falling to the left, they'll grab controls to try

20  to salvage their lives.  And we know that will occur with the

21  forklift.  Those are all reasonable inferences from these facts.

22            So what we're going to have before you is this.

23  Yours will be smaller than this one.  It's called the verdict

24  form.  And what you have to do is read these questions as a

25  group, consider the evidence, what we're going to do in the next

1    few minutes, and then answer them.  So the first one is, "Do you

2    find that the forklift manufactured by the Raymond Corporation

3    that was being operated by Adelaida Anderson when she was

4    injured on July the 29th of 2017 at the FedEx warehouse at

5    Effingham, Illinois, contained an unreasonably dangerous

6    condition as claimed by the plaintiffs that existed at the time

7    it left the control of the Raymond Corporation?"

8         Couple things.  We don't have to prove that both

9    things were dangerous.  Either one is good enough, and I told

10   you that at the beginning.  And the other is, "at the time it

11   left control."  That's stipulated.  There were no changes.  So

12   we're -- those are the sort of rules as we consider this.  And

13   what the judge is going to tell you is that when you use the

14   expression "unreasonably dangerous," the risk of danger inherent

15   in the design outweighs the benefit of the design when the

16   product is put to use that is reasonably foreseeable.  It's

17   reasonably foreseeable she will drive over cracks.  It's

18   reasonably foreseeable that she will go down and find herself

19   out for a variety of reasons.  As I said in the opening, it

20   could be any reason from a bee sting to a heart attack.  This

21   machine needs to stop or bad things will happen.  So that's the

22   definition of unreasonably dangerous.

23        Do they have a good reason for the danger?  I

24   think we all know it's dangerous if a machine continues to move

25   when you're out of it.  Did they have a good reason?  We all

1    know that if there's an unguarded pinch point, a wheel that is

2    spinning in a location where somebody might be, that's a danger.

3    But do they have a good reason?  We're going to talk about that.

4            Another part of the instruction the Court is

5    going to give you talks about -- and you'll have this language

6    back with you -- "Was it unreasonably dangerous in one or more

7    of the following aspects."  Remember, it doesn't have to be

8    both.  One or more.  So we have to identify two:  An operator

9    compartment design that did not apply the brakes when

10   Mrs. Anderson's left foot went out of the compartment, and/or --

11   really could be "or" -- a steer wheel design that did not have a

12   guard to prevent Mrs. Anderson's foot and leg from being run

13   over by the forklift.

14           And of course Jeff Anderson claims damages and

15   we're going to talk about that in a moment.

16           The Raymond Corporation not only denies this --

17   you know, it's one thing for Raymond to say, "Look, we tried to

18   make a safe product."  I understand that.  Manufacturers don't

19   want to admit their products are dangerous when they have 31,000

20   of them out there with the same danger for sure.  But, you know,

21   it's another level of badness in my opinion, it's another level

22   of wrong, to then blame the plaintiff, to blame the person you

23   injured, with no facts, no reasonable inferences from facts.

24   Just to say, "Well, it's her fault.  Let us go."

25           But let's look at the what the actual facts are.

1    These are the facts I promised in my opening that we would

2    prove, and I think we did.  I said that we would introduce you

3    to the B56.1 Standards, and I said that these would be

4    identified as things that bound the Raymond Corporation.  And

5    indeed Mr. Kerila said, "Yes, we have to comply with standards

6    that use the word 'shall.'  We have to do that."

7                    But you know what he didn't say?  You never heard

8    him say they did comply with 7.20.2.  Never heard those words.

9    And what's interesting is, Mr. Rogers told us how he was a

10   member of the committee and he's been working for Raymond since

11   the '80s, but even he wasn't willing to go that far and say this

12   forklift complies with that standard.  He said, "Oh, it complies

13   with these standards."  We were here to talk about 7.20.2.

14   Everybody knew it.  But he couldn't say the words because it

15   wouldn't have been true.

16                    You know, we didn't hear it from Mr. Rogers,

17   Mr. Kerila.  That's okay.  But we didn't even hear it from

18   Dr. Rhoades.  Dr. Rhoades doesn't have a long-term relationship

19   with these people.  He didn't say it either.  But what's

20   interesting about Dr. Rhoades, he wasn't even asked to look at

21   safety.  "What were you asked to do?"  "Comfort."  Did I say

22   comfort was an issue in this case?  That's what they wanted to

23   talk about.

24                    And we didn't hear it from Dr. Rodowicz.  She's a

25   bright woman.  She's been doing this a long time.  Can't even

1    remember how many times she's testified or her company's

2    testified in left-leg amputation cases.  She couldn't say it

3    either.

4         So how do people comply with this standard?  This

5    is what Raymond built, 157, and this is the way other

6    manufacturers comply.  They put a pedal under the operator's

7    left foot, and that pedal applies the brake.  Standard doesn't

8    say it has to apply the brake.  But what we know is an entire

9    industry has decided that the right way to comply with 7.20.2 is

10   to put a brake under the left foot.  Entire industry.

11        Now why do we know that's relevant, what the

12   entire industry does?  Because remember, when I asked Mr. Rogers

13   and Mr. Kerila, "Who gets to decide whether you comply with

14   these standards or not?"  And they both said, as did Dr. Meyer,

15   if I recall, they all said, "Well, the manufacturer gets to

16   decide."  I said, "There's no outside entity that gets to

17   decide?"  "No."  "No government entity?"  "No."  "There's nobody

18   who comes and checks that forklift before you ship it to see if

19   it complies with B56.1, 7.20.2?"  "No."

20        So where do we look to see how everybody else

21   interprets that and how they interpret it?  We look at what

22   other manufacturers do, and they universally apply left-foot

23   brake.  Don't you know if I was wrong on that point, don't you

24   know if I was wrong on that point, Raymond would have come and

25   said, "We're not the only ones.  Look, there's the ABC Company

1    and the XYZ Company."  They didn't do that because that fact

2    doesn't exist.  They are alone in their choices, and we know the

3    consequence of that choice.

4              The Raymond Corporation's design allows their

5    forklift to keep moving after the operator is out.  And the

6    Crown, Unilever, Nissan, Mitsubishi, Jungheinrich, Linde,

7    everybody, stops that forklift the fastest way possible when

8    that operator gets in danger.  And they didn't challenge that

9    evidence at all.

10             You know, later on in the case, as the case moves

11   forward, Dr. Rhoades talked about something about a feature

12   brochure, and it reminded me, maybe there's other ways you can

13   get this thing to stop.  Because remember, our complaint is it

14   keeps moving after you're out.  So what did they tell us about?

15   They told us about this laser system that they've had.  Now

16   what's interesting is they've had this laser system since 1980.

17   It's a patented device.  They just decided not to put it on

18   because they don't want to acknowledge that people might get

19   off.  What they want to do is say, "Hey, we gave you a book.

20   You're on your own."  That's not enough.  That's not enough.

21             That patent says, in the abstract, this can be

22   designed to apply the brake.  Since 1980, they've had that, and

23   they chose not to do it.  And they chose not to do it the rest

24   of the industry does.  What they chose to do is put comfort so

25   far ahead of safety that they have blinders, even the

1    possibility that a human being will be a human.

2                  So the next question we have is, did it matter?

3    The violation's kind of easy with respect to the pedal.  The

4    next question is, does it matter?  So let's take a look at what

5    happened.  What you're seeing now is this 10-foot arc.  Mike

6    Rogers told us this.  He and Dr. Meyer were basically in

7    agreement as to this last 10 feet.  There was a curve.

8    Mr. Rogers even said if someone falls out, if they pulled on

9    that -- on the -- I'm sorry, as they fall to their left and pull

10   on that control, they could cause this very curve.  So that's an

11   explanation for the curve.  The best explanation for the curve

12   is, as she's falling out, struggling for a second and a half or

13   so, struggling to keep this thing from getting her, as any of us

14   would, as any human would.  This is what happened.  The forklift

15   came and got her.

16                  At the end of this, you'll see red.  That's the

17   15 inches that matter.  If the forklift never gets to that

18   15 inches, it never gets to Lidy.  How do we know this?  Well,

19   Dr. Kerrigan and Dr. Rodowicz didn't agree on everything,

20   although they did agree on the important stuff, which is the

21   left foot was crushed by the wheel.  They did also agree on

22   this.  Lidy didn't have an interaction with that wheel until

23   right before the forklift came to stop.

24                  You'll recall Dr. Kerrigan says, "I can tell from

25   the rotation, it could not have been more than 15 inches."

1   Well, I put 15 inches here.  That's the most it could have done.

2   And I asked Dr. Kerrigan, "How many revolutions?"  She said, "I

3   don't know."  She knew.  But if she said what Dr. Kerrigan said,

4   the problem is, she places Lidy down here at the very end, and

5   if the forklift didn't get to her, why is she here?  Because her

6   goal was to convince you that the forklift was going to get to

7   Lidy no matter what and that Lidy intentionally stepped off this

8   forklift.  Didn't leap off.  Stepped off backwards.  "Oh, my

9   gosh, I'm in an emergency situation that I could have stopped by

10  plugging or I could have stopped by putting the brake or I could

11  have stopped by steering.  But no, I'm not going to choose those

12  obvious choices.  I'm going to step off backwards into the path

13  of this forklift."  That's Dr. Rodowicz's testimony.

14          But let's think about what would have happened if

15  the brake had been applied.  Not at the very end, because we

16  know that the brake was applied 6 feet from the end, 5 feet of

17  stopping and 1 foot to get it started; right?  That little delay

18  that Rogers told us about.  So we know that's -- takes 6 feet.

19  What if she has the shaking, the foot comes out, and the brake

20  starts back there?  Where does that forklift end up?  There's

21  never an interaction.  There's never a danger.  She's protected.

22          There's a violation, and there's a cause of the

23  injury caused by that violation, shown by the mathematics and

24  testimony of not only Dr. Meyer who we brought to you -- and by

25  the way, let me just mention, I brought Dr. Meyer because I

1    think he's the smartest guy in the room, and I wanted somebody

2    who would give us that kind of independent thought.  And I

3    brought Dr. Kerrigan because I think he's one of the smartest

4    guys in the room.  He wasn't a professional witness.  You know,

5    he said, "I'm not -- I'm just not -- you know, that's curious to

6    me.  I'm not -- I just don't know how it can happen that way."

7    It wasn't, "It must happen this way."  Real scientists, real

8    people who have an open mind, recognize that things are

9    complicated.  And I brought you Dr. Jeka to explain that loss of

10   balance can occur, not because somebody gets a violent force

11   against them, but because our automatic system, a system

12   Dr. Rodowicz didn't even understand, can just cause us to move

13   our feet.  We move our feet all the time.  We don't even think

14   about it.  And I wanted you to understand that.

15              Let's go to the next thing.  Remember, I said

16   we're going to look at two design issues.  What's the other

17   design issue?  The other design issue was the unguarded wheel.

18   Simple fix.  Simple fix.  Put a guard there.  And what was their

19   reason for not putting a guard there?  Was it a reasonable

20   reason?  I mean, sometimes people have a reasonable reason for

21   danger.  You know, what was their reason?  Well, gosh, in the

22   morning, it might slow you down when you do your inspection, to

23   have to look over that guard through that hole.  I mean, you

24   might do that.  But then he went on to say, "You know, you just

25   really have to look at the wheel and drive it.  You don't feel

1    if there's a chunk."  So that's not even a real reason.

2              The next reason was, well, it might make it a

3    little less convenient to change the wheel.  If you change the

4    wheel every hour, that might be an argument.  The wheels go

5    months at a time without being changed.  And all you do is

6    unbolt the guard.

7              The third reason is, well, the wheel comes out a

8    little bit.  That's their design choice.  I'm not retrofitting

9    their machine.  This should have been thought about before this

10   machine left the factory in 2014.  It's a simple fix.

11             But how do we know it would have made a

12   difference?  Well, Dr. Kerrigan told us it would have made a

13   difference.  But you know, yesterday -- I hope you guys were

14   watching the same slideshow I watched.  Yesterday, Dr. Rodowicz

15   showed us some slides.  And what she told us was, "First thing I

16   did is I scanned the forklift, then I scanned the shoe, then I

17   scanned the human, then I put them together, and I learned some

18   things."  You might recall, I said, "Dr. Rodowicz, are those

19   things really accurate?"  And you might have been wondering,

20   "Why is Mr. Warshauer trying to prove her drawings are accurate?

21   I thought he was supposed to be attacking her."  She said yes.

22   Okay.  I believe that Exponent and its 800 professional

23   engineers can probably do a pretty good computer simulation with

24   a laser scanner.  I have no reason to believe that it's not

25   accurate, but she confirmed it's accurate.

1    So what do we learn?  You'll recall these two
2    slides.  What she did is, the computer could look at her
3    surrogate -- that's what we're going to call the woman here --
4    can look at the surrogate from one side, and then it could
5    switch and look at the surrogate from the other side; right?  So
6    what we're doing here is one photograph is from this side.
7    That's on the left.  And the other photograph on the right is
8    from the right rear of the forklift; right?

9    What did we learn?  These are sequential and
10   they're matched.  When the -- she tells us that the right foot,
11   which you can see in the upper left picture -- she tells us that
12   the right foot hit the ground first.  Okay.  The right foot is
13   interacting with the forklift at the exact same level the guard
14   would be there.

15   Remember where the guard is?  The guard is at the
16   exact same level as the skirt of the rear of the forklift.  So
17   we know that what we see on the black is the same as where we
18   want to put the guard.  So we see over to the right, that right
19   foot has been hit by the apron.  The next frame down, the left
20   foot's in danger because there's no guard.  These feet are the
21   same size.  They belong to the same person.  And what do we see
22   on the right side?  We look in there and we go, "Wait a minute.
23   The forklift on the right-hand side, that right foot, which
24   wasn't injured, is being pushed backwards by the skirt of the
25   forklift."  And then you go to the very last photograph.  That

left foot has been eaten by this forklift wheel and that right
foot is not even harmed.  And you can see in the background the
wheel and you can see a gap between the toe and the wheel.

What does that teach us?  It teaches us if there
had been a guard, if there had been a guard, this foot would
have been pushed out of the way.  So was that an unreasonable
danger?  That would be for you to decide.  I think the answers
to those questions would be yes.

Next question you'll get, "If your answer to
Number 1 is yes, do you further find that the injuries sustained
by Adelaida Anderson on July 29th of 2017 while operating the
Raymond forklift were proximately caused by the unreasonably
dangerous condition of the forklift as she claimed?"  One of
those conditions.  And again, the answer is yes.

The next thing you're asked to do is, "If your
answer to Number 2 above is yes, do you find that Adelaida
Anderson failed to exercise ordinary care for her own safety in
operating the Raymond forklift as claimed by the Raymond
Corporation when she was injured on July 29th, 2017?"

We have a woman of impeccable skills who had a
response to an automatic balance adjustment by her body.  That
wasn't a conscious choice by her.  No one said she drove too
fast.  No one said that she handled the curve improperly.  No
one said that she didn't steer properly.  What they simply say
is this:  She jumped off.  That's their entire case.  She

stepped in front of the forklift for no reason.  If you think
that that doesn't make sense, then the answer to this question
is no.  She had nothing to do with the cause of her injuries
that weren't her fault.

The next question that you'll be asked is
Number 4.  You're going to skip Number 4 because she doesn't
have a percentage of fault.  And you're going to skip Number 5.

And that brings us to what we're going to talk
about in a moment:  Damages.  But before I get there, I want to
ask you, did the Raymond Corporation help us answer these
questions by focusing on what matters, or did they try to
distract us?  Let's think about their case.  Did it answer the
questions, or were they distractions?

First thing they told you, "We're just a small
mom-and-pop company owned by George Raymond in upstate New York
in the Finger Lakes district."  Mr. Kerila has worked there his
entire life, and when asked, "Isn't it true that you're actually
not a mom-and-pop corporation, but owned by one of the largest
industrial conglomerates in the world?"  He goes, "I don't know
who owns the company."  You know, if you can't believe people on
the little stuff, why believe them on the big stuff?

Then he told us about a seven-step process to
create the forklift.  They knew when they presented that
evidence to you and spent an hour of our lives talking about
this process, that evidence of good care, of their care in

1    creating the product, is not a defense.  It doesn't matter how

2    careful they are.  All that matters is whether the product at

3    the time it left their factory and was used by Lidy was

4    unreasonably dangerous.  Did it have one or either of those, one

5    or both of those defects?  They talk about a seven-step process,

6    but they don't even collect their accident reports.  They don't

7    call customers and say, "How many people have suffered left-leg

8    injuries?  We're interested in this."  They can't even tell us

9    how many of our family and friends and neighbors have suffered

10   similar injuries.  They're missing the eighth stage, which is,

11   make sure your product is safe once it's in the marketplace.

12            They distracted us by showing us a video of

13   forklifts going off loading docks.  They knew that wasn't

14   relevant to our interest.  I actually asked.  "Does this make it

15   more likely if we do -- if we comply with 7.20.2 like the rest

16   of the industry?  Or have a guard?  Will it make it more likely

17   to go off a loading dock?"  No.  It's a distraction.

18            The forklift is comfortable.  They actually paid

19   Dr. Rhoades $91,000 to prove it was comfortable.  We never said

20   it wasn't.  And they didn't even video it.  What are they

21   hiding?  Distraction.

22            They said there are no forces that would force

23   someone to lose their balance.  We never, ever said that she was

24   forced, as if the thing came to a dead stop at 20 miles an hour

25   and ejected her.  We never said that.  What we said is, in

1    foreseeable reasonable use, it's expected people will make

2    balance adjustments or fall out from bee stings or heart attacks

3    or maybe stupidity.  And they said that just never happens

4    because there's not enough forces.  Remember what Dr. Jeka said?

5    Forces don't matter.  What matters is what our spinal system is

6    thinking is necessary to keep us.

7               I've been moving around constantly.  My hands

8    move, my feet move.  I don't think about that.  It just happens.

9    We all know that.  None of us think how to ride a bike.

10   Remember Ms. Boone?  Said Lidy said she slipped.  And remember

11   what else?  Ms. Boone, this was -- Mr. LoCoco asked the

12   question, "You've never lost your balance, have you?"  Remember

13   she said, "Oh, yes, sir, I have.  Oh, yes, sir, I have."

14   Distraction.

15              They showed you videotapes that proved one thing,

16   that a forklift that is in perfect condition that is driven in a

17   manner that doesn't actually hit the cracks offers a pretty

18   smooth ride.  Lidy's forklift was worn out, but you know, they

19   know that.  They know forklifts get old.  You know, I got a

20   forklift -- a truck I drove up here, and I'm fortunate to have

21   two vehicles.  One is electric.  It's an electric car like

22   lawyers have.  I go over those things on the highway.  I don't

23   feel them.  That truck shakes, particularly when it's empty.  I

24   remember an F150 I had.  Loved that truck.  Probably should have

25   replaced the shocks when it had 200,000 miles on it, but

1  everything rattled your teeth.

2          We know that's the way things act when they get

3  old and that's why their experiment doesn't work, and it ignores

4  Lidy and it ignores Ms. Boone and it ignores all the other

5  people who said when you use forklifts at this warehouse, they

6  cause shaking.  Distraction.

7          Wood was on the floor.  She was thrown out.  You

8  know what, if that happened, I'm fine with it.  That forklift

9  still should have stopped and it still should have had a guard

10  and we still wouldn't be here if it had either of those.  But

11  Mr. Rogers, remember I asked him, "Why were we talking about

12  wood?"  We spent ten minutes on the wood.  He goes, "Well, it

13  doesn't have anything to do with this case."  It's a distraction

14  to get you off your game.  A distraction.

15          It's Mrs. Anderson's fault.  And I asked both

16  Mr. Rogers and Dr. Rodowicz, "Is it important to consider all of

17  the facts?"  And Mr. Rogers says, "Yeah."  I said, "Well, did

18  you consider this statement?"  "I didn't consider that."  "Did

19  you consider her experience and training?"  "I didn't consider

20  that."  I asked Dr. Rodowicz, "Oh, my gosh, did you consider her

21  expertise, her awards for safety, well trained, it was an easy

22  path, cracks that cause shaking, witness statements?"  And she

23  goes, "Oh, I wasn't even aware that someone had said she

24  slipped."  Didn't even consider it, but yet was able to come to

25  a conclusion.  Don't you know she had that fact?

1    But you see, if she put that fact into the

2    equation, it's a different answer.  So what do you do?  Throw it

3    out, pretend like you never heard of it.  She ignored the fact

4    that it could have stopped and easily steered away.  There was

5    no reason in the world for Lidy Anderson to jump out there

6    unless she was falling.  She would never have jumped out.  You

7    know at the end of the day, what they're doing is -- the Raymond

8    Corporation doesn't have the guts to actually say it.  But what

9    they are doing, they are looking at this woman and they are

10   saying, "Lidy Anderson, you are a liar."

11   So that brings us to, how do we answer this

12   question?  That leads us to this question, the most important

13   question.  You know, I would easily go over the bar with you and

14   help you answer the question, is it their fault, did they -- are

15   they unreasonable?  That's easy.  Coming up with numbers for a

16   human life and how it's changed?  That's really hard work.  And

17   that's going to tax you and you're going to argue about it, but

18   I want you to keep this in mind.  See, justice is not like

19   coffee.  Cup of coffee, a half a cup is still a cup of coffee.

20   Half a cup of justice is really no justice at all.

21   These are the numbers that we thought about:

22   $1,500,000 for disfigurement, $2 million for pain and suffering,

23   $2 million for emotional distress -- I'm sorry -- $3 million for

24   emotional distress.  Past medical expenses were stipulated to.

25   That's a number that's easy:  $870,776.  Medical expenses in the

1    future, that's what Life Care Planner Klosterman helped us

2    understand.  And don't you know, if her numbers were not right

3    and accurate, they would have come up with a witness to

4    challenge them.  That's $3,014,062.  And I understand all of her

5    numbers were conservative.  And I actually -- I will tell you I

6    dropped the ball.  I disappointed myself for not insisting on

7    prosthetics that will change her life, the best you can get.

8    And Mr. King told us those were sophisticated and we know

9    they're more expensive, and I didn't force these people to do

10   that, and I'm sorry about that.  But this is the lowest it can

11   go.  She has one leg.

12           Past earnings are $246,000.86.  Future lost

13   earnings -- and that's already been reduced, they've already

14   done that for us -- $727,162.  We're not asking for past

15   caretaker expenses.  We're not asking for caretaker expenses in

16   the future.  That's included in the life care plan.  And the

17   total of these numbers is $13,358,086.

18           If your answer to Number 2 was yes, then you're

19   going to check yes here.  Number 8, you're going to say yes.

20   "Do you find that the injuries sustained by Jeff Anderson for

21   loss of consortium have value?"  I get a cold and I want my wife

22   to take care of me.  This is a man who sadly is facing his last

23   months.  His wife can't take care of him.  That's a hard loss.

24   I'm on the road and I get upset and I call my wife and just --

25   "Cool me down.  I had a bad day in trial today.  Just give me

1  some support."  She's always there.  She's always there for me.

2  And Lidy, this wife who he met and fell in love with --

3  remember, I thought it was funny.  "I wanted a good Catholic

4  girl."  Well, he found one, and they had a beautiful child.  And

5  they've taken that away from him.  And I don't have a clue how

6  to come up with these numbers.

7           $200,000 for past lost suffering -- past lost

8  services, $500,000 for what he will miss in the coming months,

9  $300,000, all the things a wife provides, and the total of that

10  is a million dollars.

11           "We the jury find for the Raymond -- find for the

12  Andersons and against Raymond."  And you will check that box,

13  and each of you will sign it.  I get a chance to come back and

14  we're going to talk about this a little more.  But when you

15  consider the argument you're about to hear, what I hope you will

16  keep in mind is whether it answers those questions or whether

17  it's a distraction.  Because if it's a distraction, we have no

18  choice but to fill these numbers out with numbers that represent

19  full, fair, and complete justice, not any more, not any less.

20  That's what we'll ask for in this case.  Thank you.

21           THE COURT:  All right.  Ladies and gentlemen,

22  it's my custom -- when I'm giving the attorneys substantial

23  amount of time to argue their case, it's my custom to allow you

24  to take a break between the arguments, so let's take a

25  ten-minute recess.  We'll come back and we will hear the

1    defendant's closing argument.

2                        (Jury exits at 9:52 a.m.)

3                        THE COURT:  Mr. Warshauer, I have your rebuttal

4    at 17 minutes.

5                        MR. WARSHAUER:  Thank you.

6                        (Recess from 9:52 a.m. to 10:07 a.m.)

7                        (Jury enters at 10:07 a.m.)

8                        THE COURT:  Thank you.  You may be seated.

9                        All right.  That break was a little longer than

10   we anticipated, because not surprisingly, we encountered some

11   technical difficulties.  So now I'm told everything is back to

12   where it should be and we're ready to go.

13                       Mr. LoCoco?

14                       MR. LoCOCO:  Thank you, Your Honor.

15                       May it please this Honorable Court, Mr. and

16   Mrs. Anderson, Counsel, may it please you, members of the jury.

17                       I know it's been a long trial, a really long

18   trial.  And I know you've been very patient and you've paid

19   attention, and on behalf of Raymond, and frankly the Andersons,

20   I want to thank you for your attention.  Your time isn't

21   voluntary; you were summoned here, but your attention and your

22   patience is.  And I'm proud to be here representing the folks

23   back at Raymond who are designing, manufacturing, and selling

24   lift trucks that our society needs.

25                       Now I mentioned it's been a long trial and it's

1    good that it's almost at an end.  Our job is almost over.

2    That's when your job takes center stage.  And Mr. Warshauer and

3    I obviously disagree about a lot of things, but as a lawyer

4    who's been doing this for 35 years, Mr. Warshauer about the

5    same, there is nothing more precious to me than our jury system.

6    So many places around the world don't have our jury system.  It

7    was written into the Constitution in the 1780s, 1770s, and we

8    still have it today.  And there's something about this system

9    where we come to you as citizens to say, "We've got a

10   disagreement.  We disagree about something.  And we ask you to

11   resolve it."  So we're putting this case in your hands.  As much

12   as this is Mr. and Mrs. Anderson's day in court, this is

13   Raymond's day in court.  We trust you.  We trust the jury

14   system.

15            I mentioned that this has been a long trial.  I

16   was thinking about that last night, and I was reminded of

17   something that happened, oh, about 13 years ago now.  I've got

18   eight children.  They're all grown now.  My youngest is 23.  But

19   back when she was about 10, I was trying a case.  It took even

20   longer.  It was a three- or four-week trial.  And I called home

21   one night about two weeks in, and Martha answered.  And I

22   said -- and she answered the phone, and I said "Hi, Martha."

23   She said, "Who is this?"  Which was not a good way to start.  I

24   then said, "Well, I'm the guy who buys you treats, goes to your

25   soccer games, helps you with your homework, takes you to the

park."  And I hear the phone drop, and I hear her yelling to my

wife, "Mommy, Grandpa's on the phone."  So I was thinking about

that last night.  I kind of miss those days.  But it's been a

long trial, and we're at the end now.

The evidence has all been admitted.  All the

witnesses have testified.  All the exhibits have been shown to

you.  After we complete the closing arguments, Judge McGlynn

will instruct you on the law, and then it's time for you to do

your job, your duty, your responsibility to render a true

verdict in this case, a verdict that's consistent with the law

and the evidence, a verdict that is consistent with the oath you

took as jurors, a verdict that is consistent with common sense.

I mentioned that in opening statement; Mr. Warshauer mentioned

that in opening statement.

Based on the evidence in the case and the law

that Judge McGlynn gives you, the only possible result here is

for you to answer that first question on the verdict, no.  This

is not a defective product.  It is not unreasonably dangerous.

There's no defect in this lift truck.  When we got together for

opening statement last week Tuesday, I guess, I spoke at the end

a little bit about the burden of proof.  In the opening

statement, you can't say a whole lot about things like that so I

just mentioned it.  I want to focus on that for a moment.

You know, it's pretty easy to file a lawsuit in

our system, and I guess that's the way it should be.  You get a

lawyer.  I guess you don't even need to get a lawyer.  You write

out a complaint.  It can even be handwritten.  You file it.

There's a filing fee.  And away you go.  Complaint's filed.  You

can sue somebody.  But here in this courtroom, over the last two

weeks, this is where the rubber hits the road.  This is where

the person bringing lawsuit, these lawyers here at this table,

have to meet the burden of proof.

You know, the law calls it a burden for a reason.

The law doesn't call it a task or a chore or a nice thing to do

on a cool autumn day.  It's called a burden.  And it's

traditional for Plaintiff's Counsel like Mr. Warshauer to say,

"You know, those scales of justice, it's just got to tilt ever

so slightly in our direction."  If I were in his shoes, I'd say

that too.  If I had put on the case that they put on, I'd be

saying that, because they don't have any support for their

claims here.

They certainly don't have any testing.  All three

of those expert witnesses they brought said they tested nothing.

All three of those witnesses had done nothing in the area of

forklift trucks ever.  And on the second question, "Did the

brake system or the lack of a guard on the steer tire cause

Mrs. Anderson's injuries?" they showed you nothing.  Nothing.

You know what we saw?  Dr. Meyer finally showed

one drawing, and he changed his testimony.  I read it to him.

When he -- when I took his deposition on the brake design, I

said, "You can't say that your suggested change would have made

any difference here?"  And he said, "It could have made a

change, could have made a difference, but I need more

information."  And on redirect examination, he changed his

testimony.  Not during direct, not during my cross, but on

redirect, they realized they had no one to say the brake pedal

design would have made a difference here.  So he gives an

opinion that the brake pedal design would have made a difference

without any support whatsoever.

You know, the law has taken -- the law in our

country still uses a few legal -- few Latin phrases, legal

maxims.  And I'm going to use one this morning, because it

really fits in this case.  It's something called ipse dixit.  I

don't even know if I said it right.  But it basically means

"just because I say so," and that was Dr. Meyer's evidence for

why a pedal under the left foot would have made a difference.

"Just because I say so."  And I'm going to read some testimony

to you a little later where he says "I didn't think I needed to

do anything more."  And that's an insult to you as jurors.

Dr. Kerrigan said -- Dr. Kerrigan didn't say

anything about the causation issue with regard to the pedals.

And on the steer tire guard, they brought you nothing again.  It

was Dr. Kerrigan this time with the ipse dixit.  "Because I say

so."

Dr. Jeka, the balance expert, no experience with

1    forklift trucks, none; no testing, although he's got that huge

2    lab at the University of Delaware.  He could have constructed

3    something.  No testing.  You know what he said?  "I didn't think

4    I needed to do anything."  Again, an insult to you as jurors.

5    "I got a lot of good credentials.  I get to say it, so you

6    should believe it."  That's not how it's supposed to work here.

7    That's not what's meant by meeting your burden of proof.

8              Mr. Warshauer calls all the evidence we brought

9    to you a distraction?  Really?  We're the only side that brought

10   you any science.  The work that Dr. Rodowicz did, you noticed

11   they didn't ask her any questions about the actual work.  They

12   didn't challenge her analysis.  Not one little bit.  You've seen

13   procedure close-up for what happens in a trial.  We had jury

14   selection, we had opening statements, Plaintiff's case,

15   Defendant's case.

16             And then I want to focus on something that

17   happened yesterday, because it was so quick, it's easy to miss.

18   We rested.  I said, "Raymond rests their case subject to the

19   exhibits."  Judge McGlynn turned to Mr. Warshauer and says, "Any

20   rebuttal case?  Any rebuttal evidence?"  And you know what they

21   put in?  A patent, which we never even challenged what's in the

22   patent.  I'm sure Mr. Warshauer just misspoke that the patent is

23   actually issued in 2007, not 1980.  But that was their rebuttal

24   case.  Nothing else.

25             Dr. Meyer's up in Chicago.  They could have had

1    him drive down here, get back on the stand, and tell you every

2    way that Mr. Rogers was wrong, every way that Dr. Rodowicz was

3    wrong.  They have nothing -- they had no rebuttal case to give

4    you because they couldn't challenge the science.  Their case is

5    all suppositioned in speculation.  Was the hand pulling on the

6    handle?  There's no evidence of that.  Was the hand pulling on

7    the tiller?  There's no evidence of that.  They brought you no

8    rebuttal case, because they couldn't rebut the science that we

9    brought you, which was not a distraction.  And I will not

10   apologize to you or to the other side that we brought you real

11   science.  You deserve that.  This is a serious case, and as I

12   said, it's Raymond's day in court as well.

13            So I mentioned the burden of proof.  The

14   plaintiff hasn't even come close.  Not even close.  And we're

15   going to talk about some of those details.

16            I said in my opening statement that this case was

17   about one thing:  Who or what is responsible for the injuries

18   suffered by Mrs. Anderson back on July 29, 2017?  We proved to

19   you that it's not the design of this lift truck.  We proved to

20   you that it was how Mrs. Anderson operated this lift truck.  And

21   I -- I want to focus on two things with respect to that.  And I

22   want to talk about the accident itself for a second.

23            First of all, Mr. Warshauer gets up in closing

24   argument, at the very end of his discussion of the liability

25   side of the case, and he makes this inflammatory allegation,

we're calling Mrs. Anderson a liar.  I've done that exactly one

time in 35 years, call a plaintiff a liar.  We are not calling

Mrs. Anderson a liar.  Why did we put the wood evidence in?  Why

did we put in -- why did we put in this medical record that

talks about Mrs. Anderson saying that the forklift jerked and

threw her off?  Because we wanted to call her a liar?  No.  Why

did we talk about the wood?  Why did we put in our -- talk about

a record that said that it tipped over and fell out?  For two

reasons.

          First of all, she has this terrible, terrible

accident.  She's not thinking about lawyers.  She's not thinking

about lawsuits.  She's not couching her words.  She's in pain.

You are going to hear whatever was popping into her head.  And

in a lot of things, Mrs. Anderson didn't know what was going on,

which is why Dr. Rodowicz had to come in here and work backwards

from the injuries.

          Mrs. Anderson had this terrible accident.  She's

at her place of employment.  She knows she's seriously hurt.

Think of the panic in someone who's in that circumstance.  Am I

going to get blamed?  Is this my fault?  And putting that aside,

once your leg has to be amputated, I psychologically can't take

the blame for that.  So it makes -- so it makes no sense to

claim that we're saying that she's lying about it.  What we're

saying is she doesn't know, and it's their burden to tell you

what happened.

1           We knew some facts.  We knew that she had these

2       right-shin lacerations.  Dr. Kerrigan didn't even focus on that.

3       We're going to come back to that.  We knew about the problems

4       that -- tears in the shoes.  What accounted for that?  We knew

5       that she had gotten caught in the steer tires, but we didn't

6       know how.  Even Dr. Kerrigan, by the way, has Mrs. Anderson

7       facing the back of the compartment.  So Dr. Jeka's here, he says

8       she felt some balance problem, and she went to broaden her base

9       of support.  Well, that doesn't explain how she ends up over

10      here.

11          What else did we know?  Anyway, what I was trying

12      to show you was the OSHA photographs, the OSHA photographs,

13      where we saw that truck a foot from the vertical post.  We

14      didn't say that Mrs. Anderson had no reason for getting out of

15      that forklift.  She shouldn't have gotten out of the forklift.

16      If she had stayed in the forklift, even if she had collided with

17      that vertical post, she would have been safe.  But she -- as

18      Dr. Rodowicz explained, the truck was going counterclockwise to

19      where that vertical post, and she jumped out, trying to squeeze

20      herself between the back of the truck and the vertical post to

21      not get hit.  And she didn't make it, and that's how -- that's

22      how her left foot got into those wheels.  Again, even

23      Dr. Kerrigan says that her left foot got into the wheels facing

24      the back of the forklift.  How does that happen if you're just

25      doing a compensatory step?

1    Let's talk about Ms. Boone.  Ms. Boone came here

2    voluntarily to testify.  She wasn't under subpoena.  She had

3    been a work friend of Mrs. Anderson.  She met with Mr. Warshauer

4    a month ago for lunch.  She talked to Mr. McCoy about a year ago

5    during -- on the phone and they recorded the statement.  Her

6    statement was read to you.  She says absolutely nothing in the

7    statement the day of the incident about losing balance.

8    Nothing.  Even when she was on the stand, she didn't say that

9    Mrs. Anderson reported losing her balance.  On the stand, she

10   said she slipped.  But there's nothing in this statement about

11   losing balance.  I told you in opening statement, medical

12   records, OSHA investigative report, FedEx Supply Chain

13   investigation, nothing in there about losing balance.

14   I asked Ms. Boone about her recorded statement

15   with Mr. McCoy.  He never asked her about loss of balance, this

16   thing that is so important to their case.  He never asked her

17   about it?  Well, he didn't ask her about it in the recording.

18   If it was that important, we would have heard about it.  So the

19   first time that we hear about losing balance in this case is

20   kind of the same thing that Mr. Kerila told you.  Mr. Kerila was

21   asked questions, charged questions, loaded with innuendo.  You

22   know, "Do you know how many people have had left-foot injuries,

23   left-leg amputations from losing your balance?"  You saw no

24   evidence, just innuendo.  And what did Mr. Kerila say?  "No one

25   ever complained about our truck having a problem with balance

1    until you asked me questions in a deposition."  This is a

2    lawyer's theory.  They're good lawyers.  "Hey, we can construct

3    a case around losing balance, because if you do that, then I can

4    bring in Dr. Jeka and I can excuse Mrs. Anderson's conduct."

5              So the first time we hear about losing balance in

6    this case is when I took Mrs. Anderson's deposition.  She had

7    very poor memory of the incident.  And I'm not criticizing her

8    for that.  But she was -- but she did say, "I went over cracks.

9    The forklift shook.  I lost my balance.  And the next thing I

10   knew, the forklift had run me over."  I don't care what other

11   questions were asked.  That's all she was -- she remembered.

12   That's what she was prepared to say.  "Where were your hands?"

13   "I don't remember."  "When did your left foot come off the

14   platform?"  "I don't remember."  "When did your right foot come

15   off the deadman pedal?"  "I don't remember."

16             One thing we do know is, that brake worked.  That

17   truck stopped.  That brake worked.  And we're the ones who

18   proved to you that whether the brake's under the left foot or

19   the right foot, we'd still be here, because a left-foot brake

20   would have not made any difference, given the timing.  And I'm

21   going to come back to that.

22             What else did Mr. Kerila say about this issue of

23   losing balance?  No one ever, no one in field testing, no one in

24   the prototype testing, no one in the comments back in their

25   whole design process of the 4250 ever said they had balance

1    problems.  And why is that?  Well, it makes perfect sense.  The

2    truck is made to accommodate people so they feel secure and

3    can't lose their balance.  You've got a slip-resistant pad.

4    You've got two handles.  You've got this back pad with this left

5    hook, you know, the hip holster, the hip hook to keep you in the

6    compartment.  You've got a canted floor, a tipped floor, left to

7    right, and back of the forklift into that corner.  So you are

8    secure.

9              So this literature that Dr. Jeka told you about

10   was people standing like this.  And even that, Dr. Rodowicz

11   explained, people weren't losing their balance when they were

12   hit with a 1g load, and this truck with the floating floor

13   wasn't getting anywhere near that, whether it was braking or

14   not.  Mr. Kerila also told you that we -- that Raymond designed

15   the brakes so that it stopped as quickly as you could without

16   sliding the tires, because then it would take longer to brake.

17   But you can't stop a 10,000-pound forklift like that.  I don't

18   care what foot is on the deadman pedal.

19              They didn't know how her feet actually came out.

20   Dr. Kerrigan didn't explain it.  Dr. Meyer didn't explain it.

21   Dr. Jeka, closest he came was when I asked him about this

22   compensatory step.  That doesn't get you into the wheels.  And

23   none of these guys, they're all guys, none of these guys did any

24   testing.  None of them.  None of them.

25              Dr. Rodowicz showed you that based on the

geometry of the truck, the facility, the medical records and the injuries, the testing that she and Mr. Rogers completed, they all prove that Mrs. Anderson could not, should not have lost her balance.  They're the only ones who brought you...

So Mr. Warshauer gets up in his closing argument and he says that Mr. Rogers tried to avoid the cracks?  They're all through the video.  Look, you can look at all three of these.  For some reason, it's not working through the system.  But he came through here, he came through here, he came down here.  There's cracks everywhere.  And what did we get?  We got -- we got those plots that showed there just aren't enough forces there to affect somebody's balance.  We brought you that science.  He calls it a distraction.  A distraction?  They brought you nothing.  They say "Just because our guys say it, it must be true."  Ipse dixit.

Dr. Meyer:  "I went to MIT."  You know, when I was -- my first day in law school, first day, we're all nervous.  I went to the University of Wisconsin.  I had a professor for civil procedure who had been teaching for 40 years, and they always gave him a big truckload of brand new law students.  He sits down.  He's not talking about civil procedure.  He's talking about being a lawyer and relaxing.  And I remember to this day him saying, "Just remember, even Harvard has a bottom half of the class."  And I thought about that over and over again, and it came to mind when I was thinking about Dr. Meyer

saying that he went to MIT.  I don't know where he was in his

class.  But MIT to the best of my recollection certainly has a

bottom half of the class.  From a scientific perspective, his

testimony was an insult.  He brought you nothing.

Remember I was asking him about this issue of

causation?  Can I have the document camera?  So this is a rough

draft of the transcript.  Our court reporter does a great job,

but I'm just giving you that disclaimer.  But this was his

testimony.  I was asking him about the fact that he hadn't given

a causation opinion at his deposition, hadn't give it on direct

examination.  You didn't say that your pedal design would have

made a difference.

So I said, question:  "You didn't say it's more

probable than not.  You said it's possible, didn't you?"

Answer:  "I said -- I'm saying right now, it's more likely than

not, had a brake been under the left foot, it would have

prevented the accident."

Then I go to his deposition, page 99, line 22.

Tells me "I'm there."  The question:  "You need more data in

order to make a final determination about the pedal

configuration; correct?"  Answer:  "Yeah.  I think at this

point, all I can say is that the pedal configuration could have

prevented, not necessarily that it would have prevented."

"Did I read that correctly?"  "Yes."

And then I ask him for his analysis.  It says he

doesn't know what I'm asking for.  Then I clarify the question,
and he says, "I think we did that diagram yesterday.
Mr. Warshauer showed it again today, that shows if Mrs. Anderson
came out of the operator compartment and a brake was applied,
she would never get to the point where the brake actually -- the
forklift actually ran over her foot."

It's this drawing.  He didn't even bring this to
the courtroom with him.  He showed it to you in his -- he did
this in his redirect.  You deserved that.

On top of that, let's be clear about what he had
to say -- well, let me finish this section.  "You have nothing
to show the jury that supports the opinion you just gave?"
Answer:  "I think this exactly supports the opinion I just
gave."

Question:  "So a handwritten drawing that you
gave last afternoon, that's it?"  Answer:  "I don't think
anything more is necessary."

Mr. Ipse Dixit, Mr. Monday Morning Quarterback,
someone who's never played the game and tells everybody later
how it should be played.  Mr. Warshauer gets up and says, "Well,
Dr. Meyer told you everybody else does it the right way.  Left
foot under the -- left-foot pedal."  Actually, that's not what
Dr. Meyer said.  Dr. Meyer said nobody does it the right way,
that the whole industry has this screwed up.  He wants a brake
under both feet.  Well, in this case, in Anderson v. Raymond, he

1    wants a brake under both feet.

2                 A month ago in a case against Crown, that's not

3    what he said.   In that case, he said "I don't like Crown's

4    left-foot brake pedal.   They need to switch these up.   The

5    sensor, which doesn't apply brake, has a one-second delay, needs

6    to be under the left foot and the brake needs to be under the

7    right foot."   Oh, my God.   Raymond's got, according to him, a

8    right-foot brake pedal.   That's not going to work here, so he's

9    got to switch back when he gets here.   Maybe he'll switch again.

10   No one has two brake pedals.   No one.   No one.   Because you

11   can't risk inadvertent application of the brake.

12               What else did we get from Dr. Meyer on this

13   issue, loss of balance?   He said this.   "Other than

14   Mrs. Anderson -- you said people are falling out.   Other than

15   Mrs. Anderson, have you ever seen anyone else fall out of a

16   4250?"   Answer:   "No."

17               You know, Mr. Warshauer mentioned that we have

18   31,000 4,250s that have been made.   31,000.   He told you several

19   times that this subject forklift had 11,000 hours on it, about

20   4,000 hours a year.   That was a lot.   That's nowhere near the

21   average.   Say, it's only 2,000, times 31,000.   That's over 60

22   million hours of use in one year.   And the 4250's been out for

23   ten years.   60 million hours of use in one year.   And that was

24   one accident.   One too many, absolutely.   But you heard about

25   Mrs. Anderson's accident.   You didn't hear about someone else

1    losing their balance and falling out.  60 million hours of use.

2    This is a safe product.

3              Getting back to the pedal design that Dr. Meyer

4    wants.  Well, as I said, a month ago, this is his testimony.

5    All right.  Question:  "And what do you want to see happen?"

6    Answer:  "What I want to see is essentially a reversal of that,

7    so that the present sensing switch is now on the left side for

8    the left foot and the right foot controls the brake."

9              Different case, different manufacturer, different

10   jury, different theory.  You actually deserve better than that.

11             How am I doing?

12             THE COURT:  You've got -- you're at 30 minutes.

13             MR. LoCOCO:  Okay.

14             Mr. Warshauer said in his closing argument that

15   we -- we just said words; right?  On how Mrs. Anderson was

16   supposed to protect herself in this accident.  Words aren't

17   enough.  Well, on their expert theories, I guess words are

18   enough, because that's all we got out of them.  And he held up

19   the operator's manual.  We didn't just say, "Here's your book,

20   Mrs. Anderson.  There's training materials."  She admitted that

21   she knew she needed to stay in the compartment to stay safe.

22             And then you heard from Mr. Kerila and

23   Dr. Rhoades all the safety features on this truck that do

24   exactly what needed to be done here.  Keep yourself in the

25   compartment while it's operating.  She was headed toward a

collision with that vertical post.  She should have stayed in
the compartment.  She should have taken her feet off of the
deadman pedal.  Mr. Warshauer spent all this time saying she had
mad skills as a forklift operator.  I never heard that term.
Maybe she did.  That doesn't mean Mrs. Anderson didn't make a
mistake.  She made a mistake.  She made a terrible mistake.
That doesn't make her a bad person.  She's not.

Mr. and Mrs. Anderson, I don't know them very
well, but you get to know Plaintiffs in a case a little bit.
And you can tell they are salt-of-the-earth people.  This is a
terrible tragedy.  No one's happy about it.  And everyone feels
sympathy for them.  But Judge McGlynn is -- another instruction
you're going to hear is that sympathy can't dictate your
decision here.  It's got to be justice.  It's got to be based on
the evidence.

So we brought Dr. Rodowicz here, and she went
through in painstaking detail how this accident happened.  She
explained the places where Dr. Kerrigan was wrong, that there's
no way that Mrs. Anderson got caught by the outside edge of this
wheel because it wouldn't explain the degloving injury.  She had
to be between these two steer wheels.  And she showed you that
with her model foot and then with the rest of her analysis.

She then went to the trouble of digitizing a
forklift, digitizing the racking, digitizing the CT scans of her
bones, digitizing a surrogate.  So in the computer space, the

1    computer space, she could explain to you what happened here.

2    And again, they didn't ask them -- ask her -- they did not ask

3    Dr. Rodowicz one question about this analysis, other than what

4    Mr. Warshauer talked about in his closing argument, other than

5    the guard issue, which I'm going to -- I will come to.

6                So she told you about the right-shin lacerations.

7    How are those accounted for?  Well, she told you how they're

8    accounted for.  She told you about the tears in the shoe and the

9    analysis she made of the shoe.  She told you about digitizing

10   the truck.  This is all to scale.  She went out and found

11   someone same height and weight as Mrs. Anderson to get some

12   measurements.  You know, this is not a 6-foot-5 person at the

13   time of the accident.  This is someone who, as I recall, is

14   5-foot-3.  She had enough space in that compartment to stay safe

15   and to get nestled into that back pad.  And Mrs. Anderson

16   testified that she always operated with her back against the

17   back pad.  And she did that day.

18                I want to show you this video.  I think we got it

19   working now.  Okay.  This is one of Mr. Rogers' runs.  He's

20   going over cracks.

21                (Video played.)

22                MR. LoCOCO:  You could see him there.  He's going

23   over cracks here.  He's going over cracks in the aisle.  I have

24   no idea how Mr. Warshauer gets up in front of you and says

25   Mr. Rogers was avoiding the cracks.  And what's really rich

1    about that statement is that they did nothing to try and figure

2    out which cracks she actually went over, what those cracks would

3    do.  Yeah, this warehouse has a lot of cracks, but this is a

4    10,000-pound forklift with huge wheels, and that floating floor

5    that was designed to help dampen out the ride for an operator

6    like Mrs. Anderson.

7                   What did we learn from Dr. Rodowicz' analysis?

8    We learn -- and she did this in a series of three slides from

9    different views -- Mrs. Anderson right before the injury was

10   facing the back of the forklift, that her left foot got in

11   between those two steer wheels, that her right leg sustained

12   injury, those lacerations on the shin, that the shoe ultimately

13   got drawn into the wheels, but the foot got free; right?  And

14   she also told you there's no way a foot -- even Dr. Kerrigan

15   said this -- would stop a 10,000-pound forklift.  Once the shoe

16   came off, her foot was also free.  There's another view of this.

17                   As long as I got this up, I want to circle this

18   right now.  I'm going to talk about the steer guard in a few

19   minutes.  But Mr. Warshauer got up here and said, you see, you

20   see, if the guard had come down to that level, her foot would

21   have been saved?  Really?  A 10,000-pound forklift, 5 tons, that

22   isn't going to be stopped for the foot?  She wouldn't have been

23   injured?  Even Dr. Kerrigan disagrees with that.  Dr. Kerrigan

24   said, "Yeah, I think if the guard's there, it might have

25   eliminated -- it would have eliminated or mitigated her injury,"

1    but he said she could have been killed.  She could have been

2    seriously injured.  And that's just common sense.

3              Again, these three slides -- and it's not -- you

4    got to keep in mind that things are moving; right?  The truck's

5    moving toward the post.  She's moving away from the post.  So

6    it's easy to get up here and try and make fun of this analysis

7    and say, "Why is she standing in front of the -- in the back of

8    the truck?"  Well, again, Dr. Kerrigan says that's how she was

9    standing.  The truck's moving, she's moving, and her foot gets

10   caught before she can move out of the way.

11             And Dr. Rodowicz' conclusion is this:  That her

12   foot came out, went over, and went down.  These arrows are for

13   the left foot.  This is a complex volitional movement.  It's

14   not, "Oh, I want to get a compensatory step to broaden my base

15   of support."  This is a volitional move that got her foot in

16   that position.

17             Dr. Rodowicz told you that Ms. Anderson -- that

18   there were no outside forces acting on Ms. Anderson to cause her

19   to lose her balance or for her foot to come out of that

20   compartment the way we see it here.  There's nothing that would

21   account for her to be ejected.  There's nothing that would

22   account for her to lose her balance.  She had this complex

23   action, and that Mrs. Anderson was responsible for not keeping

24   herself in the compartment until the truck came to a stop, which

25   even Mrs. Anderson said she knew she needed to do that to avoid

1    injury, and that she could be seriously injured if she didn't.

2    This evidence, this reconstruction by Dr. Rodowicz, is

3    completely unrebutted.  We didn't hear from Dr. Kerrigan again.

4    It's unrebutted.  And this part of it wasn't even questioned

5    yesterday.

6              One other thing we learned is that in doing the

7    surrogate study -- remember these plots?  They're all under --

8    all the ones in the middle, you know, they're all under 0.1g.

9    Remember this?  Dr. Rodowicz said, you know, they've got this

10   theory she was pulling on the handle, she was pulling on the

11   steer tiller.  There's no evidence of it, mind you.  We heard

12   "if, if, if, if" throughout their case.  So Dr. Rodowicz asked

13   the surrogate to "Try and put yourself in Dr. Kerrigan's stated

14   position, hands on the controls, left foot on the outside of

15   this wheel."  And you heard Dr. Rodowicz say the surrogate

16   couldn't do it.  Maybe somebody 6-foot-5, but not someone who's

17   5-foot-3.

18             Now are we suggesting to you that Mrs. Anderson

19   intended to hurt herself?  Of course not.  She made a mistake.

20   Most -- we all make mistakes.  Most of the time, we get away

21   with them.  You know, I'm going too fast, I shouldn't have.

22   Turned too quick, shouldn't have.  But you get away with it.

23   Unfortunately, this is one of those things where she didn't

24   survive it.  It's a bad result.  But that doesn't mean that

25   there's anything wrong with this truck.

1           All right.  I want to talk about the design a

2    little bit more, and specifically these defects.  Dr. --

3    Mr. Kerila was here to talk about the design process for two

4    reasons:  One, as evidence that they didn't screw this up.  They

5    knew what they were doing.  They've been designing trucks for

6    decades, and this 4250 design project went through the same

7    steps, all seven of those steps we talked about.  I'm going to

8    get to the eighth step in a second that Mr. Warshauer's

9    suggesting.  All seven of these steps -- even Dr. Ipse Dixit,

10   Dr. Monday Morning Quarterback, Dr. Meyer agreed that there's a

11   design process:  Concept, dedicated -- detailed design, bench

12   testing, prototyping, field testing, design refinement, and

13   other steps.  Even he agreed with that.

14           So why'd we put that before you?  One, to show

15   you that this design came about using an effective process, and

16   two, because Dr. Meyer said "I didn't get past concept.  I

17   didn't get past concept."  He's designed nothing.  He hasn't

18   shown you two pedals.  He hasn't even reversed the pedals on the

19   Crown.  He's done no testing to show how it would have made a

20   difference.  Nothing.  He's done no steer tire guard.

21           You know what we got for that?  We've got

22   Mr. Warshauer on his computer putting a strip there.  On the two

23   pedals, what did we get?  We got Mr. Warshauer animating

24   something, not Dr. Meyer.  What did we get?  Mr. Warshauer

25   animating, using our scan, the scan of the forklift.  Today in

1   closing argument, you saw something that had never been shown

2   before in the courtroom, him moving that forklift along the

3   path.  Did his experts do that?  No.  Mr. Warshauer.  You know

4   what?  In courtrooms, the lawyers would love to be the

5   testifiers.  Why get all messy with witnesses?  But that's not

6   how we do it.  You deserved better than that.

7           What else did we learn?  We learned there isn't a

8   single product in the field that does what Dr. Meyer wants.

9   There isn't a single product that has two deadman pedals.  There

10  isn't a single product that has two brake pedals.  Not a one.

11  All those names that Mr. Warshauer put up, they couldn't point

12  to one that has two pedals.  Not one.

13          What else did we hear?  Mr. Warshauer says, "What

14  about the standard?"  70.20.2.  Well, Mr. Rogers said in his

15  opinion this truck meets the standard.  All of it.  He's the

16  only guy who's a member of the committee.  And we heard

17  Mr. Kerila tell you that they go through their safety design

18  review line by line in the standard to make sure that the truck

19  meets those standards.  And all that line says is that means

20  have to be provided to disconnect the travel circuit when the

21  operator gets out of the truck.  This truck does that.  That

22  standard doesn't say means have to be provided for the brake to

23  come on.  That's what happens here when you get out of the

24  truck.  The brake comes on.  It just says turn off the travel

25  circuit so that you can coast.  That's their big evidence.

1     So Dr. Meyer has two theories:  Two pedals,

2     left-foot deadman pedal and a right-foot deadman pedal, and a

3     steer guard.  And as I said earlier, a month ago he gave the

4     opposite.  Remember I said, "You really believe your testimony

5     here, Dr. Meyer?  You really believe it?  You really believe

6     that people are going to get hurt?"  There's 31,000 trucks out

7     there.  If this was such a bad problem, people would be falling

8     out left and right.  Because this is a design defect case.

9     Every single one of them has the same design problem.

10    And what else?  I then asked him, "Have you

11    written anybody?"  Remember what he said?  He said "I wrote

12    OSHA."  And then I reminded him, I asked him at his deposition,

13    "Did you write anybody?  You really believe these opinions?  Did

14    you tell anybody except us?  Did you write OSHA?  Did you write

15    FedEx?"  By the time he got to trial, he had written OSHA.  You

16    know why?  Because he's been doing this for a long time.  He

17    knew I was going to ask him again, and he didn't want to be

18    embarrassed.

19    Like I said, it's easy to file a lawsuit.  It's

20    easy to sue somebody.  It's easy to find somebody with a Ph.D.

21    to come in and ipse-dixit the case.  "Just because I say so."

22    That's what you got from the plaintiffs, at $485 an hour for

23    Dr. Meyer, $500 an hour for Dr. Jeka.  Remember, I'm the one who

24    had to ask those questions.

25    THE COURT:  I don't know what's wrong with this

1       chair.  Sorry about that.

2                       MR. LoCOCO:  That's okay.

3                       485, $500 an hour, for nothing.  No work.  I'd be

4       embarrassed too.  He simply talked.

5                       Mr. Kerila told you that Raymond goes outside

6       when they need to.  Dr. Rhoades did this whole analysis of the

7       compartment, talked about how operators are stable in there.

8       Mr. Warshauer turns this whole project into comfort.  He asked

9       Dr. Rhoades that at least twice.  Dr. Rhoades said comfort is a

10      part of safety.  If you're not comfortable, you're going to get

11      fatigued, and then you're going to make mistakes.

12                      So we provided reams of testimony about how this

13      compartment is designed, how it was developed, how it was

14      designed to keep Mrs. Anderson and every other operator in the

15      compartment.  They don't lose their balance.  You heard about

16      Mrs. Anderson and that's it.

17                      Now I want to talk about -- oh, Mr. Warshauer

18      brought up this Operator Compartment Sensor System, OCSS, the

19      laser option that Raymond has been making available for years.

20      Made it available to FedEx on this truck.  They didn't buy it.

21      Now are we criticizing FedEx for not getting it?  No.  It's a

22      training tool, and it's got nothing to do with this case,

23      because even if those lasers had been in place, Mrs. Anderson

24      still gets hurt, which is where I'm heading to now, this issue

25      of causation.

1    You know, it's easy to sit in your office in

2  Chicago, pontificate about how everybody else should design

3  products.  Dr. Meyer has never put his name on a product.  He's

4  never had to risk coming into a courtroom to have a jury judge

5  him.  He's making $485 an hour, thank you very much, criticizing

6  the works of others.

7    Now on the brake pedal under the left foot --

8  let's just not even talk about two pedals.  Put the pedal under

9  the left foot.  Did they show you any science to prove that it

10  would have made a difference here?  None.  They showed you that

11  drawing at the very end of Dr. Meyer's testimony and said,

12  "Well, if the left foot had been on a pedal, it would have

13  stopped not as far back."  Did they show you where?  Did they

14  show you where?  Just because you're moving the point of rest

15  doesn't mean that her foot's not going to get caught.  Just gets

16  caught earlier in the scenario.

17    And how do we know that's what was going to

18  happen?  Mr. Rogers' analysis and Dr. Rodowicz' analysis, they

19  looked at it two different ways.  So this is Dr. Rodowicz'

20  analysis.  They had the surrogate do a compensatory step.  We've

21  got to find out how far can somebody of Mrs. Anderson's stature

22  broaden their base of support if they're trying to get a firmer

23  base of support.  And they came up with 4.3 inches, 4.3 inches

24  as the average step.

25    And what did Dr. Rodowicz tell you?  That at

1    3 miles an hour, that truck hits the left foot in 0.08 seconds,

2    80 thousandths of a second, less than a tenth of a second.  At

3    4 miles an hour, it hits in 0.06 seconds.  At 5 miles an hour,

4    which is the speed that Dr. Meyer gave us, it's 0.05 seconds, 50

5    thousandths of a second.  A blink of an eye is a tenth of a

6    second.  So she puts her foot down, no brake in the world is

7    going to stop that truck before it hits her.

8                   What did we learn from -- I'm sorry, that was

9    Dr. Rodowicz.  What did we learn from Mr. Rogers?  He went

10   through a more -- an analysis with more steps.  And what he

11   showed is that at 3 miles an hour, it takes another 13 and a

12   half inches for the truck to stop once her foot hits the ground.

13   So let's say 4.3 inches is too short.  Maybe it's a foot.  She

14   still is going to get hurt.  At 4 miles an hour, it's

15   24.2 inches, 2 feet.  She is going to get hurt even with a

16   left-foot deadman pedal.  And it's their burden to prove that

17   that left-foot pedal would have made a difference in this case.

18   They didn't even come close.  They didn't even try.  Dr. Meyer,

19   "I just get to say it," Dr. Ipse Dixit.

20                   On the steer tire guard, no one has that.  Every

21   single manufacturer of this style truck has a steer tire

22   opening, and it's not for inconsequential reasons.  You've got

23   to do a daily inspection.  You put that on, people are going to

24   take it off.  And then you're also making it more dangerous for

25   technicians because you can't jack the truck up high enough to

1    get a wheel out.  And they didn't show you a design.  Not one.

2    And they certainly didn't show you how it would have made a

3    difference here.  And Dr. Rodowicz showed you this picture too.

4    They didn't bring that picture to you to say, "Oh, see, she

5    wouldn't have been injured."  10,000-pound piece of equipment.

6    "Maybe we can get the jury to believe this.  Maybe."

7              So when you get to the verdict --

8              THE COURT:  Five minutes.

9              MR. LoCOCO:  Five?

10             So when you get to the verdict, the first

11   question is, as Mr. Warshauer said, "Do you find that this

12   forklift contained an unreasonably dangerous condition?"

13   Obviously no.  They haven't proved it.  They haven't even come

14   close.  "Was it a cause?"  Even if somehow you said yes to the

15   first question, the answer is no, and then you're done.  You all

16   sign the part of the verdict that says "We find for Raymond."

17   You sign all your names and you're done.  It's that simple.

18   That's what the evidence shows.

19             Few other things I want to mention.  Now you

20   notice I used almost my time on the issue of who's responsible,

21   because Mrs. Anderson was seriously hurt, she was damaged.  Now

22   I do want to say just a couple of things about damages, not

23   because I think you're going to get there, because I don't, but

24   because the numbers that we talked about weren't tied to

25   anything that you could get your arms around.  They were

1    millions, because that's what lawyers do.

2              There's an old cliche.  "Ask for the moon, you

3    might get a few stars."  The kind of numbers that Mr. Warshauer

4    was talking about here are the moon, the stars, and a few

5    planets.  So common sense.  Common sense.  Money is worth the

6    same thing in here as it is out in the real world.  Lawyers go

7    to seminars.  "How can I ask for a lot of money without sounding

8    like I'm asking for a lot of money?"  That's what was going on

9    here.

10             I just have a few final comments and then I'm

11   going to sit down.  This is the last chance that I have to say

12   anything on behalf of my clients.  As you know now, Plaintiffs

13   go first and they get to have the last word.  They go last.  And

14   that's just the way the rules are.  Somebody has to have the

15   last word.  They have the burden of proof.  When I finish,

16   Mr. Warshauer, someone else from his team, can get up and talk

17   to you about what I've said.  And I've got to sit on my hands.

18   Doesn't mean that I agree with anything or everything that

19   they're saying.  It's just the rules.

20             When I think about the rebuttal argument, I think

21   about the old movie Pinocchio.  You know, Jiminy Cricket sat on

22   Pinocchio's shoulder, whispering, trying to keep him on the

23   straight and narrow.  So when he's talking to you in his

24   rebuttal, I just imagine I'm Jiminy Cricket up there, responding

25   with the evidence, the science, the testing that we brought to

1    you.

2              Last thing.  It's almost time for you to go back

3    into the jury room, to put on the black robes of justice and do

4    justice and have your verdict speak the truth.  Mr. Warshauer is

5    absolutely right.  I love that he pointed this out.  I love that

6    it's absolutely true that we all stand for you when you come in,

7    including Judge McGlynn, because you're the judges here.  You

8    have an overwhelming power but you have an overwhelming

9    responsibility.

10             I recognize that your verdict is going to be

11   difficult, especially if you find in favor of Raymond.  It might

12   be the hardest thing you ever do, because these people are nice

13   people.  They're sympathetic people.  But the evidence doesn't

14   support a verdict in favor of the plaintiffs.  This lawsuit is

15   about what is right, what is fair, what is just.  Simply put, it

16   would not be right, it would not be fair, it would not be just

17   to hold my client responsible, even a little, for what happened

18   here.

19             That said, I'm confident in our jury system.  I'm

20   confident in the facts in the case we presented.  I have

21   confidence in you that when you get back in that jury room, you

22   will do the right thing, the fair thing, the just thing, maybe

23   not the easy thing, but you'll do what is right and just and

24   return a verdict in favor of Raymond.  Thank you.  Thank you,

25   Your Honor.

1    THE COURT:  Thank you.

2    All right.  Ladies and gentlemen, we still have

3    rebuttal argument and then I have a number of instructions to

4    read to you, so I'm going to give everybody a five-minute break

5    right now.  Let's come back at 11:15.

6    (Jury exits at 11:08 a.m.)

7    (Recess from 11:08 a.m. to 11:18 a.m.)

8    (Jury enters at 11:18 a.m.)

9    THE COURT:  All right.  Please be seated.  Thank

10    you.

11    Mr. Warshauer?

12    MR. WARSHAUER:  May it please the Court.

13    You know, in the last 45, 50 minutes, Mr. McCoy

14    and I have been accused basically of suborning perjury and

15    Ms. Boone has been accused of being a liar.  I ought to tell

16    you, that's the kind of thing that can make me angry.  I thought

17    instead of being angry, I thought maybe if I tell you a story,

18    it would get me back centered to where I need to be.

19    It's a story of two farmers, and one farmer has a

20    cabbage patch.  And his neighbor's goat eats the cabbage, and he

21    sees the neighbor's goat eat the cabbage.  He says, "Neighbor,

22    your goat ate my cabbage."  Neighbor says, "I don't have a

23    goat."  He says, "Neighbor, I got video of your goat eating my

24    cabbage."  "Well, if I did have a goat, it didn't eat your

25    cabbage."  "Again, I have a video of your goat eating my

cabbage."  "Well, I don't have a goat.  But if he did eat your
cabbage, it made him sick and you owe me money."  And that's
what we've heard over the last 45 minutes.  Just a complete
denial of any responsibility at all.

But I want to start with this thing that really
got my blood boiling.  If I could have the presenter, please?

You heard the Raymond Corporation's lawyer say to
you that Dr. Meyer changed his stripes, that he didn't want a
left-foot brake on one machine and he didn't want it on another
machine.  He knew when he told you that it was a lie.  He knew
when he told you that it was false.  And he did it to distract
you from the truth of this case.

What Dr. Meyer actually said, and this was
Wednesday morning, "Now with regard to the Crown, you -- or even
Raymond, you actually want brakes under both feet; correct?"
"Pardon me?"  "You want brakes under both feet?"  "I do, yes."
"So whether you pick up your left foot or your right foot, the
brake comes on?"  "Yes."

You know why Dr. Meyer says that?  Because he
wants this machine to be as safe as possible so that when my
friends and family and your friends and family and neighbors go
to work, they come back safe.  They have the highest chance of
that.  When we talk about punch presses and keeping our hands
out of the way, it's both hands.  And both feet could be in
danger, and that's why he wants them both on the floor and he

1    wants that machine to react when they're not there, because that

2    makes sense.  In fact, 7.20.2, which we never heard him say they

3    complied with, demands that when you leave the operating

4    position, that every single witness agreed is two feet on the

5    floor, that machine should react.  And he never said Raymond's

6    forklift does it.

7              And don't you know that if Mike Rogers could have

8    uttered the words "This forklift complies with 7.20.2," he would

9    have done it, and he didn't.  Don't you know that if Jason --

10   that if Mr. -- if their company man, the company man who doesn't

11   even know who he works for because he doesn't want to admit the

12   simple truth, that they're not a mom-and-pop company, if he

13   could have said it, he would have said it too.  Bob Kerila.

14             So I'm going to spend a couple of minutes talking

15   about the science, because there were experiments and there was

16   science that you saw.  You don't need to test whether the left

17   brake works when an entire industry already does it.  You don't

18   need to design the right way to do it when you can simply look

19   at the competitors and see an entire industry does it that way.

20   So making someone spend money to test is sort of like the waste

21   of money they wasted with Dr. Rhoades.  Yeah, everybody agrees

22   having one pedal is more comfortable than two.  I would have

23   stipulated to that.

24             But let's look and see where we got this data.

25   The interaction doesn't happen until the end.  Everyone agrees

that two witnesses agreed to that.  The braking distance comes

from testing done by Raymond.  That's data.  The onset of the

braking is Mr. Rogers.  We didn't challenge this simple science.

We agreed with it, and Dr. Meyer agreed with it.  And the fact

of the matter is, the brake didn't go on until she was all the

way out.  But you know what they want you to believe?  They want

you to believe that what she did is just step out, like they're

characters.  They're ten people in somebody's office and this

young woman who's never been on a forklift.

But what did we learn about people who really

know about balance?  What'd Dr. Jeka say?  It's ridiculous to

try to duplicate a loss of balance.  It is what's called a

dynamic event.  It would be like watching a NASCAR race and

saying, "Okay, this guy's going to get rear-ended, and we know

his car's going to spin seven times and land on the roof."  No,

every time is different.

I actually asked Dr. Rodowicz, why is it that

when I trip over the same thing, I end up on two sides of the

sidewalk?  One time, I fell; the other, I don't.  Because it's a

dynamic event.  And as she struggled out, that explains how this

forklift came to the left and came towards her foot, as she

finally failed in her effort.

But we also know this.  Using that same math,

those same numbers that no one challenges, 5 feet of brakes, 1

foot of onset, and the unchallenged truth that at the time of

the event, as she lay in a pool of her own blood that was
ever-growing, she looked at her coworker and said "I slipped and
could not stop," the only reasonable inference is that she had
indeed slipped further back and she couldn't stop.  Because even
Dr. Rodowicz admits, when you're falling to your left, you can't
put the brakes on, and unless you can fly, you can't lift your
right foot.  So those two statements are true and two people
heard them.

           And the reason I didn't give any credence to
Dr. Rodowicz is she didn't even consider it.  And folks, he
accused me of inventing that.  Let's look at the real record.
The real record is this, made that night.  One of our emergency
responders, that emergency responder is Rechel Boone, she told
us this under oath.  Stated she slipped and that the lift would
not stop.  She slipped and the lift would not stop.  That's
before any lawyers were involved.  She didn't say "I jumped off
and it ran over me."  She didn't say "I lost control."  While
she was laying there in the pool of blood, that is the time that
she's most likely to be truthful.  It's called in the law an
excited utterance.  And that excited utterance is "I slipped off
and it wouldn't stop."  Two people heard that.  Dr. Rodowicz
didn't even want to consider it.

           At the end of the day, if this had been a Crown,
a Jungheinrich, a Mitsubishi, we would not be here.  But let's
do look back at the pedal, because what they want us to do is

1    ignore the work that Dr. Rodowicz did.  All of a sudden, it's

2    not so technically precise now that they see, when we look at it

3    carefully, it actually proves the plaintiff's case.  It actually

4    proves the Andersons are right, you see, because that right foot

5    didn't get crushed.  It was pushed back like a cowcatcher would

6    push back the cow.  The whole point of the guard we want is to

7    push her back.  Would she have ended up with a bruised arch?

8    Would she have ended up perhaps worst case scenario with some

9    maybe cracked toes?  Maybe.

10                   What did Dr. Low tell us?  Dr. Low said it was

11   the degloving, the turning of the wheel that ate her foot that

12   caused this amputation.  It wasn't that she had a couple of

13   broken toes.  He said that was no big deal.  At worst, if we see

14   what we see in the bottom right-hand picture, the interaction

15   between her foot and this forklift would have been no big deal.

16   She'd be back at work at a job she loved and would still be the

17   poster child for safety, and would have lost that ten years in a

18   row of never missing a day, because she probably would have

19   taken maybe half a day off because she had a bruised toe.

20                   They talk about 60 million hours with no

21   injuries.  Not true.  They asked Dr. Meyer, "Isn't it true

22   you've earned $200,000 in Mr. Warshauer's cases?"  And what was

23   his answer?  "Seven cases like this one."  One is too many.

24   Seven is outrageous.

25                   But what's really outrageous is a company that

1    comes to you and says "We don't have any injuries," but refuses

2    to count them.  Where are their accident reports going?  They go

3    to the engineers, who might make the product safer for my

4    neighbors, my friends, my family, and yours?  No.  It goes to

5    the legal department so that they can be prepared to defend

6    lawsuits.  He said it goes to legal department for early

7    litigation warning.  They start and prepare their defense before

8    the helicopter leaves to take the woman to the hospital.

9            And then they come in to say "We have 60 million

10   hours with no injuries."  You can't say that if you don't look.

11   That's not fair.  You can't say you have no injuries when you

12   refuse to ask people like Walmart and FedEx, "How many left-leg

13   crush injuries do you have where people lost their balance like

14   Ms. Anderson and ruined their lives?"  How many do we as a

15   community tolerate and let them just say, "We don't have to

16   comply with the standard.  We don't have to do what the rest of

17   the industry does, because after all, it's just one lady's leg."

18           You know, he said to you, "Our society needs lift

19   trucks."  It does.  But not at the expense of safety.  There are

20   plenty of brands you can buy that are safer than this one.

21   Maybe not as comfortable.  But we need safe lift trucks.  And

22   the way we get safe lift trucks is when a community comes

23   together and says to the Raymond Corporation, "Do it right.

24   Just do it right.  And quit blaming your -- the users.  Take

25   some responsibility."

1          Now they have a new excuse for no guard.  People

2    will take it off.  You know, that's -- I guess we shouldn't have

3    seatbelts because there are a handful people who hook them

4    behind their seats.  Uh-uh.  That's not an excuse.  It's an

5    excuse.  It's not a reason.

6          You know, when we talk about credible

7    witnesses -- and he can call Dr. Meyer names all he wants.  But

8    I want you to think about who had to be chastised by the Court

9    for refusing to answer questions.  Who was on a mission to lead

10   you down a path?  Did it ever happen to Dr. Meyer, Dr. Kerrigan,

11   Dr. Jeka, any of our witnesses?  No, because they came to tell

12   the truth.  They didn't need to tell a story.  They didn't need

13   to refuse to answer.

14         Remember Dr. Rodowicz yesterday?  I kept having

15   to -- I'd ask her a question.  She just wanted to give you a

16   speech.  And I had to say, "Well, I take that as a no" because

17   she didn't want to give you a yes or no, because a yes or no

18   means "Maybe they won't hire me again."  Her company that has

19   done so many of these cases, they can't remember, and she can't

20   even remember.  But they want to come to you and say, "Oh, we've

21   had 60 million hours with no injuries."  That is not true, and

22   that is a lie.  And then they say, "We're not calling her a

23   liar.  We're just saying she's not truthful."

24         You know, they're really hanging their hat at the

25   end of the day on Dr. Rodowicz.  End of the day, it all comes

1    down to her credibility.  And you can never have an opinion

2    that's credible or reliable without considering all the data.

3    Do you remember that long list of things I asked her if she

4    considered?  "Did you consider this woman's safety history, her

5    skills in operating a forklift, the fact that she didn't but

6    could have applied the brake?  If what you say is true, the fact

7    that she could have but didn't apply the foot brake?  If what

8    you say is true, the fact that she said she would never jump off

9    a forklift?"  "I didn't consider any of that.  I didn't consider

10   any of that.  I didn't consider any of that."  In the computer

11   world, they say garbage in, garbage out.

12              But the one thing that she didn't consider was

13   Rechel Boone.  Rechel Boone didn't have a dog in this fight.  I

14   said, "If they wanted to buy you a taco at lunch, would you have

15   met with them and told them the same thing?"  "Yeah."  "Did

16   Mr. McCoy screw up and not ask about what happened?"  I've been

17   giving him a hard time about that for three days, but doesn't

18   change the fact it's been there from the very beginning.  They

19   just didn't talk about it.  As lawsuits progress, we learn more

20   stuff all the time.  But this fact that she slipped has been

21   there from the beginning, and it is a perfect explanation and

22   it's a reasonable inference.

23              I want to switch gears with you and talk about

24   this money.

25              THE COURT:  Two minutes.

```
 1            MR. WARSHAUER:  Two?

 2            $13 million.  If the Mona Lisa, one of the most

 3   expensive paintings in the world, was made by one of the great

 4   masters, just had a cut in it, somebody would say, "You've

 5   damaged a hundred-million-dollar painting."  A baseball player

 6   gets $13 million for ten games these days.

 7            But I want to leave you with this thought.  I

 8   want you to go imagine that Lidy's leg sent a letter, her real

 9   leg, the one they took from her, sent a letter to her

10   prosthetic.  It would go like this:

11            "You don't know how it feels when you are cut

12   from your lifeline like an apple being picked when it isn't

13   fully grown, when you're replaced with hard plastic and metal

14   where bones should be.  You probably want to know why she hates

15   you.  It's because she had to learn how to walk again, because

16   you can't run like I could, because you can't skate or climb

17   trees like I could, because you can't make her itch like I

18   could, because you remind her of the crush, crush that took me

19   away from her.  I was made with her.  You were made for her.

20   You took six weeks to be created, and you are plastic.  I miss

21   her.  Will you tell her that I miss her?  Let her know the

22   feeling is mutual.  Just tell her goodbye for me."

23            THE COURT:  All right.  Would you move your

24   easel, Counsel?

25            Ladies and gentlemen of the jury, you have seen
```

1    and heard all the evidence and arguments of the attorneys.  Now

2    I will instruct you on the law.  You have two duties as a jury.

3    Your first duty is decide the facts from the evidence in the

4    case.  This is your job and yours alone.  Your second duty is to

5    apply the law that I give you to the facts.  You must follow

6    these instructions even if you disagree with them.  Each of the

7    instructions is important and you must follow all of them.

8           Perform these duties fairly and impartially.  You

9    should not be influenced by anyone's race, color, religion,

10   national ancestry, or sex.  It is your duty to resolve this

11   case, determining the facts based on the evidence, and follow

12   the law as given in instructions.  Your verdict must not be

13   based on speculation, prejudice, or sympathy.  Nothing I say

14   now, nothing I said or did during the trial is meant to indicate

15   any opinion on my part about what the facts are and about what

16   your verdict should be.

17          During this trial, I have asked witnesses a

18   question myself.  Do not assume that because I asked questions,

19   I hold any opinion on the matters I asked about or on what the

20   outcome of the case should be.

21          In this case, Raymond, the defendant, is a

22   corporation.  All parties are equal before the law.  A

23   corporation is entitled to the same fair consideration that you

24   should give any individual person.

25          The evidence consists of the testimony of the

1    witnesses, the exhibits admitted into evidence, and

2    stipulations.  A stipulation is an agreement between both

3    parties that certain facts are true.

4         I have taken judicial notice of certain facts.

5    You must accept those facts as proven.  Here are the facts I've

6    taken judicial notice of:  On July 29th, 2017, a lift truck

7    accident occurred at the FedEx Supply Chain warehouse in

8    Effingham, Illinois, involving Adelaida Anderson and a

9    Model 4250 standup counterbalance lift truck manufactured by the

10   defendant Raymond.

11        Mrs. Anderson was operating the lift truck at the

12   time of the accident.  Mrs. Anderson's left foot made contact

13   with the left truck steer wheel outside the operator's

14   compartment.  Mrs. Anderson received a serious bodily injury as

15   a result of this accident.  There have been no substantial

16   changes to the lift truck from the time it left Raymond's

17   control until the time of the injury.

18        During the trial, certain testimony was presented

19   to you by video recording.  You should give this testimony the

20   same consideration you would give had the witness appeared and

21   testified here in court.

22        Certain things are not to be considered as

23   evidence.  I will list them for you.  First, if I told you to

24   disregard any testimony or exhibits or struck any testimony or

25   exhibits from the record, such testimony or exhibits are not

1  evidence and must not be considered.

2          Second, anything that you may have seen or heard

3  outside the courtroom is not evidence and must be entirely

4  disregarded.

5          Third, questions and objections or comments by

6  the lawyers are not evidence.  Lawyers have a duty to object

7  when they believe a question is improper.  You should not be

8  influenced by any objection and you should not infer from my

9  rulings that I have -- of you as to how you should decide the

10  case.

11          Fourth, the lawyers' opening statements and

12  closing arguments to you are not evidence.  Their purpose is to

13  discuss the issues and the evidence.  If the evidence as you

14  remember it differs from what the lawyers said, your memory is

15  what counts.

16          Any notes you have taken during this trial are

17  not -- only aides to your memory.  The notes are not evidence.

18  I'm sorry.  Any notes you have taken during the trial are only

19  aides to your memory.  The notes are not evidence.  If you have

20  not taken notes, you should rely on your independent

21  recollection of the evidence and not be unduly influenced by the

22  notes of other jurors.  Notes are not entitled to any greater

23  weight than the recollection or impression of each juror about

24  the testimony.

25          In determining whether any fact has been proven,

1    you should consider all the evidence bearing on the question,

2    regardless of who introduced it.  You should use your common

3    sense in weighing the evidence and consider the evidence in

4    light of your own observations in life.

5              In our lives, we often look at one fact and

6    conclude from it another fact exists.  In law, we call this an

7    inference.  A jury is allowed to make reasonable inferences.

8    Any inference you make must be reasonable and must be based on

9    the evidence in the case.

10             You may have heard the phrases "direct evidence"

11   and "circumstantial evidence."  Direct evidence is proof that

12   does not require an inference, such as testimony of someone who

13   claimed to have had personal knowledge of the fact.

14   Circumstantial evidence is proof of a fact or a series of facts

15   that tends to show that some other fact is true.  An example of

16   direct evidence that it's -- that it is raining is testimony

17   from a witness who says, "I was outside a minute ago and I saw

18   it raining."  Circumstantial evidence that it is raining is the

19   observation of someone entering a room carrying a wet umbrella.

20             The law makes no distinction between the weight

21   to be given to either direct or circumstantial evidence.  You

22   should decide how much weight to give to any evidence.  In

23   reaching your verdict, you should consider all the evidence in

24   the case, including circumstantial evidence.

25             You must decide whether the testimony of each

witness is truthful and accurate, in part, in whole, or not at all.  You may also decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, you may consider among other things the ability and opportunity the witness had to see, hear, or know the things the witness testified about; the witness's memory; any interest, bias, or prejudice that the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all the evidence in the case.

You may consider statements given by the parties or witnesses under oath before trial as evidence of the truth of what they said in the earlier statements, as well as in deciding what weight to give their testimony.  If you decide that before the trial, one of these witnesses made a statement not under oath or acted in a manner that is inconsistent with his or her testimony here in court, you may consider the earlier statement only in deciding whether his testimony here in court was true and what weight to give to his or her testimony here in court.

In considering a prior inconsistent statement or conduct, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

It is proper for lawyers to meet with any witness

1    in preparation for trial.  You may find that testimony of one

2    witness or a few witnesses more persuasive than the testimony of

3    a large number.  You need not accept the testimony of the larger

4    number of witnesses.

5           The law does not require any party to call as a

6    witness every person who might have knowledge of the facts

7    relating to this trial.  Similarly, the law does not require any

8    party to present all exhibits or as exhibits all papers and

9    things mentioned during the trial.

10          You've heard witnesses give opinions about

11   matters requiring special knowledge and skill.  You should judge

12   this testimony the same way you would judge the testimony of any

13   other witness.  The fact that such person has given an opinion

14   does not mean that you're required to accept it.  Give the

15   testimony whatever weight you think it deserves, considering the

16   reasons given for the opinion, the witness's qualifications, and

17   all the other evidence in the case.

18          If you decide that the Andersons have proven all

19   the propositions of their case, then it is not a defense that

20   the condition of the forklift could not have been discovered by

21   Raymond or that care was used in the manufacturing of the

22   product.

23          When I use the expression "unreasonably

24   dangerous," I mean that the risk of danger inherent in design

25   outweighs the benefits of the design when the product is put to

1    use that is reasonably foreseeable, considering the nature and

2    function of the product.

3              Adelaida Anderson claims that she was injured

4    while operating the Model 4250 standup counterbalance forklift

5    truck manufactured by the Raymond Corporation.  She claims there

6    existed in the Model 4250 forklift at the time it left the

7    control of the Raymond Corporation a condition which made the

8    Model 4250 forklift unreasonably dangerous in one or more of the

9    following respects:  One, that an operator compartment design

10   that did not apply the brakes when Mr. Anderson's -- I'm

11   sorry -- Mrs. Anderson's left foot went out of the operating

12   compartment, and two, a steer wheel design that did not have a

13   guard to prevent Mrs. Anderson's foot and leg from being run

14   over by the forklift.

15             Jeff Anderson claims that he sustained damages

16   for loss of consortium because of the injuries to his wife that

17   were caused by one or more of the following dangerous conditions

18   of the forklift.

19             The Raymond Corporation denies that any of those

20   two claimed conditions of the Model 4250 forklift made it

21   unreasonably safe, that any of the two claimed conditions of the

22   Model 4250 forklift was a proximate cause of either Plaintiff's

23   injuries and that either Plaintiff was injured to the extent

24   they claim.

25             The Raymond Corporation also claims that Adelaida

1    Anderson failed to exercise ordinary care for her own safety in

2    the operation of the forklift, in that she failed to follow the

3    Raymond Corporation's instructions and the training she received

4    in one or more of the following ways:  That she failed to keep

5    the forklift under proper control and she left the confines of

6    the operating compartment while the forklift was still moving.

7                When I say a particular party must prove

8    something by a preponderance of the evidence, or when I use the

9    expression "if you find" or "if you decide," this is what I

10   mean.  When you have considered all the evidence, you must be

11   persuaded that it is more probably true than not true.

12               Adelaida Anderson has the burden of proving each

13   of the following propositions as to any of the -- any one of the

14   conditions claimed by her:  First, that the condition claimed by

15   her as stated to you in these instructions existed in the

16   Model 4250 forklift; second, that the condition made the

17   Model 4250 forklift unreasonably dangerous; third, that the

18   condition existed at the time the Model 4250 forklift left the

19   control of the Raymond Corporation; fourth, that she, Adelaida

20   Anderson, was injured; fifth, that the condition of the

21   Model 4250 forklift was a proximate cause of those injuries.

22               If you find in your consideration of all the

23   evidence that any of these propositions have not been proven,

24   then your verdict should be for the Raymond Corporation.  But if

25   on the other hand you find from your consideration of all the

1   evidence that each of these propositions has been proved, then

2   you must consider the Raymond Corporation's claim that Adelaida

3   Anderson failed to exercise ordinary care for her own safety

4   while operating the Model 4250 forklift.

5              As to that claim, the Raymond Corporation has the

6   burden to prove the following, that Adelaida Anderson failed to

7   follow the Raymond Corporation's instructions and the training

8   she received in one or more of the following ways:  She failed

9   to keep the forklift under proper control and she left the

10  confines of the operating compartment while the forklift was

11  still moving, and that Ms. Anderson's failure to follow the

12  Raymond Corporation's instructions and training she received in

13  one or both of the ways claimed by the Raymond Corporation was

14  the proximate -- or was a proximate cause of her injuries.

15             If you find from your consideration of all the

16  evidence that Adelaida Anderson has proved all propositions

17  required of her and that Raymond Corporation has not proved all

18  the propositions it is required to prove, then your verdict

19  should be for Adelaida Anderson.

20             If you find from your consideration of all the

21  evidence that the Raymond Corporation has proved all the

22  propositions it is required to prove, and if you further find

23  that Adelaida Anderson's fault in failing to exercise ordinary

24  care for her own safety was more than 50 percent of the total

25  proximate cause of the injuries or damages for which the

recovery is sought, your verdict should be for the Raymond
Corporation.

If you find from your consideration after all the
evidence that Adelaida Anderson proved all the propositions
required of her, and that the Raymond Corporation proved all the
propositions it's required to prove, you will apportion the
percentage of the proximate cause attributed -- attributable to
Adelaida Anderson and the Raymond Corporation.

If you find that Adelaida Anderson's failure to
exercise ordinary care for her own safety was more than
50 percent of the total proximate cause of the injuries for
which recovery is sought, then your verdict should be for the
Raymond Corporation.

If you find that Ms. Anderson's failure to
exercise ordinary care for her own safety was 50 percent or less
of the total proximate cause of her injuries for which recovery
is sought, then your verdict should be for Adelaida Anderson and
you will determine the damages she sustained from the accident,
reduced by the percentage of her fault to exercise ordinary care
for her own safety in the operation of the forklift.

If you find that Adelaida Anderson's entitled to
recover damages from the Raymond Corporation, you must also
consider whether her husband Jeff Anderson has proved that he's
entitled to damages for loss of consortium, reduced by the
percentage of her fault for failure to exercise ordinary care

1    for her own safety in the operation of the forklift.

2            If you find that Adelaida Anderson's injury was

3    proximately caused by unreasonably dangerous condition of the

4    forklift, and if you also find that she failed to exercise

5    ordinary care for her own safety in operating the forklift, and

6    if you further find that her own fault in failing to exercise

7    ordinary care for her own safety in operating the forklift was

8    50 percent or less of the total proximate cause of the injury

9    for which recovery is sought, then you must determine the amount

10   of damages to be awarded by you as follows.

11           First, you'll determine what portion of

12   percentage of fault is attributable to Adelaida Anderson's

13   failure to exercise ordinary care and in operation of the

14   forklift by not following the Raymond Corporation's instructions

15   and the training she received in one or more of the following

16   ways claimed by the Raymond Corporation:  One, that she failed

17   to keep the forklift under control; two, she left the confines

18   of the operating compartment while the forklift was still

19   moving.  What percentage of fault is attributable to the Raymond

20   Corporation for an unreasonably dangerous condition of the

21   forklift?

22           Second, you will determine the total amount of

23   damages to which Adelaida Anderson would be entitled under the

24   Court's instruction if Adelaida Anderson had exercised ordinary

25   care for her own safety in the operating of the forklift.

 1          Third, you will reduce the total amount of

 2   Adelaida Anderson's damages by the percentage of her fault for

 3   her failure to exercise ordinary care for her own safety in

 4   operating the forklift.

 5          Fourth, you will determine if Jeff Anderson's

 6   proved he has sustained damages that were proximately caused by

 7   the accident.

 8          Fifth, if you find that Jeff Anderson has proven

 9   that he has sustained damages that were proximately caused by

10   the accident, you will determine the total amount of damages to

11   which Jeff Anderson would be entitled under the Court's

12   instruction if Adelaida Anderson had exercised ordinary care for

13   her own safety in operating the forklift.

14          Sixth, you will reduce the total amount of Jeff

15   Anderson's damages by the percentage of Adelaida Anderson's

16   fault for her failure to exercise ordinary care and for her own

17   safety in operating the forklift.

18          Now you got all that?  You will be given multiple

19   copies of these instructions that will be available to you.  But

20   I digress.

21          It was the duty of Adelaida Anderson before and

22   at the time she was injured to use ordinary care for her own

23   safety.  Adelaida Anderson was contributory negligent if she

24   failed to use ordinary care for her own safety while operating

25   the forklift, and her failure to use such ordinary care was a

1    proximate cause of her injury.  Adelaida Anderson's contributory

2    negligence, if any, which is 50 percent or less of the total

3    proximate cause of the injuries or damages for which recovery's

4    sought, does not bar her recovery.

5              However, the total amount of damages to which she

6    and her husband Jeff Anderson would otherwise be entitled is

7    reduced in proportion to the amount of Adelaida Anderson's

8    negligence.  This is known as comparative negligence.

9              If Adelaida Anderson's contributory negligence is

10   more than 50 percent of the total proximate cause of injuries

11   for which recovery is sought, the Raymond Corporation shall be

12   found not liable.

13             So when I use the expression "proximate cause," I

14   mean a cause that as a natural and ordinary course of events

15   produced the plaintiff's injury.  It need not be the only cause,

16   nor the last or nearest.  It is sufficient if it combines with

17   other -- another cause resulting in the injury.

18             When I use the words "ordinary care," I mean the

19   care a reasonably careful person would use under the

20   circumstances similar to those shown by the evidence.  The law

21   does not say how a reasonably careful person would act under

22   those circumstances.  That's for you to decide.

23             If you decide for the Andersons on the question

24   of liability, then you must then fix the amount of money which

25   will reasonably and fairly compensate them for all the following

elements of damages proved by the preponderance of the evidence to have resulted from an unreasonably dangerous condition of the Model 4250 forklift.  You should also take into consideration the nature, extent, and the duration of the injury.  You should consider the disfigurement resulting from this injury; the loss of normal life experienced and reasonably certain to be experienced in the future; the pain and suffering experienced and reasonably certain to be experienced in the future as a result of these injuries; the emotional distress experienced and reasonably certain to be experienced in the future; the reasonable expense of necessary medical care, treatment, services received, and the present cash value of the reasonable expenses of medical care, treatment, and services reasonably certain to be received in the future; the value of earnings lost and the present cash value of the earnings reasonably certain to be lost in the future; and the reasonable expense of necessary help and the present cash value of such expenses reasonably certain to be required in the future.  Whether any of these elements of damages have been proven by the evidence is for you to decide.

When I use the expression "loss of normal life," I mean the temporary or permanent diminished ability to enjoy life.  That includes a person's inability to pursue the pleasurable aspects of life.

If you find the Andersons are entitled to damages

1    arising in the future because of injuries, future medical

2    expenses, loss of earning, loss of society or loss of

3    companionship, sexual relations, you must determine the amount

4    of these damages which will arise in the future.  If these

5    damages are of a continuing nature, you may consider how long

6    they will continue.  If these damages are permanent in nature,

7    then in computing these damages, you must consider how long the

8    Andersons are likely to live.

9            With respect to loss of future earnings, you may

10   consider that some people work all their lives and others do

11   not, that a person's earnings may remain the same, they may

12   increase or they may decrease in the future.

13           In computing the damages arising in the future

14   because of future medical expenses or loss of future earnings,

15   you must determine the present cash value.  Present cash value

16   means the sum of money needed now which, when added to what the

17   sum may reasonably be expected to earn in the future, will equal

18   the amount of the expenses and earnings at the time of the

19   future -- or time in the future when the expenses must be paid

20   and the earnings would have been received.

21           Damages for pain and suffering, loss of normal

22   life, disfigurement, loss of society, companionship, and sexual

23   relations are not reduced to present cash value.  According to a

24   table of mortality in evidence, the life expectancy of a woman

25   aged 54 years is 27.22 more years.  This figure is not

1    conclusive.  It is the average life expectancy of women who have

2    reached the age of 54.  It may be considered by you in

3    connection with other evidence relating to the probable life

4    expectancy of Adelaida Anderson in this case, including evidence

5    of her occupation, health, habits, and other activities, bearing

6    in mind that some persons live longer and some persons less than

7    average.

8            If you decide for the Andersons on the question

9    of liability, you must fix the amount of money which would

10   reasonably and fairly compensate Jeff Anderson for any of the

11   following elements of damages arising out of injuries to his

12   wife Adelaida Anderson, proved by the evidence to a result in

13   unreasonably dangerous condition in the Model 4250 Raymond

14   forklift.

15           Here are the elements of damages you should

16   consider:  The reasonable value of services of his wife of which

17   he had been deprived and the present cash value of services of

18   his wife he is reasonably certain to be deprived of in the

19   future; the reasonable value of the society, companionship, and

20   sexual relations with his wife of which he has been deprived and

21   the society, companionship, and sexual relationship with his

22   wife of which he is reasonably certain to be deprived in the

23   future.  Whether any of these elements of damages have been

24   proved by a preponderance of the evidence is for you to decide.

25           When I use the term "society" in these

instructions, I mean the mutual benefit that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guide and protection.

Upon retiring to the jury room, you must select a presiding juror.  The presiding juror will preside over your deliberations, and you -- and will be your representative here in court.

A verdict form has been prepared for you.  The verdict form asks you various questions.  You will discuss these questions, and when you have reached unanimous agreement on the answer to a question, you will mark the appropriate answer and follow the remaining instructions on the verdict.

I do not anticipate that you will need to communicate with me.  If you do need to communicate with me, the only proper way is in writing.  The writing must be signed by the presiding juror, and if he or she is unwilling to do so by some other juror, the writing should be given to the marshal who will give it to me.  I will respond in writing or by having you return to the courtroom so that I can respond orally.  If you do not communicate with me, you should not indicate in your note -- I'm sorry.  If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

All right.  Those are the instructions.  We'll send you back.

1    We need to swear in this jury; right?

2         THE COURTROOM DEPUTY:  I need to swear in the

3    CSO.

4         THE COURT:  All right.  We do have lunch for you.

5         (Courtroom security officer sworn.)

6         THE COURT:  Thank you, ladies and gentlemen.  You

7    may retire to the jury room and contemplate your verdict.

8         THE COURTROOM DEPUTY:  He just advised that he's

9    leaving now, so I'm going to swear him in real quick.  Sorry.

10        (Courtroom security officer sworn.)

11        THE COURT:  Now you may go.

12        (Jury exits at 12:05 p.m.)

13        (Recess from 12:05 p.m. to 1:51 p.m.)

14        (Jury enters at 1:51 p.m.)

15        THE COURT:  All right.  Please be seated.

16        All right.  We are on the record in Anderson v.

17   Raymond Corporation.  Has the jury reached a verdict?

18        FOREPERSON:  Yes, we have, Your Honor.

19        THE COURT:  Would you hand the verdict to my

20   clerk?

21        In the matter of Anderson v. Raymond Corporation,

22   verdict form:  "Do you find that the forklift manufactured by

23   Raymond Corporation that was being operated by Adelaida Anderson

24   when she was injured on July 29th, 2017, at the FedEx warehouse

25   in Effingham, Illinois, contained an unreasonably dangerous

```
 1        condition as claimed by the plaintiff that existed at the time

 2        it left the control of the Raymond Corporation?"

 3                        And the answer is no.

 4                        All right.  Juror Number 1, is this your verdict?

 5                        JUROR NO. 1:  Yes, Your Honor.

 6                        THE COURT:  All right.  Juror Number 2, is this

 7        your verdict?

 8                        JUROR NO. 2:  Yes, Your Honor.

 9                        THE COURT:  Juror Number 3, is this your verdict?

10                        JUROR NO. 3:  Yes, Your Honor.

11                        THE COURT:  Juror Number 4, who's listed as the

12        presiding juror, is this your verdict?

13                        JUROR NO. 4:  Yes, Your Honor.

14                        THE COURT:  All right.  And this is your

15        verdict -- what's your Juror Number?

16                        JUROR NO. 5:  Yes, Your Honor.

17                        THE COURT:  Juror Number 5.

18                        Juror Number 6, is this your verdict?

19                        JUROR NO. 7:  I'm 7.

20                        THE COURT:  Juror Number 7, is this your verdict?

21                        JUROR NO. 7:  Yes, sir.

22                        THE COURT:  All right.  And the alternate

23        deliberated with you, and you've signed the verdict form as

24        well; is that correct?

25                        JUROR:  I did not.
```

1        THE COURT:  You did not.  Okay.  All right.

2        Ladies and gentlemen, this will conclude your

3    service.  I will enter judgment on your verdict.  I think that

4    they have a questionnaire for you that they want you to fill out

5    that you'll be given before you leave.

6        You'll remember the admonitions that I gave to

7    you about not being able to talk to anybody about this case.

8    Now that you've reached your verdict, you may talk to others

9    about this case.  You may talk to the lawyers about it.  You may

10   talk to the parties about it.  You may talk to me about it.

11       Anything on behalf of the plaintiff?

12       MR. WARSHAUER:  No, sir.

13       THE COURT:  Anything for the defense?

14       MR. LoCOCO:  No, Your Honor.  Thank you.

15       THE COURT:  All right.  I'll hand this to the

16   clerk.  I'm sure we have some stuff back for you, so if you'll

17   go back in the jury room, we'll get some matters before you, and

18   you're free to leave or free to stay.  All right.

19       (Jury exits at 1:55 p.m.)

20       THE COURT:  All right.  Is there anything that

21   needs to be taken up outside -- the jury has left the room.

22   Plaintiff have anything they need to take up with the Court?

23       MR. WARSHAUER:  No, sir.

24       THE COURT:  Okay.  Anything for defense?

25       MR. LoCOCO:  No, Your Honor.

1210

1     THE COURT:  Thank you.  We are adjourned.

2     (Proceedings concluded at 1:55 p.m.)

3              °  °  °  °  °  °  °  °  °  °  °

4              **COURT REPORTER'S CERTIFICATE**

5          I certify that the foregoing is a correct
   transcript from the record of proceedings in the above-entitled
6  matter.

7

      Dated this 21st day of December, 2021
8

9  /s/ Hannah Jagler
   _____
10
      Hannah Jagler, RMR, CRR, FCRR
11    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25